**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**SE PROPERTY HOLDINGS, LLC,**
**as Successor by Merger with**
**VISION BANK,**

       **Plaintiff,**

**v.**                                                                 **Case No. 3:13cv6/MCR/CJK**

**HCB FINANCIAL CORP.,**

       **Defendant.**
_____/

## ORDER

This case involves claims by Plaintiff SE Property Holdings, LLC ("SE Property") against Defendant HCB Financial Corp. ("HCB") for declaratory relief, breach of contract, tortious interference with a business relationship, and conspiracy to breach a fiduciary duty, arising out of a loan participation agreement and a related deficiency judgment in excess of $10,000,000.  SE Property seeks a declaration that the assignments of the participation agreement and the deficiency judgment to HCB from the original lead bank, GulfSouth Private Bank ("GulfSouth"), are void for violation of public policy.  SE Property also seeks to terminate HCB's lead bank status and undertake its own collection efforts.  The case was tried before the Court without a jury, and the Court is now prepared to rule.

**Rule 52 Standards**

In a nonjury case, the Court must make findings of fact specially, considering all of the evidence and taking into account the credibility of the witnesses, and separately state its conclusions of law.  *See* Fed. R. Civ. P. 52(a).  The rule "does not require a finding on every contention raised by the parties," but requires the Court to provide sufficient detail demonstrating that care was taken in ascertaining and analyzing the facts necessary to the decision and providing "sufficient particularity" to facilitate meaningful review.  *Feazell v. Tropicana Prods., Inc.*, 819 F.2d 1036, 1042 (11th Cir. 1987).

At trial, HCB moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c).  Rule 52(c) permits the Court during a nonjury trial and after a party has been fully heard on an issue to enter judgment "on a claim or defense that, under controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c).  The rule also requires that any "judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a)."  *Id.* The Court retains discretion under Rule 52(c) to "decline to render any judgment until the close of the evidence," and, during trial in this case, the Court exercised this discretion. Now, in accordance with the requirements of Rule 52(a), having heard and considered all of the testimony, evidence, and arguments presented at trial and in the written briefs and motions filed,[1] the Court enters the following findings of fact and conclusions of law.

**Findings of Fact**

Procedural Background

On August 27, 2012, SE Property, as the successor by merger with Vision Bank, brought this suit against GulfSouth and other banks, all of whom were participants in a loan participation agreement and equitable owners of a deficiency judgment in the amount of $10,371,604.03.[2]  On January 4, 2013, the Federal Deposition Insurance Corporation as Receiver for GulfSouth ("FDIC-R") removed the case to federal court.[3]  Sometime after the date of removal, SE Property learned that GulfSouth had previously assigned its

---

[1]  The parties incorporated into their closing arguments the arguments made in prior filings regarding attorney's fees, the propriety of equitable and declaratory relief, and proper construction of a stipulation, which the Court has also considered.

[2]  In general, a loan participation agreement is a contract between lenders, often with a lead lender making a loan and then selling undivided interests in the loan to one or more other lenders, which are referred to as participants.  *See* Leon, Christopher E., *The Lead Lender's Liability to its Participant*, 109 Banking Law Journal 532, 532-34 (Nov.-Dec. 1992).  The "lead bank" (or in this case, "Originating Bank") generally acts as the agent for the participating banks for purposes of servicing the loan, collecting the loan proceeds, declaring default, and exercising remedies, though the precise duties of the lead bank will vary depending on the language of the agreement.  The participating banks are not parties to the loan documents but share in the proceeds in accordance with their relative *pro rata* contribution or interest in the loan.  *Id.*

[3]  The FDIC was appointed Receiver for GulfSouth on October 19, 2012, was substituted as a Defendant in this case on November 19, 2012, and timely removed the case on January 4, 2013.  *See* 12 U.S.C. § 1819(b)(2)(B).  Also, SE Property is an Ohio limited liability company and HCB is a Florida corporation.

participation interest in the agreement and the deficiency judgment to HCB and that HCB had also obtained assignments of all other participating bank interests.  On January 28, 2013, SE Property amended its complaint to add HCB.  On August 13, 2013, after learning through discovery the extent of HCB's affiliation with Rupert E. Phillips, a judgment debtor on the deficiency judgment, SE Property filed a Second Amended Complaint, which is the operative pleading.  SE Property subsequently voluntarily dismissed the FDIC-R,[4] and the case proceeded to a bench trial.[5]

The Participation Agreement

In 2003, Colonial Bank, which was the predecessor to GulfSouth, and the borrower, North Tip Development, LLC, executed a loan in the principal amount of $10,635,000, secured by a mortgage on real property located in Walton County, Florida, known as Driftwood Estates, and several personal and corporate guarantees.  The guarantors of the North Tip loan are Olson & Associates of NW Florida, Inc., Carl Richard Olson, Elaine Olson, Rupert E. Phillips ("Phillips"), and Sandra K. Phillips.  The loan was subsequently assigned from Colonial Bank to GulfSouth on March 8, 2006, and thereafter, GulfSouth entered into a series of Non-Recourse Loan Participation Agreements, by which GulfSouth sold participation interests in the North Tip loan in various percentages to Central Progressive Bank ("CPB")[6] (44.9%), Bank of Vernon (1.21%), and Vision Bank (44.9%), the "Participating Banks."  GulfSouth retained an 8.99% participation interest and also retained the status as "Originating Bank," which made it responsible, among other things, for servicing and collecting the loan.

---

[4]  The FDIC-R was voluntarily dismissed with prejudice based on a stipulation between SE Property and the FDIC-R that the FDIC-R claims no interest in either the Participation Agreement or the deficiency judgment at issue in this suit.  (*See* docs. 125, 127).

[5]  The Second Amended Complaint includes five causes of action that remain pending against HCB: Count I for declaratory relief as to the validity of the assignments to HCB; Count II, pled as an alternative to Count I, for declaratory relief to terminate HCB's agency status and allow SE Property to undertake collection efforts against the debtors on the deficiency judgment; Count III for damages for tortious interference; Count V for damages for conspiracy to breach a fiduciary duty; and Count VI for breach of contract.  In a prior summary judgment ruling, the Court granted summary judgment in HCB's favor as to Count IV for breach of fiduciary duty and Count VII for injunctive relief.  (Doc. 210).

[6]  CPB's interest was subsequently transferred to First NBC Bank after CPB was liquidated by the Federal Deposit Insurance Corporation.

