**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| **SE PROPERTY HOLDINGS, LLC,** )<br>as Successor by Merger with )<br>VISION BANK, )<br> )<br>　　　　Plaintiff, )<br> )<br> )<br> )<br>vs. )<br> )<br> )<br> )<br> )<br> )<br>**GULFSOUTH PRIVATE BANK,** )<br>**FIRST NBC BANK,** )<br>**HCB FINANCIAL CORP.**, a Florida )<br>Corporation, )<br> )<br>　　　　Defendants. )<br>_____ ) | **Case No. 3:13cv6/MCR**<br><br>Pensacola, Florida<br>March 23, 2015<br>8:06 a.m. |

**DAY 1**

TRANSCRIPT OF **BENCH TRIAL** PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
CHIEF UNITED STATES DISTRICT JUDGE
(Pages 1-292)

FOR **THE PLAINTIFF:**　　　　**JULIE S. BRADY, ESQUIRE**
　　　　　　　　　　　　　　**BRANDON T. CROSSLAND, ESQUIRE**
　　　　　　　　　　　　　　Baker & Hostetler
　　　　　　　　　　　　　　200 South Orange Avenue, Suite 2300
　　　　　　　　　　　　　　Orlando, Florida  32801

FOR **THE DEFENDANTS:**　　　　**PHILIP A. FRANCO, ESQUIRE**
　　　　　　　　　　　　　　**APRIL D. SMITH, ESQUIRE**
　　　　　　　　　　　　　　Adams and Reese, LLP
　　　　　　　　　　　　　　11 N Water Street, Suite 23200
　　　　　　　　　　　　　　Mobile, Alabama  36602

```
 1                         PROCEEDINGS
 2          (Court called to order; All parties present.)
 3          THE COURT:  Good morning.  This case is set for bench
 4    trial this morning.  It is, of course, the case of SE Property
 5    Holdings versus HCB Financial.
 6          I'm going to ask -- I know we met a week or so ago,
 7    but I'm going to ask you all to go ahead and state your name and
 8    the client that you represent just to get the record straight
 9    right off the bat.
10          Mr. Crossland, we'll start with you and your client.
11          MR. CROSSLAND:  Good morning, Your Honor.  Brandon
12    Crossland from Baker Hostetler, representing the Plaintiff, SE
13    Property Holdings, LLC.
14          THE COURT:  All right, thank you.
15          MS. BRADY:  Julie Brady from Baker Hostetler,
16    representing the Plaintiff as well.  And with us is Brian
17    Campolo.
18          THE COURT:  All right, thank you.
19          MR. CROSSLAND:  And, Judge, we should also introduce
20    Krista Sivick from our office, Baker & Hostetler.  She also
21    represents the Plaintiff, SE Property.
22          THE COURT:  Do you wish to be up at the counsel table?
23    We could pull another chair up if that would be helpful.
24          MS. SIVICK:  Thank you, Your Honor, but I think I'm
25    okay right here.
```

1        **THE COURT:**  All right, very well.

2        Mr. Franco?

3        **MR. FRANCO:**  Good morning, Your Honor.  Philip Franco

4  from Adams and Reese, representing HCB Financial Corporation.

5        **MS. SMITH:**  Good morning, Your Honor.  April Smith

6  from Adams and Reese, representing HCB Financial Corporation.

7        **MR. DOBSON:**  Good morning, Your Honor.  Joe Dobson,

8  and I'm president of HCB Financial Corp.

9        **THE COURT:**  All right, thank you.  Well, it's nice to

10  have you all here.  I'm looking forward to your presentations.

11  I'm ready to get started.

12        Mr. Crossland, Ms. Brady, anything that we need to

13  discuss this morning before you start with your opening

14  statements?  I believe you all were going to make an opening

15  statement.

16        **MS. BRADY:**  Just a few things, Your Honor.  We will

17  want to invoke the rule.  You had stated that you wanted us to

18  state that again at the beginning of the trial.

19        **THE COURT:**  Okay.  The rule has now been invoked, and

20  so you all should advise your witnesses accordingly.

21        **MS. BRADY:**  And the second matter is that one of our

22  witnesses, Martin Sandel, will be testifying this afternoon.

23  And he has to leave for India later this week, so we had

24  discussed this with Mr. Franco about putting him in full, his

25  testimony in full.

1          **THE COURT:**  All right.

2          **MS. BRADY:**  So his testimony will be taken in its

3     entirety.

4          And then there was one remaining issue as to

5     deposition designations for Mr. McLeod that -- I don't know when

6     Your Honor wanted to address those.

7          **THE COURT:**  Is this the issue that -- the new

8     objections that were made?

9          **MS. BRADY:**  New objections and new designations, yes,

10    Your Honor.

11         **THE COURT:**  All right.  I'll go ahead and hear from

12    you on that then.  Go ahead, Ms. Brady.

13         **MS. BRADY:**  Your Honor, pursuant to the pretrial

14    order, the parties worked to submit the joint pretrial

15    stipulation and exchange depo designations and objections, and

16    those were all filed as attachments -- schedules to the pretrial

17    stipulation, which was due to be filed on March 2nd and was

18    filed on March 2nd.

19         Both sides have designated deposition excerpts from

20    Purser Mac McLeod, who was the interim president of GulfSouth

21    right before it went into receivership.  And then objections

22    were done as well, both parties submitted their objections.

23         When we met prior to the pretrial conference after the

24    trial testimony of Mr. Campbell, Mr. Franco and I went through

25    all of the objections and the designations to try to resolve as

1    many as possible to bother the Court as little as possible.

2         We had made additional inclusions on the Monday before

3    the pretrial conference which was due of mostly underlining

4    stuff that had been incomplete from their designations.  And Mr.

5    Franco had not seen them, so we did go through them at the

6    meeting we had prior to the pretrial conference.

7         SE Property did not designate additional designations

8    after submission of the pretrial stipulation.  Everything that

9    is in the copy that was sent to the Court last week, last

10   Thursday I believe, was designated in a schedule for pretrial

11   stipulation.

12        On Wednesday Mr. Franco -- we had sent him a copy of

13   the highlighted transcript before we were going to provide it to

14   Your Honor, and he included additional designations and

15   additional objections, a large part of the objections being to

16   his own original designations or to joint designations.

17        And so when SE Property submitted them to the Court,

18   SE Property objected to the late assertion of objections and

19   designations because the pretrial order makes clear that any

20   objections not listed will be deemed waived.

21        In response, Mr. Franco advised the Court that SE

22   Property had made additional designations on Monday, and that

23   just isn't the case.

24        **THE COURT:**  Okay.  Thank you.

25        Mr. Franco, that's what I read in your email.  Your

1    email to the Court indicated that SE Property had made

2    additional designations.

3            **MR. FRANCO:**  Yes, ma'am.  When we submitted the

4    pretrial stipulation, you will see that what was attached to the

5    pretrial stipulation was -- you will see, for instance, what was

6    attached to the pretrial stipulation was a deposition of

7    Mr. McLeod.

8            And for instance, as an example, on page 94, you will

9    see from lines 9 through 15 there was nothing designated on that

10   deposition that was submitted to the Court.

11           **THE COURT:**  Page what is that?

12           **MR. FRANCO:**  Page 94.  You will see that that is not

13   designated on the copy that was submitted to the Court.

14           When we met after Mr. Campbell's deposition, I was

15   presented with this copy, which I have since submitted to the

16   Court.  And you will see on page 94 that there's an underlining

17   of those same lines, indicated to me at the meeting that that

18   was additional designations that were made.  And we discussed

19   all of those additional designations, some of which I agreed to,

20   some of which I didn't agree to.

21           We also -- after that meeting, I received an email

22   that said that they had designated those, if you simply look at

23   Schedule F in the deposition, which we didn't discuss at the

24   meeting, they said we designated those in the schedule.

25           Well, if you look at the Schedule F to the pretrial,

1    you will see -- for instance, in the designation for Mr. McLeod,

2    you will see counter-designations on page 6 of 38 -- I'm sorry,

3    counter-designations, none of which were the underlying

4    designations that I just referred to.

5            Then they come back and say, well, wait a minute, we

6    put these in the objection column.

7            Well, we didn't look at the objection column for

8    additional designations.  We looked at those as objections.  And

9    they're entitled to make whatever objections they're entitled to

10   make, so we didn't look at the objection column for any

11   additional designations.

12           And quite frankly, when we were discussing the

13   underlying additional designations at the deposition of

14   Mr. Campbell no one said to me -- or I didn't understand that

15   there were additional designations -- that they had actually

16   designated at 420 of 430 on the date that we were turning in

17   this pretrial stipulation.

18           **THE COURT:**  Well, Mr. Franco, if I permit you to make

19   objections to the -- to these -- we'll call them the new

20   designations by SE Property, which I may do, that would not

21   include permission for you to go back and review the entire

22   deposition and make objections.  I mean, those -- that's -- I

23   think that's primarily what Ms. Brady is objecting to, and I can

24   understand that.

25           **MR. FRANCO:**  Your Honor, the reason I made the

1    statement to the Court is, my understanding of Federal Rule 32

2    is that when a deposition is introduced at a trial or a hearing

3    that at that time objections may be made.

4            THE COURT:  Then why did you make any objections?

5            MR. FRANCO:  Because I preserved my objections along

6    the way to remind me as I'm going along.  I do that in

7    depositions all the time.

8            THE COURT:  Mr. Franco, that's inconsistent with the

9    Court's order.  Your interpretation of Rule 32b is not an

10   incorrect interpretation, but my order takes precedent over that

11   rule, and my order is very clear.

12           MR. FRANCO:  Your order is very --

13           THE COURT:  It's even underlined.

14           MR. FRANCO:  Your order is very clear, Your Honor, but

15   I did not understand that your order took precedence over a

16   federal rule.  That was my understanding.

17           THE COURT:  Well, your understanding is --

18           MR. FRANCO:  If I'm incorrect in that --

19           THE COURT:  Yes, your understanding is incorrect in

20   that regard, so my pretrial order does take precedent over the

21   rule.

22           MR. FRANCO:  The reason that I was focusing on 32 is

23   because 32 protects the opposite party, because any objections

24   that could have been cured at the deposition, for instance,

25   leading or anything of that nature, those objections are waived

1    if they're not made.  But I did not understand that hearsay

2    objections, for instance, as to substance under 32 -- I believe

3    it's (a), I can't remember which subsection it is -- are

4    preserved by the federal rules.

5         So that was my understanding.  If the Court rules

6    against me, I understand that, but that's why I did what I did.

7         **THE COURT:**  But, again, your actions at the deposition

8    in making objections and then later designating, you know, those

9    objections for the Court suggest that you did understand the

10   rule.

11        **MR. FRANCO:**  As I said before, my practice has always

12   been in any deposition to make the objections as I see them.

13   That way when I'm going through the deposition I remember that I

14   have to -- in case I don't note that when I'm going through the

15   deposition at another time that I should make that objection.

16        **THE COURT:**  Well, I understand that.  But what I'm

17   saying is you also -- you also indicated your objections

18   consistent with the Court's pretrial order to some of the SE

19   Property questions, did you not, initially?

20        **MR. FRANCO:**  Yes.

21        **THE COURT:**  Okay.  But then you went back and went

22   through the deposition again later, right?

23        **MR. FRANCO:**  Correct.

24        **THE COURT:**  And made more objections?

25        **MR. FRANCO:**  Correct.

1         **THE COURT:**  That's what they're objecting to.

2         **MR. FRANCO:**  And my understanding -- again, if the

3 Court rules against me, I understand that.  But my understanding

4 is, at the time it's introduced as if the witness is on the

5 stand, I have the opportunity to object under the Federal Rule

6 of Civil Procedure.  That's my understanding.

7         **THE COURT:**  What would be the point of my pretrial

8 order if that were the case?  Why would you need to make any

9 objections if I was just going to rule on everything

10 contemporaneously at trial?

11         **MR. FRANCO:**  To resolve whatever objections you can

12 resolve before it's actually introduced.  If there are

13 additional objections -- as the trial progresses, there may be

14 reasons to make additional objections that weren't necessarily

15 available or visible or known at the time.  As we go through --

16 especially relevance.  Relevance is always a tough one to deal

17 with before trial.

18         So the reasoning from my standpoint is, those are

19 objections we know about.  There may be additional objections I

20 need to make when the actual witness is taking the stand.  And

21 as the deposition is introduced, it's supposed to be as if the

22 witness is taking the stand, and that's why I think Rule 32 says

23 you can make additional objections at that time.

24         That's my understanding.  Again, if the Court rules

25 against me, then I apologize, but that was my rationale.

1        **THE COURT:**  All right.  I understand.  Well, my order

2    will control, and it's consistent apparently with the way the

3    Plaintiffs interpreted the order as well.

4        **MR. FRANCO:**  Thank you, Your Honor.

5        **THE COURT:**  All right.  Anything else?

6        **MR. CROSSLAND:**  I think one just quick one.

7        **THE COURT:**  Let me just say, if there are objections,

8    however, to the designations that were made that are new

9    designations, I'll allow those objections today.

10        **MS. BRADY:**  Okay.  I just -- new -- there were no new

11    designations after May (sic) 2nd.

12        **THE COURT:**  Well, that -- I guess I just heard

13    Mr. Franco say that there were new designations made after your

14    meeting.

15        **MS. BRADY:**  No.

16        **MR. CROSSLAND:**  No.

17        **MS. BRADY:**  Your Honor, Exhibit F, using the example

18    that Mr. Franco just put up, he showed the highlighted copy of

19    the designations that HCB submitted.

20        What those designations refer to is they had

21    highlighted their designations and then our -- yellow highlights

22    HCB's designations, pink highlights HCB's agreed to designations

23    by SEPH.

24        **THE COURT:**  What are you reading from, please?

25        **MS. BRADY:**  I'm sorry, Your Honor.  Schedule F to the

1   pretrial.

2             **THE COURT:**  Bear with me.  You all know your case far

3   better than I know it at this point in your discovery activities

4   and what you've done to work together to prepare this case for

5   trial.

6             All right.  So I'm -- exhibit -- say it again.

7             **MS. BRADY:**  Schedule F, Exhibit F.

8             **THE COURT:**  I don't know if I have Schedule F.  What

9   is that specifically?

10            **MS. BRADY:**  It is a copy of HCB's deposition

11  designations with SE Property Holdings's objections.

12            **THE COURT:**  I have an exhibit list -- just a minute.

13            **MS. BRADY:**  We can put it up.

14            **THE COURT:**  Hold on just a minute.  I have an exhibit

15  list with SE Property Holdings's objections.  Is that what

16  you're taking about?

17            **MS. BRADY:**  It's after that.  It's the last

18  attachment.

19            **THE COURT:**  Unfortunately, my documents do not have an

20  attachment number.

21            **MR. CROSSLAND:**  Judge, we have a clean copy of

22  Schedule F.

23            **THE COURT:**  I have a dash 2.  Maybe I do have it.

24  Hold on.  There it is.  Okay, I do have it.

25            **MS. BRADY:**  So this is HCB depo designations with SE

```
 1    Property's objections.  And if you look at --
 2              THE COURT:  Let me stop you one minute.  What I have
 3    that was attached, Document 297-6, which is what you're
 4    referring to, is that the same as this, which I'm holding up is
 5    what I printed that you all sent in last week?
 6              MS. BRADY:  Yes with --
 7              THE COURT:  This is colored but --
 8              MS. BRADY:  Yes, with the removal of the objections
 9    that we were able to resolve.
10              THE COURT:  When you met on the 16th?
11              MS. BRADY:  Yes.  And then Mr. Franco's handwritten
12    notations are included on that.
13              THE COURT:  I saw that.
14              MS. BRADY:  What was attached to Exhibit -- and F that
15    is HCB's attachment.  And if you look on page 5 of 297-6, it
16    says yellow highlights HCB's designations, pink highlights HCB's
17    agreed to designations by SEPH.  So those weren't all the
18    designations.  Those were just HCB's.
19              THE COURT:  I don't know what you're referring to.
20    Page 5 of --
21              MS. BRADY:  Page 5 of Document 297-6.
22              THE COURT:  Page 5 is a deposition.
23              MR. FRANCO:  At the bottom, Your Honor, page 5 of
24    Document 297-6.
25              THE COURT:  I'm there.
```

1          **MS. BRADY:**  It's a legend that says yellow highlights

2    HCB's designations, pink highlights HCB's agreed to designations

3    by SEPH.

4          **MR. FRANCO:**  It's the page numbered 5 at the bottom as

5    opposed to page 6 of the Document 297-6 at the top.

6          **THE COURT:**  I have -- obviously, I have pages that are

7    the deposition page numbers.  At the bottom of the page I have

8    -- I'm looking, for instance, at 2 -- it has the number 2, and

9    then it's got parentheses pages 5 to 8, and I have pages 3,

10   pages 9 to 12.

11         **MR. FRANCO:**  Your Honor, I'd be glad to give you mine

12   and show you where it is.

13         **THE COURT:**  Well, I don't -- no.  I really would like

14   to --

15         **MR. FRANCO:**  Move on?

16         **THE COURT:**  No -- well, yeah -- but work from what I

17   have, because, you know, I don't want to get into some

18   disagreement about whether what you're each giving me is

19   accurate in the record.

20         So -- oh, okay, you're on the actual -- okay, I got

21   it, page 6 of 38, all right.

22         **MS. BRADY:**  So, yes, page 6 of 38, the yellow

23   highlights are HCB's designations, and the pink highlights are

24   HCB's agreed to designations by SEPH.

25         What is attached to that, the marked-up transcript

1   that Mr. Franco referred to, was simply just their designations.

2   That was not both sides' designations.

3          He used as an example page 94.  And if Your Honor

4   looks at page 5 of 8, the example -- page 94 of their

5   designations was lines 1 through 8 and lines 16 to 23, and

6   that's where we would mark "incomplete, add lines 9 to 15."

7          So all of the underlining was included in our

8   objections to their designations.  So just to clarify to the

9   Court that nothing was added after the submission on May (sic)

10  2nd from SE Property -- March 2nd.

11         **THE COURT:**  All right, Mr. Franco?

12         **MR. FRANCO:**  Yes, ma'am.  If you look -- it's exactly

13  what I was saying before.  If you look at the same page 5 that

14  she referred you to, you will see at the top

15  "counter-designations."

16         **THE COURT:**  Uh-huh.

17         **MR. FRANCO:**  That was the additional designations that

18  we were aware of.

19         If you look at the attached deposition to the pretrial

20  stipulation, you will see those designations that I agreed to of

21  those in pink.  We accepted some of those.

22         Now she is saying, oh, we attached -- we noted

23  additional designations in the objection column.  She didn't do

24  it in the table of counter-designations.  She stuck it in the

25  objection column.

1     So I didn't pay attention to the objection column as

2  designations because my -- those were just objections.  I don't

3  pay attention to the objections because they're entitled to

4  their objections.  There was no reason for me to look at

5  objections, and so we didn't notice that.

6     And when we went to the meeting, there was additional

7  underlined parts of the deposition which we discussed and I

8  understood those to be new designations.

9     She says they were actually in the objection column.

10  I was not aware of that.  And when we discussed them, that was

11  the additional ones that are underlined in what we last

12  submitted to the Court.

13     So what you have last in the deposition of Mr. McLeod

14  are the underlined portions that are at issue, because they say

15  they designated those under the objection column, and I say we

16  weren't aware of that, and that's why we discussed them at the

17  conference.

18          THE COURT:  Ms. Brady?

19          MS. BRADY:  Yes, just -- I know you want to wrap this

20  up.  I have an email that I sent to April Smith at 9:00 a.m.

21  Monday morning, March 2nd, advising her that we had some

22  objections for incompleteness, and I said, sometimes the entire

23  answer is not included, and we designate the additional lines

24  that should be included.  So they should have had notice that

25  there were additional designations.

1       **THE COURT:**  In your email does it tell her where you

2    -- you say you did that in the objection section or --

3       **MS. BRADY:**  It says -- and I'll just read so we can be

4    clear, "For Mac McLeod our designations, your

5    counter-designations, and our objections are in the margin.  For

6    Mr. McLeod the majority of our objections are for

7    incompleteness.  Sometimes the entire answer is not included,

8    and we designate the additional lines that should be included."

9       I did not reference that it was in the objections

10   column.

11      **THE COURT:**  Well, Mr. Franco, that would seem obvious

12   to me that you could just look at the deposition and see what

13   they had underlined and that that was their objection to the

14   completeness issue.

15      **MR. FRANCO:**  No, ma'am, they hadn't underlined it at

16   that point.  The only indication we got is in the objection

17   column they're saying that there were inclusions.  She never

18   said they were in the objection column.  We didn't know that.

19      **THE COURT:**  This is getting silly.

20      **MR. FRANCO:**  It is.

21      **THE COURT:**  I'm going to allow it.  So you can make

22   objections to those additional designations if you feel

23   necessary.

24      **MR. FRANCO:**  And for the Court's purposes, those are

25   the underlined portions in what the Court has last?

1      **THE COURT:**  Correct, that's what I understand.

2      **MR. FRANCO:**  Thank you.

3      **MS. BRADY:**  But as far as additional designations and

4  objections from Mr. Franco, those are not to be included?

5      **THE COURT:**  They're not included.

6      **MS. BRADY:**  Thank you, Your Honor.

7      **THE COURT:**  Okay, let's go.  We'll start with opening

8  statements, Mr. Crossland.

9      **MR. CROSSLAND:**  Just the one quick one, real quick.

10  Mr. Campolo has a flight to leave the country on Friday morning.

11  I don't think we told them about that, but I don't think it's

12  going to be an issue.

13      We plan on calling him this morning.  And I would just

14  ask that, if they do call him in their case, that they just do

15  it early so as to avoid having to call him on Friday.  He has a

16  flight out of the country.  I just can't recall if we told them

17  that or not.

18      **THE COURT:**  Well, you're telling them now.

19      Mr. Franco?

20      **MR. FRANCO:**  Your Honor, if I could understand who

21  their witnesses are and in what order, that would better help me

22  understand what we can try to accomplish and what we can't.

23      **THE COURT:**  Well, I don't know that they're suggesting

24  you take him out of turn.  I think they're just saying if you

25  could call him earlier in your case --

1          **MR. FRANCO:**  We will try to accommodate any witness to

2     the extent it doesn't prejudice my case, which I don't think is

3     going to happen at this point, but we'll deal with it as we go

4     along.  I didn't even know who their first witness is today, so

5     I don't know what is going to happen today.

6          **THE COURT:**  Right.  Well, I'm not sure that y'all all

7     need to exchange witnesses, if that's not something that you --

8     I'm not going to require you to if that's not something you

9     otherwise agreed to.

10          But just as far as Mr. Crossland, because you're just

11     -- you're now, you know, first day of trial advising them of

12     this, and he is your corporate representative, they're either

13     going to need to take him out of turn and complete their

14     examination, you know, in your case, or you're going to need to

15     try to persuade them to call him early.

16          **MR. CROSSLAND:**  Understood.

17          **THE COURT:**  I don't know that I can assist you all any

18     more than that.

19          All right, Mr. Crossland, you're up for opening.

20          **MR. CROSSLAND:**  Yes, Your Honor.  If I may, I have a

21     timeline here if I can --

22          **THE COURT:**  That would be fine, thank you.

23          **MR. CROSSLAND:**  We do have it as well on an electronic

24     -- if this isn't very readable for the Court.  Let's see what we

25     can do.

1          **THE COURT:**  It might be helpful -- you have this also

2    electronically, you said?

3          **MR. CROSSLAND:**  Yes, Your Honor.

4          **THE COURT:**  That might be helpful to have it both

5    ways.  Let me ask if you would move that closer.  I don't have a

6    jury to worry about and I'm getting older.

7          **MR. FRANCO:**  Your Honor, does this screen change

8    because the glare is on it?

9          **THE COURT:**  Yes.  That's much more helpful and I can

10   see Ms. Brady.

11         **MR. CROSSLAND:**  May it please the Court.

12         **THE COURT:**  Yes.

13                        **OPENING STATEMENT**

14         **MR. CROSSLAND:**  No man can be the judge in his own

15   cause, but that's what we have in this case.  The person who

16   owes the debt is in charge of collecting the debt.

17         And that's why this is not really a dispute between

18   HCB and SE Property.  This is a dispute between SE Property and

19   Rupert Phillips, a judgment-debtor on a judgment that exceeds

20   $12 million.

21         And that's because Mr. Phillips, through his use and

22   control of HCB, has shielded himself in a clever but completely

23   improper scheme from the collection and execution efforts of SE

24   Property, who has a $4.5 million interest in that deficiency

25   judgment.

1        In this case SE Property seeks to remove that shield

2   of protection and to hold HCB liable for its tortious acts.

3        So what specifically is SE Property asking this Court

4   to do?

5        SE Property is asking this Court to enter declarations

6   giving SE Property the right to collect on its portion of the

7   judgment.

8        SE Property is also seeking monetary damages against

9   HCB for breach of contract, tortious interference, and civil

10  conspiracy; and to hold HCB liable for forcing SE Property into

11  this protracted litigation, one that has permitted the

12  judgment-debtors for years to hide their assets and secure

13  otherwise collectible interests.

14       Contrary to what HCB will tell this Court, SE Property

15  is not seeking a few things.  SE Property is not seeking the

16  recision of any agreement or assignment.  SE Property is not

17  seeking reformation of the Participation Agreement.  SE Property

18  is not asking this Court to rewrite the Participation Agreement.

19  And SE Property certainly is not asking this Court to rule on

20  substantive objections that judgment-debtors may raise in a

21  subsequent claim.

22       When this trial is over, the Court will have more than

23  sufficient evidence to find that SE Property is entitled to

24  collect on its portion of the judgment and that it's entitled to

25  monetary damages against HCB.

 1              This story starts with a loan that was made by

 2     Colonial Bank to North Tip Development.  North Tip Development

 3     was seeking a loan to develop various lots in the Driftwood

 4     Estates in Walton County.  It was a large loan of about

 5     $11 million.

 6              GulfSouth acquired that loan from Colonial, and

 7     GulfSouth sought participating banks.

 8              This Court is going to hear the testimony of executive

 9     vice president of GulfSouth, Chris Campbell, and he's going to

10     tell you that he found various participants to help in the loan.

11     He found Vision Bank, Central Progressive and you'll sometimes

12     hear them referred to as CPB, and Bank of Vernon.

13              Vision Bank and CPB held a 44.9 percent interest in

14     the judgment and the loan, and Bank of Vernon held about 1.2

15     percent.  That left GulfSouth with about 9 percent interest in

16     the loan.

17              Each of the participating banks -- Vision Bank, CPB,

18     and Bank of Vernon -- had separate Participation Agreements with

19     GulfSouth.  All of the agreements were the same, and under each

20     of those GulfSouth was designated as the originating bank, the

21     agent for collection on this loan.

22              Ultimately, North Tip defaulted on the loan when it

23     failed to pay the amount due at maturity, and GulfSouth

24     initiated a lawsuit on behalf of the participating banks.

25              And my eyes are a little bad.  May I move a little

1    closer?

2              THE COURT:  Yes.

3              MR. CROSSLAND:  In March of 2006, you'll see the first

4    Participation Agreement between Vision Bank and GulfSouth.

5              Ultimately, after the loan goes into default,

6    GulfSouth files what we call the North Tip lawsuit, and that was

7    in October of 2009.

8              Quickly, GulfSouth, on behalf of the originating

9    banks, actually obtains a final judgment of foreclosure in

10   December of 2009, and ultimately a deficiency judgment is

11   entered in the amount of about $10.5 million, and that's done

12   March 29th, 2011.

13             Counsel for GulfSouth in that matter was Richard

14   Petermann, who you'll hear about in this case as well, and he's

15   going to testify.

16             The Court is also going to hear testimony from Martin

17   Sandel in this case.  Martin Sandel is a lawyer.  He works with

18   an entity SES, and he'll explain his exact employment situation

19   with them.

20             Mr. Sandel also -- he worked directly with Vision Bank

21   in terms of nonperforming loans, and he became involved with

22   this North Tip matter.

23             And Mr. Sandel is going to testify that there was a

24   dispute between the participating banks about what to do with

25   the separate lots that made up the collateral after the

1   foreclosure was entered.

2          GulfSouth had bought it back and there was a dispute.

3   And one of the parties raised the idea of potentially doing a

4   lot drawing and basically putting all the lots in a hat and just

5   drawing names.

6          Vision Bank objected to that because essentially it

7   would have allowed the smaller banks -- GulfSouth and Bank of

8   Vernon -- to pull the lots they would get in the same way that

9   the bigger participants were.

10         And that dispute turned into a lawsuit, and Vision

11  Bank was forced to file a lawsuit and got an injunction to

12  prevent that procedure.

13         Once the parties agreed to work together and take the

14  property as tenants in common, it got dismissed, but the dispute

15  about what to do with the collateral continued.

16         And ultimately, Mr. Sandel is going to testify that

17  there was an agreement as part of one of many conference calls

18  to sell the lots to CPB.  And Mr. Sandel is going to state that

19  as part of that agreement the participating banks agreed to

20  divide up the judgment.  And he's going to tell the Court that

21  that happened before the deficiency judgment had happened, but

22  they had agreed to divide up the judgment and allow Vision Bank

23  to collect on its own.

24         Mr. Sandel is going to testify that he would not have

25  agreed to a sale to CPB based on the lot price absent the

1   agreement to divide up the loan as between the participating

2   banks.

3         The Court is going to see significant evidence

4   confirming this agreement.  You're going to have the testimony

5   of Mr. Sandel, but ultimately --

6         Mr. Dyer, if you'll pull up Exhibit 57.

7         What you're going to see is that Mr. Campbell, the

8   executive vice president, actually signs partial assignments of

9   the judgment, and he executes them in favor of the single

10  purpose entities for each of the participating banks.

11        What the Court will not hear during trial is any

12  substantive disagreement that there was this agreement to divide

13  up the loans.

14        There were questions about procedure and how it could

15  be accomplished, but no bank -- you will not hear any testimony

16  from any bank and you won't see any emails where a bank says,

17  no, that was never our agreement or, no, you're not getting a

18  partial assignment.

19        And you'll see on the timeline that Mr. Sandel

20  constantly inquired about the status of dividing up the judgment

21  and getting the pro rata assignments for nearly two years.  In

22  the light purple area there.

23        The partial assignments, however, were never delivered

24  to SE Property, and it's not until after the filing of this

25  lawsuit that SE Property learned why, and the reason why all

1    traces back to Rupert Phillips.

2           As I mentioned before, him and his wife are

3    judgment-debtors on the deficiency judgment.  They're subject to

4    allegedly a significant amount of liens.  In fact, HCB will tell

5    the Court that they're subjected to $67 million in liens.

6           The evidence is also going to show the Court that in

7    fact HCB owns $58 million of those prior judgment liens.  And

8    the evidence is going to show that, despite having $58 million

9    in judgment liens, that HCB bought this interest and that HCB

10   has never attempted execution efforts on Mr. Phillips.

11          Mr. Phillips's strategy is clever but it's improper.

12   He accomplished the strategy to shield himself from SE

13   Property's collection efforts through a variety of assignments.

14          He negotiated -- the evidence is going to show that he

15   negotiated with Bank of Vernon, GulfSouth, and CPB to acquire

16   all of their interests in the deficiency adjustment, giving him

17   55 percent ownership in the judgment.

18          The evidence is going to show that Vision Bank and SE

19   Property were completely excluded from those negotiations.  They

20   were never advised of them by anybody, and in fact there are

21   affirmative misrepresentations about what was happening.

22          As part of the "assignments," Mr. Phillips obtained 55

23   percent of the deficiency judgment, but he also obtained the

24   originating bank status of GulfSouth.

25          These assignments are an improper shield and they're

1    improper for multiple reasons.

2            First, public policy is going to find that there's an

3    irreconcilable conflict of interest for HCB that warrants

4    invalidating the assignments; and also, they were in reality a

5    settlement of GulfSouth's claims in violation of the

6    Participation Agreement.

7            The reason that HCB has a conflict of interest, you'll

8    see from the evidence, is Mr. Phillips has a significant amount

9    of control over HCB.

10           In April of 2007, Mr. Phillips becomes the president,

11   treasurer, secretary, and sole director of HCB.  At that time he

12   was also the sole shareholder of HCB.

13           In June of 2010, Mr. Phillips forms Phillips Capital

14   Partners, Inc., and he elected himself as the sole proprietor

15   and the president of Phillips Capital Partners.  He remains

16   those to this today.

17           And Phillips Capital Partners, Inc. is held by

18   Mr. Phillips, his wife, and their children through various

19   family trusts.  Those are the only owners of Phillips Capital.

20           Later in 2010, Mr. Phillips transferred all of his

21   stock in HCB that he held individually to Phillips Capital, and

22   Phillips Capital claims to be the sole shareholder of HCB at

23   this point.

24           The evidence is going to show that just days before

25   the deficiency judgment was entered Mr. Phillips resigns as the

1    president, secretary, and treasurer of HCB, and he appoints Joe

2    Dobson as the president.

3            Now, Joe Dobson is the current president of HCB, but

4    he's a man who's worked for Mr. Phillips, as the evidence is

5    going to show, since 1981 continuously.

6            And Mr. Dobson is going to testify at this trial, and

7    he's going to tell you that, despite this action and despite SE

8    Property's claims, HCB has established no ethical wall as to

9    Mr. Phillips.  They've not attempted to prevent him from being

10   involved in this litigation.  They've not attempted to prevent

11   Mr. Phillips from being involved in decision-making regarding

12   collection on any debts.

13           He's going to tell you that in fact the decision to

14   acquire all of these interests were not approved by a board of

15   HCB.  There was no board meeting.  That decision was made by

16   Mr. Phillips.

17           He's going to tell you that, despite the fact that HCB

18   had underwriting policies that it uses normally to collect on

19   purchased debts, Mr. Dobson didn't use those in relation to

20   GulfSouth's interest.

21           He's going to tell you that GulfSouth picked up the

22   GulfSouth interest despite the fact that it already owned a $49

23   million judgment against each and every one of these

24   judgment-debtors.

25           And he's going to tell you that --

1           **THE COURT:**  Say that again.

2           **MR. CROSSLAND:**  Yes, Your Honor.  It is actually on my

3    timeline.

4           **THE COURT:**  Right, I was looking at that a minute ago.

5           **MR. CROSSLAND:**  There's a lot on here.  Right here in

6    January of 2011, HCB takes the assignment of the $49 million

7    judgment that was dated in June of 2009 from Bank Atlantic.  All

8    of our judgment-debtors are subject to that judgment.

9           And it's not until June of 2012 that GulfSouth picks

10   up -- I'm sorry -- that HCB picks up the deficiency judgment

11   interest and originating bank status.  So about a

12   year-and-a-half before these transactions with GulfSouth, HCB

13   already had picked up a $49 million judgment against the

14   judgment-debtors.

15          This type of evidence and more will establish the

16   irreconcilable conflict that violates public policy.  The other

17   reason the assignment should be invalidated is because in fact

18   the assignments were a settlement.

19          Mr. Dyer, pull up Exhibit 1.  I want to look at

20   paragraph 3, please.

21          Exhibit 1 is a document we're going to hear about.

22   It's the first iteration of the Participation Agreement.  And

23   there are multiple more, but they all say the same thing, so we

24   just use Exhibit 1 for ease of use.

25          What you're going to see in paragraph 3, it says, "The

 1    originating bank may not, however, without the prior consent and

 2    concurrence of the participating bank" -- and number 2 -- "waive

 3    or release any claim against any borrower or against any

 4    comaker, guarantor, or endorser under the loan."

 5           So GulfSouth could not, without the consent and

 6    concurrence of Vision Bank, waive or release any claim against

 7    any borrower.

 8           In fact, the Court is going to hear the testimony of

 9    Mr. McLeod.  Mr. McLeod was the interim CEO of GulfSouth, and he

10    became the interim CEO in January 2012.

11           And the evidence will show that the discussions

12    regarding these assignments were between Mr. McLeod and Mr.

13    Phillips.  And Mr. McLeod is going to testify that he believed

14    he was settling GulfSouth's $932,000 interest in the judgment

15    with Mr. Phillips for $200,000.  So he is settling a portion of

16    GulfSouth's interest in the judgment.

17           Mr. Dyer, Exhibit 72, please.

18           All of the parties believed that these were

19    settlements with Mr. Phillips, and in fact Mr. Phillips says as

20    much.

21           In May of 2012, just about a month prior to the

22    assignments with GulfSouth, Mr. Phillips sends an email to

23    Mr. McLeod, and Mr. Phillips sends it from his HCB email

24    account.

25           **THE COURT:**  Does this have an exhibit number?

1      **MR. CROSSLAND:**  Exhibit 72, yes, Your Honor.  And

2   Mr. Phillips tells Mr. McLeod, "We'll discuss the email below at

3   9:00 a.m. tomorrow.  I'll contact Larry Huggins and settle with

4   the Bank of Vernon."

5          The Bank of Vernon was a small participant on the

6   loan, and the point of contact was Mr. Huggins.  And in fact,

7   HCB ends up getting assignments from Bank of Vernon.  Those

8   assignment documents mirror the assignment documents that HCB

9   entered into with GulfSouth.  And Mr. Phillips tells Mr. McLeod

10  a month prior to it happening that he's going to settle with

11  Bank of Vernon.  And that was always the plan, Judge.

12          Mr. Dyer, Exhibit 26.

13          The plan was always to get a satisfaction of the

14  judgment.  And we know that because in June of 2011, Mr.

15  Phillips and Mrs. Phillips, they own a lot, it's called Lot 26.

16  That's how it will be referred to, Lot 26, in Nature Walk.  And

17  they sell it to Fred McLaughlin.

18          And Fred McLaughlin at the time and currently is the

19  president of HCB.  But Mr. McLaughlin didn't buy this lot free

20  and clear.  He took Lot 26 subject to $60 million in judgment

21  liens that were held on it against Mr. and Mrs. Phillips.

22          More specifically, Mr. Phillips and Mr. McLaughlin

23  sign an agreement that recognizes these judgment liens.

24          Paragraph 3 of this real estate closing agreement --

25  I'm sorry, paragraph 2, Mr. Dyer.

1         This is a real estate closing agreement for Lot 26.

2    And it says essentially that in particular -- the second

3    sentence there, line 3 -- "In particular, a buyer understands

4    and agrees that buyer is taking title subject to the matters set

5    forth in Exhibit A."

6         Let's look at Exhibit A, Mr. Dyer.

7         Exhibit A to this real estate closing agreement

8    contains the various items to which Mr. McLaughlin is taking

9    subject to lot 26.

10        No. 6, he's taking this subject to "satisfaction of

11   judgment in favor of GulfSouth Private Bank against Rupert E.

12   Phillips and Sandra K. Phillips."

13        In the agreement to sell the lot Mr. Phillips says

14   that there will be a satisfaction of the deficiency judgment.

15   That's a year prior to when the assignment actually happened in

16   June 2012.

17        Mr. Campolo, the vice president of SE Property, will

18   tell the Court that SE Property was not aware of any of these

19   negotiations, that SE Property never knew of these settlements,

20   and that SE Property didn't even know that HCB had acquired the

21   originating bank status until this litigation was filed.

22        SE Property never consented to these settlements or

23   these releases of claims by GulfSouth against Mr. Phillips and

24   his wife.

25        Alternatively, Judge, SE Property is also seeking to

1   collect on the judgments by terminating the agency status of

2   HCB.

3          Mr. Dyer, if you'll pull up Exhibit 1, we're going to

4   look at paragraph 4, please.

5          Again, we've gone back to the Participation Agreement.

6   And in the Participation Agreement, HCB at this point has

7   designated as the disclosed agent for collection of SE Property.

8          And paragraph 4 says -- and this is at the time -- I'm

9   sorry, paragraph 4(a) says the originating banks agency status

10  under section 3 above shall terminate at the election of the

11  participating bank upon -- and we go to number 2 -- if within

12  the opinion of the participating bank the originating bank

13  should fail to comply with its fiduciary and/or other

14  obligations as provided under this agreement.

15         So if within the opinion of SE Property at this point

16  HCB is not upholding its fiduciary duties, it has the right to

17  terminate the agreement.

18         In fact, you're going to hear testimony that SE

19  Property never consented to the release of the deficiency

20  judgment lien over Lot 26.  In fact, HCB never approached SE

21  Property to discuss it.

22         You're going to hear, as I just mentioned, from

23  Mr. Campolo that material information was never disclosed to SE

24  Property -- Mr. Phillips's affiliation with HCB, Phillips

25  Capital, HCB's negotiations to acquire his interest, HCB's

1    actual interest as the originating bank.  Those were never

2    disclosed to Vision Bank or SE Property.

3           And as I mentioned before, the conflict of interest

4    prevents HCB from acting as SE Property's agent.

5           Now, HCB is going to claim that SE Property never

6    actually terminated the agency status.  That's what Count Two is

7    for.  We've asked the Court to declare that it's terminated.

8           And then the only question remaining for Count Two is

9    what to do about it.

10          The Court has already found as part of its summary

11   judgment order that in fact there are no provisions in the

12   Participation Agreement that relate to this situation, that once

13   a deficiency judgment has been entered and in the case of maybe

14   a judgment-debtor taking over collection effort.

15          So the Court will have to look at the intent of the

16   parties as to what they wanted to have happen if there was a

17   termination.

18          You're going to hear the testimony of Mr. Sandel that

19   there was correspondence through nearly a two-year period that

20   everyone agreed everyone would go their own way and collect on

21   the judgment.  And you're going to see emails that talk about

22   the intent of the parties and the intention to split up the

23   judgment and let everyone go their own way.

24          You're going to see the signed partial assignment of

25   the pro rata interest in the judgment, and that's further

1   evidence.

2           Mr. Dyer, if you'll pull up Exhibit 68, we're going to

3   look at pages 5 and 6 please.

4           You're also going to hear a position that was never

5   before raised.  The question for the Court as to what to do if

6   it terminates the agency status is what did the contracting

7   parties agree to do.  And at the time the contracting parties of

8   the Participation Agreement were Vision Bank and GulfSouth.

9   What did they intend to do?

10          Well, HCB says that if you look at the agreement, if

11  you don't like what we're doing, you have to buy out our

12  interest.  But even GulfSouth never took that position.

13  GulfSouth at some point claimed that it wasn't sure what to do

14  because there is a dispute between the banks.

15          First NBC acquired the interest of CPB somewhere

16  around November of 2011, so CPB kind of steps out of the picture

17  and First NBC comes in.

18          And so GulfSouth has to file a dec action to see what

19  to do with this judgment now that there's a dispute.  And here

20  is what GulfSouth said had to happen:

21          Paragraph 23.  "A conflict has arisen between

22  GulfSouth, Defendant FNBC" -- that's First NBC -- "and Defendant

23  Centennial Bank."

24          Now, Centennial Bank received some assets from Vision

25  Bank, and it was improperly named in this lawsuit.  It should

1    have been Vision Bank.

2            GulfSouth says, "Specifically, GulfSouth must reach a

3    mutual agreement with the Defendants before it decides what to

4    do with the deficiency judgment.  The conflicting desire as to

5    Defendant First NBC and Defendant Centennial Bank make it

6    impossible to reach a mutual consensus of what to do."

7            But nowhere in here or anywhere else does GulfSouth

8    ever say, if you don't like what we're doing, buy our interest.

9    In fact, they told a court in a pleading, we have to reach an

10   agreement.

11           HCB takes a position that not even GulfSouth ever

12   took.

13           Under either Count One or Count Two the evidence in

14   this case is going to show that SE Property is entitled to

15   collect on its portion of the judgment.

16           SE Property is also seeking monetary damages against

17   HCB in this case for civil conspiracy, breach of contract, and

18   tortious interference.

19           The evidence is going to show that HCB knew about the

20   Participation Agreement.  It's been submitted in the trial

21   brief, and in fact they actually acquire the Participation

22   Agreement.

23           The evidence is going to show that HCB knew that

24   GulfSouth could not settle or waive claims as to Mr. Phillips or

25   any other borrower, and despite that knowledge HCB moves forward

1    with a settlement with GulfSouth, forcing a breach of fiduciary

2    duty by GulfSouth.  That's tortious interference, that's going

3    to be the tortious interference claim.

4         And the evidence is going to show that HCB conspired

5    to and did tortiously interfere in the contracts.  The evidence

6    is also going to show that HCB -- well, let me say it this way,

7    no one ever admits that they've conspired, no one ever just

8    concedes that there's an agreement to do something unlawful.

9    But the evidence is going to lead to the inescapable conclusion

10   that HCB also knew about the pro rata assignments and that it

11   tortiously interfered with those rights by never delivering them

12   to SE Property.

13        The damages that SE Property is seeking in this case

14   is the full amount of SE Property's judgment, because HCB's

15   actions have precluded SE Property from undertaking collection

16   efforts and likely have precluded SE Property from recovering

17   against judgment-debtors, who now have had years to hide their

18   assets based on this protracted litigation.

19        SE Property is also going to ask for its attorney fees

20   in filing and pursuing this action against HCB.

21        In the end, Judge, HCB is likely to throw up many red

22   herrings in this case to avoid a declaration in Plaintiff's

23   favor and to avoid liability.  But the evidence will establish

24   that the assignments are invalid.  Because, Judge, no man can be

25   the judge of his own cause, and the person who owes the debt

1    cannot be in charge of collecting it.  Thank you.

2              **THE COURT:**  All right.  Thank you, Mr. Crossland.

3              Mr. Franco?

4              **MR. FRANCO:**  Thank you, Your Honor.

5                          **OPENING STATEMENT**

6              **MR. FRANCO:**  This is not the first time one party has

7    tried to sidestep the provisions of a contract.  In fact, the

8    Plaintiff is trying to sidestep the provisions so drastically

9    that they now try to characterize this not as a dispute between

10   the Plaintiff and the Defendant in this case.

11             Plaintiff has gone through great lengths to stretch

12   multiple theories of law to ultimately do one thing:  Collect

13   it's 44.9 percent of the deficiency judgment independently

14   against the judgment-debtors.

15             Plaintiff tries to have this honorable court ignore

16   that, one, it did not need this Court to terminate any agency

17   status under the Participation Agreement.  It had that right in

18   its sole discretion under the Participation Agreement.

19             Secondly, it tries to have this Court ignore that it

20   did not need this Court to obtain the right to collect against

21   the judgment-debtors under the Participation Agreement.  That

22   remedy was specifically provided under the Participation

23   Agreement if Plaintiff did not agree with HCB's collection

24   efforts.

25             But Plaintiff wants instead to sidestep having to pay

```
 1    for that remedy as was agreed by the parties in the binding

 2    Participation Agreement.  Nowhere will you hear that the

 3    Participation Agreement is invalid or void or rescinded.

 4    Nowhere.  They want the right instead for free, even though the

 5    parties to this agreement specified how to pay for it.

 6            In fact, Vision Bank and SEPH have been trying to

 7    sidestep the remedies in the Participation Agreement even before

 8    this suit was filed through Mr. Sandel, who was a plaintiff

 9    malpractice attorney, who had no banking experience whatsoever,

10    never represented a bank.

11            They send him down, and he tries to force an agreement

12    to decide -- to divide, excuse me, the deficiency judgment

13    between the banks so that they could independently collect their

14    44.9 percent share of the deficiency judgment and keep all the

15    proceeds without buying it under the Participation Agreement as

16    was agreed by the parties.

17            Now, first with respect to such an agreement, there

18    was no such agreement between the banks.  And Mr. Campbell, who

19    not only signed the Participation Agreement on behalf of

20    GulfSouth, but who was intimately involved in this alleged

21    agreement, will testify in his deposition that there was no such

22    agreement.

23            Secondly, most importantly, any such agreement to

24    divide the judgment cannot, under Florida law, be enforced

25    against the judgment-debtors because the judgment-debtors never
```

```
 1    agreed to divide the judgment.  And you will hear no evidence
 2    that the judgment-debtors agreed to divide the judgment.
 3            After Mr. Sandel's efforts failed to force an
 4    agreement for nothing as opposed to paying for it, SEPH filed
 5    suit in state court to try to enforce the alleged agreement
 6    among the banks.
 7            After this case was removed to this Court, they added
 8    HCB to the suit and asked this Court for preliminary junction.
 9    After they saw how this Court relied on various provisions of
10    the Participation Agreement in its decision in denying the
11    preliminary injunction, they changed course to try to invalidate
12    the assignment to HCB and get around the Participation Agreement
13    so that somehow Plaintiff could collect its 44.9 percent of the
14    judgment independently.
15            But Plaintiff's legal theories to allow them to divide
16    the judgment to collect themselves all break down.  In this case
17    it's much more about the legal issues than it is the factual
18    issues in this case.
19            To illustrate the legal deficiencies in Plaintiff's
20    case, I'm going to put up on the screen the conclusion as to
21    what they're asking this Court to do in their trial brief.
22            And you will see as to Count One, ultimately what
23    they're asking for in the declaration -- in the declaratory
24    judgment is for this Court to grant SE Property the right to
25    independently collect to its pro rata share of the deficiency
```

1    judgment.

2           Plaintiff wants the right to independently collect its

3    share of the judgment.  The problem is with that count that

4    Florida law does not allow that because the judgment-debtors do

5    not agree.

6           And you will also hear and you will see communications

7    by Mr. Petermann that the reason that there was hesitancy about

8    any such agreement is for the same reason that Florida law

9    doesn't allow it, because it allows multiple actions against the

10   judgment-debtors by multiple parties, which creates a problem

11   for the judgment-debtors.

12          That's the same reasoning that the Florida court

13   specifies as the reason Florida does not allow such a pro rata

14   distribution or division of the judgment.

15          As to Count Two, look at what they want at the end of

16   Count Two.  Granting SE Property the right to independently

17   collect up to its pro rata share of the deficiency judgment.

18   It's the same relief.

19          That's the whole purpose of this proceeding is to try

20   to collect on its pro rata share independently against the

21   judgment-debtors.  It's the same legal problem, however, for

22   them.  That's why they're trying to stretch these other legal

23   theories and trying to concentrate on other things to try to

24   avoid the crucial issue in this case.

25          As to Counts Three, Four, and Six -- the Court has

1   already dismissed Count Five, and so what do they ask for in

2   Counts Three, Four, and Six?

3           Going to the second page, they ask for damages in the

4   amount of $4,656,000 and some change, damages in the amount of

5   their entire share of the deficiency judgment.

6           So now, in view of stretching, they want to be paid in

7   full their share of the deficiency judgment without having to

8   collect any of it from the individual judgment-debtors, without

9   having to prove whatever could be collected from Mr. Phillips,

10  for instance, who is 70 years old, without having to prove how

11  much they could have collected or they can collect against

12  Mr. Phillips, who has millions of dollars of superior judgments

13  against him.

14          And they reference the superior judgments, but you

15  know what, HCB is not the only one who hasn't proceeded on the

16  superior judgments.  The superior lienholders and judgment

17  holders never proceeded for the same reason.  These are

18  individuals who don't have assets.  They're not going to waste a

19  lot of time and money trying to go after what's not there.  That

20  wasn't HCB's original decision.  That was these judgment

21  creditors' original decisions, many of them.

22          HCB, like many of the judgment-debtors, don't have

23  unlimited funds to go chasing after what is not there.  This

24  company might, but HCB doesn't.

25          It's quite a stretch of the legal theory to get

```
 1    damages that it can't and hasn't proven.
 2              An agreement which provides an adequate remedy in this
 3    case exists.  Plaintiff just doesn't want to pay what the
 4    agreement provides.  They say it's too expensive.
 5              That's the bargain.  How many cases exist where
 6    there's no defense because you think it's too expensive?  That
 7    was the agreement made as to how to go collect as the leading
 8    bank, if you wanted to collect as the leading bank.
 9              Now, let's talk about the Participation Agreement
10    itself.  Paragraph 10 -- and this is a stretch for my eyes,
11    always has been in this case for some reason.
12              Paragraph 10 is entitled "Default."  Paragraph 10(a)
13    states, "If an event of default shall have occurred" -- the very
14    first phrase.
15              Paragraph 10(a) states that SEPH and HCB shall agree
16    on the manner.  In other words, after default this is how we're
17    going to work it.  The originating bank and the participating
18    banks are going to agree in the manner and to what extent any
19    rights and remedies under the loan will be exercised.
20              Paragraph 1 defines the loan.  And if we look back at
21    paragraph 1, paragraph 1 defines the loan.  And as you see, when
22    it defines the loan here, it says all documents relating to the
23    loan.  That's what the loan is.  It's not just the note.  It's
24    all documents relating to the loan.
25              The witnesses in this case will agree that the
```

```
 1    guarantees are documents relating to the loan.  The witnesses

 2    will agree a deficiency judgment is a right or a remedy under

 3    the guarantees in the loan.

 4           More importantly, the parties acted in accordance with

 5    paragraph 10(a), which they will try to ignore.  After a default

 6    on the North Tip loan, GulfSouth was the bank who proceeded to

 7    obtain the foreclosure judgment.  All agreed.

 8           GulfSouth was the bank who proceeded on the deficiency

 9    judgment, as agreed.  In fact, you will see that Mr. Sandel

10    said, I want you to pursue the deficiency judgment on behalf of

11    all of the banks.  GulfSouth didn't do that.  It proceeded to

12    obtain the judgment in its own name.

13           Mr. Campbell, who signed the Participation Agreement

14    on behalf of GulfSouth Bank, will testify the lead bank was to

15    and did control collection after default under the contract.

16           Paragraph 10(a) and paragraph 11 -- we'll look at

17    paragraph 11, we've looked at 10(a) -- specifically says that if

18    you don't agree after default on how to collect, then under

19    paragraph 11 the participating bank -- participating bank shall

20    have the right to purchase in its sole discretion.

21           It doesn't need a court to tell them that, just as

22    termination of the agency didn't need a court to tell them that.

23    They had that right or remedy specifically under the contract by

24    paying a specified sum.  That's what they're trying to avoid

25    doing.
```

1          At the end of the day, no matter how they try to

2    characterize this, that's what they want this Court to do.  They

3    want this Court to say and to stamp their ability to go collect

4    it pro rata.

5          In fact, if you will notice in one of their stretches,

6    they say, well, if the assignment is invalid, it goes to FDIC,

7    which they won't be able to prove, and FDIC doesn't want this.

8          So what happens?  It just vanishes in mid-air?  The

9    lead position goes -- where does the lead position go?

10         They don't cover that because it's a problem with

11   their theory.

12         Nowhere in this agreement does it specify more than

13   one bank collecting from the judgment-debtors.  In fact, that's

14   the reason for the purchase options.

15         If one who is collecting doesn't agree with the others

16   or the others don't agree with who is collecting, then they can

17   take it.  It doesn't say they both get it, and neither does

18   Florida law.

19         Nowhere in this agreement does any participating bank

20   obtain the right to collect unless it purchases the lead bank

21   position.  That's the agreement they're trying to avoid in this

22   case.

23         This entire case is their effort to get an independent

24   right to collect against the judgment-debtors, contrary to

25   Florida law and contrary to the terms of the Participation

1    Agreement.

2            Now, I heard in the opening statement a statement that

3    this is not a recision.  That's another stretch and that's

4    another avoidance.  They say that this is a dec action and it's

5    not a claim in equity.

6            Well, we would refer the Court to the case of

7    *Allegheny Casualty Company v. Archer*, 2014 Westlaw 4162787.

8    It's from the Middle District of Florida in 2014.  That was a

9    dec action claiming a performance bond was void.

10           The Court held that was an action for recision in

11   equity and denied relief because there was an adequate remedy at

12   law.

13           They asked -- and it's all in their brief -- that the

14   Court invalidate the assignment.

15           To invalidate, according to the dictionary I picked up

16   which was the Second College Edition of the American Heritage

17   Dictionary, which was just a dictionary my secretary had,

18   defines invalidate is to nullify, and it also says a synonym for

19   nullify is to rescind or revoke.

20           So for them to try to tell this Court that they want

21   it declared void but that's not asking for a recision of the

22   contract is just another stretch of their law.  It's not the

23   law.

24           They're asking for a contract, an assignment not to be

25   valid, to in fact be invalidated, to in fact be revoked.  That's

1    an equitable argument under any context.

2            And they have an adequate remedy, and this Court has

3    recognized in the preliminary injunction matter that there is an

4    adequate remedy at law in this case, and the adequate remedy at

5    law is the contract between the parties.

6            Now, I'd like to address a couple of things that

7    counsel said individually.  He said we forced them to litigate.

8            There was no forcing of them to litigate.  In fact,

9    they didn't need this Court.  They had the right, if they wanted

10   to, to declare the agency terminated.  They had that right under

11   the contract.  All they had to do is do it.  They never even did

12   it.  It's not that they did it and it was refused.  They never

13   even did it.

14           Secondly, they want the right to collect against the

15   judgment-debtors.  They didn't need this Court for that right.

16   They didn't have to ask this Court to exercise any right under

17   declaratory judgment, because they had that right under the

18   contract.  They just don't want to pay for it.

19           The agency argument that they make, they skip the law.

20   They say HCB -- and they say Mr. Phillips is the agent.  He's

21   not the agent.  HCB is the agent.  And they ignore the

22   difference between HCB as an entity under Florida law and

23   Mr. Phillips as a director.

24           They skip the fact that in order to make the two equal

25   you have to pierce, and they haven't pleaded piercing.  More

1    importantly, in order to pierce under Florida law they would

2    have to -- they can't pierce to get to a director.  They can

3    only pierce to get to shareholders, number one, and they haven't

4    even joined the shareholders as a party.

5             So they just conveniently skip the step of having to

6    pierce to consider HCB and Rupert Phillips as one and the same.

7             They say that paragraph 3(a) -- they focus on

8    paragraph 3(a), if the Court recalls, because they say under

9    paragraph 3(a) -- they say that under paragraph 3(a) that this

10   was a -- this so-called settlement, which it wasn't --

11            By the way, Mr. McLeod will make clear there was no

12   settlement with Mr. Phillips.  When he -- he got this off their

13   books.  That's what he did when he assigned this loan, he got it

14   off their books.  It was gone from GulfSouth's books.

15            He didn't release any of the judgment-debtors, and nor

16   did HCB consider there would be a release of the

17   judgment-debtors.  In fact, HCB believes it still has a claim

18   against not only Mr. Phillips but against Mr. Olsen and other

19   guarantors.

20            But they claim under 3(a) there was a settlement.

21   Well, here is the contradiction.  They claim that the agency in

22   3(a) doesn't apply after default.  They say that paragraph 3(a)

23   the agent for collection, that's not -- that doesn't apply after

24   default.  It's ambiguous, they say.  But yet they want to use

25   3(a) to put forward another theory in order to stretch their

1   claim.

2           Lot 26.  I think the Court has already recognized what

3   happened on Lot 26.  And what they have ignored is that there

4   were prior ranking judgments on Lot 26 over and above any prior

5   ranking claims that were ultimately purchased by HCB.  There

6   were prior judgments.  That's why the inferior judgment was

7   released.  That's part of the normal course.

8           At the end of the day, all of these facts about who

9   did what are their effort to misdirect from the legal problem in

10  their ability to collect.  That's what they're trying to do.

11  And in their view, everybody is trying to defraud everybody

12  else.  That's their view.

13          There are more than reasonable explanations for what

14  was done.  HCB was specifically in business to purchase

15  distressed loans and obtained a $10 million loan from First NBC

16  Bank to do that.

17          You don't get a $10 million loan from a bank to

18  defraud anybody.  That's their business and that's -- and

19  they've purchased numerous loans that have nothing to do with

20  Rupert Phillips as well as some that do, and there are reasons

21  why they purchased the ones that they did.

22          At the end of the day, though, remember what their

23  claim is.  They want to void the contract.  They want the right

24  to independently collect, and Florida law says you don't.

25          Oh, by the way, I've heard -- or seen in their memos,

1    they say, oh, well, that doesn't prohibit the agreement between

2    the banks.

3            My response to that is, so what?  Whether there's an

4    agreement between the banks or not, it doesn't get you anywhere

5    in this case.  There's no reason for the Court to do anything

6    because what you want -- and what you'll hear in testimony is

7    what they wanted is they wanted this agreement so that they

8    could collect from the judgment-debtors.  That's what they want.

9    And they not only want that.  They want the Court to give them

10   all their money without even any effort to collect.

11           When it's all and done, as I've said before, Your

12   Honor, the legal issues in this case are much more at the heart

13   of this case than the fact issues.  Thank you, Your Honor.

14           **THE COURT:**  Thank you.  All right.  Ms. Brady, are you

15   going to lead?

16           **MS. BRADY:**  Yes, Your Honor.  Before we start with the

17   first examination, we wanted to move some joint exhibits from

18   both parties into evidence.

19           **THE COURT:**  Okay.

20           **MS. BRADY:**  Those would be Joint Exhibits -- and

21   they're from Plaintiff's exhibit numbers -- 1, 2, 3, 4, 6, 26 to

22   31, 28 -- 28 does have a Social Security number in it that will

23   probably need to be redacted.

24           **THE COURT:**  Do we need to --

25           **MR. CROSSLAND:**  Oh, we did it.  Sorry, we did it.

1          **MS. BRADY:**  It's already been done, sorry.  53, 54, 83

2     to 89, 93, 94, 107, 117, 121, 123 to 126, 129, 130, and 134.

3          **THE COURT:**  All right.  Hearing no objection or

4     problem with those exhibits, those will all be admitted pursuant

5     to joint stipulation.

6          **(Joint Exhibits 1, 2, 3, 4, 6, 26 to 31, 53, 54, 83 to**

7     **89, 93, 94, 107, 117, 121, 123 to 126, 129, 130, and 134,**

8     **admitted.)**

9          **THE COURT:**  Your first witness?

10          **MS. BRADY:**  Brian Campolo.

11          **BRIAN CAMPOLO, PLAINTIFF WITNESS, DULY SWORN**

12          **MADAM CLERK:**  Please state your full name and spell

13     your last name for the record.

14          **THE WITNESS:**  Brian Campolo, and that's Brian with a

15     little "i", C-a-m-p-o-l-o.

16          **THE COURT:**  Ms. Brady, when you're ready.

17                    **DIRECT EXAMINATION**

18     BY MS. BRADY:

19     **Q.**   Well, she took my first question from me, so we'll start

20     with my second.  Where do you live, sir?

21     **A.**   I live in Columbus, Ohio.

22     **Q.**   And where are you employed?

23     **A.**   SE Property Holdings.

24     **Q.**   And in what capacity are you employed with SE Property

25     Holdings?

1   **A.**    I'm the vice president.

2   **Q.**    And if I refer to SE Property Holdings as SE Property, we

3   both understand we're talking about the Plaintiff, SE Property

4   Holdings?

5   **A.**    Yes.

6   **Q.**    Okay.  What is SE Property Holdings?

7   **A.**    SE Property Holdings is a nonbank subsidiary that's owned

8   by Park National Corporation.  It was created to hold real

9   estate and other property that had been previously foreclosed on

10  by Vision Bank and nonperforming assets and a few performing

11  assets that were left over from when Park National sold Vision

12  Bank to Centennial Bank.

13  **Q.**    You say left over from when Park sold the performing assets

14  from Vision Bank to Centennial Bank.  When did that occur?

15  **A.**    That sale occurred in February of 2012.

16  **Q.**    And did -- Centennial did not take all the assets of Vision

17  Bank?

18  **A.**    That's correct.  As part of that sale we sold all the

19  branchs, the deposits, and most of the loans.  Centennial did

20  not want to purchase any of the nonperforming loans of the bank.

21  And then there were a couple of loans that would have been

22  considered on the fence between performing and nonperforming, so

23  at their discretion they chose not to take that either.

24      So after that sale occurred, Vision Bank ceased to exist

25  and Park National just merged those assets into another entity

1    called SE Property Holdings, which is solely owned by Park

2    National Corporation.

3    Q.    So does SE Property consider itself the successor to Vision

4    Bank?

5    A.    Yes, by merger.

6    Q.    Were you previously employed by Vision Bank?

7    A.    I was.  So I actually started working at Park in 2006.  We

8    purchased Vision Bank in March of 2007, and then in late October

9    of 2010 they asked me to transfer down to Vision Bank.  So I was

10   employed at Vision Bank from about October of 2010 until it

11   ceased to exist in February of 2012.

12   Q.    Okay.  And what were your duties when you were at Vision

13   Bank during that time?

14   A.    My title was vice president and commercial loan manager,

15   and I was in charge of the commercial credit department.  I had

16   a couple of credit analysts working underneath me, so I trained

17   them in commercial underwriting, worked with loan officers to

18   help them with underwriting and to structure commercial loan

19   deals.

20   Q.    And did you transition -- when Vision Bank ceased to exist,

21   did you transition straight into an employee of SE Property?

22   A.    I did.

23   Q.    Currently what is the nature of SE Property's business?

24   A.    So, like I said, we hold the legacy assets of Vision Bank.

25   And we typically do not make any new loans.  It's just working

1    that portfolio of nonperforming assets out.

2    **Q.**    You said that SE Property typically doesn't make new loans.

3    Does SE Property purchase or otherwise acquire any loans or

4    judgments from other entities?

5    **A.**    No.  We've -- I'm not even sure if we've ever done that.

6    We might have done it in a one-off basis as part of a settlement

7    with credit that we already had, but we're not in the business

8    of purchasing judgments.

9    **Q.**    Okay.  What do your duties include currently at SE

10   Property?

11   **A.**    The main duties are to manage the rest of the loan

12   portfolio, if it still exists.  So if they mature or there's

13   issues with credit administration, I take care of that.

14       And then a big part of my job is keeping up with and

15   overseeing the litigation that a lot of our credits are

16   currently in.  So I will work with our counsel on the various

17   cases and, you know, they'll fill me in on how they're

18   progressing.

19       And if we have to make a decision at the bank level of what

20   to do next, I typically report that to senior management, give

21   them my opinion, and we would make a decision based on that.

22   **Q.**    Sir, do you have an understanding as to what asset is at

23   issue in this case?

24   **A.**    Yes.

25   **Q.**    And what asset is that?

1   **A.**    The deficiency judgment related to the North Tip

2   Development loan.

3   **Q.**    And what interest did -- it would be Vision Bank -- have in

4   the North Tip Development loan?

5   **A.**    It has about 45 percent.

6   **Q.**    And if Vision Bank had an approximate 45 percent interest,

7   what happened with the remainder of the interest?

8   **A.**    They were -- it was split up between three other

9   participant banks.

10  **Q.**    You used the term "participant banks."  Can you explain

11  what it means to participate in a loan?

12  **A.**    Sure.  Some banks, depending on their level of capital, are

13  only allowed, either by internal regulations or federal

14  regulations, to lend a certain amount to one borrower.

15       So a lot of times smaller banks especially, if they find a

16  deal that they consider creditworthy but it's over their

17  threshold, they'll find either one other bank or a couple of

18  other banks to participate with this loan, and they would buy

19  pieces of it so the originating bank's exposure is reduced.

20  **Q.**    Was it a common practice of Vision Bank to participant in

21  loans?

22  **A.**    No, I wouldn't say common.  I mean, we might have had half

23  a dozen loans that were participated with folks that were not

24  Park National Bank.  So, you know, Vision Bank had its own --

25  even though it was owned by Park, it had its own capital

1    structure because it was a separate charter.

2        So there were times after we purchased Vision Bank that

3    they would need to participate the loan to Park National Bank,

4    so it would be at the same company.

5        And as far as outside banks, they were few and far between.

6    **Q.**   What involvement have you had in this litigation?

7    **A.**   So I've been the corporate rep, and just as the litigation

8    has gone on I've been involved with, you know, talking with

9    counsel, I've been deposed on it, and signing affidavits.  Just

10   the natural course of litigation I've been involved in.

11   **Q.**   Have you reviewed records and documents of SE Property?

12   **A.**   I have.

13   **Q.**   And how were those documents and records maintained?

14   **A.**   Electronically.

15       **MS. BRADY:**  Mr. Dyer, if you can pull up Plaintiff's

16   Exhibit 1 which has already been moved into evidence.

17   **BY MS. BRADY:**

18   **Q.**   Sir, can you tell me what this document is?

19   **A.**   Yes.  This is the Participation Agreement.

20   **Q.**   The Participation Agreement between whom?

21   **A.**   This is between GulfSouth Bank and Vision Bank.

22   **Q.**   Have you reviewed this document before?

23   **A.**   I have.

24   **Q.**   What is the date of this Participation Agreement?

25   **A.**   The date of the agreement is -- let's see -- March 8th,

1    2006.

2    **Q.**   Okay.  And who signed this agreement on behalf of Vision

3    Bank?

4    **A.**   Bill Lloyd, I believe, unless you're going to pull that up

5    for me.  Yes, Bill Lloyd.

6    **Q.**   Do you know who Bill Lloyd is?

7    **A.**   Yes.  He was the senior lender at Vision Bank Florida

8    during this time.

9    **Q.**   And is Mr. Lloyd now with SE Property?

10   **A.**   He is not.

11        **MS. BRADY:**  Mr. Dyer, if you can bring up Exhibit 30,

12   which has already been moved into evidence as Plaintiff 30.

13   **BY MS. BRADY:**

14   **Q.**   Sir, do you recognize this document?

15   **A.**   I do.

16   **Q.**   And what is it?

17   **A.**   This is the deficiency judgment that was awarded as part of

18   the North Tip Development loan.

19   **Q.**   And can you briefly explain what a deficiency judgment is?

20   **A.**   Sure.  After a loan goes bad and the underlying collateral

21   is foreclosed on, there would be a credit applied to the loan in

22   the amount of the collateral value.  And what's left after that,

23   what's still owing is the deficiency amount.

24   **Q.**   And if -- in this deficiency judgment, what is the amount

25   of the deficiency judgment?  I think it's on the second page.

1   **A.**    The amount is $10,371,604.03.

2   **Q.**    And who does this deficiency judgment provide that amount

3   can be recovered against?

4   **A.**    It would be North Tip Development, LLC, Olson & Associates

5   of Northwest Florida, Inc., Carl Richard Olson, Elaine Olson,

6   Rupert Phillips, Sandra Phillips.

7   **Q.**    And sir, do you have any understanding as to what SE

8   Property's interest in this deficiency judgment would be or is?

9   **A.**    Yes, about 45 percent.

10  **Q.**    So it's the same interest that it originally had in the

11  loan?

12  **A.**    Correct.

13  **Q.**    Why is Vision Bank not listed as the holder of this

14  deficiency judgment, if you know?

15          **MR. FRANCO:**   Objection, Your Honor.  May call for

16  speculation if he's not a party to it.

17          **THE COURT:**   If you could establish or lay a

18  foundation, please.

19  **BY MS. BRADY:**

20  **Q.**    Sir, based upon your employment with Vision Bank and then

21  with SE Property, do you have any understanding as to why this

22  deficiency judgment is in the name of GulfSouth, and Vision Bank

23  is not included as a party?

24          **MR. FRANCO:**   Same objection, Your Honor, plus it may

25  call for hearsay.

 1          **THE COURT:**  I would ask how he knows.  He could answer

 2    the question yes or no, and then ask how, but then don't ask him

 3    the question.

 4          **MS. BRADY:**  Sure.

 5    BY MS. BRADY:

 6    **Q.**   Sir, do you know why Vision Bank is not included as a party

 7    on this deficiency judgment, yes or no?

 8    **A.**   Yes.

 9    **Q.**   And how do you know?

10    **A.**   Because it was given in the name of the lead bank.

11    **Q.**   How do you know it was given in the name of the lead bank?

12    **A.**   Because I believe it says it on the first page here.

13    **Q.**   Okay.  Are you familiar with an entity called HCB Financial

14    Corp.?

15    **A.**   Yes.

16    **Q.**   And how are you familiar with -- I'll just call it HCB --

17    with HCB?

18    **A.**   Through the course of this litigation we've become aware of

19    who HCB is.

20    **Q.**   Did you -- have you ever heard of HCB prior to this

21    litigation?

22    **A.**   No.

23          **THE COURT:**  When you say "this litigation," what

24    specifically are you referring to?

25          **MS. BRADY:**  Sure, Your Honor.

1   **BY MS. BRADY:**

2   **Q.**   This litigation that SE Property commenced against

3   GulfSouth, the litigation that we're in front of the Court for

4   today, so not the deficiency judgment action or the foreclosure

5   action that GulfSouth brought against the judgment-debtors, but

6   this action today?

7   **A.**   Yes.

8   **Q.**   So let me reask the question in case the answer is

9   different.  Were you familiar with HCB Financial Corp. before SE

10  Property filed the litigation that we are at trial in now?

11  **A.**   No.

12  **Q.**   Okay.  And how did you become aware of the existence of

13  HCB?

14  **A.**   We found out that the deficiency judgment had been assigned

15  from GulfSouth to HCB.

16  **Q.**   Had HCB ever contacted SE Property and advised that the

17  deficiency judgment was assigned from GulfSouth to HCB?

18  **A.**   No.

19  **Q.**   Did GulfSouth ever contact SE Property and advise SE

20  Property that it was going to be assigning the deficiency

21  judgment to HCB?

22  **A.**   No.  We had no idea that it had been assigned.

23  **Q.**   Do you know if anything other than the deficiency judgment

24  was assigned?

25  **A.**   They also assigned the Participation Agreement.

1   **Q.**   The Participation Agreement that we looked at earlier?

2   **A.**   Correct.

3   **Q.**   Did you receive -- did anybody contact you and advise that

4   HCB -- that they were in negotiations with HCB to assign the

5   deficiency judgment in the Participation Agreement?

6   **A.**   No.  We were left in the dark through that whole process.

7   **Q.**   Did you hear from any other of the participating banks

8   during that process?

9   **A.**   No.

10  **Q.**   Are you familiar with an attorney by the name of Richard

11  Petermann?

12  **A.**   Yes.

13  **Q.**   And who do you understand, if you have any understanding,

14  as to who Mr. Petermann is?

15  **A.**   He was counsel for GulfSouth Bank.

16  **Q.**   Did Mr. Petermann ever contact SE Property and advise as to

17  the assignment from GulfSouth to HCB?

18  **A.**   No.

19  **Q.**   Once SE Property came to learn of HCB, what did SE Property

20  do?

21  **A.**   We amended our complaint to include them in these

22  proceedings.

23  **Q.**   It had not been originally included as a party?

24  **A.**   Pardon me?

25  **Q.**   It had not been originally included as a party?

1    **A.**    No, not in the first complaint.

2    **Q.**    To your knowledge, has anybody else at SE Property been

3    contacted by -- let me rephrase.

4        What is your understanding of the ownership of HCB?

5    **A.**    It's my understanding HCB is owned by --

6            **MR. FRANCO:**  Objection, Your Honor.  How he knows may

7    be hearsay.

8            **THE COURT:**  Okay.

9            **MS. BRADY:**  I'll rephrase.

10   **BY MS. BRADY:**

11   **Q.**    Did HCB ever advise SE Property of its affiliation with

12   judgment-debtor Rupert Phillips?

13   **A.**    Well, no.  We've had no communication with them.

14   **Q.**    If you've had no communication with them, did HCB ever

15   contact SE Property to discuss a course of action on collecting

16   on the deficiency judgment?

17   **A.**    No, they didn't.

18   **Q.**    Has SE Property received anything in writing from HCB

19   setting out any course of action?

20   **A.**    No.

21   **Q.**    Has SE Property received anything from HCB requesting or

22   seeking SE Property's agreement on any aspect of addressing the

23   deficiency judgment?

24   **A.**    No.  It's been radio silent.

25           **MS. BRADY:**  Mr. Dyer, if you can pull up Plaintiff

1    107, which has already been moved into evidence as Plaintiff's

2    Exhibit 107.

3    **BY MS. BRADY:**

4    **Q.**    Sir, have you seen this document before?

5    **A.**    I have.

6    **Q.**    And what is this document?

7    **A.**    This was the partial release of the deficiency judgment

8    relating to the Lot 26, Nature Walk.

9    **Q.**    And who was it signed by?

10   **A.**    Signed by Joe Dobson, the president of HCB.

11   **Q.**    Was SE Property ever contacted by HCB regarding this

12   partial release?

13   **A.**    No, we were not.

14   **Q.**    Did HCB ever seek SE Property's permission or agreement in

15   executing this partial release?

16   **A.**    No.

17            **MS. BRADY:**   Mr. Dyer, if you could move back to

18   Plaintiff's Exhibit No. 1 and bring up paragraph 3.

19   **BY MS. BRADY:**

20   **Q.**    And, sir, if you could read to the Court 3(a).

21   **A.**    Sure.   Section 3 is Agent for Collection and Servicing.

22   3(a) says, "The originating bank shall act as a disclosed agent

23   of the participating bank in connection with receipt and

24   collection of the participating bank's ownership interest in the

25   loan and in payments to be made there under.   The originating

*Brian Campolo - Direct/Brady*                      64

```
 1   bank shall additionally act as a disclosed agent of the
 2   participating bank in connection with the continued servicing of
 3   the loan."
 4   Q.   And so what is your understanding of what an agent does?
 5            MR. FRANCO:  Objection, Your Honor.  I'm sorry, I
 6   thought she was going to ask him for his opinion on 3(a).  I'm
 7   sorry.
 8            THE COURT:  Sir, you can answer.
 9            THE WITNESS:  Can you repeat that.
10            THE COURT:  What is your understanding of what an
11   agent does?
12            THE WITNESS:  It's my understanding an agent acts in
13   the best interest and on the behalf of their party they're
14   representing.
15   BY MS. BRADY:
16   Q.   And what is SE Property's view, if it has one, on having
17   HCB serve as its agent under the Participation Agreement?
18   A.   Well, we think it's pretty unfair that they would -- that
19   we would have to be subject to them being our agent.
20   Q.   Why?
21   A.   Because of their affiliation with one of the
22   judgment-debtors.
23   Q.   What is -- what are SE Property's concerns about having --
24   about the -- excuse me.  What are SE Property's concerns about
25   Mr. Phillips's affiliation with HCB?
```

1    **A.**    Well, Mr. Phillips is the chairman of HCB.  They are

2    supposedly in charge of collection activities on this judgment

3    and act as our agent on this judgment.

4        Pretty hard to believe that the entity would try to collect

5    against their chairman as a -- I don't know the right word -- as

6    -- as they should.  As a participant bank or another bank or a

7    third party would collect with as much effort, it's hard to

8    believe that HCB would do that against their own chairman.

9    **Q.**    Would SE Property have consented to the assignment to HCB

10   if it was contacted prior to them -- prior to the assignment?

11            **MR. FRANCO:**  Objection, Your Honor, calls for

12   speculation.

13            **THE COURT:**  What was your position at the time, sir,

14   of the assignment?

15            **THE WITNESS:**  That would have been in 2012.  I was

16   with SE Property Holdings, same as I am now.

17            **THE COURT:**  And the position that you had at that

18   time?

19            **THE WITNESS:**  Would have been vice president.

20            **THE COURT:**  Overruled.

21            **THE WITNESS:**  Can you repeat that?

22            **MS. BRADY:**  Certainly.

23   **BY MS. BRADY:**

24   **Q.**    Would SE Property have consented to the assignments to HCB

25   if it were consulted prior to the assignments?

1    **A.**   No, absolutely not.  We would have done some sort of due

2    diligence on who HCB is.  And once we realized the affiliation

3    with one of the judgment-debtors, we would have said no.

4    **Q.**   Okay.  And if SE Property was contacted and said no and

5    GulfSouth proceeded with the assignments, do you have any

6    understanding as to what SE Property would have done?

7    **A.**   Well, I'm not an attorney so I don't know the exact legal

8    moves we would have made, but we would have used whatever rights

9    that we had to keep that from happening.

10          **MS. BRADY:**  Mr. Dyer, if you can pull up Plaintiff's

11   Exhibit 1 again and focus on paragraph 4.

12   **BY MS. BRADY:**

13   **Q.**   Sir, if you can read paragraph 4(a)(ii).

14   **A.**   Sure.  Section 4 is the Termination of Agency Status.  Line

15   (a) says, "The originating bank's agency status under Section 3

16   above shall terminate at the election of the participating bank

17   upon:"

18          No. 2 is, "If within the opinion of the participating bank

19   the originating bank should fail to comply with its fiduciary

20   and/or other obligations as provided under this agreement."

21   **Q.**   And do you have any understanding as to what fiduciary

22   obligation means?

23   **A.**   Yes.  It's my understanding that --

24          **MR. FRANCO:**  Objection, Your Honor.  His understanding

25   of the law -- his understanding is irrelevant.  It's the law

1    that controls.

2            **THE COURT:**  Yeah, I -- I think I agree.  It's not

3    going to make any difference in the grand scheme of things in

4    terms of how I view this.  I'm going to rely on the law, which

5    would otherwise make his opinion irrelevant, I think, so

6    sustained.

7    **BY MS. BRADY:**

8    **Q.**   You see 4(a)(2), it says, "If within the opinion of the

9    participating bank the originating bank shall fail to comply

10   with its fiduciary and or other obligations as provided under

11   this agreement."

12           Can you tell me what SE Property's opinion is as to whether

13   HCB has complied with its obligations?

14   **A.**   They have not.

15   **Q.**   And why is that, sir?

16   **A.**   We haven't been -- well, we were never contacted initially

17   that -- to let us know that they even had this or had been

18   assigned this judgment.

19           They haven't talked to us about any kind of collection

20   strategies, any kind of information that they've gathered on the

21   borrowers and the judgment-debtors.

22           So, you know, doing nothing on a collection case is -- that

23   would be not acting in a fiduciary duty.

24           **MR. FRANCO:**  Your Honor, I'd have to move to strike

25   that last comment of whether it's acting as fiduciary duty or

1   not for the same reason we discussed before.

2             **THE COURT:**  Overruled.  It's his opinion.

3             **MS. BRADY:**  Mr. Dyer -- actually, hold on one second.

4   Keep 4 up there, please.

5   **BY MS. BRADY:**

6   **Q.**   Has SE Property terminated the agency status of HCB under

7   paragraph 4?

8   **A.**   That's what we're seeking to do in this case.

9   **Q.**   But outside of this case, SE Property never sent

10  notification to HCB that it was terminating the agency status?

11  **A.**   We didn't know that they were the agent until this

12  litigation.

13  **Q.**   Do you know why even once litigation was commenced SE

14  Property didn't terminate the agency status and try to collect

15  on the deficiency judgment against the guarantors?

16  **A.**   After the litigation commenced?

17  **Q.**   Yes.

18  **A.**   It's my understanding that's what we're trying to do with

19  the litigation, so it hasn't come to a resolve yet.

20  **Q.**   You've heard during opening arguments that Mr. Franco

21  asserted that HCB is taking the position that SE Property did

22  not need to come to court, SE Property had the option of

23  purchasing the lead bank's status from HCB.

24       What is SE Property's position on purchasing the lead bank

25  status from HCB?

1   **A.**   Well, giving more money to an entity that is controlled by

2   one of the judgment-debtors just to get the right to collect

3   against one of the judgment-debtors does not make any sense

4   whatsoever.

5   **Q.**   Doesn't make sense in what way, sir?

6   **A.**   Well, why would we pay money to an entity controlled by a

7   judgment-debtor just to get the ability to collect against the

8   same judgment-debtor?  That just doesn't make very good business

9   sense.

10  **Q.**   Sir, sitting here today, do you have any knowledge as to

11  the judgment-debtor's financial situation or ability to repay

12  the judgment?

13  **A.**   I think through this litigation we've got some pretty stale

14  financial information on the judgment-debtors.  And, of course,

15  public records, but they don't typically tell the whole story.

16  So we certainly don't have sufficient financial information to

17  make any kind of decision on how to proceed collection-wise.

18  **Q.**   Okay.  Why not just let HCB undertake that process?

19  **A.**   Well, again, I mean, that company's chairman is one of the

20  judgment-debtors.  So it's pretty hard to put a lot of trust in

21  their effort to either provide us with the right information

22  that we want, first off, because they've never contacted us to

23  let us know they had it.

24       So, you know, really their history or their behavior over

25  the last couple of years would preclude us from putting any

1    trust in their ability to get us what we want and act in our

2    best interest.

3    **Q.**   And so to date, sir, outside of this litigation and through

4    counsel, HCB has not contacted SE Property in any way?

5    **A.**   No, HCB has not contacted us in any way.  The only contact

6    really we've had at all is within about a day of my deposition

7    when opposing counsel had asked, you know, who I report to and

8    who has the highest authority at SEPH, and I replied Tom Button,

9    he received a voicemail from Rupert within about 24 hours

10   wanting to talk, which Tom did not respond to.

11        So that's been the only time that they've reached out.

12   **Q.**   So you've never heard from -- SE Property never heard from

13   Mr. Dobson, HCB's president?

14   **A.**   No.

15   **Q.**   Sir, what is SE Property claiming are its damages in this

16   case?

17   **A.**   At least the amount of the judgment.  We haven't -- you

18   know, we haven't been able to collect.  We've been precluded

19   from getting any sort of information on the judgment-debtors

20   since HCB has been in charge.  And as a result, we've had to go

21   through this, you know, pretty costly and extensive litigation

22   just to earn that right.

23   **Q.**   To earn what right, sir?

24   **A.**   To collect on the money that we're owed.

25   **Q.**   Is SE Property claiming any other measure of damages?

1   **A.**   Yes.   In addition to the judgment plus accrued interest, it

2   would be the legal fees that we've had to spend over the last

3   three to four years to get to this point today.

4   **Q.**   And do you know the amount of those legal fees, sir?

5   **A.**   I do.   So through and up until this trial began, our fees

6   have been just under $900,000, about $898,000.

7   **Q.**   And how are you familiar with the amount of fees that have

8   accrued?

9   **A.**   Our accounting department keeps track of all the invoices

10  we pay for legal fees on all the loans that we have, so I just

11  asked them to compile me a report on the legal fees we've paid

12  to date on this case.

13  **Q.**   What is -- what is the report based on, what information?

14  **A.**   It would be literally the invoices from the law firm that

15  have made it to our accounting department and they've written

16  checks for.

17          **MS. BRADY:**   Mr. Dyer, if you can pull up what's been

18  marked for identification as Plaintiff's Exhibit 133.

19  **BY MS. BRADY:**

20  **Q.**   Is this the spreadsheet you referenced --

21          **MR. FRANCO:**   Your Honor, I'm understanding that the

22  Court's ruling is the attorney fees issue would be addressed

23  after the trial, to the extent necessary.   Am I incorrect?

24          **THE COURT:**   I thought we were going to allow -- I

25  think we were going to allow the evidence in as far as the

1    efforts that have been made, maybe not the amounts.  But I need

2    to look at my order, Mr. Franco.

3         **MR. FRANCO:**  I'm sorry if I'm mistaken, Your Honor,

4    but I was under the impression that the entire attorney's fees

5    issue would be addressed after the proceeding, especially in

6    accordance with Rule 54, that attorney's fees should be

7    addressed after the proceeding.

8         **THE COURT:**  Well, my order is going to control, not

9    Rule 54.  But if that's what I said, then Rule 54 would govern

10   along with our local rule.

11        **MR. FRANCO:**  I don't have it in front of me either,

12   Your Honor, but that was my understanding.

13        **THE COURT:**  I do.  I'm looking for it, Mr. Franco.

14   Just one moment.  There were a number of orders entered

15   pretrial, and I need to pull that one up.  I have it, I have the

16   order.  It's Document 325.  But let me read again what we

17   decided -- what I decided.  I know I denied the motion.

18        **MS. BRADY:**  Your Honor, if you look at footnote 2,

19   we're willing to agree to that procedure if that's how

20   Defendants want to handle this.

21        **MR. FRANCO:**  Your Honor, I'm looking at page 4 of your

22   decision, right before the first full paragraph, last sentence.

23        **THE COURT:**  Ms. Brady?

24        **MS. BRADY:**  I was going to say the sentence Mr. Franco

25   directed you to dealt with the supplemental relief of attorney's

1    fees.  The next sentence says if the plaintiff tort claims

2    however proof through substantive damages is relevant evidence

3    at trial, and then there's just the footnote 2.  We're willing

4    to agree to that procedure.  Mr. Franco had not agreed prior to

5    that.

6            **THE COURT:**  Right, that's what my footnotes indicates,

7    Mr. Franco, that you had not consented to that procedure.  So I

8    did understand they would present this evidence here.  It seems,

9    you know, it seems like it would be most --

10           **MR. FRANCO:**  I do consent to that.  We can handle the

11   attorney's fees after the trial is over, as far as I'm

12   concerned.

13           **THE COURT:**  Well, how much evidence are we talking

14   about?  I just heard from him and you're going to introduce this

15   exhibit?

16           **MS. BRADY:**  Yes.

17           **THE COURT:**  Is there anything else?

18           **MS. BRADY:**  No, I mean, just some testimony about what

19   has accrued since then.

20           **THE COURT:**  It seems to me it would be economical to

21   do that here, most economical.

22           **MR. FRANCO:**  Well, to be honest with you, I thought we

23   were doing this after the trial, and I'm not prepared to

24   cross-examine him on all of these invoices at this time.

25           **THE COURT:**  All right.  Well --

1          **MR. FRANCO:**  I mean, we may very well at the end of

2    the day wind up agreeing to this number, but I just haven't paid

3    attention to that because I thought we were doing this after the

4    trial.  And it's my error but I would ask --

5          **THE COURT:**  Yeah, you completely misinterpreted the

6    order.

7          **MR. FRANCO:**  I did.

8          **THE COURT:**  All right.  We'll handle it after trial,

9    recognizing the ruling as far as the law is concerned,

10   obviously, is not subject to challenge after trial.

11         I mean, that -- my decision as to whether attorney's

12   fees are available is, you know, is not going to change.  That's

13   not going to change.  But in terms of the proof and amounts,

14   we'll handle that after trial.

15         **MS. BRADY:**  Okay, yes, Your Honor.

16         **THE COURT:**  So Exhibit 133 will not be admitted,

17   Plaintiff's 133.

18   **BY MS. BRADY:**

19   **Q.**   Sir, you stated that SE Property was claiming as its

20   damages the entire amount of the deficiency -- excuse me -- its

21   interest -- it's entire interest in the deficiency judgment.

22         Do you know how much that amount is at this point in time?

23   **A.**   The principal amount is about four-and-a-half million.

24   With accrued interest, that number is about $5.6 million.

25   **Q.**   And how do you know that number, sir?

1    **A.**    Through, again, our accounting department would prepare a

2    payoff just like they prepare those invoices, and the accruing

3    interest days since past the judgment at the judgment rate.

4    **Q.**    And is calculated payoffs part of SE Property's normal

5    business practice?

6    **A.**    It is.

7    **Q.**    And do you review the payoffs when they're prepared?

8    **A.**    I do.

9    **Q.**    And you believe that payoff amount was what, sir?

10   **A.**    It was about 5.6.

11           **MS. BRADY:**   Your Honor, if I can just have a moment to

12   confer with counsel?

13           **THE COURT:**   Yes, that will be fine.

14           **MS. BRADY:**   That's all, Your Honor, though Mr.

15   Crossland advised me he needs a quick bathroom break if

16   possible.

17           **THE COURT:**   All right.  Well, we are about at that

18   time, so we'll go ahead and take our morning recess.  We'll be

19   in recess for 15 minutes.

20           Sir, you should not discuss your testimony with anyone

21   during your recess, including your attorneys.

22           We'll be in recess for 15 minutes.

23

24

25

```
1              (Recess was taken.)

2                   THE COURT:  Mr. Franco?

3                   MR. FRANCO:  Yes, Your Honor.

4                   MS. BRADY:  Can I just bring up one matter first?

5                   THE COURT:  Do what?

6                   MS. BRADY:  I just have one matter, first.

7                   THE COURT:  Yes.

8                   MS. BRADY:  I just wanted to make sure, because we saw

9       Mr. Osborn outside and the witness room.  He is under a subpoena

10      by us, and I just want to make sure he is not conferring with

11      counsel.

12                  THE COURT:  Okay.

13                  MR. FRANCO:  I understand the rules, Your Honor.  I

14      haven't conferred with Mr. Osborn.

15                  MR. CROSSLAND:  Your Honor, Mr. Cheatam has been

16      sitting in the back of courtroom listening to testimony.  I know

17      Mr. Osborn was talking with just Mr. Cheatam.  We just want to

18      make sure that there are no communications about what was said

19      in this courtroom.

20                  Mr. Cheatam is an attorney with Adams & Reese.  He's

21      been in the back of the courtroom listening to everything that's

22      been going on.  We just want to make sure.

23                  THE COURT:  There should not be.  I mean, that would

24      certainly violate the rule.  And you all are officers of the

25      Court, and you understand that.  And I, you know, advised you
```

1    earlier that you needed to instruct your witnesses accordingly,

2    but certainly, that would extend to any other members of your

3    law firms here in the courtroom.

4            MR. FRANCO:  Understood, Your Honor.

5            THE COURT:  All right.  Mr. Campolo, you're still

6    under oath.

7            Mr. Franco, you may propose with your cross.

8                         **CROSS-EXAMINATION**

9    BY MR. FRANCO:

10   Q.   Mr. Campolo, as I understand it, you're currently the vice

11   presidents of SEPH, correct?

12   A.   Yes.

13   Q.   And for the record, when I say "SEPH," I'm referring to

14   Southeast Property Holdings, correct?

15   A.   Understood.

16   Q.   Sir, your current salary at SEPH is $156,000 a year; is

17   that correct?

18   A.   That's correct.

19   Q.   And prior to vice president, you were assistant secretary

20   of SEPH; is that correct?

21   A.   Correct.

22   Q.   For about six to eight months?

23   A.   Yes.

24   Q.   And you had basically the same job responsibilities?

25   A.   It was the exact same.

1    Q.   And basically, as either the vice president or assistant

2    secretary, you helped manage the loan portfolio of SEPH; am I

3    correct?

4    A.   Yes.

5    Q.   Now, prior to being the assistant secretary for SEPH, you

6    were a commercial loan manager for Vision Bank; is that right?

7    A.   Yes.

8    Q.   And then you were a vice president at Vision Bank?

9    A.   Well, those are one in the same.

10   Q.   Okay.  And prior to that, you were commercial loan manager

11   for Park National Bank, you said, correct?

12   A.   Commercial loan officer.

13   Q.   And prior to that, you were a commercial credit analyst --

14   A.   Yes.

15   Q.   -- at Park National Bank?

16        Now, Park National Bank is wholly owned by Park

17   National Corporation, isn't it?

18   A.   Yes.

19   Q.   And Park National Corporation also wholly owns SEPH; am I

20   correct?

21   A.   Correct.

22   Q.   SEPH is a nonbank subsidiary of Park National Corporation;

23   am I correct?

24   A.   Yes.

25   Q.   What's your banking experience outside of Park National

1  Bank and its affiliate, SEPH, Mr. Campolo?

2  A.   That's the first and only place I've worked since college.

3  Q.   Okay.  When did you go to the workout side of banking?

4  A.   It would be when SEPH was formed and took the legacy assets

5  from Vision Bank, so early 2012.

6  Q.   All right.  So in February of 2012, all the nonperforming

7  loans of Vision Bank went to SEPH; is that correct?

8  A.   Yes.

9  Q.   And you understood that to be a transfer of assets from

10  Vision Bank to SEPH, didn't you?

11  A.   Yes.

12  Q.   Without any compensation to Vision Bank; is that correct?

13  A.   Correct.

14  Q.   So SEPH paid nothing for this loan, did it?

15  A.   Well, it was all within the same company.

16  Q.   Is that a "yes," sir?  SEPH paid nothing for this loan, did

17  it?

18  A.   That's right.

19  Q.   Now, another company, SE Properties Solutions, which I will

20  call SPS, which we have referred to in this case, was hired to

21  assist with working out nonperforming loans, wasn't it?

22  A.   Yes, they were hired to help us with the law firms that we

23  used in the state and help us with directing them on legal

24  matters.

25  Q.   Who hired SPS?

1    A.    It would have been the senior management at Park

2    Corporation.

3    Q.    Okay.  And SPS's role continued after Vision Bank's

4    nonperforming loans were transferred to SEPH; am I correct?

5    A.    That is correct.

6    Q.    Now, you understand that Martin Sandel is with SPS,

7    correct?

8    A.    Yes.

9    Q.    And you don't know his official title with SPS, do you?

10   A.    I don't know what his official title is.

11   Q.    Okay.  But in your capacity as vice president of SEPH, you

12   deal with him in connection with management of SEPH's

13   nonconforming loans; am I correct?

14   A.    That is right.

15   Q.    How is SPS compensated for assisting SEPH with its

16   nonperforming loans, sir?

17          MS. BRADY:  Objection, relevance.

18          THE COURT:  What is the relevance?

19          MR. FRANCO:  The relevance is bias on behalf of SPS

20   and Mr. Martin Sandel, Your Honor, in this case.  SPS is the one

21   that's been dealing with this debt on a daily basis in this

22   case.  That's number one.  And Martin Sandel individually has

23   been doing that.  So the compensation of both the company that's

24   been doing it and Mr. Sandel certainly who will be a witness is

25   relevant for bias, just as this --

1          THE COURT:  I probably agree with you with Mr. Sandel,

2    but I don't know what about the company.

3          MR. FRANCO:  The company is the one that's hired to do

4    the work, and SPS -- as Mr. Campolo has just testified, SPS was

5    hired to do the work, Mr. Sandel has some relationship with some

6    capacity with SPS which we will cover with Mr. Sandel.  So I

7    think SPS -- he's acting on behalf of SPS, and we will see some

8    e-mails later.  He's acting on behalf of SPS, and obviously he's

9    also a witness, so I believe the compensation of the company

10   that's hired to manage these assets is important in connection

11   with what they're doing, how they're doing it, and why they're

12   doing it.

13         THE COURT:  I disagree as to the company.

14         MR. FRANCO:  Okay.

15         THE COURT:  I'll take up Mr. Sandel with you when that

16   question comes up.  So the objection will be sustained.

17   BY MR. FRANCO:

18   Q.   How is Mr. Sandel --

19         I understand it's not Mr. Sandel you're ruling on,

20   correct?

21         THE COURT:  Well, I thought you said you were going to

22   take that up with Mr. Sandel.

23         MR. FRANCO:  Well, I'm going to ask him right now.

24   BY MR. FRANCO:

25   Q.   How is Mr. Sandel compensated for his role in assisting

1    SEPH with its nonperforming loans?

2            THE COURT:  Well, that's not relevant yet because he

3    hasn't testified, and it goes to bias on Mr. Sandel's part, I

4    thought is what you were just suggesting to me.

5            MR. FRANCO:  That's correct, Your Honor, but --

6            THE COURT:  He hasn't testified yet.

7            MR. FRANCO:  If Mr. Sandel tells me something, that

8    doesn't mean I necessarily have to believe it.  I think I'm

9    entitled to ask this witness what his compensation is.

10           THE COURT:  Well, you might be able to after

11   Mr. Sandel testifies, but right now Mr. Sandel's credibility as

12   a witness is not at issue.  Has his depo been submitted in the

13   case?

14           MR. FRANCO:  No, but he's going to be a witness,

15   and --

16           THE COURT:  Then I need to hear from Ms. Brady,

17   because, I mean, we have an orderly process here.  And right

18   now, because he hasn't testified, his credibility is not at

19   issue.

20           MS. BRADY:  And, Your Honor, this was also part of the

21   Rule 72 objection --

22           THE COURT:  Right.

23           MS. BRADY:  -- that the Court ruled on and found

24   that -- we asserted privilege as well, but the Court found that

25   this information was entirely irrelevant, I believe.  I'm trying

1    to find the exact --

2            THE COURT:  As to Mr. Sandel?

3            MR. FRANCO:  Your Honor, that ruling was based on

4    discovery cutoff time period.

5            MS. BRADY:  No.

6            MR. FRANCO:  It wasn't based on --

7            THE COURT:  Let me find my ruling, please.  Just a

8    minute.  I mean, I remember the issue and I -- but because this

9    was an issue and there was a good bit of confusion at the time

10   as far as deposition transcripts -- deposition, excuse me,

11   testimony and the magistrate judge's ruling and what exactly it

12   was you all were objecting to and seeking to --

13           MS. BRADY:  Your Honor --

14           THE COURT:  -- ruling on.

15           MR. FRANCO:  My understanding of the Court's ruling

16   was that you found that it was not a privilege; however, because

17   of the discovery cutoff that it was not allowed.  That's my

18   understanding of what the Court ruled at that point.

19           THE COURT:  I have to find my ruling.

20           MS. BRADY:  Your Honor, I don't believe that is

21   accurate.  Document Number 324, is your order.  This is from

22   your order:  Area of Inquiry Number 15, requested information

23   and compensation agreement --

24           THE COURT:  Just a minute, please.

25           MS. BRADY:  Oh, sorry.

1          THE COURT:  I was completely comfortable with all of

2     these pretrial rulings at the time I entered them, but I'll have

3     you know I was in the middle of a two-week trial when you-all

4     were engaged in a lot of this, and so I'm going to need to

5     refresh my memory on it.

6          All right.  324.  What page are you on?

7          MS. BRADY:  Page 4 of 7 of Document 324, that first

8     paragraph.

9          THE COURT:  All right.  Area of Inquiry Number 15?

10         MS. BRADY:  Yes.

11         THE COURT:  This is pertaining to this -- this whole

12    order is pertaining to the magistrate judge's ruling and your

13    objection to the ruling.

14         MS. BRADY:  Yes.

15         THE COURT:  Okay.

16         MS. BRADY:  And then this dealt with information

17    regarding the compensation of SE Property and SPS, including

18    Martin Sandel, and the Court found that it was covered by the

19    stipulation.

20         THE COURT:  At the time was the issue -- and I don't

21    remember your Inquiry Number 15, but was the issue substantive

22    relevance or was the issue bias?

23         MS. BRADY:  Was our objection?

24         MR. FRANCO:  May I, Your Honor?  The issue in the

25    motion was privilege.

1          THE COURT:  Okay.

2          MR. FRANCO:  Only.  And the magistrate made that clear

3    that it was only privilege.  The Court ruled on the privilege

4    issues, but then the Court, Your Honor, yourself, went one step

5    further and said that some discovery was cut off because it was

6    past the cutoff date and was relevant to earlier claims.  That's

7    how I understand the ruling, Your Honor.

8          MS. BRADY:  Your Honor, I don't believe --

9          THE COURT:  Does this order speak at all -- I don't

10   see it, so if you-all can point me to language in the order

11   where I address an issue of bias.  I mean, bias is always

12   relevant.

13          Any time a witness takes the stand for any purpose and

14   raises his or her right hand, bias is always relevance, and so

15   if an employee takes the witness stand and is testifying on

16   behalf of a corporation that has an interest in the case, than

17   what that corporation pays that employee is going to be relevant

18   to bias.  Certainly not relevant to any substantive issue, but

19   it's relevance to bias.  And that's my ruling, if that's your

20   purpose.

21          MR. FRANCO:  Yes, ma'am.  Yes, it is.

22          THE COURT:  But if there's some other issue of

23   relevance, then I would need to hear that from you.

24          MR. FRANCO:  And, Your Honor, if you want me to wait

25   to ask Mr. Campolo this after Mr. Sandel testifies, then we run

1    into the Friday problem with the schedule.  If you want me to

2    wait, I'll wait.  But there's no reason why we can't elicit it

3    now.  There's no question Mr. Sandel is going to be a witness.

4              THE COURT:  All right.  Agreed?

5              MS. BRADY:  Yes.

6              THE COURT:  All right.  Then I'll allow you to ask

7    him, to ask Mr. Campolo.

8              MR. FRANCO:  Let me rephrase it.  Forgot what I said.

9    BY MR. FRANCO:

10   Q.   How is Mr. Sandel compensated for his role in assisting

11   SEPH with its nonperforming loans?

12   A.   I don't know.

13   Q.   And you -- the one that deals with him?

14   A.   That's correct.

15   Q.   And does he deal with anybody at SEPH, other than you

16   primarily?

17   A.   Yes, he deals with the other officers at SEPH.

18   Q.   Who pays him?

19   A.   I don't know if his check comes from Park Corporation or

20   SEPH.  I've never seen the contract between SEPH and SPS.

21   Q.   Now, you report in your capacity, sir, at SEPH to Tom

22   Button, correct?

23   A.   Yes.

24   Q.   And Mr. Button is the chief credit officer at Park National

25   Bank?

1   A.   That is correct.

2   Q.   Now, you're familiar with the promissory note from North

3   Tip Development, LLC, which served as the basis for this loan,

4   aren't you?

5   A.   Yes.

6   Q.   I'm going to show you Defendant's Exhibit 7, which is a

7   copy of the promissory note.

8           THE COURT:  All right.  So are we agreeing to the

9   admission of or introduction and admission of exhibits?

10          MR. FRANCO:  I'm going to offer it right now, Your

11  Honor.

12          THE COURT:  But is the plaintiff agreeing to this in

13  your case?

14          MS. BRADY:  To Exhibit 7?

15          THE COURT:  It's a defense exhibit, and he's going to

16  be admitting it here, so --

17          MS. BRADY:  I have no objection to this one.

18          THE COURT:  Okay.

19          MR. FRANCO:  I offer Defense Exhibit 7, Your Honor.

20          THE COURT:  All right.  That will be admitted.

21      (DEFENSE EXHIBIT 7:  Received in evidence.)

22  BY MR. FRANCO:

23  Q.   Sir, this is a -- I'm putting this up on the screen for

24  you.

25          This is the promissory note, as you understood it,

1    that serves as the basis for this loan that we're talking about

2    from North Tip Development.  You understand that, don't you?

3    A.   Yes.

4    Q.   And that was dated at the top right March 8th back in 2006,

5    correct?

6    A.   Yes.

7    Q.   And it was in the original amount of $11,000,135, correct?

8    A.   Yes.

9    Q.   The only bank on that note is GulfSouth Private Bank; isn't

10   that true, sir?

11   A.   Yes.

12   Q.   Now, to this date as we sit here, neither SEPH nor Vision

13   Bank has terminated GulfSouth's agency status under the

14   participation agreement; isn't that correct?

15   A.   That's what we're aiming to do here.

16   Q.   And you don't know why SEPH hadn't done so; isn't that

17   correct, sir?

18   A.   To terminate against GulfSouth?  Is that what you asked?

19   Q.   Terminating the GulfSouth agency status.  You don't know

20   why SEPH or -- nor Vision did that, do you?

21   A.   Well, I know why we did not for the first year after the

22   deficiency judgment.

23   Q.   Okay.  Let me show you your deposition, sir, and ask if

24   this helps refresh your recollection.

25          MR. FRANCO:  May I approach, Your Honor?

```
 1              THE COURT:  Yes.
 2    BY MR. FRANCO:
 3    Q.   I'm going to show you the small copy.  If you need the big
 4    one, we'll give you.
 5    A.   This should work.
 6    Q.   Would you look at page 32 for me.
 7              MS. BRADY:  I'm sorry, what page?
 8              MR. FRANCO:  32.
 9    BY MR. FRANCO:
10    Q.   And ask if that helps refresh your recollection, sir.
11    A.   It does.
12    Q.   Okay.  And what was your recollection at the time?
13    A.   Why -- as to why it hasn't been terminated?
14    Q.   Yes, sir.
15    A.   Same reason.  No.
16    Q.   No, you didn't know?
17    A.   Well, I --
18    Q.   No, no, the next sentence.  I'm sorry, so you and I are
19    clear on the question.  My question is, you didn't know why SEPH
20    has not terminated the agency status; isn't that true?
21    A.   Right.  I mean, I -- what I said was no.
22    Q.   No, that we hadn't terminated it?
23    A.   Right.
24    Q.   What did you say about knowing why?
25    A.   Well, I don't know why it hasn't been terminated.  In my
```

CAMPOLO – CROSS

1    opinion, it should be.

2    Q.    I thought you testified --

3    A.    That's what we're trying to do.

4    Q.    -- in response to counsel's question that you knew why

5    today, didn't you?

6              MS. BRADY:  Objection, mischaracterizes his testimony.

7              THE COURT:  Yeah, just ask him again, please.

8              MR. FRANCO:  Yes.

9    BY MR. FRANCO:

10   Q.    Didn't you testify today that you knew why the agency

11   status wasn't terminated?

12             MS. BRADY:  Objection.  Mischaracterizes his

13   testimony.

14             THE COURT:  Well, he can answer this yes or no.  He

15   was here.

16             THE WITNESS:  Because we're in litigation right now.

17   BY MR. FRANCO:

18   Q.    That's what you testified today, correct?

19   A.    Right.

20   Q.    That you knew why it wasn't terminated?

21   A.    Yes.

22             MR. FRANCO:  May I have that -- may I approach?

23             THE COURT:  Yes.

24   BY MR. FRANCO:

25   Q.    How did you learn why it was terminated -- why it was not

1   terminated between the time of your deposition and today?

2   A.   Well, we're trying to terminate it through this litigation.

3   Q.   I understand, sir, but with all respect, that wasn't my

4   question.

5            How did you learn why SEPH didn't terminate the agency

6   status between the time I took your deposition and today?

7            MS. BRADY:  Object to the extent it calls for

8   privileged information.

9            MR. FRANCO:  He -- Your Honor, he testified to it.  If

10  it's privileged information, then that would have been waived.

11           THE COURT:  Well, I think I agree.  Overruled.

12  BY MR. FRANCO:

13  Q.   So did you learn from your attorneys?  Is that what you're

14  saying?

15  A.   Tell me your question again.

16  Q.   Yes.  Let me go through this again so we're on the same

17  page.

18  A.   Okay.

19  Q.   Today you offered some testimony as to why SEPH has not

20  terminated the agency relationship when you were on the stand in

21  response to your attorney's questions, correct?

22  A.   And my answer was that we're trying to, correct?

23  Q.   Just answer my question.  Didn't you testify to the reason

24  the agency relationship wasn't terminated?

25  A.   Yes.

1    Q.    Okay.  When I took your deposition, you didn't recall, you

2    didn't know, why the agency relationship had not been

3    terminated; isn't that true?

4    A.    That's what it says, yes.

5    Q.    Okay.  And so between that time I took your deposition,

6    sir, which was just recently -- the deposition was January 20,

7    2015.  Do you recall that date?

8    A.    I do.

9    Q.    Between that time and now, how did you learn the reason

10   that SEPH had not terminated the relationship?

11   A.    Well, we were in litigation at that time also.  I guess I'm

12   confused on the difference of the question.

13   Q.    How did you acquire the knowledge that you didn't have when

14   I took your deposition about why the agency relationship was not

15   terminated by SEPH?

16   A.    I don't know.

17   Q.    Now, Mr. Campolo, in your experience, you know what a

18   deficiency judgment is, don't you?

19   A.    Yes.

20   Q.    And you know that a deficiency judgment is the exercise of

21   a right in the event of a default on a loan, don't you?

22   A.    That's correct.

23   Q.    And so is a foreclosure judgment:  That's the exercise of a

24   right in the event of a default on a loan, correct?

25   A.    Yes.

```
1    Q.   Who obtained the deficiency judgment under this loan after

2    default -- let me rephrase that.

3              You don't get to a foreclosure judgment or deficiency

4    judgment until -- unless there's a default, right?

5    A.   Yes.

6    Q.   Okay.  So a default took place first, and then who obtained

7    the foreclosure judgment which came first?

8    A.   GulfSouth.

9    Q.   Who obtained the foreclosure judgment -- I'm sorry, who

10   obtained deficiency judgment under this loan after the default?

11   A.   GulfSouth.

12   Q.   Now, you're aware, sir, that the participation agreement

13   sets out a formula for SEPH to buy the lead bank position,

14   aren't you?

15   A.   Yes.

16   Q.   And the originating bank's position interest at that point

17   was 8.99 percent, correct?

18   A.   Correct.

19   Q.   Now, SEPH, or Vision, either one of them, never notified

20   GulfSouth after default that it wanted to exercise its remedy to

21   purchase GulfSouth interest, did it?

22   A.   That's correct.

23   Q.   And SEPH, or Vision never notified HCB after default that

24   it wanted to exercise its remedy to purchase HCB's interest, did

25   it?
```

1    A.    We didn't know HCB had any interest in it until this case.

2    Q.    Okay.  Did you know HCB had an interest in it before you

3    filed the amended complaint?

4    A.    The first amended complaint?

5    Q.    Yes, sir.

6    A.    I believe at the time we filed the first amended complaint,

7    we knew that they were involved, just not to the extent that

8    they were involved with Mr. Phillips.

9    Q.    Okay.  But my question was:  Before you filed the suit, you

10   knew that HCB, HCB Financial Corporation, you knew that they had

11   the lead position, didn't you, sir?

12            MS. BRADY:  Objection, mischaracterizes his testimony.

13            THE COURT:  Overruled.  You can answer.

14            THE WITNESS:  We're talking about the first amended

15   complaint?

16   BY MR. FRANCO:

17   Q.    Yes, sir.

18   A.    Yes.

19   Q.    And instead of requesting the lead position or requesting

20   to purchase the lead, SEPH chose to file the lawsuit in the

21   amended complaint, correct?

22   A.    Yes.

23   Q.    Now, you weren't a party to any negotiations regarding

24   assigning or dividing the deficiency judgment in this case, were

25   you, sir?

1    A.    Me personally?

2    Q.    Yes, sir.

3    A.    No.

4    Q.    And it's your understanding that it's SEPH's position in

5    this case that such an agreement gave it the right to pursue

6    collection from the judgment-debtors, right?

7    A.    Yes.

8    Q.    And keep whatever SEPH collects from the judgment-debtors,

9    correct?

10   A.    Yes.

11   Q.    And you also understand that it's SEPH's position that such

12   an agreement to divide this judgment gave the other

13   participants -- the other participants the right to collect on

14   their own shares of the deficiency judgment; isn't that correct?

15   A.    Yeah, that's what the parties agreed to.

16   Q.    But you were not a party to that agreement, were you?

17   A.    No, me personally, no.

18   Q.    To your knowledge, outside of this case, SEPH has never

19   received an assignment of a *pro rata* interest in a deficiency

20   judgment, has it?

21   A.    No, it was never put in the mail.

22   Q.    No, sir.  Outside of this case and the facts of this case,

23   SEPH has never received an assignment of a *pro rata* interest in

24   any deficiency judgment, has it?

25   A.    Oh, you're saying not related to this loan?

1    Q.    Yes, sir.

2    A.    That's correct.

3    Q.    And to your knowledge, you're not aware of any

4    participation agreements to which SEPH is a party which provides

5    for a *pro rata* assignment of a deficiency judgment for SEPH, are

6    you?

7    A.    That's correct.

8    Q.    Now, you are aware, sir, that GulfSouth never undertook any

9    collection efforts to enforce the deficiency judgment after it

10   was obtained in March of 2011, aren't you?

11   A.    Yes.

12   Q.    You're also aware that GulfSouth believed the guarantors

13   didn't have anything to collect, aren't you?

14   A.    I'm not sure if I've -- can speak to what GulfSouth thought

15   at that time.

16   Q.    Let me show you your deposition and ask you if this helps

17   refresh your recollection.  I'm going to ask you to look at page

18   53.

19            May approach, Your Honor?

20            THE COURT:  Yes.

21   BY MR. FRANCO:

22   Q.    This is the bigger type.

23   A.    Thank you.

24   Q.    Okay.  Did you read especially line 14, sir?

25   A.    Yes.

1    Q.    Okay.  Let me ask you this again.

2          Does that help refresh your memory to my question:

3    You are aware that GulfSouth believed the guarantors had nothing

4    to collect, aren't you?

5    A.    Yes.  I must have seen the statement.  I don't remember

6    seeing it as I sit here today, but that was my deposition.

7    Q.    Okay.  Thank you --

8          I'm sorry, Your Honor, may I approach?

9          THE COURT:  Yes.

10   BY MR. FRANCO:

11   Q.    Thank you.  And you were aware at that GulfSouth believed

12   it would not make sense to incur substantial attorneys fees and

13   worthless litigation just to force a bankruptcy, weren't you?

14   A.    Yes.

15   Q.    There was over a year from the time GulfSouth obtained a

16   deficiency judgment until GulfSouth assigned its rights to HCB,

17   correct?

18   A.    Yes.

19   Q.    And that's where GulfSouth remained the originating bank;

20   am I correct?

21   A.    Correct.

22   Q.    You're also aware that when there's a superior judgment or

23   lien on a particular asset, if that asset is seized, then the

24   superior lienholder has the ability to be paid first on that

25   asset, correct?

1    A.    Correct.

2    Q.    And you're aware that SEPH has a claim in this suit over

3    release of HCB's judgment lien on a lot in Walton County, that's

4    lot 26 we've been talking about, correct?

5    A.    That's right.

6    Q.    You're aware there was superior judgments and mortgages on

7    that piece of property, aren't you?

8    A.    Yes.

9    Q.    And you understand that if there was superior mortgages or

10   liens on that property and HCB attempted to seize it, the

11   superior judgments or lienholders would have gotten paid the

12   proceeds of any judicial sale, don't you?

13          MS. BRADY:  Objection, legal conclusion.

14          MR. FRANCO:  I'm asking his understanding.

15          THE COURT:  Overruled.  It is his understanding and

16   certainly within his capacity, his employment capacity.  He can

17   answer this.

18          THE WITNESS:  Can you repeat that, please, sir?

19   BY MR. FRANCO:

20   Q.    Yes.  You understand that if there was superior mortgages

21   or liens on that property and HCB attempted to seize it, the

22   superior judgments or lienholders would have gotten paid the

23   proceeds of any judicial sale, correct?

24   A.    That's correct.

25   Q.    Now, we talked about your understanding -- strike that.

1          If -- is it your understanding that if SEPH exercises

2     the right of remedy to purchase the lead, that any collection by

3     SEPH, as originating bank, would have to be paid or shared with

4     all the other participants; isn't that correct?

5     A.   Can you say that again?

6     Q.   Yes.

7          If SEPH exercised its right of remedy to purchase the

8     lead position, you understand that any collection after that by

9     SEPH, as originating bank, would have to be paid out or shared

10    with all the other participants; isn't that correct?

11    A.   Well, what time frame are we talking about?

12    Q.   After SEPH would exercise its right to purchase the lead

13    bank position.

14    A.   So is this before the assignment to HCB?

15    Q.   At any time.

16         If SEPH exercises its rights to purchase the lead bank

17    position, sir, isn't it true that you understand that any

18    collection by SEPH, as the originating bank, would have to be

19    shared or paid out to the other participants?

20    A.   If there were other participants left, yes.

21    Q.   Is it your knowledge that SEPH has offered to buy any of

22    the other participations in this case?

23    A.   No, we have not.

24    Q.   Now, but instead of sharing under SEPH's position in this

25    case, of obtaining a *pro rata* division of the deficiency

1   judgment, you understand that it wouldn't have to share what it

2   collected with anybody else, any other participants in this

3   bank; isn't that true?

4   A.   It was my understanding that that was the agreement, yes.

5   Q.   And SEPH would get to do that for free if the judgment was

6   divided, wouldn't it?

7   A.   What do you mean for free?

8   Q.   Would get to collect on the *pro rata* assignment of the

9   deficiency judgment for free, wouldn't have to pay for it, would

10  it?

11  A.   Well, it was my understanding that was our -- that

12  agreement was in exchange for us to go along with the way the

13  collateral was disposed of.

14  Q.   I understand.  And you're talking about what somebody else

15  told you; isn't that true, sir?  Because you weren't a party to

16  that, were you?

17  A.   Right, I've seen -- yes, the e-mails.

18  Q.   And so my question to you is if SEPH gets the right

19  under -- to a *pro rata* share of the deficiency judgment, it gets

20  it in this position in this case for free, doesn't have to pay

21  for it; is that right?

22  A.   Well, no, there's no monetary value exchanging hands.

23  Q.   Mr. Campolo, let's look back at paragraph 4 of the

24  participation agreement which is Exhibit 1.  I'm going to put it

25  on the screen.  Would you look at the top of the nonrecourse

1    loan participation agreement.  Who is identified as the

2    borrower?

3    A.   North Tip Development, LLC.

4    Q.   And who is identified as the guarantors or endorsers or

5    comakers?

6    A.   Carl and Elaine Olson, Rupert and Sandra Phillips, Olson

7    Associates of Northwest Florida, Inc.

8    Q.   Separately identified between the borrowers and the

9    guarantors on that document, isn't it?

10   A.   Yes.

11   Q.   Okay.  Let's talk about SEPH's claim for damages.

12           You've done asset searches to determine what assets of

13   the guarantors are collectible, haven't you?

14   A.   We have.

15   Q.   And you can't tell me one asset from your search that's

16   collectible from Mr. Phillips, can you?

17   A.   Not from the public searches.  They typically don't tell

18   the whole story.

19   Q.   And you don't know what damages SEPH has suffered as a

20   result of an alleged conspiracy, do you?

21   A.   Well, we think the amount of the judgment is what we have

22   suffered.  We've been unable to collect on it.

23   Q.   Okay.  I'm going to show you your deposition and ask you if

24   this helps refresh your memory.  Would you like at page 92?

25           May I approach, Your Honor?

1           THE COURT:  Yes.

2    BY MR. FRANCO:

3    Q.   Have you had a chance to look at that?

4    A.   Yes.

5    Q.   Does that help refresh your memory to the question of --

6    that you can't tell us -- excuse me, you don't know what damages

7    SEPH has suffered as a result of the alleged conspiracy?

8    A.   Well, I said we don't know, but I would say at least our

9    *pro rata* share.

10   Q.   Okay.  Other than the *pro rata* share, you don't know of any

11   damages, do you?

12   A.   No.

13   Q.   And you're actually asking the Court to award you the full

14   amount of your damages -- excuse me, the full amount of the

15   principal and interest without any collection efforts against

16   the judgment-debtors; am I correct?

17   A.   That's correct.

18   Q.   All right.  Sir, isn't it true that Vision Bank was aware

19   that the loan matured in December of 2007?

20   A.   That's correct.

21   Q.   And that the borrowers made no payment -- the borrower,

22   excuse me, made no payments after that?

23   A.   Correct.

24   Q.   That's a default in your understanding, isn't it?

25   A.   It is.

1    Q.   And Vision Bank was aware that the borrowers largest

2    project, National Mark, had a loan of $40 million; am I correct?

3    A.   Yes.

4    Q.   Which was in default.  Am I correct?

5    A.   Yes.

6    Q.   And in litigation.  Correct?

7    A.   Yes.

8    Q.   And Vision Bank was aware the borrowers had $150 million of

9    bank debt at that point; isn't that correct?

10   A.   That's correct.

11   Q.   All of which was in default, correct?

12   A.   I believe so, yes.

13   Q.   And Vision Bank was aware that other lenders had either

14   sold their debt at steep discounts or were in the process of

15   doing so; am I correct?

16   A.   I believe so.

17   Q.   I am going to show you Defendant's Exhibit 13 -- I'm sorry,

18   Defendant's Exhibit 115.  Excuse me.

19        MR. FRANCO:  Your Honor, at this time I'd like to

20   offer, introduce, and file Defendant's Exhibit 115, which is a

21   Vision Bank special asset report dated May 2009.

22        MS. BRADY:  No objection, Your Honor.

23        THE COURT:  All right.  That will be admitted.

24     (DEFENSE EXHIBIT 115:  Received in evidence.)

25

1  BY MR. FRANCO:

2  Q.   Now, this document was, in fact, authored by Bill Lloyd,

3  wasn't it?

4  A.   That's correct.

5  Q.   See that?  Okay.

6       And this report shows $141 million of contingent debt

7  for each of the guarantors in default, including North Tip; am I

8  right, sir?

9  A.   Yes.

10 Q.   And that was back in June of 2009, this report, isn't it?

11 A.   Yes.

12 Q.   And in February of 2009 Vision Bank received updated

13 financial statements from the guarantors showing negative net

14 worth, didn't it?

15      MS. BRADY:  Your Honor, objection to relevance at this

16 point.  We're back in 2009 as to their financial worth.

17      THE COURT:  Relevance, Mr. --

18      MR. FRANCO:  Relevance is Vision Bank has known for

19 some time that this judgment is uncollectible against these

20 guarantors and the statements that they're making now is

21 contrary to what they knew at the time.

22      MS. BRADY:  This is two years prior to the judgment.

23      THE COURT:  What?

24      MS. BRADY:  This is more than two years prior to the

25 judgment.

1          MR. FRANCO:  Well, we're going to go through --

2          THE COURT:  I'm going to allow it.  Overruled.

3          MR. FRANCO:  Thank you, Your Honor.

4          THE COURT:  Go ahead.

5    BY MR. FRANCO:

6    Q.   On February 19th, if you look at the report, of 2009,

7    Vision Bank received updated financial statements from the

8    guarantors showing negative net worth; am I correct?

9    A.   Yes.

10   Q.   It's right here.  Received updated financial statements

11   from the guarantors showing negative net worth and minimal

12   liquidity.  Correct?

13   A.   Correct.

14   Q.   All right.  I'm going to show you Defendant's Exhibit 111,

15   which is your affidavit that was submitted in connection with

16   this case.

17          I would offer, introduce, and file Defendant's Exhibit

18   111, Your Honor.

19          MS. BRADY:  I'm sorry, what number?

20          MR. FRANCO:  111.

21          THE COURT:  Introduce it as an exhibit?

22          MR. FRANCO:  Yes.

23          THE COURT:  Okay.  111?

24          MR. FRANCO:  Yes, Your Honor.

25          MS. BRADY:  One second, Your Honor.

1           No objection.

2           THE COURT:  Okay.  That will be admitted.

3       (DEFENSE EXHIBIT 111:  Received in evidence.)

4   BY MR. FRANCO:

5   Q.   And, Mr. Campolo, I'm going to focus on paragraph 7 of --

6   this is an affidavit that you actually signed in connection with

7   this litigation; am I correct?  I'm going to show you your

8   signature line, but you signed this and swore to it; am I

9   correct?

10  A.   Yes.

11  Q.   And that was dated February 6 of 2013 -- there's a problem

12  with the date there.  One says February 11; one says February 6.

13  But either one, doesn't matter, it's around that time period

14  that you executed it; am I correct?

15  A.   Yes.

16  Q.   I want to focus on paragraph 7.  And at the time, sir, you

17  were the assistant secretary of SE Properties, correct?  Had the

18  same responsibilities as vice president, correct?

19           I'll show you the first page.

20  A.   Yes.

21  Q.   In paragraph 7 you state:  Vision Bank, and then SE

22  Property, believed that GulfSouth was preparing assignments of

23  the deficiency judgment, assigning each of the participating

24  banks its respective *pro rata* share in the deficiency judgment

25  as requested by plaintiff.  See that?

1    A.    I do.

2    Q.    You didn't mention in that paragraph any agreement to

3    assign respective *pro rata* shares in the deficiency judgment,

4    did you, sir?

5    A.    Can you ask that again?

6    Q.    Yes.  You used the word "as requested by plaintiff" when

7    talked about the assignment of the deficiency judgment.  You

8    didn't use the word "agreement" anywhere in this paragraph, did

9    you?

10   A.    That word "agreement" is not in that paragraph.

11   Q.    As a matter of fact, Mr. Campolo, you can't show me

12   anywhere in your affidavit where you say anything about an

13   agreement rather than a request to divide the *pro rata* share of

14   the deficiency judgment to SEPH; isn't that true, sir?

15   A.    That's correct.

16   Q.    I would like to then show you Defendant's Exhibit 108,

17   which is a copy of the amended complaint in this case, which I

18   would offer and introduce.

19            MS. BRADY:  Objection, Your Honor, relevance.

20            THE COURT:  As to the complaint?

21            MS. BRADY:  As to the earlier version of the

22   complaint.

23            MR. FRANCO:  This is the amended complaint.

24            MS. BRADY:  We're on the second amended complaint in

25   this action.

1          MR. FRANCO:  This was -- there were three pleadings

2    filed.  This is the second of three.

3          THE COURT:  Overruled.

4    BY MR. FRANCO:

5    Q.   All right.  I want you to look at paragraph -- this is

6    filed on behalf of SE Property Holdings, your understanding; am

7    I correct?

8    A.   Yes.

9    Q.   I want you to look at paragraph 33 for me, as soon as I can

10   get it.

11         Now, paragraph 33, SE Property states:  Since

12   obtaining the deficiency judgment, Vision Bank and then SE

13   Property repeatedly requested that -- requested that GulfSouth

14   assign to each of the participating banks its respective

15   *pro rata* share of the deficiency judgment.  Do you see that?

16   A.   I do.

17   Q.   Again, we see the reference to "request" rather than any

18   reference to an agreement.  Am I correct, Mr. Campolo?

19   A.   That's correct.

20   Q.   Now, I think in your earlier testimony, sir, you talked

21   about why you wouldn't want to purchase the lead bank position.

22   Do you remember your testimony today in response to counsel's

23   question?

24   A.   Yes.

25   Q.   Okay.  And you said that would give more money to HCB; am I

1    correct?

2    A.    That's correct.

3    Q.    Okay.  By doing that, you would actually eliminate HCB's

4    control over the collection process.  Isn't that your

5    understanding, sir, if you bought it?

6    A.    Yes, that's my understanding.

7    Q.    And that would allow SEPH to collect directly against the

8    judgment-debtors, if you bought the lead bank position, wouldn't

9    it, sir?

10   A.    If we bought the lead bank position, yes.

11   Q.    Okay.  And you testified -- by the way, nothing prohibited

12   H -- excuse me, I'm sorry, nothing prohibited SEPH from

13   contacting HCB outside of this litigation, did it?

14   A.    No.

15   Q.    And nothing prevented SEPH from terminating the agency

16   status even after this lawsuit was filed; am I correct?

17   A.    Can you say that again?

18   Q.    Yes.  Nothing prevented or prohibited SEPH from terminating

19   the agency status at any time, has it?

20            MS. BRADY:  Objection, legal conclusion.

21            THE COURT:  Overruled.

22            THE WITNESS:  Well, that's what we're trying to do

23   here.

24   BY MR. FRANCO:

25   Q.    I understand.  But nothing prevented SEPH from contacting

1    HCB and saying, We want to terminate the agency status.  Is that

2    correct?

3    A.   That's correct.

4    Q.   And nothing prohibited SEPH from contacting HCB or

5    GulfSouth and demanding to purchase the lead bank position

6    because it didn't agree on the collection efforts, did it?

7    A.   Well, we thought we had an agreement with GulfSouth.

8    That's why we didn't --

9    Q.   Nothing prohibited SEPH from doing that, did it?

10   A.   No.

11   Q.   Now, you testified that SEPH has spent approximately

12   $900,000 in attorneys fees in this litigation; am I correct?

13   A.   Yes.

14   Q.   Aren't you aware that that's approximately the price it

15   would have cost to purchase the lead from HCB or GulfSouth, sir?

16   A.   Yes.

17   Q.   So instead of purchasing the lead, SEPH chose to litigate

18   and spend about the same amount of money, correct?

19   A.   That's correct.

20   Q.   Mr. Campolo, isn't it true, sir, that the reason that SEPH

21   didn't want to purchase the lead bank position is it because it

22   didn't think that the judgment was collectible and it didn't

23   want to put more money out; isn't that true, sir?

24   A.   No, I don't believe so.

25   Q.   But SEPH wouldn't want to put $900,000 out for a judgment

1   it didn't think was collectible, would it?

2           MS. BRADY:  Objection.  He didn't testify that he

3   didn't think it was collectible.

4           MR. FRANCO:  That wasn't my question.

5           THE COURT:  It's a bit argumentative, so I'm going to

6   sustain.

7   BY MR. FRANCO:

8   Q.   Isn't it true, Mr; Campolo, that SEPH has not agreed with

9   the collection efforts of the lead bank in this case?

10  A.   Yes.

11          MR. FRANCO:  That's all the questions I have.  Thank

12  you, Your Honor.  I tender the witness.

13          THE COURT:  Thank you.

14          All right.  Ms. Brady, redirect?

15                      **REDIRECT EXAMINATION**

16  BY MS. BRADY:

17  Q.   Sir, why did SE Property never notify GulfSouth that it

18  would like to purchase GulfSouth's lead bank position?

19          MR. FRANCO:  Objection, Your Honor.  That's been asked

20  and answered.

21          THE COURT:  Overruled.

22          THE WITNESS:  Can you ask me that again?

23  BY MS. BRADY:

24  Q.   Sure.  Why did SE Property not notify GulfSouth that it

25  wanted to purchase the lead bank position from GulfSouth?

1   A.   Because we thought we had an agreement that we would be

2   assigned our *pro rata* share of the judgment.

3   Q.   Did GulfSouth during the course of the time it was in lead

4   bank -- had lead bank status ever take the position that if SE

5   Property wasn't happy with its course of action, its only

6   recourse was to buy the lead bank status?

7   A.   No.  From the e-mails I've seen --

8           MR. FRANCO:  Objection, Your Honor, that calls for

9   hearsay.

10          THE COURT:  Sustained.  And I don't know what he's

11  getting ready to refer to, but reference to e-mails would be

12  enough at this point.

13  BY MS. BRADY:

14  Q.   Have you seen any -- refer to Plaintiff's Exhibit 68.

15          MR. FRANCO:  I'm sorry, plaintiff's or defense?

16          MS. BRADY:  Plaintiff.  Give me a second.

17  BY MS. BRADY:

18  Q.   Sir, in May of 2012, you were employed with Vision Bank?

19  A.   May of 2012 would have been SE Property Holdings.

20  Q.   Okay.  And that was after the -- that was after the sale of

21  the assets, certain of the assets to Centennial?

22  A.   That's correct.

23  Q.   Okay.  So you would have been vice president of SE Property

24  at that time?

25  A.   I was either assistant secretary or vice president, the

```
 1    exact same job description.
 2    Q.   Okay.  And part of your -- you testified earlier that part
 3    of your involvement on behalf of SE Property was being involved
 4    in the litigations?
 5    A.   Yes.
 6    Q.   Do you recall reviewing a complaint for declaratory relief
 7    filed by GulfSouth against the participating banks?
 8                MR. FRANCO:  Objection, Your Honor.  That's beyond the
 9    scope.  I didn't go into that, and I wouldn't have the ability
10    to question him on it.
11                THE COURT:  What is the point?
12                MS. BRADY:  Point, Your Honor, is scope.
13                THE COURT:  And how is it within the scope?
14                MS. BRADY:  The position that GulfSouth took regarding
15    lead bank -- purchasing the lead bank interest if there was a
16    disagreement over how to proceed.
17                THE COURT:  Overruled.  There was a great deal of
18    questioning --
19                MR. FRANCO:  Not by GulfSouth.  She's -- she said
20    GulfSouth's position.  I didn't ask anything about GulfSouth's
21    position.
22                THE COURT:  Well, you did ask why they didn't pursue
23    that action, did you not?
24                MR. FRANCO:  I just asked him if they did pursue the
25    action, not -- all I asked him was GulfSouth didn't pursue
```

1    collection.

2              THE COURT:  I'll going to allow it.  You can recross.

3              MR. FRANCO:  Thank you, Your Honor.

4              THE COURT:  All right, go ahead.

5    BY MS. BRADY:

6    Q.   Have you reviewed this complaints for declaratory relief

7    filed by GulfSouth, sir?

8    A.   Yes.

9              THE COURT:  Is this 68?

10             MS. BRADY:  Yes.  Your Honor, at this time, I'd like

11   to offer Plaintiff's Exhibit 68 into evidence as Exhibit 68.

12             MR. FRANCO:  Your Honor, I object on the basis of

13   hearsay.  This is a statement by GulfSouth.  They're not a party

14   to this case.

15             THE COURT:  What's the response to hearsay?

16             MS. BRADY:  Your Honor, they did not assert a hearsay

17   objection to this exhibit.

18             THE COURT:  Was this exhibit listed?

19             MS. BRADY:  Yes.  Exhibit 68, their only objection was

20   irrelevant.

21             THE COURT:  All right.  Overruled.

22   BY MS. BRADY:

23   Q.   Sir, if you can look at paragraph -- I believe it is 20,

24   23.  If you can read that aloud.

25             THE COURT:  Can you go to that paragraph?

1          MS. BRADY:  I'm sorry, excuse me, Mr. Dyer.  Paragraph

2     23.

3          THE COURT:  Thank you.

4          MS. BRADY:  Can you get the second half up?

5          THE COURT:  I'm not sure if he'll be able to do that

6     together.  Maybe.

7          MS. BRADY:  I have confidence.

8          THE COURT:  There we go.

9     BY MS. BRADY:

10    Q.   Sir, can you read that aloud.

11    A.   A conflict has arisen between GulfSouth, Defendant FNBC,

12    and Defendant Centennial Bank.  Specifically GulfSouth must

13    reach a mutual agreement with the defendants before it decides

14    what to do with the deficiency judgment.  The conflicting

15    desires of defendant FNBC and Defendant Centennial Bank make it

16    impossible to reach a mutual consensus on what to do with the

17    deficiency judgment.

18    Q.   That paragraph talks about mutual consensus.  Do you know

19    if there's anywhere in this complaint that GulfSouth asserts

20    that as the lead bank it makes the decision and the other banks

21    can purchase its interest if they're not satisfied?

22         MR. FRANCO:  Objection, leading, but --

23         THE COURT:  Overruled.

24         THE WITNESS:  Not to my knowledge.

25

1   BY MS. BRADY:

2   Q.   Why did SE Property never request to buy the lead position

3   from HCB once it knew of HCB?

4   A.   Because we did not want to give money to an entity that's

5   controlled by the judgment-debtor just to go and try to have to

6   collect again on the judgment-debtor.

7   Q.   Do you have any understanding as to how much Vision Bank

8   had already lost on this loan?

9           MR. FRANCO:  Objection, Your Honor, that's way beyond

10   the scope.  I didn't go into the losses on this line.  And I

11   don't know what the relevance is.  I object, beyond the scope

12   and relevance.

13          THE COURT:  Do you have a response?

14          MS. BRADY:  Let me rephrase.  Actually, let me just

15   move on.

16   BY MS. BRADY:

17   Q.   Your question, Mr. Campolo, about whether SE Property had

18   ever received an assignment of a *pro rata* interest in any

19   judgment previously, how many participation agreements has SE

20   Property been a participating bank in that did not involve as

21   parent entity?

22   A.   Maybe six or less.  It was a relatively small amount.

23   Q.   Do you know if SE Property requested a *pro rata* assignment

24   in any of those cases of the deficiency judgment?

25   A.   No, we've -- actually, never gotten to this point with

1    another participation.

2    Q.   You mean -- what do you mean by "this point"?

3    A.   Where we're in litigation over deficiency judgment.

4    Q.   Did SE Property have an issue with GulfSouth never

5    undertaking collection efforts?

6    A.   Well, I mean, the reason we didn't was because we thought

7    we were getting the *pro rata* share of the deficiency judgment,

8    that we had an agreement, so we weren't.

9    Q.   You were questioned whether SE Property had offered to buy

10   any other participating interests of the judgment.  Do you have

11   an understanding as to how those interests are owned beyond the

12   44.90 percent owed by SE Property?

13   A.   Well, it's my understanding that HCB also purchased those

14   as well.

15   Q.   So is it your understanding, then, that the only two

16   entities that have an interest --

17              MR. FRANCO:  Objection, Your Honor, leading.

18              THE COURT:  It is, Ms. Brady.  Sustained.

19   BY MS. BRADY:

20   Q.   So, sir, who are the entities that now have an interest in

21   the deficiency judgment?

22   A.   HCB and SEPH.

23   Q.   Do you have any -- do you know who first suggested the

24   possibility of separate judgments, *pro rata* assignments of the

25   judgment?

1          MR. FRANCO:  Objection Your Honor, calls for hearsay.

2    This is the agreement, the *pro rata* assign.  I think we've

3    already covered that he wasn't a party to that, and anything he

4    knows is by hearsay.

5          MS. BRADY:  Just asked if he knows.

6          THE COURT:  Right now she just asked a yes or no

7    question.

8          THE WITNESS:  I do not.

9    BY MS. BRADY:

10   Q.   Sir, you were questioned regarding a special asset report

11   in 2009.  What is the -- in your opinion, the value of

12   financials provided in 2009 in 2015?

13   A.   Well, they're irrelevant in my opinion.

14   Q.   Why are they irrelevant?

15   A.   Well, they're six years old.  A lot can happen in six

16   years.

17   Q.   You were also questioned, sir, as to the damages SE

18   Property is asserting and the position that it's asserting the

19   amount of its *pro rata* shares as to whether you had information

20   as to any collectible assets of the judgment-debtors.  What type

21   of information does SE Property at this time have access to?

22   A.   Other than public records, would be stale financial

23   information.

24   Q.   Why doesn't SE Property, if you know, have information to

25   anything other than public records?

CAMPOLO - REDIRECT

1    A.   We haven't been provided any by HCB.

2              MS. BRADY:  One second, Your Honor, I'm sorry.

3              THE COURT:  Okay.

4    BY MS. BRADY:

5    Q.   Sir, you were questioned about -- on Defendant's Exhibit

6    108 about paragraph 33 of the complaint.  If you look at, sir,

7    paragraph 34, will you read that paragraph.

8              THE COURT:  This is Defendant's Exhibit 108?

9              MS. BRADY:  Yes.

10             THE WITNESS:  Yes.  As far back as August of 2011,

11   GulfSouth, through it's counsel, advised SE Property's

12   representative that it was preparing a draft of assignments of

13   the pro rata shares of the deficiency judgment.  GulfSouth,

14   through its counsel, subsequently advised SE Property that the

15   assignments were signed by GulfSouth and would be sent to the

16   participating banks.  SE Property never received or was assigned

17   its pro rata share of the deficiency judgment.

18   BY MS. BRADY:

19   Q.   Sir, you were questioned, sir, as to the use of the words

20   repeatedly requested in paragraph 33, but do you have an

21   understanding as to whether any request for the assignments

22   actually resulted in executed assignments?

23   A.   Well, yes.  The assignments were executed; we just never

24   received them.

25   Q.   Sir, you were questioned as to why SE Property did not

1  term -- outside of this litigation terminate the agency status

2  once it learned of HCB.  Did SE Property have any concerns what

3  would happen if it just terminated the agency status and sought

4  to collect directly from the judgment-debtors, if you know?

5  A.   I don't know.

6           MS. BRADY:  One second, Your Honor.

7           THE COURT:  Yes.

8  BY MS. BRADY:

9  Q.   Since the time that SE Property learned of HCB's

10  involvement in HCB's acquisition of the deficiency judgment, has

11  anything been free for SE Property?

12  A.   Has anything been free?

13  Q.   Yes.

14  A.   No.  We've spent a lot of money in litigation.

15           MS. BRADY:  That's all I have, Your Honor.

16           THE COURT:  Thank you.

17           Mr. Franco, I'll allow you to recross just on that

18  exhibit, 68.

19           MR. FRANCO:  Thank you, Your Honor.

20                      **RECROSS-EXAMINATION**

21  BY MR. FRANCO:

22  Q.   Mr. Campolo, the exhibit that we're talking about was a

23  suit filed by GulfSouth.  You understood that, correct?

24  A.   Yes.

25  Q.   It was not filed by HCB, was it?

1    A.   No.

2    Q.   Okay.  And you're also aware that that suit was filed

3    instead of delivering any assignment of any *pro rata* interest in

4    the judgment, weren't you, sir?

5    A.   Yes.

6    Q.   So GulfSouth filed that suit after this alleged agreement

7    saying that there was no agreement.  Isn't that your

8    understanding, sir?

9    A.   No.  It was my understanding that that happened after FNCB

10   (sic) came into the picture.

11   Q.   HCB?

12   A.   No, no, no.

13   Q.   Oh, First --

14   A.   The bank that bought Central Progressive.

15   Q.   All right.  So it was your understanding that FNBC

16   purchased the participation interest of CPB in this loan,

17   correct?

18   A.   Right.

19   Q.   And FNBC didn't agree to any assignment of any deficiency

20   judgment.  That's your understanding; am I correct?

21   A.   That's what the dispute's over, yes.

22   Q.   Okay.  And there was a lawsuit then filed by GulfSouth,

23   that lawsuit that we just looked at, that exhibit?

24   A.   Yes.

25   Q.   Okay.  And it's also your understanding that -- and counsel

CAMPOLO - RECROSS

1    pointed to paragraph 23, but the issue is it's not if GulfSouth

2    disagreed that GulfSouth would purchase the lead bank position,

3    it's if SEPH disagreed with collection efforts, it had the

4    right, in your understanding, to purchase the lead; am I

5    correct?

6                MS. BRADY:  Objection, argumentative.

7                THE COURT:  Well, state it again.  Let me --

8                MR. FRANCO:  Yes.

9                THE COURT:  Long question.

10   BY MR. FRANCO:

11   Q.   Sir, it wasn't GulfSouth's right if it didn't agree with

12   collection with any of the other banks to purchase the lead bank

13   position, was it?  It already had the lead bank position, didn't

14   it?

15   A.   Right.

16   Q.   If there was a disagreement on the collection efforts by

17   the lead bank, it was the participating banks who had the remedy

18   to purchase the lead bank position, correct?

19   A.   That's correct.

20               MR. FRANCO:  Your Honor, at this time, I understood

21   you allowed me to go into that, but rather than try to call

22   Mr. Campolo back as part of my case to try to get him off the

23   stand, I would like to ask a few additional questions that I

24   would ask him as part of my case.

25               THE COURT:  All right.

1          MS. BRADY:  With the understanding that then he is

2     done testifying, we don't have to call him again.

3          THE COURT:  That would need to be the understanding.

4          MR. FRANCO:  I certainly wouldn't duplicate anything.

5     I can't tell what's going to happen between now and the time

6     he's here, but my intent is not to recall him at this time.

7     That's for sure.  I don't know what else may come up.  If he's

8     here, fine; if he's been released, then he's been released.

9          MS. BRADY:  We don't agree with that, Your Honor, no.

10    If he wants to take his testimony now --

11         THE COURT:  I agree.

12         MR. FRANCO:  Then I will reserve my rights to call him

13    as part of my case, and it may interfere with his schedule, Your

14    Honor.  I thought I would ask him some questions now, just two

15    or three questions, to follow up while we're here.

16         What I will not do is I absolutely will not duplicate

17    that, if I even had the intent of calling him again, and I may

18    not have that intent.  He's not here, then he's not here.  He

19    can be released after this.  If he stays, he stays.  If he's

20    released, I'm consenting to his release.

21         MS. BRADY:  Okay.  That's fine, Your Honor.

22         THE COURT:  All right, then.  Go ahead.

23         MR. FRANCO:  Thank you, Your Honor.

24

25

1   **DIRECT EXAMINATION**

2   BY MR. FRANCO:

3   Q.   Now, you talked about the special asset report in 2009

4   which indicated that you had received -- SEPH, excuse me, on

5   occasion had received some financial information of these

6   guarantors, correct?

7   A.   Correct.

8   Q.   It also indicated a tremendous amounts of other loans that

9   were in default.  Fair statement?

10  A.   Yes.

11  Q.   There's been in change in the tremendous amount of other

12  loans that were in default that went to judgments, is there,

13  sir?

14  A.   What do you mean?

15  Q.   There's multimillion dollars of judgments that went against

16  these guarantors, isn't there?

17  A.   Yes.

18  Q.   And you're also not telling the Court that since 2009 that

19  you haven't receive any updated financial statements from these

20  guarantors, are you?

21  A.   No, I said what we had was stale.

22  Q.   What you had in 2009 you said was stale.  Didn't you

23  receive things in 2012, sir?  2013?

24  A.   Yes.

25  Q.   Sir, paragraph 34 of the amended complaint, which was

1    Exhibit 108, followed paragraph 33, obviously, and I pointed out

2    to you that SEPH in paragraph 33 didn't say anything about an

3    agreement and used the words "requested."  You remember that?

4    A.    Yes.

5    Q.    In paragraph 34, is there any statement in paragraph 34

6    that says anything about an agreement, other than a request?

7    A.    Well, GulfSouth advised us that it was preparing a draft of

8    the assignments.

9    Q.    Pursuant to a request, not an agreement, according to this

10   document; isn't that true, sir?

11   A.    That's true.

12   Q.    And GulfSouth, for whatever reason, decided not to deliver

13   any such assignment; isn't that true?

14   A.    That is.

15   Q.    And instead, they filed a lawsuit because there was an

16   agreement over such a dividing the judgment; isn't that true?

17   A.    Because there's a disagreement, yes.

18   Q.    Sir, is it fair to say, would you accept my word for the

19   fact that there's no mention of any agreement in this entire

20   amended complaint to divide the *pro rata* shares, sir?

21   A.    That the word "agreement" comes up in there?

22   Q.    Correct.

23   A.    That's right.

24        MR. FRANCO:  I have no further questions, Your Honor.

25   Thank you.

1          THE COURT:  Okay.  Cross, Ms. Brady?

2          MS. BRADY:  Yes, very briefly, Your Honor.

3                    **CROSS-EXAMINATION**

4    BY MS. BRADY:

5    Q.   Sir, do you have any understanding as to the period of time

6    that passed between -- between when GulfSouth signed the partial

7    assignments and when it filed the declaratory action?

8    A.   Can you ask me the question?

9    Q.   Sure.  Do you have any knowledge as to how much time there

10   was between when GulfSouth executed the partial assignments and

11   when they filed the GulfSouth declaratory judgment action?

12   A.   No.  I'd have to look at the dates on the documents.

13          MS. BRADY:  That's all, Your Honor.

14          THE COURT:  All right.  Any redirect, Mr. Franco?

15          MR. FRANCO:  No, Your Honor.  Thank you very much for

16   the opportunity to have asked him questions.

17          THE COURT:  Mr. Campolo, you may step down.

18        (Witness excused.)

19          THE COURT:  And your next witness?

20          MR. CROSSLAND:  Your Honor, the plaintiff's going to

21   call Mr. Dobson, and we're going to -- even with my direct

22   examination, is going to go past noon.  I'm fine with that.

23   It's going to wrap around.  I just want to make sure that the

24   Court is okay with that process, that he'll still be on the

25   stand and we just stop -- whenever the Court wants to stop, we

1    just stop at something that makes sense.

2          THE COURT:  I'm fine with that.

3          MR. CROSSLAND:  And what time was the Court looking to

4    kind of --

5          THE COURT:  Probably 12:15-ish, something like that.

6          MR. CROSSLAND:  All right.  We'll call Mr. Dobson,

7    then.

8          MR. FRANCO:  He should go to the witness stand,

9    correct, Your Honor?

10         THE COURT:  Yes, yes.  Thank you.

11          **JOE DOBSON, PLAINTIFF WITNESS, DULY SWORN**

12         THE WITNESS:  Joe Vernon Dobson, D-O-B-S-O-N, Junior.

13         THE COURT:  Mr. Crossland?

14         MR. CROSSLAND:  May it please the Court?  Thank you,

15   Your Honor.

16                    **DIRECT EXAMINATION**

17   BY MR. CROSSLAND:

18   Q.    Mr. Dobson, where do you work?

19   A.    I'm president of HCB Financial Corp.

20   Q.    Okay.  And HCB is a Florida limited liability company,

21   correct?

22   A.    That is correct.

23   Q.    Closely held corporation?

24   A.    Yes.

25   Q.    When was HCB incorporated?

DOBSON – DIRECT

1   A.   I'd have to look at the incorporation documents.  I'm

2   sorry.

3   Q.   As you sit here today, you don't know when HCB was

4   incorporated?

5   A.   No, I don't know.

6   Q.   But that was before you became involved with HCB, correct?

7   A.   Yes.

8        MR. CROSSLAND:  Counsel, I'm going to refer the

9   witness to Plaintiff's Exhibit 18 that's been marked for

10  identification.

11  BY MR. CROSSLAND:

12  Q.   Mr. Dobson, do you recognize Plaintiff's Exhibit 18 that's

13  been marked for identification?

14  A.   I do.

15  Q.   What is it?

16  A.   It's a resolution of the board of directors of HCB

17  Financial Corp.

18       MR. CROSSLAND:  Your Honor, we would move Plaintiff's

19  Exhibit 18 into evidence -- that's been marked for

20  identification into evidence as Plaintiff's Exhibit 18.

21       MR. FRANCO:  No objection, Your Honor.

22       THE COURT:  It will be admitted.

23     (PLAINTIFF EXHIBIT 18:  Received in evidence.)

24  BY MR. CROSSLAND:

25  Q.   Who signed the resolution that is Plaintiff's Exhibit 18?

DOBSON – DIRECT

1          MR. FRANCO:  Excuse me, there's a document that

2     doesn't go with that resolution that's attached to it.  I think

3     that might have been an error by plaintiff's counsel, but

4     there's -- there is a stock power that doesn't go with the

5     resolution of the board.

6          THE COURT:  Well, I'm not sure.  This is all

7     electronic, so you're seeing something I'm not sure they are.

8          MR. CROSSLAND:  Judge, this specific document has

9     talked about in depositions throughout this case.  If you look

10    at the Bates labels, they are consecutive.  There's been no

11    complaint that the third page is not an attachment.  Certainly

12    there's no objection raised to that by HCB before.

13         MR. FRANCO:  There was.  There was an irrelevant

14    raised -- objection raised in the list, and that document has

15    nothing to do with the resolution.

16         THE COURT:  Okay.  Well, right now the question is

17    whether you raised this objection.

18         MR. FRANCO:  Irrelevant.

19         MR. CROSSLAND:  It's certainly not an objection

20    that --

21         MR. FRANCO:  Your Honor, this is.

22         THE COURT:  Wait, wait, whoa.

23         MR. FRANCO:  I'm sorry.

24         THE COURT:  I can't hear you both at the same time.

25         First of all, I need to look at the pretrial

1    stipulation and see if this was raised.

2              MR. FRANCO:  Page 4 of 20, Your Honor.

3              THE COURT:  Page -- what is that, Mr. Franco?

4              MR. FRANCO:  Page 4 of 20 of the objections which is

5    Exhibit Schedule B, Document 297-2, Exhibit Schedule B to the

6    pretrial stipulation.

7              THE COURT:  One minute, one minute.  Okay.  297-2, and

8    then what's the number?

9              MR. FRANCO:  I'm sorry, it's 297-1, Your Honor.  I'm

10   sorry.

11             MS. SMITH:  Page 4.

12             MR. FRANCO:  Page 4.

13             THE COURT:  That makes more sense.  Thank you.

14             MR. FRANCO:  Page 4 of 20, and it's Plaintiff's

15   Exhibit 18, and there's an irrelevant objection.  This is --

16   this resolution is irrelevant -- I mean, this stock power is

17   irrelevant to this resolution, has nothing to do with it.

18             THE COURT:  Well, the resolution's already been

19   admitted, so --

20             MR. FRANCO:  The resolution -- yes, the resolution has

21   been admitted.  I have an objection to this stock power that's

22   attached to it.  It's not part of the resolution.  That's why

23   I'm calling it to the Court's attention and my attention that

24   it's not -- it should not have been attached.

25             THE COURT:  What's your position, Mr. Crossland, as to

1    this -- the third page of this exhibit and its relevance?

2            MR. CROSSLAND:  Yes, Your Honor.  Well, first of all,

3    we've listed all three of the pages by Bates label in this -- in

4    the pretrial stipulation.  We identified HCB 141 through 143, so

5    if there's some misunderstanding about what is included in this

6    exhibit, there shouldn't have been.

7            Relevance would be as to whether this entire document

8    is relevant to this case.  The stock power identifies that

9    Mr. Phillips initially owned all the stock in HCB by himself and

10   that he then transferred all of the stock to Phillips Capital.

11           THE COURT:  Objection is overruled.  The entire

12   exhibit including the third page will be admitted.

13           All right, go ahead.

14           MR. CROSSLAND:  Thank you, Your Honor.

15   BY MR. CROSSLAND:

16   Q.   Looking at page 2 of the resolution, Mr. Dobson, this

17   resolution was dated March 22nd, 2011, correct?

18   A.   It's very difficult for me to see.  I'm sorry.  I'm getting

19   old.

20   Q.   That's all right.  We blew it up a little bit for you.

21   A.   Thank you.  March 22nd, 2011.

22   Q.   Okay.  And it's signed by the director, Rupert Phillips,

23   correct?

24   A.   Correct.

25   Q.   And you're the current CFO of HCB?

1    A.   No, sir.

2    Q.   You're not the current chief financial officer of HCB?

3    A.   No, sir, I'm president.

4    Q.   And you became president on March 22nd, 2011, at HCB,

5    correct?

6    A.   Yes.

7    Q.   And Fred McLaughlin, he's the vice president of HCB?

8    A.   Yes.

9    Q.   Mr. McLaughlin was appointed as vice president on March 22

10   as well, correct?

11   A.   Yes.

12   Q.   And Alan Paine (phonetic) is the secretary and treasurer of

13   HCB?

14   A.   Yes.

15   Q.   He was also appointed to those positions on March 22nd of

16   2011?

17   A.   Yes.

18   Q.   And all of these appointments were made as part of this

19   resolution, correct?

20   A.   Yes.

21   Q.   And that resolution was signed by Mr. Phillips?

22   A.   That is correct.

23   Q.   And at this time, March 22nd, 2011, Mr. Phillips resigned

24   as the president of HCB, correct?

25   A.   That's correct.

1    Q.   Are you aware of whether or not Mr. Phillips ever signed a

2    document purporting to be the president of HCB after March

3    22nd of 2011?

4    A.   I'm not aware.

5    Q.   But he shouldn't have, right?

6    A.   No.

7    Q.   Because after March 22nd of 2011, he was not the president

8    of HCB?

9    A.   That's correct.

10   Q.   And any indication that Mr. Phillips was the president of

11   HCB after March 22nd would be a misrepresentation, correct?

12   A.   According to this document, correct.

13   Q.   And according to the fact that he was no longer the

14   president of HCB, correct?

15   A.   Correct.

16        THE COURT:  Excuse me, Mr. Dobson, will you move the

17   microphone closer to you.

18        THE WITNESS:  I'm sorry.  Thank you.

19   BY MR. CROSSLAND:

20   Q.   March 22nd, 2011, Rupert Phillips resigned as treasurer of

21   HCB, correct?

22   A.   Yes.

23   Q.   You can go to page 1 take a look at it.

24        On March 22nd, 2011, Mr. Rupert Phillips also

25   resigned as the secretary of HCB, correct?

1   A.   Yes.

2   Q.   So according to this document, prior to March 22nd of 2011,

3   Mr. Phillips was the sole officer of HCB, correct?

4   A.   Correct.

5   Q.   And sole director of HCB?

6   A.   Yes.

7   Q.   Now, there were no discussions of this resolution before

8   Mr. Phillips executed, were there?

9   A.   I'm sorry, I'm having trouble understanding that question.

10  Q.   Sure.  Mr. Phillips did not advise you why he wanted you to

11  be the president of HCB before this resolution was executed, did

12  he?

13  A.   No, he just asked me if I would be president.

14  Q.   And you told him, sure, I'll be president.

15  A.   I did.

16  Q.   Now, Mr. Phillips remains HCB's chairman of the board,

17  correct?

18  A.   He remains the sole board member.

19  Q.   He's the sole board member and the chairman of HCB's board?

20  A.   Yes.

21  Q.   Now, you understand that this action relates in part to

22  whether HCB's entitled to continue as the operating bank as it

23  relates to collection on deficiency judgment against

24  Mr. Phillips, correct?

25  A.   I don't understand that question.  I'm sorry.

DOBSON – DIRECT

1   Q.   Okay.  Part of what's at issue in this case is whether or

2   not HCB can continue to be the originating bank in the

3   collection efforts against Mr. Phillips, correct?

4   A.   Correct.

5   Q.   And this dispute has been ongoing for multiple years,

6   correct?

7   A.   Which dispute?

8   Q.   The current dispute that we're sitting here in trial on?

9   A.   Yes.

10  Q.   And throughout that time, Mr. Phillips has remained the

11  chairman of HCB's board?

12  A.   Yes.

13  Q.   He provides advice to HCB?

14  A.   Yes.

15  Q.   And you testified he's the only member on the board of HCB?

16  A.   Yes.

17  Q.   HCB has not attempted to establish some sort of ethical

18  wall between Mr. Phillips and this litigation, has it?

19  A.   No.

20  Q.   And there's been no formal procedure to limit Mr. Phillips'

21  access to collection efforts of HCB against himself or the other

22  judgment-debtors?

23  A.   No.

24  Q.   And there's been no formal procedure to limit Mr. Phillips'

25  input into the collection efforts of HCB against himself or the

1   other judgment-debtors?

2   A.   No.

3   Q.   And to the extent there is a decision to be made concerning

4   whether collection efforts will be taken against Mr. Phillips,

5   Mr. Phillips is a participant to those discussions?

6   A.   Yes.

7   Q.   In fact, Mr. Phillips has been a participant of discussions

8   with HCB's counsel in this case, hasn't he?

9   A.   Yes.

10  Q.   And Mr. Phillips attended mediation as the corporate

11  representative of HCB in this case, didn't he?

12  A.   In the first mediation I believe, yes.

13  Q.   And Mr. Phillips was consulted during the settlement

14  conference that took place in this courthouse, correct?

15  A.   Which settlement?

16  Q.   The one that was in this courthouse in January of this

17  year?

18  A.   I don't know where the other one was held, so I'm assuming

19  we're talking about the second settlement.

20  Q.   Yes.

21  A.   Yes.

22  Q.   You called him?

23  A.   Yes.

24  Q.   To discuss what was going on at the settlement conference?

25  A.   Yes.

1    Q.   And immediately after the settlement conference,

2    Mr. Phillips called Tom Button in part, didn't he?

3    A.   I don't know.

4    Q.   Let's talk about your relationship with Mr. Phillips for a

5    minute.  You've worked for companies owned by Mr. Phillips since

6    July 5th, 1991, correct?

7    A.   Correct.

8    Q.   Fair to say he's been your boss for more than 20 years?

9    A.   Not directly, no.

10   Q.   But you've worked for his companies?

11   A.   I worked for companies that have gone up and at some point

12   along the way, he has been either partial owner of or --

13   Q.   And those same companies have paid your salaries since

14   1991, correct?

15   A.   Yes.

16   Q.   What is your salary at HCB?

17   A.   $102,000.

18   Q.   Who are the owners?

19   A.   Phillips Capital Partners, Inc.

20   Q.   Okay.  That's not what you told us during deposition, is

21   it?

22   A.   No, I was confused during the deposition.  HCB -- we talked

23   about HCB Financial Corp. and HCB Advisory Group and PCP and --

24   Q.   So at deposition you told us that, in fact, Rupert and his

25   wife and his children were the shareholders in HCB, correct?

DOBSON – DIRECT                         138

1   A.   Correct.

2   Q.   And you are the CFO of Phillips Capital Partners, correct?

3   A.   That's correct.

4   Q.   And so you should have known that Phillips Capital was the

5   shareholder of HCB and not Mr. Phillips individually?

6   A.   Correct.

7   Q.   But your testimony today is that Phillips Capital Partners

8   Inc., is the sole shareholder of HCB?

9   A.   Yes.

10  Q.   There are no other shareholders?

11  A.   No.

12  Q.   And Phillips Capital became the sold shareholder of HCB

13  when Mr. Phillips transferred his shares in HCB to Phillips

14  Capital, correct?

15  A.   That is correct.

16  Q.   If you go to page 3 of exhibit 18, in fact this stock power

17  was executed by Mr. Phillips, right?

18  A.   Yes.

19  Q.   And it was executed November 3rd, 2010?

20  A.   That is correct.

21  Q.   So prior to November 3rd, 2010, Mr. Phillips was the sole

22  shareholder in HCB?

23  A.   That's correct.

24  Q.   And he referred all of his individual interest in HCB to

25  Phillips Capital, correct?

139

DOBSON - DIRECT

1   A.   Correct.

2   Q.   And this was an effort to consolidate companies that Mr.

3   Phillips was involved in under Phillips Capital Partners'

4   umbrella, wasn't it?

5   A.   That's correct.

6   Q.   And you're not aware of any consideration that Phillips

7   Capital paid to Mr. Phillips for the stock transfer, are you?

8   A.   No.

9   Q.   HCB certainly hasn't investigated what consideration

10  Phillips Capital paid to Mr. Phillips for this stock power?

11  A.   No.

12  Q.   So he may have got nothing?

13  A.   He received nothing, as far as I know of.

14  Q.   As far as you know, Mr. Phillips received absolutely

15  nothing for transferring all of his stock in HCB to Mr. Phillips

16  Capital?

17  A.   That's correct.

18  Q.   Because that was a part of a consolidation process?

19  A.   That's correct.

20  Q.   And at that time, you're aware that there are multiple

21  judgments against Mr. Phillips, correct?

22  A.   At which time?  I'm sorry.

23  Q.   In November of 2010?

24  A.   Yes.

25  Q.   In fact, HCB owns one of the judgments that had been

```
 1   entered against Mr. Phillips as of November of 2010?

 2   A.   Correct.

 3   Q.   And owns the $49 million Bank Atlanta judgment?

 4   A.   Yes.

 5   Q.   Okay.  Did HCB ever try to undo the transfer of

 6   Mr. Phillips stock power from himself to Phillips Capital?

 7   A.   No.

 8   Q.   Could have?

 9        MR. FRANCO:  Objection, Your Honor.  That calls for a

10   legal conclusion:  Could have.

11        MR. CROSSLAND:  Just asked if --

12        THE COURT:  If he knows, he can answer.

13        THE WITNESS:  I don't know.

14   BY MR. CROSSLAND:

15   Q.   But it didn't?

16   A.   No.

17   Q.   Now Mr. Phillips is the president of Phillips Capital,

18   correct?

19   A.   Yes.

20   Q.   And you understand when I had say Phillips Capital, I am

21   referring to Phillips Capital Partner, Inc.?

22   A.   Yes.

23   Q.   The sole shareholder of HCB?  Yes?

24   A.   Yes.

25   Q.   Thank you.
```

1          And Mr. Phillips is the chairman of the board of

2    Phillips Capital, correct?

3          MR. FRANCO:  Your Honor, objection at this point that

4    we go further into other companies.  The issue in this case is,

5    as I understand it from SEPH, is control over HCB's actions.  If

6    he's trying the piercing issue, it's not been pleaded, he hasn't

7    alleged that, he hasn't joined parties that need to be joined,

8    and that's irrelevant.

9          MR. CROSSLAND:  It's absolutely critically relevant,

10   Your Honor.  We've established through the testimony of

11   Mr. Dobson that in fact Mr. Phillips received zero for his

12   transfer of all the stock in HCB and that prior to November of

13   2010, he was the sole shareholder.  We're now establishing that

14   he was the chairman of board, the president of Phillips Capital

15   Partners, and that his ownership interest in that is through

16   him, his wife, and his children, and their family trust.  They,

17   in fact, own HCB.

18         THE COURT:  I'll allow it.  Given Phillips Capital

19   Partners interest in HCB, I'll allow it.  All right.

20   BY MR. CROSSLAND:

21   Q.   Mr. Phillips is the chairman of the board of Phillips

22   Capital, correct?

23   A.   Yes.

24   Q.   And as with HCB, is he the only board member for Phillips

25   Capital?

1    A.   I don't know at this time.  I'd have to go back and look at

2    the resolutions.

3    Q.   Okay.  And you're the CFO of Phillips Capital?

4    A.   Yes.

5    Q.   As you sit here, you don't know if there are any board

6    members of Phillips Capital other than Mr. Phillips?

7    A.   No.

8    Q.   And Sandra Phillips, you know who that is?

9    A.   Yes.

10   Q.   That's Rupert's wife, correct?

11   A.   Yes.

12   Q.   And she's the vice president of Phillips Capital?

13   A.   Yes.

14   Q.   And the owners of Phillips Capital include Mr. Phillips,

15   correct?

16   A.   Yes.  I'm sorry, could you ask that question again?

17   Q.   Sure.  The owners of Phillips Capital include Mr. Phillips,

18   correct?

19   A.   Owners of Phillips Capital include Mr. Phillips' trust.

20   Q.   Okay.  And Mrs. Phillips trust?

21   A.   Exactly.

22   Q.   And their kids' trust?

23   A.   Yes.

24   Q.   And who are the beneficiary of those trusts?

25   A.   Mr. Phillips, Sandra Phillips, and their children.

1  Q.   Okay.  And Mr. Phillips and his wife and his kids are also

2  the trustees of those trusts?

3  A.   I don't know.  I'd have to look at the trust documents.

4  Q.   Okay.  But they are the beneficiaries?

5  A.   Yes.

6  Q.   You're aware that this lawsuit relates to HCB's alleged

7  acquisition of various rights from GulfSouth, correct?

8  A.   Yes.

9  Q.   Acquisition of rights to a deficiency judgment?

10  A.   Yes.

11  Q.   And acquisition as originating bank under a participation

12  agreement with Vision Bank, correct?

13  A.   Yes.

14  Q.   Okay.  And there were negotiations regarding those

15  transactions, between HCB -- there were negotiations regarding

16  those transactions?

17  A.   Regarding the transactions --

18  Q.   That ultimately happened between GulfSouth and HCB?

19  A.   Yes.

20  Q.   You didn't have any involvement in those negotiations?

21  A.   No.

22  Q.   You played no role in those?

23  A.   No.

24  Q.   Those negotiations were handled by Mr. Phillips?

25  A.   Yes.

DOBSON - DIRECT

1   Q.   And to your knowledge, Mr. McLaughlin, the vice president

2   of HCB, had no role in those negotiations?

3   A.   I don't know of any role he played.

4   Q.   And you're not aware of whether Mr. Paine had any roles in

5   those negotiations?

6   A.   I don't believe he had any role either.

7   Q.   And at the time of these negotiations with GulfSouth, you

8   were the president of HCB?

9   A.   Yes.

10  Q.   Now, ultimately, HCB paid a total of 200,000 for all of

11  GulfSouth's interest in the deficiency judgment, the

12  participation agreement, and some leftover lots, correct?

13  A.   Yes.

14  Q.   You don't know how that amount was determined?

15  A.   No.

16  Q.   You were not involved in negotiating the dollars that would

17  be spent to purchase GulfSouth's interest, correct?

18  A.   No.

19  Q.   And again, at this time you were the president of HCB?

20  A.   Yes.

21  Q.   But Mr. Phillips is the person who determined how much

22  money would be paid to GulfSouth, correct?

23  A.   I don't know.

24  Q.   Okay.  I'm going to show you a copy of your deposition

25  transcript and see if that helps refresh your recollection.

DOBSON – DIRECT

```
1   A.    Okay.

2           MR. CROSSLAND:  Counsel, I'm referring the witness to

3   page 56.  We're going to look first 8 lines.

4           May I approach, Your Honor?

5           THE COURT:  Yes.

6   BY MR. CROSSLAND:

7   Q.   See if I can get there for you.  Look at page 56, first 8

8   lines.

9   A.   56.  Sorry, the first 8 lines.

10  Q.   Yeah, the question I'm asking:  Does it help refresh your

11  recollection regarding whether Mr. Phillips made the decision as

12  to the dollars that were to be paid?

13  A.   I guess I'm misunderstanding the question.

14  Q.   Okay.

15  A.   And so -- I mean, GulfSouth could have determined that it

16  would take 200,000; but, I mean, whether it was GulfSouth that

17  determined the 200,000 or Mr. Phillips, I don't know for sure.

18  Q.   Right, but Mr. Phillips made the decision that HCB would

19  pay the 200,000?

20  A.   Yes.

21  Q.   And part of what HCB bought as part of that transaction was

22  the deficiency judgment?

23  A.   Yes.

24           MR. CROSSLAND:  And, Mr. Dyer, if you'd pull up

25  Plaintiff's Exhibit 30th, please.
```

1    BY MR. CROSSLAND:

2    Q.   If you'll look at the screen there, Mr. Dobson, Plaintiff's

3    Exhibit 30 is the deficiency judgment that HCB acquired from

4    GulfSouth, correct?

5    A.   Correct, yes.

6    Q.   And Mr. Phillips, he's the judgment-debtor on that

7    deficiency judgment?

8              Go to the second page, Mr. Dyer.

9    A.   Correct.

10   Q.   And HCB believes that in order for SE Property to control

11   the collection process as originating bank, SE Property should

12   be required to pay approximately $932,000, correct?

13   A.   Rephrase the question.  I'm sorry.

14   Q.   Sure.  Part of HCB's claim in this case is that if SE

15   Property wants to be the originating bank, it should buy out

16   HCB's status as the originating bank, correct?

17   A.   Decision is under the participation agreement, if SE

18   Property Holdings wants to be the originating bank position, it

19   should buy that originating bank position, correct.

20   Q.   Right, and that would cost SE Property approximately

21   $932,000?

22   A.   Correct.

23   Q.   Okay.  And HCB paid 180,000 for the interest in the

24   deficiency judgment, along with some other things?

25   A.   That's correct.

DOBSON - DIRECT

1  Q.   Now HCB also acquired the interest of other banks to the

2  deficiency judgment, correct?

3  A.   Correct.

4  Q.   In fact, HCB acquired Bank of Vernon's interest?

5  A.   Correct.

6  Q.   Paid Bank of Vernon $12,000?

7  A.   Correct.

8  Q.   And Bank of Vernon previously held about a 1.2 interest in

9  the deficiency judgment?

10 A.   Correct.

11 Q.   HCB also acquired First NBC's interest in the judgment?

12 A.   Correct.

13 Q.   Didn't pay anything to First NBC for that, did it?

14 A.   The allocation in the purchase was zero.

15 Q.   It's part of a loan portfolio?

16 A.   Part of the loan portfolio.

17 Q.   And the allocation was zero?

18 A.   Correct.

19        THE COURT:  And remind me the interest.

20        MR. CROSSLAND:  Yes.

21 BY MR. CROSSLAND:

22 Q.   And the interest of First NBC was the same of Vision Bank:

23 44.9 percent?

24 A.   That's correct.

25 Q.   Okay.  And First NBC had acquired its interest from CPB?

1    A.    Yes.

2    Q.    And that interest was 44.9 percent of the judgment?

3    A.    That's correct.

4    Q.    And HCB bought it for nothing?

5    A.    Correct.

6    Q.    Other than Rupert Phillips, there were no other employees

7    of HCB that negotiated with GulfSouth, correct?

8    A.    I'm not aware of any others.

9    Q.    And there were no other employees that negotiated with Bank

10   of Vernon, correct?

11   A.    I'm not aware of any others.

12   Q.    What about First NBC?

13   A.    Yes, there were others.

14   Q.    The decision to acquire GulfSouth's interest in this

15   transaction was not discussed at a board meeting, was it?

16   A.    No.

17   Q.    It was never approved by the board?

18   A.    There was no document generated by the board.

19   Q.    There's no meeting minutes?

20   A.    No.

21   Q.    In fact, HCB wanted not only to acquire the deficiency

22   judgment, but it wanted to take the originating bank position so

23   HCB could control the collection process?

24   A.    Could control the expenses of the collection process.

25   Q.    Okay.  But that would also include controlling the

DOBSON – DIRECT

1    collection process?

2    A.    Correct.

3    Q.    And as part of this transaction, HCB knew that it was

4    assuming GulfSouth's duties and responsibilities as the

5    originating bank?

6    A.    Yes.

7    Q.    And HCB knew the terms of the Vision Bank participation

8    agreement, because, in fact, HCB purchased GulfSouth's interests

9    in it?

10   A.    That's correct.

11   Q.    Let's talk a little bit about HCB's correspondence with SE

12   Property.  HCB never advised SE Property of its negotiations

13   with GulfSouth relating to this acquisition, did it?

14   A.    No.

15   Q.    And HCB never advised SE Property of negotiations with

16   GulfSouth to become the originating bank?

17   A.    No.

18   Q.    And HCB never advised SE Property with alleged acquisition

19   of any of the participating banks' interest in the deficiency

20   judgments, so Bank of Vernon or CPB or First NBC?

21   A.    I'm sorry, can you restate that question?  It was a long

22   one.

23   Q.    Sure.  HCB never advised SE Property of its negotiations

24   with Bank of Vernon or First NBC to acquire their interest in

25   the deficiency judgment?

DOBSON – DIRECT

1   A.   No.

2   Q.   And once the transaction was completed, HCB never

3   approached SE Property and advised that it had become the

4   originating bank under the participation agreement?

5   A.   No.

6   Q.   And HCB never approached SE Property about purchasing SE

7   Property's interest in the deficiency judgment?

8   A.   No.

9   Q.   Isn't that because HCB believes that it controls the

10   collection process and holds the majority of the deficiency

11   judgment?

12   A.   Not necessarily, no.

13   Q.   So your testimony today is that -- let me reask the

14   question.

15        Isn't it true that HCB never approached SE Property to

16   acquire SE Property's interest in the judgment because HCB

17   believed it was already the originating bank and had control of

18   the collection process?

19   A.   I can't say that's the reason.

20   Q.   Do you remember taking a deposition in this case?

21   A.   Yes.

22   Q.   And you told the truth during that deposition, right?

23   A.   Yes.

24   Q.   And that deposition took place July 10th, 2013?

25   A.   Yes.

1   Q.   Okay.  And there were questions in that deposition about

2   why you didn't approach SE Property, correct?

3            MR. FRANCO:  Objection, Your Honor.

4            THE WITNESS:  I can't recall.

5            MR. FRANCO:  He needs to refer to the deposition if he

6   wants him to refer to the deposition.

7            THE COURT:  Fair.

8            MR. CROSSLAND:  Starting at page 91.

9            THE WITNESS:  Okay.

10           MR. CROSSLAND:  Line 24, the question you were

11  asked --

12           MR. FRANCO:  Objection, Your Honor, that's -- I think

13  he's asking -- he has to ask him if he's going to refresh his

14  recollection before he tries to impeach him.

15           THE COURT:  I'll let him look at the question first

16  and see, because we didn't have that -- since Mr. Dobson didn't

17  have the deposition when the question was first asked.

18           THE WITNESS:  I'm sorry, which line?

19  BY MR. CROSSLAND:

20  Q.   Sure.  There were questions in your deposition --

21           MR. FRANCO:  Can we take the deposition off the

22  screen, Your Honor?

23           THE COURT:  No.

24           MR. CROSSLAND:  I'm supposed to show it, I'm not

25  supposed to show it?

1              THE COURT:  Why wouldn't it be on the screen?

2              MR. FRANCO:  Because the document is shown to the

3    witness to refresh your recollection.  I didn't think it was

4    allowed into evidence at this point.

5              THE COURT:  Mr. Franco, Mr. Dobson is a party, and a

6    party's deposition in federal court can be used for any purpose.

7    It can be admitted; it can be used for any purpose.

8              And plus --

9              MR. FRANCO:  Thank you, Your Honor.

10             THE COURT:  -- allows me to follow along to see if the

11   property procedure is being followed in terms of impeachment, if

12   that's the purpose.

13             Okay.  Go ahead, Mr. Crossland.

14   BY MR. CROSSLAND:

15   Q.   All right.  On page 91, line 24, there's a question about

16   whether Mr. Phillips ever considered approaching SE Property

17   about acquiring its interest in the deficiency, correct?

18   A.   Yes.

19   Q.   And you said you were not aware of any.  You know that HCB

20   did not, on its own, unilaterally, correct?

21   A.   Correct.

22   Q.   And then the question was:  Is there a reason why you did

23   not?

24   A.   Looking for the answer.  Once I was in the originating bank

25   position and had the other participant position, I didn't really

1   have a reason to at that point, that I know of.

2   Q.   Right.  So in fact -- thank you, sir.

3   A.   Sure.

4   Q.   Once HCB had the originating bank position and control of

5   the other participation interests, HCB didn't see the need to

6   approach SE Property, did it?

7   A.   Well, technically, we didn't approach any of the other

8   banks to purchase their positions either.

9   Q.   Maybe I didn't ask a good question.

10  A.   Sorry.  That's kind of why I said -- you know.

11  Q.   Right.  My question was once HCB acquired the originating

12  bank status and the other interests of the participants, it

13  didn't see a need to approach SE Property, did it?

14  A.   No.

15  Q.   Since HCB acquired the various interests in the deficiency

16  judgment and GulfSouth's interest in originating bank, HCB has

17  never approached SE Property with a collection strategy outside

18  of this litigation, has it?

19  A.   No.

20  Q.   Never said to SE Property, Hey, they've got a lot of

21  judgment liens, let's just wait and see what happens?

22  A.   No.

23  Q.   Never asked SE Property if it would agree to a course of

24  action that HCB might want to take?

25  A.   No.

1  Q.   And prior to this litigation, HCB never advised SE Property

2  of Mr. Phillips' affiliation with HCB?

3  A.   No.

4  Q.   Never advised that he's the chairman of the board?

5  A.   No.

6  Q.   Never advised that he's a consultant?

7  A.   No.

8  Q.   Never advised that, through his family trust, he's one of

9  the owners?

10  A.   No.

11  Q.   I want to talk generally about HCB and its underwriting

12  procedures when it looks at acquiring interest in various debts

13  or loans or judgments.  HCB does that stuff, correct?

14  A.   Yes.

15  Q.   And typically, as part of the underwriting procedure, you

16  would underwrite the collateral?

17  A.   Correct.

18  Q.   And what does that mean?

19  A.   Underwriting collateral looks at the collateral that's been

20  promised against the note to see what the fair market value

21  might be for that collateral.

22  Q.   And you also -- HCB also typically underwrites the

23  borrowers, correct?

24  A.   Sometimes.  Not all the time but sometimes.

25  Q.   You analyze what you might be able to collect on the

1   collateral?

2   A.   When we underwrite loan portfolio packages, usually we

3   greatly discount any judgment or deficiency on the borrowers.

4   Q.   But you do analyze what you can recover on the collateral?

5   A.   Yes.

6   Q.   And you analyze what you might be able to recover from the

7   borrowers?

8   A.   Correct.

9   Q.   Same thing for guarantors that might be on a debt?

10  A.   Correct.

11  Q.   You analyze them to see what collectability there might be?

12  A.   Correct.

13  Q.   And those matters are mostly handled by yourself and

14  Mr. McLaughlin?

15  A.   The underwriting of the collateral, mostly by myself and

16  Mr. McLaughlin.

17  Q.   And these underwriting methods were not performed by you as

18  part of HCB's acquisition of GulfSouth's interest in the

19  deficiency judgment or the participation agreement, were they?

20  A.   Correct.

21  Q.   As you sit here today, you cannot identify a dollar figure

22  that you expect to recover from any of the judgment-debtors, can

23  you?

24  A.   Not a specific dollar figure.

25  Q.   And as of your deposition in July of 2013, you were still

1    looking into the amount that you expected to recover, correct?

2    A.    That's correct.

3    Q.    Still looking?

4    A.    Once the second amended complaint came about and there was

5    some question as to whether or not we had a valid assignment to

6    the note, everything just pretty much stopped, because we didn't

7    want to make demands of the Olsons or demands of Mr. Phillips

8    that we weren't entitled to after you questioned me, the

9    assignment or after -- not you personally, but after --

10   Q.    I get accused all the time.

11   A.    I'm sorry, I don't want to accuse you of anything --

12   Q.    I understand.

13          So because there was a dispute raised by SE Property

14   as to whether HCB could collect on this deficiency judgment, you

15   kind of stopped your efforts?

16   A.    We put them on hiatus.

17   Q.    Isn't it true that HCB already had a $49 million

18   judgment --

19   A.    That's true.

20   Q.    -- against these exact same guarantors?

21   A.    Yes.

22   Q.    Dispute that fact, HCB hasn't done anything to determine

23   collectability of the judgment-debtors since SE Property brought

24   HCB into this litigation?

25   A.    We've asked for tax returns and personal financial

1   statements.

2   Q.   I'm sorry, I thought you just testified that there was a

3   hiatus once HCB got brought into this action.

4   A.   The second amended complaint.

5   Q.   Okay.  So since that time, despite the fact that there's a

6   $49 million judgment in HCB's hands, HCB hasn't done anything to

7   determine the collectability of the judgment-debtors?

8   A.   No.

9   Q.   And prior to the acquisition of deficiency judgment in this

10  case, you didn't sit down with the other officers of HCB and

11  attempt to evaluate potential recovery over a two-year period?

12  A.   No.

13  Q.   Five-year period?

14  A.   No.

15          MR. CROSSLAND:  Judge, this is probably a pretty good

16  place to stop if the Court is ready.

17          THE COURT:  All right.  Mr. Dobson, you may step down.

18  Please don't discuss the testimony with anyone, including your

19  attorneys, during the break.

20          THE WITNESS:  Yes, Your Honor.

21          THE COURT:  All right.  Something?

22          MS. BRADY:  Yes, I was going to --

23          THE COURT:  Go ahead.

24          MS. BRADY:  -- bring up one matter.

25          As Your Honor is aware, because we've discussed it

DOBSON – DIRECT

1    both now and last week at the pretrial, we're going to get into

2    a lot of e-mail correspondence between the parties and the

3    participating banks.

4              THE COURT:  Go ahead, Mr. Dobson.  You're fine.

5              THE WITNESS:  I don't wanted to interrupt.

6              THE COURT:  Thank you, though.  I appreciate that.

7              MS. BRADY:  And there's, of course, hearsay

8    implications in all of that, we've spent a considerable amount

9    of time researching the hearsay issues when you have

10   circumstances such as this where that's how the parties

11   communicated, and that goes though show intent.  And I have --

12   so we'll be making the hearsay -- assuming Mr. Franco will be

13   making the hearsay objection as we go along, and rather than

14   addressing, well, this case is this, and this case is that, I've

15   pulled what I think are the best cases addressing the issue and

16   I was thinking it could be helpful to the Court and to

17   Mr. Franco to give them to you now.

18             THE COURT:  Yeah, that would be great.  Thank you.

19             All right.  Ms. Brady, we have made some arrangements

20   to accommodate you, I believe, and my preference would be to

21   take an hour and 15 minutes for lunch, since you're going to be

22   right here, we've given you a room in the courthouse, do you

23   think you can manage in an hour and 15 minutes?

24             MS. BRADY:  Yes.

25             THE COURT:  All right.  We'll be in recess then until

DOBSON – DIRECT

1    1:30.

2              MS. BRADY:  Thank you, Your Honor.

3    (lunch recess.)

1   **THE COURT:**  So I looked at the hearsay issue.  And the

2   emails, to the extent that the emails are being offered to

3   establish that the agreement was made, it will not be considered

4   hearsay.  The Court will not consider the statements for the

5   truth and would be nonhearsay.

6        So --

7   **MR. FRANCO:**  May I?

8   **THE COURT:**  Yes.

9   **MR. FRANCO:**  I assume you're talking about the fact

10  that those statements are admissible only to the extent they are

11  present mental state at the time the agreement was made, not

12  statements later that were made in agreement back --

13  **THE COURT:**  I'll have to see it in context.  I don't

14  know.  I'll have to see it in context.

15  **MR. FRANCO:**  Just so Your Honor knows, my position is

16  any statement made has to be at the time by the declarant's --

17  the state of mind of the declarant at the time it's made, and

18  it's not admissible to show -- statements that say we made this

19  agreement back two years ago is not as admissible as hearsay.

20  That's my position, and I have some cases to substantiate that.

21  When we get to it we'll --

22  **THE COURT:**  Well, I'll need to see those cases,

23  because my understanding is you were not offering it as a

24  present sense impression, if that's what Mr. Franco is referring

25  to.

1          **MS. BRADY:**  Right, Your Honor, they just go to the

2   discussions between the parties as to the terms of the agreement

3   and the knowledge and the belief.

4          **THE COURT:**  Right.  My understanding is that -- and

5   correct me if I'm wrong, Ms. Brady, but my understanding is you

6   all are offering it in not under an exception to the hearsay

7   rule, but as nonhearsay.

8          **MS. BRADY:**  Exactly.

9          **THE COURT:**  So I'm not sure I follow your objection

10  then, Mr. Franco.

11         **MR. FRANCO:**  So it's not offered to prove the truth of

12  the matter asserted?

13         **THE COURT:**  Correct.

14         **MR. FRANCO:**  Just that it was made?

15         **THE COURT:**  Just that it was made.

16         **MR. FRANCO:**  Thank you, Your Honor.

17         **THE COURT:**  But raise your objection when --

18         **MR. FRANCO:**  Yeah, we will.

19         **THE COURT:**  Although, I mean, at some point I may just

20  give you a standing objection, because I understand you have

21  quite a few emails.

22         **MR. FRANCO:**  Thank you, Your Honor.

23         **THE COURT:**  And I'll look at -- if there's a specific

24  statement that you feel, Mr. Franco, does not fall within, you

25  know, the understanding of the ruling I'm making -- your

1    understanding of the ruling I'm making, then feel free to let me

2    know that.

3            **MR. FRANCO:**  Thank you, Your Honor.

4            **THE COURT:**  So, Mr. Dobson, you're still under oath,

5    and we are still in Mr. Crossland's direct.

6            **MR. CROSSLAND:**  Thank you, Your Honor.

7                    **DIRECT EXAMINATION** (Cont'd.)

8    **BY MR. CROSSLAND:**

9    **Q.**   Mr. Dobson, did you speak to anybody during the break about

10   your testimony?

11   **A.**   No, I did not.

12           **MR. CROSSLAND:**  Mr. Dyer, would you pull up

13   Plaintiff's Exhibit 1, please.

14   **BY MR. CROSSLAND:**

15   **Q.**   I'm going to go to the second page, provision 10(a).

16   Mr. Dobson, I'm showing you Plaintiff's Exhibit 1, looking at

17   10(a), and we're specifically looking at provision 10(a) of that

18   agreement.  Do you see that?

19   **A.**   Yes.

20   **Q.**   10(a) says, "If in the event a default shall have occurred

21   and be continuing under the loan or any event or condition

22   occurs exists which following any grace, cure, or notice and

23   cure period required by the terms of loan may become an event of

24   default, then the participating bank and the originating bank

25   shall determine by mutual agreement whether and in what manner

1    to do, to what extent, and any and all rights and remedies of

2    the originating bank under the loan will be exercised and in the

3    subsequent management and disposition of any collateral."  Do

4    you see that?

5    **A.**   Yes.

6    **Q.**   Even under HCB's interpretation of 10(a) there has to be a

7    mutual agreement about the process, correct?

8    **A.**   Yes.

9    **Q.**   And you've already testified, haven't you, sir, that you

10   never reached out to Vision Bank or SE Property once HCB

11   acquired this loan?

12   **A.**   No.

13   **Q.**   And you never tried to reach a mutual agreement about a

14   course of action?

15   **A.**   No.

16   **Q.**   You never told SE Property here is what we see with the

17   judgment-debtors, here is what we'd like to do?

18   **A.**   No.

19   **Q.**   So HCB never even tried to get this mutual agreement,

20   correct?

21   **A.**   No.

22   **Q.**   I'm sorry.  So my question was correct, so it is correct

23   that that never happened?

24   **A.**   That -- no.

25            **MR. CROSSLAND:**  If you go to the next page, Mr. Dyer,

1  we're going to look at paragraph 11.

2  **BY MR. CROSSLAND:**

3  **Q.**   Now, it's HCB's position that if the parties don't agree

4  that Vision Bank or SE Property would have to buy out HCB's

5  interest, right, that's HCB's position in this case?

6  **A.**   Yes.

7  **Q.**   Paragraph 11(a) only applies, even under HCB's theory, in

8  the event the originating bank and participating bank have not

9  agreed, correct?

10  **A.**   Yes.

11  **Q.**   And it's clear that HCB never tried to reach an agreement

12  with SE Property?

13  **A.**   Not yet.

14  **Q.**   I'm sorry?

15  **A.**   Not yet.

16  **Q.**   So it's never happened as we sit here today?

17  **A.**   Yes.

18         **MR. CROSSLAND:**  Judge, I'm having a bit of trouble --

19  and I don't know that it's your fault, but I'm having just a bit

20  of trouble hearing him.

21         **THE COURT:**  Well, it's --

22         **THE WITNESS:**  I'm sorry.  If I get too close it starts

23  feeding back.

24         **THE COURT:**  Okay.  Well, let's just --

25         **THE WITNESS:**  I'll try to talk -- my throat is kind

1    of --

2            **MR. CROSSLAND:**  I may just ask you if I don't hear

3    you, and that's the only reason I'm doing it is I may not hear

4    it.

5            **THE WITNESS:**  Fine, yeah, I won't be offended.

6            **MR. CROSSLAND:**  Okay.

7    BY MR. CROSSLAND:

8    **Q.**   Mr. Dobson, HCB has no information on Mr. Phillips's source

9    of income, does it?

10   **A.**   No.

11   **Q.**   It doesn't know where Mr. Phillips gets the money to live

12   every day, correct?

13   **A.**   Well, he's retired, so he receives some money from Social

14   Security.

15   **Q.**   Okay.  You've previously testified in your deposition that

16   Mr. Phillips -- you didn't know his source of income; isn't that

17   right?

18   **A.**   Right, at that time.

19   **Q.**   And HCB has not looked into any transfers of assets by

20   Mr. Phillips since it acquired the deficiency judgment, has it?

21   **A.**   No.

22   **Q.**   And it hasn't -- HCB hasn't looked into the transfer of any

23   assets of Mr. Phillips at any point in time, right?

24   **A.**   No.

25   **Q.**   And we've already established that HCB never investigated

1    Mr. Phillips's assignment of his stock to Phillips Capital

2    Partners for the HCB stock, right?

3    **A.**   No.

4    **Q.**   HCB hasn't reviewed any fact information sheets from

5    Mr. Phillips, has it?

6    **A.**   No.

7    **Q.**   Hasn't reviewed a fact information sheet for Mrs. Phillips?

8    **A.**   No.

9    **Q.**   You've never asked Mr. Phillips for a fact information

10   sheet?

11   **A.**   No.

12   **Q.**   Haven't taken the deposition of Mr. Phillips, have you?

13   **A.**   No.

14   **Q.**   Haven't taken the deposition of Mrs. Phillips?

15   **A.**   No.

16   **Q.**   Haven't taken the deposition of any person or entity

17   regarding the assets or liabilities of any of the

18   judgment-debtors, have you?

19   **A.**   No.

20   **Q.**   Now, HCB hasn't obtained bank records for any of the

21   judgment-debtors?

22   **A.**   No.

23   **Q.**   They haven't served any writs of garnishment?

24   **A.**   No.

25   **Q.**   HCB certainly didn't try to file a fraudulent transfer

1   action against Mr. Phillips relating to the HCB stock, correct?

2   **A.**   No.

3   **Q.**   In fact, HCB hasn't attempted to execute on any asset of

4   Mr. Phillips or any of the judgment-debtors to date, has it?

5   **A.**   In this -- in this participation?

6   **Q.**   Ever.  Has HCB ever attempted to execute on an asset of

7   Mr. Phillips?

8   **A.**   We've accepted some property that was a loan to a company

9   that -- that Mr. Phillips, I believe, was guarantor on.  We

10  accepted a short sale on that property.

11  **Q.**   You accepted a short sale?

12  **A.**   Yes.

13  **Q.**   But in this case you remember that SE Property asked HCB to

14  produce any and all documents relating to the handling of

15  collection activities on the deficiency judgment, correct?

16  **A.**   Yes.

17  **Q.**   And the response to that request was there were none?

18  **A.**   I think it happened after that request was made.  I'd have

19  to go back and look.  I don't know the exact date right now.

20  **Q.**   Is it your testimony, sir, that HCB has in fact received

21  documents after a discovery request in this case and that those

22  documents have not been produced to SE Property?

23  **A.**   I'm not sure I was aware that that document would apply to

24  this case.

25  **Q.**   What document are you talking about, sir?

**A.**   The short sale.

**Q.**   What was the property that was subject to the short sale?

**A.**   An office condominium in Miramar Beach.

**Q.**   And what entity held the property?

**A.**   Phillips Properties.

**Q.**   Not Mr. Phillips individually?

**A.**   No, no, not Mr. Phillips individually.

**Q.**   Other than consultants at HCB, HCB's counsel hired in this case, HCB has never retained any third-party consultant to examine the collectability of this deficiency judgment, correct?

**A.**   Correct.

**Q.**   Isn't it true that HCB hopes that it can arrive at a settlement with the judgment-debtors?

**A.**   I'm sorry, could you ask that one again.

**Q.**   Isn't it true that HCB hopes it can arrive at a settlement with the judgment-debtors?

**A.**   On the -- on the judgment -- on the deficiency judgment?

**Q.**   Yes.

**A.**   Yes.

**Q.**   Okay.  And HCB believes that by controlling the collection process it can manage that settlement?

**A.**   Can manage the costs of that settlement, correct.

**Q.**   Well, by managing the cost you manage the settlement itself?

**A.**   Yes.

1   **Q.**   And one of the judgment-debtors that HCB wants to settle

2   with is Rupert Phillips?

3   **A.**   Yes.

4   **Q.**   The chairman of HCB?

5   **A.**   Yes.

6   **Q.**   Who consults to HCB?

7   **A.**   Yes.

8   **Q.**   And he provides advice to HCB?

9   **A.**   Yes.

10  **Q.**   Let's talk about a stock transfer by Steven Roe.  You're

11  familiar with Steven Roe?

12  **A.**   Yes.

13  **Q.**   Who is that?

14  **A.**   That's Mr. Phillip's son-in-law.

15  **Q.**   He's married to Mr. Phillips's daughter, Bobby Anne?

16  **A.**   That's correct.

17  **Q.**   Now, Mr. Roe transferred 120,000 shares of stock in

18  GulfSouth to HCB, correct?

19  **A.**   Correct.

20  **Q.**   And he did that in February of 2011?

21  **A.**   I believe so.

22  **Q.**   And the only stock that GulfSouth has ever owned -- I'm

23  sorry -- strike that.  The only stock that HCB has ever owned in

24  GulfSouth was a stock that was transferred by Mr. Roe to

25  GulfSouth?

1    **A.**    To my knowledge, yes.

2    **Q.**    And you're the CFO of HCB?

3    **A.**    Yes -- well, no.  CFO of Phillips Capital Partners.  I'm

4    president of --

5    **Q.**    I'm sorry, president of HCB?

6    **A.**    Yes.

7    **Q.**    Now, you don't know why Mr. Roe transferred that stock in

8    GulfSouth to HCB, do you?

9    **A.**    No.

10   **Q.**    The decision to acquire Mr. Roe's stock was made by

11   Mr. Phillips?

12   **A.**    Yes.

13   **Q.**    And he didn't tell you why HCB was going to acquire the

14   stock that his son-in-law held in GulfSouth?

15   **A.**    No.

16   **Q.**    But HCB paid Mr. Roe for that stock, didn't it?

17   **A.**    Yes.

18   **Q.**    Paid him $360,000?

19   **A.**    Yes.

20   **Q.**    And then GulfSouth eventually failed, correct?

21   **A.**    Correct.

22   **Q.**    And HCB never recovered a single penny of its $360,000

23   payment to Mr. Phillips's son-in-law, did it?

24   **A.**    No.

25   **Q.**    Are you familiar with a bank called First NBC?

1   **A.**   Yes.

2   **Q.**   Now, First NBC we've already heard acquired CPB's interest

3   in the deficiency judgment, correct?

4   **A.**   Yes.

5   **Q.**   And that was in the fourth quarter of 2011?

6   **A.**   I believe that's correct, yes.

7   **Q.**   And HCB actually owns stock in First NBC, correct?

8   **A.**   Yes.

9   **Q.**   When was that stock acquired?

10  **A.**   Sometime before when First NBC went public.  It was after

11  the middle of 2012.

12  **Q.**   Okay.  And HCB previously had a $10 million line of credit

13  with First NBC, correct?

14  **A.**   Yes.

15  **Q.**   Now, the relationship between First NBC and HCB actually

16  started because Central Progressive asked HCB to do some due

17  diligence for CPB, correct?

18  **A.**   Correct.

19  **Q.**   CPB asked HCB to conduct due diligence into CPB's assets?

20  **A.**   Correct.

21  **Q.**   And CPB at the time was a participant in this loan?

22  **A.**   Correct.

23  **Q.**   And CPB asked HCB to examine its assets in mid to late

24  2011, correct?

25  **A.**   Correct.

1   **Q.**   And at that time HCB would have had information about CPB's

2   interest in this loan?

3   **A.**   Correct.

4   **Q.**   I mean, you're doing due diligence, right?

5   **A.**   Right.

6   **Q.**   Would that have included correspondence between CPB and the

7   other participants of this loan?

8   **A.**   I'm not sure.  I can't remember seeing any correspondence

9   at the time when we were going through those assets.

10  **Q.**   And then CPB ultimately closed at the end of 2011, right?

11  **A.**   Correct.

12  **Q.**   And First NBC acquired some or all of the assets of CPB?

13  **A.**   All of the assets of CPB.

14  **Q.**   Now, Jason Osborn, he's an attorney.  You're familiar with

15  him, correct?

16  **A.**   Yes.

17  **Q.**   He's an attorney that represents HCB?

18  **A.**   Yes.

19  **Q.**   And Jason Osborn was involved in the First NBC transaction,

20  correct?

21  **A.**   Correct.

22  **Q.**   And that was he was working with First NBC in its

23  acquisition of CPB's interest in this loan?

24  **A.**   Correct.

25  **Q.**   You're familiar with Lot 26 in Nature Walk, correct?

1    **A.**    Yes.

2    **Q.**    And that -- that's a lot that was previously owned by

3    Mr. and Mrs. Phillips?

4    **A.**    Correct.

5    **Q.**    And that's a lot that HCB had -- I'm sorry, let me start

6    over.  That's a lot that GulfSouth initially had a judgment lien

7    on, correct?

8    **A.**    Correct.

9    **Q.**    And at some point down the road HCB released that judgment

10   lien as to Lot 26, correct?

11   **A.**    That's correct.

12   **Q.**    And it did so without talking to SE Property?

13   **A.**    Yes.

14   **Q.**    Never got SE Property's consent to release Lot 26?

15   **A.**    No.

16   **Q.**    Now, the negotiations for the sale of Lot 26 by

17   Mr. Phillips and his wife to Mr. McLaughlin, those were between

18   Mr. Phillips and Mr. McLaughlin?

19   **A.**    Correct.

20   **Q.**    You didn't have any discussions with Mr. McLaughlin prior

21   to the sale of Lot 26?

22   **A.**    No -- well, we talked but I didn't -- we didn't talk

23   about --

24   **Q.**    You didn't talk about -- you didn't talk to Mr. McLaughlin

25   about his purchase of Lot 26 before it happened?

1    **A.**    Correct.

2    **Q.**    Had you talked to Mr. Phillips about his sale of Lot 26

3    prior to the actual sale happening?

4    **A.**    I can't recall having talked to him.

5    **Q.**    Now, Lot 26 was a short sale?

6    **A.**    Correct.

7    **Q.**    And the original mortgage holder was BB&T?

8    **A.**    Correct.

9    **Q.**    And the proceeds from that sale were $136,000?

10   **A.**    Correct.

11   **Q.**    And that sale took place on June 24th, 2011, correct?

12   **A.**    I believe so.  I'd have to go back and look.

13   **Q.**    All the proceeds -- the $136,000 were paid directly to

14   BB&T?

15   **A.**    Probably net closing costs.

16   **Q.**    Okay, fair enough.  BB&T then released its lien on Lot 26

17   the very next month?

18   **A.**    BB&T?

19   **Q.**    Yes.

20   **A.**    I assume.

21   **Q.**    Now, the reason HCB claims that it released Lot 26 is

22   because there were so many superior liens ahead of the

23   deficiency judgment on Lot 26, correct?

24   **A.**    Correct.

25   **Q.**    Let's look through that for a minute.

1    **MR. CROSSLAND:**  Mr. Dyer, pull up Plaintiff's Exhibit

2    26.

3    **BY MR. CROSSLAND:**

4    **Q.**   Now, Exhibit 26 is a settlement statement identifying the

5    sale from Fred McLaughlin to Rupert Phillips.  And Exhibit A,

6    which is the last page, is really where I want to focus.

7         **MR. CROSSLAND:**  Let's start with the first -- there

8    you go, Mr. Dyer.

9    **BY MR. CROSSLAND:**

10   **Q.**   Now, Exhibit A identified the liens that were on Lot 26 at

11   the time of the sale, correct?

12   **A.**   Correct.

13   **Q.**   All right.  And the first one identifies the BB&T mortgage,

14   correct?

15   **A.**   Correct.

16   **Q.**   And at the bottom in all caps it says, "BB&T, as successor

17   in interest to Colonial Bank, has agreed to accept the net

18   proceeds from the closing as payment to release the property

19   from the lien of the mortgage," correct?

20   **A.**   Correct.

21   **Q.**   So once this sale occurred and BB&T got its proceeds net

22   the closing costs, BB&T release its lien?

23   **A.**   Correct.

24   **Q.**   And at that point the mortgage disappeared on that

25   property?

1   **A.**   BB&T's mortgage?

2   **Q.**   Yes.

3   **A.**   Yes.

4   **Q.**   So the only thing left once BB&T did that would be the

5   judgment liens, correct?

6   **A.**   Correct.

7   **Q.**   Now, let's look at the judgment liens.  The judgment liens

8   are listed in 3 through 6, correct?

9   **A.**   Correct.

10   **Q.**   Those are the four judgment liens on this property, 3, 4,

11   5, and 6?

12   **A.**   Yes.

13   **Q.**   Okay.  Now, No. 3 is a judgment that was initially held by

14   SPCP Group, LLC.  You see that?

15   **A.**   Yes.

16   **Q.**   Now, SPCP Group, they also agreed to release the property

17   from the lien of this judgment, right?

18   **A.**   Yes.

19   **Q.**   So that one disappeared in June of 2011 as well?

20   **A.**   Correct.

21   **Q.**   Let's look at the next one.  The next one we talked about a

22   little bit, let's talk about it a little more.  The next

23   judgment lien on this property was the judgment that originally

24   was held by Bank Atlantic, correct?

25   **A.**   Correct.

1   **Q.**   That's the $49 million one?

2   **A.**   Yes.

3   **Q.**   And it says Bank Atlantic has assigned the judgment to HCB

4   Financial Corp., and HCB Financial Corp. has agreed to release

5   the property from the lien of this judgment, correct?

6   **A.**   Correct.

7   **Q.**   So that judgment lien is gone, too?

8   **A.**   Correct.

9   **Q.**   Let's look at No. 5.  No. 5 is in judgment from First

10   Commercial Bank, correct?

11   **A.**   Correct.

12          **MR. CROSSLAND:**  Mr. Dyer, if you'll put up on the side

13   as a second document, please, Plaintiff's Exhibit 29 that's into

14   evidence.

15   **BY MR. CROSSLAND:**

16   **Q.**   All right.  Now, this Exhibit 29, which is on the

17   right-hand part of your screen, that is the judgment from First

18   Commercial Bank.  That was the only other judgment lien

19   remaining on Lot 26, correct?

20   **A.**   Yes.

21          **MR. CROSSLAND:**  And Mr. Dyer, if you'll go to the

22   second page of Exhibit 29.

23   **BY MR. CROSSLAND:**

24   **Q.**   Amount of First Commercial's judgment was $500,000, right?

25   **A.**   Correct.

1   **Q.**   Now, this lien got wiped out as well, didn't it?

2   **A.**   I'm not sure.

3   **Q.**   Okay.  But it says Exhibit A --

4        **MR. CROSSLAND:**  Take that down, Mr. Dyer.  Put back up

5   Exhibit A, if you would, to Exhibit 26, please.

6   **BY MR. CROSSLAND:**

7   **Q.**   And then the last judgment lien we have on Lot 26 is this

8   Satisfaction of Judgment in favor of GulfSouth Private Bank

9   against Rupert and Sandra Phillips, you see that?

10  **A.**   Yes.

11  **Q.**   And this agreement specifically says that there's going to

12  be a satisfaction of the GulfSouth judgment, right?

13  **A.**   Are these exceptions or are these -- I'm sorry.

14  **Q.**   Well, it says satisfaction, right?

15  **A.**   Well, he's -- the sale is contingent on satisfaction of

16  these judgments, or do these judgments stay in place after?  I

17  don't know.  I'm sorry.  I'm not an attorney.

18       **MR. CROSSLAND:**  Let's look at, Mr. Dyer, page 3 of

19  Exhibit 26.  If you'll go to paragraph 2.

20  **BY MR. CROSSLAND:**

21  **Q.**   Now, page 3 is a real estate closing agreement between

22  Mr. Phillips and Mr. McLaughlin, correct?

23  **A.**   Correct.

24  **Q.**   And the second sentence says, "In particular, buyer," which

25  is Mr. McLaughlin, right?

1    **A.**    Correct.

2    **Q.**    -- "understands and agrees that Mr. McLaughlin is taking

3    title subject to the matters set forth in Exhibit A, correct?

4    **A.**    Correct.

5    **Q.**    Now, we go to Exhibit A.  And we know --

6              **MR. CROSSLAND:**  If you'll blow it up for me, Mr. Dyer.

7    BY MR. CROSSLAND:

8    **Q.**    We know the BB&T mortgage is gone?

9    **A.**    Correct.

10   **Q.**    And we know that the $49 million judgment is gone?

11   **A.**    Correct.

12   **Q.**    And we know that the SPCP judgment is gone?

13   **A.**    Correct.

14   **Q.**    All right.  The last two we have, one of them is the

15   judgment lien from GulfSouth, correct?

16   **A.**    Correct.

17   **Q.**    In June of 2011 HCB did not have any ability to release the

18   judgment lien, correct, the deficiency judgment lien held by

19   GulfSouth?

20   **A.**    Can you restate that question?

21   **Q.**    Sure.  In June of 2011 HCB did not have the ability to

22   release the deficiency judgment lien held by GulfSouth because

23   it hadn't bought that interest yet, correct?

24   **A.**    Correct.

25   **Q.**    Okay.  And HCB ultimately did release that judgment,

1    correct?

2    **A.**    Correct.

3    **Q.**    But that didn't happen until December of 2012?

4    **A.**    Correct.

5    **Q.**    All right.  Let's look at Plaintiff's Exhibit 107.  You

6    recognize Exhibit 107, correct?

7    **A.**    Yes.

8    **Q.**    This is the partial release of the deficiency judgment for

9    Lot 26, correct?

10   **A.**    Correct.

11   **Q.**    And you signed this?

12   **A.**    Yes.

13   **Q.**    And it's dated December 27, 2012?

14   **A.**    Correct.

15   **Q.**    About a year after Mr. Phillips sells Lot 26 to

16   Mr. McLaughlin?

17   **A.**    Correct.

18   **Q.**    Given that BB&T had already gotten out of the way, and

19   given that HCB had already released the $49 million Bank

20   Atlantic judgment, and given that SPCP had already released its

21   lien, HCB, as the owner of the deficiency judgment, was, at

22   worst, second in line on the property, right?

23   **A.**    Correct.

24   **Q.**    There's no reason that HCB would have executed this release

25   a year-and-a-half after the transaction, is there?

1   **A.**   Well, it was a short sale.

2   **Q.**   Okay.

3   **A.**   So the proceeds would have been -- to us would have been

4   zero from the short sale.

5   **Q.**   Right, the short sale to BB&T a year-and-a-half earlier you

6   would have gotten nothing, that's true.  But HCB didn't own the

7   deficiency judgment in June of 2011, right?

8   **A.**   Correct.

9   **Q.**   So why is the short sale relevant?

10  **A.**   Because there would have been no proceeds after the first

11  mortgage to distribute.

12  **Q.**   Right.  But if HCB kept its deficiency judgment lien on the

13  property as opposed to releasing it, when Mr. McLaughlin went to

14  get a mortgage he would have had to deal with this judgment

15  lien, correct?

16  **A.**   Correct.

17  **Q.**   Or if he tried to sell the property, the deficiency

18  judgment would have still been sitting on there, right?

19  **A.**   Correct.

20  **Q.**   And whoever was trying to buy or sell the property would

21  have had to come to HCB and said, look, you've got a judgment

22  lien, it's not been wiped out by a prior foreclosure, how do we

23  take care of this?

24  **A.**   Correct.

25  **Q.**   And one of the ways would have been to say pay me money to

1    get rid of my lien?

2    **A.**   Yes.

3    **Q.**   And if Mr. McLaughlin, who bought the property, wanted to

4    get a mortgage on the property, he could only have done so if

5    the bank would have said, well, we'll take it subject to the

6    other two liens, correct?

7    **A.**   Correct.

8    **Q.**   So really, the only way that Mr. McLaughlin could ever

9    actually get a mortgage or sell the property would have been to

10   come to HCB and say, look, I need you to release the lien,

11   right?

12   **A.**   Unless someone else took it subject to the same liens he

13   took it.

14   **Q.**   Right, somebody else could have taken it subject to this

15   lien?

16   **A.**   Correct.

17   **Q.**   But there was no reason for HCB to release this deficiency

18   judgment lien a year-and-a-half after the short sale, was there?

19   **A.**   Well, other than at the time we perceived that there were

20   no funds to be distributed.

21   **Q.**   Then why ever put a judgment lien on any property?

22   **A.**   So that you can recover --

23   **Q.**   When the person goes to get a mortgage or sell the

24   property, right?

25   **A.**   Correct.

1   **Q.**   There was no pressure from a first mortgage holder saying,

2   hey, I'm going to foreclose if you don't give up the lien,

3   right?

4   **A.**   Correct.

5   **Q.**   Was there an agreement by Mr. Phillips and Mr. McLaughlin

6   that HCB or Mr. Phillips would get rid of this deficiency

7   judgment lien?

8   **A.**   Not that I'm aware of.

9   **Q.**   So there is no reason why HCB executed this document, is

10  there?

11          **MR. FRANCO:**   Objection, asked and answered for the

12  fourth time, Your Honor.

13          **THE COURT:**   Sustained.

14  **BY MR. CROSSLAND:**

15  **Q.**   Are you familiar with the GP Air loan that was given by

16  GulfSouth to Mr. Phillips's son?

17  **A.**   Not completely familiar, but somewhat familiar, yes.

18  **Q.**   Did HCB ever take any of the collateral that related to the

19  GP Air loan?

20  **A.**   Yes.

21  **Q.**   What did it take?

22  **A.**   There was an airplane that was subject to that mortgage.

23  **Q.**   Okay.  And HCB actually bought the airplane?

24  **A.**   Yes -- well, HCB didn't buy the airplane.  HCB -- Phillips

25  Capital Partners took GP Air -- took an equity interest in GP

1    Air.

2    **Q.**   Phillips Capital Partners took an equity interest in GP

3    Air?

4    **A.**   Correct.

5    **Q.**   Not HCB?

6    **A.**   No.

7    **Q.**   In fact, HCB had no involvement with the GP Air loan?

8    **A.**   No.

9    **Q.**   Do you know whether Mr. Phillips ever directed GulfSouth to

10   send the payment schedule to HCB for the GP Air loan?

11   **A.**   He -- I think he asked them to send it to me.

12   **Q.**   At HCB?

13   **A.**   Correct.

14   **Q.**   But HCB had no involvement in getting that collateral?

15   **A.**   No.

16   **Q.**   Now, Mr. Dobson, you would agree with me that if this Court

17   finds that the assignments as between GulfSouth and HCB are

18   valid, that HCB is required to act as SE Property's agent for

19   collection on the deficiency judgment?

20          **MR. FRANCO:**   Objection, Your Honor, calls for a legal

21   conclusion.

22          **MR. CROSSLAND:**   To your understanding.

23          **THE COURT:**   His understanding, I'll let him testify to

24   that.

25          **THE WITNESS:**   Yes.

1  BY MR. CROSSLAND:

2  Q.   Isn't it true that HCB has already dismissed a lawsuit

3  against Mr. Phillips relating to a personal guarantee he

4  executed?

5  A.   I can't remember.

6  Q.   Do you remember HCB picked up an interest from the Bank of

7  Bonifay, correct?

8  A.   We've picked up actually a lot of assets that used to be in

9  the Bank of Bonifay.

10  Q.   Okay.  But specifically at some point HCB picked up an

11  interest held by Bank of Bonifay relating to a personal

12  guarantee against Mr. Phillips.  Do you remember that?

13  A.   I can't remember.

14         MR. CROSSLAND:  All right.  Let's go to Exhibit 130,

15  Plaintiff's Exhibit 130.  Go to page 2, please.

16  BY MR. CROSSLAND:

17  Q.   Plaintiff's Exhibit 130, starting on page 2 is a complaint

18  filed by the Bank of Bonifay versus Phillips Property, Inc., and

19  Rupert Phillips.  You see that?

20  A.   Yes.

21         MR. CROSSLAND:  Mr. Dyer, go to page 5 of Exhibit 130,

22  and just blow up for me Count Two, if you would.  There you go.

23  BY MR. CROSSLAND:

24  Q.   And you see as part of this complaint that Bank of Bonifay

25  was pursuing a guarantee action against Mr. Phillips?  You see

1     that?

2     **A.**    Yes.

3            **MR. CROSSLAND:**    Mr. Dyer, if you go to page 43 of

4     Exhibit 130, and blow that up for me, please.

5     **BY MR. CROSSLAND:**

6     **Q.**    And you see this is the same case, correct?

7     **A.**    Yes.

8     **Q.**    And you see this is an order from the court stipulating for

9     substitution of party plaintiff, correct?

10    **A.**    Correct.

11    **Q.**    And that's in August of 2011?

12    **A.**    Correct.

13    **Q.**    And the new party plaintiff is who?

14    **A.**    HCB Financial Corp.

15    **Q.**    All right.  So HCB did, in fact, pick up this interest in a

16    lawsuit against Mr. Phillips relating to his guarantee, correct?

17    **A.**    Yes.

18            **MR. CROSSLAND:**    Mr. Dyer, go to page 47.

19    **BY MR. CROSSLAND:**

20    **Q.**    And you see on page 47 that's a stipulation for dismissal,

21    correct?

22    **A.**    Correct.

23    **Q.**    And that's a dismissal of the lawsuit against Mr. Phillips,

24    correct?

25    **A.**    Yes.

1    **Q.**    And that was filed by HCB?

2    **A.**    Correct.

3    **Q.**    HCB hasn't refiled that action against Mr. Phillips, has

4    it?

5    **A.**    It has not.

6    **Q.**    Why did HCB dismiss it?

7    **A.**    I can't remember.

8    **Q.**    Do you remember if HCB got paid any amount of money to

9    dismiss this lawsuit?

10   **A.**    I can't remember.

11   **Q.**    Do you remember who gave the direction at HCB to dismiss

12   this lawsuit?

13   **A.**    I cannot remember.

14   **Q.**    But you know that HCB picked up this interest and then

15   dismissed the lawsuit and has yet to refile it, correct?

16   **A.**    Correct.

17   **Q.**    Now, beyond the lawsuit that was dismissed by HCB against

18   Mr. Phillips, HCB holds other judgments against him, doesn't it?

19   **A.**    Correct.

20         **MR. CROSSLAND:**  Mr. Dyer, let's go to Exhibit 117 for

21   the Plaintiff that's been admitted as a joint exhibit.

22   **BY MR. CROSSLAND:**

23   **Q.**    Figuring, Mr. Dobson, we've talked about the Bank Atlantic

24   judgment, we may as well look at it.

25         Plaintiff's Exhibit 117 is the Bank Atlantic judgment

1    against Nature Walk Development, Mr. Olson, Ms. Phillips, Olson

2    & Associates, Rupert Phillips, and Elaine Olson, correct?

3    **A.**   Correct.

4    **Q.**   And this is the $49 million judgment --

5             **MR. CROSSLAND:**   Mr. Dyer, if you go to page 2, blow up

6    that top paragraph, please.

7    **BY MR. CROSSLAND:**

8    **Q.**   The total judgment is $40 million and change plus $8.8

9    million and change, correct?

10   **A.**   Correct.

11   **Q.**   About $49 million judgment?

12   **A.**   Correct.

13   **Q.**   Now, that judgment is held by HCB, correct?

14   **A.**   Correct.

15   **Q.**   And the assignment of those -- of this $49 million judgment

16   by Bank Atlantic to HCB happened January 3rd, 2011?

17   **A.**   Correct.

18   **Q.**   About a year-and-a-half before HCB purchased all of these

19   interests from GulfSouth, Bank of Vernon, and CPB?

20   **A.**   Correct.

21             **MR. CROSSLAND:**   Mr. Dyer, Exhibit 123, please.

22   **BY MR. CROSSLAND:**

23   **Q.**   It's not the only judgment HCB holds against these

24   judgment-debtors, is it?

25   **A.**   No.

1  **Q.**   Exhibit 123 is a $9 million judgment initially held by

2  Fifth Third Bank, correct?

3  **A.**   Correct.

4  **Q.**   And again we've got the judgment-debtors?

5  **A.**   Correct.

6  **Q.**   And this one also was assigned by Fifth Third Bank to HCB,

7  correct?

8  **A.**   Correct.

9        **THE COURT:**  Is this 123 or 23?

10        **MR. CROSSLAND:**  123.

11        **THE COURT:**  Thank you.

12        **MR. CROSSLAND:**  Mr. Dyer, if you'll go to Exhibit 125.

13  **BY MR. CROSSLAND:**

14  **Q.**   One more judgment that HCB holds against Mr. Phillips,

15  correct, is this Farm Credit of Northwest Florida judgment?

16  **A.**   Correct.

17  **Q.**   And along with the judgment, HCB holds the right to pursue

18  Mr. Phillips on his guarantee on that, correct?

19  **A.**   Correct.

20  **Q.**   And Mrs. Phillips?

21  **A.**   Correct.

22  **Q.**   And this --

23        **MR. CROSSLAND:**  Mr. Dyer, if you go to Exhibit 101,

24  please.  This one has also been admitted.  Mr. Dyer, is it

25  possible to flip that sideways.  Perfect, thank you.

1    **BY MR. CROSSLAND:**

2    **Q.**   Do you recognize Exhibit 101, sir?

3    **A.**   Yes.

4    **Q.**   What is it?

5    **A.**   It is a list of judgment liens for Rupert and Sandra

6    Phillips.

7    **Q.**   Who prepared it?

8    **A.**   I don't know.

9    **Q.**   And it says that it's a list of judgment liens as of July

10   of 2012, correct?

11   **A.**   Correct.

12   **Q.**   And this is something that your expert witness, Mr. Gaudet,

13   relied on, isn't it?

14   **A.**   Correct.

15   **Q.**   Let's look at line number 3 here -- I'm sorry, line number

16   4 here.  Now, under judgment creditor, this exhibit for line

17   number 4 says Bank Atlantic?

18   **A.**   Correct.

19   **Q.**   But as of July 13th, 2012, Bank Atlantic wasn't the

20   judgment creditor anymore, was it?

21   **A.**   No.

22   **Q.**   So this is inaccurate?

23   **A.**   Well, it's accurate inasmuch as they were the original

24   bank.

25   **Q.**   But it doesn't identify that HCB had actually acquired that

1    judgment about a year-and-a-half prior?

2    **A.**   No, it doesn't.

3    **Q.**   Mr. Dobson, what's the total value of the assets of HCB?

4         **MR. FRANCO:**   Objection, Your Honor, relevancy of the

5    total assets of HCB.

6         **THE COURT:**   What's the relevancy, Mr. Crossland?

7         **MR. CROSSLAND:**   It's damages, Your Honor.   In fact,

8    we've established that Mr. Phillips transferred individually all

9    of his stock from himself in HCB to Phillips Capital Partners,

10   that he did that in November of 2010, he got no consideration

11   for it, and that it was transferred to Phillips Capital Partners

12   which he partially owns and is president of.

13        HCB's claim in this case is we cannot prove damages

14   because we can't prove a collectible asset.   Under the Uniform

15   Fraudulent Transfer Act of Florida, that is clearly a fraudulent

16   transfer.   And certainly, if we're given the right to collect

17   after this case, Mr. Phillips and HCB and Phillips Capital will

18   argue that the statute of limitations has now run.

19        **THE COURT:**   That is the -- that was sort of the path

20   you took in opening statement.

21        **MR. FRANCO:**   I'm sorry, Your Honor, but the issue in

22   this case is not the collection against the debtors.   That's not

23   part of this case.   So if he's trying to make the collection

24   against the debtors part of this case, it's not.

25        **THE COURT:**   I think he's just trying to establish that

1   -- what the assets are of the corporation that is the defendant.

2   That's the question I heard asked.

3           **MR. FRANCO:**  That's correct.  But it's in terms of

4   collection against the judgment-debtor, is it not?  Isn't that

5   -- that's what allegedly makes it relevant.

6           **THE COURT:**  The damages, though -- the damages run to

7   -- if there are damages, they can come from HCB.  That's the

8   Defendant in this case.  Right?

9           **MR. FRANCO:**  That's correct, if he proves what he

10  couldn't collect against Rupert Phillips and the other

11  co-guarantor.

12          **THE COURT:**  I'm going to allow it.

13          **MR. FRANCO:**  Thank you, Your Honor.

14          **THE COURT:**  Overruled.

15          Go ahead and either -- do you need the question

16  restated?

17          **THE WITNESS:**  Please.

18          **THE COURT:**  Go ahead, please, Mr. Crossland, restate

19  your question.

20  **BY MR. CROSSLAND:**

21  **Q.**   What is the total value of the assets that HCB holds?

22  **A.**   I'd have to look at a balance sheet.

23  **Q.**   Is it in excess of $6 million?

24  **A.**   Yes.

25  **Q.**   Is it in excess of $10 million?

1    **A.**    I can't remember.  I'm sorry.

2    **Q.**    And what about the total net north of HCB, is it in excess

3    of $6 million?

4    **A.**    I can't remember.  I'd have to look at a balance sheet.

5    **Q.**    Part of what HCB claims in this case is that it hasn't

6    pursued collection against the judgment-debtors because they're

7    not collectible, correct?

8    **A.**    Correct.

9    **Q.**    And in fact, HCB has proffered that there are $67 million

10   in judgments ahead of the deficiency judgment that is at issue

11   in this case?

12   **A.**    Correct.

13   **Q.**    And it's true, though, that in fact HCB owns $58 million of

14   those judgments?

15   **A.**    Correct.

16   **Q.**    HCB believes that it's a waste of money to undertake

17   collection efforts against the judgment-debtors at this point,

18   right?

19   **A.**    Correct.

20   **Q.**    Yet HCB has spent hundreds of thousands of dollars in this

21   case trying to prevent SE Property from getting the right to

22   collect against them, right?

23   **A.**    No.

24   **Q.**    HCB hasn't spent --

25   **A.**    We spent hundreds of thousands of dollars defending

*Dobson - Direct/Crossland*

1   ourselves.

2   **Q.**   And your defense is that SE Property should not have the

3   right to collect on the deficiency judgment?

4   **A.**   It should have the right if it purchases the originating

5   bank position.

6   **Q.**   Right.  But HCB's position is only in that way could SE

7   Property ever collect against these judgment-debtors, correct?

8   **A.**   Not necessarily, no.

9   **Q.**   What other ways could SE Property become the originating

10  bank?

11  **A.**   Well, they couldn't become the originating bank, but that's

12  not the question.  The question was there's no other way to

13  collect.

14  **Q.**   What other ways could SE Property collect against the

15  judgment-debtors under the deficiency judgment?

16  **A.**   If the originating bank was able to collect from the

17  debtors and then distribute those funds.

18  **Q.**   Okay.  And that hasn't happened yet?

19  **A.**   No.

20  **Q.**   There have been no efforts for that to happen yet?

21  **A.**   I wouldn't say no efforts.  We've gone over financial

22  statements, personal information statements, we had a

23  third-party look at it.

24  **Q.**   But we know we've been on hiatus at least since the second

25  amended complaint was filed?

1    **A.**    Correct.

2    **Q.**    Isn't it true, sir, that HCB's position in this case is

3    that HCB's ownership of those prior judgments is not prejudicial

4    to SE Property?

5    **A.**    Can you ask that question again.

6    **Q.**    Sure.  HCB doesn't think there's any prejudice to SE

7    Property by the fact that HCB owns $58 million in judgments

8    ahead of the deficiency, correct?

9    **A.**    I don't understand the term -- how you're using the term

10   "prejudice."  I'm sorry.

11   **Q.**    Isn't it true, sir, that HCB believes that if it collects

12   any money as part of collection efforts under the Bank Atlantic

13   or Fifth Third judgment that had been received by HCB that it

14   can keep all of those funds?

15   **A.**    That would be a question for my attorneys to determine.

16   **Q.**    Isn't it true, sir, that HCB has already told this Court

17   that if HCB executes on the prior judgments that are superior to

18   the deficiency judgment, then HCB can retain all the funds

19   recovered just as the prior lienholders would have had the right

20   to do.

21   **A.**    We had the right to.

22   **Q.**    So if HCB collects money on the Bank Atlantic judgment,

23   it's going to keep those funds, correct?

24   **A.**    We had the right to.

25   **Q.**    And you would do that, right?

1    **A.**    We might.  We might not.

2    **Q.**    Well, why wouldn't you?

3    **A.**    Well, there may -- you know, it could be no funds to

4    collect but -- but --

5    **Q.**    Maybe I didn't ask you a good question.

6    **A.**    Sorry.

7    **Q.**    If HCB finds money and can collect it under the Bank

8    Atlantic judgment, HCB is going to keep all of that money, isn't

9    it?

10   **A.**    It's hard to answer that question without knowing the

11   specifics of the situation when we got to that point.

12   **Q.**    So it's your testimony that if HCB finds a bank account

13   with $5,000 in it and then garnishes that bank account, that it

14   may in fact split some of that money with SE Property as opposed

15   to keeping it all to itself?

16   **A.**    Once again, that's a hard question to answer right now.  I

17   don't know -- see, I can't -- I can't guess what future

18   negotiations may lead to.

19   **Q.**    You don't deny that HCB has already told this Court it has

20   the right to keep any funds it recovers on the prior judgments?

21   **A.**    Has the right, correct.

22          **MR. CROSSLAND:**  One moment, Your Honor.

23   BY MR. CROSSLAND:

24   **Q.**    Mr. Dobson, the only third-party that's ever looked at the

25   collectability of the judgment-debtors is Mr. Gaudet, correct?

1   **A.**   As far as I know, correct.

2   **Q.**   HCB hasn't hired anybody outside of this litigation to

3   examine the collectability of the judgment-debtors?

4   **A.**   HCB has not, no.

5           **MR. CROSSLAND:**  Thank you, Your Honor.

6           **THE COURT:**  Mr. Crossland, you admitted an Exhibit

7   101, which was the list of judgment liens against Rupert and

8   Sandra Phillips.  And I didn't have that in the list of joint,

9   you know, stipulated exhibits that Ms. Brady called out earlier

10  this morning.

11          **MR. CROSSLAND:**  Correct.

12          **THE COURT:**  So are there other stipulated exhibits?

13          **MR. CROSSLAND:**  I tried not to do that, and I think

14  that might had been an oversight, but we'd offer it into

15  evidence at this point.

16          **MR. FRANCO:**  Your Honor, may I?

17          **THE COURT:**  Yes.

18          **MR. FRANCO:**  That was not listed as a joint, but we

19  had no objection to it, so maybe that can clear it up.

20          **THE COURT:**  Okay.

21          **MR. FRANCO:**  We had made no objection to that exhibit.

22  It wasn't listed as joint, we just had no objection to it.

23          **THE COURT:**  Well, I mean, we can do this any way you

24  all want.  I mean, if you want to agree --

25          **MR. FRANCO:**  I'm sorry, I stand corrected.  It is

1    listed as a joint exhibit.  I'm sorry.

2              **THE COURT:**  Oh, it is listed.  Well, maybe at the next

3    break or even during the evening recess you all could tomorrow

4    morning if we don't have enough time during the afternoon recess

5    but tomorrow morning you all could go ahead and just here on the

6    record in front of the Court admit -- go ahead and introduce and

7    I will admit all of those exhibits that have been agreed to or,

8    you know, jointly stipulated to.

9              **MR. CROSSLAND:**  Certainly.

10             **THE COURT:**  Because otherwise we have to -- every time

11   you go to -- you go to move something in and you say it's

12   already admitted, we have to check against what we have to make

13   sure it's been already admitted, and it would just save us that

14   trouble if, you know, we did it beforehand -- you did it

15   beforehand.

16             **MR. CROSSLAND:**  I understand.  It might make sense to

17   do that tonight, we'll get a full list, and in the morning

18   tomorrow probably try and read that for the Court, if that

19   helps.

20             **THE COURT:**  Yes, thank you.

21             Mr. Franco, you're up on your cross of Mr. Dobson.

22             **MR. FRANCO:**  Thank you, Your Honor.

23                          **CROSS-EXAMINATION**

24   BY MR. FRANCO:

25   **Q.**   Mr. Dobson, let's go in reverse of how counsel covered his

1   questions.  The prior judgment creditors, did they make any

2   attempts to your knowledge to enforce their judgments against

3   Mr. Phillips or the other guarantors prior to any assignment to

4   HCB, sir?

5   **A.**   Not to my knowledge.

6   **Q.**   And they had those judgments for some point in time before

7   they were acquired by HCB, didn't they?

8   **A.**   Correct.

9   **Q.**   Now, counsel also asked you about the HCB stock that was

10   transferred and the value of assets?

11   **A.**   Yes.

12   **Q.**   You remember that?  Do you remember what the value of HCB

13   stock was at the time it was actually transferred, what the

14   value of HCB's assets were back at that point, sir?

15   **A.**   At the time they were transferred?

16   **Q.**   Yes.

17   **A.**   HCB -- if I recall correctly, the balance sheet showed not

18   that many assets on HCB.

19   **Q.**   Right.  In fact, at the time it was transferred HCB didn't

20   have many, if any, assets at the time, did it?

21   **A.**   Right.  It was sort of a company that wasn't really doing

22   any business.

23   **Q.**   The Bank Atlantic assignment that was referenced in

24   Plaintiff's Exhibit 101, that was a list of those, that

25   assignment was recorded in the public records, to your

1   knowledge, wasn't it, sir?

2   **A.**   Correct.

3   **Q.**   In connection with the Bank of Bonifay loan, let me see if

4   I can help refresh your memory.  If I can, I can.  If I can't, I

5   can't.

6        Do you remember, sir, whether there was any foreclosure in

7   connection with that judgment in which HCB actually was paid?

8   **A.**   If I recall -- I'm having trouble recalling that one.  I'm

9   sorry.

10  **Q.**   Okay.  But you're not here telling us that there was no

11  such foreclosure and there was no recovery of money?

12  **A.**   No.  I just can't recall that particular --

13  **Q.**   Okay.  Now, let's turn to Plaintiff's Exhibit 29.

14           **MR. FRANCO:**  It would be easier if we could put that

15  back up on the screen from your guy, if that's okay.

16           **MR. CROSSLAND:**  That's fine, you can help him, Mr.

17  Dyer.

18  **BY MR. FRANCO:**

19  **Q.**   And let's go to -- let's go to the Exhibit A, please.

20  Okay.

21           **MR. CROSSLAND:**  I'm sorry, are you on Exhibit 26?  I

22  thought you said 29.

23           **THE COURT:**  You did say 29.

24           **MR. FRANCO:**  I said 29.

25           **MR. CROSSLAND:**  Are you talking about the closing

1    statement?

2          **MR. FRANCO:**  I'm talking about what he just pulled up.

3    What exhibit did you just --

4          **MR. CROSSLAND:**  That's 26.  I'm sorry, I apologize.

5          **MR. FRANCO:**  I may have said 29.  So we're on the same

6    page.

7    **BY MR. FRANCO:**

8    **Q.**  For the record, we are on Plaintiff's Exhibit 26, and

9    Exhibit A of that document.

10         You see in this document where it says -- where it says in

11   the first one BB&T has agreed to accept, you see that?

12   **A.**  Yes.

13   **Q.**  You see in the second one where it says -- I'm sorry, No. 3

14   where it says SPCP has agreed to release, you see that?

15   **A.**  Yes.

16   **Q.**  You see in No. 4 where it says Bank Atlantic and HCB

17   Financial have agreed to release?

18   **A.**  Correct.

19   **Q.**  It doesn't say that in No. 5, does it, sir?

20   **A.**  No.

21   **Q.**  Okay.  And to your knowledge, was there any release of the

22   First Commercial Bank mortgage in the amount of over $500,000 on

23   this property?

24   **A.**  I don't recall.

25   **Q.**  Okay.  And this certainly doesn't stand for that

1   proposition that it was released, does it?

2   **A.**   No.

3   **Q.**   Okay.  And that judgment for First Commercial Bank primes

4   -- it was recorded November of 2009 -- primes the HCB mortgage

5   in No. 6 that was filed April of 2011; is that correct?

6   **A.**   Correct.

7   **Q.**   So what would HCB have received if that property was

8   seized?

9   **A.**   Nothing.

10  **Q.**   Now, Mr. Olson is also a judgment-debtor on this loan

11  that's at issue, am I correct, in this case?

12  **A.**   Correct.

13  **Q.**   Okay.  Has HCB done anything differently with Mr. Olson

14  than it has with Mr. Phillips?

15  **A.**   No.

16           **MR. FRANCO:**   Okay.  Let's pull up paragraph --

17  Plaintiff's Exhibit 1 of the Participation Agreement.  Can we

18  pull of paragraph 10(a), please, again.

19  **BY MR. FRANCO:**

20  **Q.**   Mr. Dobson, is it your understanding from this lawsuit that

21  SEPH alleges that HCB has not done what SEPH wants done with

22  respect to collection efforts, sir?

23  **A.**   I'm sorry, I was reading it.  Can you ask it again.  I'm

24  sorry.

25  **Q.**   Isn't it your understanding that SEPH alleges in this

```
 1   lawsuit that HCB has not done what it should be doing in

 2   connection with collection efforts?

 3   A.    Correct.

 4   Q.    Is it your understanding then there is no agreement between

 5   SEPH and HCB as to how to collect on this judgment?

 6   A.    Correct.

 7   Q.    And what's your understanding if there is no agreement

 8   between the originating bank and any of the participating banks

 9   on how to collect after default?  What are the rights of the

10   participating bank, in your understanding?

11   A.    They have the right to buy out the originating bank's

12   share.

13   Q.    Has SEPH ever offered or come to you to exercise that

14   right?

15   A.    No.

16   Q.    Did SEPH, to your knowledge, ever go to GulfSouth Bank to

17   exercise that right when it didn't agree with what GulfSouth

18   Bank was doing?

19         MR. CROSSLAND:  Objection, speculation or hearsay.

20   There's no predicate for it.

21         THE COURT:  Yeah, you have to lay a foundation for it.

22         MR. FRANCO:  Thank you.

23   BY MR. FRANCO:

24   Q.    Were you made aware at the time that HCB purchased this

25   judgment from GulfSouth or any time after that that SEPH had
```

1  made any offer to purchase the lead bank or originating bank

2  position?

3  **A.**    No.

4  **Q.**    All right.  Mr. Dobson, let's get some of your educational

5  background because that wasn't gone into.  Can you tell us what

6  your educational background is, sir.

7  **A.**    I have a bachelor of arts in religion and philosophy from

8  Lyon College, which is a Presbyterian affiliated liberal arts

9  college in Arkansas.  I have a master of arts in theological

10  studies from Columbia Theological Seminary in Decatur, Georgia.

11  And then I have a master of science in information management --

12  information technology and financial management from the

13  University of Maryland University College.

14  **Q.**    What type of business does HCB do, sir, currently?

15  **A.**    We purchase portfolios of distressed assets from banks and

16  from third parties.

17  **Q.**    And how long has HCB been in that business?

18  **A.**    Since 2011.

19  **Q.**    Since 2001?

20  **A.**    Since 2011.

21  **Q.**    '11?

22  **A.**    Yes.

23  **Q.**    Thank you.  Since 2011.  What was HCB doing before 2011, if

24  you know?

25  **A.**    It was a dormant company from what I understand.

1   **Q.**   And what had it been incorporated to do originally?

2   **A.**   It had been incorporated to be a bank holding company.

3   **Q.**   And did that progress forward?

4   **A.**   No.

5   **Q.**   Okay.  So it was dormant until about 2011?

6   **A.**   Yes.

7   **Q.**   And that's when it got into the purchase of distressed

8   assets, correct?

9   **A.**   Correct.

10  **Q.**   What types of distressed assets has HCB acquired?

11          **MR. CROSSLAND:**  Judge, I'm just going to object on

12  scope.  I think he can ask these questions at some point.  I

13  just don't want to redo it again if he's going to put Mr. Dobson

14  back up.  That's really my objection.  I think we're outside the

15  scope.  I just don't want to redo this for the purpose of court,

16  but that's --

17          **THE COURT:**  You don't want to --

18          **MR. CROSSLAND:**  I don't want -- if he calls Mr. -- I'm

19  sorry.

20          **THE COURT:**  We won't redo it.

21          **MR. CROSSLAND:**  Okay.  Sorry.

22          **MR. FRANCO:**  I have no intention of redoing it.

23          **THE COURT:**  Go ahead.

24          **MR. FRANCO:**  Thank you, Your Honor.

25  **BY MR. FRANCO:**

1   **Q.**   I think my question was:   What type of distressed assets

2   has HCB acquired since 2011?

3   **A.**   HCB has acquired, let's see, notes, mortgages,

4   deficiencies, some REO, which is other real estate owned by a

5   bank.

6   **Q.**   Do you have any concept of how many notes HCB has acquired

7   since it started in that business in 2011?

8   **A.**   Somewhere just north of about 70 notes.

9   **Q.**   Seventy notes?

10  **A.**   Yes.

11  **Q.**   Do all of those notes relate to Rupert Phillips, sir?

12  **A.**   No, no.

13  **Q.**   Okay.   And other than notes, what else have you purchased?

14  **A.**   Mortgages, judgments.

15  **Q.**   Do you know how many judgments you've purchased?

16  **A.**   No.   I'm sorry.   I'd have to go back and look.

17  **Q.**   All right.   Have you purchased -- what you called REO,

18  that's real estate, correct?

19  **A.**   Correct.

20  **Q.**   And do you know how many pieces of real estate HCB has

21  purchased?

22  **A.**   Maybe four or five.

23  **Q.**   Okay.   What's HCB's strategy of purchasing assets,

24  Mr. Dobson?   What's it in the business of doing?

25  **A.**   Buying those distressed assets at a number below what we

1    believe we can collect from those assets, try to profit.

2    **Q.**   So what's the ultimate goal of purchasing distressed

3    assets?

4    **A.**   To make a profit.

5    **Q.**   Now, on -- counsel showed you -- I believe he showed you

6    the Plaintiff's Exhibit 18, which was the board resolution,

7    March 22, 2011, which appointed you as president?

8    **A.**   Correct.

9    **Q.**   How did you feel about that, Mr. Dobson?

10   **A.**   I was excited because I thought I was going -- it would be

11   a good opportunity for me to be able to use my masters degree in

12   financial management.

13   **Q.**   When had you been involved with HCB before that?

14   **A.**   I had not.

15   **Q.**   But you were -- you were CFO for Phillips Capital?

16   **A.**   Correct.

17   **Q.**   And you were CFO for Phillips Capital for some time prior

18   to becoming president of HCB, didn't you?

19   **A.**   Correct.

20   **Q.**   Now, once you became the president, what generally do you

21   do for HCB, sir?

22   **A.**   I -- one of the main functions that I have is underwriting

23   assets in these portfolios that we look at, as well as just

24   day-to-day operational items.

25   **Q.**   Now, the deficiency judgment is -- I can't remember what

1   Plaintiff's exhibit number it is, but Exhibit 64 is --

2           **MR. FRANCO:**  Excuse me, Your Honor.

3           **MR. CROSSLAND:**  Mr. Franco, it's 30 if you would like

4   Mr. Dyer to put it up.

5           **MR. FRANCO:**  Can he pull it up for me?  Thank you.

6   **BY MR. FRANCO:**

7   **Q.**   What's the date of that judgment?

8   **A.**   I'm sorry, I'm having trouble reading it.  It looks like

9   4/7/2011.

10  **Q.**   You're going to have to go to the next page.

11  **A.**   Sorry.

12  **Q.**   Where the judge actually signs it at the bottom.

13  **A.**   March 29th, 2011.

14  **Q.**   What efforts were you aware of throughout 2011 by GulfSouth

15  Bank to sell or assign its rights to this judgment?

16          **MR. CROSSLAND:**  Objection, Your Honor, same thing,

17  speculation and hearsay without a predicate.

18          **MR. FRANCO:**  Your Honor, I asked him what efforts he

19  was aware of, that's all I asked him.

20          **THE COURT:**  Well, but how is he aware of those

21  efforts?

22          **MR. FRANCO:**  First I need an answer as to whether he

23  was aware of the efforts.  I think I know what his answer is.

24          **THE COURT:**  You asked him what efforts he was aware

25  of?

1          **MR. FRANCO:**  Correct, of GulfSouth Bank to collect on

2    the judgment.

3          **THE COURT:**  You asked him what efforts, not whether he

4    was aware of efforts, so there's a difference.  Whether he's

5    aware of efforts is a yes or no answer.  But if you're asking

6    him what efforts, then you're asking him to describe those

7    efforts.  And my response to the objection is you need to lay a

8    foundation for that.

9          **MR. FRANCO:**  Okay.  Thank you, Your Honor.

10   **BY MR. FRANCO:**

11   **Q.**   In the year 2011, you were with HCB, correct?

12   **A.**   Correct.

13   **Q.**   And were you personally made aware of any efforts by

14   GulfSouth in connection with assigning its right to this

15   judgment?

16   **A.**   No.

17   **Q.**   What efforts were you aware of throughout 2011 by HCB or

18   Rupert Phillips to acquire any rights to this judgment of March

19   29, 2011?

20         **MR. CROSSLAND:**  Objection, speculation and hearsay as

21   it relates to Mr. Phillips.  HCB, obviously he could answer

22   that.  But it's the same question, what efforts were you aware

23   of for Mr. Phillips, it's the same problem.

24         **THE COURT:**  All right.

25         **MR. FRANCO:**  I think I can ask him what efforts he was

1    aware of, Your Honor, as to any efforts to acquire any rights.

2    He covered what he was aware of or what he wasn't acquire of and

3    I think I'm --

4           **THE COURT:**  He did in regards to HCB but not as to --

5    well, you --

6           **MR. FRANCO:**  I'll break it up.

7           **THE COURT:**  Yeah, because there's a hearsay objection

8    as to one and not the other.

9    **BY MR. FRANCO:**

10    **Q.**  What efforts were you aware of throughout 2011 by HCB to

11    acquire any rights of this judgment of March of 2011?

12    **A.**  None.

13    **Q.**  What efforts were you aware of by Rupert Phillips to

14    acquire any rights to this judgment in 2011, Mr. Dobson?

15           **MR. CROSSLAND:**  Same objection, hearsay and

16    speculation without a predicate.

17           **THE COURT:**  That would be hearsay.  Sustained.

18    **BY MR. FRANCO:**

19    **Q.**  Since you've been with HCB, what efforts were you aware of

20    by GulfSouth to enforce the deficiency judgment against Rupert

21    Phillips at any time based on anything that you read?

22           **MR. CROSSLAND:**  Objection, Your Honor.  I mean, even

23    with the condition at the end, he's still asking what efforts

24    was he aware of by GulfSouth.  We still have the exact same

25    hearsay predicate issue.

```
 1            THE COURT:  I don't see any --

 2            MR. FRANCO:  Your Honor, I'm not offering it to prove

 3    the truth.  I'm offering it to get into his knowledge of what he

 4    knew about GulfSouth Bank's efforts to try to enforce the

 5    judgment.  That's all.

 6            THE COURT:  Why is his -- why is it relevant to his

 7    knowledge?  I mean, is there some action that he took or didn't

 8    take based on that?  Or otherwise are you just -- is this really

 9    an effort to establish that there were or weren't efforts?

10            MR. FRANCO:  I think we've already established there

11    weren't any efforts by GulfSouth to enforce this judgment.

12    We've already established that.  I just want to know what he

13    knew about it.  But that's all right, Your Honor, I'll move on.

14    We've already established that.

15            THE COURT:  All right, go ahead.

16    BY MR. FRANCO:

17    Q.   Now, counsel brushed over the acquisition or purchase of

18    CPB assets, and I want to go through it chronologically, Mr.

19    Dobson, to explain what happened.

20         When did HCB begin looking into any purchase of any of the

21    CPB assets or loans?

22    A.   I believe that would have been in the summer of 2011 or

23    maybe June.

24    Q.   And who was involved on behalf of HCB?

25    A.   Myself, Fred McLaughlin, and Jason Osborn.
```

1   **Q.**   And tell us how that progressed.

2   **A.**   We were in a participation with SunSouth and Central

3   Progressive Bank.   And I believe Mr. McLaughlin was directed to

4   go to Central Progressive Bank to see how we might be paid on

5   that participation.

6         And Central Progressive instead turned around and said that

7   they needed help trying to underwrite some of the nonperforming

8   assets that they had on their balance sheet because they were

9   concerned about the status of their bank.

10  **Q.**   What was the condition of CPB at that time?

11  **A.**   They were in bad financial condition.

12  **Q.**   Okay.   And was Mr. McLaughlin sent there to discuss the CPB

13  participation in this case?

14  **A.**   No.

15  **Q.**   So the participation you talked about had nothing to do

16  with this case?

17  **A.**   No.

18  **Q.**   And that's what he was sent to CPB to do?

19  **A.**   Correct.

20  **Q.**   As a result of that -- then go on with the story that --

21  after he got there CPB is the one who approached him about other

22  assets, am I correct?

23  **A.**   Correct.   So they came over to Destin to meet with us and

24  to go through the portfolio of troubled assets that they had

25  item by item.

1    We looked at those assets, and it -- we were interested in

2   those assets because it looked like we would be able to buy

3   those at a pretty good discount and then turn around and work

4   those assets out.

5   **Q.**   Was this part of your business at the time?

6   **A.**   That was what our business was.

7   **Q.**   Okay.  So what did HCB do to pursue that?

8   **A.**   We knew it would take an amount of capitalization that we

9   didn't have at that time.  So we had purchased some notes from a

10   company called Hudson Capital Realty in New York.  And we knew

11   they were well capitalized, and so we had approached them about

12   lending us enough money to buy those assets so we could work

13   those out.

14    So we met in Central Progressive Bank's corporate

15   headquarters in Lacombe and met in the boardroom with

16   representatives from Hudson Capital Realty.  And we all state

17   down at the conference table and once again went through those

18   assets in more detail with the ability to ask background

19   questions as we went through those.

20   **Q.**   Is that what you refer to as underwriting?

21   **A.**   That is what I refer to as underwriting.

22   **Q.**   And how did that progress after that discussion?

23   **A.**   It progressed well, and it looked like the assets could be

24   purchased at a discount and so --

25   **Q.**   When you're talking about assets, for the Court, you're

*Dobson - Cross/Franco*

1    talking about what kind of assets?

2    **A.**   Notes, mortgages, deficiencies.

3    **Q.**   Distressed assets?

4    **A.**   Distressed assets.

5    **Q.**   So you're talking about purchasing all of CPB's distressed

6    assets, am I correct, at that point?

7    **A.**   The ones that were causing a problem on their balance

8    sheet, correct.

9    **Q.**   Was there any focus particularly on the HCB participation

10   in this case?

11   **A.**   No.

12   **Q.**   There was much more than that?  How much more in terms of

13   dollars?

14   **A.**   $134 million, I believe, in assets.

15   **Q.**   Okay.  So tell us what happened after the underwriting

16   process.

17   **A.**   After the underwriting process, we went back and talked

18   with Hudson Capital Realty, and they were more interested --

19   instead of loaning us the money, they wanted to form a

20   partnership with us and have equity in it and go forward that

21   way.

22       But as time went on, we ended up not being able to

23   capitalize well enough to participate in that.  And so we ended

24   up in an agreement with Hudson Capital Realty to help them

25   manage some of those assets that were geographically close to us

1    over in the Florida Panhandle.

2    **Q.**    All right.  So keep going.  What happened to the assets of

3    CPB after that?

4    **A.**    CPB failed, and they were taken over by the FDIC, and First

5    NBC acquired all of those assets from the FDIC.

6    **Q.**    Do you recall that CPB failed and was taken over November

7    18, 2011?  Does that sound right to you?

8    **A.**    That sounds right to me.

9    **Q.**    Okay.  And so what happened after First NBC purchased all

10   of the assets of CPB?  That included the distressed assets as

11   well as other assets?

12   **A.**    Yes.

13   **Q.**    What happened after that with respect to the distressed

14   assets?

15   **A.**    They proceeded to sell a portion of those distressed assets

16   to Hudson Capital Realty.

17            **THE COURT:**  Excuse me just a moment.  I need to sign

18   something, so just hold one second, please.

19            All right.  Go ahead.  Thank you.

20            **MR. FRANCO:**  May I, Your Honor?

21            **THE COURT:**  Yes, thank you.

22   **BY MR. FRANCO:**

23   **Q.**    What happened to HCB's desire in purchasing any CPB assets

24   or loans after the First NBC purchase?

25   **A.**    We continued to want to purchase the trouble assets in that

1 portfolio that we had underwritten that had not been sold to

2 Hudson Capital Realty.

3 **Q.** Now, again, when you use "trouble assets" that's the same

4 thing as distressed assets?

5 **A.** Distressed assets.  I'm sorry.

6 **Q.** And so tell us how that progressed.

7 **A.** Later, after First NBC looked through the assets

8 themselves, they came back and approached us about the

9 possibility of buying a portion of those distressed assets.

10 **Q.** Okay.  And keep going, please.

11 **A.** And in order to be capitalized enough to do that, they

12 agreed to give us a line of credit to purchase those assets and

13 also go forward and use access on that line of credit to

14 purchase other assets, you know, to further our business model

15 of purchasing these distressed assets.

16 **Q.** In the future?

17 **A.** In the future, working those out, yes.

18 **Q.** So you talked about a loan from FNBC to do two things, as I

19 understand it.  One, to purchase the distressed assets from CPB

20 that they wanted to get rid of?

21 **A.** Correct.

22 **Q.** And two, for your future business to purchase distressed

23 assets that FNBC was not involved in?

24 **A.** Correct.

25   **MR. CROSSLAND:**  Judge, I would object on the scope

1    here.  If he's going to be outside of scope of direct, I would

2    ask that he not lead on questions just like that.  This is far

3    afield on the scope and, again, he's going to do it one time or

4    another, but he shouldn't be allowed to lead.

5              **THE COURT:**  Agreed.

6              **MR. FRANCO:**  All I would doing is summarizing what he

7    already said.

8              **THE COURT:**  Well, I mean, this is far afield from

9    where we were in Mr. Crossland's direct.  So you are now no

10   longer in cross, and in your own direction direct of your own

11   witness, and so you would be subject to the same rules as

12   Mr. Crossland is with his witness.

13             **MR. FRANCO:**  Although, Your Honor, he went into this

14   purchase with the CPB assets so I don't --

15             **THE COURT:**  I don't know about to this extent.

16             **MR. FRANCO:**  I understand.  That's why I'm going into

17   it in more detail.

18   **BY MR. FRANCO:**

19   **Q.**   Okay.  So how much was loaned by FNBC?

20   **A.**   The line of credit was for $10 million.

21   **Q.**   I'm going to show you what is -- has been labeled

22   Defendant's Exhibit 132 and 133.  One is an asset purchase

23   agreement between FNBC and HCB, and the other is the collateral

24   assignment of loans that's related to that purchase.

25             In essence, what happened after the loan was obtained from

1    FNBC, sir?

2    **A.**    We purchased a portfolio of distressed assets owned by --

3    **Q.**    And that's what's set forth in the asset purchase

4    agreement?

5    **A.**    Yes.  I'm not seeing it but --

6              **MR. FRANCO:**  At this time, Your Honor, I would like to

7    offer to introduce as Defendant's Exhibit 132 and 133.

8              **MR. CROSSLAND:**  Judge, I don't see the relevance in

9    132 or 133.  But to be completely candid with the Court, we did

10   not object to relevance on 132, so I have no objection to that.

11             **THE COURT:**  132 or 23?

12             **MR. FRANCO:**  132, Your Honor.

13             **MR. CROSSLAND:**  132.

14             **MR. FRANCO:**  132 and 133.

15             **THE COURT:**  Oh, I'm sorry, I wrote down the wrong

16   number, it was 133.

17             **MR. CROSSLAND:**  But 133, Your Honor --

18             **THE COURT:**  Which one is 132?

19             **MR. FRANCO:**  That's the Asset Purchase Agreement, Your

20   Honor.

21             **THE COURT:**  Go ahead, Mr. Crossland.

22             **MR. CROSSLAND:**  And then 133 is a collateral

23   assignment of loans, loan rights and loan document.  I don't

24   understand the relevance, candidly, Your Honor.  We're not --

25   there's no claim at trial that HCB doesn't have other legitimate

1    business purposes, and I just don't see the relevance of this

2    one.

3              MR. FRANCO:  Your Honor, this is very relevant because

4    it shows that they didn't go after the CPB participation in this

5    case.  That was part of the total asset package that evolved

6    when these discussions took place as opposed to what they're

7    trying to say that we first went after the CPB asset -- I mean,

8    participation agreement, and that also plays into the reasons --

9    the additional benefit and reasons for obtaining the assignment

10   of the GulfSouth lead position in order to ultimately after we

11   acquired this help protect the interest in the CPB participation

12   which will be explained.

13             THE COURT:  Why is this the collateral --

14             MR. FRANCO:  Only that it's related to the -- it was

15   all part of the same agreement, Your Honor, same transaction.

16             THE COURT:  I'm going to allow this.  I'll admit 132

17   and 133, but I'm not sure I'm going to let you -- I'm not sure

18   how much farther you're planning to go with this.

19             MR. FRANCO:  I'm not.  I'm just going to ask him at

20   this point --

21      **(Defendant's Exhibits 132 and 133 admitted into evidence.)**

22   BY MR. FRANCO:

23   Q.  The date of this, would you take my word for it, is May 4,

24   2012, sir, when HCB purchased this --

25   A.  Not 2004.

1   **Q.**   I said May 4, 2012.

2   **A.**   I'm sorry.  I didn't hear you.  Yes.

3   **Q.**   Okay.  And can you tell me what distressed assets HCB

4   purchased from FNBT, or do you need to look at this?

5   **A.**   It would be helpful but -- yes.

6          **MR. FRANCO:**  May I approach, Your Honor?

7          **THE COURT:**  Yes.

8   **BY MR. FRANCO:**

9   **Q.**   I'm showing you Exhibit 132, which is the Asset Purchase

10  Agreement.  Is this what you were referring to earlier in your

11  testimony as a purchase of a portfolio?

12  **A.**   Yes.

13  **Q.**   What does that mean?

14  **A.**   It means we purchased a group of assets that were purchased

15  by First NBC and through the failure of Central Progressive

16  Bank.

17  **Q.**   Can you tell us from that agreement what distressed assets

18  HCB purchased at that point?

19  **A.**   I can if I can get back to that section.  In general, we

20  purchased loans, mortgages, litigation, and real estate owned.

21  **Q.**   And how much -- and did that include the CPB participation

22  in this loan in this case as part of that portfolio?

23  **A.**   Yes.

24  **Q.**   All right.  How much did HCB pay FNBC to purchase that

25  portfolio of loans according to that agreement, sir?

1   **A.**   $2.8 million.

2   **Q.**   And that was part of the $10 million -- he used part of the

3   $10 million loan from FNBC to do that?

4   **A.**   Correct.

5   **Q.**   So there was another $7.2 million available for future

6   purchases?

7   **A.**   Correct.

8   **Q.**   And who at HCB did the underwriting for that purchase?

9   **A.**   Myself, Fred McLaughlin, and Jason Osborn.

10  **Q.**   Now, I think you testified before, sir, in your examination

11  already that you were not in the negotiations for the purchase

12  or assignment of the GulfSouth interest, correct?

13  **A.**   Correct.

14  **Q.**   Who handled the legal documents?  Was it you?

15  **A.**   On the GulfSouth purchase?

16  **Q.**   Yes.

17  **A.**   No.

18  **Q.**   Is it normal for you to leave -- or for HCB to leave the

19  legal documents to lawyers?

20  **A.**   Yes.

21  **Q.**   Do you know who signed the documents on behalf of HCB?

22  That's not the document in front of you.

23  **A.**   I'm sorry.

24  **Q.**   Do you know who signed the assignment between GulfSouth and

25  HCB, sir?

1    **A.**    It would have been me.

2    **Q.**    Excuse me?

3    **A.**    I can't remember, but I think it was me.

4    **Q.**    When HCB buys notes, what does that normally include?

5    **A.**    Notes, mortgages, judgments, litigation.

6    **Q.**    After HCB acquired the $10 million line of credit from FNBC

7    on May 4, 2012, what did HCB purchase or acquire from Wells

8    Fargo?

9    **A.**    All the notes kind of -- there's a lot of notes so it's

10   hard to remember exactly.

11   **Q.**    May I refresh your memory?  Does the word Fudpuckers make

12   any --

13   **A.**    Yes.  So from Wells Fargo we bought several loans and

14   mortgages that were -- the borrowers were a restaurant in

15   Destin, Florida.

16   **Q.**    Do you recall what was purchased?

17   **A.**    Notes, mortgages.

18   **Q.**    And do you remember how much in notes and how much HCB paid

19   for those notes?

20   **A.**    We paid 2.8, I think.

21   **Q.**    And do you recall how much the notes were on face value?

22   **A.**    There was around six, between five and six.

23   **Q.**    So you purchased $6 million of distressed notes for $2.8

24   million, roughly?

25   **A.**    Correct.

1  **Q.**   Was that before or after HCB acquired the GulfSouth assets?

2  **A.**   After.

3  **Q.**   And what debtors were related to Rupert Phillips in that

4  purchase?

5  **A.**   None.

6  **Q.**   When HCB acquired the GulfSouth interest in the North Tip

7  loan, what debts did you understand had been settled with any of

8  the guarantors?

9  **A.**   None.

10  **Q.**   When HCB acquired the deficiency judgment from GulfSouth in

11  this case, what did you know about the declaratory judgment

12  action that had been filed by GulfSouth regarding assignment of

13  the pro rata interests in the deficiency judgment?

14  **A.**   At what time?  I'm sorry.

15  **Q.**   When HCB acquired the deficiency judgment, did you know

16  anything about the declaratory judgment action that GulfSouth

17  had filed?

18  **A.**   No.

19  **Q.**   Why did HCB not notify Vision Bank of the assignment by

20  GulfSouth, Mr. Dobson?

21  **A.**   Assumed that the originating bank had notified them.

22  **Q.**   When were you first made aware of SEPH's first suit seeking

23  a division of the deficiency judgment?

24  **A.**   In the lawsuits.

25  **Q.**   And you were made aware of it only through the lawsuit?

1   **A.**   Yes.

2   **Q.**   What did you know about any agreement among the banks to

3   divide the deficiency judgment, sir?

4   **A.**   Didn't know of any.

5   **Q.**   When did you first learn about any such alleged agreement?

6   **A.**   In the lawsuits.

7   **Q.**   Now, what did HCB purchase from Bank Trust?

8   **A.**   Bank Trust?  I'm sorry, these were along time ago.

9   **Q.**   Let me help refresh your memory, if I can.

10   **A.**   Okay.

11   **Q.**   Do you remember HCB purchasing about four notes from Bank

12   Trust in September of 2012?

13   **A.**   Yes.

14   **Q.**   And do you remember how much it paid for those notes?

15   **A.**   I can't.  I can't remember.  I'm sorry.

16   **Q.**   Okay.  What did HCB actually acquire when it got the notes?

17   **A.**   Mortgages, notes.

18   **Q.**   Mortgages on two hotels, correct?

19   **A.**   Right, I'm sorry, yes.

20   **Q.**   And two other pieces of property?

21   **A.**   And two other pieces of property, correct.

22   **Q.**   And who were the debtors?  Were they any relation to Rupert

23   Phillips?

24   **A.**   Two of the debtors were on the hotels in Pensacola, and

25   they were no relation to Mr. Phillips.  And then the other two

1    notes were on Phillips -- Phillips Properties was the borrower

2    on those notes.

3    **Q.**   Do you recall whether Bank Trust was agreeable to only

4    selling two instead of four of the notes?

5    **A.**   Usually when the bank has a portfolio, they want you to buy

6    the portfolio.

7    **Q.**   Okay.  So is it your recollection they wanted all four

8    notes purchased?

9    **A.**   Yes.

10   **Q.**   What did HCB purchase from Farm Credit that was mentioned

11   by Mr. Crossland?

12   **A.**   Notes and mortgages.

13   **Q.**   And when about did that happen?

14   **A.**   I can't -- I can't recall the exact date.

15   **Q.**   All right.  Would October of 2012 refresh your memory?

16   **A.**   That sounds about right.

17   **Q.**   Okay.  And what was purchased from Farm Credit?

18   **A.**   Notes and mortgages from borrower being Phillips

19   Properties.

20   **Q.**   Okay.  And how much was paid for that?

21   **A.**   I think we paid $1.9 or $1.95 million.

22   **Q.**   Okay.  And who were the judgment-debtors?

23   **A.**   Phillips Properties.

24   **Q.**   What did HCB get when it purchased those notes and

25   mortgages?

**A.**   The notes and mortgages.

**Q.**   All right.  It was a mortgage on a farm, am I correct?

**A.**   Right, the collateral was a farm.

**Q.**   All right.  And what did HCB consider the value of the farm to be when it purchased the notes?

**A.**   I think it had appraised for $2.4 million.

**Q.**   And how much -- did HCB pay less than that?

**A.**   Yes.

**Q.**   What did HCB acquire from Smart Bank?

**A.**   Four notes.

**Q.**   And does December 2012 refresh your memory?

**A.**   That's about right.

**Q.**   Do you remember how much was paid as to how much the actual notes' face value were?

**A.**   If I recall, I think we paid -- this is hard -- around $800,000, I think.

**Q.**   And do you know how much the notes were?

**A.**   They were probably worth -- their face value was somewhere around one-and-a-half million.

**Q.**   Do you know how Smart Bank acquired those loans?

**A.**   From the failure of GulfSouth Bank, when it purchased all the assets when GulfSouth Bank fell.

         **MR. CROSSLAND:**  I object and move to strike on hearsay.  Without the predicate he wouldn't know that.

         **THE COURT:**  Mr. Franco, it sounds like you need to

1    just lay a foundation for that.  It sounds like it might be

2    hearsay.

3             **MR. FRANCO:**  Yes, Your Honor.

4    **BY MR. FRANCO:**

5    **Q.**   What happened to GulfSouth Bank?

6    **A.**   It failed.

7    **Q.**   And who purchased the assets of GulfSouth Bank?

8    **A.**   Smart Bank.

9    **Q.**   And were these --

10            **THE COURT:**  How does he know that?  I think that's --

11   **BY MR. FRANCO:**

12   **Q.**   Tell us how you know that.

13            **THE COURT:**  That's the foundation.

14   **BY MR. FRANCO:**

15   **Q.**   Is that published on the FDIC website, sir?

16            **MR. CROSSLAND:**  Objection, Your Honor.  We cannot lay

17   a predicate by leading the witness to how he should know it.

18            **THE COURT:**  Well, and it's also -- the fact that it's

19   published on a website certainly doesn't get around the hearsay

20   problem.  I mean, common knowledge is not an exception to the

21   hearsay rule.

22            **MR. FRANCO:**  Okay, Your Honor.  It's not that critical

23   as to how Smart Bank got it.

24            **THE COURT:**  All right.  Then I'll consider that you're

25   withdrawing the question.

1              **MR. FRANCO:**  I do.

2        **BY MR. FRANCO:**

3        **Q.**    When did GulfSouth fail, to your knowledge?

4        **A.**    I can't recall.

5        **Q.**    Would October of 2012 help refresh your memory?

6        **A.**    Sounds about right.

7        **Q.**    Let's look at this.  I'm going to show you Defendant's

8        Exhibit 129.

9              **MR. CROSSLAND:**  Your Honor, I'm just going to object.

10       It's about the third time he's refreshed the recollection of the

11       witness without even clearing up that something might help him.

12       I mean, if we're going to refresh --

13             **MR. FRANCO:**  That's what I'm getting ready to do.

14             **THE COURT:**  Well, but, Mr. Franco, I have to agree, I

15       mean, you've done that several times, you've just suggested the

16       answer as a way of refreshing this witness's memory, and that's

17       just not proper.

18             **MR. FRANCO:**  Okay, I understand, Your Honor.

19             **THE COURT:**  You can't testify and you can't lead him

20       like that.

21             **MR. FRANCO:**  Right.

22             **THE COURT:**  I've had an objection.  My ruling is that

23       it's sustained.

24             **MR. FRANCO:**  May I approach the witness?

25             **THE COURT:**  Yes, you may.

1    BY MR. FRANCO:

2    **Q.**   I'm going to show you Defendant's Exhibit 129 and ask you

3    if that helps refresh your memory as to when GulfSouth failed.

4    **A.**   October of 2012.

5              **MR. FRANCO:**  Actually, Your Honor, I would like to

6    offer -- introduce and file Defendant's Exhibit 129 into

7    evidence.  This is the Purchase and Assumption Agreement between

8    FDIC and Smart Bank dated October 19, 2012.

9              **MR. CROSSLAND:**  Your Honor, a bunch of objections.

10   Relevance, hearsay, authenticity, materiality, lack of

11   predicate.

12             **THE COURT:**  Was this listed on Defendant's --

13             **MR. FRANCO:**  Yes, it was listed.

14             **MR. CROSSLAND:**  It was listed.  We've objected based

15   on all of those grounds.  And I think if Your Honor looks at it,

16   there's no signature on it, he has no involvement with Smart

17   Bank, he's not going to be able to establish predicate with this

18   witness.

19             **THE COURT:**  Well, first of all, hearsay, how is this

20   not hearsay?

21             **MR. FRANCO:**  Because it's an official document of the

22   federal agency, that's why.

23             **THE COURT:**  That doesn't get around a hearsay problem.

24             **MR. FRANCO:**  I think it does, Your Honor.  There's an

25   exception to hearsay if there's an official publication of an

*Dobson - Cross/Franco*                                                    230

```
 1    agency.
 2              THE COURT:  Well, all of the statements within --
 3    well, let me let you go ahead and present your position and
 4    then --
 5              MR. FRANCO:  803(8) is public records of an agency,
 6    Your Honor.
 7              THE COURT:  Is it certified public records?
 8              MR. FRANCO:  No, it doesn't say that.
 9              THE COURT:  What does it -- I have to get my rule
10    book.
11              MR. FRANCO:  I'll read it, Your Honor.
12              THE COURT:  That's fine, I'll read it.
13              MR. FRANCO:  It's Federal Rule of Evidence 803(8).
14              THE COURT:  This is a rule that's usually -- I mean,
15    you usually see this when there's an effort to introduce an
16    investigative report.  And what did you say this is again?
17              MR. FRANCO:  This is an actual agreement that FDIC
18    enters and it's an action of a federal agency.  And it doesn't
19    -- as I read (8), Your Honor, it doesn't limit it, of course, to
20    investigative reports.
21              THE COURT:  Well, it's a matter observed while under
22    legal duty to report.  So I'm -- I don't know that the agreement
23    -- and I'm not sure, Mr. Franco.  I'm just -- I'm not sure.  It
24    just strikes me that an agreement between the FDIC and a --
25              MR. FRANCO:  Your Honor, part (A) unless I'm -- I hope
```

1    I'm not outdated here -- it says, public records -- I'm sorry,

2    it says records, reports, statements, or data compilation in any

3    form of public offices or agency setting forth (A) the

4    activities of the office or agency.

5              This is certainly activity of the agency of the

6    Federal Deposit Insurance Corporation.  That's their main

7    activity.

8              **THE COURT:**  I must have an outdated rule --

9              **MR. CROSSLAND:**  Judge, I don't have that either.  What

10   he just read I don't have that.

11             **THE COURT:**  Mine does not say that.  So my book and

12   rule -- and I'm looking at the 2014 Revised Edition.

13             **MR. CROSSLAND:**  I have the pink one.

14             **THE COURT:**  Mine may be newer than yours.

15             **MR. CROSSLAND:**  That wouldn't surprise me, actually.

16             **THE COURT:**  This is -- what I'm looking at is the 2014

17   Revised Edition that supersedes the 2014 edition which you may

18   have.

19             **MR. CROSSLAND:**  I think that's absolutely correct.

20             **THE COURT:**  I'm not sure there's going to be a

21   material distinction, but we'll see.

22             **MR. CROSSLAND:**  Judge, while he's looking for that may

23   I say --

24             **MR. FRANCO:**  I --

25             **THE COURT:**  Before we go down this path -- and Mr.

1    Franco, you may be right.  I just -- I'm not sure about that.

2    But I'm not sure that this is relevant.

3              MR. FRANCO:  Oh, I think it is, Your Honor.

4              THE COURT:  Why is this relevant?

5              MR. FRANCO:  First of all, it does say, it sets out

6    the office's activities, so I think it's the same concept,

7    unless I'm reading the wrong one again.  Mine says a record or

8    statement of a public office if it sets out the office's

9    activities.

10             THE COURT:  Well, I don't know.  I'm not familiar with

11   these agreements like you all are so I'd have to look at it.

12             MR. FRANCO:  That's fine.  But let's talk about the

13   relevancy as well.  Let's assume that the hearsay objection

14   aside, but my reason for getting it in is SEPH is insinuating

15   that FDIC has foregone any rights to lead bank position in this

16   case.  First of all, they can't prove that.  But more

17   importantly --

18             THE COURT:  I haven't heard that yet in their case.

19             MR. FRANCO:  They have said it.

20             THE COURT:  Well, they may have said it and you're

21   aware of that, but in the confines of this trial they haven't

22   said it yet.

23             MR. FRANCO:  That's why I'm addressing it because my

24   understanding is --

25             THE COURT:  But wait, hold on just a minute.  If --

 1   again, I have -- we have rules that we kind of play by in a

 2   trial setting.  And until that is an issue in the trial and they

 3   make it an issue in their case in chief, it's not relevant.

 4          So I understand, you know, you're taking Mr. Dobson

 5   sort of out of turn, if you will, I mean, you're putting on your

 6   direct examination of him in the Plaintiff's case in chief, but

 7   that doesn't make this relevant if the evidence to make it

 8   relevant hasn't come in yet, just because you are anticipating

 9   it's going to come in.

10          **MR. FRANCO:**  Well, I was going off of their trial

11   brief.  And in fact, in my opening I showed you what they're

12   asking for in Count One.  And they specifically --

13          **THE COURT:**  Right, but you -- your opening is what you

14   anticipate the evidence is going to be, correct?

15          **MR. FRANCO:**  Okay, yes.

16          **THE COURT:**  I'm telling you that evidence hasn't come

17   in yet.

18          **MR. FRANCO:**  All right.

19          **THE COURT:**  So to you this may be form over substance.

20   But for me, who sits behind this bench, you know, day in and day

21   out and has to, you know, apply rules of procedure and rules of

22   evidence, form is important.

23          **MR. FRANCO:**  Your Honor, I understand what you're

24   saying.  And my response to that is, their case and their

25   presentation is that they get the right to collect.  That's

1    their case.

2         They're skipping the fact that if the Court

3    invalidates the assignment, where does the lead go to?  They

4    have to show that.  That's why this is relevant because this

5    shows that Smart Bank acquired this asset.  That's my argument.

6    This shows that.  That's why it's relevant.

7         **THE COURT:**  I understand.  I'm just not sure that it's

8    been made relevant yet, but Mr. Crossland, maybe it's coming.

9         **MR. CROSSLAND:**  Yeah.  I think even if and when it may

10   ever become relevant, his statement about why it's relevant is

11   exactly why it's excluded as hearsay.

12        And before we even go to this exception he comes to,

13   Exhibit 129 is not an executed agreement.  It's just pages.

14   They're not signed by anybody.  This is not an official record.

15   It's not even a contract.

16        It's an unsigned document that, first of all, this

17   witness cannot testify to because he's not with the FDIC, he's

18   not with Smart Bank.  He has no idea if this agreement was ever

19   signed or if it ever will be signed, and he has no predicate to

20   talk about it.

21        **THE COURT:**  And then we move even further back to an

22   authenticity problem.

23        **MR. FRANCO:**  Well, Your Honor, it is signed.  The

24   signatures, as you'll see, have been redacted.

25        **THE COURT:**  But this witness -- I mean, Mr. Crossland

 1    has a point, this witness is not with either of those entities,

 2    so I'm not sure how you get that to be authenticated.  That's

 3    why I asked if it was certified.  I mean, it's not

 4    authenticated.

 5           So I think as a predicate matter that's a problem for

 6    you.  Even if we -- you know, notwithstanding any relevancy

 7    problem or hearsay problem.

 8           **MR. FRANCO:**  I understand the Court's feelings and --

 9           **THE COURT:**  It's more than feelings.  Those are rules.

10           **MR. FRANCO:**  Well, I understand the ruling, let me put

11    it that way, and that's fine.  It's going to also apply to

12    anything they try to get in from FDIC as we move along.  As long

13    as we understand that, that's fine, we'll move along.

14           **THE COURT:**  It will, it certainly will, if you don't

15    have the, you know, the predicate for the authenticity.

16           **MR. FRANCO:**  Thank you, Your Honor.

17           **MR. CROSSLAND:**  I understand that we need to lay

18    whatever predicate it might be, and then we may deal with

19    whether something comes in as a verbal act of the FDIC.  I fully

20    understand those issues, and when they come up we'll address

21    them as necessary, but it doesn't apply to this.

22           **MR. FRANCO:**  I want to just make a note right here

23    that when we get to their attempt to bring in FDIC statements,

24    we have the same treatment.  Otherwise, I have to go back again

25    and call another witness and come back, but we'll deal with it

1    as it comes up.

2             THE COURT:  Right now all I'm going to do is make my

3    ruling as to this purported agreement between the FDIC and --

4    this was Smart Bank?

5             MR. FRANCO:  Smart Bank.

6             THE COURT:  On authentication grounds the objection is

7    sustained.

8             MR. FRANCO:  Thank you, Your Honor.

9             MR. CROSSLAND:  Your Honor, just to clarify, we can

10   still raise whatever other objections we may have at whatever

11   point he attempts to bring this in, we haven't waived any of

12   those objections either as to this specific document?

13            I know your ruling is just on authenticity at this

14   point.  I just want to make sure that we may raise relevance or

15   hearsay or whatever else it may be at the proper time.

16            THE COURT:  Yeah, I haven't given you -- you've

17   already -- you have raised them, I just haven't ruled, because

18   right now with this witness that's as far as I need to go.

19            MR. CROSSLAND:  Understood.  Thank you, Your Honor.

20            MR. FRANCO:  Sorry about that, Your Honor.

21            THE COURT:  It's okay.  No need to apologize.

22   BY MR. FRANCO:

23   Q.   Mr. Dobson, back to you.  Are you awake?

24   A.   Yes.

25   Q.   What stock in GulfSouth did HCB have at the time that

1    GulfSouth failed?

2    **A.**   Stock that we purchased from Steven Roe.

3    **Q.**   That Mr. Crossland asked you about?

4    **A.**   Correct.

5    **Q.**   And how much of that stock did you have?

6    **A.**   I can't remember how many shares it was.

7    **Q.**   What happened to the value of that stock when GulfSouth

8    failed in October of 2012?

9    **A.**   It would have gone to zero.

10   **Q.**   What did HCB purchase from Regions Bank?

11   **A.**   What was the date?

12   **Q.**   September of 2013 help refresh your memory?

13           **MR. CROSSLAND:**  Objection, Your Honor.  The witness

14   literally asked the question and counsel testified.

15           **THE COURT:**  This is one of those form things, Mr.

16   Franco, that is important.

17           **MR. FRANCO:**  Let me rephrase, Your Honor.

18   BY MR. FRANCO:

19   **Q.**   When did HCB purchase the Wholesale Nation note from

20   Regions Bank, do you recall?

21           **MR. CROSSLAND:**  Objection, Your Honor.  It assumes

22   facts not in evidence that HCB purchased that.  If we're going

23   to go outside the scope, he's got to not lead the witness and

24   give him the answers.

25           **MR. FRANCO:**  I didn't lead the witness.  I asked him

1    when it was done.

2              **THE COURT:**  I guess what the objection is it relates

3    to the purchase, your suggestion that there's been a purchase.

4    Because that is -- that is the way you phrased the question.

5    And so by him answering, then you get into evidence the fact

6    that there was a purchase.

7              **MR. FRANCO:**  All right.

8    **BY MR. FRANCO:**

9    **Q.**   Mr. Dobson, are you aware of whether or not HCB ever

10   purchased a Wholesale Nation note?

11   **A.**   We did.

12   **Q.**   And from whom did HCB purchase that?

13   **A.**   Regions.

14   **Q.**   Okay.  Do you recall when that was?

15   **A.**   It was in 2013.

16   **Q.**   Okay.  And do you recall how much was paid for the purchase

17   of that note?

18   **A.**   We paid somewhere around $370,000.

19   **Q.**   How much was the value of the note?

20   **A.**   Just under -- just under $700,000, I think.

21   **Q.**   What did HCB get?

22   **A.**   A note and mortgage.

23   **Q.**   On what?

24   **A.**   The collateral in the mortgage was a piece of real estate,

25   commercial real estate in Fort Walton Beach.

1    **Q.**   And were any of those debtors -- who were the debtors?

2    Were they related to --

3    **A.**   Wholesale Nation.

4    **Q.**   No relation?

5    **A.**   No relation to who?

6    **Q.**   I'm sorry.  Let me ask the question.  Who were the debtors

7    on that loan?

8    **A.**   Wholesale Nation.

9    **Q.**   Excuse me, sir?

10   **A.**   Wholesale Nation.

11   **Q.**   Was that any relation to Mr. Rupert Phillips?

12   **A.**   No.

13   **Q.**   And why did HCB by that note?

14   **A.**   To make a profit.

15   **Q.**   What did HCB do with the note?

16   **A.**   We ended up selling that note.

17   **Q.**   Did you make money or not?

18   **A.**   Yes, yes.

19   **Q.**   Do you recall what HCB purchased from Colonial Financial?

20   **A.**   Colonial Financial?  It would have been a portfolio of

21   notes that had been in the Bank of Bonifay.

22   **Q.**   And did they pay face value of those notes or a discount?

23   **A.**   It was a discount.

24   **Q.**   Do you remember what the value was compared to what was

25   paid?

1   **A.**   Probably somewhere -- I'd have to go back and look, but

2   usually between -- somewhere between 30 and 60 percent.

3   **Q.**   Discount?

4   **A.**   Uh-huh -- well, 30 percent -- 30 to 60 percent of the

5   unpaid principal balance.

6   **Q.**   How much money did HCB expend to purchase those notes -- or

7   that portfolio, I should say?

8   **A.**   I think Colony was maybe 1.8 or 1.9.  It's been along time.

9   I can't remember.

10  **Q.**   All right.  But you -- were you over a million dollars?

11  **A.**   Yes.

12  **Q.**   What debtors were related to Rupert Phillips?

13  **A.**   None.

14  **Q.**   Do you recall after the purchase of the portfolio from FNBC

15  that we talked about, the CPB portfolio, did HCB purchase any

16  other loans from FNBC?

17  **A.**   We purchased another portfolio later on.

18  **Q.**   And when was that?

19  **A.**   I believe that was in 2013.

20  **Q.**   And about how many loans did you purchase, additional loans

21  in this portfolio?

22  **A.**   I think we had -- I think we purchased five notes.

23  **Q.**   Okay.  And who were the debtors?

24  **A.**   They were a gentleman -- can I talk about debtors by name?

25  **Q.**   Oh, yeah, that's a good thing.  Let me ask it this way.

1   Were any of those debtors related to Rupert Phillips?

2   **A.**   No.

3   **Q.**   What did HCB get?

4   **A.**   Notes, mortgages, and a piece of real estate owned.

5   **Q.**   When we talked about the HCB purchases, sir, did HCB

6   purchase these distressed assets at face value?

7   **A.**   No.

8   **Q.**   And what does it purchase it at, what percentage discount

9   normally?

10   **A.**   There's not a normal percentage, but I'd say in the 30 to

11   60 percent range, maybe a little bit lower, maybe some in the

12   20s, 20 to 60 percent of the unpaid principal balance.

13   **Q.**   Now, I want to talk about the time period when HCB --

14   excuse me -- when SEPH filed its suits.  At the time that HCB

15   first joined -- let me rephrase that.

16          At the time SEPH first brought HCB into this lawsuit, what

17   was HCB doing about collecting any of the deficiency judgment

18   against any of the debtors?

19   **A.**   On the GulfSouth participants?

20   **Q.**   Yes.

21   **A.**   We had requested tax returns, and we had requested personal

22   financial statements.

23   **Q.**   Okay.  And what other conditions was taken into effect by

24   HCB at that time, economic conditions?

25   **A.**   Well, I mean, the economy was bad.  A lot of the developers

```
 1    had fallen on hard times in the area, and a lot of them had been

 2    wiped out.

 3    Q.    Okay.  What allegation were you aware of by SEPH when it

 4    first joined HCB into the lawsuit that GulfSouth had settled

 5    this debt with Rupert Phillips?

 6    A.    I'm sorry, can you ask that question again?  It was a

 7    long --

 8    Q.    Yes.  When HCB first was joined into this lawsuit, which is

 9    in the amended complaint, the first amended complaint, what

10    allegation were you aware of that GulfSouth had settled this

11    debt with Rupert Phillips?  Was there any allegation in there

12    that you recall at that time?

13    A.    In the suit itself?

14    Q.    In the amended -- the first time they brought HCB --

15    A.    No, there was nothing in there about that.

16    Q.    When you were first made aware that SEPH alleged that

17    GulfSouth had settled this debt with Rupert Phillips and other

18    guarantors and that the assignment was invalid, how did that

19    affect your proceeding to collect against these debtors, sir?

20    A.    We put that collection on hiatus.

21    Q.    And why was that?

22    A.    Because if the Court rules that we don't have a valid

23    assignment, then I wouldn't want to put liability on HCB

24    Financial Corp. for going out and requesting information from

25    borrowers that I don't have an assignment to for their debt.
```

1   **Q.**   And does that mean financial information?

2   **A.**   Correct.

3   **Q.**   So this information that you're talking about, tax returns,

4   other -- this is financial information?

5   **A.**   Correct.

6   **Q.**   And it's your understanding when SEPH filed this second

7   amended complaint that they allege that you didn't have the

8   right to do that?

9   **A.**   Correct.

10   **Q.**   Had Bank Atlantic enforced this judgment before -- sought

11   to enforce this judgment against Rupert Phillips before HCB

12   purchased it?

13           **MR. CROSSLAND:**   Objection, Your Honor, relevance.

14           **THE COURT:**   Overruled.

15           **THE WITNESS:**   I'm sorry, ask the question again.

16   **BY MR. FRANCO:**

17   **Q.**   Had Bank Atlantic, the $49 million judgment, had that been

18   -- had there been any enforcement proceedings against

19   Mr. Phillips, to your knowledge, prior to the purchase by HCB?

20   **A.**   Not that I'm aware of.

21   **Q.**   Now, let's talk -- we talked about Lot 26 in Nature Walk.

22   That was the lot that was ultimately sold to Mr. McLaughlin,

23   correct?

24   **A.**   Yes.

25   **Q.**   Who was the lot sold to?

1    **A.**    Fred McLaughlin.

2    **Q.**    Okay.  What was on the lot at the time?

3    **A.**    A partially completed home.

4    **Q.**    And how much was it sold for, that lot?

5    **A.**    $136,000.

6    **Q.**    And what happened to those proceeds?

7    **A.**    The net proceeds went to the bank with the first mortgage,

8    which would have been BB&T.

9    **Q.**    Mr. Dobson, what notice of termination of agency

10   relationship has HCB received from SEPH under the Vision Bank

11   Participation Agreement?

12   **A.**    None.

13   **Q.**    What request or demand has HCB received from SEPH to

14   acquire HCB's interest under the Vision Bank Participation

15   Agreement?

16   **A.**    None.

17              **MR. FRANCO:**  Your Honor, may I have a second?

18              **THE COURT:**  Yes.

19              **MR. FRANCO:**  Maybe longer than a second.  Thank you.

20   **BY MR. FRANCO:**

21   **Q.**    Let me ask you this question:  Counsel -- Mr. Crossland

22   asked you if HCB has taken any efforts to try to enforce the

23   prior Bank Atlantic $49 million judgment.  Do you remember that?

24   **A.**    Yes.

25   **Q.**    And how old is Mr. Phillips?

1    **A.**    He's over 70.

2    **Q.**    And are you aware of the -- any assets that Mr. Phillips

3    owns, sir?

4    **A.**    No.

5    **Q.**    And how much money would you spend to try to enforce a $49

6    million judgment if you don't know that he has any assets?  How

7    much money are you going to spend?

8    **A.**    I'm not going to spend any money trying to pursue someone

9    that I don't think has any assets.

10   **Q.**    In all the assets that we talked about that you purchased

11   -- HCB has purchased, is it HCB's normal course to conduct

12   depositions, seize assets of guarantors to enforce the

13   judgments?

14   **A.**    No.

15   **Q.**    Do you have guarantors on all these other loans?

16   **A.**    Yes.

17   **Q.**    Why is that not your normal course, Mr. Dobson?

18   **A.**    Just to control the expenses of collection.

19              **MR. FRANCO:**  That's all the questions I have.  Thank

20   you, sir.  I tender, Your Honor.

21              **THE COURT:**  We're going to take our afternoon recess.

22              Mr. Dobson, you may step down.  Please don't discuss

23   your testimony with anyone during the recess.  We'll be in

24   recess until 3:45.

25              **(Recess taken 3:29 to 3:45 p.m.)**

```
1              THE COURT:  Mr. Dobson, you're still under oath.

2              Mr. Crossland, you may now conduct your cross.

3              MR. FRANCO:  Your Honor, may I ask one question?

4         Do we do proffers at the end of the trial?  What is

5    your routine for proffering any exhibits?  Should I do it now,

6    or should I do it at the end of all the testimony when we finish

7    the testimony in the trial?  How do you want us to do it?

8              THE COURT:  What is this, the exhibit that you wish --

9              MR. FRANCO:  Yes, the bank's purchase agreement that

10   we talked about.  Can I do that he end of trial?  Is that your

11   normal routine?

12             THE COURT:  Normally, I let you just -- it depends on

13   how long your proffer is.  How long do you anticipate it being?

14             MR. FRANCO:  Oh, proffer?

15             THE COURT:  If you want to tell me -- just go ahead

16   and make your proffer now.  That's fine.

17             MR. FRANCO:  Okay.  I was just going to proffer the

18   exhibit itself.

19             THE COURT:  Oh, well, I thought you were -- okay.

20             MR. FRANCO:  I wasn't going elicit any testimony.  I

21   was going to offer the proffer.

22             THE COURT:  Just for the record?

23             MR. FRANCO:  Yes.

24             THE COURT:  You can do that now.  Just make sure it

25   has an Exhibit Number on it --
```

1          MR. FRANCO:  Yes.

2          THE COURT:  -- and Ms. Simms will keep those separate.

3          Do you have it available?  If not, we can do it at the

4     end.

5          MR. FRANCO:  I have it right here.

6          THE COURT:  Okay.

7          MR. FRANCO:  At this time, Your Honor, I'd like to

8     proffer Defendant's Exhibit 129, which is the agreement between

9     FDIC and SmartBank dated October 19, 2012.

10         THE COURT:  It's unsigned.  That's the unsigned

11    agreement?

12         MR. FRANCO:  The signatures have been whited out

13    and -- however, there is some testimony as to why that happened

14    later.

15         THE COURT:  Okay.

16         MR. FRANCO:  From another witness.

17         THE COURT:  At this time, that exhibit is not being

18    introduced into evidence?

19         MR. FRANCO:  Yes, Your Honor.  Thank you.

20         THE COURT:  Thank you.

21         All right, Mr. Crossland.

22         MR. CROSSLAND:  May it please the Court.

23         THE COURT:  Yes.

24

25

1     **CROSS-EXAMINATION**

2  BY MR. CROSSLAND:

3  Q.   Mr. Dobson, do you remember during your testimony with

4  Mr. Franco, I believe you testified that you had not –– you

5  didn't know about the GulfSouth declare –– I'm sorry, the

6  declaratory judgment action GulfSouth had filed until later?

7  A.   I'm sorry, can you be more specific?

8  Q.   Sure.  You understand that at some point GulfSouth had

9  filed its declaratory judgment action, correct?

10 A.   Yes, yes.

11 Q.   Okay.  And your testimony is that you didn't know about

12 that until well after the transaction between GulfSouth and HCB

13 had been completed, correct?

14 A.   Well, I must have misunderstood the question.  I mean, that

15 would have been part of the –– the underwriting that would have

16 went through and send to Progressive Bank.

17 Q.   Okay.  So you knew about –– your testimony today is that

18 you knew about a dispute regarding the *pro rata* assignments when

19 you were doing your due diligence with Central Progressive?

20 A.   I'm sorry.  Can you ask that question again?

21       MR. FRANCO:  Objection.  That's –– the objection is

22 that that's confusing.  You confused the dates and what –– you

23 went back from –– you went back from when he was doing the

24 GulfSouth assignment, and you went back to another point in

25 time.  It needs to be clear.  I'm confused as to the question.

1          THE COURT:  Restate the question, please.

2          MR. CROSSLAND:  Sure.

3    BY MR. CROSSLAND:

4    Q.   When did you become aware of the GulfSouth declaratory

5    judgment action?

6    A.   This is when GulfSouth had a judgment against the borrowers

7    on North Tip.

8    Q.   Right.

9    A.   As we were going through that portfolio is one of the items

10   in there.  It was the North Tip participation.

11   Q.   When you say going through the portfolio, that's when you

12   were doing your due diligence --

13   A.   At Progressive Bank, correct.

14   Q.   Late in 2011?

15   A.   Correct.

16   Q.   And so at that point, you knew that there were issues

17   relating to a possible *pro rata* assignment of the deficiency

18   judgment?

19   A.   No.

20          MR. FRANCO:  Objection.  Thank you.

21   BY MR. CROSSLAND:

22   Q.   What did you believe that the GulfSouth declaratory

23   judgment action was?

24   A.   At the time, when we underwrite those assets, spend a lot

25   of time on the assets where there's collateral where we can

1    collect.  And then Mr. Osborn was the one who basically went

2    through the deficiency and the judgments.  Because his capacity

3    and experience as a lawyer made him better to go through those.

4              MR. CROSSLAND:  I understand.

5              THE COURT:  Can you clarify for me, just to make sure

6    that we're all on the same page as to what action you're

7    referring to?  I think I know.  I'm not sure if Mr. Dobson

8    knows.

9              MR. CROSSLAND:  Sure, fair enough.

10   BY MR. CROSSLAND:

11   Q.   What, if anything, do you know about the declaratory

12   judgment action that GulfSouth filed?

13             THE COURT:  What -- your understanding, based on your

14   question, of the declaratory judgment, what was it that

15   GulfSouth was seeking in the action that you're asking him

16   about?  I think he --

17             MR. FRANCO:  May we show him the complaint to be

18   clear?

19             THE COURT:  No, just let him -- he'll ask his

20   question, but I do think he needs to be clear on --

21             MR. FRANCO:  The reason --

22             THE COURT:  -- what the action --

23             MR. FRANCO:  -- reason I objected before, Your Honor,

24   and I'm objecting now, is it's confusing as to what he's talking

25   about and the time period that he's talking about.  That's what

 1    was my objection.

 2              THE COURT:  He can explain in his question what action

 3    he's talking about, doesn't need to show the -- we don't need to

 4    take time do that.

 5              MR. CROSSLAND:  Gotcha.  We'll do, Judge.

 6    BY MR. CROSSLAND:

 7    Q.   You understand that at some point GulfSouth filed a

 8    declaratory judgment action regarding a dispute between

 9    GulfSouth and the participants on the loan on how to handle the

10    deficiency judgment?

11    A.   Yes, I learned about that in the lawsuit, but I didn't

12    go -- during the underwriting process Mr. Osborn was the one who

13    underwrote the judgment.

14    Q.   When you saw you learned about that in the lawsuit, what

15    lawsuit are you referring to?

16    A.   I think it would be the first amended or -- first amended

17    complaint.

18    Q.   And so it's your testimony here today that you did not know

19    about a dispute between the participating banks on how to handle

20    the deficiency judgment until this litigation that we're here on

21    trial for today?

22    A.   Correct, I wasn't aware of that.

23              MR. CROSSLAND:  Mr. Dyer, please pull up Exhibit 84.

24              MR. FRANCO:  Plaintiff's Exhibit?

25              MR. CROSSLAND:  Plaintiff's Exhibit 84.

1    BY MR. CROSSLAND:

2    Q.    Do you recognize Plaintiff's Exhibit 84 as an agreement to

3    assign participation interest between HCB and GulfSouth,

4    correct?

5    A.    Correct.

6    Q.    And you signed this agreement, correct?

7    A.    Correct.

8          MR. CROSSLAND:  Mr. Dyer, go to page 3 of Exhibit 84.

9    Let's go with the third "whereas" clause, Mr. Dyer.  Yes, sir.

10   BY MR. CROSSLAND:

11   Q.    You see the third "whereas" clause on page 3 says:  Whereas

12   on or about May 2nd, 2012, GulfSouth filed a declaratory

13   judgment action in the Circuit Court of Walton County, Case

14   Number 2012 CA 2014.  The GulfSouth declaratory action against

15   First NBC Bank, Centennial Bank and Bank of Vernon seeking

16   direction from the Court as to how to proceed in administering a

17   loan and participation agreements as to the deficiency judgment,

18   which action is still pending.

19         Do you see that?

20   A.    I see that.

21         MR. CROSSLAND:  Okay.  Let's go to paragraph Number 1

22   on the same page, Mr. Dyer.

23         THE COURT:  Is this in the evidence, 84?

24         MR. CROSSLAND:  Yes, Your Honor, Plaintiff's Exhibit

25   84 was one of the ones we sought to admit.

1          THE COURT:  Thank you.

2    BY MR. CROSSLAND:

3    Q.   And you see paragraph 1, it says that assignee -- the

4    assignee was HCB, correct?

5    A.   Right.

6    Q.   It says the last sentence of paragraph 1:  Assignee shall

7    also assume control and direction over the GulfSouth declaratory

8    action, and if such action is continued will move to replace

9    GulfSouth as the plaintiff in that action.

10          Do you see that?

11   A.   Yes.

12   Q.   So in fact, you knew about the GulfSouth declaratory

13   judgment action before June 26, 2012, which is when you signed

14   this agreement?

15   A.   I must have missed that; but, yes, I must have.  If

16   that's -- back then, signed it.

17   Q.   Mr. Dobson, there's no dispute that HCB claims it's

18   received an assignment of GulfSouth, Bank of Vernon, and Central

19   Progressive's interest in the deficiency judgment, correct?

20   That's HCB's claim?

21   A.   Correct.

22   Q.   And HCB's claiming that SE Property has never notified HCB

23   of a termination of HCB's agency status under the participation

24   agreement, correct?

25   A.   Correct.

1    Q.   Mr. Dobson, if SE Property terminated HCB's agency status

2    and started collection actions, what would HCB have done?

3             MR. FRANCO:  Objection, Your Honor, calls for

4    speculation, especially at this point in time.

5             THE COURT:  Overruled.

6             THE WITNESS:  That would have been up to our

7    attorneys.

8    BY MR. CROSSLAND:

9    Q.   Do you have any understanding of what HCB would have done?

10   A.   No, not at this time.

11   Q.   But as president of HCB, you're sitting before this Court

12   and telling it that we should have sent you a notice of

13   termination if we wanted to get out of the participation

14   agreement?

15   A.   That's what the agreement calls for.  If one of the

16   participants doesn't like how the debt is being collected, they

17   have an avenue to carry --

18   Q.   You could purchase one.  That's one of HCB's theories,

19   correct?

20   A.   Mm-hmm.

21   Q.   Or you can terminate the agency status, correct?

22   A.   I'm not an attorney.  I don't know.

23   Q.   So as you sit here, you have no understanding of what would

24   happen -- what would have happened if SE Property had terminated

25   the agency status?

1    A.    No.

2    Q.    Who personally guaranteed the $10 million line of credit to

3    First NBC?

4    A.    Mr. Phillips.

5    Q.    Mr. Phillips did?

6    A.    Yes.

7    Q.    Anybody else?

8    A.    Not the that I'm aware of.

9              MR. CROSSLAND:  Mr. Dyer, pull up the timeline,

10   please.

11             THE COURT:  Can you please remind me, what was the

12   date that this transaction was completed where the 10 million

13   line of credit was issued by First?

14             MR. FRANCO:  May 4 -- may I?

15             THE COURT:  Yes, somebody.

16             MR. FRANCO:  May 4, 2012.

17             THE COURT:  Thank you.

18   BY MR. CROSSLAND:

19   Q.    So as guarantee for a $10 million line of credit, the only

20   personally guarantee that FNBC requested was that of

21   Mr. Phillips, correct?

22   A.    Correct.

23   Q.    By May 24th, 2012 --

24             Your Honor, can I actually use the board here?  It

25   might just be a little easier.

```
 1              THE COURT:  Sure.

 2              THE WITNESS:  I can't see it.

 3              MR. CROSSLAND:  I can't see it either.  I'm sitting

 4     right in front of it.

 5              THE WITNESS:  I'm going to have to have it closer.

 6     I'm sorry.

 7              MR. CROSSLAND:  That's all right.  I think you and the

 8     judge are the only ones that matter at this time point.

 9              MR. FRANCO:  May I see?

10              THE COURT:  Yes.

11              MR. CROSSLAND:  Try not to yell at you.

12              THE COURT:  Don't yell at the court reporter.

13              MR. CROSSLAND:  Yes, Your Honor.

14     BY MR. CROSSLAND:

15     Q.   May 4, 2012, is when First NBC loaned HCB $10 million,

16     correct?

17     A.   Correct.

18     Q.   And the only personal guarantee we have is that of

19     Mr. Phillips for that $10 million line?

20     A.   Correct.

21     Q.   Okay.  Do you know why Mr. Phillips signs that personal

22     guarantee, as opposed to some other officer of HCB?

23     A.   No.  The bank requested it.

24     Q.   Okay.  And we know that as of May 4th, 2012, you've got

25     this $49 million BankAtlantic judgment against Mr. Phillips,
```

DOBSON – CROSS

1   correct?

2   A.   Correct.

3   Q.   And you've got this $10.5 million deficiency judgment

4   against Mr. Phillips, correct?

5   A.   Correct.

6   Q.   So even with close to $60 million in judgments against them

7   First NBC only required Mr. Phillips to sign the line of credit?

8           MR. FRANCO:  Objection to the form, signed the line of

9   credit?

10  BY MR. CROSSLAND:

11  Q.   Sign the personal guarantee as security for the line of

12  credit.

13  A.   Correct.

14  Q.   And you have no understanding as to why First NBC would

15  accept a personal guarantee of a man who had $60 million in

16  judgment liens on him at the time he signed that personally

17  guarantee?

18          MR. FRANCO:  Objection, argumentative, and it calls

19  for speculation as to what's in FNBC's mind, Your Honor.

20          MR. CROSSLAND:  I just asked if he had any

21  understanding of it.

22          THE COURT:  You —

23          MR. FRANCO:  His understanding would only be if it was

24  told, which is hearsay.

25          THE COURT:  You can ask:  Do you have any

1    understanding.

2            MR. CROSSLAND:   Thank you, Your Honor.

3    BY MR. CROSSLAND:

4    Q.   Do you have any understanding of why First NBC only

5    required the signature on a personal guarantee by Rupert

6    Phillips who had $60 million in judgment against him at that

7    point in time?

8    A.   No.

9    Q.   I think you testified earlier HCB does own stock in First

10   NBC, correct?

11   A.   Yes.

12   Q.   Do you recall the question by Mr. Franco how much money

13   will HCB spend to pursue an asset if the asset is not

14   collectible?  Do you remember that one?

15   A.   Yes.

16   Q.   And you said HCB would spend –– would not the spend any

17   money on an uncollectible asset, correct?

18   A.   Correct.

19   Q.   We know in this case that HCB had already acquired the

20   BankAtlantic judgment, correct?

21   A.   Correct.

22   Q.   And we know that HCB acquired the Fifth Third judgment for

23   about $9 million, correct?

24   A.   Correct.

25   Q.   And we know that HCB paid $200,000 to GulfSouth to get its

1    interest in the deficiency judgment, correct?

2    A.    Correct.

3    Q.    And we know that Bank of Vernon -- HCB paid Bank of Vernon

4    12 grand to get its interest in deficiency judgment, correct?

5    A.    Correct.

6    Q.    That $212,000 was expended by HCB after it already had

7    $50 million in judgments against Mr. Phillips, correct?

8    A.    Correct.

9    Q.    A person that you say is uncollectible?

10   A.    At the present time.

11         MR. CROSSLAND:  No more questions, Your Honor.

12         THE COURT:  Redirect?

13         MR. FRANCO:  One minute, Your Honor.

14                    **REDIRECT EXAMINATION**

15   BY MR. FRANCO:

16   Q.    Mr. Dobson, the May 4, 2012, loan from FNBC, the

17   $10 million loan?

18   A.    Yes.

19   Q.    What was the collateral for that loan, sir?

20   A.    Collateral for that loan was -- were the assets that were

21   purchased.  So when we would purchase a note or mortgage or a

22   distressed asset or piece of property, then we would pledge that

23   back to First NBC.

24         MR. FRANCO:  Thank you.  That's all the questions I

25   have.

1          THE COURT:  Sir, you may step down.

2          THE WITNESS:  Thank you, Your Honor.

3      (Witness excused.)

4          THE COURT:  Your next witness.

5          MR. CROSSLAND:  Yes, Your Honor.  At this point in

6   time, plaintiff is going to play the videotape trial testimony

7   of Chris Campbell that was taken Monday --

8          Go ahead, Mr. Dobson.

9          THE WITNESS:  I don't want to -- you can always

10  interrupt me.  Maybe not the judge, but always me.

11         The trial testimony of Mr. Campbell that was taken

12  last Monday.

13         THE COURT:  Okay.

14         MR. FRANCO:  Deposition testimony.

15         MR. CROSSLAND:  No, Your Honor, it is noticed as trial

16  testimony, and we had already taken the depositions.  It's

17  certainly not depo testimony twice.

18         THE COURT:  Certainly.

19         MR. FRANCO:  For the record, he's referring to a

20  deposition at this point, so the record is clear.

21         MR. CROSSLAND:  Your Honor, I think we ought to just

22  take up the issue that I know is going to come up at some point

23  during the Mr. Campbell's trial testimony.

24         THE COURT:  Okay.

25         MR. CROSSLAND:  Mr. Campbell was deposed years ago in

1    his case.  No one gets two depositions.  But what Mr. Campbell

2    did when he was subpoenaed was advise that he would not be able

3    to appear before this Court because his children were on spring

4    break.  So Mr. Franco and I agreed that we would take trial

5    testimony of Mr. Campbell.  And in an effort to be very clear

6    about the procedure for that, I sent Mr. Franco an e-mail

7    outlining procedure that I wanted to follow, which would be we

8    ask our questions, you make your objections, we let the

9    questions be answered, and then we let the Court rule on the

10   objections that were preserved.

11        That e-mail was confirmed to me in an e-mail by

12   Mr. Franco.  I have both of those e-mails.  We noticed the trial

13   testimony, not as a notice of taking deposition, because, as I

14   said, we already took his deposition years ago.  It was noticed

15   as a notice of taking trial testimony.  And, in fact, that's

16   what both parties told this Court would happen in the pretrial

17   statement.

18        Specifically the pretrial statement said Chris

19   Campbell, Mr. Campbell has notified the parties that he is

20   unavailable to testify at trial due to previously scheduled

21   vacation plans.  The parties have agreed to obtained

22   Mr. Campbell's trial testimony prior to trial.  Mr. Campbell's

23   videotaped trial testimony and transcript will be presented to

24   the Court in its entirety during trial.

25        Now, the procedure could not have been more clear.

1 The reason that this is an issue is because Plaintiff's Exhibit

2 24 and Plaintiff's Exhibit 23 came into evidence without

3 objection.  And this is not a situation where Mr. Franco just

4 didn't object or didn't say anything.  Mr. Franco specifically

5 looked at the exhibit and said, I have no objection to these

6 coming in.

7 　　　　　Now, that was trial testimony.  I specifically did not

8 ask questions of Mr. Campbell relating to Exhibit 24 or 33,

9 because they came in without objection as evidence.

10 　　　　　This is an issue we discussed last Monday.

11 　　　　　THE COURT:  Wait.  You first you said 23 and 24.  Then

12 you said 24 and 33.

13 　　　　　MR. CROSSLAND:  24 and 33.

14 　　　　　THE COURT:  Okay.  So 24 and 33, not 23.

15 　　　　　MR. CROSSLAND:  Right.  Correct, Your Honor.

16 　　　　　So as an exhibit let me just read to the Court what

17 happened on Exhibit 24, because -- let me tell you how the issue

18 came up.

19 　　　　　After this Court explained what hearsay is, at the

20 pretrial conference last week, on Wednesday, Mr. Franco advised

21 that he intended to today raise new objections that were not

22 raised during the trial testimony of Mr. Campbell, specifically

23 as to Plaintiff's Exhibit 24 and Plaintiff's Exhibit 33.  I

24 advised him that we already discussed this matter and that I

25 would have asked other questions if he had objected to these

1    e-mails coming in.

2           And that because Mr. Campbell is now unavailable, to

3    tardily assert objections it's highly prejudicial to me.  It's

4    as if we just put Mr. Dobson on the stand, and then I'm

5    cross-examining -- I'm examining another witness, and Mr. Franco

6    says, wait, I have objections to exhibits that already came in,

7    because we're treating it like trial testimony.

8           His objections were not merely:  I'm not going to say

9    anything, I'll just let it go.  He actually says -- this is what

10   he says for Exhibit 24 --

11          THE COURT:  What page are you on?

12          MR. CROSSLAND:  I'm on page 42 of the transcript.

13          THE COURT:  Just a minute, please.

14          Okay.

15          MR. CROSSLAND:  "Counsel, I'm going to refer the

16   witness to Plaintiff's Exhibit 24 that's been marked for

17   identification.  I'm just handing you a copy of it.  Do you want

18   to make your objections now, or do you want me to make a

19   proffer, then object?  It doesn't matter to me how you want to

20   do it.

21          "Mr. Franco:  Oh, okay.  I'm sorry.  For the --

22          "Mr. Crossland:  For the purposes of today, it doesn't

23   matter.

24          "Mr. Franco:  I didn't know you were waiting on me.

25   This is Chris Campbell, isn't it?"

1           And I said it is.

2           He said, well, he's here to testify.

3           I said okay.

4           So I don't have an objection to this.

5           And then I asked him to clarify what his objection

6   was.

7           "Okay.  And your objection is?"

8           Mr. Franco said:  "I said I don't have an objection

9   since Mr. Campbell is here testifying."

10          And then I offer Exhibit 24 into evidence without

11  objection.

12          Exhibit 24 is an e-mail from Mr. Campbell --

13          Can I put it up on the screen so you have it, Judge?

14          THE COURT:  Okay.

15          MR. CROSSLAND:  Ricky, can you switch over and put

16  Exhibit 24 up, please?

17          If you'll blow up the top e-mail, please.

18          Thank you, sir.

19          Okay.  This is an e-mail from Chris Campbell where he

20  says:  Brian we did get a judgment entered, a judgment granted.

21  As per our original agreement with Vision, Rick Petermann is

22  trying to figure out how we can divide up the approximate

23  $10 million judgment into our *pro rata* shares.

24          Exhibit 33 is a similar type document talking about an

25  agreement.

1          There were no objections to these exhibits, and when

2     there were no objections, I relied on the document coming in as

3     evidence at trial.  I did not ask questions, any other questions

4     relating to intent of the parties or how it may deal with the

5     ambiguous provisions in the participation agreement.

6          Because the procedure was clear, objections would be

7     noted and made at that time, preserved for this Court to rule on

8     when we played the tape.  When Mr. Franco came back two days

9     later after the pretrial conference, said I have more

10    objections, specifically to 24 and 33, I told him of this

11    prejudice, and I told him that I did not ask other questions.

12         And so I know that part of why Mr. Franco's saying

13    that this is deposition testimony is because he plans on relying

14    on Federal Rule of Procedure 32(a), which says that you can

15    object to depositions at trial.  And I would agree.  But this

16    was not a deposition.  The rules were very clear.

17         As you'll see through the transcript, we both object

18    throughout to preserve those objections and let the witness

19    answer so the Court could either take or not take the testimony,

20    but rule on the objections raised as if Mr. Campbell was sitting

21    here at trial.  In fact it was noticed as trial testimony.  It

22    was not a deposition.

23         And I just -- I think it's an issue that's going to

24    come up, and I figure we might as well deal with it now.

25              THE COURT:  Okay.

1          MR. FRANCO:  May I?

2          Your Honor, when we subpoenaed Mr. Campbell to

3    testify, I don't know whether SEPH did or not, but we're the

4    ones who subpoenaed Mr. Campbell to testify.  After he received

5    the subpoena, he contacted me and said, I'm going on spring

6    break with my kids, is there any possibility that we can avoid

7    me having to be a trial.

8          I then contacted Mr. Crossland and advised him of the

9    contact by Mr. Campbell and the problem.  I told him that I

10   would be happy to take the deposition of Mr. Campbell just to go

11   into things that we had not gone into in the original

12   deposition, that we could use the original deposition and I

13   would simple ask him any additional questions outside of that

14   deposition, that we could use the original.

15         In response, he said no, I want to go from the very

16   beginning with Mr. Campbell.  He said what is the process?  I

17   said the process, if that's what you want to do, is you take him

18   on direct, I take him on cross, and you take him on redirect.

19   That's how it works, in my understanding.  Nowhere did I discuss

20   waiving any objections in that discussion and nor I do

21   understand that that was being done.

22         When we went to the deposition, I was going to the

23   deposition with the understanding, as I told you at the pretrial

24   conference, that if a witness testified to a statement out of

25   court, that he was adopting that statement and it would not be

1    considered hearsay.  The Court looked at the rules and ruled

2    otherwise, which I understand.  And I've had other judges do the

3    same thing.  Some judges allow it; some judges don't.  I

4    understand the Court's ruling, and I agree with it in this case.

5            The point is that you don't just take trial testimony;

6    you take a deposition under our rules.  You can use it for trial

7    testimony if the witness is unavailable or by agreement of the

8    parties, but it's considered a deposition subject to our rules

9    of civil procedure.

10           A deposition under 32(c), which I've sited to the

11   Court before, is that -- (b), excuse me, 32(b).  Counsel

12   referenced 32(a), but it's really 32(b).  And it says an

13   objection may be made at the hearing or trial to the admission

14   of any deposition testimony that would be inadmissible if the

15   witness were present and testifying.

16           Consequently, what I advised counsel for is if -- and

17   that the Court told us that it was going to have depositions

18   played during the trial, that was the basis for me saying if I

19   have any other objections, I intend to make them at the time the

20   deposition is admitted into evidence, and I believe that I'm

21   allowed to do that under Rule 32(b).

22           That is not contrary to any of the Court's rulings, as

23   I understand in this case, because the fact is we were taking a

24   deposition after the deposition cutoff was over.  It's -- it was

25   for the purpose of perpetuating the testimony, but it's still

1    considered a deposition, and we treat it as a deposition subject

2    to the rules.

3            If Mr. Campbell was testifying live and the Court had

4    sustained objections to hearsay, then I would be able to deal

5    with that with Mr. Campbell on the stand, and I would object --

6    I would have objected if he was on the stand to any testimony

7    about an e-mail that simply confirms his testimony.

8            THE COURT:  Well, it sounds like what Mr. Crossland is

9    saying is that you had -- he thought he had an agreement with

10   you as to the procedure that you would follow for this specific

11   testimony, and that had the agreement been different or the

12   understanding had been different, he would not have agreed to

13   this procedure with Mr. Campbell.  He would have -- he would

14   have ended up ruining this man's plans because obviously we need

15   him here for trial testimony.

16           MR. FRANCO:  Well, I think Mr. Crossland is -- first

17   of all, there's nowhere that I recall any e-mail saying we're

18   waiving any rights to objection.  That's number one.

19           THE COURT:  Well, I need to see the e-mails because --

20           MR. FRANCO:  All right, and so do I.

21           THE COURT:  Well, you --

22           MR. FRANCO:  More important 32(b) protects him,

23   because it references 32(d), and if he could have cured this,

24   then it's considered waived.  So if he can make a case that he

25   would have been able to cure that objection, and normally that's

1    a leading question that you can cure, or nonresponsiveness, but

2    if he can show the Court that he could have remedied the

3    objection at the time, then 32(d)(3) protects him, as I read it,

4    and, therefore, he is protected.

5              But to say that I can't make an objection under 32(b)

6    when the deposition is used at trial would be contrary to the

7    Federal Rules of Civil Procedure.  And that's my position, Your

8    Honor.

9              THE COURT:  Okay.  All right, I understand.

10             MR. CROSSLAND:  All right, judge.  I'm going to hand

11   both the Court and Mr. Franco the e-mails which he already has

12   because he sent and received them.  I'll bring the Court a copy

13   first.  Thank you.

14             Judge, I handed you a few documents, and I'll just

15   tell you, I was very careful because I understood what we were

16   doing, and I understood that I wouldn't get another chance at

17   Mr. Campbell.  So I wanted to be abundantly clear about what we

18   were doing, and I didn't want this issue to come up, but it did

19   anyways.

20             The first one I handed you, Judge, is a notice of

21   taking videotaped trial testimony of Chris Campbell for use at

22   trial.  I didn't say deposition.  In fact, we did subpoena

23   Mr. Campbell, and we subpoenaed him to appear for his trial

24   testimony last Monday.

25             THE COURT:  Who subpoenaed him?

1          MR. CROSSLAND:  We did.  They also did, but we did as

2     well, and then I set up this trial testimony.  I got the court

3     reporter and videographer, and I served a subpoena on him.

4     There was no objection by HCB to this notice of taking trial

5     testimony.  If there was some question that this was trial

6     testimony not a deposition, we should have got an e-mail.

7          And in the e-mails, the first one I handed you, Judge,

8     on page 1 at the bottom, it's from me to Phil Franco; Robin

9     Cheatam; April Smith; Teresa Wilson; my assistant, Jean Dorn;

10    and Julie Brady.  And the first line, we just confirmed what we

11    were going to do and that Mr. Campbell was going to be there.

12         For paragraph 2, I said for procedure, I simply meant

13    that I think this to be that we ask all of our questions and use

14    all of our exhibits during the examination.  We interject or

15    objections as necessary to preserve them for rulings by the

16    Court, but we ask all questions and use all exhibits with

17    objections noted.

18         We then play the tape for the Court and stop it where

19    necessary to allow the Court to rule on objections as to certain

20    questions or exhibits.  Is that how you anticipated the

21    objections to questions/answers and exhibits working?  That's my

22    only procedural question.  I don't think we have a big dispute

23    but wanted to confirm.

24         He says that's basically the way I see it working.

25    You would ask your questions and offer exhibits, and I would

```
1    object.  I would then cross-examine, do the same, and you would

2    object.  The Court would rule on the objections to testimony or

3    exhibits when they are offered at trial, when the depos are

4    offered at trial.  We haven't offered a depo designation.  We're

5    playing Mr. Campbell's in full.

6              So there's no question that we were going to make

7    objections, that those were the preservations for the record.

8    And in fact, throughout this transcript, you'll see that

9    Mr. Franco made the objections.  But more importantly for 24 and

10   33, he doesn't say that he's -- there is no -- he says there's

11   no objection.

12             And the Ninth Circuit in United States v. Mason --

13   actually, let me site the Court to the United States v.

14   Comstock.  It's an Eighth Circuit opinion.

15             May I approach, Your Honor?

16             THE COURT:  Yes.

17             MR. CROSSLAND:  If you'll flip to page -- the page

18   with the Number 40 on the bottom right-hand side.  This is a

19   criminal case, but it deals with this very issue.

20             And where the little footnote tabs are, 1 and 2, it

21   says:  At trial, each time the Government moved to admit

22   evidence that defendant's pretrial motion sought to suppress --

23             THE COURT:  Wait, wait, wait.  Where are we?

24             MR. CROSSLAND:  I'm sorry.  Page 40, in the left-hand

25   column.
```

1            THE COURT:  Okay.

2            MR. CROSSLAND:  The little footnotes, 1 and 2:  At

3    trial.

4            THE COURT:  Okay.

5            MR. CROSSLAND:  It says:  At trial, each time the

6    Government moved to admit evidence that defendant's pretrial

7    motion sought to suppress; namely, the firearms and ammunition

8    seized from defendant's home, defense counsel stated no

9    objection.  Normally, the denial of a pretrial motion to

10   suppress evidence preserves the objection for appeal and defense

11   counsel need not the renew it at trial.  Yet -- and I'm skipping

12   passed the parenthetical there.  Yet this Court has found

13   pretrial objections waived when an appellant's counsel

14   affirmatively stated no objection at trial to the admission of

15   evidence previously sought to be suppressed.

16            This is precisely what occurred here.  As such, we

17   hold defendant consciously and intentionally waived any

18   objection to the district court's receipt of the evidence at

19   issue.

20            That's exactly what we have.  This is not a case where

21   he failed to make the objections.  He consciously and

22   intentionally said, I have no objection to it coming in.  And

23   when he said that, it affected the questions I might have asked,

24   such as:  What other discussions do you have relating to this

25   e-mail?  What did this e-mail have in terms of intent with

1    regard to the participation agreement?

2              I didn't get to ask any of those questions because I

3    relied on his conscious statement that there was no objection to

4    it coming in.

5              Now, that belief may have been on a mistake belief

6    about what hearsay was, but I can't be prejudiced by that.

7    Because if Mr. Campbell was here testifying and Mr. Franco said

8    no objection to an exhibits, it's going to come in, and we're

9    going to move on, and he can't then later say, wait, Judge, I

10   want to go back and now get that exhibit excluded.  And that's

11   what he's trying to do here, because I can't call Mr. Campbell

12   again, because the procedure we discussed and the fact that it's

13   trial testimony.

14             THE COURT:  Mr. Franco, that's what is sounds like to

15   me is that you didn't object based on what you believed hearsay

16   to be or not to be, or what you thought the Court would rule,

17   and you turned out to be wrong about that.

18             MR. FRANCO:  That's correct; however, even if you look

19   at the case that he just gave you, it talks about waiving --

20   counsel affirmatively stated no objection at trial.  That's the

21   difference.  I never said -- and I told you what my procedure

22   was when we discussed this earlier.  I make objections during

23   depositions to remind myself what objections I should be making.

24   That doesn't mean I waive any right to make objections later.

25             In the e-mails that counsel handed you, nowhere in

1    there did I say I'm waiving objections.  You make objections,

2    and if it's played at trial, I get the right to make objections.

3    That was my position.

4         THE COURT:  How would that be handled in this case

5    with this deponent with the procedure that you and Mr. Crossland

6    agreed to?

7         MR. FRANCO:  Because if he can prove -- if I object to

8    this now, this out of -- this e-mail, if I object on the basis

9    of hearsay, the question is:  How could he have cured that?  If

10   he shows the Court he could have cured it, then it's waived, and

11   I agreed with that.  But this is a hearsay document.  He

12   couldn't cure that then.  It's -- it was hearsay then, it's

13   hearsay now.

14        If it was a leading question that he could have

15   reformulated, then it's waived, but I think that's the whole

16   purpose behind 32(b) and 32(d)(3).

17        THE COURT:  Let me ask another question about 32.

18   This -- I don't think this has ever come up in a trial that I've

19   had in 13 years on the bench, so but just, in looking at the

20   rule, it refers to testimony, objections to testimony, not

21   objections to exhibits.

22        MR. FRANCO:  I don't -- again, this hasn't come up in

23   my 36 years either, but I would suggest to you that there's no

24   distinction, because in order to get the exhibit in, the

25   testimony has to come in.  He has to have testified to this

1    exhibit.  It just doesn't appear by itself.  So that's my first

2    reaction to that.

3            And I think that the point of it is that the exhibits

4    only come in by virtue of testimony, and if I object to the

5    question about the exhibit as hearsay, then that's my objection.

6    And I think 32(b) applies to that.  I think the whole purpose of

7    32(b), Your Honor, when you step back and look at it -- and now

8    we have to look at it -- is that when a deposition -- and you

9    can couch it whatever way you want.  This is a deposition taken

10   for use a trial.  At the trial, according to 32(b), the opposing

11   party has the right to object.

12           THE COURT:  Let me ask --

13           MR. FRANCO:  It's pretty clear.

14           THE COURT:  What is this exhibit number?  Exhibit 24

15   and 33?

16           MR. CROSSLAND:  Yes, Your Honor.

17           THE COURT:  Okay.  Now, in the exhibit list, are these

18   identified?

19           MR. CROSSLAND:  Yes, Your Honor.

20           MR. FRANCO:  Yes.  There are objections on the exhibit

21   list.

22           THE COURT:  Okay.  So there are objections on the

23   exhibit list?

24           MR. FRANCO:  Yes, Your Honor.

25           MR. CROSSLAND:  Correct, and I don't dispute that,

1    Your Honor.  My entire point is had there been objections

2    raised, as opposed to an affirmative and conscious statement

3    that there is no objection to it coming in, which he conceded

4    was based on his mistaken understanding of hearsay.

5            THE COURT:  Right, but Mr. Franco has a good point,

6    and that is if the objection had been raised, you'd have to get

7    around -- you'd have to deal with the hearsay objection.

8            MR. CROSSLAND:  No question, Your Honor, and that's

9    exactly my point.

10           THE COURT:  So you're not really prejudiced?

11           MR. CROSSLAND:  Well, here's the prejudice, Your

12   Honor:  I agree, but the prejudice is in the fact that I didn't

13   have to ask all the numerous questions I would have asked of

14   Mr. Campbell regarding who did you talk to?  What was discussed?

15   What was the intention, as this e-mail related to your intention

16   with the provisions of the participation agreement?

17           THE COURT:  Let me just go ahead and cut through this,

18   and let me see the exhibits.  And maybe my finding is that

19   they're not hearsay.

20           MR. CROSSLAND:  Okay.

21           THE COURT:  Maybe.

22           MR. CROSSLAND:  Do I put it on the screen, or how

23   would you like to do that?

24           THE COURT:  I'd like to see them.

25           MR. FRANCO:  Or, we could -- Your Honor, if you want,

1    we could wait until you get to them in the deposition and stop

2    it so you'd know the context.

3              THE COURT:  Maybe that's -- maybe it is better if I

4    have the context then.  So let's do that.  Let's just proceed

5    and then when we get to page or 40 or 44 --

6              MR. FRANCO:  I'll object, and then the Court can rule.

7              THE COURT:  Well, I'm going to take a minute, because

8    I want to look at the exhibits, but --

9              MR. FRANCO:  Right.

10             THE COURT:  Go ahead and get those exhibits.  You were

11   doing that Mr. Crossland.

12             MR. CROSSLAND:  Yes, Your Honor.

13             THE COURT:  I apologize.  Go ahead and get those, get

14   those to me, and I will deal with it at the point in time when

15   we reach that point.  That's on page 44.

16             MR. CROSSLAND:  May I approach, Your Honor?

17             THE COURT:  Yes.

18             MR. CROSSLAND:  And while Mr. Dyer is pulling it up,

19   Your Honor, I do think regardless of whether they come in for

20   the purpose that there was actually an agreement, they fall

21   under the nonhearsay exception that we sited in *BKCAP*, because

22   it goes with -- my point is the prejudice in terms of asking all

23   those questions around it.  I wasn't afforded that opportunity

24   and will never be afforded that opportunity at this point.  But

25   we'll play the tape, and we'll stop whenever the Court is ready.

1          THE COURT:  Okay.

2      (Videotape testimony of Chris Campbell played in open

3  court.)

4      (Last question asked before tape stopped for the Court's

5  ruling:)

6          "Q   I'm going to show you what has been marked

7      for identification as Plaintiff's Exhibit 8, handing a

8      copy to counsel.  Ask you to take a look at Plaintiff's

9      Exhibit 8 that's been marked for identification.

10          MR. FRANCO:  At this time, I would enter an

11      objection to hearsay before the witness actually looks

12      at the document."

13      (Live colloquy.)

14          THE COURT:  Is this Exhibit 8 in your exhibit book?

15          MR. CROSSLAND:  Yes, Your Honor, it should be in the

16  exhibit notebook at Plaintiff's Exhibit 8.

17          THE COURT:  All right.  Mr. Franco it would be my

18  intent to admit this consistent with what I said earlier for as

19  evidence of the fact of an agreement.  But not for the truth of

20  the matter asserted within the document or with all the details

21  and specifics of the agreement.

22          MR. FRANCO:  Give me one second, Your Honor.

23          THE COURT:  All right.

24          MR. FRANCO:  Remind me self what the letter says.

25          THE COURT:  Sure, certainly.

1          MR. FRANCO:  Your Honor, ruling this is not hearsay

2     because it's not used to prove the truth of an agreement.

3          THE COURT:  Correct.

4          MR. FRANCO:  Then I would ask what is the relevance of

5     it if it's not used to prove the truth of an agreement?

6          THE COURT:  All right.  Well let me hear from -- I

7     should have let Mr. Crossland speak first.

8          Mr. Crossland?

9          MR. CROSSLAND:  Yes, Your Honor, Exhibit 8.  The Court

10    has ruled that there's an ambiguous provision in the

11    participation agreement as to what the parties intended to have

12    happen in a situation where deficiency judgment has been

13    entered.  We're going to start down a line of e-mails now and

14    with the testimony of Mr. Sandel that fall along this line that

15    we say there was an agreement, but more importantly for what

16    this is for, it shows that the party intended to have a *pro rata*

17    distribution of the judgments, and it's really the fact that it

18    was said.  And it's that it was said, it shows the intent, and

19    on provision of this Court has deemed to be ambiguous, and

20    that's kinds of what the *BKCAP* case exactly stands for.  I don't

21    know if the Court had the opportunity to review that.

22          THE COURT:  I did.

23          MR. FRANCO:  Your Honor, that's used to prove the

24    truth of an agreement.  That's what he's saying in no uncertain

25    words.  That's what he's trying to offer this for, and as I

1  understand, it's not evidence of an agreement; and, therefore,

2  if it's not evidence of an agreement, why is it being admitted,

3  except for prejudicial -- it's prejudicial to me for somebody to

4  look at this and say that that was the intent of the parties and

5  therefore the agreement.  That's the problem with it.  If it's

6  not offered to prove the truth, why is it being admitted in

7  evidence in the first place?

8          THE COURT:  Do you have Mr. -- obviously Mr. Sandel is

9  on the witness last, Mr. Petermann is on the witness list.

10          MR. FRANCO:  Yes.

11          MR. CROSSLAND:  They're both on the witness list.

12          THE COURT:  I haven't reviewed their depositions, but

13  what do you anticipate they're going to say?

14          MR. CROSSLAND:  I anticipate they're all going to say

15  that this was said, that's what he wrote, and it demonstrated

16  that this is what the parties were discussing.  We just heard

17  the testimony of Mr. Campbell that there were three options on

18  the table, one of which was a division of the judgment, and he's

19  going to get into testimony from Mr. Franco that it was --

20  discussion was always on the table.

21          This shows that as early as 2010, the parties were

22  talking about what they were going to do when a deficiency

23  judgment was entered.  It goes to the intent of the parties

24  regarding a provision of the participation agreement that this

25  Court has found ambiguous.  It mirrors the *BKCAP* case because it

1    goes to the intent of ambiguous provision.

2            THE COURT:  Go ahead, Mr. Franco.

3            MR. FRANCO:  Mr. Sandel and Mr. Petermann will be

4    testifying live, not through testimony.  That's number one.

5    Number two, there is testimony, you will hear from Mr. Petermann

6    that he's always had problems with such an agreement, and things

7    being on the table being discussed are not an agreement.

8            THE COURT:  He'll be able to testify about that.

9            MR. FRANCO:  Yes.

10           THE COURT:  I'm going to admit the documents, as I

11   said earlier, consistent with the ruling that I made, that these

12   are coming in as evidence that an agreement was made.

13           MR. FRANCO:  I'm sorry, I thought you were ruling that

14   it was not evidence that it was an agreement that was --

15           THE COURT:  No, I came in after lunch saying that I

16   was going to admit the e-mails and --

17           MR. FRANCO:  Not for the truth of what was been

18   asserted here.

19           THE COURT:  For the -- evidence as to the parties

20   reaching an agreement.

21           MR. FRANCO:  I'm sorry.

22           THE COURT:  Did you read the cases?

23           MR. FRANCO:  For the record -- and I'm a little

24   confused, so pardon me -- but I thought you were ruling that it

25   was not used to prove the truth and therefore it was not

1    hearsay.  So it be can't be used to prove the truth of an

2    agreement if that's the basis that it's being admitted.

3            THE COURT:  It's being -- I'm going to consider it as

4    evidence of the parties' intent to reach an agreement.  So -- be

5    more specific?

6            MR. FRANCO:  But not than an agreement was reached?

7    It's not offered for the proof that there was an agreement,

8    because if it is, then it's hearsay.

9            THE COURT:  Well --

10           MR. FRANCO:  That's my problem.

11           THE COURT:  Not the terms of it may be.  You're

12   correct in terms of what the specifics were of the agreement.

13   So in that regard, I would agree with you.

14           MR. FRANCO:  As long as Your Honor, who makes the

15   decisions in this case, is not accepting this as evidence that

16   there was an agreement, because then it would be offered to

17   prove the truth, which is out-of-court statement and hearsay.

18           Now, Mr. Petermann can testify to whatever counsel

19   asks him to do, or I, but this is hearsay.  It's an out-of-court

20   statement made years ago.  And that's why it's hearsay, and

21   that's what I understood the Court to rule, that --

22           THE COURT:  Well, I don't know how -- as far as

23   drawing the line --

24           MR. FRANCO:  That's exactly my problem --

25           THE COURT:  I know but I can't --

1          MR. FRANCO:  -- because if it's used to prove the

2     truth, it's hearsay.

3          THE COURT:  I can consider this for evidence of the

4     parties' intent to reach an agreement, and that's what I'm going

5     to do.  I'm going to consider this this evening, and I'm going

6     to look at some more case law, as to whether I can take it as

7     proof of an agreement.  But right now, I'm going to admit it.

8          MR. FRANCO:  I understand, to which you understand my

9     objection would be if it's used to prove the truth of an

10    agreements, it's hearsay.

11         THE COURT:  Well, it's not exactly.  I mean, it is --

12    right now, I'm going to admit it for evidence of the intent.

13    All right?

14         MR. FRANCO:  Okay.

15         THE COURT:  I'm going to consider it tonight on the

16    fact of the agreement being reached.  Okay.  But as to the

17    specific details of the agreement, I'm not sure.  You may be

18    right as to that part.  But the fact that the parties reached an

19    agreement in reference to how the participating banks and

20    originating bank would handle the deficiency judgment and

21    collection on the deficiency judgment, I may still consider it

22    for that purpose.  But I don't need to go that far right now.

23         MR. CROSSLAND:  And, Judge, I think just to what the

24    Court was talking about, the *Mueller* case talks about the

25    specifics, and e-mails and communications that relate to the

1    terms of an agreement.  And Mr. Sandel can testify this was an

2    oral agreement.  And so these e-mails that show the specifics of

3    that agreement are going to be used for that purpose, and I

4    think that the *Mueller* case is instructive as to the very

5    question you're talking about.

6            This one specifically shows that as early as 2010,

7    this is what Mr. Petermann then believed and what the

8    participants were all then believing would happen, that there

9    would be a *pro rata*.  It goes to their intent as to what would

10   happen when a judgment was entered, so --

11           THE COURT:  That's what I've ruled at this point.

12           MR. CROSSLAND:  Thank you, Your Honor.

13           THE COURT:  I'm going to look closer into the

14   distinction between that, the intent of the parties and taking

15   it as to the actual fact that the agreement was reached, and

16   then beyond that as to the specifics of the agreement.

17           MR. CROSSLAND:  Understood, Your Honor.  Thank you.

18           THE COURT:  And, of course, as this is a bench trial,

19   so, Mr. Franco, if I find something in the case law tonight --

20   and you're certainly free to come in tomorrow morning with case

21   law to counter what the plaintiff submitted earlier today, and

22   I'll consider that in the morning, if you have something.

23           MR. FRANCO:  For the court's purposes for tonight,

24   when you look at the case that they've sited to you, the

25   *BKCAP* --

1          THE COURT:  They gave me a stack of cases.

2          MR. FRANCO:  I know, but the *BKCAP* case, I think is

3  what he was just referring to, specifically says not what it

4  meant in truth or in fact.  So just pay attention to that case

5  as well, Your Honor.  It's a F.Supp. case.  It's called

6  B-K-C-A-P, all in caps.

7          THE COURT:  All right.

8      (Video playing.)

9      (Last question asked before tape stopped for the Court's

10  ruling:)

11          "Q   And does the paragraph that you just read

12      correspond with some of the discussions the banks were

13      having regarding possible division of the participation

14      agreement between the participating banks?

15          "A   It does.

16          MR. FRANCO:  I'm sorry, what was that question?

17      Can you repeat that?

18          MR. CROSSLAND:  Can you read back for me, please.

19      (Record read.)

20          MR. FRANCO:  Objection, leading.

21      (Live colloquy.)

22          MR. CROSSLAND:  Can we back that up to the part she

23  read it, Your Honor.

24          THE COURT:  Right.

25          MR. CROSSLAND:  Can you could that, Mr. Dyer?

```
1              THE COURT:  All right.  Overruled.

2         (Video playing.)

3         (Last question asked before tape stopped for the Court's

4    ruling:)

5              "Q   I'm going to restate it anyways.

6                   Does the paragraph you just read

7         correspond with the discussions between the

8         participating banks regarding a division of the

9         deficiency judgment?

10        MR. FRANCO:  Objection, still leading.

11        (Live colloquy.)

12             THE COURT:  Overruled.

13        (Video playing.)

14             THE COURT:  Mr. Crossland, it's 5:30.  Why don't we

15   just pick up tomorrow morning where he is ready to give his

16   response.

17             MR. CROSSLAND:  We'll have Mr. Dyer fast-forward it

18   for the Court to that point, and then we're coming up to

19   Exhibit 24 is the next thing anyways.

20             THE COURT:  I noticed that it's probably a good time

21   to stop.  And let me look at some of the cases again, time to do

22   a little bit of research on our own.

23             MR. FRANCO:  And, Your Honor, just for Your Honor's

24   purposes, Exhibit 24 is coming up on the next page.

25             THE COURT:  Right, that's what we're talking about.
```

1          MR. CROSSLAND:  Your Honor had asked us just to kind

2   of mention where we're as we go along.

3          We have Mr. Campbell's transcript totals about three

4   hours and ten minutes, so we're about an hour into that, and I

5   wish it was shorter, but it's just not.  Mr. McLeod is about 50

6   minutes total with everyone's together.

7          And then if I were projecting -- although probably

8   inaccurately -- I would think maybe Wednesday around lunchtime

9   we're going to be done.  I'm hoping earlier, but I just don't

10  want to tell the Court that's what we're thinking.  Maybe

11  Wednesday lunchtime is when we'll finish our case-in-chief.

12         MR. FRANCO:  May I ask for preparation purposes who

13  would be the next witness.

14         MS. BRADY:  Mr. Sandel.

15         MR. CROSSLAND:  Sure.  And just so we have it on the

16  record, we've subpoenaed everybody, but in terms of who

17  Mr. Franco may need to ensure here tomorrow for court, just

18  planning purposes for people affiliated with HCB, Mr. Phillips

19  and Mr. McLaughlin will very likely go tomorrow and possibly

20  Mr. Osborn in the afternoon.  Just so we can make sure that

21  those witnesses are here.

22         THE COURT:  Okay.

23         MR. CROSSLAND:  That's kind of what we're planning for

24  tomorrow.  There may be some other witnesses -- well, no, I

25  think that's probably it.

1          MR. FRANCO:  Thank you.

2          THE COURT:  All right.  Mr. Franco, you will need to

3     have your witnesses ready to go when the plaintiffs rest.

4          MR. FRANCO:  I understand that, Your Honor.  I am also

5     anticipating that I may cover these witnesses when he puts them

6     on.

7          THE COURT:  Sure.

8          THE WITNESS:  So that may obfuscate me having to bring

9     them back as part of my case.  We'll see how it goes.

10         THE COURT:  I anticipated that.  In terms of any

11    additional that you may have in witnesses that the plaintiff

12    doesn't call, we'll need you to have them here, even though they

13    may have to wait a little bit.

14         MR. FRANCO:  Okay.  Your Honor, I would like to ask

15    this question, because it happened to me in my last trial.  When

16    he puts on one of my people, I have the option to either

17    cross-examine at that point or take that party as part of my own

18    case; am I correct?  Is that the Court's --

19         THE COURT:  It depends on how you-all have arranged

20    the -- if you don't have that witness under -- I don't know if

21    the witness is not under subpoena, I don't know what you-all

22    have done to secure your witness -- the witnesses to be here.

23         MR. FRANCO:  I'm sorry, I don't think I explained it

24    well.

25         If he puts on, for instance, Mr. Phillips.

1          THE COURT:  Okay.

2          MR. FRANCO:  I can cross-examine at that point based

3    on the scope.  And then if I wish, not to duplicate, I can bring

4    him back as part of my case; is that correct?

5          THE COURT:  Sure.

6          MR. FRANCO:  Okay.  Because I was told in another case

7    I couldn't do that, I had to make a selection right then and

8    there.

9          THE COURT:  No, I don't have a problem with that

10   but --

11         MR. FRANCO:  No duplication.

12         THE COURT:  With the caveat as far as time.

13         MR. FRANCO:  I see.

14         THE COURT:  And then also, of course, whether you're

15   in cross or you're in direct, you're subject to the rules that

16   extend to leading questions.

17         MR. FRANCO:  And Your Honor handled it this morning.

18   I think my understanding is, if I choose to go beyond the scope,

19   as part of my case, even though he's on at that point in time, I

20   do get a redirect on that basis; am I correct?

21         THE COURT:  Yes.

22         MR. CROSSLAND:  And, Your Honor, the only issue we

23   take with that, that's something we raised with Mr. Franco --

24   and he wanted to put on his own witnesses after the fact,

25   apparently now he's going to do it this way -- candidly, the

```
 1   Court can hear what it's going to hear, and it doesn't truly
 2   affect us one way or the other.  We would just ask that the
 3   leading questions and the refreshing efforts that were made
 4   today for Mr. Dobson don't reoccur on questions that are clearly
 5   outside the scope.  It's just -- I think it's improper.
 6            THE COURT:  Okay.  Yeah, I mean, we talked about that.
 7            MR. FRANCO:  I understand the rules.
 8            THE COURT:  He'll abide by that instruction.  But I
 9   guess this does cause me to, you know, discuss with you,
10   Mr. Franco, the need to be orderly, if you will, in your
11   presentation.
12            For instance, if you are going to cross Mr. Phillips,
13   that's fine.  But then if you move into your own direct, so you
14   go beyond the scope of cross, you won't be able to lead.
15            MR. FRANCO:  I understand, Your Honor.
16            THE COURT:  I mean --
17            MR. FRANCO:  I understand, as long as --
18            THE COURT:  -- not just the refreshing.  Lead in any
19   way.  So when I say "orderly," you'll need to, you know, confine
20   your cross to the -- within the scope of what the direct was.
21   And you did this fine this morning.  I just -- I want you to do
22   it that way again that -- where I know there's a break, you're
23   moving from cross into your direct.  I don't -- I certainly
24   don't want every time you ask a leading question that's on --
25   we're on -- I don't want to jump back and forth.
```

1          MR. FRANCO:  I understand, Your Honor.  I'll do my

2     best to try to differentiate between the scope.  And sometimes

3     the scope is pretty broad, depending on how he -- what he covers

4     with Mr. Rupert Phillips, especially.

5          THE COURT:  Well, if it's broad, then you'll be able

6     to stay in cross.

7          MR. FRANCO:  Yes, sir -- yes, ma'am.

8          THE COURT:  But we'll see how that goes.

9          MR. FRANCO:  Thank you.

10          THE COURT:  Okay.  Anything else then before we --

11          MR. FRANCO:  8:00 o'clock tomorrow.

12          THE COURT:  -- reconvene tomorrow?  Yes.

13          MR. CROSSLAND:  Thank you, Judge.

14          THE COURT:  All right.  Well, you all have a nice

15     evening.  I'll see you tomorrow morning.

16          (Proceedings adjourned at 5:33 p.m.)

17                         * * * * * * * *

18          I certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled matter.  Any
19     redaction of personal data identifiers pursuant to the Judicial
      Conference Policy on Privacy are noted within the transcript.

20

21     _Julie A. Wycoff_                     3/23/2015

22     _____     _____
       Julie A. Wycoff, RMR, CRR            Date
23     Official U.S. Court Reporter

24

25

1                        **I N D E X**

2

3    Plaintiff Witnesses

4    BRYAN CAMPOLO

5        Direct Examination by Ms. Brady          51
         Cross-Examination by Mr. Franco          77
6        Redirect Examination by Ms. Brady        111
         Recross-Examination by Mr. Franco        120
7        Direct Examination by Mr. Franco         124
         Cross-Examination by Ms. Brady           126
8

9    JOE DOBSON

10       Direct Examination by Mr. Crossland      127
         Cross-Examination and Direct by Mr. Franco  198
11       Cross-Examination by Ms. Crossland       248
         Redirect Examination by Mr. Franco       259
12

13   VIDEO OF CHRIS CAMPBELL                       278

14

15

16

17

18

19

20

21

22

23

24

25