**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| **SE PROPERTY HOLDINGS, LLC,** ) | |
| as Successor by Merger with ) | |
| VISION BANK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | **Case No. 3:13cv6/MCR** |
| ) | |
| vs. ) | Pensacola, Florida |
| ) | March 24, 2015 |
| ) | 8:00 a.m. |
| ) | |
| **GULFSOUTH PRIVATE BANK,** ) | |
| **FIRST NBC BANK,** ) | |
| **HCB FINANCIAL CORP.**, a Florida ) | |
| Corporation, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**DAY 2**

TRANSCRIPT OF **BENCH TRIAL** PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
CHIEF UNITED STATES DISTRICT JUDGE
(Pages 1-216)

FOR **THE PLAINTIFF:**          **JULIE S. BRADY, ESQUIRE**
                               **BRANDON T. CROSSLAND, ESQUIRE**
                               Baker & Hostetler
                               200 South Orange Avenue, Suite 2300
                               Orlando, Florida  32801

FOR **THE DEFENDANTS:**         **PHILIP A. FRANCO, ESQUIRE**
                               **APRIL D. SMITH, ESQUIRE**
                               Adams and Reese, LLP
                               11 N Water Street, Suite 23200
                               Mobile, Alabama  36602

```
 1                            PROCEEDINGS
 2            (Court called to order; All parties present.)
 3            THE COURT:  Good morning.  Does either side wish to be
 4    heard on the issue pertaining to the agreement and the evidence
 5    of the agreement?
 6            MR. CROSSLAND:  Just -- I don't know if I might do
 7    this one quickly, you had also asked us yesterday for exhibits
 8    to come in.  Do you want to do that first?
 9            THE COURT:  No.  Let me address the evidentiary issue
10    first.  Do you have anything else to add?
11            MR. CROSSLAND:  I don't.  I agree to everything that
12    we had.  In terms of just on the evidence without a waiver by
13    the nonobjection, if it's not coming in just pure evidence of
14    the agreement, it certainly should come in as intent of the
15    parties under Decap (phonetic) and all those other things.  24
16    and 33 should be coming in at an absolutely minimum for that
17    purpose.
18            THE COURT:  Mr. Franco?
19            MR. FRANCO:  Your Honor, I just would add that,
20    according to what we read last night in the cases, there is a
21    distinction about whether or not it comes in to prove the truth
22    of the agreement itself.
23            And our position is that if it's hearsay and it's --
24    if it's hearsay, it's an out-of-court statement and they're
25    trying to prove the truth of it, then it doesn't come in.
```

1    If it comes in for some other reason, then it can't be

2    used to prove the agreement itself.  That's our position.

3    **THE COURT:**  All right.  The way I interpret this issue

4    is one of verbal acts.  And if the statement is coming in to

5    prove -- as a verbal act to prove the existence of a contract,

6    in other words, something that affects the legal rights and

7    obligations of the parties such as a contract, then it's

8    nonhearsay.

9    And that's the way I interpret -- I interpret this

10   evidence that I've been considering in Plaintiff's Exhibit 8 and

11   then also that's already been admitted, the letter from I

12   believe it was Mr. Petermann, and then also this morning we have

13   Exhibit 24 and 33.

14   And I do believe that statements can come in as

15   evidence of the existence of the agreement.  That's the point of

16   the verbal act rule, if you will.

17   It's important, I think, to note that the statements

18   are not coming in to prove the truth of the matter asserted in

19   the statement.

20   For instance, if the statement is -- and I can

21   actually turn to the exhibits, but that the parties had an

22   agreement that the deficiency judgment would be divided up and

23   assigned on a pro rata basis as to the participating entities,

24   that statement is not being offered to prove the truth of that

25   statement.  It's being offered to prove the fact that the

 1     parties had that agreement, but it's not being offered to prove

 2     that the deficiency judgment was actually divided up and

 3     assigned.  In fact, we know it wasn't.  That's one of the

 4     reasons we're here.

 5             So you may consider that a fine distinction, but it's

 6     nonetheless a distinction that I make.  And the evidence rule

 7     speaks to -- let me just -- and I think this was recently added

 8     to the rules when they were most recently adopted, the fact that

 9     it -- to be hearsay, the evidence has to be offered for the

10     truth of the matter asserted in the statement.  And that's not

11     what we have here.

12             So that's my ruling.  I do want to, though, sort of

13     consider this issue at the time each of the statements is being

14     offered.  I don't want to -- I'm not just making a wholesale

15     ruling.  I'm making my ruling as to the ones that are under

16     consideration right now, the exhibits.

17             8 has already been admitted.  24 and 33, I know we

18     needed to be prepared for those this morning.  And then beyond

19     that, Mr. Crossland, if you will introduce those, let me -- you

20     know, let me take a moment to look at the actual statement, and

21     then I'll rule.

22             **MR. CROSSLAND:**  Yes, Your Honor.

23             **THE COURT:**  Okay.  So we have the deposition -- the

24     video deposition that we're still looking at with Mr. Campbell.

25             **MR. CROSSLAND:**  Yes, Judge, sorry.

1      **THE COURT:**  I'm sorry, the exhibits Mr. Crossland,

2  yes.

3      **MR. CROSSLAND:**  Here is what we had.  I handed

4  Mr. Franco this list just a few minutes ago and asked him to

5  correct me if I mistake something, so hopefully we have this

6  cleared up.

7      In terms of the exhibits that were admitted jointly --

8  that were admitted as joint exhibits before we started any other

9  presentation of evidence, we had 1, 2, 3, 4, 6, 26 through 31,

10  53, 54, 83, 84, 85, 86, 87, 88, 89, 93, 94, 107, 117, 121, 123

11  through 126, 129, 130, and 134.

12      **THE COURT:**  Correct.

13      **MR. CROSSLAND:**  As part of testimony that was elicited

14  yesterday, we also admitted 8, 18, 68, 101, and 125.  And as

15  part of testimony that was elicited by Mr. Franco, I believe

16  that he entered into evidence -- these are now Defendant's

17  Exhibit, Defendant's Exhibit 7, 108, 111, 115, 132, and 133.

18      **THE COURT:**  All right, those are defense exhibits.

19      **MR. CROSSLAND:**  And I'll ask my paralegal to try to

20  keep track so at the end of the day -- we'll recap it in the

21  morning and maybe we can do the same thing for everything else

22  that comes in as we go to make sure everybody else is on the

23  same page.  Does that makes sense for the Court?

24      **THE COURT:**  That's fine.

25      **MS. BRADY:**  And there were two other joint exhibits --

1    you had asked what other joint exhibits hadn't been moved in

2    yet, and those are 19, 99, 101, and 131.

3         **MR. FRANCO:**  So this is being added to this list?

4         **THE COURT:**  Well, 19, 99, and 131 Ms. Brady is

5    indicating are joint exhibits.

6         **MR. FRANCO:**  So these are new ones that they're

7    putting in now?

8         **THE COURT:**  Well, I don't know when they're putting

9    them in, but I think she's just -- I asked what other joint

10   exhibits there were so I that know -- I'd rather go ahead and

11   get these on the record so that we just save time when you're

12   examining your witness and these are already in, you don't need

13   to seek to, you know, introduce them and seek to admit them.

14        **MR. FRANCO:**  Can we have the last three again?

15        **THE COURT:**  19, 99, 131, and 101 but that was one

16   already admitted.

17        **MR. CROSSLAND:**  And we would offer those at this

18   point.

19        **THE COURT:**  All right, those will be admitted.

20        **(Joint Exhibits 19, 99 & 131 admitted into evidence.)**

21        **MR. CROSSLAND:**  Anything else for the Court or are we

22   prepared to let you delve back into a video?

23        **THE COURT:**  Mr. Franco, anything else for you all?

24        **MR. FRANCO:**  No, ma'am.

25        **THE COURT:**  Then we'll turn to Mr. Campbell again.

1    And let me go ahead and just say that Plaintiff's 124 and 133

2    will be admitted over Defense objection.  That's noted and

3    preserved, but we don't need to stop, let's just keep moving on

4    those.

5              **MR. CROSSLAND:**  Sorry.  It's 24 and 33.  I thought I

6    heard you say 124 and 133.

7              **MR. FRANCO:**  You did.

8              **THE COURT:**  Oh, I did.  That's what I thought -- so

9    you're right, it's 24 and 33, I apologize.

10             **(Plaintiff's Exhibits 24 & 33 admitted into evidence.)**

11             **MR. FRANCO:**  Can I ask what page we're resuming on?

12             **THE COURT:**  Let me see where we left off.

13             **MR. CROSSLAND:**  On the left-hand side on the bottom

14   transcript it actually does the page and then it does a colon

15   and then the line number, but I think we're at 42 -- 41, line

16   20, sorry.

17             **(Video of Chris Campbell published and not**

18   **transcribed, with the exception of the objections ruled by the**

19   **Court:)**

20   *BY MR. CROSSLAND:*

21   **Q.**   *All right.  Mr. Campbell, I want you to look at page 2, the*

22   *email from Mr. Sandel to yourself dated July 21st, 2011, at 1:45*

23   *p.m.*

24   **A.**   *Okay.*

25   **Q.**   *What was Mr. Sandel talking about in that email?*

1          **MR. FRANCO:** *Objection. Calls for speculation. The*
2  *document speaks for itself.*
3          **(Video paused.)**
4          **THE COURT:** Overruled. He can testify based on his
5  interpretation as the receiver of the email. Go ahead.
6          _____
7          **MR. CROSSLAND:** *Counsel, I'm going to refer the*
8  *witness to Plaintiff's Exhibit 39 that's been marked for*
9  *identification.*
10         **MR. FRANCO:** *Okay. I have an objection to this one.*
11         **MR. CROSSLAND:** *Okay. Go ahead.*
12         **MR. FRANCO:** *Two objections: One, hearsay from --*
13         **THE COURT:** The objection will be overruled for the
14  reasons noted earlier. I mean, these are statements that are
15  offered to prove the existence of the contract or the agreement
16  between these parties, Mr. Campbell being the representative of
17  GulfSouth at the time and Mr. Petermann being the representative
18  of Southeast Property at the time. So objection --
19         **MR. FRANCO:** Your Honor, I just would like you to
20  correct your statement. Mr. Petermann was not SPS.
21  Mr. Petermann was a GulfSouth attorney. I think you said SPS.
22         **THE COURT:** Oh, I'm sorry, I apologize, I did. Too
23  many different entities. I apologize.
24         So both -- both then representatives of GulfSouth, and
25  these statements again are referencing an agreement that would

1  certainly affect the legal rights of that entity, who they were

2  speaking on behalf of.

3          All right.  So objection is overruled.  39 will be

4  admitted.

5          **(Plaintiff's Exhibit 39 admitted into evidence.)**

6          _____

7          **MR. CROSSLAND:**  *Counsel, I'm going to refer the*

8  *witness to Plaintiff's Exhibit 40 that's been marked for*

9  *identification.*

10          **MR. FRANCO:**  *Same objection as before, hearsay and*

11  *attorney/client privilege.*

12          **MR. CROSSLAND:**  *Same response.*

13          **THE COURT:**  Objection will be overruled.  This is

14  evidence of the agreement.  It's the assignment -- it's the

15  assignment which is evidence of the agreement.

16          _____

17  *BY MR. CROSSLAND:*

18  **Q.**  *And the second page of Plaintiff's Exhibit 40, what is it?*

19  **A.**  *It is a partial -- an unexecuted partial assignment of*

20  *judgment.*

21  **Q.**  *Okay.  And on this unexecuted partial assignment of*

22  *judgment, who is the assignor?*

23          **MR. FRANCO:**  *Objection to this line going into the*

24  *actual document.  So I'm going to maintain my objection.*

25          **MR. CROSSLAND:**  *What's the objection?*

1          **MR. FRANCO:**  *That -- same thing, it's privileged and*

2    *hearsay.*

3          **THE COURT:**  This is on 40 or 41?

4          **MR. CROSSLAND:**  This is the same exhibit, 40, we've

5    just moved on to the second page of it.

6          **THE COURT:**  Well, I've already admitted that.  I do

7    have a thought about 41, though, before -- make sure we stop at

8    41.

9          **MR. CROSSLAND:**  Yes, Your Honor.

10   _____

11   *BY MR. CROSSLAND:*

12   **Q.**  *Let's talk a bit more about this pro rata assignment issue.*

13   *Was there ever an agreement between the participating banks to*

14   *divide up the deficiency judgment between all of the banks?*

15         **MR. FRANCO:**  *Objection.  Asked and answered.*

16         **THE COURT:**  Overruled.

17   _____

18         **MR. CROSSLAND:**  *Counsel, I'm going to refer the*

19   *witness to Plaintiff's Exhibit 51 that's been marked for*

20   *identification purposes.  If you have any objection to that,*

21   *please let me know.*

22         **MR. FRANCO:**  *Let me take a look at it.  Same*

23   *objection.  Hearsay and privilege --*

24         **MR. CROSSLAND:**  *Same response.*

25         **MR. FRANCO:**  *-- attorney/client privilege, excuse me.*

1          **THE COURT:**  My ruling is the same.  This is, again --

2     this is an email letter from Mr. Petermann to Mr. Campbell, both

3     of whom are representatives of GulfSouth.  It reflects the

4     assignments, which is evidence of the agreement.

5          All right.  Go ahead.  Can you stop that one more

6     time, please, sir.

7          The other thing I want to note is that, standing

8     alone, it wouldn't be enough, as I said earlier at the pretrial

9     conference and I think even following the pretrial conference in

10    a written order, it wouldn't be enough that the declarants are

11    going to be here to testify, but it certainly minimizes any

12    concerns about a lack of trustworthiness, they'll be here,

13    you'll be able to cross-examine them, and in light of my finding

14    that it's nonhearsay, you know, that again, it's just -- it's

15    just one more reason not to exclude the statements, they will be

16    here.  But standing alone, it wouldn't be enough.

17         All right, go ahead.

18         **MR. CROSSLAND:**  The only other thing that I was going

19    to note is that we had also mentioned the effect on the listener

20    on various other nonhearsay uses, at this point it's those were

21    raised during the deposition of the trial testimony.  But

22    anyways --

23         **THE COURT:**  I mean, if you want to make your record,

24    effect on the listener may be for some of these, but I don't

25    know that that would be my ruling across the board.

| | |
|---|---|
| 1 | **MR. CROSSLAND:**  Certainly, Your Honor, I'm not trying |
| 2 | to change your ruling at all, but thank you. |
| 3 | **THE COURT:**  Okay. |
| 4 | _____ |
| 5 | **MR. CROSSLAND:**  And, Your Honor, I just asked Mr. Dyer |
| 6 | to kind of click along -- |
| 7 | **THE COURT:**  Stop is that, please.  Do what? |
| 8 | **MR. CROSSLAND:**  I just asked Mr. Dyer when there's |
| 9 | pauses where he's looking maybe he'd just kind of click along. |
| 10 | It looks like it's going one second at a time and we won't miss |
| 11 | anything, if that's okay with the Court. |
| 12 | **THE COURT:**  It is.  Let me go back, though, Mr. |
| 13 | Crossland, because you just raised something that I think it's |
| 14 | important to go ahead and place on the record. |
| 15 | This position that these statements are admissible |
| 16 | because of the effect on the hearer.  I don't -- I wouldn't -- I |
| 17 | don't think I would agree with that, and that's why I said it |
| 18 | wouldn't be my ruling across the board, insofar as we have |
| 19 | communications between one representative of GulfSouth and |
| 20 | another representative of GulfSouth. |
| 21 | However, when we get to Mr. Sandel's statements, I |
| 22 | most likely will include in my ruling that the statements are |
| 23 | admissible to explain why Vision Bank and SE Property did not |
| 24 | terminate -- take steps to terminate the originating bank's |
| 25 | position, at least during the time that there's evidence they |

1    believe this agreement existed.  All right.  Go ahead.

2    _____

3           *MR. CROSSLAND:  We'd move Plaintiff's Exhibit 51*

4    *that's been marked for identification into evidence as*

5    *Plaintiff's Exhibit 51.*

6           **THE COURT:**  It's admitted.

7           **(Plaintiff's Exhibit 51 admitted into evidence.)**

8    *BY MR. CROSSLAND:*

9    Q.   *What is Mr. Petermann advising you in this letter?*

10          *MR. FRANCO:  Objection.  Calls for -- the document*

11   *speaks for itself.*

12          **THE COURT:**  Overruled.

13   _____

14   *BY MR. CROSSLAND:*

15   Q.   *Did you advise Mr. Petermann upon receiving this letter*

16   *that there was no agreement to partially assign the judgment?*

17          *MR. FRANCO:  Objection.*

18          *THE WITNESS:  I --*

19          *MR. CROSSLAND:  Hold on.*

20          *MR. FRANCO:  Attorney/client privilege, subject to*

21   *that objection.*

22          **THE COURT:** Overruled.

23   _____

24   *BY MR. CROSSLAND:*

25   Q.   *What was Mr. Petermann directing you to do in the last two*

1    *sentences of paragraph 3?*

2         **MR. FRANCO:**  *Objection.  Calls for -- the document*

3    *speaks for itself, I should say.  Also, attorney/client*

4    *privilege as well, and hearsay.*

5         **THE COURT:**  Overruled.

6    _____

7    **Q.**   *I'm going to refer you to what's been marked for*

8    *identification as Plaintiff's Exhibit 56.  I've handed a copy to*

9    *counsel and asked if he has any objections once he's had a*

10   *chance to look at it.*

11        **MR. FRANCO:**  *Objection to any emails from Mr.*

12   *Petermann and Mr. Sandel that are in this string as hearsay.*

13        **THE COURT:**  Overruled.

14   _____

15        **MR. CROSSLAND:**  *We would offer Plaintiff's Exhibit 56*

16   *that's been marked for identification into evidence as*

17   *Plaintiff's Exhibit 56.*

18        **MR. FRANCO:**  *I hope I don't have to renew my*

19   *objections every time you offer it.*

20        **MR. CROSSLAND:**  *No.  I take your objections that you*

21   *make when I hand it to you as the same thing throughout.*

22        **MR. FRANCO:**  *Okay.*

23        **THE COURT:**  Objection is overruled.

24   _____

25        **MR. CROSSLAND:**  *Counsel, I'm going to refer the*

1   *witness to Plaintiff's Exhibit 57 that's been marked for*

2   *identification.*

3         **MR. FRANCO:**  *Oh, I'm sorry.  The objection is to this*

4   *was obtained by -- from Mr. Petermann's files and is*

5   *attorney/client privilege.*

6         **THE COURT:**  Overruled.

7   _____

8   **Q.**   *Do you have any reason to believe that as the executive*

9   *vice president you would not have the authority to sign this*

10  *partial assignment of judgment?*

11        **MR. FRANCO:**  *Objection, asked and answered.*

12        **THE COURT:**  Overruled.

13  _____

14        **MR. CROSSLAND:**  *Counsel, I'm going to refer the*

15  *witness to Plaintiff's Exhibit 80 that's been marked for*

16  *identification.*

17        **MR. FRANCO:**  *Objection.  Attorney/client.*

18        **MR. CROSSLAND:**  *It's been waived.  It wasn't raised in*

19  *the pretrial statement.*

20        **MR. FRANCO:**  Your Honor, we need to address this.

21        **THE COURT:**  Please stop the tape.

22        **MR. FRANCO:**  This is -- this is not relating to the

23  pro rata agreement issue.  This is an email dated June 26, 2012,

24  from Mr. Campbell to Mr. Petermann referencing another

25  conversation.  So that's -- I object to that as hearsay.

1          **THE COURT:**  Okay.  Mr. Crossland?

2          **MR. CROSSLAND:**  To the extent that Mr. Franco is

3     objecting to it as double hearsay or hearsay within hearsay,

4     it's not.

5          We cited the Court to the case of *Mahlandt v. Wild*

6     *Canid Survival and Research Center, Inc.,* it's an Eighth Circuit

7     opinion from 1978, at 588 F.2d 626.  And what is *Mahlandt* case

8     tells us is there's a distinction when you're looking as to

9     whether something is double hearsay.

10         For example, if I tell the Court that Julie Brady told

11    me something, that would be double hearsay.  But that's not what

12    this email says.

13         What this email that is Exhibit 80 says is Mr. McLeod

14    has settled.  It does not say that Mr. McLeod told me he

15    settled.

16         **THE COURT:**  But why isn't the email itself hearsay?

17         **MR. CROSSLAND:**  Sure.  The email itself is not hearsay

18    for multiple reasons or there are exceptions to it.

19         First, it's Mr. Campbell's then existed belief about

20    the transaction.  It's contemporaneous with when in fact these

21    assignments were signed.  In fact, it's the same day the

22    assignments were signed.

23         **THE COURT:**  Let me stop you.  What are you offering

24    this for?

25         **MR. CROSSLAND:**  We're offering it, one, to prove the

1   conspiracy.  We've alleged a civil conspiracy, and that's really

2   -- the second point is this is an exception to the hearsay rule

3   as a co-conspirator statement.

4           It's a statement -- the conspiracy that's been alleged

5   is that GulfSouth and HCB conspired to have GulfSouth breach its

6   fiduciary duties under the agreement.

7           The breach of the fiduciary duties that they conspired

8   to do was to violate provision 3 of the Participation Agreement

9   by settling, releasing, or waiving claims against one of the

10  borrowers or guarantor, in which case is Mr. Phillips.

11          This email is evidence of that conspiracy, amongst

12  other things that we're going to get to later.  But this email

13  shows in fact that GulfSouth has agreed to settle in violation

14  of a Participation Agreement.  It is a co-conspirator statement

15  that can be attributed to HCB as a hearsay exception.

16          **THE COURT:**  Mr. Franco, why would this not be a

17  statement of a co-conspirator in furtherance of the conspiracy?

18          **MR. FRANCO:**  First of all, it's definitely used to

19  prove the truth.

20          **THE COURT:**  Well, this is an exception, though.

21          **MR. FRANCO:**  Under the rules, as I understand it, Your

22  Honor, they have to -- they have to prove by a preponderance of

23  the evidence first that there's a conspiracy before this would

24  even be allowed.  That's number one.  And they haven't done

25  that.

1    Mr. McLeod is here to testify about the fact that what

2  he was doing was getting this off their books.  He didn't intend

3  this and never viewed this as a settlement with any of the

4  guarantors.  He's going to be here to testify.

5    There's no evidence of a conspiracy at this point,

6  certainly not by preponderance of the evidence, and this is

7  hearsay, and it's being offered by somebody else.

8    **THE COURT:**  What I'm going to do is I'm going to go

9  ahead and admit it subject to your need to establish, you know,

10  the conspiracy.  And then if you are unable to do that, then I

11  will strike it and won't consider it.

12    **MR. CROSSLAND:**  Yes, Your Honor.

13    **THE COURT:**  All right.  Go ahead.  It's admitted

14  subject to that -- to the Plaintiff's need to establish that

15  proof.

16    **(Plaintiff's Exhibit 80 admitted into evidence.)**

17  _____

18  Q.  *Mr. Campbell, I'm going to refer you to Plaintiff's Exhibit*

19  *74 that's been marked for identification.*

20    ***MR. FRANCO:***  *Objection.  This comes from Mr. McLeod.*

21  *Hearsay, unless he testified to it in his deposition, which I*

22  *don't happen to recall.*

23    **THE COURT:**  Tell me about this.  I'm not sure what

24  this is in reference to.

25    **MR. CROSSLAND:**  Sure, Your Honor.  This one we're not

1    using for the truth of the matter asserted.  As we move forward

2    with other witnesses, you're going to see emails right around

3    this time frame that established a conspiracy and knowledge by

4    HCB.

5             **THE COURT:**  Tell me who these players are, Mr.

6    Crossland.

7             **MR. CROSSLAND:**  Sure.  So what we have is -- really

8    the only thing I care about -- well, let me just do it a little

9    bit.

10            Jason Osborn was -- so down at the bottom, Jason

11   Osborn was an attorney for HCB.  Rupert Phillips is the chairman

12   of the board of HCB, and Henry Bucky Fox at the bottom was an

13   attorney for HCB.

14            At the bottom Mr. Osborn is asking about various

15   things that he needs to see in order to complete this

16   transaction between GulfSouth and HCB.  And part of what he asks

17   for are agreements or correspondence between Vision Bank and

18   GulfSouth Bank relating to the ownership of lots, the Driftwood

19   lots we've heard about, and while the judgment is held entirely

20   by GSP.

21            He also, you know, he asked about, you know, what

22   agreements there have been, and he said, well, if there are any

23   documents like that, I want to see them, I need to know about

24   them.

25            Rupert Phillips takes Mr. Osborn's email and forwards

1    it on to Mac McLeod, who was at this point the interim CEO of

2    GulfSouth.  And this is in June, this is about 20 days before

3    the assignments are actually done.

4            In response, Mr. McLeod sends this to his attorney,

5    Mr. David Anderson, but he copies Chris Campbell, and he says,

6    David, I'm copying Chris Campbell on our staff.  He would be the

7    only person who may have knowledge of this.

8            So what we see is Chris Campbell gets tied in to

9    answer questions about the lot drawing procedure, deficiency

10   judgment, agreements and correspondence that may have been going

11   on between these parties at this point.

12           This -- the only thing I care about is that he's

13   copied on this.  And we'll deal with Mr. Osborn in terms of what

14   he asks for when that comes up.  But for Mr. Campbell's

15   purposes, all I need this for is that he's copied on it, not

16   using it for the truth of any matter asserted therein.

17           **THE COURT:**  This doesn't appear to me, Mr. Franco,

18   that it's coming in at all for the truth of the matter asserted.

19   It's coming in to show this relationship between these parties.

20           **MR. FRANCO:**  As long as the Court understands that in

21   June of 2012 Mr. Campbell was not even the chief credit officer.

22   So we'll deal with that at the time.

23           And the representations about what this reflects is

24   not accurate.  What this reflects is there was a question about

25   the real estate and how it was -- what was the status of the

1  real estate so they could do the documentation.  That's all this

2  is about.

3  　　　　THE COURT:  Right, but that doesn't go to the

4  admissibility of it and whether it's hearsay or not.  I mean,

5  it's not being offered for the truth of these statements.  It's

6  being offered as evidence of intent and what these people were

7  doing at this period of time together with regards to the North

8  Tip --

9  　　　　MR. FRANCO:  I understand Your Honor's ruling.  Your

10  Honor, let me say one other thing.  When you're talking about

11  admitting documents in furtherance of the conspiracy --

12  　　　　THE COURT:  I didn't say I was admitting this in

13  furtherance --

14  　　　　MR. FRANCO:  No, I understand.  This is in reference

15  to your reconsideration of the whole concept in this prior

16  exhibit.

17  　　　　In furtherance of the conspiracy, there has to be

18  statements made in furtherance of the conspiracy at that time,

19  not a later statement about what happened in the past.

20  　　　　THE COURT:  I understand that.

21  　　　　MR. FRANCO:  Thank you.

22  　　　　THE COURT:  And I will remember that when I'm

23  considering Plaintiff's 80.  But for 74, my ruling is it's not

24  being offered for the truth of the matter asserted, and it's

25  admissible.

```
 1              (Plaintiff's Exhibit 74 admitted into evidence.)

 2              MR. CROSSLAND:  Thank you, Your Honor.

 3        _____

 4              MR. FRANCO:  Offer Defendant's Exhibit 1.

 5              MR. FRANCO:  Your Honor, we need a ruling on that.

 6              THE COURT:  Just a minute, please.  I have the wrong

 7        exhibit book.  I didn't note an objection here when I reviewed

 8        this.

 9              MR. FRANCO:  It wasn't -- there was no objection.

10              THE COURT:  I thought somebody just said Your Honor we

11        need a ruling.

12              MR. CROSSLAND:  Mr. Franco did.  There's no objection.

13              MR. FRANCO:  There's no objection.  I just wanted to

14        make sure it's admitted.  It's in the deposition, I've offered

15        it.

16              THE COURT:  There's no objection.  Do you have an

17        objection?

18              MR. CROSSLAND:  No.

19              MR. FRANCO:  I just want to make sure when there's no

20        objection and I offer it that the Court would admit it so that

21        we have it in the record, correct?

22              THE COURT:  Okay, I understand.  I thought you were

23        suggesting there is an objection.

24              MR. FRANCO:  No, ma'am.  And it is attached to the

25        deposition as well.
```

1    **THE COURT:**  Defendant's 1.  But you're correct, we

2    need to admit it for purposes of this record, unless you all

3    agree that all exhibits, you know, attached to the -- to the --

4    it's cleaner to admit it for the record here, let me just do

5    that.  So Defendant's 1 will be admitted.

6         **(Defendant's Exhibit 1 admitted into evidence.)**

7         **MR. CROSSLAND:**  And Your Honor, if we might, just to

8    make sure we're clear on all the Plaintiff's exhibits that came

9    in, can we just make sure that we have all those in?

10        **MR. FRANCO:**  Can we do that after the deposition?

11        **THE COURT:**  Yeah, we can do that afterwards.  And, you

12   know, we don't need to go back over all of the ones that we --

13   you know, each time we do this, we can start where we left off,

14   we don't need to go back to the ones that were already admitted.

15        **MR. CROSSLAND:**  Right.

16        **THE COURT:**  All right.  So Defendant's 1 is admitted.

17   _____

18   *BY MR. FRANCO:*

19   **Q.**   *Okay.  I'm going to show you what's been labeled as*

20   *Defendant's Exhibit 65.*

21        **MR. CROSSLAND:**  *No objection.*

22        **MR. FRANCO:**  Your Honor, we need a ruling.

23        **THE COURT:**  It's admit, Plaintiff's (sic) Exhibit 65

24   is admitted.  There's no objection.

25        **(Defendant's Exhibit 65 admitted into evidence.)**

_____

**THE COURT:**  Stop for just a minute.  I made a misstatement earlier.  This exhibit that you all were just reviewing with Mr. Campbell and I admitted, it was not Plaintiff's 65, it was Defendant's 65.  Ms. Williams had noted that I had misspoken.

**MR. FRANCO:**  I didn't catch that, Your Honor.

**THE COURT:**  She's quick so she caught it.

_____

Q.  *All right.  I'm going to show you what's been labeled as Defendant's Exhibit -- excuse me -- 67.*

**THE COURT:**  That will be admitted, Defendant's 67.  There's no objection.

**(Defendant's Exhibit 67 admitted into evidence.)**

_____

Q.  *I'm going to show you Defendant's Exhibit 72 next.*

**MR. CROSSLAND:**  *Objection, hearsay and calls for a legal conclusion.*

**MR. FRANCO:**  *Okay.  Who is the hearsay from?*

**MR. CROSSLAND:**  *Rick Petermann has researched and legal conclusion the same thing.*

**THE COURT:**  So what's the objection?

**MR. CROSSLAND:**  Yes, Your Honor.  The email from Rick Petermann to -- well, the bottom email on the first page of 72.  I mean, this is kind of one of those ones that you mentioned

1    earlier, it's an email string.  So the one at the bottom --

2         **THE COURT:**  Well, there have been a number of email

3    strings.

4         **MR. CROSSLAND:**  Yes, Your Honor.  Specifically down at

5    the bottom --

6         **THE COURT:**  This is from Chris Campbell to Martin

7    Sandel, right?

8         **MR. CROSSLAND:**  Yes.

9         **THE COURT:**  To Marty Sandel.  And he's referencing his

10   attorney or GulfSouth's attorney Mr. Petermann having researched

11   the division of the judgment and the fact that he doesn't

12   believe it can be accomplished.

13        **MR. CROSSLAND:**  We'll withdraw the objection.

14        **THE COURT:**  Okay.  72 is admitted.

15        **(Defendant's Exhibit 72 admitted into evidence.)**

16        **THE COURT:**  Go ahead, thank you.

17   _____

18   **Q.**  *Okay.  I'm going to show you Defendant's Exhibit -- that's*

19   *been labeled Defendant's Exhibit 74.  This is dated July 29 of*

20   *2011.*

21        **THE COURT:**   There's no objection, Defendant's 74 is

22   admitted.

23        **(Defendant's Exhibit 74 admitted into evidence.)**

24        **THE COURT:**  Can you speed us up there this?  Take us

25   through this quickly on this back and forth on the exhibit, I've

1    admitted it, please.

2    _____

3    **Q.**  *Did you ever ask any of the judgment-debtors if they agreed*

4    *to a pro rata division of the deficiency adjustment, sir?*

5           **MR. CROSSLAND:**  *Objection, relevance.  You can answer.*

6           **THE COURT:**  Overruled.

7    _____

8           **THE COURT:**  Will you stop the video, please.  We

9    probably need to take our recess now or we're going to be off

10   track for your lunch recess.  Let's take 15 minutes for recess,

11   and when we reconvene we'll hopefully wrap up Mr. Campbell's

12   depo.

13           **(Recess taken.)**

14           **THE COURT:**  Okay.  Let me -- before we pick back

15   up with Mr. Campbell, I'm hoping that we're not going to go

16   over -- I mean, you're going to call Mr. Peterman

17   Mr. Sandel.  If they're going to discuss these e-mails,

18   and -- I'm not sure why we've gone through them with

19   Mr. Campbell.

20           And just in terms of streamlining your presentation,

21   we've spent a lot of time with Mr. Campbell hearing that he

22   doesn't know or recall much of anything.  So I'm not sure why --

23   why not get those e-mails in through another witness?  Maybe a

24   little late at this point, but to ask this question.