The Non-Recourse Loan Participation Agreement between GulfSouth and Vision Bank/SE Property (the "VB Participation Agreement") is at the center of the parties' dispute.[7]  The VB Participation Agreement provides that the Participating Bank is the "legal and equitable owner" of the stated 44.9 "percentage in the indebtedness, promissory note or notes, collateral security and all documents related to the Loan, together with all rights, privileges and remedies applicable thereto."[8]  The Originating Bank holds "possession of and title to all loan documents and collateral security in the Originating Bank's name," according to Section 2.  The VB Participation Agreement outlines the following duties, rights and obligations of the Participating Banks and Originating Bank.  In relevant part, under Section 3, it is the Originating Bank's duty to act as the agent of the Participating Bank in collecting and servicing the loan, and the Originating Bank is required to "exercise the same degree of care and discretion in continuing to service the Loan and in collecting payments thereunder" as if acting for its own benefit.  The VB Participation Agreement further provides in relevant part that the Originating Bank may take certain actions only with the prior consent of the Participating Bank, such as waiving or releasing "any claim" against a Borrower or guarantor and making or consenting to "any release, substitution or exchange of collateral."  Section 3(d) allows the Participating Bank to "terminate the agency status of the Originating Bank as provided in Section 4 of the Agreement."

According to Section 4, the Participating Bank has the right to terminate the Originating Bank's agency status if, within the opinion of the Participating Bank, the Originating Bank fails to comply "with its fiduciary and/or other obligations" under the agreement.  If the agency is so terminated, the Participating Bank has the right to notify the Borrower and require the Borrower to make loan payments directly to the Participating

---

[7]  The parties have stipulated that, although there are multiple versions of the Non-Recourse Loan Participation Agreements, all versions contain identical terms, provisions and conditions.

[8]  "Loan" is defined in the VB Participation Agreement as "the indebtedness, promissory note or notes, collateral security, and all documents relating to the loan or loans" described in the agreement.

Bank in an amount sufficient to satisfy its percentage of ownership interest in the loan.[9] In Section 5, the Originating Bank disavows any warranty regarding the collectibility of the loan or the solvency of the borrower.  Section 7 requires the Originating Bank to promptly notify the Participating Bank in the event the Originating Bank learns of material information related to the Borrower and Guarantors which may have a material adverse affect on collectibility of the loan or any request by the Borrower or Guarantor for release of any collateral securing the loan or release of any personal obligation under the loan.

In the event of default, Section 10 of the VB Participation Agreement provides that "the Participating Bank and the Originating Bank shall determine by mutual agreement whether and in what manner and to what extent any and all rights of Originating Bank under the Loan will be exercised, and the subsequent management and disposition of any collateral."  In the event of foreclosure on collateral securing the loan, title is taken in the names of both "the Originating Bank and the Participating Bank, as tenants in common," and all decisions about the collateral are to be made jointly.  Further, if the banks have not agreed in writing within ten days, "then the Originating Bank shall, in a commercially reasonable fashion, make such decisions as to the administration of the Loan as the Originating Bank deems appropriate," and all such decisions will bind both the Originating Bank and the Participating Bank.  Also, in the event of disagreement about how to proceed on default, the Participating Bank has the right to purchase the Originating Bank's ownership interest on 10 days' notice.  In Section 12, the parties agree that the Originating Bank will not be liable "for any action taken or omitted or for errors in judgment" made as Originating Bank unless made "in bad faith or as a result of the Originating Bank's willful misconduct or gross negligence."

<u>Default, Foreclosure, and Deficiency Judgment</u>

North Tip Development, LLC, defaulted on the loan in 2009, and GulfSouth, as the Originating Bank, brought a foreclosure action against Driftwood Estates, which secured

---

[9]  The agreement further states that in the event that the agency status of the Originating Bank is terminated, the remainder of the VB Participation Agreement survives and continues to apply until the loan is either paid in full or the Participating Bank's interest is repurchased by the Originating Bank.  (VB Participation Agreement § 4(c)).

the loan.  The property was sold to GulfSouth at the foreclosure sale, and afterwards, the title to the property was transferred to each Participating Bank, or its designated entity, to hold as tenants in common, with each entity having an undivided interest in the property equal to its share of the loan.[10]   At one point, Vision Bank initiated a declaratory suit in state court to prevent GulfSouth from distributing the property between the Participating Banks pursuant to a lot-drawing procedure.   The record shows that from as early as April 9, 2010 (at the time when the parties were discussing the lot-drawing procedure regarding the foreclosed property), Richard Petermann, attorney for GulfSouth, proposed to the Participating Banks that, after dividing the property in some fashion, GulfSouth would obtain a deficiency judgment that would "then be partially assigned to each participant based upon their pro-rata shares." (Plaintiff's Ex. 8).  Gulfsouth voluntarily dismissed the suit when the parties mutually agreed not to engage in lot-drawing but to sell the property to CPB at its appraised value, divide the proceeds among each Participating Bank according to its *pro rata* share, and take a deficiency judgment in the name of the Originating Bank.

Accordingly, in March 2011, a deficiency judgment (or "North Tip deficiency judgment") was entered in the amount of $10,371,604.03 in favor of GulfSouth and against North Tip Development, LLC and the guarantors, jointly and severally, one of whom is Rupert E. Phillips, Chairman of the Board of HCB.  There were subsequent discussions and emails regarding how to divide up the deficiency judgment on a *pro rata* basis according to the banks' shares.  Chris Campbell, Executive Vice President of GulfSouth, and Martin Sandel, General Counsel for Southeast Property Solutions, LLC (an asset holding company for Vision Bank and now for SE Property), each expressed in emails that dividing the deficiency judgment into the banks' *pro rata* shares had been Vision Bank and GulfSouth's original understanding, and nothing in the record reflects that any Participating Bank dissented from that view.  Sandel testified at trial that he only agreed GulfSouth could

---

[10]  GulfSouth and Bank of Vernon took title to their collective undivided 10.2% interest in the property in the name of Northpoint Asset Holdings, LLC; Vision Bank took title to its undivided 44.9% interest in the name of Vision-Park Properties, LLC; and CPB took title to its undivided 44.9% interest in the name of MBF #2, and CPB's interest was subsequently transferred to First NBC Bank.

take the deficiency judgment in its own name on the understanding that the Participating Banks would subsequently divide the judgment by assigning each Participating Bank its *pro rata* participation share, though he added the qualifier, "if it could be done," which reflects his understanding that Petermann was researching the issue under Florida law.

By email dated May 24, 2011, Campbell (on behalf of GulfSouth) noted that Petermann was looking into how to divide the judgment into *pro rata* shares, "[a]s per our original agreement with Vision." Campbell testified to the contrary at trial that he did not believe they had reached a firm agreement to divide the deficiency judgment into *pro rata* shares. Instead, he said this was just one of several options being considered.[11] (Plaintiff's Ex. 23, 24). By that time, however, the deficiency judgment had already been entered solely in the name of GulfSouth, the Originating Bank, and there were no other proposals being discussed. Sandel consistently referred to the *pro rata* division as an "agreement" in email correspondence and reminded Campbell that they had agreed to this "from the outset," and Campbell never disagreed. In a string of emails between Sandel and Campbell on July 21, 2011, however, Campbell informed Sandel that Petermann's research had shown that the *pro rata* division of the deficiency judgment could not be legally accomplished. Sandel was becoming increasingly impatient and responded that Vision Bank had been promised its share of the judgment and had acted on the agreement by consenting to the sale of the foreclosed property and taking the deficiency judgment in GulfSouth's name, which, according to Sandel, otherwise "should have been taken in the name of each bank," consistent with the VB Participation Agreement. (Plaintiff's Ex 33; Defendant's Ex. 72). Campbell acknowledged that both CPB and GulfSouth had agreed to this "from the outset," if it was possible.