25           **MS. BRADY:**  I'm sorry, Your Honor.  Yes, Your Honor.

1    And the -- as you know, the trial testimony was of Mr. Campbell

2    was taken ahead of time, not necessarily where it would have

3    been taken in sequence.  And because we had the agreement to

4    play it in full, we couldn't back and then chop it up to place

5    him later beyond other witnesses.

6         I will be examining Mr. Sandel, and I'm trying

7    right now to cut out a lot of documents I would address with

8    him.  Some I need to for different purposes, the effect on

9    SE Property, but my intention is to try to not duplicate it

10   as much as possible.

11        **THE COURT:**  All right.  Well, the exhibits so far,

12   I mean, the ones that we've been through you've been through

13   with Mr. Campbell, they're admitted.  And so, you know, you

14   don't need to take time to establish, you know, a foundation

15   for their admission.  They're in.

16        **MS. BRADY:**  Yes, Your Honor.

17        Okay.  All right.  Let's wrap him up.

18        (Video playing in open Court.)

19        **MS. BRADY:**  Plaintiff calls Martin Sandel, Your

20   Honor.

21        **MARTIN SANDEL, PLAINTIFF WITNESS, DULY SWORN**

22        **DEPUTY CLERK:**  Be seated.

23        Please state your full name and spell your last

24   name for the record.

25        **THE WITNESS:**  My name is Martin Sandel,

1     S-A-N-D-E-L.

2               **THE COURT:**  All right.

3               Ms. Brady, when you're ready.

4                     **DIRECT EXAMINATION**

5     **BY MS. BRADY:**

6     **Q.**   Good morning, Mr. Sandel.

7     **A.**   Good morning.

8     **Q.**   Sir, where are you employed?

9     **A.**   I am not employed by SPS, Southeast Property Solutions,

10    but I am an independent contractor with them.  So depends

11    the definition of employment.  But that's where I spend my

12    work time.

13    **Q.**   So as an independent contractor for Southeast Property

14    solutions, which they go by the acronym SPS?

15    **A.**   Yes.

16    **Q.**   What services do you provide for SPS?

17    **A.**   Legal services.

18    **Q.**   Okay.  And what type of legal services?

19    **A.**   Well, probably best that I describe how I got involved

20    in that, if that's all right.

21          We provide services associated with Vision Bank, which

22    is now SE Property Holdings, LLC, and various special

23    purpose entities associated with that group also, Park

24    National Bank out of Ohio and Park National Corporation.

25    **Q.**   So you currently -- currently do you only provide these

1    services for Park and its subsidiaries?

2    **A.**   Correct.  I don't provide legal services for any other

3    parties.

4    **Q.**   Okay.  And are you an attorney, sir?

5    **A.**   I am.

6    **Q.**   When did you begin providing legal services to Vision Bank?

7    **A.**   Began in April of 2009, the last week of April 2009.

8    **Q.**   Okay.  And when did you cease providing legal services to

9    Vision Bank?

10   **A.**   I have not ceased.  When this commenced, it was

11   supposed to be a one- or two-year assignment, and now we'll

12   be entering our sixth year in a few weeks, and it is winding

13   down, however.

14   **Q.**   But are you still performing the services to Vision Bank or

15   different entity?

16   **A.**   Well, I'm now performing them on behalf of Park

17   National Corporation, Park National Bank, SE Property

18   Holdings, LLC, and its subsidiaries, various subsidiaries,

19   Vision-Park Properties, and others.

20   **Q.**   What is Vision Bank -- Vision-Park Properties, sir?

21   **A.**   Vision-Park Properties was a special purpose entity

22   that we recommended be created to hold difficult or troubled

23   assets where the bank did not want to expose itself or the

24   entity to liability for holding a troubled asset.

25   **Q.**   So Vision-Park Properties would hold assets that were

*Martin Sandel - Direct/Brady*                                  30

1   attained or held by either SE Property or Vision Bank?

2   **A.**   It did.  Some, but not all.

3   **Q.**   Now, sir, at some point in time, Vision Bank ceased to

4   exist; is that accurate?

5   **A.**   There is a time when Vision Bank ceased to exist, yes.

6   **Q.**   And when was that, sir?

7   **A.**   In February of 2012.

8   **Q.**   And why did Vision Bank cease to exist?

9   **A.**   The management of Park National Corporation, Park

10  National Bank made the decision internally to sell off some

11  of its assets.  So it sold its performing loans, its

12  branches, and certain other assets that I -- we weren't

13  involved in that transaction, but -- directly, but

14  indirectly we were.  And sold those assets to Centennial

15  Bank, and retained the nonperforming loans in the new

16  entity, SE Property Holdings, LLC.

17       In actuality, SE Property Holdings, LLC, had already

18  been created.  It was one of those entities that held

19  troubled assets; and as I understand it, the regulators

20  basically said, if you're going to sell these assets --

21          **MR. FRANCO:**  Objection, Your Honor, hearsay.

22          **THE WITNESS:**  -- there's no bank here --

23          **MR. FRANCO:**  Objection, Your Honor.

24          **THE COURT:**  Sustained.

25          **MS. BRADY:**  Let's move on, sir.

1   **BY MS. BRADY:**

2   **Q.**   You stated that you were indirectly involved in the process

3   of transferring from Vision Bank to Centennial and SE Property.

4   What role did you play?

5   **A.**   Well, this transaction was handled by their corporate

6   counsel, but we were obviously heavily involved in the

7   loans, in the nonperforming loans, and assets and were

8   called upon at that time, both before and after the merger

9   was finalized, to provide data -- first to provide data that

10  was necessary to complete the transaction, and then

11  subsequently with all the outside counsel to confer with

12  them, determine whether we needed to file substitution of

13  parties or we needed to file certificate of merger in

14  Florida and Alabama, make sure there was no interruption of

15  the litigation that was going on.  So this took great deal

16  of time.

17  **Q.**   Can you briefly describe the type of legal services you

18  provided to Vision Bank, and now to SE Property?

19  **A.**   Yes.  I could probably best describe it in this way.  I

20  had sold my law practice in Ohio in early 2009.  My friend

21  and business associate of 45 years, Robert Meyers, we went

22  to law school together, called me and said, Martin, could

23  I -- I'd like to meet with you.  And I said, sure.  We're

24  friends, and we have some investments together.  And he --

25  this is by way of background, not to prove the truth of the

1    matter

2              **THE COURT:**  I'll allow it for subsequent conduct.

3              **THE WITNESS:**  Yeah, exactly.

4              So we met, and he advised me that he had been

5    contacted by Park National Corporation about Vision Bank and

6    the troubled bank down here.  I said, Well, how did you know

7    about them?  He said, Martin, they gave me my first loan

8    when I was right out of law school.  I had a wife and two

9    kids, and my wife is pregnant, and they gave me a loan for a

10   house and a car.  And I -- I just feel loyal to them.  And

11   when they called and said we'd like to meet with you, we

12   did -- I did.

13             And so he said, I've talked to them about this, went

14   down and looked at the assets, the troubled assets, the

15   collateral, looked at the documents.  I told them -- given them

16   legal advice, told them the problems they have, and I would like

17   you to manage the litigation for me in Florida.  Would you do

18   that?  I said, Well, how long of a commitment will this be, Bob?

19   And he said, Maybe one, maybe two years.  And I said, Sure.

20             He's a friend, and I -- he had and -- he felt he

21   had -- he wanted to pay back Park Bank for what they had done

22   for him, so I said sure.  And I commuted down here weekly for

23   the first six months to conduct these legal services.

24   When we first got there -- more direct in answering your

25   question, we first got on site, we found that the bank had

1    almost no documents electronically preserved.  They were all

2    hard-copy files, and we had at the time --

3              **MR. FRANCO:**  Objection, Your Honor.  This is going

4    way beyonds the background, I think.  It's nonresponsive, I

5    think, at this point.

6              **THE COURT:**  We do have a schedule, Ms. Brady.

7    **BY MS. BRADY:**

8    **Q.**   Sir, let me just --

9    **A.**   Sure.

10   **Q.**   -- ask you specific questions?

11        You mentioned that you were first on site in Florida,

12   do you recall when approximately that was?

13   **A.**   As I mentioned, it was the last week of April 2009.

14   **Q.**   And you mentioned the troubled assets.  One of these -- was

15   one of these troubled assets an entity called North Tip

16   Development, LLC?

17   **A.**   It was.

18   **Q.**   And can you tell me what the status of -- and -- what was

19   Vision Bank's involvement in a loan to North Tip?

20   **A.**   Vision Bank was a participant in the loan where the

21   lead bank was GulfSouth bank.  And GulfSouth, I believe, had

22   8.99 percent participation and Bank of Vernon had 1.21 and

23   Vision had 44.9, as did Central Progressive -- percent

24   interest in the loan participation.

25   **Q.**   And what was the status of the loan when you first arrived

1   at the end of April 2009?

2   **A.**    Well, they -- the lead banker, GulfSouth had counsel

3   and they were proceeding with the litigation.  I'm not sure

4   when we first came if they had actually gotten foreclosure

5   or they were in the process of getting foreclosure, but I

6   believe they were in the process of getting foreclosure.

7   **Q.**    So the loan was already in default?

8   **A.**    It was in default.

9   **Q.**    Okay.  And GulfSouth already had counsel involved?

10  **A.**    They had counsel involved.

11  **Q.**    What role did you take in the litigation involving North

12  Tip?

13  **A.**    Well, I assumed a role of liaison with Park Bank and

14  Vision Bank in managing and directing the litigation.  I

15  basically reviewed what was -- had transpired, reviewed the

16  documents.  We -- normally I would retain counsel for the

17  bank, but in this case, the lead bank had retained counsel

18  and had a number of conference calls with other loan

19  participants and their counsel.

20  **Q.**    You mentioned the lead bank had counsel.  Do you recall who

21  that counsel was?

22  **A.**    It was -- Rick Petermann was their selected counsel.

23  **Q.**    And you mentioned conference calls with the other

24  participating banks.  Was one of your duties to interact with

25  Mr. Petermann and the other participating banks?

1    **A.**   It was.

2    **Q.**   And who did you interact with at GulfSouth?

3    **A.**   Exclusively Chris Campbell.

4    **Q.**   So he was the only individual at GulfSouth you interacted

5    with?

6    **A.**   That's the only person I recall interacting with.

7    **Q.**   What about at Bank of Vernon?

8    **A.**   You know, I didn't have an in-depth interaction with

9    Mr. Huggins.  I think his name was Larry Huggins.  I really

10   can't say that I had one or more than one calls with him,

11   but he was on the e-mail chain and he was in the conference

12   calls participating.

13   **Q.**   And what about Central Progressive Bank?

14   **A.**   Sandy Menetre was actively involved in this loan on

15   behalf of Central Progressive.

16   **Q.**   Were there any other counsels involved other than

17   Mr. Petermann?

18   **A.**   At different times there were other counsel involved, yes.

19   There was David Matthews at a given point in time, briefly

20   Robert Reynolds was involved.  Probably missing somebody else,

21   but that's what I remember.

22   **Q.**   You mentioned conference calls and e-mails.  How did the

23   parties, the participating banks, primarily correspond?

24   **A.**   Well, correspond, if you mean in writing and not meetings,

25   there were conference calls, but the primary method of

1    corresponding was e-mail.

2    **Q.**  Any personal meetings, or was it primarily e-mails and

3    conference calls?

4    **A.**  There were some personal meetings.  It was, I think,

5    difficult to get everyone together.  Sandy Menetre was in New

6    Orleans, as I recall, or in that area, Louisiana.  But I had

7    some meetings with Chris Campbell regarding issues associated

8    with the defaulted loan.

9    **Q.**  Did you ever communicate with Mr. Petermann directly?

10   **A.**  I did.

11   **Q.**  How were you kept apprised of the status of the litigation?

12   **A.**  How was I kept apprised?

13   **Q.**  Yes, sir?

14   **A.**  Well, we were apprised, or I was apprised, either by

15   what was disclosed by Rick Petermann in the conference calls

16   or by what was disclosed in the e-mails.

17   **Q.**  And were these conference calls and e-mails about pursuing

18   a course of action, or were they after the fact as to actions

19   that GulfSouth had taken?

20   **A.**  They were about pursuing a course of action that they

21   wanted to get input from the participating banks.

22   **Q.**  How were decisions made regarding the course of action?

23   **A.**  Well, there was -- everybody was heard.  There was an

24   attempt to have everyone heard.  And at some points we were not

25   able to come to an agreement, and frankly, there wasn't -- there

1   wasn't a decision made without, for example on the collateral,

2   without assistance of the courts.

3   **Q.**   You just mentioned the collateral.  Backing up a step, did

4   this litigation result in a foreclosure judgment?

5   **A.**   It did.

6   **Q.**   And do you know who obtained the property at the

7   foreclosure sale?

8   **A.**   GulfSouth bank obtained it at the foreclosure sale.

9   **Q.**   Okay.  And then what happened once GulfSouth obtained the

10  property at the foreclosure sale regarding the property?

11  **A.**   You mean disposition of the property?  Is that your

12  question.

13  **Q.**   Yes, sir?

14  **A.**   Well, there were a number of calls, conference calls,

15  and a number of e-mails about how the collateral should be

16  disposed of.  And some of the banks wanted to have a

17  lot-drawing procedure, which we thought was unfair and

18  unduly weighted on minority participants, and also didn't

19  like the arbitrary grouping of seven.  And so we suggested

20  just an auction, just an auction of the property, and then

21  the proceeds be divided up among the participants according

22  to each participant's *pro rata* share.

23  **Q.**   Do you have an understanding as to what property was at

24  issue here?

25  **A.**   I do.  It was there were 168 developed lots in North Tip

1  or, rather, Driftwood Estates is where the lots were located in

2  Walton County.  That's what was an issue, about what are we

3  going to do with the property.  Subsequently, there were, I

4  think, three or four other lots that we identified, but they

5  weren't really part of this process of are we going to auction

6  the lots, are we going to have a drawing.

7  **Q.**   The process of what to do with the lots dealt with the 168

8  lots --

9  **A.**   Correct.

10  **Q.**   -- of Driftwood?

11  **A.**   I'm sorry for cutting you off.

12  **Q.**   Okay.  And you mentioned that Vision Bank objected to the

13  procedure.  What happened once Vision Bank objected?

14  **A.**   Once Vision Bank objected, we got -- I got a letter from

15  Rick Petermann indicating that they were going to go ahead with

16  that procedure despite our objection, which led to us filing an

17  action to enjoin that activity.

18        **MS. BRADY:**   Mr. Dyer, if you can, pull up

19  Plaintiff's Exhibit 8, which has already been admitted into

20  evidence.  Go to the next page.  No, the next page of the

21  letter, the actual letter, I'm sorry.  Page 008-003 on the

22  bottom.

23  **BY MS. BRADY:**

24  **Q.**   Sir, is this the letter you received from Mr. Petermann?

25  **A.**   I think it is.  Yes.  Says time sensitive at the top.  He

1    was indicating that there were going to go ahead with this

2    procedure and I guess wanted that to be gotten out to the

3    participants.

4    **Q.**   Okay.  And if you look at the second -- if you can focus on

5    this next page, second-to-last paragraph?

6            **THE COURT:**  I'm sorry, remind me of the date of

7    letter, please.  I can't see it on my screen.  There's

8    something over the date.

9            **MS. BRADY:**  I believe it's April 9, 2010.

10           **THE COURT:**  Thank you.

11           **THE WITNESS:**  I'm sorry, your question is what.

12   **BY MS. BRADY:**

13   **Q.**   Yes, sir.  That sentence, can you read that aloud, sir?

14   **A.**   Sure.  Says, second-to-last sentence in the letter, it

15   says -- paragraph in the letter, it says:  After the lots have

16   been distributed, GulfSouth will obtain a final non-appealable

17   judgment against the guarantors which will then be partially

18   assigned to each participant based upon their *pro rata* shares.

19   **Q.**   And was that part of the proposal for the lot-drawing

20   procedure?

21   **A.**   It was.

22           **MR. FRANCO:**  Objection, Your Honor, leading.  It

23   was a little late.  Sorry.

24           **THE COURT:**  It was leading, but it was late.  But it

25   was leading.

1        **MS. BRADY:**   Sure.

2   **BY MS. BRADY:**

3   **Q.**   Do you know how -- was there a point in time, sir, when the

4   parties began discussing partially assigning the ultimate

5   deficiency judgment?

6   **A.**   Yes, there was.

7   **Q.**   Do you know when that first was brought up for discussion?

8   **A.**   I'm trying to remember.  As best I can recall, I think it

9   was in early 2010.  It could have been late 2009; but in that

10  period of time, we began discussing it.  And I recall distinctly

11  that it first came up in one of the conference call that I

12  mentioned.

13  **Q.**   And can you explain briefly a little bit of the context of

14  that conference call?

15  **A.**   The conference call was called, I think generally, to

16  apprise the participants what was going on.  And Rick Petermann

17  was leading the conference call, and there were discussion -- as

18  I recall, and I can't remember the specifics of each issue, but

19  there was discussion about how the litigation is progressing,

20  when -- what are we going to do with the lots, and how are we

21  going to dispose of that.  And then we talked about obtaining

22  the judgment, and I'm sure it was in that conference call that I

23  suggested that we would like to have a *pro rata* assignment of

24  the monetary judgment.

25  **Q.**   Okay.  And that was -- so that was prior to entering the

1    deficiency judgment?

2    **A.**   Oh, yes, yeah.  It might have been even way earlier in

3    2009.  I don't recall the date of that, but it was way before

4    the deficiency judgment was entered that we first began

5    discussing it.

6    **Q.**   Was there any other -- any discussions that there would

7    only be a partial assignment if this lot-drawing procedure took

8    place?

9    **A.**   No.  I had indicated that we -- that was part of this --

10   this procedure that he put in his letter, but I had always

11   indicated that we wanted to have a partial assignment of our

12   judgment.

13   **Q.**   Did the lot-drawing procedure take place?

14   **A.**   No.

15   **Q.**   And why not?

16   **A.**   Because we engaged -- I engaged on behalf of the bank, SE

17   Property Holdings, I engaged Baker & Hostetler to file an action

18   to enjoin the lot-drawing procedure, declaratory judgment.

19   **Q.**   And what happened in that litigation?

20   **A.**   And injunction or -- I'm not sure if it was a temporary

21   restraining order or an injunction, but relief was awarded and

22   the lot-drawing procedure did not occur.

23   **Q.**   Okay.  And then what became of that litigation beyond an

24   injunction being entered?

25   **A.**   Well, I'm not sure if you're asking about relating to the

1    lots, the disposition of the lots.

2    **Q.**   Did that litigation result in a trial? A dismissal?  What

3    became of the actual litigation itself, if you recall?

4    **A.**   I think it was dismissed.  It wasn't -- it wasn't pursued

5    because the basis of that litigation was to deal with the

6    collateral, and then we ultimately made an agreement with

7    respect to the collateral.

8    **Q.**   Okay.  And what was the agreement that was made with

9    respect to the collateral?

10   **A.**   After a great deal of the discussion and negotiation back

11   and forth, there was an agreement reached.  And I think that

12   there was an e-mail I sent in October of '10, I seem to recall,

13   that summarized that agreement.  But basically there was an

14   agreement where Central Progressive would buy the lots at the

15   appraised value that we had for the lots.  I think it was 23,000

16   each, and some change.  And the participants would then be paid

17   out according to the percentage participation interest.

18        I believe that Vision got about a million-seven in

19   cash, and I recall writing this e-mail in October of '10

20   saying:  Here are the terms, we accept the price, this is a

21   good price, you have to wire the funds to us by this date.

22   As part of this, it's conditioned upon us getting a *pro rata*

23   share of the deficiency, and there was some other -- one or

24   two other issues I seem to recall on that, but -- and that

25   transaction was consummated in the sense that the lots were

1    sold to Central Progressive.

2    **Q.**   So did -- excuse me, was part of the agreement to sell

3    the -- agree to the sale of the lots to CPB that the parties

4    would then do *pro rata* assignments?

5    **A.**   It was.  It was conditioned on that.

6    **Q.**   Did you express that condition to the other participating

7    banks?

8    **A.**   I did.

9    **Q.**   Sir, on this conference call, was it a -- what was the

10   discussion as to -- was it to separate judgments, assignments of

11   a judgment?  What was the context of the call of what the

12   parties agreed to enter into?

13   **A.**   Well, there was more than one conference call, but I think

14   you're referring to what I referred to as the initially call

15   where I brought the subject up about the assignment.  And I

16   recall counsel for GulfSouth saying, Well, I don't know if we

17   can do that.  And I said why?  And he said, Well, I think that

18   it's contrary to Florida law.  And I said, Well, Rick, I'm not a

19   Florida lawyer, I don't know.  Research it.  Let us know if it's

20   against the law.  Then that settles it.

21        And so in the initial conversation, that's -- that's

22   how it devolved where he was going to research whether it

23   could be done.

24   **Q.**   Whether a judgment could be --

25   **A.**   Could be *pro rata* assigned to the participants.

1    **Q.**   Do you recall when the deficiency judgment was ultimately

2    obtained?

3    **A.**   I think it was March -- if I'm correct, March 29, 2011.

4         **MS. BRADY:**  Mr. Dyer, if you can briefly bring up

5    Plaintiff's Exhibit 30, which has been previously admitted

6    into evidence.

7    **BY MS. BRADY:**

8    **Q.**   Sir, do you recognize the deficiency judgment that was

9    obtained?

10   **A.**   I do.

11   **Q.**   And the date on it is -- second page, Mr. Dyer?

12   **A.**   Right.  I see it was ordered on that day, and then this

13   is a certified copy dated early -- later than that on the

14   front.

15   **Q.**   Okay.  And at the point in time that GulfSouth obtained

16   this deficiency judgment on March 29, 2011, do you know the

17   status of the parties' discussions regarding partial

18   assignments?

19   **A.**   Well, it was always -- Chris Campbell, who was the lead

20   bank, it was always agreed between -- among Chris Campbell and

21   Central Progressive that they would do this if it could be done.

22   We were waiting word from counsel, their counsel, GulfSouth

23   counsel, Mr. Petermann.  And, in fact, you know, there were

24   e-mails to me which GulfSouth, Chris Campbell affirmed that.

25   But it was always agreed subject to it being able to be done.

1          **MS. BRADY:**  One second, Your Honor.

2          **THE COURT:**  All right.

3    BY **MS. BRADY:**

4    **Q.**   I want to refer the witness to Plaintiff's Exhibit 20,

5    marked for identification?

6         Sir, ms@spssupport.com, is that your e-mail address?

7    **A.**   It is.

8    **Q.**   And Chris Campbell.  And then can you tell me who else is

9    cc'd on that e-mail?

10   **A.**   Michelle Schmidt, Brian Berns, Larry Huggins, Rick

11   Petermann.

12   **Q.**   And the date of this e-mail?

13   **A.**   April 7, 2011.

14         **MS. BRADY:**  At this time, I offer Plaintiff's

15   Exhibit 20 into evidence as Plaintiff's Exhibit 20.

16         **THE COURT:**  All right.  Mr. Franco?

17         **MR. FRANCO:**  No objection, based on the Court's

18   earlier rulings about hearsay.

19         **THE COURT:**  Okay.

20   (PLAINTIFF EXHIBIT 20:  Received in evidence.)

21   BY **MS. BRADY:**

22   **Q.**   And, sir, do you see this e-mail?  It's about a week after

23   entry of the deficiency judgment.  And what are you asking

24   Mr. Campbell?

25   **A.**   I'm asking, I say, Chris, what are the specific lot

1    numbers?  And that question relates to the fact that after

2    we disposed of the 168 lots, he somehow discovered there

3    were some other lots, three or four other lots.

4        And this must have been fairly early in the process

5    where I'm asking him tell me what the lot numbers are,

6    because I intended to go out and look at the lots.  And I

7    think that's what that relates to.  And, as I said, I wanted

8    to get an assessment of value, and I recall talking to some

9    brokers about that.

10       And then I added also:  How are we going to divide up the

11   judgment so each bank can proceed with the collection as it sees

12   fit.

13   **Q.**   And why are you asking how if the banks already had an

14   agreement?

15   **A.**   It was an agreement in principal.  They were all -- as I

16   said, that was always an agreement with Chris.  Sure, we'll do

17   it if we can do it.  But then it's the mechanics.  You know,

18   Rick Petermann at one time said he was going to prepare an

19   agreement.  You know, I had affirmed that we had this agreement

20   when the lots were sold.

21       In the end, after this litigation was commenced, we saw

22   that he sent a short assignment, assuming that was how he

23   was going to handle the transaction.  So the mechanics of

24   how that agreement were -- was what I was asking:  How are

25   we going to do it.

1    And subsequently, he put me in direct contact -- there's

2    e-mails, an e-mail chain.  He put my in direct contact with Rick

3    Petermann.  Please talk to Martin about how you're going to do

4    this, basically.

5         **MS. BRADY:**  Mr. Dyer, if you can pull up

6    Defendant's Exhibit 67, since this version is already in

7    evidence.  If you could move first to the second page of the

8    letter and blow up that -- excuse me, enlarge that second

9    paragraph.

10   **BY MS. BRADY:**

11   **Q.**   And, sir, I know we have that paragraph enlarged, but can

12   you see the date on this letter?

13   **A.**   April 13th, 2011.

14   **Q.**   Okay.  And this is a -- who is this letter from, sir?

15   **A.**   This letter is from Robert Reynolds.

16   **Q.**   And do you recall receiving this letter?

17   **A.**   I do.

18   **Q.**   And that second paragraph?

19   **A.**   Yes.  What about it.

20   **Q.**   With respect to this judgment, it would appear very

21   difficult to divide up a judgment.  And then Mr. Petermann

22   expresses his views as to why?

23        Did you respond to this --

24   **A.**   Yes, I responded --

25   **Q.**   -- response?

1  **A.**    -- the same day, the very same day.

2          **MS. BRADY:**  Okay.  And Mr. Dyer, if you could go

3  to the first page of the letter, and enlarge that text.

4  **BY MS. BRADY:**

5  **Q.**   And was this your response to Mr. Reynolds?

6  **A.**   Yes, it is.

7  **Q.**   And did you ever receive a response from either

8  Mr. Reynolds or Mr. Campbell or any other participating banks

9  expressing disagreement with your statement or asserting that

10 there was never an actual agreement reached?

11 **A.**   No, never.

12 **Q.**   Did you receive a response from Mr. Campbell or

13 Mr. Petermann or any of the other participating banks

14 questioning the second sentence in your response that Vision

15 would not have consented to the sale to Central Progressive for

16 that agreement?

17 **A.**   No.  No, I did not.

18         **MS. BRADY:**  Bring up Plaintiff's Exhibit 22 for

19 identification.

20 **BY MS. BRADY:**

21 **Q.**   Sir, again is that from your e-mail address?

22 **A.**   It is.  Same date, I believe.

23 **Q.**   And that's an e-mail to Mr. Reynolds?

24 **A.**   Yes.

25         **MS. BRADY:**  And if you can blow up, enlarge

1    Mr. Sandel's text at the top.

2    **BY MS. BRADY:**

3    **Q.**   And, Mr. Sandel, what are you stating in this e-mail?

4    **A.**   I say:  Please see my e-mail below of October 29, 2010,

5    outlining the terms of our settlement and agreement to sell

6    Vision's interest in the lots to Central Progressive.

7         **MS. BRADY:**  Offer Plaintiff's Exhibit 22 mark for

8    identification into evidence as Exhibit 22.

9         **MR. FRANCO:**  I'm not sure how to do this for the

10   record.  I objected before on hearsay and the Court overruled

11   that.  So I thought I had an ongoing objection to these kinds of

12   e-mails.  But in case I don't, my objection is it's hearsay.  I

13   understand the Court's ruling.

14        **THE COURT:**  Right.  No, you have a standing objection.

15        **MR. FRANCO:**  Thank you, Your Honor.

16        **MS. BRADY:**  Your Honor, this one I'm using to -- as to

17   the point of whether anybody responded to him, not to any of

18   truth of the matters asserted in this correspondence.

19        **THE COURT:**  I understand.  But, Mr. Franco, on that

20   issue, you have a standing objection as to the hearsay objection

21   that you've raised, but any other objections that you might have

22   to any of these exhibits, you'll need to alert me to that.

23        **MR. FRANCO:**  Yes, Your Honor.

24        **THE COURT:**  Okay.  Thank you.

25        All right.  That's admitted.  Plaintiff's 22.

1    (PLAINTIFF EXHIBIT 22:  Received in evidence.)

2    **BY MS. BRADY:**

3    **Q.**   Sir, in this e-mail you're forwarding an earlier e-mail you

4    had sent to Mr. Menetre of CPB back in October regarding the

5    sale of the property; is that accurate?

6    **A.**   I am, yes.  It's just a followup to my earlier e-mail

7    to Robert Reynolds in which I said we'd already agreed to

8    this, and I thought, gee, he's not here.  He's kind of in

9    and out of this.  I should send this to him so he

10   understands the substance of our agreement.  And I did that.

11   **Q.**   And did Mr. Reynolds or Mr. Campbell or any of the

12   participating banks respond to this letter and question the

13   agreement?

14   **A.**   No.

15   **Q.**   Did Mr. Menetre respond to this e-mail and advise that that

16   was -- that the *pro rata* assignments --

17        **MR. FRANCO:**  Objection, Your Honor, leading.

18        **THE COURT:**  Sustained.

19   **BY MS. BRADY:**

20   **Q.**   Did you receive any response from Mr. Menetre regarding

21   this e-mail?

22   **A.**   I did.  I received a response, and I think it was a

23   confirmatory response, as I recall, confirming our position on

24   the matter.  But I don't have the e-mail in front of me.

25        **MS. BRADY:**  And, Mr. Dyer, can you pull up

```
 1    Plaintiff's Exhibit 23 marked for identification.
 2    BY MS. BRADY:
 3    Q.    And, sir, can you identify this document?
 4    A.    This appears to be an e-mail I -- from Sandy Menetre of
 5    May 3, 2011.
 6    Q.    Who is it to?
 7    A.    In response to my -- or, no, it was before my e-mail.  I
 8    agree with the --
 9    Q.    Hold on, hold on, hold on?
10          And that e-mail was sent to you?
11    A.    It was.
12    Q.    And the date of that e-mail?
13    A.    May 3, 2011.
14          MS. BRADY:  At this point I offer Plaintiff's
15    Exhibit 23 marked for identification into evidence as
16    Plaintiff's Exhibit 23?
17          THE COURT:  That will be --
18          MR. FRANCO:  Wait one second, Your Honor, please.
19          THE COURT:  All right.
20          MR. FRANCO:  Your Honor, in addition to the hearsay we
21    already discussed, I would object to the relevancy of this.
22    This doesn't deal with -- all this deals with is the real estate
23    90-day listing period.
24          MS. BRADY:  Your Honor, we're only using this e-mail
25    for that last sentence on the first page of Mr. Sandel following
```

1    up and inquiring about the judgments.

2             **MR. FRANCO:**  He didn't respond to that.  He agreed

3    with the 90-day listing period.  That's why it's irrelevant.

4             **THE COURT:**  Overruled.

5    **BY MS. BRADY:**

6    **Q.**   Sir, the bottom e-mail from you to Chris Campbell,

7    that's -- can you read that last sentence?

8    **A.**   Please advise when it is anticipated the participants will

9    have their *pro rata* judgments.

10   **Q.**   Are you able to quantify the number of times that you

11   requested the *pro rata* assignments?

12   **A.**   I've tried to think about that.  I'm guessing an estimate

13   would be probably 18 to 25 times or 20 times -- 20 times would

14   be a get estimate.

15   **Q.**   Over a period of how long?

16   **A.**   Oh, a few years.  I mean, 10, 11, 12.

17            **MS. BRADY:**  Mr. Dyer, if you can pull up

18   Plaintiff's Exhibit 3 (sic), which has been previously

19   admitted into evidence.

20   **BY MS. BRADY:**

21   **Q.**   Sir, if I can direct your attention to the bottom of the

22   e-mail on the -- Plaintiff's Exhibit 33?

23            Sir, if you can, read the first two sentences of that.

24   **A.**   This appears to be an e-mail to me from Chris Campbell,

25   says:  Martin, can we set a call with Rick for Monday to

1    discuss.  If it is possible, both CPB and GulfSouth had

2    agreed to it from the outset.  Please let me know -- that's

3    the first two sentences.

4    **Q.**   Okay.  And do you know what that statement you made was in

5    response to?

6    **A.**   It was in response to my asking when are we going to get

7    this accomplished.

8            **MS. BRADY:**  And if -- Mr. Dyer, if you can go to

9    the bottom of page 2 of that.  Highlight that text on the

10   bottom, yes.

11   **BY MS. BRADY:**

12   **Q.**   Sir, can you read that sentence?

13   **A.**   Martin, Rick Petermann has researched the division of the

14   judgment and does not believe it can be accomplished.  Do you

15   have an example where this has been done in the past.

16   **Q.**   And did you speak to Mr. Petermann about this issue of

17   dividing the judgment, of whether it was possible?

18   **A.**   When I spoke to him and had e-mails with him.