Petermann responded to Sandel by letter dated July 29, 2011, stating that he had determined a partial assignment was not legally prohibited, but he was concerned that the judgment debtors could challenge the collection efforts as improper if the debtors were subject to multiple collection actions. Petermann also informed Sandel by email that all of

---

[11] None of the emails suggest that any other proposals were being considered or pursued after the lot-drawing proposal was rejected early in the banks' discussions. Also, Campbell's recollection may be colored by his current employment with Rick Olson, who is a judgment debtor on the North Tip loan.

the participants (CPB, Bank of Vernon and GulfSouth) had agreed that Vision Bank could take the lead on the post-judgment collection efforts, and he offered to draft a written agreement to this effect if they provided him with the terms.  Sandel declined the offer and responded that Vision Bank would "go it alone," collecting and retaining up to the amount of its own *pro rata* share of the deficiency.  On August 10, 2011, Petermann prepared a draft assignment of Vision Bank's *pro rata* interest in the deficiency judgment to Vision Bank and sent it to Campbell; however, the assignment was not executed, and in his trial testimony, Campbell did not recall it.

In the meantime, CPB had been taken over by the FDIC, and First NBC Bank acquired its assets.[12]  By mid-December 2011, Petermann indicated in an email to Sandel that there was some concern about whether First NBC Bank would consent to the partial assignment of the deficiency judgment; nonetheless, Petermann concluded that GulfSouth did not need First NBC Bank's consent, and he said he was re-drafting the partial assignments for Campbell to execute the following week.  Petermann sent the drafts to Campbell on December 19, 2011, noting that there had been no objection by First NBC Bank and that the others had agreed the judgment should be assigned *pro rata*.[13] (Plaintiff's Ex. 51).  Petermann offered to deliver the partial assignments, and the record confirms that at some point, Campbell signed one on behalf of GulfSouth in favor of SE Property's predecessor (Plaintiff's Ex. 57), but it was not dated or delivered.  At trial, Petermann could not recall whether he had received the partial assignments or delivered them, and Campbell said he did not know whether anyone had instructed Petermann not to deliver them.

On January 25, 2012, SE Property became the successor of Vision Bank.  Consequently, the VB Participation Agreement and all related loan documents, together

---

[12]  Defendant HCB is a shareholder of First NBC Bank.

[13]  The letter states specifically that the special asset entities for GulfSouth, Bank of Vernon, and Vision Bank, that is, Northpoint Asset Holding, LLC and Vision-Part Products, LLC, "are all in agreement that the judgment should be assigned pro-rata and since MBF II has not objected to the distribution of the judgment by partial assignment . . . GulfSouth is authorized to execute the enclosed partial assignments." (Plaintiff's Ex. 51).  *See supra* Note 10 (noting MBF II was CPB's special asset entity and which was ultimately transferred to First NBC Bank).

with Vision Bank's 44.9% participation interest, including a *pro rata* equitable ownership interest in the deficiency judgment (which was entered in GulfSouth's name), were transferred to SE Property.  Sandel continued to provide legal advice to SE Property and also to inquire about the delay in receiving the promised assignment of SE Property's portion of the deficiency judgment from GulfSouth.  Instead of receiving the anticipated partial assignment, SE Property learned that GulfSouth had filed suit in state court in May 2012, seeking a determination of its rights and obligations under the VB Participation Agreement as Originating Bank.  According to the complaint, a disagreement existed among the Participating Banks about whether the deficiency judgment should be split into *pro rata* shares, as SE Property wanted, or left as a whole, as First NBC Bank wanted.[14]

Sandel was shocked by the suit because he had been under the impression that the banks had already mutually agreed to divide the judgment.  However, without explanation, GulfSouth voluntarily dismissed the suit on June 28, 2012.  Campbell explained at trial that his new boss at GulfSouth, interim CEO Mac Mcleod, had directed him to drop the suit. In an email dated June 26, 2012, Campbell informed Petermann that McLeod had "settled with Rupert Phillips," and, "I'm not sure of the terms but Mac is needing for us to drop the lawsuit that is currently pending." (Plaintiff's Ex. 80).  The *pro rata* assignments were never delivered.

GulfSouth's Assignments to HCB

In February 2012, Mac McLeod was named interim President and CEO of GulfSouth.  Apparently, the bank was not doing well financially, and so McLeod began contacting GulfSouth shareholders with the goal of finding ways to recapitalize the bank. HCB is a GulfSouth shareholder, and its business is purchasing distressed loans for a

---

[14]  The state court pleadings reflect that Centennial Bank was named in the suit instead of SE Property (see Plaintiff's Ex. 68), but Sandel said this was a simple mistake, because some of Vision Bank's assets were transferred to Centennial Bank and other assets, like the interest in the North Tip deficiency judgment, were transferred to SE Property.  Thus, GulfSouth intended to name SE Property in the suit because it holds the interest in the North Tip deficiency judgment.

profit.[15]  In approximately April 2012, Rupert Phillips, HCB's Chairman, sole board member, and a self-described "deal junky," went to GulfSouth and introduced himself to McLeod, for the stated purpose of making a deal to avoid foreclosure on his son's airplane.  Phillips inquired as to whether GulfSouth would allow one of Phillips's companies to assume the note ("the GP Air loan"), and McLeod responded that the FDIC was "in the next room," so there was nothing he could do until the North Tip loan was settled.  McLeod acknowledged at trial that he had used this GP Air loan proposition as leverage to get some money out of the North Tip deficiency judgment.[16]  In a note dated May 9, 2012, McLeod told Phillips his preference was "to get North Tip off the books so we can book GP Air as a performing loan but even more important to have you be a part of our future.  I like the way you think." (Plaintiff's Ex. 69).  He and Phillips ultimately negotiated a deal to assign GulfSouth's $932,000 *pro rata* share of the deficiency judgment, as well as the Originating Bank status, to HCB for $200,000 and GulfSouth's apparent agreement not to foreclose on the GP Air loan.[17]

There is no dispute that Phillips, and not HCB's president, Joe Dobson, negotiated the deal with McLeod on behalf of HCB.  McLeod did not know Dobson and said HCB only