19   **Q.**   Okay.  And do you know if a determination was ultimately

20   made whether it was possible?

21   **A.**   It was made that it was possible.  He made that

22   determination.

23   **Q.**   At this time Plaintiff's Exhibit 36, marked for

24   identification.  Sir, do you recognize this document?

25   **A.**   I do.

1    **Q.**   And is that -- and who is this document from?

2    **A.**   This is from Rick Petermann to me.

3    **Q.**   And the date on that document?

4    **A.**   July 29, 2011.

5    **Q.**   Do you recognize this letterhead?

6    **A.**   I do.  That's his law firm.

7    **Q.**   And would Mr. Petermann frequently send you letters through

8    e-mail?

9    **A.**   He did.  That was, I think, his preferred method of e-mail

10   communication.

11          **MS. BRADY:**  At this time, Plaintiffs offer

12   Exhibit 36 into evidence.

13          **THE COURT:**  All right.  It will be --

14          **MR. FRANCO:**  Same objection we had to hearsay, Your

15   Honor.

16          **THE COURT:**  All right.  It will be admitted.

17   (PLAINTIFF EXHIBIT 36:  Received in evidence.)

18   **BY MS. BRADY:**

19   **Q.**   Sir, what does this e-mail convey to you -- excuse me, this

20   letter?

21   **A.**   It conveys that he has talked to Chris Campbell regarding

22   my discussions with Chris Campbell about the partial assignment,

23   and it goes on to say that he doesn't -- he's not aware of any

24   specific law prohibiting an assignment.

25          And specifically after I got the earlier e-mail, the

1    one where Chris Campbell said he doesn't believe it can be

2    done, I contacted Rick Petermann and said, you know just

3    give me some law.  I mean, have you got a statute?  Have you

4    got a case?  So I encouraged him to look into it, and I

5    think that's how he came to the conclusion that he --

6              **MR. FRANCO:**  Objection, Your Honor.  That calls

7    for speculation as to what's in Mr. Petermann's mind of what

8    he did after that conversation took place.

9              **THE COURT:**  Well, it would go to Mr. Petermann's

10   intent, Petermann's intent.

11             **MR. FRANCO:**  But only based on what Mr. Petermann

12   said.  He's going into what Mr. Petermann did after they talked.

13   That's speculation as to what's in Mr. Petermann's mind of what

14   he found out or what he didn't find out.

15             **THE COURT:**  Just a minute.

16             **MR. FRANCO:**  That was his testimony that he was going

17   into.  That's what I object to.  I don't object to the

18   conversation.  I object to what he apparently assumed what

19   Petermann did and concluded after that.

20             **THE COURT:**  Is this opinion that you have, Mr. Sandel,

21   about Mr. Petermann's conclusion based on your discussions with

22   him?

23             **THE WITNESS:**  Well, it's based on the fact that I

24   asked him to get -- to research it, combined with what he says

25   in the letter.  He says, I'm not aware of any specific law

1    prohibiting this.

2              **THE COURT:**   Overruled.   He can give that opinion based

3    on his dealings with Mr. Petermann.

4    BY MS. BRADY:

5    **Q.**    Sir, if you look at that second paragraph?

6    **A.**    Yes.

7    **Q.**    You understand from Chris Campbell that CPB, GulfSouth, and

8    Bank of Vernon have all been in agreement that Vision can take

9    the lead on the post judgment collection efforts.   What was SE

10   Property's position on taking the lead on collection efforts?

11   **A.**    Well, as it states later in the paragraph, we wanted to

12   go it alone.   We wanted to be captain of our own ship on

13   collection, and he says that further on in the paragraph.

14   **Q.**    Does this letter give you an option?

15   **A.**    It did.   It said, just tell me.   Either way, there will

16   be a need for an agreement.   Just tell me what you want, and

17   I said we're going to go it alone.

18   **Q.**    Let me back up a second, sir.   What are the options that

19   are given to SE Property in this letter?

20   **A.**    Well, I didn't know if it's an option.   He says it's not

21   clear to me whether Vision wants the other banks to pay a

22   *pro rata* share of the cost or Vision wants to go it alone,

23   incurring its own costs but retaining all sums.

24        So that's the option, if that -- if you're calling it

25   an option.   And I said, no, we want to go it alone, and

1    we'll pay all of our costs.

2              **MS. BRADY:**  Mr. Dyer, if you can bring up

3    Plaintiff's Exhibit 37 for identification.

4    **BY MS. BRADY:**

5    **Q.**   And, sir, what is this document?

6    **A.**   It's my response to his letter.

7    **Q.**   And it's -- hold on one second.

8          Is that from your e-mail address?

9    **A.**   It is from my e-mail address to Chris Campbell, and it's a

10   short e-mail and it just says --

11   **Q.**   Hold on one second.

12         And the date on that e-mail?

13   **A.**   July 29th, 2011.

14             **MS. BRADY:**  At this time I offer Plaintiff's

15   Exhibit 37 into evidence.

16             **THE COURT:**  37 is admitted.

17   (PLAINTIFF EXHIBIT 37:  Received in evidence.)

18   **BY MS. BRADY:**

19   **Q.**   And what does -- excuse me, what do you convey to

20   Mr. Petermann and Mr. Campbell in this e-mail?

21   **A.**   I said we wanted to go it alone where Vision retains all

22   and collects up to the amount of its *pro rata* assigned

23   deficiency.  I added please draft a proposed agreement because

24   he said in his e-mail, let me know and I'll draft an agreement.

25   So I was just giving him latitude to do that.

1   **Q.**   Did you ever receive a response to this e-mail that Mr. --

2   from either Mr. Petermann or Mr. Campbell that this was no

3   longer an option?

4   **A.**   No.

5   **Q.**   Did you ever receive a proposed agreement from

6   Mr. Petermann?

7   **A.**   No.

8             **MS. BRADY:**   Now, Mr. Dyer, if you can bring up for

9   identification Plaintiff's Exhibit 41.

10  **BY MS. BRADY:**

11  **Q.**   Sir, is this an e-mail from your e-mail address?

12  **A.**   It is.

13  **Q.**   To Mr. Petermann?

14  **A.**   It is.

15            **MS. BRADY:**   And the e-mail below that, Mr. Dyer.

16            And this is in response -- Just leave it on the

17  full screen.

18  **BY MS. BRADY:**

19  **Q.**   It's in response to an e-mail from Mr. Petermann to you?

20  **A.**   It is.

21  **Q.**   And the date on the e-mail?

22  **A.**   August 22nd, 2011.

23            **MS. BRADY:**   Okay.   At this time I offer

24  Plaintiff's Exhibit 41 into evidence.

25            **THE COURT:**   It's admitted.

1    (PLAINTIFF EXHIBIT 41:   Received in evidence.)

2    **BY MS. BRADY:**

3    **Q.**   Sir, if I could direct your attention to the middle of

4    Mr. Petermann's e-mail to you:   Also I will be forwarding the

5    final assignments of judgment shortly?

6         What did this convey to you?

7    **A.**   It conveys -- it conveys to me that Rick Petermann is

8    following up on the earlier e-mails that we've just gone through

9    and the agreement of the parties that there would be a *pro rata*

10   assignment of judgment and that Rick Petermann has conveyed --

11   has prepared a document, an assignment or assignments, which

12   he's going to forward shortly to Chris Campbell --

13   **Q.**   Do you recall following up with Mr. Petermann and

14   Mr. Campbell after receiving that e-mail as to the status of

15   the --

16   **A.**   Yes.

17   **Q.**   -- assignments?

18   **A.**   Yes, I do.   There were other e-mails requesting to know the

19   status of the assignments.

20   **Q.**   Can you quantify how many?

21   **A.**   Several more in the next several months.

22         **MS. BRADY:**   At the time Plaintiff's Exhibit 48 for

23   identification, please, Mr. Dyer.

24   **BY MS. BRADY:**

25   **Q.**   Sir, do you recognize this document?

1   **A.**   I do.

2   **Q.**   And what does this document inform you, what does this

3   letter -- excuse me, what is this document?

4   **A.**   Well, it's a letter on letterhead of Rick Petermann to me

5   regarding --

6   **Q.**   Date?

7   **A.**   -- driftwood and specifically regarding the assignment of

8   the *pro rata* judgments.

9   **Q.**   And the date on this letter?

10  **A.**   Is December 16th, 2011.

11          **MS. BRADY:**   At this time I offer Plaintiff's

12  Exhibit 48 into evidence.

13          **THE COURT:**   It will be admitted.

14          **MR. FRANCO:**   Same objection.

15          **THE COURT:**   It will be admitted.

16  (PLAINTIFF EXHIBIT 48:   Received in evidence.)

17  **BY MS. BRADY:**

18  **Q.**   What is Mr. Petermann advising you in this letter?

19  **A.**   He's accounting, in part, I guess, for the delay, but he

20  says that CPB was acquired by another bank.  And I knew that

21  these things were going on in the background as well, which is

22  why I just didn't go off and file a lawsuit.  I mean, I knew

23  there could be some communication delays, but he was affirming

24  that there was not anybody to communicate with, and that he

25  concluded that they don't need the new bank's permission to

1    assign it, and he's therefore redrafting and sending them on to

2    GulfSouth for execution.  That's what he says in summary.

3    **Q.**   Okay.  And did you respond to this letter?

4    **A.**   I'm sure I did and acknowledged it.

5            **MS. BRADY:**  Mr. Dyer, if we can pull up

6    Plaintiff's Exhibit 50 for identification.

7    **BY MS. BRADY:**

8    **Q.**   Sir, do you recognize this document?

9    **A.**   It's a little small for me to give an honest answer, but --

10           **MS. BRADY:**  The lower part, Mr. Dyer, please, the

11   middle e-mail.

12           **THE WITNESS:**  Yes.  That's my letter -- e-mail,

13   rather, December 19th to Chris -- to, rather, Rick Petermann

14   thanking him for his e-mail of December 16th and asking him when

15   we can expect to see the assignment.

16           **MS. BRADY:**  At this time I offer Plaintiff's

17   Exhibit 50 into evidence.

18           **THE COURT:**  It's admitted.

19   (PLAINTIFF EXHIBIT 50:  Received in evidence.)

20   **BY MS. BRADY:**

21   **Q.**   And, sir, what was Mr. Petermann's response to this -- your

22   e-mail correspondence?

23       Mr. Dyer, if you can go to the top e-mail.

24   **A.**   He advised that he had sent them to Chris today, the

25   date of his e-mail, which was December is 19th and expected

1   him to sign them today or tomorrow, he says.

2   **Q.**   Okay.  Did you receive these assignments in December 2011?

3   **A.**   I did not.

4   **Q.**   Did you follow -- did you follow up with Mr. Petermann or

5   Mr. Campbell?

6   **A.**   I think I sent him an e-mail in January.  We were real busy

7   with a merger, but I do recall getting back to him saying, Hey,

8   what's up, I haven't got the assignments, or something like

9   that.

10          **MS. BRADY:**  Mr. Dyer, if you can pull up

11  Plaintiff's Exhibit 55 marked for identification.

12  **BY MS. BRADY:**

13  **Q.**   Sir, do you recognize this document?

14  **A.**   I do.

15  **Q.**   And the date on this document?

16  **A.**   January 4th, 2012, from me to Chris Campbell.

17          **MS. BRADY:**  Okay.  At this time I offer

18  Plaintiff's Exhibit 55 into evidence.

19          **THE COURT:**  All right.  That's admitted.

20  (PLAINTIFF EXHIBIT 55:  Received in evidence.)

21  **BY MS. BRADY:**

22  **Q.**   And, sir, what are you doing in this e-mail?  What's the

23  purpose of this e-mail?

24  **A.**   I'm just asking where is his status.  I don't understand

25  the delay.  Where is our judgment.

1    **Q.**   Still did not have the assignments at this point in time?

2    **A.**   I did not.

3            **MS. BRADY:**  Mr. Dyer, if you can pull up

4    Plaintiff's Exhibit 56 for identification.

5            Mr. Crossland tells me 56 is already in.

6    **BY MS. BRADY:**

7    **Q.**   Sir, if you can look at this exhibit.  You can look on the

8    second page, the bottom e-mail.  Read that e-mail, Mr. Sandel?

9    **A.**   This is e-mail of January 17, 2012, from me to Rick

10   Petermann with a copy to Chris Campbell:  Rick and Chris,

11   again I ask:  Where is Vision's judgment, question mark.

12   **Q.**   And if you could read Mr. Campbell's response?

13   **A.**   This is Chris Campbell's response:  Martin, I have signed

14   the assignment and mailed it to Rick.  He should be receiving it

15   and distributing it to the participants.

16   **Q.**   And if you can look at Mr. Petermann's correspondence on

17   the top, first e-mail?

18   **A.**   I'll be on the lookout for it and will FedEx it as soon

19   as I receive it.  Rick.

20   **Q.**   And the date on this e-mail?

21   **A.**   January 17th, 2012.

22   **Q.**   And did you receive the assignments?

23   **A.**   I did not.

24   **Q.**   Did you come to learn -- was there any point in time that

25   you came to learn of a dispute regarding the distribution of the

1   deficiency judgment?

2   **A.**    Yes, and I think it was May.  My recollection is May.  I

3   got a call that Centennial Bank had been served with a lawsuit.

4       Now, this was not uncommon because of the merger.

5   Sometimes they would be sued and it was an action that

6   should be against us, or vice versa.  So I asked that it be

7   sent over to me by Centennial Bank.  They sent it over to

8   me, I got it, I reviewed it, and it was an action that they

9   had filed against -- really should have been against us or

10  involving the participant banks, saying that now there was a

11  dispute over the assignments.

12  **Q.**    Was this the first you came to learn of there being a

13  dispute?

14  **A.**    That day was the first day.

15  **Q.**    Did you read the complaint when you received it?

16  **A.**    I did.  And I forwarded it on to you.

17  **Q.**    What was your reaction to the allegations in the complaint?

18  **A.**    Shock.  I mean, it was totally different than all we had

19  just gone through, all the dealings that we had about this.

20  Really not -- shock and confusion.  Not understanding how -- how

21  we're here in the face of all of these other e-mails where

22  everybody's in agreement on the concept.  And now we're in

23  agreement, he's doing an assignment as -- to document it.

24  **Q.**    And do you have any understanding as to what happened with

25  the GulfSouth -- the complaint for declaratory relief that

1   GulfSouth filed?

2   **A.**   It was voluntarily dismissed by them about a month later,

3   as I recall, without explanation.

4   **Q.**   And what happened after GulfSouth dismissed its declaratory

5   judgment action?

6   **A.**   Well, what happened is I contacted you; hence, that we have

7   to find out what's going on here.

8   **Q.**   Don't go into your --

9   **A.**   I'm not.

10  **Q.**   -- contacting me or your conversations --

11  **A.**   Yeah.

12  **Q.**   -- with my firm, please?

13       At the time that you filed -- at the time SE Property

14  filed this action, who did it believe had control of the

15  deficiency judgment?

16  **A.**   We always believed that the --

17       **MR. FRANCO:**  I'm sorry, Your Honor, may I?  I

18  didn't hear that question.

19       **MS. BRADY:**  I'll rephrase.  Let me rephrase it anyway.

20  **BY MS. BRADY:**

21  **Q.**   At the time SE Property first filed the litigation that

22  we're here for today, who did SE Property believe was the lead

23  bank under the participation agreement?

24  **A.**   GulfSouth bank.

25  **Q.**   At the point in time -- at that point in time, had you ever

1    heard of an entity called HCB Financial Corp.

2    **A.**    Never.

3    **Q.**    When did you first come to learn of HCB Financial Corp.

4    **A.**    Several months later.  I think it was in the fall and --

5    **Q.**    Don't --

6    **A.**    Yes.

7    **Q.**    Did you have any knowledge that GulfSouth -- did you know

8    that GulfSouth had executed assignments of the deficiency

9    judgment and the Vision Bank participation agreement to HCB?

10   **A.**    No, we were not advised of that by GulfSouth, nor by HCB.

11   **Q.**    Did any of other participating banks advise you as to the

12   assignments of their interests?

13   **A.**    They did not.

14   **Q.**    Did GulfSouth contact you -- Mr. Petermann, or

15   Mr. Campbell, or anybody else at GulfSouth contact you after the

16   fact and explain that the deficiency judgment and the

17   participation agreement were assigned to HCB?

18   **A.**    No.

19   **Q.**    Did you receive any communications directly from HCB?

20   **A.**    Never.

21   **Q.**    During the time that you engaged with Mr. Petermann and

22   Mr. Campbell, did -- were there any disagreements, other than

23   the lot-drawing procedure about certain assets?

24           **MR. FRANCO:**  Objection, leading.

25           **THE COURT:**  Sustained.

1    **BY MS. BRADY:**

2    **Q.**   Were there ever disputes --

3    **A.**   Yes.

4    **Q.**   -- between SE Property and the participating banks?

5    **A.**   There were disputes.

6    **Q.**   And what position did GulfSouth take in response to any

7    disputes that arose between any of the participating banks on

8    any matter?

9    **A.**   That's a general question.  There were a lot of

10   disputes.  There was a dispute about taxes, for example.

11   They wanted us to pay penalties and late fees on taxes.  And

12   I said, Chris, did we ever get notice of this and refuse to

13   pay it?  If we did, then we owe it; if not, then that's your

14   problem.  So that was a dispute.

15        You know, you know, I recall me -- to my knowledge,

16   there was no effort to collect on this judgment, and I think

17   that's because --

18             **MR. FRANCO:**  Objection, Your Honor.

19             **THE WITNESS:**  They had assigned it.

20             **MR. FRANCO:**  Speculation as to what's in somebody

21   else's mind.

22             **THE COURT:**  Overruled.  He's talking about his

23   understanding of what disputes existed.

24             **MR. FRANCO:**  He's talking -- I'm sorry, but I

25   understood his response to be with GulfSouth, was why GulfSouth

1    was not doing something.  That's why I object.

2          **THE COURT:**  And I took that to mean that he and his

3    client had an objection to that or dispute with it.  Is that --

4          **MR. FRANCO:**  I understand.

5          **THE WITNESS:**  Yeah.

6          **MR. FRANCO:**  My objection was to what GulfSouth was

7    doing in its own mind.  That's all.

8          **THE COURT:**  I think --

9          **MR. FRANCO:**  If he's not going to testify that, then I

10   have no objection.

11         **THE COURT:**  I didn't interpret or would not construe

12   it as evidence of what was in GulfSouth's mind.  Really is what

13   was in Mr. Sandel's mind and his client's feelings about it.

14         Okay.

15   **BY MS. BRADY:**

16   **Q.**  And what approach did GulfSouth take in trying to resolve

17   any disputes?

18   **A.**  They tried to get input from all of the parties, always on

19   any disputes that we had or any -- what I'll call pivotal

20   issues -- in the participation.  You know, Chris was always

21   quick to send an e-mail out, as you see, among all the

22   participants, or we need to have a call about this and get

23   everybody's input on this.

24         You know, there was an attempt to try to come to

25   agreement, and we did come to agreement on a number of

1   things.  Eventually, we came to agreement on disposition of

2   the collateral.

3   **Q.**  Did GulfSouth ever take the position, whether through

4   Mr. Campbell or Mr. Petermann, that if any participating bank

5   wasn't happy with the course of action, its remedy was to buy

6   the lead bank position?

7   **A.**  They never did.

8   **Q.**  In response to your -- SE Property's objection to the

9   lot-drawing procedure, was it ever expressed that SE Property

10   had the option of buying the lead bank position?

11   **A.**  No.

12   **Q.**  And who did you interact with at GulfSouth?

13   **A.**  Chris Campbell.

14   **Q.**  Did you have any understanding as to his authority?

15   **A.**  I always understood it to be complete authority.  He was

16   the vice president.  I think there was a loan officer.  He was

17   the one assigned to this, and we had all of our dealings -- I,

18   on behalf of Vision, had all of our dealings with Chris

19   Campbell.

20   **Q.**  Okay.  Did Mr. Campbell ever advise you that he didn't have

21   full authority to make decisions or ever advise that he needed

22   to contact anyone else within GulfSouth?

23        **MR. FRANCO:**  Your Honor, that -- these are all

24   leading questions.  Questions should be what did he advise

25   you of anything, not leading him to say yes or no.

 1  Objection.

 2          **MS. BRADY:**  I'll rephrase.

 3          **THE COURT:**  I'll overred on that question.  I think he

 4  can answer that yes or no whether he was ever advised by

 5  Mr. Campbell that he didn't have the authority --

 6          **THE WITNESS:**  No.

 7          **THE COURT:**  -- to take any action that he took.

 8          **THE WITNESS:**  The answer is no.

 9  **BY MS. BRADY:**

10  **Q.**  Sir, did you have any reason to believe that those

11  assignments would not be delivered?

12  **A.**  I had no reason to believe they were not, would not be.

13          **MS. BRADY:**  If I can could have one minute, Your

14  Honor?

15          **THE COURT:**  Yes.

16          **MS. BRADY:**  Nothing further.

17          **THE COURT:**  All right.  Mr. Franco, we're going to

18  break for lunch before your cross, so we'll be in recess until

19  1:30.

20          Sir, please don't discuss your testimony with

21  anyone, including counsel.

22          **THE WITNESS:**  I have not, no.

23          **THE COURT:**  All right.  Thank you.  So we will be in

24  recess and reconvene at 1:30.  You'll be back on the stand then,

25  sir.

1          **THE WITNESS:**  Yes.

2          **THE COURT:**  All right.  Thank you.

3          **(Recess taken.)**

4          **THE COURT:**  Mr. Sandel you're still under oath.

5          And Mr. Franco, you may proceed, sir.

6          **MR. FRANCO:**  Thank you, Your Honor.

7                    **CROSS-EXAMINATION**

8    **BY MR. FRANCO:**

9    **Q.**   Mr. Sandel, you came to Panama City Beach in April of 2009,

10   correct?

11   **A.**   I did.

12   **Q.**   And that was because either Park National Corporation or

13   Park National Bank asked you to come to Florida; is that

14   correct?

15   **A.**   No.  It was because Bob Myers asked me to come.

16   **Q.**   And you were asked to come to provide assistance to Vision

17   Bank, is that correct, at the time?

18   **A.**   I -- I was.

19   **Q.**   Concerning defaulting loans of Vision Bank?

20   **A.**   Correct.

21   **Q.**   Now, when you came down to Florida in April of 2009, did

22   you actually come down here as general counsel for a company

23   called Southeast Property Solutions, sir?

24   **A.**   Yes.

25   **Q.**   So as far as you were concerned, you came down from the

1   very beginning to be general counsel to provide legal advice; is

2   that right?

3   **A.**   Correct.

4   **Q.**   And you were providing legal advice to Park National?

5   **A.**   And its affiliates.

6   **Q.**   All right.  Now, you were at the time licensed to practice

7   law in Ohio; is that right?

8   **A.**   I still am.

9   **Q.**   Okay.  And you had a practice -- a litigation practice in

10  Ohio; is that right?

11  **A.**   I did.

12  **Q.**   Mr. Sandel, your primary practice for your career had been

13  as a plaintiff medical malpractice lawyer; isn't that correct,

14  sir?

15  **A.**   It had been.

16  **Q.**   And you had no engagement letter with SPS or Park National

17  or any bank or SEPF, sir?

18  **A.**   I had no engagement letter, no.

19  **Q.**   And it's your position that you're not an employee of SPS?

20  **A.**   I am not.

21  **Q.**   And you have no written agreement with SPS?

22  **A.**   I do not.

23  **Q.**   And SPS itself provides legal services and advice to SEPH;

24  isn't that true?

25  **A.**   Through its -- through the counsel that --

1   **Q.**   That's the business of SPS, isn't it, sir, to provide legal

2   advice to SEPH?

3   **A.**   It is.

4   **Q.**   Are you an officer of SPS?

5   **A.**   Vice president.

6   **Q.**   You are vice president of SPS?

7   **A.**   Yes.

8   **Q.**   Now, when you left your primary plaintiff medical

9   malpractice in Ohio in April of 2009 to come here, you had not

10  managed any bank litigation, had you, Mr. Sandel?

11  **A.**   I didn't leave -- just to clarify, counsel, I sold my

12  practice before 2009.  But the answer to your question is, I

13  didn't have background or experience in managing banking

14  litigation.

15  **Q.**   And you had not, in fact, represented any banks, to your

16  knowledge, had you?

17  **A.**   My recollection, no.

18  **Q.**   But you understood you were to come down here and develop a

19  strategy for handling a flood of defaulting bank loans; is that

20  correct, sir?

21  **A.**    No.  I understood that I would be hiring counsel who had

22  the requisite experience, to do interviewing and hiring counsel

23  and working with them to develop strategies on a case-by-case

24  basis.

25  **Q.**   But you, in fact, understood that you were to come down

1    here and develop a strategy for handling defaulting loans; isn't

2    that true?

3            **MS. BRADY:**  Objection, asked and answered and

4    argumentative.

5            **THE COURT:**  Let him answer one more time.

6            **THE WITNESS:**  Not me personally.  There were other

7    people involved in developing strategies.

8    **BY MR. FRANCO:**

9    **Q.**   But you were to manage that?

10   **A.**   I was to manage the litigation.

11   **Q.**   How were you compensated for your services that are

12   provided to SPS and SEPH, sir?

13   **A.**   I received a salary.

14   **Q.**   Excuse me?

15   **A.**   I received a salary.

16   **Q.**   You received, in the past tense, or you receive?

17   **A.**   I do, I do receive a salary.

18   **Q.**   Okay.  And what amount of salary is that?

19           **MS. BRADY:**  Objection, Your Honor, privilege.

20           **THE COURT:**  Overruled.

21           **THE WITNESS:**  $90,000 base salary plus bonus.

22   **BY MR. FRANCO:**

23   **Q.**   What's the bonus based on?

24   **A.**   Totally discretionary.

25   **Q.**   How much of a bonus did you get last year?

1   **A.**   $90,000.

2   **Q.**   So you got double your salary?

3   **A.**   Yes.

4   **Q.**   I'm going to show you Defendant's Exhibit 36, sir, which is

5   an email dated September 16, 2009, from you to Mr. Campbell.

6           **MR. FRANCO:**  I would offer this email at this time.

7           **THE COURT:**  I don't think --

8           **THE WITNESS:**  Are you showing --

9           **MR. FRANCO:**  Not yet, not to you.  I have to see if

10  they have an objection.

11          **THE WITNESS:**  I'm sorry.

12          **MS. BRADY:**  No objection.

13          **THE COURT:**  Just a minute.

14          **MR. FRANCO:**  Admitted, Your Honor?

15          **THE COURT:**  Yes.  Let me -- well, you can go ahead and

16  put it up, yeah.  I just want to turn to it as well.

17          **(Defendant's Exhibit 36 admitted into evidence.)**

18  BY MR. FRANCO:

19  **Q.**   Now, this -- can you see it, sir?

20  **A.**   I can, yes.

21  **Q.**   All right.  This is a September 16, 2009, email from you to

22  Mr. Campbell at GulfSouth, correct?

23  **A.**   Yes, it is.

24  **Q.**   And it bears your email address, correct?

25  **A.**   It does.

1   **Q.**   And it's regarding the -- excuse me -- the North Tip loan;

2   am I correct?

3   **A.**   It is.

4   **Q.**   Now, that was shortly after you arrived in April of 2009,

5   correct?

6   **A.**   Approximately five months later.

7   **Q.**   All right.  And the first thing you did was you thanked Mr.

8   Campbell for his continuing and diligent work on behalf of the

9   participating banks, didn't you, sir?

10   **A.**   I did.

11   **Q.**   And that was after default of the loan, right, because by

12   the time you came here the loan was in default?

13   **A.**   Correct.

14   **Q.**   And then you go on to reject a deficiency proposal from the

15   lead bank, GulfSouth's counsel -- I'm sorry, from the lead bank,

16   GulfSouth's counsel, regarding the guarantors; am I correct?

17   **A.**   I did.

18   **Q.**   And your position was that you would not release the

19   obligers or guarantors without -- and this is your words --

20   exhaustive collection effort; is that right?

21   **A.**   Correct.

22   **Q.**   You were speaking on behalf of SEPH at the time, weren't

23   you?

24   **A.**   I was.

25   **Q.**   Who funds SEPH, Mr. Sandel?

1   **A.**   I'm not sure I understand what do you mean "who funds it."

2   **Q.**   Where does it get the funds to do exhaustive collection

3   efforts?

4   **A.**   We work for the bank.

5   **Q.**   Which bank?

6   **A.**   For Park and its affiliates.  I've already testified to

7   that.

8   **Q.**   Okay.  So the funds for collection efforts that you -- SEPH

9   uses comes from Park National Bank, doesn't it?

10  **A.**   Park pays the legal fees, if that's your question, counsel.

11  **Q.**   It is, sir, thank you.

12  **A.**   Or Vision or SEPH, one of those entities as the case may

13  be.

14  **Q.**   Now, CPB had the same amount of participation in this loan

15  as SEPH, didn't it, or Vision Bank?

16  **A.**   They did, 44.90.

17  **Q.**   And you disagreed with the lead bank's concept regarding

18  collection from the guarantors at that time, didn't you?

19  **A.**   I did.

20  **Q.**   Did you ever make a statement, Mr. Sandel, to anyone

21  outside of SPS or SEPH that you would pursue collection efforts

22  on judgment-debtors no matter what the cost?

23  **A.**   I might make that on a case if I have a particularly

24  fraudulent judgment-debtor.  We have a number of those with

25  fraudulent transfers, hiding assets.

1    **Q.**    No matter what the cost?

2    **A.**    I -- I would exhaust collection efforts against that person

3    until I understood what their assets and collectability were.

4    **Q.**    Before you began providing any services to SPS, you had not

5    engaged in any exhaustive collection efforts against any

6    borrowers, had you, sir?

7    **A.**    Had not.

8    **Q.**    Now, in September of 2009, pursuant to the email we just

9    looked at, it's fair to say it was becoming apparent that there

10   were different interests between the banks involved in this

11   loan, isn't that true, sir?

12   **A.**    They were positioned differently, yes.

13   **Q.**    And at that time the originating bank was the one in direct

14   contact with the guarantors, correct?

15   **A.**    We could not be, since they were the lead bank, so the

16   answer would be yes.

17   **Q.**    That's my point.  That was after default on the loan and

18   they were the lead bank?

19   **A.**    Correct.

20   **Q.**    And you were aware at that time that if SEPH or Vision Bank

21   didn't agree with the collection efforts by GulfSouth, then

22   Vision Bank or SEPH had the ability to purchase the lead

23   position on that loan; isn't that correct?

24   **A.**    I was aware of that prior to default on March 29, 2011,

25   yes.

1    **Q.**   Were you aware of that after default, Mr. Sandel?

2    **A.**   After default there is no default because the -- I mean,

3    after a deficiency judgment is rendered, there's no default,

4    there's a judgment.

5    **Q.**   Mr. Sandel, my question was:  Were you aware at that time,

6    in 2009, that if SEPH or Vision Bank didn't agree with the

7    collection efforts, then Vision Bank or SEPH had the ability to

8    purchase the lead position on the loan?

9    **A.**   Yes.

10   **Q.**   That's my question.  Okay.  And that was in September of

11   2009.  And you were aware of that that would happen by paying

12   for the lead position, isn't that true, sir?

13   **A.**   I was aware of it because that's what the Participation

14   Agreement provided as an option at that time.

15   **Q.**   Who did you understand was in charge of obtaining a

16   judgment on the deficiency in September of 2009?

17   **A.**   The lead bank and its chosen counsel.

18   **Q.**   And you understood that the originating bank controlled the

19   collection process in September of 2009, didn't you?

20   **A.**   I did.

21   **Q.**   And you understood that if the participating banks or

22   Vision, as one of those banks, didn't agree with the collection

23   process, what they could or couldn't do was all set forth in the

24   Participation Agreement?

25   **A.**   Well, there was --

1    **Q.**   Isn't that true?

2    **A.**   There was a fiduciary duty, too, and there was discussions

3    had.  But I understood, as I said earlier, that we could buy

4    them out, that that was an option, yes.

5    **Q.**   According to the Participation Agreement?

6    **A.**   Correct.

7    **Q.**   Now, I'm going to show you Defendant's Exhibit 40.

8         **MR. FRANCO:**  Excuse me one second, Your Honor.

9         **THE COURT:**  All right.

10        **MR. FRANCO:**  I'm sorry.  I'd offer Defendant's Exhibit

11   40.  This is the Final Judgment of Foreclosure.

12        **MS. BRADY:**  It's already come in.  We have no

13   objection, but that's already in as Joint 6.

14        **MR. FRANCO:**  I'm sorry.

15        **THE COURT:**  It's admitted already.

16        **MR. FRANCO:**  Thank you, Your Honor.

17   **BY MR. FRANCO:**

18   **Q.**   Mr. Sandel, that's the Final Judgment of Foreclosure,

19   correct?

20   **A.**   It is.

21   **Q.**   And that's dated December 8, 2009?

22   **A.**   Or December 9, 2009, but it's December 2009.

23   **Q.**   Okay.  And GulfSouth obtained that foreclosure judgment,

24   correct?

25   **A.**   Counsel for GulfSouth did.

1    **Q.**   On behalf of GulfSouth and only GulfSouth; am I correct,

2    sir?