---

[15]  Phillips testified that HCB was formed in 2004 or 2005 as a bank holding company.  Phillips was an investor and on the board of directors.  After a downturn in the market, he became the sole investor in HCB.  On November 3, 2010, Phillips transferred all of his HCB stock to his closely held family business, Phillips Capital Partners, which is now HCB's sole shareholder,  for no consideration.  Phillips, who is HCB's sole director, testified that the HCB stock was worthless when he transferred it to Phillips Capital Partners and that HCB was "dormant" until March 2011, when he decided to use HCB to purchase distressed notes.  Curiously, the North Tip deficiency judgment was entered against him the same month.  Since March 22, 2011, Joe Dobson has been HCB's  President and Fred McLaughlin, HCB's Vice President, but Phillips has continued to negotiate assignments of judgments (that were entered against him personally) and other matters to HCB.  For instance, Phillips testified that in July 2011, he had encouraged his son-in-law to purchase 120,000 shares of GulfSouth, but when the deal started going bad, Phillips wanted to protect his son-in-law and daughter from loss, so he had HCB purchase the stock from them.  Thus, when GulfSouth failed, HCB suffered the loss, not Phillips's daughter and husband.  Phillips was no longer an officer of HCB in July 2011, but he was undoubtedly directing HCB's actions, at least as to some matters.

[16]  McLeod said he was not aware of prior negotiations to assign the Participating Banks their *pro rata* portions of the North Tip deficiency judgment.  He also said he never looked at the terms of the Participation Agreement; his only concern was to raise capital for the bank.

[17]  HCB paid $180,000 for the assignment of the deficiency judgment and assignment of GulfSouth's participation interest, as well as assignment and assumption of GulfSouth's position as the Originating Bank on the Participation Agreements, plus an additional $20,000 for an 86.54% membership interest in North Point Asset Holdings company.

came into the picture when McLeod and Phillips were ready to close the deal.   HCB's attorney, Jason Osborn, finalized the details by preparing the assignments for GulfSouth and HCB to execute and making sure that GulfSouth dismissed the state court declaratory judgment suit.[18]   On June 26, 2012, GulfSouth executed the assignments to HCB, including its 8.99% participation interest in the deficiency judgment.   On the same day, GulfSouth dropped the state court declaratory judgment suit, and HCB acquired First NBC's 44.9% interest in the deficiency judgment.[19]   On June 29, Bank of Vernon executed an assignment to HCB of its 1.21% interest in the North Tip deficiency judgment.   Through these assignments, HCB owned 55.1% of the participation interests related to the North Tip deficiency judgment and also assumed the status of Originating Bank.

SE Property's Vice President Brian Campolo testified that SE Property never received any communication from GulfSouth or HCB regarding the assignment of GulfSouth's share, nor did HCB disclose to SE Property its affiliation with judgment debtor Rupert Phillips, or that Phillips had negotiated the assignment.   According to McLeod, he considered GulfSouth's assignment to HCB a settlement of GulfSouth's interest in the deficiency judgment but not a settlement regarding any other Participating Bank, stating, "I was settling our judgment and assigning our interests," that is, "we were just assigning our position  . . . in return for the payment."  (McLeod Depo. at 52).   Phillips testified to his similar understanding that the GulfSouth assignment did not release him personally from the North Tip deficiency judgment, though at the same time, like McLeod, he also used the

_____

[18]   In December 2011, Osborn was working for Hudson Capital, an entity purchasing CPB assets during its liquidation.  First NBC Bank was also purchasing CBP assets.  The record shows that during this time, Osborn was communicating with Petermann and other Participating Banks by email regarding the North Tip deficiency judgment, though he was not yet working for HCB.  Osborn was working for HCB by April 2012.

[19]   Dobson testified that HCB owns stock in First NBC Bank. He testified that First NBC Bank gave HCB a $10 million line of credit in late 2011 to purchase a portion of the CPB distressed assets that First NBC Bank had acquired.  Phillips personally guaranteed the $10 million line of credit for HCB.  In June 2012, HCB used that line of credit to acquire from First NBC Bank a loan portfolio that included the CPB Participation Agreement's 44.9% interest in the North Tip loan.  HCB also obtained Bank of Vernon's participation interest in the North Tip deficiency judgment.  Dobson said Phillips negotiated the GulfSouth and Bank of Vernon transactions but that others were also involved in negotiating with First NBC Bank.  According to Osborn, Phillips was directing these transactions.

term "settle" in related discussions and emails.[20]  Phillips testified that he was anxious for "some closure" and did not want the FDIC to obtain the lead position when it took over GulfSouth.  McLeod and Phillips finalized the assignments to HCB well before the FDIC was appointed Receiver for GulfSouth on October 19, 2012.

There is no question as to why Phillips was eager to have the North Tip deficiency judgment assigned to HCB, a company Phillips effectively controls and which is solely owned by his closely held family corporation.  Phillips testified he has approximately $80 million in judgments against him personally, and of this amount, HCB has acquired approximately $68 million.[21]  The record reflects that HCB paid a fraction of the value of these loans to obtain them.  Phillips has also used HCB to protect his family.  Phillips's negotiations resulted in HCB assuming the GP Air loan to insulate his son's airplane from foreclosure, and HCB purchased GulfSouth shares from Phillips's daughter to protect her from loss.  Moreover, Phillips's control over HCB has continued throughout this litigation.  Phillips admitted he attended a mediation in this case as the corporate representative of HCB.[22]  It is obvious to the Court that Phillips, a sophisticated businessman and self-proclaimed "deal junkie," plainly understood that he could avoid collection efforts on the North Tip deficiency judgment by having HCB control the collection through the Originating Bank status.

<u>Release of Property of the Judgment Debtor</u>

On June 24, 2011, within months after entry of the North Tip deficiency judgment, Phillips and his wife, both judgment debtors on the North Tip deficiency judgment, transferred a parcel of property they owned, Lot 26 in Naturewalk at Seagrove in Walton County, Florida, by warranty deed to Fred McLaughlin, Vice President of HCB.  McLaughlin

---

[20]  For instance, in a related matter, by email to McLeod dated May 22, 2012, Phillips stated that he intended to "settle with the Bank of Vernon" the following day.  Phillips admitted using the term "settle" but stated it "was probably the wrong word" to use.

[21]  HCB has acquired a Bank Atlantic judgment against Phillips in the amount of $49 million and a Fifth Third Bank judgment against him in the amount of $9 million, in addition to negotiating GulfSouth's assignment of the North Tip deficiency judgment against Phillips in the amount of over $10 million.