3    **A.**   In the name of GulfSouth with the fiduciary duty to the

4    participant banks.

5    **Q.**   Okay.  And that was after default?

6    **A.**   Yes.

7    **Q.**   And you were aware of that at the time, am I correct, that

8    that was happening?

9    **A.**   I was.

10   **Q.**   Now, in your testimony today, you said that the issue of

11   dividing the deficiency judgment was your proposal to the banks

12   on behalf of Vision Bank; is that right?

13   **A.**   It was.  I did -- I did say that.

14   **Q.**   And in fact, I wrote down exactly what you said today.  You

15   said you suggested that you would like to have it; isn't that

16   what you said today?

17   **A.**   In a conference call, yes.

18   **Q.**   And Rick Petermann, who was counsel for GulfSouth at the

19   time, he told you when you -- when you suggested that, that he

20   didn't know whether it could be done or not, right?

21   **A.**   He did.

22   **Q.**   And because you didn't have any experience, you didn't know

23   whether it could be done either, did you?

24   **A.**   No, because I'm not a Florida licensed lawyer.

25   **Q.**   And you didn't deal with banks or bank litigation either,

1    did you?

2    **A.**    I did not.  That's why I had outside counsel.

3    **Q.**    So Mr. Petermann told you he'd look into it?

4    **A.**    He did.

5    **Q.**    And your suggestion was that each bank would then pursue

6    its own collection from the judgment-debtors, correct?

7    **A.**    Well, each bank would have that opportunity.  I wanted the

8    opportunity on behalf of Vision.  What the others did was up to

9    them.

10   **Q.**    Right.  But the point I want to make is that that concept

11   envisioned that you would actually use the judgment to go try to

12   collect on it, correct?

13   **A.**    Pro rata judgment, yes.

14   **Q.**    Against the judgment-debtors?

15   **A.**    Correct.  Sorry for cutting you off, counsel.

16   **Q.**    That's all right.  I'm going to show you Defendant's

17   Exhibit 51, which I would offer at this time.  It's a May 21,

18   2010 --

19              **THE COURT:**  I believe that's in.  Is it in, Ms. --

20              **MS. BRADY:**  It's Joint 9.  I don't know if it's come

21   in.

22              **THE COURT:**  Oh, it hasn't come in yet, all right.

23              **MR. FRANCO:**  Just so we're straight, Your Honor, this

24   is Defendant's Exhibit 51.  Sometimes I even get mixed up.

25              **THE COURT:**  I recognize the number, but I think you're

```
 1    right, Mr. Franco, it was Plaintiff's 51 I was thinking about.

 2    But Ms. Brady is indicating this is also a Joint Exhibit 9.

 3              Is that --

 4              MS. BRADY:  Yes.  I used that -- it should have come

 5    in as 9, I believe.

 6              MR. FRANCO:  Well, if it's the same, then do we --

 7              MS. BRADY:  No objection regardless.

 8              THE COURT:  Is it in?

 9              MR. FRANCO:  If there's no objection to it --

10              THE COURT:  Well, if it's already been admitted, I

11    don't want to confuse the record.

12              Ms. Simms, you don't know it as 9?

13              MADAM CLERK:  No.

14              THE COURT:  All right.  So it will be admitted as

15    Defendant's Exhibit 51.

16         (Defendant's Exhibit 51 admitted into evidence.)

17              MR. FRANCO:  My paralegal is saying 9 didn't come in.

18              THE COURT:  Right, that's what we're confirming.

19    BY MR. FRANCO:

20    Q.   This is a May 21, 2010, email from you to Mr. Petermann,

21    correct?

22    A.   It is.

23    Q.   And you also copied Chris Campbell at GulfSouth?

24    A.   I did.

25    Q.   And so on May 21, 2010, you asked Mr. Petermann, as counsel
```

1    for GulfSouth, whether we are now proceeding on a separate

2    deficiency judgments?

3    **A.**   On the separate deficiency judgments.

4    **Q.**   On the separate deficiency judgments, right?

5    **A.**   Right.

6    **Q.**   Now, I want to show you following this Defendant's Exhibit

7    53, which I understand has no objection.

8            **MS. BRADY:**   No objection.

9            **THE COURT:**   All right, Defendant's 53 is admitted.

10           **(Defendant's Exhibit 53 admitted into evidence.)**

11           **MR. FRANCO:**   Thank you, Your Honor.

12   **BY MR. FRANCO:**

13   **Q.**   In May of 2010, you asked him if you were proceeding on the

14   separate deficiency judgments and here we have a motion for

15   deficiency judgment against the guarantors on the loan.  You see

16   that?

17   **A.**   Right.

18   **Q.**   So it's pretty clear at this point that the next step was a

19   motion for deficiency judgment, which was filed after your

20   email, and it was filed on June 21, 2010, correct, by

21   Mr. Petermann?

22   **A.**   I'll take your word for it that it was filed --

23   **Q.**   You see it?

24   **A.**   Yeah, I see the timestamp, counsel.

25   **Q.**   Okay, thank you.  And despite your question about now

1    proceeding on the separate deficiency judgments, this motion for

2    deficiency judgment is on behalf of GulfSouth Bank only, isn't

3    it, sir?

4    **A.**   It is.

5    **Q.**   And this was about a month after you asked Mr. Petermann if

6    he was proceeding to get separate deficiency judgments; isn't

7    that true, sir?

8    **A.**   It's about a month after that earlier email, yes.

9    **Q.**   So Mr. Petermann didn't proceed to get separate deficiency

10   judgments as you requested, did he?

11   **A.**   No.  But I was talking about the concept here, and it was

12   probably inartfully worded, but I did say it, I'm not denying

13   that I said it in the email, the concept of separate judgments

14   for the participant banks.

15   **Q.**   But you asked for separate judgments before there was even

16   a motion for a deficiency judgment, correct, Mr. Sandel?

17   **A.**   I did.

18   **Q.**   And Mr. Petermann -- and you asked Mr. Petermann that,

19   didn't you?

20   **A.**   I did.

21   **Q.**   And Mr. Petermann didn't proceed that way, did he?

22   **A.**   He did not.

23   **Q.**   Now, Mr. Sandel, this morning -- I think it was morning,

24   yeah -- you talked about the fact that as a result of the final

25   judgment of foreclosure there were about 168 single family lots

1    that had been recovered by GulfSouth Bank?

2    **A.**    Correct.

3    **Q.**    And GulfSouth put title to those lots into an entity called

4    Northpoint Asset Holdings, LLC, correct?

5    **A.**    I believe so.

6    **Q.**    And each of the banks was given an interest in Northpoint

7    Asset Holdings according to their percentage interest in the

8    North Tip loan as tenants in common, correct?

9    **A.**    I -- I think that each bank had their special purpose

10   entity holding fractional interests, yes.

11   **Q.**    But as tenants in common?

12   **A.**    Correct.

13   **Q.**    And that was pursuant to the Participation Agreement,

14   wasn't it?

15   **A.**    Right.

16   **Q.**    And after that your proposal concerning how to divide up

17   the lots among the banks involved in this loan was not

18   acceptable to all the other banks, was it?

19   **A.**    They did not want to have an auction.

20   **Q.**    So a suit was filed to partition those lots among the banks

21   by GulfSouth, wasn't it?

22   **A.**    It was.

23   **Q.**    I'm going to show you Exhibit 56 -- I'm sorry --

24   Defendant's Exhibit 56.

25           **MR. FRANCO:**  And I understand there's no objection to

1    this?

2                **MS. BRADY:**  No objection.

3                **THE COURT:**  It will be admitted.

4            **(Defendant's Exhibit 56 admitted into evidence.)**

5    BY MR. FRANCO:

6    **Q.**   This is a complaint for partition.

7                **MR. FRANCO:**  Is it admitted, Your Honor?

8                **THE COURT:**  Yes.

9                **MR. FRANCO:**  Thank you.

10   BY MR. FRANCO:

11   **Q.**   This on the second page -- sorry.  It's several pages into

12   the exhibit, but I have on the screen what's entitled Complaint

13   For Partition.  You see that?

14   **A.**   I see it.

15   **Q.**   And that was filed by Mr. Petermann as well, wasn't it?

16   Let's look and make sure.  You see that?

17   **A.**   I see it.

18   **Q.**   And that was filed on behalf of Northpoint Asset Holdings,

19   LLC, which was the entity that GulfSouth had put the title to

20   the foreclosed lots in; is that correct?

21   **A.**   Do you have the timestamp on that, counsel?  Because I

22   don't see a case number or a timestamp on that.

23   **Q.**   September 14th, 2010.

24   **A.**   Okay, you did show me the summons earlier, okay.

25   **Q.**   So that was another disagreement you had with Mr. Petermann

1    on behalf of either GulfSouth or the company that the foreclosed

2    lots were held in by GulfSouth; am I correct?

3    **A.**    It was one disagreement about the collateral and how to

4    dispose of it.  It had a number of tentacles to it.

5    **Q.**    Now, I'm going to show you Defendant's Exhibit 68, which I

6    understand has no objection.  That's an April 13, 2011, email

7    from you to Mr. Robert Reynolds.

8              **THE COURT:**  Okay, that will be admitted.

9          **(Defendant's Exhibit 68 admitted into evidence.)**

10   BY MR. FRANCO:

11   **Q.**    First I'd like you to turn to the second page, which we

12   will do.  And you sign off on this email as executive vice

13   president and general counsel for Southeast Property Solutions,

14   LLC.  You see that?

15   **A.**    I do.

16   **Q.**    And for Vision Bank?

17   **A.**    Right.

18             **MS. BRADY:**  Your Honor, I'd just ask that the witness

19   be able to see the entire email.

20             **MR. FRANCO:**  Absolutely.

21             **THE COURT:**  Will you show that, Mr. Franco?

22             **MR. FRANCO:**  The exhibit is up here, but if we have

23   the original we'll show him the original, either way.

24             May I approach, Your Honor?

25             **THE COURT:**  Yes.

1    **BY MR. FRANCO:**

2    **Q.**   Tell me when you're ready, Mr. Sandel.

3    **A.**   I'm sorry?

4    **Q.**   Tell me when you're ready.

5    **A.**   I'm ready.

6    **Q.**   Thank you.  On the second page you sign off on this email

7    as executive vice president and general counsel; is that right?

8    **A.**   I do.

9    **Q.**   Now, you just told me a few minutes ago that you were --

10   you received a salary; is that right?

11   **A.**   I do.

12   **Q.**   Didn't you say earlier, sir -- I'm sorry.  Didn't you say

13   something about -- strike that.

14        Didn't you report your income on a 1099?

15   **A.**   I do, I think so, yes.

16   **Q.**   As a salary?

17   **A.**   I think it's just he reports it as a distribution, but

18   that's -- it's a flat -- I mean, from my standpoint I receive a

19   salary.

20   **Q.**   Well, if it's a distribution, do you own --

21   **A.**   A fixed amount, it's a fixed amount.  Maybe that's a better

22   way of saying it.

23   **Q.**   Do you own any part of SPS?

24   **A.**   I don't.

25   **Q.**   You're not a member?

1   **A.**   I'm not a member.

2   **Q.**   And here you're speaking on behalf of Vision Bank, pretty

3   clear, correct?

4   **A.**   I am.

5   **Q.**   Now, look at the last page.  And on the last page Robert

6   Reynolds sent you and the other banks an email or it looks like

7   in letter form but it was sent by email; am I correct?

8   **A.**   On the last -- you're taking me to the last page of this

9   document?

10  **Q.**   Yes, which is page 3 at the bottom of it.

11  **A.**   I see it.

12  **Q.**   Okay.  And in which he says that it would appear to be very

13  difficult to divide up a judgment, right?

14  **A.**   He says that, yes.

15  **Q.**   And that it made no sense to charge off in different

16  directions with the same judgment, correct?

17  **A.**   That's what he says.

18  **Q.**   And you were responding to Mr. Reynolds in this email on

19  page 1, weren't you?

20  **A.**   On page 1 it looks like I'm responding to Sandy Menetre,

21  page 1 of Exhibit 68.

22  **Q.**   Sir, on page 1 what I'm looking at is April 13 -- it's on

23  the screen, April 13, 2011 --

24  **A.**   I'm sorry, I see that.

25  **Q.**   -- to Robert Reynolds from you.  Are you with me?

1    **A.**    Yes.

2    **Q.**    And it says -- in response to his questioning this dividing

3    the judgment, you basically tell him, "See below my October 29,

4    2010, outlining the terms of our settlement and agreement to

5    sell Vision's interest in the lots to Central Progressive.  I

6    trust this will refresh your recollection of our agreement."

7    You see that?

8    **A.**    I do.

9    **Q.**    And the first part -- let's look at your email of October

10   29, 2010, which is on the bottom.  And you -- what you say,

11   "Outline the terms of what you call an agreement," am I correct?

12   **A.**    Correct.

13   **Q.**    And the first part of the email addresses purchasing or

14   selling the lots that had been recovered in the foreclosure,

15   right?

16   **A.**    Right.

17   **Q.**    And in paragraph 3 you state that Vision Bank -- let's turn

18   to that -- you say that "Vision Bank is not assigning its pro

19   rata share of the deficiency judgment obtained or to be obtained

20   in this matter and explicitly reserves its rights to same and to

21   independently undertake collection efforts on its judgment."

22   You see that?

23   **A.**    I see that.

24   **Q.**    Mr. Sandel , why did you have to reserve rights if you

25   already had an agreement?

1   **A.**   Because it didn't have the assignment.

2   **Q.**   Why didn't --

3   **A.**   The written assignment.

4   **Q.**   In this letter of October 2010, why were you simply just

5   not saying that there was an agreement to divide the pro rata --

6   the judgment?

7   **A.**   I don't know why I didn't say it that way.

8   **Q.**   But instead you were reserving rights, right?  Am I

9   correct?

10  **A.**   We've talked about that.  That's what it says.  I'm not

11  denying I wrote it, counsel.

12  **Q.**   Now, you didn't say anything in paragraph 3 in your email

13  about an agreement, did you?  In October of 2010, in this email,

14  you didn't say anything about an agreement, did you?

15  **A.**   I did in the earlier email on that day, counsel, that I

16  sent him.

17  **Q.**   I'm talking about in October.  Are you saying --

18  Mr. Sandel, are you saying in April 2011, see my email in

19  October 2010 which was an agreement, and then you look at the

20  October 2010 email and there's nothing in there about an

21  agreement, is there?

22  **A.**   Those are -- those are the terms under which we would

23  consent to the sale of the lots.

24  **Q.**   And it says, "Without satisfaction of all of the

25  conditions, there will be no meeting of the minds," you see

1    that?

2    **A.**   I do.

3    **Q.**   I'm going to show you -- I'm sorry.  Mr. Sandel, did you

4    get $1,752,732.50 wired to Vision by five p.m. on October 29,

5    2010, sir?

6    **A.**   As I sit here, I don't know the time of its actual arrival,

7    but I know that the funds came in.

8    **Q.**   But you don't know if that was done according to paragraph

9    1 in this letter, do you?

10   **A.**   As I sit here, no, but I know that the funds were wired.

11   **Q.**   And here you specifically say on the paragraph following

12   paragraph 4, "Time is of the essence" in responding, didn't you?

13   **A.**   I did.

14   **Q.**   All right.  This is -- I'm going to show you Defendant's

15   Exhibit 64.  I believe this is already in evidence as a

16   Plaintiff's Exhibit, but this is the deficiency judgment,

17   Mr. Sandel.  And that deficiency judgment came in March of 2011,

18   you see that?

19   **A.**   I do.

20   **Q.**   And that was obtained by GulfSouth only in the name of

21   GulfSouth; am I correct?

22   **A.**   Yes.  We have established that.

23   **Q.**   Now, I'm going to show you Defendant's Exhibit 55, which

24   has already been admitted.  And this is a string of emails dated

25   April 7th of 2011.  And on page 2 is where Mr. Petermann

1    states --

2                MR. CROSSLAND:  I'm sorry, which exhibit are you on?

3                MR. FRANCO:  I'm sorry.  It's Defendant's Exhibit 65.

4                MR. CROSSLAND:  Thank you.

5                MR. FRANCO:  I'll wait for you.

6                MS. BRADY:  We're there.  Thank you.

7    BY MR. FRANCO:

8    Q.   Now, let's start at the back of this email string.

9                THE COURT:  Is there any objection to this?

10               MS. BRADY:  No objection.

11               MR. FRANCO:  It's already admitted, Your Honor.

12               THE COURT:  Oh, it is, okay.

13               MR. FRANCO:  And please, if I state something that's

14   correct on the objection or admission please --

15               THE COURT:  Well, I just want to make sure if it's

16   already admitted that it's not admitted under a different

17   number.

18               MR. FRANCO:  No.  I have this one, and it's already

19   admitted as Defendant's Exhibit 65.

20               THE COURT:  Okay.

21   BY MR. FRANCO:

22   Q.   Now, this basically -- this string asks where you are in

23   the deficiency judgment, you see that?

24   A.   Well, among other things it asks that, yes.

25   Q.   And then in your email you talk about where you are on the

1    lots -- on page 2 you talk about where you are on the lots, you

2    see that?

3    **A.**   I do.   That was -- I think that was the original --

4    perhaps, counsel, the original thread in the email that they

5    were talking -- Sandy Menetre may be talking about getting the

6    lots listed.

7    **Q.**   Right.   And then you say, "How are we going to divide up

8    the judgment so each bank can proceed with collection as it sees

9    fit"?

10   **A.**   Right.

11   **Q.**   Right?   And this is after the previous email where you said

12   you already had an agreement?

13   **A.**   I'm talking about the mechanics, as I said.

14   **Q.**   I know, but if you could answer yes or no first, that would

15   help me.

16        This is after your previous email where you said in your

17   previous email you already had an agreement; am I correct?

18   **A.**   You're correct.   But tell me, I'm not sure I understand the

19   question, if it's a yes or no question.

20   **Q.**   Well, this one says, "How are you going to divide up the

21   judgment?"

22   **A.**   It does say that, yes.

23   **Q.**   So if you already had an agreement to assign a pro rata

24   share of the deficiency judgment, why did you ask how the

25   judgment was going to be divided ?

**A.**    Well, that's a good question.  There are different

interests here on the part of the banks.  You have banks with a

miniscule interest, and you have banks that have 44.9 percent

interest, and that's part of the problem.

        The bank with the 1.21 percent interest had no interest,

you know, in pursuing collection on its own.  That was the first

problem.

        Two of the banks were in trouble.  So that entered into

this whole equation, I believe, in terms of the mechanics that

were involved.

        This question was about mechanics -- Rick, how are we going

to do that?  Are you going to draft an agreement?  Are you going

to have an assignment?  How -- it's a polite way of saying how

can we get this done and move past this.

**Q.**   And this wasn't, Mr. Sandel, because you knew that

Mr. Petermann was still looking into it, sir?

**A.**    I don't know the exact date.  I'd have to see all the email

chains.  I think the date was later when he said "I don't see

any problem with it."

        But I don't know if I had a phone conversation and he told

me that or what, but I was assuming that we were going to do it,

Chris Campbell was assuming that we were going to do it, if it

could be done.

        If he was going to tell us -- *No, here is a case, Martin, I*

*found this research, here is a case, we can't do it* -- okay, if

1    the case is clear, that's the end of it.  But I never got a

2    case, I never got a statute.

3    **Q.**   I understand.  But at this point, sir, I haven't seen any

4    emails from Mr. Petermann -- if you know of one, you could tell

5    me, but I haven't seen any emails from Mr. Petermann up to this

6    point saying it could be done.  Did you?  Have you seen an email

7    in this case so far?

8    **A.**   We talked about some on direct, but I think those were

9    later in time.

10   **Q.**   Okay.  So at this point you hadn't gotten any email from

11   Mr. Petermann that said he'd looked into it and it could be

12   done?

13   **A.**   No.

14   **Q.**   All right.  Let's turn to Exhibit 68.  The prior exhibit I

15   just showed you date-wise was April 7th, 2011, when you asked

16   how are we going to divide it.

17        And now I'm going to show you Defendant's Exhibit 68, which

18   I understand has already been admitted into evidence.  And let's

19   see -- let's look at the third to last page of this string.

20        Now, in the prior email -- excuse me.  Strike that.

21        This is about a week later.  And in response to your email,

22   Mr. Reynolds, who was an attorney; am I correct?

23   **A.**   Yes.

24   **Q.**   He -- he writes at the bottom paragraph, "With respect to

25   the judgment, it would appear to be very difficult to divide up

1  a judgment," and then it goes on to say, "In our view, it makes

2  no sense to charge off in various directions with the same

3  judgment."  You see that?

4  **A.**    I do.

5  **Q.**    And your concept was that Vision Bank wanted an assignment

6  of the deficient judgment so it could collect on its assigned

7  portion of the judgment, right?

8  **A.**    Wanted a pro rata assignment of the deficiency judgment.

9  **Q.**    So it could collect?

10 **A.**    Correct.

11 **Q.**    So it could, in fact, charge off in its direction on the

12 same judgment; am I correct?

13 **A.**    So that it could inquire and do a collection effort and

14 inquire about collectability and fraudulent transfers.

15 **Q.**    Is that a yes, sir?

16 **A.**    Yes.

17 **Q.**    So it could charge off in its direction on the same

18 judgment?

19 **A.**    So that it could pursue its collection of that judgment.

20 **Q.**    Now, it wasn't just contemplated that the assignment of

21 this judgment would just be to Vision Bank, was it?  It was

22 going to be done to all the participating banks, right?

23 **A.**    That's correct.

24 **Q.**    That was your concept?

25 **A.**    No.  I mean, it's the fair concept.

1   **Q.**   Right.   And then each bank would have the right to enforce

2   its part of the judgment?

3   **A.**   If they so chose to do so.

4   **Q.**   All right.   So what would happen if they both seized the

5   same asset?

6   **A.**   Well, we'd have to deal with that when we came to it.   But

7   I happened to know that the banks were in trouble, that a 1.21

8   percent bank is probably not going to pursue it, that Central

9   Progressive was in trouble, and that GulfSouth was in trouble.

10          And I -- I seriously questioned whether they were going to

11   pursue it, and I wanted to pursue it and investigate the

12   collectability on behalf of Vision Bank.

13   **Q.**   Mr. Sandel, at the time -- at that time of these emails,

14   you -- it was apparent to you that GulfSouth, the lead bank, was

15   in financial trouble; isn't that true?

16   **A.**   Chris Campbell shared certain things with me, yes --

17   **Q.**   Okay.

18   **A.**   -- about that.

19   **Q.**   So -- and because of that, you had a question of what FDIC

20   would do with this loan if or when GulfSouth was taken over by

21   FDIC, isn't that true, sir?

22   **A.**   I don't remember, but probably I would have had that

23   question.   I wouldn't, you know, dispute that.

24   **Q.**   And so you didn't want FDIC to control the collection, did

25   you, sir?

*Martin Sandel - Cross/Franco*

1    **A.**   No, I did not.

2    **Q.**   I'm going to show you next Defendant's Exhibit -- I'm

3    sorry.  This one would be Plaintiff's Exhibit 33, which is in

4    evidence.  And this is the same -- just ignore this sticker.

5    This is the same as one of my exhibits.

6        Now, in this email Mr. Campbell tells you Mr. Petermann has

7    researched the division of the judgment and he does not believe

8    it can be accomplished.  You see that?

9    **A.**   I see it.  I see it, yes, sir.

10   **Q.**   Well, the reason Mr. Petermann was looking into it is

11   because that's what was discussed from square one, wasn't it?

12   **A.**   Correct.

13   **Q.**   And in this email Mr. Campbell -- excuse me, strike that.

14       You -- Mr. Campbell also asks -- since Mr. Petermann said

15   he had researched and didn't believe it could be accomplished,

16   he asked you for an example where this has been done in the

17   past.  You see that?

18   **A.**   I see it.

19   **Q.**   And despite Mr. Campbell asking you for an example, you

20   never gave him one; is that right?

21   **A.**   I asked him for -- he was the counsel for the lead bank in

22   a fiduciary capacity to the others.  I asked him to give me some

23   authority where it can't be done.

24   **Q.**   I understand, Mr. Sandel, but my question was not that,

25   sir.  My question was:  Despite him asking you for an example,

1   you never gave him one; is that right?

2   **A.**   I, instead, asked him to give me proof that it can't be

3   done.

4   **Q.**   And I would only ask you, if you could answer yes or no

5   first so I know what you're answering and then you're entitled

6   to explain that.

7   **A.**   Okay.

8   **Q.**   I'm going to show you Defendant's Exhibit 74, which I

9   understand is admitted.

10          Now, this is July 29, 2011, and this is an email forwarding

11   a letter from Mr. Petermann to you.

12   **A.**   Okay.

13   **Q.**   And Mr. Petermann states that he -- that he actually

14   questions whether the judgment-debtors would have a right to

15   argue that the partial assignment could subject them to multiple

16   executions, depositions, levies, et cetera, from each of the

17   banks owning a partial interest in the final judgment.  You see

18   that?

19   **A.**   I see that.

20   **Q.**   Okay.  You understood from that that there may be a problem

21   down the road, didn't you, Mr. Sandel?

22   **A.**   I understood that he was saying that there may --

23   **Q.**   Yes or no, sir, please.

24   **A.**   Oh, I --

25   **Q.**   Did you understand that there may a problem down the road?

1   **A.**   I understood he was saying there may be a problem down the

2   road.  That's a different --

3   **Q.**   But you didn't understand that?

4   **A.**   I understood that he was saying that.

5   **Q.**   And he was the one looking into it, wasn't he?

6   **A.**   Supposedly he was.

7   **Q.**   Well, you didn't look into it, did you?

8   **A.**   No.  He's the lead counsel.  He's the one that we charged

9   with the responsibility of advising the participants of what

10  they can and cannot do.

11  **Q.**   Well, what you read from that is that there might be a

12  hiccup down the road?  Isn't that what you read from that?

13  **A.**   I read just what he said.  I read that he had an opinion

14  that there is this possibility that he states in the -- in the

15  letter.  I read that.

16  **Q.**   Mr. Sandel, I'm going to refer you to page 161 of your

17  deposition at line 7.

18          **MR. FRANCO:**  May I approach, Your Honor?

19          **THE COURT:**  Yes, sir.

20  BY MR. FRANCO:

21  **Q.**   I'm going to ask you to look at that and tell me whether

22  you think -- whether that helps refresh your recollection, sir,

23  as to what you understood.

24  **A.**   I see that.  I'm -- I'm not contradicting that today.

25  **Q.**   Okay.  And so -- may I see that again.

1   **A.**    Sure.

2   **Q.**    Thank you.  You understood him saying, "As your counsel, I

3   want you to be aware that conjecturally there might be a hiccup

4   down the road"?

5   **A.**    I read that, yes.  I'm happy to have that to be my

6   testimony today.

7   **Q.**    I show you Defendant's Exhibit 78.

8            **THE COURT:**  I don't think this one is in.

9            **MR. FRANCO:**  It is not, Your Honor.  This is a string

10   email dated October 25, 2011, on the first page from

11   Mr. Campbell to Mr. Sandel.

12            **MS. BRADY:**  No objection.

13            **THE COURT:**  Defendant's Exhibit 78 will be admitted.

14         **(Defendant's Exhibit 78 admitted into evidence.)**

15            **MR. FRANCO:**  78, Your Honor?

16            **THE COURT:**  That's what I thought you identified.

17            **MR. FRANCO:**  Yes.  Did you say 78?

18            **THE COURT:**  I did.

19            **MR. FRANCO:**  I'm sorry, I thought you said 70.

20            **THE COURT:**  78.

21   BY MR. FRANCO:

22   **Q.**    Now, this begins with you asking about the status of the

23   deficiency judgment?

24   **A.**    I don't see that.

25   **Q.**    One second.  At the bottom of this first page, you see it?

 1   It says from you to Chris Campbell, October 25, 2011, you see

 2   that?

 3   **A.**   I -- I see an email, but I don't see the substance --

 4   **Q.**   I'm going to get to the second page.  I just wanted to make

 5   sure you saw the first page.

 6   **A.**   Yes, thank you.

 7   **Q.**   "Where are we in getting Vision's judgment," you see that?

 8   **A.**   Yes.

 9   **Q.**   And Mr. Campbell sends it to Rick Petermann, correct?

10   **A.**   I think it's in the forward, yes, and then he asks the

11   question there, have you had any response.

12   **Q.**   Right, "Have you had any response from either CPB or Dana's

13   office on Vision's judgment request?"  You see that?

14   **A.**   I see that, yes.

15   **Q.**   That's another use of the word "request" that we've seen in

16   this emails, isn't it, sir?

17   **A.**   That's a word that Chris Campbell used.

18   **Q.**   Uh-huh.  And for the record, Dana's office, Dana was Dana

19   Matthews who was an attorney for CPB at one time in this loan?

20   **A.**   He was, yes.

21   **Q.**   And now, you're aware that CPB was under a cease and desist

22   order from FDIC at the time, weren't you?

23   **A.**   I'm not sure of the exact timing when I was aware of it,

24   but I did become aware of it at some point in time.

25   **Q.**   Well, you certainly knew they were in trouble?

1   **A.**   I did, from Sandy Menetre.

2   **Q.**   And CPB had the same 44.9 percent participation interest in

3   this loan, correct?

4   **A.**   They did, sir, yes.

5   **Q.**   A pro rata assignment allowing you to collect independently

6   and keep the proceeds all yourself would obviously affect CPB's

7   participation interest, wouldn't it?

8   **A.**   It might.

9   **Q.**   Well, if you're collecting and they're not collecting,

10  they're not getting the money, are they?

11  **A.**   Maybe they don't want to collect.  I don't know what was

12  their state of mind.

13  **Q.**   But it would affect them if you were seizing assets that

14  were available for them to seize, wouldn't it, sir?

15  **A.**   Hypothetically it would.

16  **Q.**   And you were aware at some point that CPB was acquired by

17  First NBC, weren't you?

18  **A.**   At some point I came aware of that, yes.

19  **Q.**   All right.  Now, we've already established -- I think you

20  already stated that a pro rata assignment of the deficiency

21  judgment was never delivered to you or Vision Bank.  Am I

22  correct?

23  **A.**   It was not.

24  **Q.**   Okay.  In fact, instead of delivering a pro rata

25  assignment, Mr. Petermann, on behalf of GulfSouth, filed a

1    declaratory judgment suit; is that right?

2    **A.**   He did.

3    **Q.**   I'm going to show you Defendant's Exhibit 85, which is

4    already admitted.  That's the Complaint for Declaratory Relief,

5    and that was filed May 2, 2012.  You see that?

6    **A.**   I do.

7    **Q.**   Turn to page 20 -- I'm sorry, paragraph 20 on page 5.

8    GulfSouth states that CPB and now FNBC have indicated that it

9    does not want the deficiency judgment split into pro rata

10   shares.  You see that?

11   **A.**   I see that allegation, yes.

12   **Q.**   And instead it wants a deficiency judgment to remain as a

13   single undivided judgment.  You see that?

14   **A.**   I see it.

15   **Q.**   Now, again, CPB had the same percentage interest in this

16   loan as did SEPH or Vision, correct?

17   **A.**   Correct.

18   **Q.**   So it appears that an equal participant in this loan didn't

19   want you or Vision going off on its own to collect and keep all

20   the proceeds it collects for itself, isn't it?  That's what

21   appears from this, isn't it?

22   **A.**   Neither Central Progressive -- no, neither Central

23   Progressive nor the successor bank contacted me directly, so I

24   just know what this document says.

25   **Q.**   You don't know anything to the contrary either, do you?

1    **A.**    I don't.  I don't know anything.  I didn't -- the first

2    knowledge I had was the lawsuit that was served on Centennial

3    Bank.

4    **Q.**    Now, we are -- this deficiency judgment -- this -- at this

5    point there appears to be a disagreement between GulfSouth and

6    Vision -- and Vision Bank or SEPH?

7    **A.**    At what point?

8    **Q.**    At the point this Complaint for Declaratory Relief is

9    filed; is that correct?

10   **A.**    There -- there appears to be on -- there appears to be a

11   dispute that they are asserting in a declaratory judgment

12   complaint -- or action complaint.

13   **Q.**    And it's your testimony, sir, as I understand it, that

14   there was an agreement to divide the deficiency judgment when?

15   When was there an agreement to divide this deficiency judgment?

16   **A.**    There -- as I testified in 2010, there was an agreement, if

17   it could be done, if it could be done, Chris Campbell indicated

18   that in an email to me.  And once it was determined by Rick

19   Petermann that he could not find any legal authority against

20   doing it, there was an agreement.

21        I might add also that Rick Petermann said in the letter to

22   me he did not need the consent of the successor bank to proceed

23   with this.