[22]  Phillips testified, "[W]e were trying to settle in good faith."  Phillips further stated, "I was representing HCB because I thought that I should be there for that meeting with Mr. Sandel."

purchased the property in a short sale transaction in lieu of foreclosure, and the proceeds from the sale, $136,000, were applied to pay off the existing mortgage.  McLaughlin took the property subject to the remaining millions of dollars in liens, all of which were superior to the North Tip deficiency judgment.  After the sale, two of the superior lienholders agreed to release their liens (one was released for no consideration and the other was assigned to HCB, which then released it), leaving only one lien on the property superior to the North Tip deficiency judgment.  Lot 26 was not "secured collateral" under the VB Participation Agreement, but it was collateral on which the deficiency judgment lien attached.  Nonetheless, in December 2012, after HCB became the Originating Bank, Dobson released the property from the North Tip deficiency judgment for no consideration and without SE Property's consent.  Dobson offered no explanation at trial for this decision.

<u>Lack of Collection Efforts and Nondisclosure of Conflict</u>

HCB has not undertaken collection efforts with regard to the North Tip deficiency judgment.  HCB maintains that its inaction is commercially reasonable and that it would be wasteful to spend money on collection efforts because superior judgments exist on all of the guarantors' property.  SE Property, unaware of GulfSouth's  assignment to HCB, filed this suit against GulfSouth in August 2012 out of frustration with its inaction as Originating Bank to undertake collection efforts and its refusal to execute the purported mutual agreement to divide the deficiency judgment among the Participating Banks pursuant to their *pro rata* shares so that the banks could undertake their own collection efforts.  Emails show that on September 18, 2012, McLeod sent Phillips a copy of the summons and complaint for this case, in which SE Property had clearly named GulfSouth as the Originating Bank in error, and Phillips forwarded it on to HCB's attorney, Osborn.  Notwithstanding, HCB allowed SE Property to continue litigating against the wrong party, GulfSouth/FDIC-R, without disclosing the assignments or its relationship with Phillips.  SE Property amended the complaint in January 2013, after learning of the assignment, and amended the complaint again in August 2013, after learning of Phillips's affiliation with HCB.

**Conclusions of Law**

This case is governed by the terms of the VB Participation Agreement, which the parties agree is a valid contract under Florida law.

Declaratory Relief

SE Property seeks a declaration that the assignment between GulfSouth and HCB is invalid and, alternatively, that HCB's conflict of interest requires termination of HCB's agency status.  Florida law provides that "[a]ny person claiming to be interested or who may be in doubt about his or her rights under a . . . contract . . . [may] obtain a declaration of rights, status, or other equitable or legal relations thereunder."  Fla. Stat. § 86.021.  The declaratory relief statute is substantive and remedial, Fla. Sta. § 86.101, and "[t]he existence of another adequate remedy does not preclude a judgment for declaratory relief," Fla. Stat. § 86.111.  Florida's declaratory judgment act "afford[s] relief from insecurity and uncertainty with respect to rights, status, and other equitable or legal relations, and is to be liberally construed," but nonetheless, granting relief under the statute "remains discretionary with the court, and not the right of a litigant as a matter of course."  *Kelner v. Woody*, 399 So. 2d 35, 37 (Fla. 3d DCA 1981).  Also, a claim for declaratory relief is not proper purely to determine factual issues "under an instrument that is clear and unambiguous and presents no need for construction."  *Id.*  Declaratory relief is not a substitution for all other established remedies but allows parties who are in doubt about their rights to "have a judicial determination of them before wrong has been committed or damage done."  *Jacksonville Expressway Auth. v. Duval Cnty.*, 189 So. 2d 837, 840-41 (Fla. 1st DCA 1966) (internal marks omitted).

Under Florida law, "[a]ll contractual rights are assignable unless the contract prohibits assignment, the contract involves obligations of a personal nature, or public policy dictates against assignment."  *Kohl v. Blue Cross and Blue Shield of Florida, Inc.*, 988 So. 2d 654, 658 (Fla. 4th DCA 2008).  Pursuant to Florida public policy, a transfer intended to defraud a creditor or to hinder the collection of a debt is prohibited; however, "[c]lose connections between a judgment debtor and the entity to which it transfers assets may raise judicial eyebrows but do not in themselves signal a [prohibited] transaction."

*Jacksonville Bulls Football, Ltd. v. Blatt*, 535 So. 2d 626, 628 (Fla. 3rd DCA 1988).  "An owner of property has the right to dispose of it as he or she sees fit; the only restriction on that right is that no transfer may be made which injures or prejudices existing creditors' rights."  *Id.* at 629.  Also, a contract is voidable at the principal's option when an agent's interests conflict with those of his principal.  *See Young v. Field*, 548 So. 2d 784, 787 (Fla. 4th DCA 1989); *see also Stilwell v. Est. of Crosby*, 519 So. 2d 68, 70 (Fla. 5th DCA 1988) (stating in the probate context that any transaction affected by a personal representative's conflict of interest is voidable by an interested person, unless the person has consented after fair disclosure).

The VB Participation Agreement was an arms length transaction between sophisticated lenders.  It did not involve obligations of a personal nature that would prohibit assignment.  It also did not expressly prohibit the Originating Bank from assigning its ownership interest or require it to obtain the consent of the Participating Bank before assigning its interest.  Assigning an ownership interest does not itself violate any public policy.  Thus, neither the VB Participation Agreement nor public policy prohibited GulfSouth from assigning its 8.99% participation ownership interest in the North Tip deficiency judgment.

The assignment of the Originating Bank status presents a more difficult question, however, and raises public policy concerns in this instance.  A fiduciary relationship between co-participants to a participation loan is not inherent but can be created by an expressed intent within the language of the participation agreement.  *See First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank and Trust Co.*, 919 F.2d 510, 514 (9th Cir. 1990) (stating that, in loan participation agreements, "fiduciary relationships should not be inferred absent unequivocal contractual language"); *Women's Fed. Sav. & Loan v. Nevada Nat'l Bank*, 811 F.2d 1255, 1258 (9th Cir. 1987); *Guaranty Sav. and Loan Assoc. v. Ultimate Sav. Bank, F.S.B.*, 737 F. Supp. 366, 370-71 (W.D. Va. 1990).  Sophisticated commercial entities may create fiduciary relations between themselves; the "determinative factor" is the specific language of the contract.  *Guaranty Sav. and Loan Assoc.*, 737 F. Supp. at 371.