24   **Q.**    So my question stands:  When exactly -- what date was there

25   an agreement to divide this deficiency judgment, Mr. Sandel?

```
 1   Tell the Court what date that is.
 2            MS. BRADY:  Objection, asked and answered and
 3   argumentative.
 4            THE COURT:  Overruled.  He can answer.
 5            THE WITNESS:  I would say, counsel, that it -- that it
 6   relates back to the original agreement.  Once Rick Petermann
 7   said there was no legal impediment, we already had agreed in
 8   concept to do this.
 9   BY MR. FRANCO:
10   Q.   You called it an agreement in principle at one point in
11   your testimony, didn't you, sir?
12   A.   I did.
13   Q.   What's an agreement in principle?  What does at that mean?
14   A.   It means that the parties have agreed subject to the
15   mechanical means of executing the agreement.
16        There was -- eventually I was shown an assignment of about
17   three lines that never came to me, so presumably that was Rick
18   Petermann's way of effectuating it.
19   Q.   And you talked about this from the time you got here in
20   September of 2009, didn't you?
21   A.   I think -- I think I did, yes.
22   Q.   So from September of 2009 all the way to May of 2010, you
23   don't have a written agreement, do you?
24   A.   I don't.
25   Q.   Why not?
```

1    **A.**   You'd have to ask them that.

2    **Q.**   And so all that time went by and you never got an agreement

3    that you said existed from square one?

4    **A.**   No.  And I wrote approximately 20 emails and no one wrote

5    back and said, Mr. Sandel, we don't have an agreement.

6    **Q.**   Well, if you requested this 20 to 25 times over years, is

7    what you said in your testimony --

8    **A.**   Yeah, over --

9    **Q.**   Why do you think you never received any division of the

10   judgment?

11        **MS. BRADY:**  Objection, speculation.

12   BY MR. FRANCO:

13   **Q.**   You had to ask 20 to 25 times over a series of years?

14        **MS. BRADY:**  Objection, speculation.

15        **MR. FRANCO:**  I'm asking him why he thinks he never got

16   the judgment.

17        **THE COURT:**  Well, I don't -- he can't answer that.  He

18   can't answer why he didn't get the judgment when it was a

19   decision from other people, so I'll sustained the objection.

20        **MR. FRANCO:**  I'll follow-up.

21   BY MR. FRANCO:

22   **Q.**   Isn't it possible, Mr. Sandel, that the other party to your

23   alleged agreement didn't consider it an agreement?

24   **A.**   That's not what the emails say, counsel.  No, I don't think

25   it's possible.

**Q.**   The emails speak for themselves.

**A.**   I don't think it's possible, on the evidence that I've seen and I've been questioned on today, no.

**Q.**   Mr. Sandel, we can go back to the emails, but when Mr. Petermann -- when you were advised that Mr. Petermann didn't believe that it could be done, your response was that you had an agreement, wasn't it?

**A.**   My response was that we had an agreement and also give me some law that says we can't do it.  Because the early part of the agreement was Chris Campbell said, look, we have an agreement on this subject to being able to do it.  So if there's some law that says we can't do it, then we're not going to do it.

**Q.**   But your response to that was that you had an agreement? Your response -- when you were told that Mr. Petermann didn't think you could do it, your response wasn't -- *Well, I'm glad you looked into it and now we can't do it*.  Your response was -- *We had an agreement*?

          **MS. BRADY:**  Objection, asked and answered.

          **THE COURT:**  It seems like -- well, I don't think you're going to get an agreement, if you will, on what you're asking.  I mean, you have asked this a number of different ways.

          **MR. FRANCO:**  No, this is a different question, Your Honor.  There was a -- Plaintiff's Exhibit 33 --

          **THE COURT:**  Okay, I'm looking at it.

1    **MR. FRANCO:**  -- was when Mr. Petermann -- when he was

2    told Mr. Petermann didn't think it could be done.  His response

3    to that email was, "We had an agreement."  It wasn't, *Okay, now,*

4    *that you've looked it, I understand we can't get it done."*

5            He took the position that it was already in agreement,

6    which is contrary to his testimony today.

7            **THE COURT:**  I don't know that to be the case, but I'll

8    allow you to ask the question one final time, and then I would

9    ask that you move on, please.

10           **MR. FRANCO:**  Thank you.

11   BY MR. FRANCO:

12   **Q.**  Do you recall your response when you were told that

13   Mr. Petermann researched it and decided -- and concluded he

14   couldn't do it?  Do you recall what your response was?

15   **A.**  No, no, that -- counsel, I wasn't told that.  I was told by

16   Chris Campbell in the email, Mr. Petermann doesn't think we can

17   do it.

18   **Q.**  Right.

19   **A.**  That's different than what you said.

20   **Q.**  Okay.

21   **A.**  And my response in an email was, "Let's see some authority

22   on the question."  And we talked about that email this morning,

23   I believe.

24   **Q.**  Your response was you had an agreement, Mr. Sandel, wasn't

25   it?

1    **A.**   Coupled with -- look, I've gone through this a few times,

2    you know --

3              **MS. BRADY:**  Objection, Your Honor.

4              **MR. FRANCO:**  Give me a second.  I'd like to get that

5    email.  Give me one second, please.

6              **THE COURT:**  Okay.

7              **MR. FRANCO:**  I'm not going to take up the Court's

8    time.

9    **BY MR. FRANCO:**

10   **Q.**   Mr. Sandel, let me ask you a different question.  You --

11   your position has always been that the agreement is to divide up

12   the deficiency judgment; am I correct, sir?

13   **A.**   Correct.

14   **Q.**   And this -- Plaintiff's Exhibit 57 has been introduced --

15   admitted into evidence.  This is the assignment that you contend

16   was the agreement?

17   **A.**   Well, this is evidence of the assignment that I never

18   received.  I mean, I see it now but --

19   **Q.**   This is what you wanted?

20   **A.**   I wanted a partial assignment of the judgment.

21   **Q.**   This is what you wanted, this document; am I correct?

22   **A.**   Correct.

23   **Q.**   And you're aware that your attorneys have offered this as

24   the document that was the agreement; am I correct?

25             **MS. BRADY:**  Objection, mischaracterization.

1          **THE COURT:**  Just -- you can't state for them what

2    their position is.  So just -- if you want to ask a question,

3    but don't preface it.

4          **MR. FRANCO:**  I will, I'll rephrase.

5    BY MR. FRANCO:

6    **Q.**   Are you aware that this is the document that you wanted?

7    **A.**   I'm -- I'm aware, counsel, that this is a document that was

8    produced not to me but in this litigation, and it very much

9    looks like the document I wanted.

10   **Q.**   Okay.  So you would have accepted this as the agreement if

11   this would have been sent to you?

12   **A.**   I would have had it reviewed by Florida counsel, my

13   counsel.  I don't make -- that's why I have outside counsel, I

14   would have solicited their opinion if it was adequate to

15   accomplish the purpose that we've been discussing for the last

16   couple of hours; and if it was, I would have accepted it.

17   **Q.**   And are you aware that SEPH's position in this case is that

18   this is the agreement that was supposed to be delivered to you?

19          **MS. BRADY:**  Objection, that's a mischaracterization.

20          **MR. FRANCO:**  It's not a mischaracterization, Your

21   Honor.  This is what they contended was signed and should have

22   been delivered to them, and they introduced Mr. Campbell's email

23   saying I signed it and this is the document I signed and it was

24   supposed to be delivered.

25          **THE COURT:**  He's not even -- he's not the corporate

1     rep in the case.

2           MR. FRANCO:  I'm asking him whether he's aware of it.

3     He's the one who made the agreement, he says.

4           THE COURT:  Well, you've asked him if this was the

5     agreement.

6           MR. FRANCO:  I did.

7           THE COURT:  So now you're trying to get him to commit

8     to a position that the attorneys for the Plaintiff have taken,

9     and I don't think that's proper.  He's not the corporate rep.

10          MR. FRANCO:  I'll ask it again so that we're clear.

11          THE COURT:  Okay.

12    BY MR. FRANCO:

13    Q.   Was this the agreement that you had been asking for?

14    A.   I'll answer it the same way I just answered it.  If this

15    had been presented to me in the format -- remember, we were

16    talking about the mechanics of executing the agreement.  I would

17    have had this agreement reviewed by our Florida counsel and

18    sought their opinion as to whether it would accomplish what we

19    wanted to accomplish.

20    Q.   Okay.  Looking at that agreement, does it?

21          MS. BRADY:  Objection.

22          THE WITNESS:  I'm not -- I'm not a Florida lawyer, and

23    we're dealing with an assignment of a Florida judgment, counsel.

24    BY MR. FRANCO:

25    Q.   All right.  Let me put it this way, Mr. Sandel:  You asked

1    for the deficiency judgment to be divided, didn't you?

2    **A.**   Yes, I did, sir.

3    **Q.**   Look at this partial assignment of judgment.  Look what it

4    says right here.

5    **A.**   I see that.

6    **Q.**   It says it assigns to Vision Park Properties, LLC, a

7    Florida Limited Liability Company, its successors and assigns an

8    undivided 44.9 percent interest in and to that certain

9    deficiency judgment.  Do you see that, sir?

10   **A.**   I see what it says, sir.

11   **Q.**   That's not what you were asking for, was it?

12   **A.**   Sir, I'll repeat my answer.  You're asking me to give an

13   opinion about a document that I am seeing in this litigation,

14   wasn't presented to me, had no opportunity to present to my

15   counsel for review, inquire of them, counsel, you know what we

16   want to do, we want to be able to execute on this judgment on

17   our own, will this give us the authority to do it, yes, no,

18   maybe, and we would have that discussion.

19       I would have -- would I have loved to have that a long time

20   ago to have that discussion with my counsel?  Unequivocally,

21   yes.

22   **Q.**   And you're an attorney and you don't know the difference

23   between division and an undivided interest?

24           **MS. BRADY:**  Objection, Your Honor.

25           **THE COURT:**  You didn't ask him that question.

1          **MR. FRANCO:**  I'm asking him now.

2          **THE COURT:**  No.  You're suggesting that he doesn't

3  know the difference.  You haven't even asked him if he knows the

4  difference.

5          **MR. FRANCO:**  Okay.  Let me ask him that question then.

6          **THE COURT:**  That's argumentative, Mr. Franco.

7  BY MR. FRANCO:

8  **Q.**   Do you know the difference between a divided interest and

9  an undivided interest as a lawyer?

10  **A.**   I know it as a lawyer, but you're talking about Florida law

11  here, counsel, and I wouldn't make this judgment on my own,

12  period, for the same reason that I wouldn't act without Rick

13  Petermann's law being provided on what we can and cannot do.

14  And I wouldn't ask him also to take an action on behalf of the

15  participant banks that was not soundly based in law.

16      If he could have produced law to me that said you can't do

17  this, end of story, we wouldn't have done it.

18  **Q.**   And you still wouldn't do it?

19  **A.**   Now after all of this, we'll have some more rounds, I can

20  guarantee you.

21  **Q.**   What does that mean, Mr. Sandel?  More litigation?

22  **A.**   There will be more -- I'm not going to permit this kind of

23  fraud to go on when a borrower borrows millions of dollars and

24  then engages in this kind of activity and deception, secreting

25  assets, transferring assets to trusts and so on.  We don't --

*Martin Sandel - Cross/Franco*

1    it's just immoral, it's wrong.

2    **Q.**   So you're going to do more litigation, is that what you're

3    telling us?

4    **A.**   We're going to collect this debt, period.

5    **Q.**   Through what?

6    **A.**   Through whatever legal means are available to us.

7    **Q.**   That's the way you do it, isn't it?

8            **MS. BRADY:**  Objection, Your Honor.

9            **THE WITNESS:**  When there is fraud like this --

10           **MS. BRADY:**  Objection, Your Honor.  There's a Motion

11   in Limine that's been granted.

12           **THE COURT:**  I mean --

13           **MR. FRANCO:**  He opened the door.  He opened the door,

14   I didn't.

15           **THE COURT:**  Well, how far do you intend to take this?

16           **MR. FRANCO:**  Not very much farther.  I think he stated

17   what I needed him to state.  I just need him to answer that last

18   question.  "That's the way you do it, isn't it?"  That was my

19   question.

20           **THE COURT:**  Overruled.

21           **THE WITNESS:**  We "do it," counsel, on a case-by-case

22   basis.  And when we have this kind of fraud, we evaluate it very

23   thoroughly.

24           Many cases, most cases, counsel, I'm able to settle.

25   When people come in and say, I don't have the money, I say,

1    prove it to me, give me your tax returns with all the schedules,

2    give me everything, and we are able to resolve most cases.

3         But if "do it" means go through the courts because we

4    have fraud and deception, then that's what it will mean.

5    **BY MR. FRANCO:**

6    **Q.**   No matter what the cost?

7    **A.**   There will be a cost --

8         **MS. BRADY:**   Objection.

9         **THE COURT:**   Sustained.  Move on, Mr. Franco.

10        **MR. FRANCO:**   Thank you, Your Honor.

11   **BY MR. FRANCO:**

12   **Q.**   Mr. Sandel, in your earlier testimony -- strike that.

13        You understood that at one point in time it was your

14   understanding GulfSouth could do this assignment without the

15   consent of the participating banks, is that -- was that your

16   understanding?

17   **A.**   Are you referring to the comment I made a few minutes ago?

18   **Q.**   No, sir.  It's earlier in your testimony with counsel for

19   Plaintiff.

20   **A.**   What I was referring to is an email from Rick Petermann who

21   said that they -- that there was a period of lack of

22   communication.  I think it was a December 2011 communication

23   from Rick Petermann wherein he said, sorry we haven't been back

24   to you, there's been a period of blackout or lack of

25   communication because of the situation between CPB and the

1    acquiring bank, but I've advised my client that we don't need

2    their consent to do this.

3    **Q.**   Right.  My question was -- that was a long answer to a

4    short question.  My question was:  Didn't you understand along

5    the way that GulfSouth could do this assignment without the

6    consent of the other participating banks?  Was that your

7    understanding?

8    **A.**   I don't -- I don't know if I -- if I had that

9    understanding.

10   **Q.**   Well, did it have the consent of CPB to do this assignment?

11   **A.**   Well, they didn't -- they didn't have our consent to do --

12   to do the -- the drawing of lots --

13   **Q.**   That wasn't my question, sir.

14   **A.**   Well, so I suppose -- could they act on their own?  They

15   already determined to do that.  Was it proper?  That's what

16   courts are for.

17   **Q.**   Sir, my question is:  They didn't have the consent of CPB?

18   **A.**   I don't know.  I don't know, because they didn't

19   communicate with me.

20   **Q.**   Now, Mr. Campbell told you in an email, Plaintiff's Exhibit

21   56, that he had signed it and forwarded this partial assignment.

22   Do you recall the email I showed you?

23   **A.**   Yes, counsel, he did say that in an email.

24   **Q.**   That was dated January 17, correct?

25   **A.**   I'll take your word for it.

1   **Q.**   Thank you.  Now, you didn't receive it for the rest of

2   January of 2012, did you?

3   **A.**   I didn't, no.

4   **Q.**   You didn't receive it in February of 2012?

5   **A.**   No.

6   **Q.**   Or March of 2012?

7   **A.**   No.

8   **Q.**   What evidence do you know of of any involvement by HCB on

9   Mr. Rupert Phillips on this pro rata assignment issue in January

10  of 2012, February of 2012, or March of 2012 when you didn't get

11  this pro rata assignment back?

12  **A.**   I don't -- I didn't know anything that was going on with

13  HCB.  I've already testified to that.  They never communicated

14  with me, nor did GulfSouth say, hey, we're thinking of selling

15  this to HCB, do you want to participate in this decision.

16          **MR. FRANCO:**  That's all the questions I have, sir.

17  Thank you very much.

18          Tender the witness, Your Honor.

19          **THE COURT:**  Thank you.  Can you do what, I'm sorry?

20          **MR. FRANCO:**  Ma'am?

21          **THE COURT:**  What did you just say?  I'm sorry.

22          **MR. FRANCO:**  I said I tender the witness.

23          **THE COURT:**  Oh, okay.  Thank you, Mr. Franco.

24          Ms. Brady, redirect?

25          **MS. BRADY:**  We have nothing, Your Honor.

1          **THE COURT:**  Sir, you may step down.

2          **MS. BRADY:**  I want to confirm that Mr. Sandel is done

3    with his testimony per the agreement we reached that he'd be

4    taken in full.

5          **THE COURT:**  Mr. Franco?

6          **MR. FRANCO:**  May I ask again when is Mr. Sandel due to

7    have to leave?

8          **MS. BRADY:**  I believe it's tomorrow.

9          **THE WITNESS:**  I'm going to India tomorrow.

10         **MR. FRANCO:**  The reason I'm hesitating, Your Honor, is

11   only because Mr. Petermann is going to testify, and I don't know

12   if there's going to be any further need for Mr. Sandel because

13   of Mr. Petermann's testimony.

14         **THE COURT:**  Mr. Petermann is going to testify --

15         **MR. FRANCO:**  Live.

16         **THE COURT:**  -- in your case?

17         **MS. BRADY:**  We're calling him tomorrow morning.  But

18   we discussed this issue at least three weeks ago and it was

19   agreed that Mr. Sandel would be taken in his entirety.

20         **THE COURT:**  If that's the case, Mr. Franco --

21         **MR. FRANCO:**  Whoa, whoa, whoa.  We have an agreement

22   to do what?

23         **MS. BRADY:**  We advised in a conference call maybe a

24   month ago of Mr. Sandel leaving the country, and it was

25   discussed that his -- we suggested actually taking every witness

1    in full for the ease of the Court, and Mr. Franco had an

2    objection with that procedure.

3         We discussed Mr. Sandel's travel needs, and it was

4    agreed that Mr. Sandel could be taken in full, and the rest of

5    the witnesses would be taken and called during their respective

6    cases.

7         **THE COURT:**  I think that's what was represented to me

8    yesterday at the beginning of trial.

9         **MR. FRANCO:**  That we would take Mr. Sandel in full?  I

10   said we would try to accommodate Mr. Sandel.  I didn't know they

11   were going to wait until this point in time to call Mr. Sandel,

12   and I didn't know what he was going to testify about this oral

13   conversations with Mr. Petermann.

14        So I didn't believe that I was saying that we would

15   absolutely release him once we had our chance to question him.

16   Now, I want to accommodate Mr. Sandel, so that's not a problem.

17   The problem is --

18        **THE COURT:**  If Mr. Sandel is not under subpoena then

19   I'm not keeping him here.

20        **MR. FRANCO:**  Well, if that's the Court's order, then

21   that's the Court's order.

22        **THE COURT:**  Well, I mean, based on what I'm hearing,

23   that's definitely my order.  But, you know, if you all -- it's

24   your case, you know, these are your witnesses.  And if -- I'm

25   not going to require any witness to stay here if they're not

1    under subpoena.

2          **MR. FRANCO:** I hear you. I didn't know when they were

3    calling Mr. Sandel. I didn't know they were going to wait until

4    this point in time.

5          **THE COURT:** Well, that's between you and Ms. Brady.

6          **MR. FRANCO:** There was no such discussion about that,

7    when they were going to call him. All we discussed is I would

8    do my best to try to accommodate him, period.

9          **THE COURT:** But I'm saying if you -- if you had those

10   concerns, you should have subpoenaed him.

11         **MR. FRANCO:** I didn't subpoena them because they said

12   they voluntarily made him available.

13         **THE COURT:** And then you said you'd try to accommodate

14   his schedule. So if there was any risk of what you now may be

15   afraid is occurring, then you should have subpoenaed him. But

16   I'm not going to get in the middle of that. If he's not

17   subpoenaed, I'm not going to order him to stay here other than

18   -- I mean --

19         **MR. FRANCO:** Your Honor, obviously, can issue any

20   order that Your Honor thinks is in order, but I just want the

21   Court to understand the agreement was I didn't have to subpoena

22   him because they were going to voluntarily produce him here.

23   That was the agreement with Mr. Crossland. That came first.

24   That came first, months ago.

25         Then I was approached with Mr. Sandel needs to get out

1  of town on a trial that we had scheduled, and we knew he was

2  going to be a principal witness a long time ago.  I said I would

3  try to accommodate him to the best of my knowledge.

4          In fact, when they said we would do every witness one

5  at a time and release them, I said I can't commit to that.  So I

6  want the Court to understand what the discussions were.

7          **THE COURT:**  I think I do.  But also understand, I know

8  you appear to -- you've not been in front of me before, but you

9  appear to me to be a very experienced trial attorney.  Trials

10 are fluid and --

11         **MR. FRANCO:**  Well, they know that, too, that's the

12 point.  Why did they wait until now to call Mr. Sandel, you

13 know?  Why did they wait until now when the man has got to get

14 out of town tomorrow?  And they called him today and then gets

15 on the stand with talks about verbal discussions with Mr.

16 Petermann that may or may not come out in Mr. Petermann's

17 testimony the same way or maybe something else I have to ask

18 him.  I understand the Court's ruling.

19         **THE COURT:**  I'm not going to keep him here, nor will I

20 keep any witness here, not just Mr. Sandel, but I won't keep any

21 of your witnesses here if they haven't been subpoenaed and

22 there's some disagreement between the attorneys.

23         **MR. FRANCO:**  I understand.  I have an email saying I

24 didn't have to subpoena him from counsel.  If they don't like

25 that agreement and they want to renege on it, that's up to them.

1          **THE COURT:**  Mr. Crossland?

2          **MR. CROSSLAND:**  Judge, your order is correct, and I'm

3    not going to argue with it.  But I'm also not going to listen to

4    any accusation that I have not complied with an agreement.

5          There was an agreement, and they've known for at least

6    a month that Mr. Sandel was going to India tomorrow.  That was

7    in writing.  That was the agreement.

8          And any accusation as to myself, Ms. Brady, or my firm

9    that we are not complying with an agreement that was agreed upon

10   is completely improper because it's not true.  And other than

11   that, that's all that needs to be said about it.

12         **MR. FRANCO:**  But for that agreement, I would have

13   subpoenaed him.

14         **THE COURT:**  Well, look, we're only in the second day

15   of trial.  He was called the second day of trial.  I mean, it's

16   not like they waited until the very last witness in their case

17   to call him.

18         **MR. FRANCO:**  I understand.

19         **THE COURT:**  I mean -- and if you knew he was -- if you

20   knew the date that he was leaving for India, then I think you

21   chose not to subpoena him at your peril.  I mean, I just --

22   that's --

23         **MR. FRANCO:**  My mistake.

24         **THE COURT:**  Okay.

25         **MR. FRANCO:**  Thank you, Your Honor.

1      **THE WITNESS:**  Am I excused?

2      **THE COURT:**  You're excused unless there's something --

3  I mean, he's here now.  So if there's something you want to

4  cover with him knowing that he's --

5      **MR. FRANCO:**  No, Your Honor.  I have covered what I

6  need to cover with him at this point.  The only thing I was

7  concerned about is what Mr. Petermann would have to say.  But I

8  understand the Court's ruling, and I think the Court understands

9  the circumstances.  I understand the Court's ruling.

10      **THE COURT:**  Thank you.

11      **MR. FRANCO:**  I have no intention of deliberately

12  trying to interfere with his schedule.  I just didn't know I was

13  going to be squeezed like this so --

14      **THE COURT:**  All right, Mr. Sandel, you're excused.

15      **(Witness excused.)**

16      **THE COURT:**  Your next witness?

17      **MR. CROSSLAND:**  The Plaintiffs call Rupert Phillips.

18      **THE COURT:**  Just for your planning purposes, we'll

19  probably recess for the afternoon break around 3:20.

20      **RUPERT PHILLIPS, PLAINTIFF WITNESS, DULY SWORN**

21      **MADAM CLERK:**  Be seated.  Please state your full name

22  and spell your last name for the record.

23      **THE WITNESS:**  Rupert Phillips.

24      **THE COURT:**  And will you spell your last name, please,

25  Mr. Phillips.

1    **THE WITNESS:**  P-h-i-l-l-i-p-s.

2    **THE COURT:**  Thank you.

3    All right, Mr. Crossland, when you're ready.

4    **MR. CROSSLAND:**  May it please the Court.

5    **THE COURT:**  Yes, sir.

6                    **DIRECT EXAMINATION**

7    BY MR. CROSSLAND:

8    **Q.**  Mr. Phillips, how old are you?

9    **A.**  70.

10   **Q.**  Are you retired?

11   **A.**  Semi-retired.

12   **Q.**  What does that mean?

13   **A.**  That means I come to work when I want to and leave when I

14   want to.

15   **Q.**  You get paid a salary by anybody?

16   **A.**  Yes, I do.

17   **Q.**  By who?

18   **A.**  Big Boss Stores.

19   **Q.**  How long have you been getting paid a salary by Big Boss

20   Stores?

21   **A.**  Probably, oh, since June of 2010.

22   **Q.**  How much do you get paid?

23   **A.**  $750 a week.

24   **Q.**  Do you get paid any money from Phillips Properties, Inc.?

25   **A.**  Not now, no.

1    **Q.**   When did that stop?

2    **A.**   Prior to Olson, which was in early 2000, 2001.

3    **Q.**   So you haven't -- you haven't received any money from

4    Phillips Properties, Inc. on a biweekly basis since 2001?

5    **A.**   2001, 2002.  You know, it's been a long time.

6    **Q.**   Does your wife receive any money from Phillips Properties,

7    Inc.?

8              **MR. FRANCO:**  Objection, Your Honor.  Is this a

9    judgment-debtor examination?  This is irrelevant.

10             **THE COURT:**  Mr. Crossland?

11             **MR. CROSSLAND:**  Yes, Your Honor.  He's going to

12   testify that he's produced Fact Information Sheets to HCB, and

13   this testimony is going to establish that they are either stale

14   or incorrect.

15             **MR. FRANCO:**  That's judgment-debtor examination.

16             **THE COURT:**  What information are you talking about?

17             **MR. CROSSLAND:**  I'll switch to it and I'll get to

18   that, and we'll do it that way.

19             **THE COURT:**  That would be my preference, thank you.

20             **MR. CROSSLAND:**  Yes, Your Honor.

21   BY MR. CROSSLAND:

22   **Q.**   Now, Mr. Phillips, you're married to Sandra Phillips,

23   correct?

24   **A.**   Correct.

25   **Q.**   And you have three children?

1    **A.**    We do.

2    **Q.**    Ryan Phillips is one of your -- is your son?

3    **A.**    Yes.

4    **Q.**    And Reagan Phillips is your daughter?

5    **A.**    Son.

6    **Q.**    I'm sorry about that.  Reagan Phillips is your son?

7    **A.**    Yes.

8    **Q.**    And Bobbie Anne Roe is your daughter?

9    **A.**    Yes.

10   **Q.**    She's married to Steven Roe?

11   **A.**    Yes.

12   **Q.**    Now, you've provided Fact Information Sheets to HCB,

13   correct?

14   **A.**    Yes.

15              **MR. CROSSLAND:**  Mr. Dyer, put up Plaintiff's Exhibit 5

16   that's been marked for identification, please.

17              May I approach, Your Honor?

18              **THE COURT:**  Yes.

19   BY MR. CROSSLAND:

20   **Q.**   Mr. Phillips, I'm going to hand you what's been marked as

21   Plaintiff's Exhibit 5 for identification, and I'll ask that you

22   flip through that and take a look for me, please.  And thank you

23   for bringing glasses.  Sometimes we don't get that.

24   **A.**   Yes, it looks like this was provided to Trustmark Bank and

25   then one to Bank Atlantic.

1    **Q.**    Okay.  And you provided these Fact Information Sheets to

2    HCB, correct?

3    **A.**    You know, I would -- I would assume that they saw them.

4    **Q.**    Okay.

5    **A.**    Yeah.

6          **MR. CROSSLAND:**  We'd move Plaintiff's Exhibit 5 that's

7    been marked for identification into evidence as Plaintiff's

8    Exhibit 5.

9          **MR. FRANCO:**  Objection, relevancy, Your Honor.  What's

10   the relevancy for this other than judgment-debtor examinations?

11         **MR. CROSSLAND:**  The relevance is that HCB claims that

12   it's received financial information from Mr. Phillips, and Mr.

13   Phillips has just testified that he provided this information,

14   HCB claims and is going to put on the testimony of Mr. Gaudet

15   that they've acted and investigated his assets.

16         This testimony goes to establish that, in fact, HCB's

17   information is either incorrect or stale or incomplete or not

18   verified.

19         **MR. FRANCO:**  Still, what does that have to do with the

20   issue in this case about a pro rata assignment or the validity

21   of the assignment to GulfSouth?  It's not relevant to that.

22         **THE COURT:**  I find that it's relevant to the issue of

23   collection efforts.

24         **MR. FRANCO:**  Why is there a --

25         **THE COURT:**  That's my ruling.  You have the benefit of

1    my ruling.  It's relevant to collection efforts.  We've heard a

2    lot about collection efforts.

3           **MR. FRANCO:**  Yeah.  And if -- if they don't have an

4    expert on commercial reasonableness, then that issue is --

5           **THE COURT:**  Well, I haven't made that ruling yet, and

6    that's not before me.  I'm ruling that this is relevant right

7    now based on the evidence that's before the Court.

8           **MR. FRANCO:**  Thank you, Your Honor.

9           **THE COURT:**  All right, thank you.

10           All right, go ahead, Mr. Crossland, it's admitted.

11          **(Plaintiff's Exhibit 5 admitted into evidence.)**

12           **MR. FRANCO:**  Your Honor, may I have a continuing

13    objection to that, collection efforts?

14           **THE COURT:**  You know, I think, Mr. Franco, I'd prefer

15    on this issue that you object to whatever exhibit --

16           **MR. FRANCO:**  That's fine.

17           **THE COURT:**  -- that you believe is subject to your

18    objection.

19           **MR. FRANCO:**  Okay.

20           **MR. CROSSLAND:**  Judge, I should probably state if

21    we're not -- no, that's all right, that's all right.

22           Mr. Dyer, if you'd go to page 7 of Exhibit 5, please.

23    **BY MR. CROSSLAND:**

24    **Q.**  Now, Mr. Phillips, this Fact Information Sheet was

25    completed by you with regard to the Bank Atlantic judgment,

1    correct?

2    **A.**   The first one here is --

3    **Q.**   I'm sorry.  On the bottom left-hand corner there should be

4    a number 7.

5    **A.**   Yeah.  I've got to see what date that was.  Is that '09?

6    **Q.**   It's actually on your screen.  Maybe that might be easier.

7    **A.**   I've got it right here.  Thank you.

8    **Q.**   Okay.  And then on the back page, the last page of Exhibit

9    5, is your signature for that Fact Information Sheet, correct?

10   **A.**   Correct.

11   **Q.**   And it's dated -- it's notarized -- this one was notarized

12   July 22nd, 2009, correct?

13   **A.**   Correct.

14   **Q.**   And at that time, according to this Fact Information Sheet,

15   you advised that your employer was Phillips Properties, Inc.,

16   correct?

17   **A.**   In '09.

18   **Q.**   In '09, right.  And your rate of pay was $1,500 every two

19   weeks, correct?

20   **A.**   Yes.

21   **Q.**   Now, you just testified to this Court that you haven't

22   received biweekly payments from Phillips Property since 2001 or

23   2002; isn't that true?

24   **A.**   Well, you know what, it's a long time, and it's pretty hard

25   to remember all of this stuff.  I know -- I think before Big

1    Boss I was being paid by Olson & Associates.  But it -- I'd just

2    have to go back and look at payroll records to determine this at

3    this point in time.

4    **Q.**   Okay.  But regardless, you don't receive biweekly payments

5    from Phillips Property, Inc., correct?

6    **A.**   No, no, absolutely not.

7            **MR. CROSSLAND:**  If you'd go to, Mr. Dyer, the next

8    page, which is page 8 of Exhibit 5.

9    **BY MR. CROSSLAND:**

10   **Q.**   If you'd go to the next page, Mr. Phillips, do you see in

11   the spouse related portion, you see what I'm talking about?

12   **A.**   The Bank Atlantic or Trustmark?

13   **Q.**   Yes, sir, same Fact Information Sheet you're on.

14   **A.**   Okay.

15   **Q.**   And if you go to the second page of that.  We just looked

16   at the first page which talked about Phillips Properties,

17   correct?

18   **A.**   Right.

19   **Q.**   And we're going to go to page 2 now, the spouse related

20   portion, the middle section there where -- Mr. Dyer has got it

21   blown up on your screen if it's easier.

22   **A.**   Okay, I see, spouse related, yes.

23   **Q.**   And it says that your wife is employed by Phillips

24   Properties, Inc., correct?

25   **A.**   Yes.

1    **Q.**    Okay.  And it says that as of 2009 she was getting biweekly

2    payments of $2,000 every two weeks, correct?

3    **A.**    Yes.

4    **Q.**    And she doesn't work for Phillips Properties anymore,

5    correct?

6    **A.**    No.

7    **Q.**    She's not getting paid $2,000 per week by them?

8    **A.**    No.  By this point in time Phillips Properties was

9    insolvent.

10   **Q.**    At what point in time was Phillips Properties insolvent?

11   **A.**    It -- probably from about along in there until -- it's

12   insolvent today.

13   **Q.**    But we agree that the information we've looked at in this

14   Fact Information Sheet is not correct anymore currently?

15   **A.**    It's been -- that's six years ago, it surely would be --

16   **Q.**    It's old?

17   **A.**    It's old.

18   **Q.**    It's outdated?

19   **A.**    Yeah, certainly.

20   **Q.**    I mean, no one should rely on this to determine your

21   financial condition today, should we?

22   **A.**    No.  They probably should rely on one that I did last

23   month.