On careful examination of the VB Participation Agreement, the Court finds that the unequivocal contractual language of the agreement creates a fiduciary relationship between the Originating Bank and the Participating Bank.  The VB Participation Agreement provides that the Originating Bank is the disclosed agent for the Participating Bank "in connection with receipt and collection of the Participating Bank's ownership interest in the Loan" and in payments made and "shall" act as the Participating Bank's agent in connection with continued servicing of the loan.  (VB Participation Agreement § 3). The Originating Bank "shall exercise the same degree of care and discretion" in collecting payments as it would ordinarily take in servicing the loan or collecting payments on its own account.  (*Id.*)  The Originating Bank also has additional duties to report to the Participating Banks any change in the borrower's financial condition or the value of the collateral, to notify the Participating Bank of any request by the borrower or a guarantor for the release or substitution of property or the release of any personal obligations under the loan, and to provide the Participating Bank with all material information, financial statements and records bearing on the borrower's or guarantor's financial condition, among other things. (VB Participation Agreement § 7).  The Originating Bank is further obligated to hold all amounts it collects "in trust for the benefit of the Participating Bank" until the payments are distributed to the Participating Bank.  (VB Participation Agreement § 8).  The agreement expressly refers to these obligations as "fiduciary" in nature, providing that the Participating Bank has the right to terminate the agency and collect its loan directly from the borrower if it determines that the Originating Bank has "fail[ed] to comply with its fiduciary and/or other obligations as provided under this Agreement."  (VB Participation Agreement § 3). It is also clear from the structure of the agreement and the actions and intent of the original Participating Banks–who agreed to take the deficiency judgment in the sole name of the Originating Bank–that, even after a default, the Originating Bank must continue to act within the scope of its contractual fiduciary and agency obligations by engaging in commercially reasonable collection efforts that bind both and holding amounts it collects in trust for the benefit of the Participating Bank.

Because a fiduciary relationship is created in the contract, common law fiduciary principles apply to govern the conduct of the Originating Bank.  Under Florida law, "[i]t is well settled that an agent is a fiduciary with respect to the matters within the scope of his agency.  The very relation implies that the principal has reposed some trust or confidence in the agent." *Fisher v. Grady*, 178 So. 852, 860 (Fla. 1937).  Florida law recognizes the long-standing agency principle that where an agency relationship exists, "the same person cannot act for himself and at the same time with respect to the same matter as the agent of another whose interests are conflicting."  *Id.; see also Treasure Salvors, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel*, 556 F. Supp. 1319, 1339 (S.D. Fla. 1983) ("An agent must act solely for the benefit of the principal in all matters connected with his agency.").  Where an agent acts under an undisclosed conflict of interest or self interest, the principal has the option to void the transaction, regardless of how fair the conduct.  *Young,* 548 So. 2d at 787 (internal marks omitted).  "The duty of full disclosure is generally defined as the duty to inform the principal of any circumstance that might reasonably be expected to influence the complete loyalty of the agent to his principal's interests."  *Id.* at 786 n.4; *see id.* at 788 (noting that "[m]any forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties" (internal marks omitted)).

SE Property argues that HCB has a conflict of interest that cannot be reconciled with the Originating Bank's fiduciary obligations under the VB Participation Agreement, and therefore, assignment of the Originating Bank status is voidable for violation of public policy.  The Court agrees.  Although the VB Participation Agreement did not require the Originating Bank to obtain the Participating Bank's consent before entering into an assignment, as the Originating Bank, GulfSouth owed the Participating Bank a fiduciary duty not to assign its status in a manner that would create an undisclosed conflict of interest.  Likewise, HCB, having obtained the Originating Bank status, owed a duty to disclose the conflict.  The conflict is clear from Phillips's control over HCB, and there is no doubt that Phillips, a judgment debtor on the North Tip deficiency judgment, plainly understood the practical implication of the assignment of Originating Bank status to HCB

in light of his own ability to direct HCB's actions.   Phillips personally negotiated assignments totaling a 51% share in the participation loan, as well as the North Tip deficiency judgment and the Originating Bank status, in exchange for a $200,000 payment by HCB, intentionally securing for HCB the sole right to engage in and control the collection efforts on the North Tip deficiency judgment.  HCB's officers (Dobson and McLaughlin) had no input in the transaction, and HCB undertook no independent investigation or due diligence inquiry before taking the assignment.  Dobson also had no procedures in place to isolate Phillips from HCB's decisions regarding the North Tip deficiency judgment. Instead, according to Dobson's candid admission, he did nothing more than sign when Phillips told him to sign.  After taking assignment of the Originating Bank status, HCB made no collection efforts against Phillips, did not inform SE Property of the assignment or disclose its affiliation with Phillips, nor did it request SE Property's consent to the conflict of interest.  To the contrary, HCB knowingly permitted SE Property to engage in litigation against the wrong party for months.

HCB argues that the Court should be mindful of its separate corporate legal status, which is distinct from Phillips personally, who is not an officer.  The evidence shows, however, that Phillips, undoubtedly a savvy deal-maker, took control of HCB and directed its actions when it served his interests to do so, despite the fact that he was not an officer. For example, it is undeniable that Phillips used HCB to settle his own liabilities and to protect the financial interests of his family because it is a separate entity.  Even in this litigation, although HCB is the defendant, Phillips has continued to exercise control, advising HCB to settle the litigation and appearing as HCB's corporate representative in a mediation.  HCB's separate corporate identity does not insulate it from a conflict of interest where Phillips has exercised unlimited control over the corporation.  Because the VB Participation Agreement creates a fiduciary relationship between the Originating Bank and Participating Bank, HCB's irreconcilable and undisclosed conflict of interest in being controlled by a judgment debtor precludes it from fulfilling the obligations of the Originating Bank, and the assignment of this status to HCB was therefore contrary to public policy and is voidable.  *See Young*, 548 So. 2d at 787.

HCB also argues that declaratory and equitable relief terminating the agency status,

as SE Property requests, is not an appropriate remedy because adequate legal remedies exist under the VB Participation Agreement.  HCB asserts that the Participating Bank's option to terminate the agency status under Section 3, to purchase the Originating Bank's interest under Section 11, and to seek damages for actions, omissions, or errors made by the Originating Bank in bad faith or with willful misconduct or gross negligence under Section 12, are adequate legal remedies.  The Court disagrees.

The VB Participation Agreement does not speak to a procedure for terminating agency status after default, or, as here, based on a conflict of interest or after a deficiency judgment has been entered in the name of the Originating Bank.  The Participating Bank's contractual right to terminate the agency status for the Originating Bank's failure to comply with its fiduciary obligations under the agreement, as provided in Section 3, applies before default, when the Participating Bank can direct the borrower to make payments to the Participating Bank up to its *pro rata* share.  Also, the Participating Bank's purchase option in Section 11 is not mandatory, and in any event, the availability of this "right" is plainly inadequate here.  A principal always has the option to terminate an agent with a material conflict of interest, and it would contravene public policy to compel SE Property to buy out the agent's share in order to terminate the agency.  *See Young*, 548 So. 2d at 787; *see also Women's Fed. Sav. & Loan*, 811 F.2d at 1260 (refusing to compel a participating bank to "remain in a relationship with a fiduciary that has proved itself untrustworthy").  Moreover, requiring the principal to wait until damages occur from the conflict due to actions taken willfully or in bad faith, in order to proceed under Section 12, is also unacceptable.  The parties to the VB Participation Agreement never contemplated that the Originating Bank–and all collection efforts on the loan or a subsequent judgment–would be controlled by a judgment debtor, and thus the agreement does not provide an express remedy at law for this situation.[23]  *See Women's Fed. Sav. & Loan*, 811 F.2d at 1260 n.6 (noting equitable remedy was appropriate because "the enforcement of fiduciary duties is

---

[23]  In different but analogous circumstances, courts have said, "it defies common sense" to allow an assignment that would have the effect of requiring contractual duties to be fulfilled through an entity controlled by a competitor.  *See also Sally Beauty Co. v. Nexxus Prods. Co.*, 801 F.2d 1001, 1007-08 (7th Cir. 1986); *Berliner Foods Corp. v. The Pillsbury Co.*, 633 F. Supp. 557, 559-60 (D. Md. 1986).

traditionally an equitable function," and the legal remedy was inadequate).  The Court finds that SE Property has no adequate remedy at law.