24   **Q.**    Mr. Phillips, go to the first page of Exhibit 5.  This is

25   another Fact Information Sheet, correct?  On the first page,

```
 1   sir -- I don't know if you have the first page --

 2   A.   The very first page, Trustmark?

 3   Q.   Yes, sir.

 4   A.   Okay.

 5   Q.   You see that one?

 6   A.   Yes.

 7   Q.   Now, if you go to the third page, this one is not signed by

 8   you, is it?

 9   A.   No.

10   Q.   It's not notarized, is it?

11   A.   Nope.

12   Q.   In fact, there's no date on it either, is there?

13   A.   Nope.

14   Q.   Are you familiar with an entity named HCB Financial Corp.,

15   Mr. Phillips?

16   A.   Yes.

17   Q.   And I'm going to refer to them as HCB, if that's all right.

18   A.   Okay.

19        MR. CROSSLAND:   May I approach, Your Honor, and take

20   that back?

21        THE COURT:   Yes.

22   BY MR. CROSSLAND:

23   Q.   You're the current chairman of the board for HCB; is that

24   correct?

25   A.   Correct.
```

1    **Q.**    You're a consultant?

2    **A.**    Yes.

3    **Q.**    You're the sole director of HCB, correct?

4    **A.**    Correct.

5            **MR. CROSSLAND:**  Mr. Dyer, pull up Plaintiff's Exhibit

6    18 that's in evidence, please.

7    **BY MR. CROSSLAND:**

8    **Q.**    Do you recognize Plaintiff's Exhibit 18 as a resolution of

9    the board of directors for HCB Financial Corp., correct?

10   **A.**    Yes.

11           **MR. CROSSLAND:**  Go to page 2, Mr. Dyer.

12   **BY MR. CROSSLAND:**

13   **Q.**    You signed this resolution, didn't you?

14   **A.**    Yes.

15   **Q.**    On March 22nd, 2011?

16   **A.**    Yes.

17   **Q.**    As the sole director of HCB, correct?

18   **A.**    Yes.

19           **MR. CROSSLAND:**  Go back to page 1, Mr. Dyer.

20   **BY MR. CROSSLAND:**

21   **Q.**    Prior to this resolution, you were the president of HCB?

22   **A.**    Yes.

23   **Q.**    And prior to this resolution, you were the secretary of

24   HCB?

25   **A.**    Yes, probably.

1    **Q.**   Well, it says that you -- you see the first whereas clause

2    on that first page that says whereas --

3    **A.**   Yeah, I see it, president, secretary, and treasurer of the

4    corporation.

5    **Q.**   So as of March 22nd, 2011, according to this resolution,

6    you resigned as the president, secretary, and treasurer of the

7    company, correct?

8    **A.**   Right.

9    **Q.**   And after that point, you were no longer the president of

10   HCB, correct?

11   **A.**   Correct.

12   **Q.**   You had been the president of HCB for how long at that

13   point?

14   **A.**   I really don't recall how long that had been.

15        **MR. CROSSLAND:**  Your Honor, may I approach?

16        **THE COURT:**  Yes.

17   BY MR. CROSSLAND:

18   **Q.**   I'm referring you to what's been marked as Plaintiff's

19   Exhibit 112 for identification.  I'd just ask you to take a look

20   at it.  I'm not going to enter it in at this point.

21        **MR. CROSSLAND:**  Your Honor, do you mind if I stay

22   right here?

23        **THE COURT:**  No, that will be fine.

24        **MR. CROSSLAND:**  All right, thank you.

25        **THE WITNESS:**  Yeah, I'm familiar with this.

1   BY MR. CROSSLAND:

2   **Q.**   Okay.  If you go to -- go to the second page there for me.

3   Does that help refresh your recollection as to when you became

4   the president, treasurer, and sole director of HCB?

5   **A.**   Yes, it's right after the group that was trying to put the

6   bank in Crestview was unable to do it, and so I'm the one that

7   had the relationship with a bank in Birmingham.  They owed the

8   money for the bank building.  They got ahead of themselves, and

9   they built the bank building before they had the charter.  So

10  they had a huge bank building sitting in Crestview, Florida, and

11  so it fell on me, is what happened, the bank building did.

12  **Q.**   Okay.  I'll take that back from you.  But you agree that it

13  was April 4th, 2007, when you became the president, treasurer,

14  secretary of record?

15  **A.**   Yes, that's when all that debacle occurred, yes.

16  **Q.**   Now, you held yourself out as the president of HCB after

17  March 22nd, 2011, didn't you?

18  **A.**   I held myself out as president of HCB?

19  **Q.**   Yes, sir.

20  **A.**   I don't understand.

21  **Q.**   Okay.  You actually signed a document that was filed with

22  the State of Florida that said you were the president of HCB in

23  April of 2011, didn't you?

24  **A.**   It would have been a mistake if I did.

25  **Q.**   Let's look at it.

**A.**    Okay.

         **MR. CROSSLAND:**  Mr. Dyer, Plaintiff's Exhibit 129,

please.

**BY MR. CROSSLAND:**

**Q.**    Mr. Phillips, I'm going to ask you to look at the screen

next to you.  These are the public filings of a company named

Eagles Landing Townhomes, LLC.  You see that?

**A.**    Yes.

**Q.**    HCB is the managing member of Eagles Landing Townhomes --

sorry, I butchered that name.  HCB is the managing member of

Eagles Landing Townhomes, LLC, isn't it?

**A.**    You're getting some things confused here.

**Q.**    All right.  Well, let's take a look.

**A.**    Can I explain what happened here?

**Q.**    No, sir.  I'm going to ask you to look at page 1 on the

bottom left -- bottom left-hand corner.  I'm going to highlight

it for you.  Down here where I'm highlighting, you see the name

HCB Financial Corp., don't you?

**A.**    I do.

**Q.**    And there it says, "Title, MGRM."  You know what that

stands for, don't you?

**A.**    I'm trying to -- I don't see what you're talking about.

**Q.**    You see the highlighted section, sir?

**A.**    I do.

**Q.**    You see "Title"?

1    **A.**    Title, yeah.

2    **Q.**    And it says "MGRM."  You know what that stands for?

3    **A.**    No.

4    **Q.**    It stands for managing member.

5              **MR. CROSSLAND:**  Now, Mr. Dyer --

6              **MR. FRANCO:**  Objection, Your Honor, that's not a

7    question.

8              **THE COURT:**  What's not a question?

9              **MR. FRANCO:**  His statement as to what it stands for is

10   not a question.

11             **THE COURT:**  Sustained.

12             **MR. CROSSLAND:**  Mr. Dyer, if you'll go to page 6 of

13   this exhibit, please.

14   **BY MR. CROSSLAND:**

15   **Q.**    You see down at the bottom, sir, of page 6, that's your

16   signature, correct?

17   **A.**    It is.

18   **Q.**    And that date of your signature is April 8th, 2011,

19   correct?

20   **A.**    It is.

21   **Q.**    And right below your name it says, "Signature of a member

22   or authorized representative of a member," correct?

23   **A.**    Correct.

24   **Q.**    And it says, "Rupert Phillips."  That's you, correct?

25   **A.**    Correct.

1   **Q.**   It says, "President"?

2   **A.**   Correct.

3   **Q.**   "HCB Financial Corp."?

4   **A.**   Correct.

5   **Q.**   And this signature that was filed with the State of Florida

6   is two weeks after the resolution where you resigned as the

7   president of HCB, correct?

8   **A.**   This piece of property -- this piece of paper was probably

9   handed to me by legal and said sign it, and I signed it.

10  **Q.**   So even your legal department in 2011 after you resigned

11  believed you were the president; is that your testimony is

12  today?

13  **A.**   Not necessarily.  It was a mistake.

14  **Q.**   Well, sir, I don't understand.

15  **A.**   We make mistakes.  I'm sorry.

16  **Q.**   The question I asked you, Mr. Phillips:  Isn't it true that

17  your signature on a document that was filed with the State of

18  Florida weeks after you resigned as president of HCB includes

19  your signature as the president of HCB?  Is that or is that not

20  true?

21  **A.**   It's true but it was a mistake.

22      **MR. CROSSLAND:**  Mr. Dyer, Plaintiff's Exhibit 30,

23  please.

24  **BY MR. CROSSLAND:**

25  **Q.**   Mr. Phillips, Plaintiff's Exhibit 30 is a deficiency

1    judgment that was entered in favor of GulfSouth Private Bank.

2    You see that?

3    **A.**    I do.

4    **Q.**    And the date of that --

5             **MR. CROSSLAND:**  Mr. Dyer, if you go to the next page.

6    **BY MR. CROSSLAND:**

7    **Q.**    -- was March 29th, 2011; is that correct?

8    **A.**    Looks so, yes.

9    **Q.**    And the judgment-debtors on this includes yourself and your

10   wife, correct?

11   **A.**    Yes.

12   **Q.**    This deficiency judgment has been acquired by HCB Financial

13   Corp., correct?

14   **A.**    HCB acquired a 44.9 percent and then acquired another 10 or

15   11 percent.

16   **Q.**    And it got those interests from First NBC Bank?

17   **A.**    The first one, yes.

18   **Q.**    And then it got the next 9 percent interest from GulfSouth?

19   **A.**    Yes.

20   **Q.**    And then it got the next 1.2 percent interest from the Bank

21   of Vernon?

22   **A.**    Yes.

23   **Q.**    The negotiations with GulfSouth for GulfSouth's 8.99

24   percent of the deficiency judgment were handled by you, sir,

25   correct?

1    **A.**    Correct.

2    **Q.**    And in terms of pursuing collections against the

3    judgment-debtors, you believe that HCB should hire an

4    independent person to determine whether the guarantees may be

5    collectible, don't you?

6    **A.**    Not necessarily.  I think HCB is capable of handling it.

7    It handled dozens of others.

8    **Q.**    So your testimony today is that HCB does not need to hire a

9    third-party independent consultant to determine the

10   collectability of this judgment; that's your testimony today?

11   **A.**    You know, I'm willing to negotiate, but I think we could

12   look at it either way.  HCB is a competent company that deals

13   with judgment creditors on a regular basis and is certainly

14   capable of negotiating judgments.

15   **Q.**    So you believe that HCB is capable of negotiating a

16   resolution of this deficiency judgment with you as its chairman

17   of the board?

18   **A.**    I think they're competent to negotiate more -- I guess --

19   and I -- I haven't really handled most of these.  They've really

20   been handled by our attorneys.  Because when HCB gets a note and

21   a judgment, they hand it off to attorneys to handle, and then

22   the attorneys come back after they talk, if they foreclose or

23   after they talk with the person, and then they come back with a

24   judgment.

25        HCB's business is to make money off that judgment; it's not

1    necessarily to collect 100 percent of a judgment.  We buy them

2    for a price, we want to make money off of it, and that's --

3    that's our business.

4    **Q.**   Isn't it true, sir, that you suggest that HCB hire an

5    independent person to look at the judgment and make a judgment

6    if they -- to determine what the guarantees are worth?  Isn't

7    that true?

8    **A.**   If I think that's true?  I think HCB could handle this

9    business.  They're a competent company.  They've handled dozens

10   of others, and they could handle this one.

11   **Q.**   Mr. Phillips --

12   **A.**   Would they handle it the way SEPH wants it handled?  No.

13   **Q.**   Do you remember taking a deposition in this case?

14   **A.**   I do.

15   **Q.**   Do you remember that deposition was taken November 5th,

16   2013, correct?

17   **A.**   Correct.

18   **Q.**   And you were there?

19   **A.**   I was there.

20   **Q.**   Mr. Franco was there?

21   **A.**   He was.

22   **Q.**   And my law partner Dennis Derkin was there?

23   **A.**   Dennis was there.

24   **Q.**   And he questioned you that day, correct?

25   **A.**   He did.

1    **Q.**    Under oath?

2    **A.**    He did.

3    **Q.**    And you promised to tell the truth that day?

4    **A.**    I did.

5    **Q.**    And everything you said was what you believed at that time,

6    correct?

7    **A.**    At that time I -- I've gone back and reviewed it and have

8    looked at it, and I actually see some mistakes in it.

9    **Q.**    Okay.  Let me ask you about this then.  And I'm going to

10   look at page 25 of your deposition, line 2, the question was:

11        **QUESTION:**  What factors would prompt that company to do

12   that from your perspective as an advisor of the company?

13        **ANSWER:**  I'm sure -- I'm sure I would -- under the

14   circumstances would suggest they go and hire an independent

15   person to look at it and make a judgment if -- what the -- what

16   the guarantees are worth."

17        That's what you said, right?

18   **A.**    That's what I said at the time, yes.

19        **MR. CROSSLAND:**  Your Honor, this might be a good place

20   to stop.

21        **THE COURT:**  All right.  It's time for our afternoon

22   recess, Mr. Phillips.  I told the parties earlier before you

23   came in that we were going to be taking a recess about now.

24        So we'll be in recess until 3:35.  Please don't

25   discuss your testimony, Mr. Phillips, with anyone including

```
 1    counsel for the Defense.
 2              All right.  So anything before we recess?
 3              MR. CROSSLAND:  I don't think so, Your Honor.
 4              THE COURT:  We'll be in recess until 3:35.
 5              (Recess taken 3:17 to 3:36 p.m.)
 6              THE COURT:  Mr. Phillips, you're still under oath.
 7              THE WITNESS:  Yes, ma'am.
 8              THE COURT:  And Mr. Crossland, for your planning
 9    purposes -- or for both you and Mr. Franco's, I need to stop
10    today about 5:20, unless -- I need to be somewhere at six, I
11    have an appointment at six.  So, you know, but if, you know, if
12    you're in the middle -- I mean if you're nearing the end and
13    need to --
14              MR. FRANCO:  We were just talking about what we were
15    potentially going to do with witnesses.
16              MR. CROSSLAND:  We'll make every effort to make that
17    happen.  The plan as we sit here right now is to finish with
18    Mr. Phillips and then allow Mr. Franco to do whatever he's going
19    to do, and then we're going to start the video deposition of
20    Mr. McLeod, and that can easily be stopped wherever.
21              I think that will probably work out just fine, and
22    maybe we're finishing with Mr. Phillips around 5:10, and then if
23    it's okay with the Court we could break there, or however the
24    Court wants.  We'll certainly make every effort to accommodate.
25              MR. FRANCO:  I haven't decided if I'm going to go into
```

1     my direct after my cross with Mr. Phillips.  It depends on how

2     this goes.

3             **THE COURT:**  And if you do, then I suspect that will

4     take the rest of the afternoon.

5             **MR. FRANCO:**  Correct.

6             **THE COURT:**  All right.  Well, go ahead, Mr. Crossland.

7             Mr. Phillips, if I didn't say this just now, you're

8     still under oath.

9             **THE WITNESS:**  Yes, Your Honor.

10            **THE COURT:**  Thank you.

11            **MR. CROSSLAND:**  May it please the Court?

12            **THE COURT:**  Yes, thank you.

13    **BY MR. CROSSLAND:**

14    **Q.**   Mr. Phillips, how many millions of dollars in judgments do

15    you have against you, sir?

16    **A.**   Today?  It's probably -- I don't know exactly, $80 million,

17    $85 million.

18    **Q.**   $49 million of that is a judgment that Bank Atlantic

19    initially obtained against you, right?

20    **A.**   Exactly, yes.

21    **Q.**   $9 million of that is a Fifth Third judgment that was

22    obtained against you?

23    **A.**   Yes.

24    **Q.**   And of course, we've got a 10-and-a-half million on this

25    deficiency judgment that GulfSouth initially obtained against

1   you, correct?

2   A.   Yes.

3   Q.   Now, HCB has acquired each of those judgments that I just

4   listed, correct?

5   A.   Yes.

6   Q.   HCB obtained the Bank Atlantic judgment in January of 2011,

7   correct?

8   A.   Correct.

9           **THE COURT:**  Could I ask you to clarify, Mr. Crossland,

10  please.  When you said HCB has acquired each of those judgments,

11  are you referring to the ones that you just specifically asked

12  Mr. Phillips about or the entirety of the 80 to 85 million?

13          **MR. CROSSLAND:**  Correct, good clarification, Your

14  Honor.  Just the three that I just listed.

15          **THE COURT:**  Thank you.

16  BY MR. CROSSLAND:

17  Q.   The $49 million Bank Atlantic judgment, HCB acquired that

18  judgment against you in January of 2011, correct?

19  A.   It acquired -- it acquired the notes, and it acquired the

20  LLC interests, and it acquired the judgments.

21  Q.   Right.  And HCB has never collected a penny from you on

22  that $49 million judgment, correct?

23  A.   No.

24  Q.   So my statement is correct?

25  A.   They never collected a penny on the $49 million judgment,

1   no.

2   **Q.**   Okay.  And after acquiring the Bank Atlantic judgment that

3   was $49 million, HCB then acquired the Fifth Third Bank

4   judgment, correct?

5   **A.**   Yes, they did, for $125,000.

6   **Q.**   So they spent $125,000 to get that?

7   **A.**   Yes, for $9 million, yes, sir.

8   **Q.**   Even though it hadn't collected a penny from you on the $49

9   million judgment, correct?

10  **A.**   Yeah, that one was $250,000.

11  **Q.**   Right, but the judgment on that was $49 million?

12  **A.**   Right, and HCB paid $250,000 for that and the LLC interest

13  and the notes.

14  **Q.**   Right.  And it hadn't collected anything on the $49

15  million?

16  **A.**   It has foreclosed on the LLC interest and is operating

17  townhomes out of that project right now.

18  **Q.**   Right.  So maybe I didn't ask a good question because

19  that's not quite what I asked.

20       HCB has not collected a penny from you under the

21  $49 million monetary judgment that was initially held by Bank

22  Atlantic, correct?

23  **A.**   Not to this point, no, sir.

24  **Q.**   And then after that, HCB spent $125,000 to pick up another

25  judgment against you that was initially held by Fifth Third,

1  correct?

2  **A.**   Correct.

3  **Q.**   And then HCB has outlaid $212,000 to pick up its 55.1

4  percent interest in this deficiency judgment, the one that's

5  $10.5 million that was obtained by GulfSouth initially, correct?

6  **A.**   Let's see, 212 -- yeah, that's what the total is.

7  **Q.**   Okay.  And your testimony is that HCB's business, its goal

8  is to make money, correct?

9  **A.**   Correct.

10        **MR. CROSSLAND:**  Mr. Dyer, if you'll pull up what's

11  been marked for identification as Plaintiff's Exhibit 11.

12  **BY MR. CROSSLAND:**

13  **Q.**   Mr. Phillips, on your screen, please, do you recognize

14  what's been marked as Plaintiff's Exhibit 11 as a written

15  consent in lieu of organizational meetings of the incorporator,

16  sole director and shareholders of Phillips Capital Partners,

17  Inc.?

18  **A.**   Yes.

19        **MR. CROSSLAND:**  And if you go to page 3 of that,

20  Mr. Dyer, please.

21  **BY MR. CROSSLAND:**

22  **Q.**   This written consent in lieu of organizational meetings was

23  signed by you as the sole director --

24        **MR. FRANCO:**  Your Honor, excuse me.  We had entered an

25  objection to this document --

1          **THE COURT:**  Oh, I'm sorry.

2          **MR. FRANCO:**  -- at our last -- on the relevancy of the

3   document.  And I understand I made a prior -- when we first

4   started this trial, which seems like a week ago, I had made an

5   objection to going any further than the fact that Phillips

6   Capital Partners was a shareholder of HCB, and now this is an

7   attempt to go further than that.

8          I realize what the Court ruled already, but I want to

9   make sure I make my objection to the relevancy.  There's no

10  piercing argument in this case, there's no pleading of piercing,

11  the shareholder hasn't been joined, and this is just going

12  further, so I object on that basis.

13         **THE COURT:**  All right.  Mr. Crossland, Plaintiff's 11?

14         **MR. CROSSLAND:**  Yes, Your Honor.  HCB's position that

15  there's no relevance completely ignores the case law that this

16  Court cited in the summary judgment order, specifically *Young*,

17  that deals with the conflict of interest in this repeated

18  argument that we have to pierce the corporate veil to satisfy

19  the public policy arguments in case law that was cited by this

20  Court in the summary judgment order is simply wrong.

21         What the *Young* case said is that the public policy can

22  void such things under a principal-agent theory when there's a

23  conflict of interest.  And the fact that HCB is owned by

24  Phillips Capital Partners, which is owned by Mr. Phillips, his

25  family, through trusts, and that that interest was acquired

1      through what appears to be a fraudulent transfer based on the

2      information we received yesterday, this document is absolutely

3      relevant.

4                **MR. FRANCO:**  May I respond?

5                **THE COURT:**  Okay.

6                **MR. FRANCO:**  This argument of HCB, the conflict, HCB

7      is the agent.  Mr. Phillips is not the agent.  Mr. Phillips

8      actually is -- is a director and owes HCB -- is an agent of HCB.

9      Mr. Phillips is not an agent for the participating banks in this

10     case individually.  There is no conflict.

11               Counsel is ignoring the difference between HCB as an

12     entity and Rupert Phillips.  He's trying to ignore that, but he

13     hasn't done it by doing it through the appropriate legal basis.

14               **THE COURT:**  I think ultimately that's the decision

15     I'll have to make is if there is a conflict.  I'm going to allow

16     this in as relevant to that question.

17               **MR. FRANCO:**  Thank you, Your Honor.

18               **THE COURT:**  The objection will be overruled.

19     Plaintiff's 11 will be admitted.

20               **(Plaintiff's Exhibit 11 admitted into evidence.)**

21     BY MR. CROSSLAND:

22     **Q.**   Mr. Phillips, Plaintiff's Exhibit 11, you signed this

23     document as the sole director of Phillips Capital Partners,

24     Inc., correct?

25     **A.**   Yes.

1   **Q.**   You remain the sole director of Phillips Capital Partners,

2   Inc.?

3   **A.**   Yes.

4   **Q.**   And your interest in Phillips Capital is through your

5   trust, isn't it?

6   **A.**   Yes.

7   **Q.**   Phillips Capital -- I'm going to refer to Phillips Capital

8   Partners, Inc. as Phillips Capital.  Do you understand that I

9   mean Phillips Capital Partners, Inc.?

10  **A.**   If you say so.

11  **Q.**   Okay.  And you'll understand that?

12  **A.**   Yes.

13  **Q.**   Phillips Capital became the sole shareholder in HCB when

14  you transferred your individual shares in HCB to Phillips

15  Capital; isn't that right?

16  **A.**   It did.

17  **Q.**   You didn't receive any money from Phillips Capital for that

18  stock transfer, did you?

19  **A.**   There were no assets.

20  **Q.**   You didn't receive any assets from Phillips Capital

21  Partners for the transfer of that stock, correct?

22  **A.**   Mr. Crossland, there's a -- there's a story with everything

23  that has happened with over $200 million worth of debt that was

24  on my head, and this is -- there's more to it than just "is this

25  this" or "is this that."

1         Now, I can answer your question yes or no, but the judge is

2     not going to get the flavor of what was occurring at this point

3     in time.

4         And I don't know if you want that flavor, Judge.

5             THE COURT:  Well, the way it will work is

6     Mr. Crossland is going to ask you questions on direct

7     examination.

8             THE WITNESS:  Okay.

9             THE COURT:  And then Mr. Franco will be able to get up

10    and ask you questions in cross.

11            THE WITNESS:  Okay.

12            THE COURT:  And then later Mr. Franco may call you as

13    his witness and ask you questions on direct, and then he'll get

14    another opportunity to ask you questions on redirect.

15            So there will be a lot of opportunity for Mr. Franco

16    to try to clear up anything that's left unsaid.

17            THE WITNESS:  Okay.

18            THE COURT:  But in terms of your examination right now

19    by Mr. Crossland, just do your best to answer just specifically

20    and directly as you can his questions.

21            THE WITNESS:  I understand, Your Honor.  Thank you.

22    BY MR. CROSSLAND:

23    Q.  So you've already testified that there was no money

24    exchanged for the stock transfer from you to Phillips Capital.

25        The question I asked you was:  Isn't it true you did not

1   receive any assets from Phillips Capital Partners when you

2   assigned your shares in HCB to Phillips Capital Partners?

3   **A.**   That's true.

4   **Q.**   And there was no other consideration -- strike that.

5   **A.**   There was consideration.

6   **Q.**   There's no question pending, Mr. Phillips.

7   **A.**   Okay.

8   **Q.**   If you look at Plaintiff's Exhibit 11, the first page --

9           **MR. CROSSLAND:**   Mr. Dyer, if you'd pull that up for

10  us.

11  **BY MR. CROSSLAND:**

12  **Q.**   In the second paragraph it says, "Resolved that Rupert

13  Phillips is hereby elected the sole director of the

14  corporation."  You see that?

15  **A.**   Yes.

16  **Q.**   And it says "To serve or hold office until the first annual

17  meeting of the shareholders or until a successor has been dually

18  elected and qualified or until his early resignation or

19  removal."  You see that?

20  **A.**   Yes.

21  **Q.**   Paragraph three says, "Resolved that the following persons

22  are hereby elected to the offices of the corporation set forth

23  opposite their respective name," and down below that it has your

24  name, Rupert E. Phillips, as president, correct?

25  **A.**   Right.

1  **Q.**   And it has your wife, Sandra Phillips, as secretary,

2  correct?

3  **A.**   Correct.

4  **Q.**   And it has Ryan Phillips as the vice president?

5  **A.**   Right.

6  **Q.**   Bobbie Anne Phillips Roe as the vice president, assistant

7  secretary?

8  **A.**   Right.

9  **Q.**   And Reagan Eli Phillips as the vice president?

10  **A.**   That's correct.

11  **Q.**   Every one of those officers of Phillips Capital is part of

12  your family, correct?

13  **A.**   Correct.

14  **Q.**   All of those individuals still hold the same offices in

15  Phillips Capital?

16  **A.**   They do.

17  **Q.**   You're still the sole director?

18  **A.**   Absolutely.

19  **Q.**   Now, you've had contact with HCB's counsel regarding the

20  North Tip loan, haven't you?

21  **A.**   Yes.

22  **Q.**   That counsel includes Jason Osborn?

23  **A.**   Yes.

24  **Q.**   And Mr. Franco?

25  **A.**   Yes.

1  **Q.**   In fact, you attended a mediation as the corporate

2  representative of HCB in this case, didn't you?

3  **A.**   Early on I think Ms. Brady was there with Mr. Sandel, and

4  Mr. Cheatem was there with me, and we were there trying to

5  settle in good faith.

6  **Q.**   And you were the corporate representative of HCB at that

7  mediation, weren't you?

8  **A.**   I was representing HCB because I thought that I should be

9  there for that meeting with Mr. Sandel.  I think two principals

10  can generally solve things that lawyers can't solve, but he

11  didn't seem to want to.

12        **MR. CROSSLAND:**  I'll move to strike that last

13  statement as nonresponsive, Your Honor.

14        **THE COURT:**  It's nonresponsive, it will be struck.

15        **THE WITNESS:**  I apologize.

16  BY MR. CROSSLAND:

17  **Q.**   The answer to my question was, yes, you did attend the

18  mediation as the corporate representative?

19  **A.**   I did, yes, I did.

20  **Q.**   In fact, you talked to HCB's counsel the same day as

21  Mr. Campolo's deposition, didn't you?

22  **A.**   I talked to him several times.

23  **Q.**   And within 24 hours of Mr. Campolo's deposition you called

24  Tom Button at Park National Bank, didn't you?

25  **A.**   I tried to get him but --

*Rupert Phillips - Direct/Crossland*

1  **Q.**   You left him a voicemail?

2  **A.**   I left him a voicemail, yes.

3  **Q.**   You had never talked to Tom Button before?

4  **A.**   Well, I -- no, I haven't.

5  **Q.**   You didn't know who he was before that day, did you?

6  **A.**   Didn't know who Tom Button was?

7  **Q.**   Right.

8  **A.**   Well, I knew he was -- I had Googled up Park National Bank,

9  you know, an $8 billion company, and I had looked through who

10  their officers and who the people were in charge.  So, you know,

11  I'm not going to sit here and tell you I didn't know who Tom

12  Button was.

13      I had heard his name and I had actually read about a suit

14  in Louisiana that he was involved in.

15  **Q.**   You didn't know that he was the one who was in charge of

16  decisions regarding this matter?

17  **A.**   No, I didn't until --

18  **Q.**   And you learned that from somebody who attended the

19  deposition, right?

20  **A.**   That's right.

21  **Q.**   And you used that information to try and settle this case

22  with SE Property, didn't you?

23  **A.**   You darn right.  HCB's MO is to settle, without a doubt.

24  **Q.**   So your testimony --

25  **A.**   In any -- any case I advise them to settle.

1    **Q.**   You advised them to settle your case?

2    **A.**   Yeah, I advised them to settle my case.  They can't because

3    of what was going on right now.  We definitely want to settle

4    it.

5    **Q.**   Isn't it true, Mr. Phillips, that your workout strategy is

6    to buy up residual pieces of judgments and debts against

7    yourself?

8    **A.**   No.

9    **Q.**   Isn't it true you told Mr. Bill Lloyd that that's your

10   workout strategy?

11   **A.**   Who?

12   **Q.**   Bill Lloyd.

13   **A.**   No.

14   **Q.**   You know who Bill Lloyd is?

15   **A.**   I know who Bill Lloyd is.

16   **Q.**   He's at Smart Bank?

17   **A.**   Yeah.

18   **Q.**   You visited him recently, didn't you?

19   **A.**   I've visited him two or three times and he's visited me.

20   **Q.**   All within the last month, right?

21   **A.**   Yeah.

22   **Q.**   And your testimony today is that you did not tell Bill

23   Lloyd that your workout strategy is to buy out pieces of

24   judgments --

25   **A.**   I did not.

**Q.**   You never told him that?

**A.**   No.  Bill Lloyd told me a lot about Park National, but I didn't tell him that about HCB.

**Q.**   So your testimony, so we're clear, is that you never made such a statement to Bill Lloyd?

**A.**   No.  HCB -- nevermind.  I'm sorry.

        **THE COURT:**  You have to wait for a question.

        **THE WITNESS:**  I understand.  I'm sorry.

**BY MR. CROSSLAND:**

**Q.**   Do you recall a transaction where your son-in-law, Steven Roe, transferred 120,000 shares of GulfSouth stock to HCB, correct?

**A.**   I do.

**Q.**   That was in July of 2011, right?

**A.**   Absolutely.

**Q.**   And initially that GulfSouth stock had been held by the FDIC?

**A.**   It had.

**Q.**   It was -- it was collateral for another loan?

**A.**   It was collateral for a $6 million -- what's called a lower floater bond issue that Silverton Bank had.

**Q.**   And the FDIC short sold that stock in GulfSouth to Mr. Roe, right?

**A.**   Actually, the FDIC called me asking me to work with them because it was the last one they had on their books, and they

1    wanted to find some method to get it out of there.

2            **THE COURT:**  What type of bond issue did you just

3    say --

4            **THE WITNESS:**  It was called a lower floater bond

5    issue.  What it was is, there's a company in Montgomery called

6    Merchant Capital, and Merchant does -- what you can do is do a

7    bond issue, and the collateral for the bond issue is a letter of

8    credit from a bank.

9            And so the Silverton -- I know this is complicated.

10   Silverton Bank took bank stock as collateral, issued the letter

11   of credit to use as collateral to do the bond issue.

12           So we had to pay the bond holders back.  But when we

13   weren't able to do that, it went back to Silverton Bank.  And so

14   the FDIC was stuck with a letter of credit, and it was the last

15   one they had in their portfolio, and they wanted it gone, they

16   were very anxious.  Mr. Campbell at Clark, Partington, Hart

17   handled that with the FDIC.

18           **THE COURT:**  Thank you.

19   BY MR. CROSSLAND:

20   **Q.**  So ultimately the end result of that transaction is that

21   the FDIC sold stock in GulfSouth to your son-in-law, Steven Roe

22   ?

23   **A.**  Right.

24   **Q.**  And when the deal went south for Mr. Roe, HCB bought the

25   stock, right?

1    **A.**   Yeah.  I didn't want to -- we didn't want our -- my

2    daughter and son-in-law to be punished for trying to help.

3    **Q.**   Right.  I mean, you didn't want your daughter and

4    son-in-law to lose their investment?

5    **A.**   Well, they lost some of it, but I didn't want them to lose

6    all of it.

7    **Q.**   You didn't want them to lose all their money?

8    **A.**   Right.

9    **Q.**   I mean, you were protecting your daughter?

10   **A.**   Exactly.

11   **Q.**   And that makes -- so HCB bought the stock?

12   **A.**   HCB bought the stock.  They lost $120,000.

13   **Q.**   But they lost -- HCB lost every dollar it paid to your

14   daughter --

15   **A.**   When GulfSouth failed, they lost every cent, correct.

16   **Q.**   And HCB's business is to make money, isn't it, sir?

17   **A.**   Well, it makes money.

18   **Q.**   And your testimony is that's the business of HCB is to make

19   money, correct?

20   **A.**   That's their business.

21           **MR. CROSSLAND:**  Mr. Dyer, if you'll put up Plaintiff's

22   Exhibit 73 that's been marked for identification, please.

23           **THE COURT:**  73, did you say?

24           **MR. FRANCO:**  73 or 173.

25           **MR. CROSSLAND:**  73.  I'm sorry I wasn't clear.  I

1  might have been face down in my suit, I'm sorry.

2  **BY MR. CROSSLAND:**

3  **Q.**  Mr. Phillips, the bottom email here, that's an email from

4  you, correct?