HCB also argues that SE Property is seeking rescission of the assignments, which cannot be accomplished because HCB paid GulfSouth for the assignments and neither GulfSouth nor HCB can be restored to their prior position.  The general rule is that the "parties to a rescinded agreement are required, insofar as possible, to restore the status quo."[24]  *Gonzalez v. Eagle Ins. Co.*, 948 So. 2d 1, 3 (Fla. 3d DCA 2006).  But, HCB has mischaracterized SE Property's claim.  SE Property has not requested rescission of the assignments from GulfSouth, and it cannot rescind an assignment to which it was not a party.  *See Bland v. Freightliner LLC*, 206 F. Supp. 2d 1202, 1206 (M.D. Fla. 2002) (applying Florida law and stating, in "an action for rescission of contract, the parties to the lawsuit must lie in contractual privity").  Instead, SE Property requests the equitable remedy of termination of the agency status under the VB Participation Agreement, to which it is a party, and the right to pursue collection on its own, which is the only adequate relief available.

Because termination of HCB's Originating Bank status leaves the VB Participation Agreement with no party serving as Originating Bank, and the Court cannot re-write the contract, SE Property must be given the right to pursue collection on its own up to its *pro rata* share of the deficiency judgment ($4,656,850.20, plus interest).  This remedy is consistent with the remaining terms of the agreement and the original parties' expressed intent.  Notably, the VB Participation Agreement expressly provided for termination of the agency status before default, which would then permit the Participating Bank to obtain collection directly from the borrower.  Although the agreement is silent regarding a conflict of interest that arises after default and foreclosure when a deficiency judgment remains, there is no reason to deviate from that same type of remedy.  SE Property is already the equitable owner of its 44.9% share of the deficiency judgment, and all other shares are

---

[24]  There are exceptions to the general rule, however, such as where restoration is not possible due to fraud or other wrongful conduct.  *See Mulle v. Scheiler*, 484 So. 2d 47, 48 (Fla. 5th DCA 1986).  In other words, contrary to HCB's position, the fact that Humpty Dumpty cannot be put back together again does not mean he is not broken and equity will not reward the one who pushed him off the wall by denying a remedy.

now controlled by HCB (essentially, Phillips).  HCB argues that Florida law does not permit a judgment to be assigned among more than one creditor without the debtor's consent, citing *Richard's Paint Mfg. Co. v. Onyx Paints, Inc.*, 394 So. 2d 1064 (Fla. 4th DCA 1981); however, *Richard's Paint* is distinguishable on these facts.  In that case, the Florida court determined that a partial assignment of a judgment does not bind the judgment debtor unless made with the debtor's consent, though "as between the assignor and the assignee, the assignment of a part of a judgment is valid and binding, even when made without the judgment debtor's consent."  *Id.* at 1066 (internal marks omitted).  The court explained that a "judgment debtor should not be obliged and forced to withstand numerous vexatious and expensive garnishment proceedings and judicial sales brought about at various times by several persons under one judgment."  *Id.* at 1066.  There, however, the debtor faced a real threat of having to pay the same debt twice where a portion of a judgment had been assigned to a third party unconnected to the original judgment.  *See id.* at 1065.  Here, by contrast, SE Property was privy to the original proceedings through the VB Participation Agreement and already owns 44.9% of the judgment.  Moreover, because HCB has accumulated all of the other ownership interests and has shown no interest in engaging in collection efforts, it is unlikely that Phillips, as the judgment debtor, would ever be faced with multiple collection efforts as a result of dividing the judgment in this instance. *Richards Paint* does not prohibit this Court from fashioning an appropriate equitable remedy that permits SE Property to pursue collection up to its equitable ownership of the deficiency judgment.

Breach of Contract

Alternatively, assuming a breach of contract analysis applies, the Court finds that the same equitable relief is appropriate.  A participation agreement is a contract, and in Florida, as elsewhere, a breach of contract occurs where there is proof of (1) a valid contract, (2) a material breach, and (3) damages.  *See Havens v. Coast Fla., P.A.*, 117 So. 3d 1179, 1181 (Fla. 2d DCA 2013).  When the terms of a contract "are not susceptible to more than one meaning, a court may not indulge in interpretation or resort to extrinsic evidence." *Land Co. of Osceola Cnty, LLC v. Genesis Concepts, Inc.*, 169 So. 3d 243, 248

(Fla. 4th DCA 2015).  However, if "a contract is rendered ambiguous by some collateral matter, it has a latent ambiguity, and the court must hear parol evidence to interpret the writing properly."  *Fi-Evergreen Woods, LLC v. Robinson*, 135 So. 3d 331, 336 (Fla. 5th DCA 2013) (internal marks omitted).  The parties agree that the VB Participation is a valid agreement, and the Court finds that HCB breached the agreement by creating an irreconcilable conflict which prevented it from fulfilling its duty as Originating Bank.

SE Property requests damages for the breach of contract in the amount of its *pro rata* share of the deficiency judgment ($4,656,850.20 plus interest) and termination of the agency status.  The damages claim is based on pure speculation because no evidence was offered to support damages in this amount.  The contract did not guaranty that the Participating Bank's entire share would be collected.  Also, SE Property presented no proof at trial that it could collect this amount or that it would have recovered this amount absent the breach.  Moreover, as discussed above, the remedy at law is inadequate to remedy the breach of fiduciary duty resulting from the irreconcilable conflict of interest in this case. Thus, the Court finds that equitable termination of the agency status and allowing SE Property to pursue collection on its own share where the Originating Bank cannot fulfill its contractual fiduciary duty because of an irreconcilable conflict of interest is consistent with the parties' intent and the only adequate remedy, even under the contract analysis.[25]  *See Women's Fed. Sav. and Loan Ass'n*, 811 F.2d at 1260 n.6 (noting equitable relief was appropriate because the contract created fiduciary duties, "the enforcement of fiduciary duties is traditionally an  equitable function," and the legal remedy would be inadequate).