5  **A.**  Let's see, what does it say?  We are still waiting on Rick

6  Petermann -- yes.

7  **MR. CROSSLAND:**  We'd offer Plaintiff's Exhibit 73 into

8  evidence as Plaintiff's Exhibit 73.

9  **MR. FRANCO:**  Your Honor, at this time I would object

10  to at least the part from Mac McLeod as hearsay.

11  **THE COURT:**  What is the purpose of the Mac -- the

12  McLeod statement?

13  **MR. FRANCO:**  And relevance.

14  **MR. CROSSLAND:**  I don't -- I don't even think we plan

15  on using the email for Mr. McLeod.  If that changes, I'll

16  certainly let the Court know.

17  The relevance of -- do you want me to address the

18  relevance?

19  **THE COURT:**  Well, no, there's no objection pending as

20  to the relevance on -- in regards to Mr. Phillips, but I -- all

21  I heard was an objection regarding in McLeod.

22  **MR. CROSSLAND:**  I should say that hearsay objection

23  has actually been waived, it wasn't raised in the pretrial

24  stipulation.

25  **THE COURT:**  All right.  Then it's overruled if it

```
 1    wasn't raised.

 2              MR. CROSSLAND:  So 73 is admitted, Your Honor?

 3              THE COURT:  Yes.  I mean, honestly, Mr. Franco, I

 4    can't envision any problem, frankly, with the McLeod statement.

 5              MR. FRANCO:  Thank you, Your Honor.

 6              THE COURT:  I'm going to let it in.  Overruled.

 7         (Plaintiff's Exhibit 73 admitted into evidence.)

 8    BY MR. CROSSLAND:

 9    Q.   Mr. Phillips, looking at Plaintiff's Exhibit 73, you sent

10    this email on June 4, 2012, correct?

11    A.   Yeah, yeah, it looks that way.

12    Q.   And this came from your HCB email address, correct?

13    A.   HCB Advisory Group, right.

14    Q.   And who is Mr. Petermann?

15    A.   I think he was GulfSouth's attorney.

16    Q.   And this is about 22 days before HCB acquires GulfSouth's

17    interest as the originating bank under the Participation

18    Agreements and the portions of the deficiency judgment, correct?

19    A.   "We are still waiting on" -- yeah, I -- yeah -- I don't

20    know.

21    Q.   Okay.  Let me flip real quick --

22    A.   I'll take your word that it's 22 days before.

23    Q.   Okay.  Why were you waiting on Rick Petermann?

24    A.   I have no idea.

25    Q.   But certainly we know that as of June 4th you were talking
```

1   to Rick Petermann, correct?

2   **A.**   No.   I never talked to Rick Petermann.

3   **Q.**   Well, it says you're still waiting on him.   The question I

4   have --

5   **A.**   That's probably -- that's probably a conversation that I

6   was having with somebody else, and Mac was talking to me, and so

7   I was just answering him based off other conversations.   I've

8   never -- for 15 years I haven't talked to Rick Petermann.   I did

9   maybe 15 years ago.

10  **Q.**   Well, sir, there's no email below yours, is there?

11  **A.**   Not on this one.

12  **Q.**   And it's -- and it does say that you're still waiting on

13  Rick Petermann, right?

14  **A.**   That could be an email from somebody else.

15  **Q.**   Did somebody else have access to your email account?

16  **A.**   Yeah.

17  **Q.**   Who?

18  **A.**   For many months I didn't even -- I only got an iPad maybe

19  two or three years ago.

20  **Q.**   Who else has access to your email account, sir?

21  **A.**   My assistant.

22  **Q.**   And who is that?

23  **A.**   Up to that time all the emails went to my assistant and

24  then they'd print them out and give them to me and then I would

25  -- I would give them the answer and they would answer them.   I

1   only -- I only went into the tech world maybe a couple of years

2   ago.

3   Q.   Who is your assistant?

4   A.   At that time it was a guy named Allen Payne, Chris Pulcifer

5   was there, and now it's Amber Skates.

6   Q.   And those people had access to your email account?

7   A.   Absolutely.

8   Q.   And this email -- this came from your email account,

9   correct?

10  A.   It says Rupert Phillips, HCB Advisory Group, that's an

11  account.

12  Q.   And it says "we," not somebody else, correct, it says "we"?

13  A.   I have no idea what that meant, "We are waiting on Rick

14  Petermann," so, yeah, I have no idea.  I have no idea.

15  Q.   Mr. Phillips, are you aware that GulfSouth had filed a

16  declaratory judgment action against First NBC, Bank of Vernon,

17  and Centennial Bank with regard to dividing up the deficiency

18  judgment?

19          MR. FRANCO:  Excuse me.  I didn't hear the first part

20  of that.  Is it are you aware or were you aware?  I didn't hear,

21  I apologize.

22          THE COURT:  I thought it was are you aware.

23          MR. CROSSLAND:  It was are you aware.

24          THE WITNESS:  I am aware.

25  BY MR. CROSSLAND:

1   **Q.**   When did you first become aware of that?

2   **A.**   When we closed on the loan.

3   **Q.**   When you say "we" closed on the loan --

4   **A.**   When HCB Financial Corp. closed on the transaction that I

5   negotiated with Mac McLeod.

6   **Q.**   Did you direct Mr. McLeod to have that lawsuit dismissed?

7   **A.**   No.

8   **Q.**   Do you know why the GulfSouth declaratory judgment action

9   was dismissed?

10   **A.**   I wasn't part of it.

11   **Q.**   Are you familiar with Lot 26 in the Nature Walk

12   Development?

13   **A.**   I am.

14   **Q.**   I'm going to refer to that as Lot 26, if that's all right.

15   You and your wife owned Lot 26 in Nature Walk at one point,

16   correct?

17   **A.**   That's correct.

18   **Q.**   And on June 24th, 2011, you sold that lot to Fred

19   McLaughlin?

20   **A.**   It was a short sale from BB&T to Fred McLaughlin, correct.

21   **Q.**   But you sold it to him?

22   **A.**   Yes.

23   **Q.**   Okay.  And the proceeds from the sale went to BB&T, who

24   held the mortgage?

25   **A.**   100 percent.

1   **Q.**   And it was a short sale because BB&T took less than it was

2   owed and it released the lien, correct?

3   **A.**   Yes -- oh, it didn't totally release the lien.  My

4   recollection is they didn't totally release the lien.

5   **Q.**   Okay.

6   **A.**   They released the lien on the house, but they didn't

7   release me.  I think that's what I recall.

8   **Q.**   Right.  BB&T released its lien over the property, though?

9   **A.**   Correct, correct.

10   **Q.**   Okay.  Now, when you sold -- when you and your wife sold

11   Lot 26 to Mr. McLaughlin, there were a significant amount of

12   judgment liens on Lot 26, correct?

13   **A.**   I imagine there probably -- there probably were, but I

14   think Mr. McLaughlin was probably aware of it and he bought it

15   under those circumstances.

16   **Q.**   Did you ever tell him that you were going to get those

17   judgment liens satisfied?

18   **A.**   No.

19   **Q.**   All right.  Let's look at Plaintiff's Exhibit 26.

20        **MR. CROSSLAND:**  May I approach, Your Honor?

21        **THE COURT:**  Yes.

22   **BY MR. CROSSLAND:**

23   **Q.**   This is a multipage exhibit, Mr. Phillips.  It might help

24   if I just give you the whole thing.

25   **A.**   Okay.

*Rupert Phillips - Direct/Crossland*

1    **Q.**    There you go, sir.

2    **A.**    This is a HUD statement and --

3    **Q.**    Right.  Exhibit 26 is the HUD settlement statement relating

4    to the sale from you and your wife to Mr. McLaughlin on Lot 26,

5    correct?

6    **A.**    Right.

7    **Q.**    And if you go to the third page of Exhibit 26, that's a

8    real estate closing agreement between you and your wife and

9    Mr. McLaughlin, correct?

10   **A.**    Yes.

11   **Q.**    And paragraph 2 --

12            **MR. CROSSLAND:**  Mr. Dyer, if you'll blow that up for

13   the Court and myself.

14   **BY MR. CROSSLAND:**

15   **Q.**    Paragraph 2 on that page identifies that "Buyer understands

16   and agrees that buyer is taking title subject to the matters set

17   forth in Exhibit A attached hereto and incorporated herein in

18   addition to the other matters set forth in the title binder,"

19   correct?

20   **A.**    Yes.

21            **MR. CROSSLAND:**  Mr. Dyer, Exhibit A.

22   **BY MR. CROSSLAND:**

23   **Q.**    The last page of Exhibit 26 is Exhibit A, correct?

24   **A.**    Yes.

25            **MR. CROSSLAND:**  If you'll just blow that up generally,

1   Mr. Dyer, please.

2   **BY MR. CROSSLAND:**

3   **Q.**   No. 1 there is the BB&T mortgage we just talked about,

4   correct?

5   **A.**   Yes.

6   **Q.**   And Nos. 3, 4, 5, and 6 are all judgment liens against

7   either you or your wife that were on Lot 26, correct?

8   **A.**   3 is not -- yeah, yeah.

9   **Q.**   Right.  And No. 6 --

10          **MR. CROSSLAND:**  If you blow that up for me, Mr. Dyer.

11  **BY MR. CROSSLAND:**

12  **Q.**   It says, "Satisfaction of judgment in favor of GulfSouth

13  Private Bank against Rupert E. Phillips and Sandra K. Phillips,

14  et al., filed April 7, 2011, recorded in Book 2863, Page 1487,"

15  correct?

16  **A.**   That's correct.

17  **Q.**   It's a satisfaction?

18  **A.**   That's correct.

19  **Q.**   Okay.  And when you sold Lot 26 in June of 2011 to

20  Mr. McLaughlin, HCB did not own the interest in the deficiency

21  judgment, correct?

22  **A.**   I'm not sure of the timing, but if you say so, I'll -- you

23  know, I'm not sure of the time, but if you say so, you've got

24  the dates right, it's probably right.

25  **Q.**   Do you know why Mr. McLaughlin would buy Lot 26 subject to

1    all of these judgment liens we just looked at?

2    A.   I think you need to ask him.

3    Q.   You don't know why?

4    A.   What?

5    Q.   You don't know why?

6    A.   Yeah.  I think that he was looking out there at that

7    subdivision, it was chained up, he looked at the houses, he

8    liked that house, Rick Olson was building one, too, he could

9    have bought that one from BB&T, and he decided he wanted to buy

10   that house, he needed a place to live, and spent a bunch of

11   money on it, and lived there.  That's what he --

12   Q.   And what was the value of Lot 26 when you sold it to

13   Mr. McLaughlin in June of 2011?

14   A.   The appraisal -- this was all -- this had to go through --

15   this was a loan with Colonial Bank.  BB&T had taken them over in

16   a transaction with the FDIC.  So this took a good while for this

17   to happen because Pete Cook -- Fred came to me, we went to Pete

18   Cook.  Pete didn't want it to have to go through foreclosure

19   because it's quite expensive for them to have to go through

20   foreclosure.

21   Q.   Pete Cook was at BB&T?

22   A.   He was at BB&T.  So right after that he had it appraised,

23   he had -- he had to get approval from the FDIC and the bank.

24   They approved it.  And I don't think -- I wasn't really

25   concerned about it because HCB on a regular basis does this for

1   people with senior liens --

2   **Q.**   Does what?

3   **A.**   With senior liens we release -- you know, this is like --

4   there's no money there, you know, are we going to force the guy

5   to foreclose on it?

6   **Q.**   Sir, I didn't say anything about HCB releasing a lien, did

7   I?

8   **A.**   Yeah, I thought you did.

9   **Q.**   No, sir, I didn't.  What I asked you was what was the

10  appraised value of --

11  **A.**   $136,000, BB&T appraisal.

12  **Q.**   That's what it was worth?

13  **A.**   Yeah.

14  **Q.**   And HCB didn't have the right to release the deficiency

15  judgment lien that sat on Lot 26 in June of 2011, did it?

16  **A.**   In hindsight, no.

17  **Q.**   How is it hindsight, sir?  It either did or it didn't.

18  **A.**   Because I didn't -- at the time I didn't realize that you

19  would make such a big deal out of something that is ordinary and

20  common in the industry.  Every one of those other six people

21  released to Fred, too, so you know it --

22  **Q.**   That's right, they did.

23  **A.**   For nothing.

24  **Q.**   Right.  And HCB released the judgment lien in December of

25  2012, right?

1   **A.**   I don't remember when it was.

2   **Q.**   All right.  Let's look at it.

3   **A.**   Quite frankly, it's out of my realm because that's not

4   anything that I would have gotten involved with.  That would

5   have been legal, probably Clark, Partington, Hart.

6          **MR. CROSSLAND:**  Mr. Dyer, blow up 107, please.

7   **BY MR. CROSSLAND:**

8   **Q.**   Mr. Phillips, Plaintiff's Exhibit 107 is the partial

9   release of deficiency judgment executed by HCB as to Lot 26,

10  correct?

11  **A.**   That's what it looks like to me.

12  **Q.**   All right.  The date on that, sir, is December 27th, 2012?

13  **A.**   Again, I don't think I was a party to that.  I wasn't -- it

14  didn't come to my attention.

15  **Q.**   I understand, sir.  I'm just asking you what the date is on

16  this document.

17  **A.**   Okay.  7/6/15 -- no, that's commission expires.  27th day

18  of December, 2012.

19  **Q.**   And by this time, all the other liens on Lot 26 had been

20  released, right?

21  **A.**   Probably, since there wasn't any other money coming out.

22  **Q.**   Right.  So why would -- HCB is in the business of making

23  money, correct, sir?

24  **A.**   Correct.

25  **Q.**   Now, why would HCB as the only lienholder left on Lot 26

1    agree to release it for zero consideration?

2    **A.**   Because it's normal business practice.

3    **Q.**   Why is it the normal business practice of a company that's

4    in business to make money to release a lien that it has first

5    priority on on property?

6    **A.**   Because we were -- we had discussed this with BB&T, and we

7    didn't want them to force it -- everybody would have been in the

8    same position had BB&T foreclosed on it.

9    **Q.**   No, sir --

10   **A.**   It would have been --

11           **MR. FRANCO:**   Objection, let him finish.

12           **THE WITNESS:**   Everyone would have been in the same

13   position that they ended up in, including HCB, had BB&T

14   foreclosed on the property and got the 136, Fred could have

15   bought it at auction.  Nobody else would have bid on that house

16   at that time.  That community was locked up.

17   **BY MR. CROSSLAND:**

18   **Q.**   Right, sir, that would have been a possibility but BB&T --

19   **A.**   More than likely that would have happened.  And if I could

20   go back, that's the way I would handle it today.

21   **Q.**   Sir, that would have been a possibility.  But isn't it true

22   that BB&T released its mortgage as to Lot 26 in July of 2011,

23   nearly a year-and-a-half before HCB released its lien on the

24   property?

25   **A.**   If that's the timing.

1    **MR. CROSSLAND:**   Mr. Dyer, please pull up Exhibit 134.

2    **BY MR. CROSSLAND:**

3    **Q.**   Mr. Phillips, this is a release of mortgage executed by

4    BB&T as to Lot 26.   You see that?

5    **A.**   I do.

6    **Q.**   And the date on this, sir, signed by Pete Cook as vice

7    president, is July 7, 2011, isn't it?

8    **A.**   Sure is.

9    **Q.**   So your scenario never happened, i.e., BB&T didn't

10   foreclose on this property, did it?

11   **A.**   They only didn't foreclose because we were working with

12   them.

13   **Q.**   Who is "we"?

14   **A.**   Me and Fred.

15   **Q.**   That's right.   And you had an agreement that you'd work out

16   all of these other deficiency judgment liens and get them

17   released, didn't you?

18   **A.**   No, I didn't have that agreement.   Fred is completely

19   capable of doing that himself.

20   **Q.**   Sir, can you explain why after BB&T released its mortgage

21   in July of 2011 and there were no other liens on Lot 26 why HCB

22   as the first priority lienholder on Lot 26 would release that

23   lien for nothing?   Can you explain that?

24   **A.**   Yes.

25   **Q.**   What's the explanation?

1    **A.**    Because there would have been no money coming in that

2    transaction that occurred.

3    **Q.**    Isn't the purpose of a judgment lien to prevent the sale of

4    a property in the future unless you get dealt with?

5    **A.**    Sir --

6    **Q.**    Is that your understanding, sir?

7    **A.**    No, that's not my understanding.

8    **Q.**    Okay.  Do you understand that a judgment lien prevents a

9    property from being sold unless it is either taken care of or it

10   goes with the property as part of the next sale?

11   **A.**    I understand that, but I understand what ordinary business

12   is, too, that banks work with each other on those type things.

13   **Q.**    Sir, and you understand that a bank will not give a

14   mortgage to property where there are liens that far exceed the

15   value of the property?  You agree with that statement, don't

16   you?

17   **A.**    With what, now?

18   **Q.**    You agree with the statement that a bank will not give a

19   mortgage on a property when there are liens that far exceed the

20   value?

21   **A.**    That's correct.

22   **Q.**    Okay.  And so Mr. McLaughlin, who owned this property in

23   December of 2011, the only lien left was the deficiency judgment

24   lien held by HCB, correct?

25   **A.**    Correct.

1    **Q.**   And then Mr. McLaughlin could not have sold that property

2    or got a mortgage on that property unless and until HCB released

3    the judgment lien, right?

4    **A.**   Yes.

5    **Q.**   And HCB, an entity that is in the business of making money,

6    released the lien for nothing; isn't that true?

7    **A.**   Just as the other six did, correct.

8    **Q.**   To your knowledge, Mr. Phillips, HCB has not served a writ

9    of garnishment as to any of your assets, has it?

10   **A.**   No.

11   **Q.**   HCB has not attempted to attach any property you own, has

12   it?

13   **A.**   No.

14   **Q.**   HCB has not taken your deposition in aid of execution, has

15   it?

16   **A.**   No.

17   **Q.**   HCB hasn't sent you any written interrogatories, has it?

18   **A.**   No.

19   **Q.**   Hasn't done any of those things for your wife?

20   **A.**   No.

21   **Q.**   Hasn't done any of those things for Mr. Olson?

22   **A.**   I don't know.

23   **Q.**   Hasn't done any of those things for Mr. Olson's wife?

24   **A.**   I don't know.

25            **MR. CROSSLAND:**   One moment, Your Honor.

1      **THE COURT:**  Yes.

2      **MR. CROSSLAND:**  No more questions at this time, Your

3   Honor.

4      **THE COURT:**  All right.  Mr. Franco?

5      **MR. FRANCO:**  Thank you, Your Honor, just give me one

6   second.  I didn't realize he was going to end that quickly.

7                        **CROSS-EXAMINATION**

8   **BY MR. FRANCO:**

9   **Q.**   Mr. Phillips, do you remember when Phillips Property, Inc.

10  became insolvent?

11  **A.**   Probably around 2007, 2008 period.

12  **Q.**   If that's the case, why were you reflecting a -- can you

13  explain why you were reflecting a salary from Phillips Property,

14  Inc., in July of 2009, on the Fact Information Sheet that

15  counsel pointed out to you?

16  **A.**   Not really.  I really don't know.  In fact, when I leave

17  here I'm going back and check our records and see if that's

18  accurate or not.

19  **Q.**   Okay.

20  **A.**   When I filled those out, I was trying to be as honest as I

21  could be, but, you know, I may have made a mistake, I don't

22  know.

23  **Q.**   Okay.  Now, counsel went into HCB and your knowledge of

24  HCB.  Can you tell us when that company was formed and what

25  happened.  You started to explain that in your direct

1    examination today.

2    **A.**   The company was formed at the height of the great market in

3    2004 and 2005.  It was formed to form a bank, a new bank holding

4    company that was going to be based in Crestview, Florida.  And

5    the exhibit he handed to me were all the investors that were

6    going to be on the board of directors of that company.

7    **Q.**   And how were you involved in the formation of it?

8    **A.**   I was going to be a director and a shareholder.

9    **Q.**   And what kind of company was it formed to be?

10   **A.**   A bank holding company.

11   **Q.**   What happened to it after its formation?

12   **A.**   Well, again, a couple of guys got started real early and

13   they started building a bank building, and then at the end they

14   couldn't get their charter.

15        And so there ended up being a bank building in Crestview,

16   Florida, with a mortgage on it to a bank in Birmingham, and I

17   was the only person left standing mainly because it was a bank

18   that I had dealt -- that I had done business with, and that's

19   the reason they made the loan.  So I took 100 percent control of

20   HCB and bailed out of it.

21   **Q.**   What did HCB own in the beginning?

22   **A.**   It owned that bank building and a few assets in that bank

23   building.

24   **Q.**   What happened to that building?  Is that called the

25   Crestview building?

1    **A.**    Yeah.  Now it's CCB Community Bank, and it belongs to -- I

2    sold it to them, CCB Community Bank.

3    **Q.**    How long ago was that?

4    **A.**    I'm guessing in -- I think it was in '07, just when the

5    bottom started to fail out, in the summer of '07, I think.

6    **Q.**    You said the bottom started to fail out.  What are you

7    talking about?

8    **A.**    The economy and real estate, it just collapsed.

9    **Q.**    And that's -- when did that happen?

10   **A.**    It was the summer of two thousand -- no, it started in

11   January of 2007.  And then by the summer of 2009 we were

12   contemplating putting Olson & Associates into bankruptcy from

13   the Olson's side.  In fact, we hired Baker & Hostetler to

14   represent us when we first got started with that bankruptcy.

15   **Q.**    Well, after 2007 or 2008, what happened to HCB?

16   **A.**    It was dormant.

17   **Q.**    Did it have any assets?

18   **A.**    It had no assets up until around the time I moved it -- you

19   know, there's so many transactions in my head, just timing I get

20   off.  But when I moved it into -- into -- under Phillips Capital

21   Partners, I moved it over there because it looked like we were

22   maybe fixing to get into the note buying business.  And Phillips

23   Capital Partners assumed about half a million dollars in debt of

24   a debt on -- that was in HCB on some bank stock.

25   **Q.**    So after it was dormant --

1   **A.**   It didn't operate until that March date of whenever it --

2   Joe went in as president, it didn't operate.

3   **Q.**   March 2011?

4   **A.**   Yeah.  In hindsight, I probably should have just formed a

5   new company and put it under Phillips Capital Partners.

6   **Q.**   Let's talk about how that developed.  You transferred your

7   shares in HCB to Phillips Capital, right?

8   **A.**   Yes.

9   **Q.**   And at that time, what assets did HCB have?

10  **A.**   It had some bank -- I don't think it had any really at that

11  point in time.

12  **Q.**   Okay.  And you did that in order to -- at that point the

13  economy was starting to collapse?

14  **A.**   No, not the time we moved it.  It was already collapsed at

15  that point in time.

16  **Q.**   Oh, okay, it was already collapsed?

17  **A.**   Yeah.

18  **Q.**   So when you say the economy collapsed, that's when all of

19  these loans start going into default, is that true or not?

20  **A.**   Yeah, about over $160 million worth of loans went into

21  default at that point in time.

22  **Q.**   You're talking about yourself?

23  **A.**   It was Olson & Associates.

24  **Q.**   But I want to talk about the economy.  There's going to be

25  a lot of distressed assets out there when the economy went bad,

1   is that true or not?

2   **A.**   Absolutely true.

3   **Q.**   So that happens, right?

4   **A.**   Yeah, that happens.

5   **Q.**   Not only are your loans in default, but a bunch of other

6   loans in the economy are in default?

7   **A.**   I know.

8   **Q.**   So there's a lot of distressed assets out there; is that

9   correct?

10  **A.**   That's right.

11  **Q.**   And is that the reason you decided that HCB was going to go

12  into buying distressed loans?

13  **A.**   Yes.

14  **Q.**   And so you transferred that over to Phillips Capital

15  Partners, right?

16  **A.**   Yes, yes.

17  **Q.**   And at that same time period, what did you do about making

18  Mr. Dobson the president of that company?

19  **A.**   Well, Phillips Capital Partners has several companies, and

20  I really don't run any of them.  And I felt like Joe would be a

21  good person to run that company, so I walked in his office and I

22  said "You're now president of HCB.  I'm 67 years old and I don't

23  want to go to work everyday."

24  **Q.**   How did he react to that?

25  **A.**   He smiled and said "Thank you."

1   **Q.**   Did you discuss any other reason?

2   **A.**   No.

3   **Q.**   So that's when the company at that point starts doing

4   business -- when I say "the company," HCB starts doing business

5   of being in the distressed loan acquisition business basically;

6   is that right?

7   **A.**   Well, we also thought that, you know, we might get back

8   into -- I'm a -- for some reason I like banks, and so I thought,

9   you know, we might try to buy some bank stocks and throw it into

10  the company and -- I really didn't know everything that we would

11  do in the company, but Fred had -- was -- Fred came aboard in

12  June of 2010, and that's when we took over the C stores.  And he

13  had been nosing around, and he thought it was a good business,

14  too, so HCB was just a vehicle to work through and throw that

15  stuff into.

16  **Q.**   Let's talk about timing just to make sure it's clear.

17  **A.**   Okay.

18  **Q.**   According to a Plaintiff's exhibit in this case, on

19  November 3 of 2010 is when you assigned 200 (sic) shares of

20  stock in HCB to Phillips Capital, right?

21  **A.**   Right.

22  **Q.**   And that's when you decided that you were going to put this

23  company under Phillips Capital?

24  **A.**   Right.

25  **Q.**   Am I correct?

1    **A.**    It was a dormant company.  And of course, Phillips Capital

2    was created because in 2007 when I was considering bankruptcy, I

3    was advised that I was old enough now that I didn't need to own

4    anything the rest of my life, that anything that needed to be in

5    my kids' names, I didn't need to ever own anything again.

6    **Q.**   All right.  And at that point in November when you

7    transferred it, as I understand what you said, HCB didn't have

8    anything; am I correct?

9    **A.**    Correct.

10   **Q.**   All right.  And after that is when you decided you were

11   going in -- that HCB was going into the distressed loan purchase

12   business, correct?

13   **A.**    Right.

14   **Q.**   And then in March of 2011 is when you walked in and told

15   Mr. Dobson, you're going to be the president of this company?

16   **A.**    Right.

17   **Q.**   Okay.  I think counsel asked you what -- what you received

18   for the transfer.  Was the stock of HCB worth anything when you

19   transferred it into Phillips Capital?

20   **A.**    In my opinion, no.

21   **Q.**   Now, you talked about the -- or you were asked about a

22   transfer involving Steven Roe.

23   **A.**    Okay.

24   **Q.**   You remember that in counsel's questions?

25   **A.**    Yeah, yeah.

1    **Q.**   Can you try to simplify what happened without taking a half

2    an hour to do that?

3    **A.**   I'll try.  I'm winded.

4    **Q.**   It may sound complicated, but can you try to simplify it

5    for us?

6    **A.**   I was in my office one day and a fellow with the FDIC calls

7    me, and he said, "Mr. Phillips, we have one letter of credit

8    left in this bank, and we would like to get it out of here."

9         And so he said, "Have you got any suggestions?"  And I

10   said, "Well, I don't know anybody that will buy any of this

11   stock."  The collateral was Bank of Bonifay stock, GulfSouth

12   Private Bank stock, and CCB Community Bank stock.

13        So he said, "Well, what if we do an appraisal of these

14   stocks and see if you can find somebody to buy these stocks?"

15        And so we -- I started looking around and inquiring.  And

16   the market was just dead for bank stocks, especially -- I'm not

17   saying public bank stocks, but private bank stocks, nobody

18   wanted them.

19        And so I asked Steve Roe would he buy these stocks.  First

20   of all, I asked my accountant, because every time you run into

21   these issues, not only do I have to deal with the legalities of

22   it, I also have to deal with the accounting side of it with COD

23   income and just -- it's just a lot of issues that you deal with.

24   It's not just a simple -- they aren't simple transactions.

25        So actually Scott Campbell had handled this transaction for

1    me, and he dealt with the FDIC.  After Steven said he would buy

2    it, he prepared the contracts.  Steven -- they had all the --

3    the appraisal -- I think the appraisal -- the Bank of Bonifay

4    went bust up, so there was no value on that, and I think they

5    had $480,000 on GulfSouth and a million dollars on CCB stock

6    were the appraisals, and Steven bought those.

7         The FDIC did not -- it was a short sale.  They did not

8    release me of the four-and-a-half million dollars deficiency.

9    They ended up putting it on debt-ex (phonetic) and selling it to

10   a bank in Huntsville, Alabama, I think it was.

11        So like a lot of banks that are in this business like HCB,

12   this bank, we negotiated a price of $225,000 for that deficiency

13   over time, in other words, we made some payments, as we could do

14   a deal inside one of the companies, either Big Boss or something

15   and raise some money, then they would loan it to me and I would

16   make the payments and buy the deficiency out.

17   **Q.**   Okay.  And so why did HCB buy 120 (sic) shares of stock in

18   GulfSouth when it did?

19   **A.**   When it -- 120,000 shares.  Because Steven had -- I was

20   trying to work with the FDIC to get this transaction to the

21   finish line.  Steven had stepped in, and I didn't want my

22   daughter and Steven to take a huge hit over something that they

23   were doing because I asked them to.  HCB certainly has the

24   capacity to make money, there's no doubt about it.

25   **Q.**   Okay.  And it makes money on distressed assets?

1    **A.**    Buying two next Monday.

2    **Q.**    Counsel covered in his questions the fact that you were the

3    one involved in the negotiations for the assignment of the

4    GulfSouth interests in this case?

5    **A.**    Absolutely, with Mac McLeod.

6    **Q.**    Can you tell us, please, how that developed,

7    chronologically, if you can.

8    **A.**    Oh.  First of all, Mac McLeod had come in to run GulfSouth

9    Private Bank.  When Mac came in, I didn't know him -- I had

10   heard his name but I didn't know him from Adam.

11       So what Mac was doing, he was asking -- he was sending out

12   letters -- because HCB was a shareholder then, he was sending

13   letters out and putting a plan together trying to raise capital

14   to save the bank.

15       My son had a loan at GulfSouth Private Bank on a 1979

16   Cheyenne airplane.  It was in a company called GP Air.  And one

17   day I was in the bank, and I don't recall if I just walked in

18   the bank or Mac called me, but I went in and asked Mac if rather

19   than foreclose on my son and have a problem with him, would he

20   sell that -- let one of our companies assume that note -- I

21   think it was Phillips Capital Partners -- assume the note, pay

22   the interest up and assume the note.

23       And he said, "I can't do anything with you, nothing, until

24   North Tip is settled."  And I said, "Really?"  He said, "Look,

25   the FDIC is in the room next door, and I can't do anything."

1    I said, "Well, can I buy that interest out and then maybe

2  you can do something with the GP Air loan?"  He said -- this

3  took several days because we had discussions and I'm sure he had

4  to check with the FDIC and other people.  He started out asking

5  $400,000, I said we don't have $400,000, we can't get it.

6  **Q.**   When you say "we," who are you talking about?

7  **A.**   I was talking about HCB.

8  **Q.**   Okay.

9  **A.**   No, I was talking about Phillips Capital Partners on that

10  and about HCB buying the notes.  Because HCB had a line of

11  credit to buy notes at a bank, and that's the way we got our

12  money.  So I don't think we had that much available.

13      So anyway, we arrived at $200,000.  I think it was $180,000

14  for that note and $20,000 for some property that the group still

15  owns.

16      He -- he came back and said if -- if I would do that

17  transaction then they would finance the GP Air loan for us.

18      So in a sense, I was forced to do it.  It wasn't my idea.

19  I didn't go to him asking him to do it.  He's the one that

20  brought it up to me at the time.

21  **Q.**   He brought up what to you?

22  **A.**   He brought up the North Tip transaction.

23  **Q.**   Okay.  So he brought it up after you went there asking if

24  you could help your son by salvaging the GP Air loan?

25  **A.**   Right.  Until that point in time, I, you know, I never had

1    a discussion with him about North Tip.

2    **Q.**   Okay.  And was it your understanding of whether he would do

3    the deal without trying to resolve the North Tip problem or not?

4    **A.**   He said he couldn't.  He said the FDIC is in the next room.

5    **Q.**   And at that point in time chronologically, Mr. Phillips,

6    had HCB already purchased the CPB participation in that North

7    Tip loan?

8    **A.**   If -- if "purchase" is the word, yeah.

9    **Q.**   Okay.  The evidence is already in about the fact that there

10   was a -- there was a transaction where FNBC gave HCB a $10

11   million loan --

12   **A.**   Line of credit.

13   **Q.**   -- and in connection with that HCB purchased a portfolio of

14   assets from FNBC, correct?

15   **A.**   That's true.

16   **Q.**   And including in those assets was the CPB participation?

17   **A.**   I think there were a couple of participations.

18   **Q.**   Right, but included in it was the CPB participation?

19   **A.**   Right, right.

20   **Q.**   And you didn't go to Mr. McLeod to purchase GulfSouth's

21   interest in that loan, did you?

22   **A.**   Not at the time, no.

23   **Q.**   Okay.  And so how did you -- how did the transaction then

24   proceed from there?

25   **A.**   Well --

1   **Q.**   You agreed on a price; am I correct?

2   **A.**   I -- at that point I turned it over to the -- to the legal

3   people and the accounting people.