Tortious Interference

SE Property claims that HCB intentionally interfered with the VB Participation Agreement as well as with the Participating Banks' informal agreement with GulfSouth to divide the judgment into *pro rata* shares and to allow SE Property to take the lead on

---

[25]  As to SE Property's other allegations of breach of contract, i.e., that HCB effectively settled a claim against Phillips and released Lot 26 from the judgment lien without consent of SE Property and that HCB unreasonably delayed in undertaking collection efforts, the Court finds it unnecessary to address them in detail or make specific findings because SE Property is already entitled to the relief it seeks in terminating the agency status and directly undertaking its own collection efforts.

collection efforts.[26]  Intentional interference requires proof of:

> (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.

*U. of W. Florida Bd. of Trustees v. Habegger*, 125 So. 3d 323, 326 (Fla. 1st DCA 2013) (internal marks omitted); *see also Ethan Allen, Inc. v. Georgetown Manor, Inc*., 647 So. 2d 812, 814 (Fla. 1994).  The protected business relationship need not be evidenced by an enforceable contract, but it must "afford the plaintiff existing or prospective legal or contractual rights," if the defendant had not interfered.  *Ethan Allen*, 647 So. 2d at 814.  The Court finds that, regardless of whether there was an *enforceable* agreement to divide the judgment into *pro rata* shares, the record reflects that there was at least an informal agreement to do so, and the record shows that HCB was aware of it through its attorney, Osborn.  Also, the VB Participation Agreement was an existing business relationship between SE Property and GulfSouth as Originating Bank, which HCB was aware of.  The Court finds that HCB's conduct of negotiating with GulfSouth through Phillips for the purpose of gaining control over the collection process and preventing SE Property from obtaining a *pro rata* assignment of the judgment from GulfSouth constitutes intentional and unjustifiable interference with SE Property's fiduciary relationship with the Originating Bank, which was its agent with respect to the judgment.  Phillips, a judgment debtor, used HCB to interfere with SE Property's relations with GulfSouth and to obtain a result, i.e., control of the judgment collection process, that he otherwise could not have lawfully obtained for himself.

As damages, SE Property again seeks the amount of its entire share of the deficiency judgment, which the Court again denies as pure speculation for the same reasons stated previously.  Alternatively, SE Property seeks attorney's fees as substantive damages, arguing that HCB's wrongful conduct made it necessary to bring suit to void the assignment and that HCB's wrongful conduct caused GulfSouth to breach its fiduciary duty

---

[26]  This was the informal agreement discussed in correspondence between Petermann, Sandel, and others about how the banks had intended "from the outset" to proceed with the deficiency judgment.

and increased the attorney's fees by causing SE Property to bring suit against the wrong party.  HCB argues that SE Property is not entitled to an award of attorney's fees under Florida law, that SE Property has an adequate remedy at law (which the Court has already rejected), and that SE Property has waived any claim to attorney's fees by failing to specifically plead it.

Under Florida law, the general rule is that each party is responsible for its own attorney's fees unless a contract or statute provides otherwise, and actual or compensatory damages ordinary do not include attorney's fees incurred while prosecuting or defending a claim.  *Price*, 890 So. 2d at 251; *see also Bidon v. Dep't of Prof. Regulation, Fla. Real Estate Comm'n*, 596 So. 2d 450, 452 (Fla. 1992).  The rule is not without exceptions, however.  Attorney's fees may be allowed as an element of damages if "the equitable nature of the action [is such] that full relief cannot be granted except by the allowance of such a fee."  *Martin v. Paskow*, 339 So. 2d 266, 268 (Fla. 3d DCA 1976).  Also, substantive damages in tort include "those amounts necessary to compensate adequately [the] injured party for losses sustained as the result of [the] defendant's wrongful . . . actions."  *Bidon*, 596 So. 2d at 452.  Where a defendant's wrongful act "has involved the claimant in litigation with others or placed him (or her) in such relation with others as makes it necessary to incur expenses to protect his interest, such costs and expenses, including attorney's fees, should be treated as the legal consequences of the original wrongful act and may be recovered as damages."  *Canadian Universal Ins. Co. v. Employers Surplus Lines Ins. Co.*, 325 So. 2d 29, 31 (Fla. 3d DCA 1976).

Although no contract or statute provides for an award of attorney's fees in this case, the Court finds that SE Property suffered damages from the intentional interference in the form of additional attorney's fees.  As a result of HCB's intentional interference and failure to disclose the assignment and its own conflict of interest, SE Property spent time and money unnecessarily litigating against the wrong party.  The Court also finds that SE Property did not waive the right to claim attorney's fees as a separate element of substantive damages.  In this instance, the attorney's fees are general damages under Florida law, that is, those that "naturally and necessarily flow or result from the injuries

alleged," *Hutchison v. Tompkins*, 259 So. 2d 129, 132-33 (Fla. 1972), and thus, there was no need to plead them with specificity.  Therefore, HCB is liable to SE Property for its attorney's fees to the point in time when HCB was named as a defendant and its relationship with Phillips became clear.

SE Property also claims that HCB conspired with GulfSouth to breach fiduciary duties owed to SE Property.  Because the Court has found tortious interference and there is no difference in the damages claimed or allowed, the Court need not address this claim separately.

Accordingly:

1.     The Court declares that portion of the Assignment and Assumption Agreement between GulfSouth Private Bank and HCB Financial Corp. dated June 26, 2012 (Plaintiff's Ex. 85), which assigns to HCB the Originating Bank status under the VB Participation Agreement voidable, and therefore, at SE Property's request, the agency status under the VB Participation Agreement is terminated.

2.     The Court similarly declares voidable that portion of the Assignment of Judgment between GulfSouth Private Bank and HCB Financial Corp. dated June 26, 2012 (Plaintiff's Ex. 83), which assigned SE Property Holdings, LLC's 44.9% equitable ownership interest in the deficiency judgment to HCB Financial Corp.  SE Property is the equitable owner of 44.9% of the North Tip deficiency judgment dated March 29, 2011, and is entitled to engage in its own collection efforts on the judgment from this date forward until the sum of its *pro rata* share, $4,656,850.20 plus interest, is satisfied.

3.     Plaintiff SE Property Holdings, LLC is also entitled to attorney's fees as substantive damages in an amount to be determined.  The parties agreed to try this issue separately after the Court determined liability.  Plaintiff has 30 days to submit proof of attorney's fees limited to those fees incurred as a result of the wrongful conduct that caused it to litigate against the wrong party by motion or supplemental proceeding.  Defendant shall have fourteen (14) days to respond with objections to the amounts claimed.

4.      Final judgment will be entered separately after the Court resolves the remaining issue of the amount of damages based on SE Property's attorney's fees.

**DONE and ORDERED** on this 24th day of September, 2015.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**