4   **Q.**   But you agreed to the price?

5   **A.**   I agreed to the price, and then that's it, I'm done.

6   **Q.**   Okay.  Now, when you say you bought -- you're done and you

7   settled, I want to make sure we're clear, because I assure you

8   counsel is going to stand up here and say you said to settle and

9   you said I buy out.  So let's make sure we're clear on that.

10      Who was acquiring the interest in the GulfSouth North Tip?

11  **A.**   HCB Financial Corp. acquired it.

12  **Q.**   And by the way, that money came from a loan from FNBC; am I

13  correct?

14  **A.**   Came from a line of credit.

15  **Q.**   Right.  And was that line of credit to Rupert Phillips?

16  **A.**   No.

17  **Q.**   It was to HCB, correct?

18  **A.**   Correct.

19  **Q.**   Did Rupert Phillips have $200,000 at that point in time?

20  **A.**   No.

21  **Q.**   As a matter of fact, Rupert Phillips had millions of

22  dollars of judgments against him at that point; is that correct?

23  **A.**   Still do, still do.

24  **Q.**   Still do.  And by the way, let me ask you this question,

25  Mr. Phillips:  With millions of dollars of judgments against

1   you, does it make any sense at 70 years old for you to buy any

2   assets?

3   **A.**   No.

4   **Q.**   Okay.  So when you say -- when you used the word "settled"

5   just a few minutes ago, did you talk to Mr. McLeod about the

6   fact that you personally would be released from the GulfSouth

7   loan?

8          **MR. CROSSLAND:**  Objection, Your Honor.  I can't tell

9   if we're in the scope or out of the scope.  And I know when I

10   get back up to do some redirect, I'm going to get a scope

11   objection.

12          And he's either leading or not leading.  I'm just --

13   and I know what objection is going to come when I stand up that

14   I'm outside his scope, and I just want to make sure that we're

15   not outside the scope that I was and he's still leading.

16          **MR. FRANCO:**  Your Honor, my response is, this is

17   within the scope.  He went into the fact that he was the one

18   that was involved in the negotiations, and this is the

19   negotiations and what was involved in the negotiations.  I think

20   it's within the scope.  That's my intention.

21          **THE COURT:**  Yes, I think so, too.  The objection is

22   overruled.

23   BY MR. FRANCO:

24   **Q.**   I'm sorry, I don't know if I got an answer to my question

25   so let me --

*Rupert Phillips - Cross/Franco*

1    **A.**    I don't remember the question.

2    **Q.**    Let me do it, Mr. Phillips.

3    **A.**    Sorry.

4    **Q.**    When you -- when you used the word "settlement" a few

5    minutes ago, did you mean that you were going to be released

6    from the North Tip debt by GulfSouth or HCB or anybody else?

7    **A.**    I never thought that for a minute.

8    **Q.**    Did you -- did you understand that Mr. Olson would be

9    released from the debt?

10   **A.**    I never thought that for a minute.

11   **Q.**    Are you aware of whether HCB has ever taken the position

12   that Mr. Olson in fact has been released from his liability?

13   **A.**    No.

14   **Q.**    Has HCB, to your knowledge, ever taken the position you've

15   been released from liability?

16   **A.**    No.

17   **Q.**    Haven't you in fact provided some financial information

18   before this challenge in this lawsuit to HCB?

19   **A.**    We have.  And in fact, Mr. Osborn took it back to Baker &

20   Hostetler to Ms. Brady.

21   **Q.**    Okay.  Would you be providing financial information, sir,

22   if you didn't think you were responsible on a loan?

23   **A.**    Probably not.

24   **Q.**    Now, the structure of what happened after you agreed on the

25   price, did you outline the structure or did you leave that to

1   the attorneys?

2   **A.**   I told the attorneys the deal and the price, and they

3   handled it, as they do on -- my involvement, I don't get in the

4   weeds on these deals.  I'm a deal junky and I do the deals, and

5   then the attorneys and the accountants handle it.

6   **Q.**   Now, what was the real reason that you had HCB purchase the

7   GulfSouth assets?  What was the real reason for that?

8   **A.**   The real reason was to keep my son from having to deal with

9   this foreclosure and deficiency.  During that period of time --

10  as Mac kept saying, the FDIC is in the room next door.  It

11  occurred to me this bank is fixing to be shut down.  And when it

12  shuts down, who is going to own this position that GulfSouth

13  has?

14       And I certainly felt like I'd like to have some closure to

15  that.

16  **Q.**   Because you already own the CPB --

17  **A.**   We already own 44.9 percent so --

18  **Q.**   Did you want to see the lead position go to FDIC?

19  **A.**   I didn't.  In fact, in hindsight, I'm not so sure that --

20  well, I better not say that.

21  **Q.**   Good.  All right.  Now, you -- let's talk about -- counsel

22  covered in his examination the fact that you have about 80 to

23  $85 million of judgments against you, and he went through the

24  fact that the Bank Atlantic judgment is 50, the Fifth Third

25  judgment is about $9 million, there's about $10 million of

1   GulfSouth.  That still leaves a bunch of million dollars of

2   judgments against you, doesn't it?

3   **A.**   Yeah, there's still a bunch out there.

4   **Q.**   Okay.  And so let's talk about --

5   **A.**   I will tell you that yesterday I -- we resolved $368,000

6   with BB&T for $10,000, so that's a win for us.

7   **Q.**   All right.  Let's talk about the Bank Atlantic purchase.

8   That was in January of 2011, as I understand it.  And as I

9   understood your earlier testimony, HCB paid only $250,000 to get

10  a $49 million judgment; is that correct?

11  **A.**   Yep.

12  **Q.**   Why did you do it?

13  **A.**   Bargain.  It also had some -- an LLC interest that Coulters

14  one of their subsidiaries Florida Finance had, and so that came

15  with it, and then we actually foreclosed on that -- that asset.

16  **Q.**   So when you bought the Bank Atlantic judgment, counsel

17  insinuating you did it just, just to protect yourself against

18  the judgment.  Is that what you did?

19      **MR. CROSSLAND:**  Objection, Your Honor, testimony about

20  what I insinuated.

21      **THE COURT:**  Yeah, just ask the question.  It doesn't

22  need that preface.

23  **BY MR. FRANCO:**

24  **Q.**   Did you buy it just to insulate yourself from the judgment,

25  sir?

1   **A.**   We bought it at a half a percent of $50 million.  I felt

2   like that with the other assets we could -- HCB could make money

3   with it.

4   **Q.**   And what did it get?

5   **A.**   It got 80 townhomes in Crestview, Florida.  They have a

6   mortgage on them, but given five, ten years it might be a good

7   asset.

8   **Q.**   So there was a mortgage on some real estate that you

9   acquired for $250,000?

10  **A.**   Right.

11  **Q.**   How many townhomes is that?

12  **A.**   80.

13  **Q.**   Anything else that you acquired when you acquired the Bank

14  Atlantic judgment?

15  **A.**   No.  I think that was it.

16  **Q.**   Okay.  Does HCB expect at some point the ability to make a

17  profit on that?

18  **A.**   It will definitely make a profit on the $250,000.

19  **Q.**   Are there any other debtors involved in Bank Atlantic?

20  **A.**   Mr. and Mrs. Olson.

21  **Q.**   Okay.  Is there a potential for recovery in the future

22  against Mr. Olson?

23  **A.**   I think there -- there is that possibility.

24  **Q.**   So you weren't the only obligor on that loan?

25  **A.**   No.

**Q.**   Let's talk about Fifth Third.  How much did HCB pay for the Fifth Third $9 million loan?

**A.**   $125,000.

**Q.**   And why did you buy that?

**A.**   Again, $125,000 for a $9 million judgment, that's a -- that's a good buy.  They've got a million -- Sandra and Rick and Elaine, I'm fairly positive that we'll be able to negotiate a nice profit out of that one.

**Q.**   Okay.  What about the -- the GulfSouth loan that you purchased, are you the only obligor or debtor on that loan?

**A.**   No.  Mr. and Mrs. Olson.

**Q.**   What -- did I miss anything else on Fifth Third?  Was there anything else that you acquired other than the judgment and the guarantees?

**A.**   No.  That was all that we acquired out of that transaction.

**Q.**   All right.  Now, Mr. Dobson explained to us other purchases.  Are there other purchases by HCB that don't involve you whatsoever?

**A.**   Probably -- I'd be guessing, 75 to a 100 more probably.  Did you say judgments or purchases?

**Q.**   Either one.  Distressed assets?

**A.**   Oh, probably 70 to a hundred that we've done so far, not counting that the deal where we were -- we brought in Hudson Realty Capital to buy the $120 million from CPB.  That was probably a hundred assets in itself.

1   **Q.**   Now, what is your title at HCB?

2   **A.**   Chairman.

3   **Q.**   Are you a shareholder of HCB?

4   **A.**   No.

5   **Q.**   Are you an officer of HCB?

6   **A.**   No.

7   **Q.**   Do you understand that you have fiduciary duties to HCB,

8   sir?  Has anybody told you that?

9   **A.**   Yes.

10  **Q.**   Now, counsel went through who the shareholders of Phillips

11  Capital Partners are.  Do you recall that?

12  **A.**   Yes.

13  **Q.**   It's fair to say that's a family corporation, isn't it?

14  **A.**   It is.

15  **Q.**   And does it have entities under it other than HCB?

16  **A.**   A lot of them.

17  **Q.**   Give me some examples.

18  **A.**   Big Boss Stores, Big Boss Property Management, HCB Advisory

19  Group, and there are others we've got a --

20  **Q.**   What does Big Boss Stores do?

21  **A.**   They've got some convenience stores and they operate them.

22  Oh, Phillips Energy, which is a Sunoco distributorship.

23  **Q.**   What about -- I'm trying to think machines, not vending

24  machines --

25  **A.**   ATM machines.

1   **Q.**   ATM machines.

2   **A.**   We have those, but it's not up under Phillips Capital

3   Partners.

4   **Q.**   You're also in the business of ATM machines?

5   **A.**   Yes.

6   **Q.**   Now, in the purchase of all of these distressed assets that

7   you talked about for HCB, you talked about the MO is to settle.

8   Do you remember that testimony?

9   **A.**   Yes.

10  **Q.**   In these judgments that you're talking about or loans or

11  distressed assets that you're talking about that HCB purchased,

12  has HCB sued any of the judgment-debtors?

13  **A.**   On rare occasions.  There may be three or four.  Our MO is

14  to go in, get the information, and settle.

15  **Q.**   Okay.  And let me ask you this, Mr. Phillips:  Has HCB ever

16  enforced any loans or judgments against you?

17  **A.**   No -- oh, I take that back.  They have.  They foreclosed on

18  a couple of pieces of property.

19  **Q.**   Do you remember in connection with which loan that was?

20  **A.**   It was some loans that they had bought from Hudson Realty

21  Capital, I think.

22  **Q.**   Has HCB enforced any loans or judgments against your

23  family, any family members?

24  **A.**   I don't recall right at this moment.  Not that I'm aware

25  of.

1   **Q.**   Is it HCB's MO to go after guarantors no matter what the

2   cost?

3   **A.**   No.  It's not worth it.

4   **Q.**   Now, counsel asked you about Plaintiff's Exhibit 73.

5          **MR. FRANCO:**  I can pull that up -- could you pull that

6   up for me.

7   **BY MR. FRANCO:**

8   **Q.**   And he asked you about a June 4 -- it says here, "We are

9   still waiting on Rick Petermann."  You see that?  I want to put

10   that in context for you date-wise.

11   **A.**   Okay.

12   **Q.**   June 26, I believe, 2012, is when the assignment by

13   GulfSouth was done -- was closed.  Do you understand that?

14   **A.**   June 26 and this is June 4th.

15   **Q.**   Of '12, and this is June 4.  Now, prior to that time you

16   had given this transaction to lawyers to close; am I correct?

17   **A.**   Yes.  I was trying to figure out these dates.  On June 5

18   Rupert wrote we are still waiting on Rick Petermann.  That's

19   after 6/4, so Mac sent me an email, I am in Atlanta but will be

20   back tomorrow, will get on top of it, and I say we're still

21   waiting on Rick Petermann.  Okay, I understand it now.

22   **Q.**   Does that help refresh your memory at all?

23   **A.**   Yeah, a little bit.

24   **Q.**   Go ahead, what does it help refresh it for?

25   **A.**   It'd strictly be assuming, but I assume we're trying to get

1    the --

2    **Q.**   Don't speculate.

3    **A.**   I really have no idea why I said we're still waiting on

4    Rick Petermann.

5    **Q.**   All right.  Let me ask you a couple of questions.  After

6    you negotiated the price, you've said that you turned it over to

7    the attorneys to close?

8    **A.**   Yeah.

9    **Q.**   Right?

10   **A.**   Yeah.

11   **Q.**   Okay.  And do you recall that the attorneys needed

12   documents and information from GulfSouth in order to get this

13   closed?

14   **A.**   Yes, yeah.

15   **Q.**   Okay.  So could it have been that HCB was waiting on Rick

16   Petermann to provide some information about what was going on

17   with the real estate, for instance?

18   **A.**   Could have been.

19   **Q.**   All right.  Let's talk about Lot 26, the short sale to

20   Fred.  Did you say that BB&T didn't release you from the debt?

21   Did I hear you say that?

22   **A.**   They had a -- they had a deficiency.

23   **Q.**   Okay.  So they had a mortgage on the property which they

24   ultimately released, but they didn't release you from the

25   deficiency?

1   **A.**   No, no, they didn't.

2   **Q.**   And the price that was paid for that property was based on

3   an appraisal that BB&T had done; am I correct?

4   **A.**   That's correct.

5   **Q.**   And so if -- as I understand what you were saying, Mr.

6   Phillips, correct me if I'm wrong, but if there wasn't an

7   agreement by BB&T and you and Mr. McLaughlin and some of the

8   other loan -- some of the other judgment-debtors, then if BB&T

9   would have foreclosed on the property, what would have happened?

10  **A.**   They would have erased all of those judgment creditors, and

11  they would have been up to auction and hopefully somebody would

12  have bought it for $136,000.

13  **Q.**   Okay.  So instead of that, BB&T agrees to have

14  Mr. McLaughlin buy it and release its mortgage, correct?

15  **A.**   Correct.

16  **Q.**   Instead of going through a foreclosure?

17  **A.**   Correct.

18  **Q.**   And if you look at the settlement statement, which is

19  Plaintiff's Exhibit 26 --

20       **MR. FRANCO:**  I can pull it out, but if you could pull

21  it up, it would be easier, Exhibit A.

22  **BY MR. FRANCO:**

23  **Q.**   If you look at that, other judgment creditors agreed that

24  they would release their liens, because otherwise they would

25  have forced a foreclosure and got nothing.  Is that how it

1    works?

2    **A.**   That's normally how it works.  In this case it's not.

3    **Q.**   All right.  And in those paragraphs there are specific

4    statements here about who agreed to release their liens.  You

5    see those?  Like in No. 3 it says SPCP agreed to release, you

6    see that?

7    **A.**   Yes.

8    **Q.**   And in No. 4 you see Bank Atlantic has assigned and HCB has

9    agreed to release, you see that, No. 4?

10   **A.**   4, yeah.

11   **Q.**   Okay.  And it doesn't say anything about GulfSouth Private

12   Bank agreeing or First Commercial Bank agreeing, does it?

13   **A.**   No.

14   **Q.**   At that time?

15   **A.**   No.

16   **Q.**   Now, as I understand it, right after this transaction on

17   June 24, 2011 -- if we go back, that's the date of this

18   settlement statement, Mr. Phillips.

19   **A.**   Okay.

20   **Q.**   Shortly thereafter July 7, 2011, BB&T released its lien.

21   That's normal, isn't it?

22   **A.**   Absolutely it's normal.

23   **Q.**   That was part of the agreement, wasn't it?

24   **A.**   Right.

25   **Q.**   To avoid a foreclosure?

1   **A.**   Right.

2   **Q.**   Isn't that what a short sale is, you avoid a foreclosure?

3   **A.**   (Indicating affirmatively.)

4   **Q.**   You got to answer yes or no.

5   **A.**   Yes, yes, yes.

6   **Q.**   And how much in your understanding did SPCP receive for

7   releasing its judgment lien?

8   **A.**   Nothing.

9   **Q.**   How much did HCB receive for releasing the Bank Atlantic

10  judgment lien?

11  **A.**   Nothing.

12  **Q.**   Now, see No. 5 here, Satisfaction of Judgment in favor of

13  First Commercial Bank.  Is there any indication on this document

14  that First Commercial Bank agreed to release its mortgage or

15  judgment?

16  **A.**   No.

17  **Q.**   Or are you aware that it has not been released?

18  **A.**   I'm only aware of what Fred said, that it was in -- this

19  was his business, and he would take the house with any of this

20  that was on there and he would deal with it.

21  **Q.**   All right.  But are you -- do you know that the First

22  Commercial Bank judgment is still of record?

23  **A.**   I don't -- I haven't checked on it.  I don't know.

24  **Q.**   All right.  And for the record, that lien or judgment was

25  recorded prior to the GulfSouth Bank lien, wasn't it?  You see

1    where it's recorded here, filed?

2    **A.**    Yeah.

3    **Q.**    When was it filed?

4    **A.**    11/4/09.

5    **Q.**    When was the GulfSouth Bank lien filed?

6    **A.**    4/7 of '11.

7    **Q.**    So the First Commercial Bank is a superior judgment or lien

8    to GulfSouth, isn't it?

9    **A.**    By a pretty good period of time.

10   **Q.**    Okay.  Now, counsel showed you the partial release by HCB,

11   that was Plaintiff's Exhibit 107, that took place in December of

12   2012.  That was Plaintiff's Exhibit 107.

13        Did I understand correctly, sir, that you weren't involved

14   in that?

15   **A.**    Nope.

16   **Q.**    And you didn't sign that, did you?

17   **A.**    No.

18   **Q.**    That was signed by Mr. Dobson we saw?

19   **A.**    Yeah, when I saw it Joe had signed it.

20   **Q.**    Now, before -- before HCB purchased the Bank Atlantic

21   judgment, that judgment was -- according to this document that's

22   in front of you, that judgment was recorded in -- according to

23   this, the Bank Atlantic judgment was filed August -- I'm

24   sorry --

25   **A.**    August 27th, 2009.

**Q.**   2009.  Did Bank Atlantic ever take any action to enforce
that judgment against you before HCB purchased it for $250,000?

**A.**   They did.

**Q.**   What did they do?

**A.**   They took my deposition once or twice.  They -- I filled
out the Fact Information Sheet for them that they -- they went
over.  And we had -- I went down to visit with them on several
times wanting to do what we could do.

**Q.**   Other than that, did they actually attempt to collect any
money from you in terms of seizing any assets?

**A.**   They never tried any of that, no.

**Q.**   Did they -- did they execute any type of enforcement other
than obtaining information from you?

**A.**   No.

**Q.**   What about the First Bank judgment -- I'm sorry, the Fifth
-- I'm getting my numbers mixed up -- the Fifth Third $9 million
judgment that HCB purchased for $125,000?

**A.**   We had to do a fact sheet and then they sent an attorney
down from Ohio that deposed my wife and myself.

**Q.**   Okay.  Did -- as a result of that, before HCB purchased it,
did they take any action to seize any assets or otherwise try to
enforce any judgment against you?

**A.**   No, they didn't.

**Q.**   And that's the judgment you purchased for $125,000?

**A.**   Yes, HCB purchased.

1   **Q.**   Now, prior to the time that HCB purchased the GulfSouth

2   interest in North Tip, did GulfSouth take any actions against

3   you to try to seize any of your assets or enforce the judgment?

4   **A.**   No.   The only thing that happened with GulfSouth is in 2000

5   when -- or 2006, seven, when Olson stopped making payments, some

6   period after that when Bill Lloyd and Sandy Menetre at the other

7   bank and Chris Campbell, Chris asked me one day when I was

8   walking through the bank if I could come up with $250,000 and if

9   Rick could, that he was talking to Bill and Sandy, and they

10  might want to work some kind of settlement, and I said in 2007

11  there's no way I could come up with a penny.

12  **Q.**   All right.   Now, counsel also went into -- went into the

13  fact that you also purchased the Bank of Vernon -- that HCB

14  purchased the Bank of Vernon interest in this North Tip.

15  **A.**   Correct.

16  **Q.**   Is that correct?

17  **A.**   Correct.

18  **Q.**   Can you tell us how that came about?

19  **A.**   I don't remember if -- HCB was doing some consulting work

20  because Bank of Vernon had a lot of participations with some

21  loans in the Panhandle.   And so we had gone around and kind of

22  looked at some of those assets.

23       And I don't remember if Larry had heard about it through

24  his attorney, Mr. Reynolds, through Mac, or if I brought it up

25  in discussing it with Larry.   And he said we got zero basis in

1    ours, we'd love to get rid of it, would you pay us some amount

2    for it.  And we negotiated $12,000.

3    **Q.**   I'm sorry.  Who approached who?

4    **A.**   I'm not sure which -- who -- whether Larry approached me or

5    I was in a conversation with him about other stuff and mentioned

6    the fact.  We -- you know, we've bought other notes from the

7    Bank of Vernon in the past.

8    **Q.**   HCB has?

9    **A.**   Yeah, we bought them from Smart Bank.

10   **Q.**   Okay.  And those were distressed loans?

11   **A.**   Yeah.

12           **MR. FRANCO:**  Your Honor, would you give me a minute?

13           **THE COURT:**  Sure.

14           **MR. FRANCO:**  Your Honor, I tender the witness at this

15   time.

16           Thank you, Mr. Phillips.

17           **THE COURT:**  Redirect?

18           **MR. CROSSLAND:**  Well, I guess I'll ask for the Court's

19   guidance.  I don't think I'm going to finish in ten minutes.

20   I'm happy to start.  I just don't know that I'll finish, but I

21   don't want to keep you, and he's going to likely be here one way

22   or the other tomorrow.

23           **THE COURT:**  Let's just go five minutes.

24           **MR. CROSSLAND:**  All right.

25           **THE COURT:**  I recognize you won't finish.

1      **MR. CROSSLAND:**  Okay.  If I start pushing, you can

2   throw something down here or yell at me, and I'll get out of

3   your way so you can go to your prior engagement.

4                         **REDIRECT EXAMINATION**

5   BY MR. CROSSLAND:

6   **Q.**   Mr. Phillips, counsel just asked you about the transaction

7   with Bank of Vernon.  You remember that?

8   **A.**   Yeah.

9   **Q.**   You believed that you were setting that debt with Bank of

10  Vernon, didn't you?

11  **A.**   No.

12                 **MR. CROSSLAND:**  Mr. Dyer, Exhibit 72.

13                 **MR. FRANCO:**  Which one?

14                 **MR. CROSSLAND:**  72.  It's been marked for

15  identification.

16                 **THE COURT:**  So this one is not in?

17                 **MR. CROSSLAND:**  Not yet, correct, Your Honor.

18  BY MR. CROSSLAND:

19  **Q.**   Mr. Phillips, Exhibit 72 --

20                 **MR. CROSSLAND:**  The top one, Mr. Dyer, if you would.

21  BY MR. CROSSLAND:

22  **Q.**   This is an email you sent on May 22nd to Mac McLeod,

23  correct?

24  **A.**   Yes.

25  **Q.**   All right.

1    **MR. CROSSLAND:**  We'd offer Plaintiff's Exhibit 72 in

2    as evidence.

3            **THE COURT:**  Okay, it will be admitted.

4            **MR. FRANCO:**  No objection, Your Honor.

5        **(Plaintiff's Exhibit 72 admitted into evidence.)**

6    **BY MR. CROSSLAND:**

7    **Q.**   According to Exhibit 72, on May 22nd you told Mr. McLeod

8    that you were going to contact Larry Huggins and settle with the

9    Bank of Vernon; isn't that right?

10   **A.**   Yes.

11   **Q.**   Okay.  And you'd agree with me, wouldn't you, that the

12   documents drafted by HCB's lawyers for the assignments between

13   HCB and Bank of Vernon essentially mirror those assignment

14   documents that were between HCB and GulfSouth?

15   **A.**   I -- I'm not a lawyer.  I don't --

16   **Q.**   Do you have any reason to disagree with that statement

17   other than the fact you're not a lawyer?

18   **A.**   The statement is that the -- the -- the documents with Bank

19   of Vernon and GulfSouth mirror?

20   **Q.**   Yes.

21   **A.**   HCB was buying their note position, so they should mirror.

22   **Q.**   And you told -- and you told Mr. Phillips -- you told Mr.

23   McLeod that you were going to settle with the Bank of Vernon,

24   right?

25   **A.**   Probably the wrong word to use, but that's what I said.

1   **Q.**   Now, as you were testifying about stock transfer to Steven

2   Roe, you testified that at that point in time you were on the

3   verge of bankruptcy, correct?

4   **A.**   In -- partially in --

5   **Q.**   2010, 2011?

6   **A.**   Well, 2007 I thought I was in bankruptcy, yeah.

7   **Q.**   Okay.  And at that point you testified that you didn't want

8   to own anything for the rest of your life in your personal name,

9   correct?

10  **A.**   That's true.

11  **Q.**   In regard to the Steven Roe purchase of stock from the

12  FDIC, you testified that the market was dead for private bank

13  stock, correct?

14  **A.**   Correct.

15  **Q.**   And even though the market was dead, you still asked

16  Mr. Roe to buy the stock from the FDIC?

17  **A.**   Correct.  You've got to understand, with that many

18  judgments, I'm trying to work with folks to kind of be done with

19  them, so yeah, that's true.

20  **Q.**   I understand.  My question only was that, even though, as

21  you describe it, there was a dead bank stock market, you asked

22  your son-in-law to buy private bank stock from the FDIC, right?

23  **A.**   I did.

24  **Q.**   And even though, as you say, there was a dead private bank

25  stock market, HCB then bought that stock from your son-in-law,

1    didn't it?

2    **A.**   It did.

3    **Q.**   And the reason you wanted to get the GP Air loan settled

4    was to protect your son from the FDIC, correct?

5    **A.**   From GulfSouth Private Bank at that point in time because

6    they were the ones that would be foreclosing.

7    **Q.**   Right.  But if it didn't get resolved and GulfSouth closed,

8    it would go to the FDIC, right?

9    **A.**   Hindsight, yeah, I guess that could have occurred.  I

10   didn't think about that at the time.

11   **Q.**   All right.  And Mr. Phillips, when you talked to Mr. McLeod

12   about the GP Air loan, he told you he couldn't do anything with

13   it until the North Tip matter was settled, right?

14   **A.**   Right.

15   **Q.**   He told you he had to settle North Tip to deal with you on

16   the GP Air, right?

17   **A.**   Mr. Crossland, you're playing with words.

18   **Q.**   No, sir.

19   **A.**   Understand the transaction, HCB bought the -- had it been

20   settled, you'd have got pennies and you'd have got 44.9 percent

21   of $200,000.  So that's not what happened.

22   **Q.**   No, sir.  I'm asking you to confirm your testimony during

23   your examination with Mr. Franco that Mr. McLeod told you he

24   could not work with you on the GP Air loan until the North Tip

25   loan was settled.  That's what he told you, and that's what you

1  testified to today, isn't it?

2  **A.**   He said something like that.  I don't recall exactly what

3  he said.

4  **Q.**   Something like "settle"?

5  **A.**   Yeah.  But the only way we could do it was buy the note, so

6  we bought the note.  It wasn't settling it.  It still exists

7  today.

8        **MR. CROSSLAND:**  May I have a minute, like a quick

9  second?  I might be done but I'm not sure.

10       **THE WITNESS:**  I hope so.

11  **BY MR. CROSSLAND:**

12  **Q.**   Mr. Phillips, you never told anyone at SE Property that you

13  were in negotiations with Mr. McLeod regarding this transaction

14  between HCB and GulfSouth, did you?

15  **A.**   Did I ever tell anyone that SE Property --

16       **MR. FRANCO:**  Your Honor, objection.  I didn't go into

17  any conversation with SEPH.

18       **MR. CROSSLAND:**  Your Honor, he asked him numerous

19  questions about negotiations in all of these different deals.  I

20  just have two questions as to whether or not he ever commented

21  to SE Property as the negotiations were ongoing.

22       **MR. FRANCO:**  No questions about any conversations with

23  SEPH.

24       **THE COURT:**  I'll allow him to recross.  Go ahead.

25  **BY MR. CROSSLAND:**

1  **Q.**   Did you ever tell anyone at SE Property about the

2  negotiations that you were having with Mr. McLeod regarding the

3  transaction with HCB and GulfSouth?

4  **A.**   No.

5  **Q.**   Once HCB acquired the interest of GulfSouth in the

6  deficiency judgment or the participation agreement, did you ever

7  contact anyone at SE Property and advise that HCB had acquired

8  those interests?

9  **A.**   I expected GulfSouth to do that, because usually the

10  selling entity will notify their other people.  I didn't do it,

11  and I don't think HCB did it either.  And I'm not sure if our

12  legal counsel did it, but I didn't.

13  **Q.**   So the answer to the question is no?

14  **A.**   I didn't, no.

15            **MR. CROSSLAND:**  That's it.

16            **MR. FRANCO:**  No recross, Your Honor.

17            **THE WITNESS:**  Mr. Crossland, here, this is your

18  exhibit.

19            **THE COURT:**  All right, Mr. Phillips, you may step

20  down.

21            **(Witness excused.)**

22            **THE COURT:**  All right, counsel, anything to discuss

23  before we reconvene at eight tomorrow?

24            **MR. FRANCO:**  If we could all get an idea of what we're

25  facing tomorrow.  I think Mr. Crossland has given me some idea.

 1   Has that changed at all?

 2          **MR. CROSSLAND:**  We can just put on the record

 3   generally what we're thinking.  We did not get as far as today

 4   as we were expecting.  The Court has asked for that update.

 5          So we have the McLeod testimony, which is about an

 6   hour's worth of video.  We also expect to call Mr. McLaughlin,

 7   Mr. Osborn, Mr. Petermann, and Mr. Lloyd, and then we'll be

 8   done.

 9          I think we expect most of those witnesses to be

10   relatively short, although the history of this case so far tells

11   me I'm probably wrong.  But I think we're going to be done

12   tomorrow, and I'm hoping we're done before the three o'clock

13   break in the afternoon.

14          **THE COURT:**  So you said McLeod, McLaughlin --

15          **MR. FRANCO:**  By deposition.

16          **THE COURT:**  Right, McLaughlin, Olson, Petermann, and

17   Lloyd?

18          **MR. CROSSLAND:**  I'm sorry, McLeod, McLaughlin,

19   Osborn --

20          **MS. BRADY:**  That order is going to change, though.

21          **MR. CROSSLAND:**  -- Bill Lloyd, and Mr. Petermann, not

22   necessarily in that order.  But we will try to notify Mr. Franco

23   tonight by email.  If he has any of his witnesses that we're

24   going to call first, we'll make those decisions and get those to

25   him as soon as we can.

1          **THE COURT:**  Okay.

2          **MS. BRADY:**  And then can we ask if we do rest tomorrow

3   which witnesses HCB has lined up first.

4          **MR. FRANCO:**  It depends on the testimony of these

5   witnesses remaining.

6          **THE COURT:**  The what?

7          **MR. FRANCO:**  Depends on the testimony of these

8   witnesses remaining.  I may not be calling anybody.

9          **THE COURT:**  Well, if there's anyone that you may call,

10  I would ask that you notify Plaintiff's counsel just like

11  they've done for you with their witnesses.

12         **MR. FRANCO:**  I will do that.

13         **MR. CROSSLAND:**  Does HCB still intend to call

14  Mr. Gaudet, for example?  He's the expert that was retained.

15         **MR. FRANCO:**  We're going to make that decision

16  tonight.

17         **THE COURT:**  Well, please let them know once you make

18  the decision about tomorrow, about tomorrow.

19         **MR. FRANCO:**  That's fine.  Well, I can assure you we

20  won't be calling Mr. Gaudet tomorrow.

21         **MR. CROSSLAND:**  I think that's it, Judge.

22         **THE COURT:**  All right.  Well, then we will be in

23  recess until tomorrow morning at eight o'clock.  You all have a

24  nice evening.

25

1    *(Proceedings concluded at 5:21 p.m.)*

2              --------------------

3    *I certify that the foregoing is a correct transcript from the*
     *record of proceedings in the above-entitled matter.  Any*
4    *redaction of personal data identifiers pursuant to the Judicial*
     *Conference Policy on Privacy are noted within the transcript.*

5

6    _____          *3-25-2015*
     *Donna L. Boland, RPR, FCRR*              *Date*
7    *Official Court Reporter*

8
                              <u>INDEX</u>
9
                                                      <u>PAGE</u>
10

11   Video Deposition of Chris Campbell                    7

12

     <u>WITNESS FOR THE PLAINTIFF:</u>
13
     *MARTIN SANDEL*
14       Direct Examination by Ms. Brady                  27
         Cross-Examination by Mr. Franco                  71
15
     *RUPERT PHILLIPS*
16       Direct Examination by Mr. Crossland             127
         Cross-Examination by Mr. Franco                 178
17       Redirect Examination by Mr. Crossland           208

18
     CERTIFICATE OF REPORTER                             216
19

20

21

22

23

24

25