**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| **SE PROPERTY HOLDINGS, LLC,** ) | |
| as Successor by Merger with ) | |
| VISION BANK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | **Case No. 3:13cv6/MCR** |
| ) | |
| vs. ) | Pensacola, Florida |
| ) | March 25, 2015 |
| ) | 8:05 a.m. |
| ) | |
| **GULFSOUTH PRIVATE BANK,** ) | |
| **FIRST NBC BANK,** ) | |
| **HCB FINANCIAL CORP.**, a Florida ) | |
| Corporation, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**DAY 3**

TRANSCRIPT OF **BENCH TRIAL** PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
CHIEF UNITED STATES DISTRICT JUDGE
(Pages 1-261)

FOR **THE PLAINTIFF:**          **JULIE S. BRADY, ESQUIRE**
                                **BRANDON T. CROSSLAND, ESQUIRE**
                                Baker & Hostetler
                                200 South Orange Avenue, Suite 2300
                                Orlando, Florida  32801

FOR **THE DEFENDANTS:**        **PHILIP A. FRANCO, ESQUIRE**
                                **APRIL D. SMITH, ESQUIRE**
                                Adams and Reese, LLP
                                11 N Water Street, Suite 23200
                                Mobile, Alabama  36602

```
1                          PROCEEDINGS
2            (Court called to order; All parties present.)
3            THE COURT:  Good morning.  All right.  Ms. Simms has
4    provided me with a list of exhibits that you all have agreed to
5    that have been admitted, so I appreciate that.
6            I think we're ready for the Plaintiff's next witness.
7            MS. BRADY:  Yes, Your Honor.  Plaintiff calls Richard
8    Petermann.
9        RICHARD PETERMANN, PLAINTIFF WITNESS, DULY SWORN
10           MADAM CLERK:  Be seated.  Please state your full name
11   and spell your last name for the record.
12           THE WITNESS:  Richard Petermann, P-e-t-e-r-m-a-n-n.
13           THE COURT:  Ms. Brady, when you're ready.
14                      DIRECT EXAMINATION
15   BY MS. BRADY:
16   Q.   Good morning, Mr. Petermann.
17   A.   Good morning.
18   Q.   Where do you work?
19   A.   In Fort Walton Beach.  I'm an attorney with the firm
20   Anchors, Smith, Grimsley.
21   Q.   And how long have you been with Anchors, Smith, Grimsley?
22   A.   I've been practicing over 30 years.  We merged firms
23   probably 10, 12 years ago.
24   Q.   And what type of law do you primarily practice?
25   A.   I mostly do commercial type litigation.  We do -- I also do
```

1    a little bit of transactional work.

2    Q.    Have you had occasion in the past to represent GulfSouth

3    Private Bank?

4    A.    Yes.

5    Q.    And how did you come to represent GulfSouth?

6    A.    If I can remember correctly, they were represented by an

7    attorney out of Alabama.  They had a foreclosure that needed to

8    be handled in Walton County, Florida, and so I was engaged to

9    represent them in connection with that foreclosure case.

10   Q.    And who was that attorney out of Alabama?

11   A.    Robert Reynolds.

12   Q.    And how did you -- do you know Mr. Reynolds?

13   A.    I've just known him for years.  We're just friends.  We've

14   worked together on other cases.

15   Q.    Was this your first representation of GulfSouth?

16   A.    To my recollection, it was my personal first representation

17   of GulfSouth.  There may have been another member of my firm

18   that handled something for them that I'm not aware of.

19   Q.    Okay.  And you mentioned a foreclosure action.  Do you know

20   who the Defendant was in that foreclosure action?

21   A.    Gosh, it's been a while.  The name of the subdivision that

22   we were foreclosing was called Driftwood Estates, if I remember.

23   And I don't have a specific recollection of the name of the

24   Defendant.

25   Q.    Does North Tip sound familiar?

1    **A.**    Yes, that does sound familiar.

2    **Q.**    Did Mr. Reynolds also represent GulfSouth in connection

3    with the foreclosure action against North Tip?

4    **A.**    I know he was involved in some discussions about how we

5    were going to handle the foreclosure and how we were going to

6    ultimately handle the distribution of the lots once title was

7    obtained to those lots.  Whether he was directly representing

8    GulfSouth or was involved on behalf of some other participating

9    bank, I don't really remember.

10   **Q.**    But to your recollection did he stay involved throughout

11   the course of the litigation?

12   **A.**    He was involved, yes.

13   **Q.**    Do you know approximately when your representation of

14   GulfSouth began?

15   **A.**    Gosh, it's been a while.  No, I don't.  Several years ago.

16   **Q.**    When did you cease representing GulfSouth?

17   **A.**    After we completed the foreclosure, I continued to

18   represent GulfSouth to obtain a deficiency judgment, and we did

19   obtain that deficiency judgment.

20       The dates, I don't remember, but it was sometime subsequent

21   to obtaining a deficiency judgment for them.

22   **Q.**    Okay.  Since sometime subsequent to obtaining the

23   deficiency judgment, were there any other actions in which you

24   represented GulfSouth?

25   **A.**    No other legal matters, no.

1    **Q.**    Who was your contact at GulfSouth?

2    **A.**    Vice president Chris Campbell.

3    **Q.**    Did you ever communicate with anyone else at GulfSouth

4    besides Mr. Campbell?

5    **A.**    I may have communicated with the then CEO of GulfSouth, but

6    I'm sure over 90 percent of my communications about this matter

7    would have been with Chris Campbell.

8    **Q.**    When you say CEO, do you remember the name of the CEO?

9    **A.**    Tony Adkins maybe.  I'm not sure about the last name.  The

10   first name was Tony.

11   **Q.**    But other than primarily Chris Campbell and maybe to a much

12   lesser extent Tony Adkins, you had no other communications with

13   anybody else at GulfSouth?

14   **A.**    Not to my recollection.

15   **Q.**    What was GulfSouth's interest in the property that was

16   going to be foreclosed?

17   **A.**    GulfSouth was the lead bank in a bank participation loan

18   that involved other banks, and I can't even really remember the

19   names of the other banks.  And so they were in charge of

20   handling that credit, you might say and so -- their percentage

21   interest I don't recall.

22   **Q.**    But you remember that there was more than one bank that had

23   an interest in the property that had made the loan?

24   **A.**    There was more than one bank that had an interest in the

25   loan.

1    **Q.**   Do you recall how many other banks had an interest?

2    **A.**   I want to say that there were a total of four banks.

3    **Q.**   During the course of your representation of GulfSouth

4    concerning -- let me back up a second.  Did you communicate with

5    any of the other participating banks directly?

6    **A.**   I don't have any specific recall of communicating with

7    them.  I suppose it's possible but I don't remember

8    communicating with them.

9    **Q.**   Have you ever communicated with somebody called Mr. Martin

10   Sandel?

11   **A.**   I did communicate with Mr. Sandel.  I don't remember what

12   bank he was with, but I did communicate directly with him so --

13   **Q.**   And what about a Mr. Huggins, Larry Huggins?

14   **A.**   I have communicated with Mr. Huggins in the past.  I don't

15   know whether it was related to this particular loan or another

16   loan that I was helping his bank with.

17   **Q.**   What about a Sandy Menetre?

18   **A.**   I don't remember speaking with a person with that name.

19   Let me say there may have been an occasion where there was a

20   conference call where all of these parties were on the phone at

21   the same time with me.  I just don't remember.

22   **Q.**   Do you recall exchanging email correspondence with any of

23   the other participating banks?

24   **A.**   I know that I sent emails to Mr. Sandel.  I know that I

25   sent emails to Mr. Campbell.  It's likely, I would think, that I

1   would have copied the other participants with some of those

2   emails.

3   **Q.**   Do you recall ever receiving emails from Mr. Sandel?

4   **A.**   Yes.

5   **Q.**   During the course of your representation of GulfSouth as

6   lead bank, did any conflicts -- do you recall any conflicts ever

7   arising between GulfSouth and the participating banks?

8   **A.**   At the time of the foreclosure, I don't recall any

9   conflicts.  At the time of the final hearing on the deficiency

10  judgment part of the case, I don't recall any conflicts.  But

11  after that -- and I don't know that they were necessarily

12  conflicts -- that's kind of a strong word -- as opposed to maybe

13  just disagreements about how they were going to handle the

14  collection of the deficiency judgment.

15  **Q.**   And we will get to that issue.

16  **A.**   Okay.

17  **Q.**   GulfSouth -- so you represented GulfSouth as the lead bank?

18  **A.**   Right.

19  **Q.**   Did GulfSouth ever take a position -- did you ever assert a

20  position on behalf of GulfSouth that if the lead banks weren't

21  happy with any step what their recourse was?

22  **A.**   I don't recall as I sit here today taking a position about

23  that.  It may be that I did, but it's just been a lot of -- a

24  lot of time has gone by so I don't remember.

25  **Q.**   Sure.  Do you recall --

1        **MS. BRADY:**  Mr. Dyer, if you can pull up Plaintiff's

2    Exhibit 1 which has already been admitted into evidence.

3    BY MS. BRADY:

4    **Q.**   Sir, do you recognize this document?

5    **A.**   My screen is pretty blurry.  There we go, that helps.

6    Yeah.  It looks like the Loan Participation Agreement.  I'm just

7    going by the caption.  I don't specifically recall anything

8    about it or what it says, but this is probably the Participation

9    Agreement that I was referring to earlier that made GulfSouth

10   lead bank.

11   **Q.**   Sir, during the course of your representation of GulfSouth,

12   you did read this Participation Agreement?

13   **A.**   I'm sure I did.  I'm assuming this is it.

14   **Q.**   If you could look, sir, at --

15        **MS. BRADY:**  Mr. Dyer, if you can pull up paragraph 11,

16   which I believe is the third page.

17   BY MS. BRADY:

18   **Q.**   Sir, if you can take a minute and look at paragraph

19   11(a)(1).

20   **A.**   Okay.

21   **Q.**   To your recollection, did you ever assert a position during

22   your representation of GulfSouth that any of the banks had to

23   purchase the lead bank's status?

24   **A.**   I don't remember.

25   **Q.**   You mentioned a minute or two ago that there were some

1    disagreements about how to handle collecting on the deficiency

2    judgment.  During the course of your representation, were you

3    ever asked to look into the possibility of dividing the

4    deficiency judgment?

5    **A.**   Yes.

6    **Q.**   And do you recall approximately when that was?

7    **A.**   No.  I'm sorry, I don't.

8              **MS. BRADY:**  Mr. Dyer, if you could pull up Plaintiff's

9    Exhibit 24 which has already been moved into evidence, and if

10   you could focus on that first top part.

11   **BY MS. BRADY:**

12   **Q.**   And, sir, if you can look at this email.  Do you see that

13   you're cc'd on it, Richard Petermann?

14   **A.**   Yes.

15   **Q.**   And at the top it says RichardPetermann@RichardPPetermann?

16   **A.**   That's it, that's me.

17   **Q.**   Did you produce documents pursuant to a subpoena a couple

18   of years ago in this case?

19   **A.**   I did.

20   **Q.**   And do you recall producing emails?

21   **A.**   Yes, I do.

22   **Q.**   And do you have an understanding that if the document has

23   your name at the top in bigger bold letters that it came from an

24   email that you printed?

25   **A.**   Yes.

1    **Q.**   If you take a second and read that four-sentence email,

2    does this refresh your recollection as to the period of time

3    when you were looking into dividing up the judgment?

4    **A.**   Yeah, it must have been in May of 2011.

5    **Q.**   And do you recall when the deficiency judgment was

6    obtained?

7    **A.**   Not specifically.  It had to have been obviously before May

8    24th, 2011.

9            **MS. BRADY:**  Mr. Dyer, if you can pull up really

10   quickly Plaintiff's Exhibit 30.

11   **BY MS. BRADY:**

12   **Q.**   Sir, do you recognize this document?

13   **A.**   It looks like the deficiency judgment.

14           **MS. BRADY:**  And Mr. Dyer, the date on the second page.

15           **THE WITNESS:**  March 29th, 2011.

16   **BY MS. BRADY:**

17   **Q.**   Okay.  Does that refresh your recollection as to when the

18   deficiency judgment was entered?

19   **A.**   Yeah, it says March 29 -- it doesn't really refresh my

20   recollection.

21   **Q.**   And then in May of 2011, you were looking into dividing up

22   the deficiency judgment?

23   **A.**   Yes.

24   **Q.**   Do you remember who asked you to look into dividing up the

25   deficiency judgment?

1   **A.**    No, I don't remember whether it was Chris Campbell or

2   whether the question came up in a conference call where maybe it

3   was kind of a question that all of the bankers were posing to

4   me.  I don't remember how it came up.

5   **Q.**    Do you remember what you were specifically told to try to

6   find an answer to?

7   **A.**    Not as I -- I don't have a specific recollection today.  My

8   recollection is that I was worried about the practical effect of

9   dividing up a single judgment amongst the participants and how

10  the participants would then pursue collection efforts and

11  whether you could even do that where you've got a single debtor

12  with multiple participants going after basically the same

13  judgment, at least as to their pro rata share.  I remember there

14  being just some practical issues I was worried about.

15  **Q.**    Sure.  And how did you look into how to resolve that issue?

16  **A.**    I can't remember.  It seems like I remember that I had some

17  discussions with some of my law partners and we kind of tried to

18  figure out whether it made sense or not.

19       I don't remember whether I did any specific legal research,

20  so I -- I don't think I generated a legal memorandum or anything

21  like that.

22       I may have written a letter back to Chris or somebody

23  saying here are my concerns and kind of left it like that.

24  **Q.**    Do you remember ultimately reaching a conclusion as to

25  whether it was possible to divide the deficiency judgment?

1    **A.**    I think that I did some work to attempt to divide the

2    deficiency judgment.  I think my conclusion was at the time I

3    wasn't aware of anything that prohibited us from dividing the

4    deficiency judgment, but again, I don't think I did any in depth

5    research on the question.

6              **MS. BRADY:**  Mr. Dyer, if you could pull up Plaintiff's

7    Exhibit 36 which has already been admitted into evidence.

8    **BY MS. BRADY:**

9    **Q.**    Mr. Petermann, do you recognize this document?  Take a

10   second to look at it if you need to.

11   **A.**    Yeah, that's -- that's my signature.

12   **Q.**    And this is a letter from you to Mr. Sandel dated July

13   29th, 2011?

14   **A.**    Yes.

15   **Q.**    In that second sentence of the first paragraph, what are

16   you conveying to Mr. Martin -- I mean, to Mr. Sandel there?

17   **A.**    Pretty much what I said a minute ago about my concerns

18   regarding how you would go about collecting on the judgment.

19   **Q.**    And what about -- does this letter address what your

20   conclusion was as to whether there was anything prohibiting it?

21   **A.**    Yeah.  I say I'm not aware of any specific law prohibiting

22   the assignment, however I question it, et cetera.

23   **Q.**    And if you look at the second paragraph of this letter, the

24   first sentence, "I understand from Chris Campbell that CPB,

25   GulfSouth, and Bank of Vernon have all been in agreement that

1    Vision could take the lead on postjudgment collection efforts."

2        What conversations do you recall with Mr. Campbell

3    regarding Vision Bank taking the lead?

4    **A.**   I don't have specific recollection of conversations as I

5    sit here today, but he must have relayed that information to me

6    at some point.

7    **Q.**   And does this letter -- by looking at this letter, sir, you

8    recognize that Mr. Sandel represented Vision Bank?

9    **A.**   Yes.

10   **Q.**   And that Vision Bank was one of the participating banks?

11   **A.**   Yes.

12   **Q.**   And if you look at the next sentence in this letter, do you

13   recall giving Vision Bank an option as to collecting on behalf

14   of all banks or "go at it alone"?

15   **A.**   I said it's not clear to me.  I don't know that I gave -- I

16   didn't have the power to give anybody an option.  I think I was

17   just pointing out that it wasn't clear which way they were

18   talking about going.

19   **Q.**   Okay.  Do you recall what Mr. -- did you receive any

20   response from Mr. Sandel as to your inquiry as to whether Vision

21   wants the other banks to pay a pro rata share at the cost of

22   collection or wants to go it alone incurring its own costs but

23   retaining all sums recovered up to its pro rata share of the

24   judgment?

25   **A.**   I'm not certain about my recollection, but I think that

1    Vision Bank said they want to go it alone.  But I don't -- I'm

2    not sure.

3    **Q.**    After Vision Bank informed you that they wanted to go at it

4    alone, do you remember communications with Mr. Campbell of

5    GulfSouth regarding drafts of the -- of an assignment?

6    **A.**    I remember doing a draft of assignments and communications.

7    The specifics or time, I don't recall.

8              **MS. BRADY:**  Mr. Dyer, if you can pull up Plaintiff's

9    Exhibit 39 which has previously been admitted into evidence.

10   **BY MS. BRADY:**

11   **Q.**    Sir, if you will look at this email.  This is -- excuse me,

12   this letter.  This is a letter from you to Mr. Campbell?

13   **A.**    Yes.

14   **Q.**    Dated August 3rd, 2011?

15   **A.**    That's right.

16   **Q.**    Okay.  And in this letter -- what are you doing in this

17   letter?

18   **A.**    Let me read.  Just writing a letter to Chris Campbell

19   informing him of my conversation with Mr. Sandel and telling him

20   I'll draft partial assignments.

21   **Q.**    And in this letter are you also advising Mr. Campbell that

22   you're not aware of any prohibition to partially assigning

23   interests?

24   **A.**    Indirectly, yes.

25             **MS. BRADY:**  Mr. Dyer, if you can pull up Plaintiff's

```
 1   Exhibit 40 which has previously been moved into evidence.
 2   BY MS. BRADY:
 3   Q.   Sir, is this you forwarding the partial assignments on
 4   August 10th, 2011, to Mr. Campbell for execution?
 5   A.   Yes.
 6   Q.   Do you recall receiving signed assignments back from Mr.
 7   Campbell in late summer or early fall of 2011?
 8   A.   I don't recall.  I may have, but I do not recall.
 9   Q.   At this time, after you sent these assignments to Mr.
10   Campbell, do you recall any other of the participating banks
11   expressing any disagreement with such a procedure?
12   A.   No.
13   Q.   At some point in time, did you become aware of First NBC
14   acquiring CPB's interest -- Central Progressive Bank's interest
15   in this deficiency judgment?
16   A.   Yes.
17   Q.   And do you recall when you became aware of that?
18   A.   No.
19   Q.   Do you recall how you became aware of that?
20   A.   No, I really don't recall that either.
21   Q.   Do you recall speaking to anybody at FNBC Bank?
22   A.   Yeah.  I spoke with it seems like an attorney maybe out of
23   Texas.  I'm not positive about that.
24   Q.   And do you remember what you spoke to the attorney that
25   you're thinking who was out of Texas about?
```

1  **A.**   No.

2  **Q.**   And do you recall when approximately this was that you

3  spoke to this attorney?

4  **A.**   When?  I do not.  It may have -- it must have been after I

5  drafted these partial assignments, but no, I don't remember

6  when.

7            **MS. BRADY:**  Mr. Dyer, if you can pull up Plaintiff's

8  Exhibit 48 which has previously been entered into evidence.

9  **BY MS. BRADY:**

10 **Q.**   Sir, if you look at this letter, this is a letter from you

11 to Mr. Sandel dated December 16th, 2011.  Take a second and read

12 this.  What are you advising Mr. Sandel in this letter?

13 **A.**   Telling him that GulfSouth has been unable to communicate

14 with anyone at First NBC and that I had advised GulfSouth that

15 they didn't have to ask First NBC's permission to assign the

16 judgment pro rata.

17 **Q.**   And does this letter convey to you that as of December

18 16th, 2011, you had not spoken to anybody at First NBC Bank

19 concerning the pro rata assignments?

20 **A.**   Well, it says that GulfSouth has been unable to

21 communicate.  I thought I made a phone call to somebody and

22 probably just ran into a brick wall.  So there may have been a

23 phone call with somebody, but I don't remember who.

24 **Q.**   Sure, but you don't -- this letter conveys that you didn't

25 have a substantive conversation with anyone --

1   **A.**   That's correct.

2   **Q.**   -- concerning First NBC's position?

3   **A.**   Correct.

4   **Q.**   And in this letter you also advise Mr. Sandel that you will

5   redraft the proposed assignments and send them to him for

6   execution?

7   **A.**   Yes.

8   **Q.**   And again, the date on this is December 16th, 2011?

9   **A.**   That's right.

10          **MS. BRADY:**   Mr. Dyer, if you can pull up Plaintiff's

11   Exhibit 51 which has also already been moved into evidence.

12   **BY MS. BRADY:**

13   **Q.**   And Mr. Petermann, the date on this letter?

14   **A.**   December 19th.

15   **Q.**   And in this letter are you forwarding the partial

16   assignments of judgment to Mr. Campbell for execution?

17   **A.**   Yes.

18   **Q.**   Do you recall receiving executed partial assignments back

19   from GulfSouth, Mr. Campbell?

20   **A.**   I don't recall.

21   **Q.**   Do you recall delivering executed partial assignments to

22   the participating banks at least to Mr. Sandel on behalf of

23   Vision Bank?

24   **A.**   I don't recall.

25   **Q.**   Do you recall communicating with an attorney by the name of

1   Jason Osborn in approximately December of 2011?

2   **A.**   I do, and it may be that that was -- when I said I had

3   talked to an attorney for the bank, that might have been who I

4   was thinking about.

5   **Q.**   Okay.  And can you recall the discussions you had with

6   Mr. Osborn?

7   **A.**   No.

8   **Q.**   Did you contact Mr. Osborn or did he contact you?

9   **A.**   I don't recall.

10  **Q.**   Your deposition -- do you recall having your deposition

11  taken -- I took your deposition on August 20th, 2013?

12  **A.**   I remember, yes.

13  **Q.**   That might refresh your memory as to some of this that

14  transpired years ago?

15  **A.**   It was probably better then than it is today.

16          **MS. BRADY:**   Your Honor, may I approach?

17          **THE COURT:**   Yes.

18          **MS. BRADY:**   May I stay here, Your Honor?

19          **THE COURT:**   Yes.

20  **BY MS. BRADY:**

21  **Q.**   Mr. Petermann, if you can look at pages 56 and 57 of your

22  deposition, starting at the bottom of 56.

23  **A.**   Okay.

24  **Q.**   Does that refresh your recollection about the nature of the

25  conversations you had with Mr. Osborn?

1   **A.**   Yes.

2   **Q.**   And what were the conversations you had with Mr. Osborn?

3   **A.**   I don't remember the specifics of the conversation, but I

4   remember it was to try to find out if that new bank had in fact

5   acquired that interest and what they wanted to do with regard to

6   the judgment and how we were going to handle distributing the

7   pro rata shares or what.

8   **Q.**   Why did you contact -- or why did you have communications

9   with Mr. Osborn concerning what FNBC wanted to do as to the

10  deficiency judgment?

11  **A.**   I guess I thought he was somehow involved with that bank.

12       **MS. BRADY:**  Mr. Dyer, if you can pull up what's been

13  previously marked as Plaintiff's Exhibit 52 for identification.

14  **BY MS. BRADY:**

15  **Q.**   Sir, do you recognize this correspondence?

16  **A.**   Yes.

17  **Q.**   Is this on your letterhead?

18  **A.**   Yes, it is.

19  **Q.**   And do you recognize that as your signature?

20  **A.**   I do.

21       **MS. BRADY:**  At this time I offer Plaintiff's Exhibit

22  52 into evidence as Exhibit 52.

23       **MR. FRANCO:**  Your Honor, one second please?

24       **THE COURT:**  Yes.

25       **MR. FRANCO:**  Your Honor, we have an objection that we

1    filed for this as hearsay.  This is an out-of-court statement

2    and we object to it as hearsay.

3            **THE COURT:**  All right.  Ms. Brady, is this -- well,

4    let me ask you to state your position.  I don't want to state it

5    for you.

6            **MS. BRADY:**  Yes, Your Honor.  I'm not offering this to

7    prove the truth of the matter asserted as to the substance of

8    the communications, just that there was correspondence between

9    Mr. Petermann and Mr. Osborn and the general nature of the

10   correspondence, what it primarily concerned, not any specifics

11   as to the statements in there.

12           **THE COURT:**  And Mr. Osborn was the attorney for FNBC?

13           **MR. FRANCO:**  No, ma'am.

14           **MS. BRADY:**  He was at least the attorney for HCB.

15           **THE COURT:**  Oh, I'm sorry.  Well, I thought he worked

16   for --

17           **MR. FRANCO:**  No, ma'am.

18           **THE COURT:**  Can I see the -- I can't read this even

19   with my glasses on, it's too --

20           **MS. BRADY:**  Mr. Petermann did testify that he

21   contacted Mr. Osborn because he believed he was involved.

22           **THE COURT:**  Yeah, I heard that.

23           **MR. FRANCO:**  I'm sorry, I didn't hear that.

24           **MS. BRADY:**  I said Mr. Petermann testified that he

25   contacted Mr. Osborn because he believed he was involved.

1          **MR. FRANCO:** I don't think he said he contacted

2    anybody. He said he didn't recall who contacted whom. I

3    thought that was his testimony.

4          **THE COURT:** He said he recalled having a conversation

5    with him.

6          **MR. FRANCO:** Correct, a conversation with him, but he

7    didn't say -- that's not the correct statement. He didn't say

8    he contacted Mr. Osborn or that Mr. Osborn contacted --

9          **THE COURT:** His testimony will be reflected in the

10   record.

11         **MR. FRANCO:** Yes, ma'am. I just wanted to make it

12   clear.

13         **THE COURT:** So that I'm clear, who is Mr. Osborn? I

14   mean, his name has come up a few times in the trial, but he

15   hasn't been a prominent feature of --

16         **MR. FRANCO:** Attorney for HCB.

17         **MS. BRADY:** He will be the next witness testifying.

18         **THE COURT:** What about Mr. McGee with Harrison and

19   Ford, who did he represent?

20         **MR. FRANCO:** I have no knowledge.

21         **MS. BRADY:** I'm not even sure, Your Honor.

22         **THE COURT:** Do you know?

23         **THE WITNESS:** No, Your Honor, I don't.

24         **THE COURT:** All right. Well, I will certainly allow

25   it in, Plaintiff's Exhibit 52, as evidence of communications

| | |
|---|---|
| 1 | between Mr. Petermann on behalf of GulfSouth and Mr. Jason |
| 2 | Osborn apparently on behalf of HCB.  So it will be admitted. |
| 3 | **(Plaintiff's Exhibit 52 admitted into evidence.)** |
| 4 | **MS. BRADY:**  Thank you, Your Honor. |
| 5 | **BY MS. BRADY:** |
| 6 | **Q.**  Sir, if you can look at Plaintiff's Exhibit 52.  This is a |
| 7 | communication from you to Mr. Osborn and Derek McGee on December |
| 8 | 20th, 2011? |
| 9 | **A.**  Correct. |
| 10 | **Q.**  And can you recall what this communication was about? |
| 11 | **A.**  Not other than just reading it again. |
| 12 | **Q.**  And do you recall what Northpoint Asset Holdings, LLC, was? |
| 13 | **A.**  I can't recall, no. |
| 14 | **MS. BRADY:**  Mr. Dyer, can you pull up Plaintiff's |
| 15 | Exhibit 53 for identification. |
| 16 | **BY MS. BRADY:** |
| 17 | **Q.**  And Mr. Petermann, can you just tell me what this document |
| 18 | is? |
| 19 | **A.**  It looks like an email from Mr. Osborn -- |
| 20 | **Q.**  From Mr. Osborn to you? |
| 21 | **A.**  -- to me sent December 29th. |
| 22 | **Q.**  And again, your name being in bold, large letters at the |
| 23 | top conveys that this is an email that you printed as part of |
| 24 | your production? |
| 25 | **A.**  Yes. |

1          **MS. BRADY:**  At this time I offer to move Plaintiff's

2    Exhibit 53 -- 53 is in, I'm sorry, Your Honor.

3          **THE COURT:**  This one has been stipulated to, it's

4    admitted, so 53 has been admitted based on party stipulation.

5          **MS. BRADY:**  Okay.

6    **BY MS. BRADY:**

7    **Q.**   Plaintiff's Exhibit 53 this is an email from Jason Osborn

8    to yourself?

9    **A.**   Yes.

10   **Q.**   And it says dated December 29th, 2011?

11   **A.**   Yes.

12   **Q.**   And the beginning, "Richard, thank you for your time

13   yesterday"?

14   **A.**   Yes.

15   **Q.**   Do you recall either meeting in person or having a phone

16   call with Mr. Osborn on December 28th, 2011?

17   **A.**   I don't recall whether we met in person or had a phone

18   call.  Based on what he's saying, we communicated.

19   **Q.**   Do you recall anything about those communications?

20   **A.**   No.

21   **Q.**   And you see that this letter -- Mr. Osborn is writing this

22   letter to follow-up on the North Tip participation among

23   GulfSouth Private Bank, Bank of Vernon, Vision Bank, and First

24   NBC Bank?

25   **A.**   Yes.

1    **Q.**   Sir, do you recall any inquiries from Mr. Sandel in January

2    of 2012 as to the status of the delivery of the partial

3    assignments of the deficiency judgment?

4    **A.**   I don't recall.

5           **MS. BRADY:**   Mr. Dyer, if you can pull up Plaintiff's

6    Exhibit 56, which has already been moved into evidence.

7    **BY MS. BRADY:**

8    **Q.**   If you can take a second, sir, to look at this email.

9    **A.**   Okay.

10   **Q.**   And is this Mr. Sandel following up asking where is

11   Vision's judgment on Tuesday, January 17th, 2012?

12   **A.**   Maybe I'm not seeing this right.

13          **MS. BRADY:**   The second page, Mr. Dyer.

14          **THE WITNESS:**   Okay, January 17th, email from Mr.

15   Sandel to me, it copied Chris Campbell, yes.

16   **BY MS. BRADY:**

17   **Q.**   And Mr. Campbell's response that he has signed the

18   assignments and mailed it to Rick -- I presume that's you, Rick

19   Petermann?

20   **A.**   That's correct.

21   **Q.**   You should be receiving and distributing to the

22   participants?

23   **A.**   Correct.

24   **Q.**   And if you can see your response on the first page --

25          **MS. BRADY:**   Top of that email, Mr. Dyer.

1    **THE WITNESS:** "I will be on the lookout for it and

2    will FedEx it as soon as I receive it."

3    **BY MS. BRADY:**

4    **Q.** And do you recall FedExing the partial assignment to Mr.

5    Sandel?

6    **A.** No.

7    **Q.** And do you know why this -- these partial assignments were

8    never delivered, at least not to Vision Bank?

9    **A.** I don't know why they weren't.  I'm sure I wouldn't have

10   just made a unilateral decision not to send them.  So there

11   would have been some reason that they weren't sent, but I don't

12   recall what it was.

13   **Q.** You can't recall the reason they were not sent?

14   **A.** No.

15   **Q.** Did you ever advise Mr. Sandel that you would not be

16   forwarding the partial assignments and deficiency judgment?

17   **A.** I don't recall.

18   **Q.** You don't recall doing it one way or the other?

19   **A.** That's right.

20   **Q.** Do you recall filing a further action on behalf of

21   GulfSouth?

22   **A.** There was -- yes.  There was some sort of an action for

23   declaratory decree or something, if I recall, basically trying

24   to get some direction from the Court as to what we should be

25   doing with it.

1   **Q.**   And why were you seeking direction from the Court as to

2   what GulfSouth should be doing with the deficiency judgment?

3   **A.**   My guess is that I was concerned that GulfSouth was going

4   to have a problem whether it gave the assignments from some

5   banks and a problem from other banks if it refused to.

6        So the best thing for GulfSouth to do to avoid any kind of

7   liability from anybody who was unhappy with whatever action it

8   might take would be to get -- maybe to get some judicial shelter

9   through a judgment.

10  **Q.**   Sure, understandable.  But what was your understanding as

11  to a disagreement between the banks?  Do you know which banks

12  were having a disagreement?

13  **A.**   Well, after looking at all this, I suspect that Mr. Sandel

14  wanted the assignment and wanted to go it alone, and there must

15  have been another bank or banks that said, no, we're not

16  comfortable with that.

17  **Q.**   Okay.  And you do recall which bank expressed that it was

18  not comfortable with the division of the deficiency judgment?

19  **A.**   I don't recall.

20      **MS. BRADY:**  Mr. Dyer, if you can pull up Plaintiff's

21  Exhibit 68, which has been moved into evidence.

22  **BY MS. BRADY:**

23  **Q.**   Do you recognize this as a copy of the complaint for

24  declaratory relief that GulfSouth filed?

25  **A.**   Yes.

1    **Q.**   And the date on this complaint, sir?

2    **A.**   It looks like May 2012.

3    **Q.**   And you don't recall communicating with Mr. Sandel between

4    January of 2012 and the date of filing this complaint that there

5    was a disagreement amongst the banks regarding dividing the

6    partial -- excuse me -- dividing the deficiency judgment?

7    **A.**   I don't recall.

8    **Q.**   If you can look at paragraph 20.  It states that, "Central

9    Progressive Bank and now Defendant FNBC have indicated that it

10   does not want the deficiency judgment split into pro rata shares

11   and that instead it wants the deficiency judgment to remain as a

12   single undivided judgment"?

13   **A.**   Yes.

14   **Q.**   How did you learn that information that First NBC Bank did

15   not want the deficiency judgment split into pro rata shares?

16   **A.**   I don't recall.

17   **Q.**   Do you recall if that was information Mr. Osborn

18   communicated to you when you discussed -- when you sought out

19   the banks' positions?

20   **A.**   It may have -- I don't recall, but it may have been, but I

21   do not have any recollection.

22   **Q.**   Prior to FNBC taking over Central Progressive Bank's

23   interest, do you recall anybody at Central Progressive Bank

24   expressing any disagreement with dividing the deficiency

25   judgment?

1    **A.**   I don't recall.

2    **Q.**   Sir, I direct your attention to paragraph 23 of the

3    GulfSouth complaint.

4         **MS. BRADY:**  Mr. Dyer, if you can split on two pages.

5         **THE WITNESS:**  As to your last question about Central

6    Progressive Bank, I think at one point in time they were

7    represented by an attorney in Destin, Dana Matthews.

8         It's possible that he and I had some conversations

9    about splitting up -- about these partial assignments of

10   judgment that we're talking about.  I don't recall whether he

11   indicated any objection to it to me, but I think there may have

12   been a discussion with him about it.

13   **BY MS. BRADY:**

14   **Q.**   Discussion.  But you don't recall if there was an

15   objection?

16   **A.**   No, I don't.

17        **MS. BRADY:**  Mr. Dyer, if you can pull up Defendant's

18   Exhibit 78, which has already been moved into evidence.  The top

19   part of the first email.  Is this Defendant's 78?

20   **BY MS. BRADY:**

21   **Q.**   This is an email from Chris Campbell to you and Mr. Sandel.

22   "Rick, have you had any response from either CPB or Dana's

23   office on Vision's judgment request?"

24        Dana's office, is that being the Dana Matthews that you

25   just spoke of?

1    **A.**   Yes.

2    **Q.**   And you said, sir, that you can't recall if there was any

3    disagreement expressed by Dana Matthews on behalf of CPB; is

4    that correct?

5    **A.**   That's correct.

6    **Q.**   Your deposition might help you?

7    **A.**   Yes.

8           **MS. BRADY:**   Your Honor, may I approach?

9           **THE COURT:**   Yes.

10   **BY MS. BRADY:**

11   **Q.**   If you can direct your attention, sir, to page 46 of your

12   deposition.

13   **A.**   Okay.

14   **Q.**   And does this refresh your memory as to whether CPB -- Mr.

15   Matthews on behalf of CPB actually expressed disagreement --

16          **MR. FRANCO:**   Your Honor, excuse me, why are we showing

17   the deposition on the screen?

18          **THE COURT:**   I don't know.

19          **MR. FRANCO:**   I would just make sure we don't do that.

20          **THE COURT:**   Well, this is a bench trial, Mr. Franco.

21   I mean, it's -- it's not near the risk that we would have if we

22   had a jury here.  I didn't even look at it.

23          **MR. FRANCO:**   No, I understand.

24          **THE COURT:**   What's the concern?

25          **MR. FRANCO:**   I'm not -- it's nothing to you, Your

1    Honor.  I just -- I thought your procedure was that you don't

2    show the deposition unless it's an impeachment issue, that's

3    all.

4              **THE COURT:**  Well, we haven't had this issue come up,

5    so I don't know that you would know my procedure.  The only time

6    this has come up in this trial is in relation to a party, and I

7    told you that in federal court depositions of a party are

8    admissible for any purpose.

9              **MR. FRANCO:**  Right, I understand that.

10             **THE COURT:**  But this is not a party.  But we haven't

11   discussed my procedure.  My procedure is in a bench trial it's

12   not really a big deal.  Okay?

13             **MR. FRANCO:**  I'm glad to know that now.  Thank you.

14             **THE COURT:**  All right.  Go ahead.

15   **BY MS. BRADY:**

16   **Q.**  Let me ask you to look at it again.  Does this refresh your

17   recollection as to whether there was any disagreement expressed

18   by Mr. Matthews on behalf of CPB?

19   **A.**  Well, at the time of the deposition I didn't recall that

20   there was any disagreement, so it does help, yes.

21   **Q.**  If you look at paragraph 23 of this complaint.

22             **MS. BRADY:**  Mr. Dyer, Plaintiff's Exhibit 68, page 5,

23   paragraph 23.  If you can pull up the second page as well.

24   **BY MS. BRADY:**

25   **Q.**  Does this paragraph address what you testified to earlier

1    that there was a dispute between the banks necessitating

2    GulfSouth filing an action?

3    **A.**    Yes.

4    **Q.**    And if you see that second sentence, "Specifically

5    GulfSouth must reach a mutual agreement with the Defendants

6    before it decides what to do with the deficiency judgment.  The

7    conflicting desires of Defendant FNBC and Defendant Centennial

8    Bank make it impossible to reach a mutual consensus on what to

9    do with the deficiency judgment."

10   **A.**    Yes.

11   **Q.**    What was the basis of your understanding that there needed

12   to be a mutual agreement between the parties?

13   **A.**    I don't remember whether my understanding was based upon

14   language in a participation agreement or just the position that

15   GulfSouth Bank was taking that it wasn't going to do something

16   without a mutual agreement.

17   **Q.**    So during the course of your representation of GulfSouth,

18   did GulfSouth generally take the position that it tried to reach

19   a mutual agreement on matters?

20   **A.**    Yes.

21   **Q.**    Did GulfSouth ever -- to your knowledge, had GulfSouth

22   asserted the position that if a bank was --

23              **MR. FRANCO:**  Objection, Your Honor, leading.

24              **THE COURT:**  It's leading, I agree.  Sustained.

25   **BY MS. BRADY:**

1   **Q.**   Do you recall if you contacted Mr. Sandel at -- for Vision

2   Bank prior to filing the GulfSouth declaratory judgment action?

3   **A.**   I don't recall.

4   **Q.**   To your knowledge, did there ever became a time when

5   GulfSouth conveyed its interest in the deficiency judgment in

6   the participation agreements to another party or entity?

7   **A.**   I was made aware of that specifically when you took my

8   deposition before, and I think I had some general knowledge that

9   this had happened back at the time all of this was going on.

10  **Q.**   What general knowledge did you have back at the time this

11  was all going on?

12  **A.**   I wasn't directly involved in that.  I found out that the

13  new CEO for GulfSouth Bank had kind of taken over the handling

14  of this matter.  And if I recall correctly, there was an

15  attorney from Birmingham that was working with the new CEO on

16  some sort of a transaction that I really didn't have any

17  involvement with.

18  **Q.**   And how did you receive this information?

19  **A.**   I think I got an email either directly from the new CEO or

20  from Chris Campbell, and I don't remember what it said, but

21  basically indicating to me, hey, we're doing something else with

22  this matter.

23  **Q.**   Did they tell you what else they were doing with this

24  matter?

25  **A.**   Not that I can recall.

*Rick Petermann - Direct/Brady*

1   **Q.**   Did they tell you who was involved in this matter?

2   **A.**   No.

3          **THE COURT:**  Ms. Brady, can I ask for clarification.

4          What time frame are we talking about here?  You say in

5   relation to the dec action.

6          **THE WITNESS:**  It had to have been -- obviously, it was

7   after I filed the dec action, and I think we just kind of let

8   the dec action get dismissed, if I remember what happened with

9   it.  I'm not sure.  But after I filed the dec action, it just

10  looked like they had went a different direction with what they

11  were going to do to handle that deficiency judgment, and I

12  really wasn't aware of what they were doing.

13         **THE COURT:**  Okay, thank you.

14         Thank you.

15  **BY MS. BRADY:**

16  **Q.**   And sir, I wanted to actually get into that time period.

17         **MS. BRADY:**  Mr. Dyer, if you can pull up Plaintiff's

18  Exhibit 75 marked for identification.

19  **BY MS. BRADY:**

20  **Q.**   And sir, is this an email to you?  Do you recognize your

21  email address on the "to" line?

22  **A.**   Yes, I do.

23  **Q.**   And again this was printed by you as noted by the larger

24  bold writing up at the top of the email?

25  **A.**   Yes.

1    **Q.**    And is an email from Jason Osborn to you?

2    **A.**    To me and others, yes.

3             **MS. BRADY:**   At this time, I offer Plaintiff's Exhibit

4    75 into evidence.

5             **THE COURT:**   Mr. Franco, any objection?

6             **MR. FRANCO:**   No objection, Your Honor.

7             **THE COURT:**   Okay, 75 is admitted.

8             **(Plaintiff's Exhibit 75 admitted into evidence.)**

9    BY MS. BRADY:

10   **Q.**   And Mr. Petermann, since it's a brief email, can you just

11   read it aloud, please.

12   **A.**    Sure.  "All:  Bucky and I are working to revise some of the

13   documents based upon our conversation with Rick Petermann and

14   our review of previous and pending litigation among the various

15   participants in the North Tip Development loan transaction.  We

16   expect to circulate revised documents no later than Monday, with

17   a goal of closing on Wednesday.  I hope that works for

18   everyone."

19   **Q.**    Okay.  And if you see on the "to" line, you recognize who

20   this is being sent to?

21   **A.**    To me and Mr. McLeod, who is that -- the CEO of GulfSouth

22   Private Bank.

23   **Q.**    And what about on the cc line?

24   **A.**    Henry Bucky Fox, Rupert Phillips.

25   **Q.**    Did you have an understanding when you received this email

1  as to who Bucky Fox was?

2  **A.**   He had represented one or more of the defendants in the

3  foreclosure and deficiency judgment lawsuit that I handled.

4  **Q.**   The GulfSouth foreclosure?

5  **A.**   Yes, correct.

6  **Q.**   And did you have an understanding as to who Rupert Phillips

7  was?

8  **A.**   One of the guarantors of the loan.

9  **Q.**   And one of the judgment-debtors to the deficiency judgment?

10  **A.**   Yes.

11  **Q.**   And so they're cc'd on this email that you received?

12  **A.**   Yes.

13  **Q.**   And it says, "Bucky and I are working to revise some of the

14  documents based on our conversations with Rick Petermann."

15       Do you recall what conversation that you had with Rick

16  Petermann -- I mean, sorry -- what conversations you had with

17  Mr. Osborn?

18  **A.**   I don't.

19  **Q.**   Do you recall providing any information or materials to Mr.

20  Osborn?

21  **A.**   I don't recall.

22  **Q.**   And it says, "In our review of the previous and pending

23  litigation among the various participants."  Do you recall

24  having conversations with Mr. Osborn about previous and pending

25  litigations among the various participants?

1   **A.**   I don't recall.

2          **MS. BRADY:**  Mr. Dyer, if you can pull up Plaintiff's

3   76 for identification.

4   **BY MS. BRADY:**

5   **Q.**   Mr. Petermann, do you recognize this document?

6   **A.**   An email from Robert Reynolds to Jason Osborn, copying me,

7   Mr. McLeod, and Chris Campbell.

8   **Q.**   And the date on this email?

9   **A.**   June 18th, 2012.

10  **Q.**   And again, the larger, bold writing with your name at the

11  top indicates this was an email printed by you?

12  **A.**   Yes.

13          **MS. BRADY:**  At this time, I offer Plaintiff's Exhibit

14  76 into evidence.

15          **THE COURT:**  Mr. Franco?

16          **MR. FRANCO:**  No objection.

17          **THE COURT:**  Okay, 76 is admitted.

18          **(Plaintiff's Exhibit 76 admitted into evidence.)**

19  **BY MS. BRADY:**

20  **Q.**   And Robert Reynolds, you testified earlier what was his

21  involvement in this action?

22  **A.**   He is an attorney from Tuscaloosa, and if I remember

23  correctly, he was involved in getting the initial foreclosure

24  case referred to me for handling here in Florida.  And from

25  reading this, it looks like he was representing the Bank of

1    Vernon.

2    **Q.**   Okay.  And that second paragraph, "It is my understanding

3    that the transaction of GulfSouth Private Bank has yet to close,

4    and obviously we would like for the transaction with Bank of

5    Vernon to close simultaneously."

6         What did you understand this transaction with

7    GulfSouth Private Bank to be?

8    **A.**   Sitting here today, I think I understand what it was, but

9    at the time I'm not sure that I did.

10   **Q.**   And who is cc'd on this email?

11        **THE COURT:**  Well, wait.  I'd like to know what he

12   thinks it is today based --

13        I mean, Mr. Petermann, is that based on your having

14   experienced it back several years ago and this is now coming

15   back to you or --

16        **THE WITNESS:**  No, no, not at all.

17        **THE COURT:**  Oh, okay.  So you would just be guessing?

18        **THE WITNESS:**  That's correct.

19        **THE COURT:**  Nevermind then.  I thought you were saying

20   it's coming back to you based on reviewing these documents.

21        All right, go ahead, Ms. Brady.

22   **BY MS. BRADY:**

23   **Q.**   Who was cc'd on this email, sir?

24   **A.**   Me, Mr. McLeod, and Chris Campbell.

25   **Q.**   And Larry Huggins.  Do you know who Larry Huggins is?

1  **A.**   Oh, I missed that, yes, Larry Huggins, and somebody else,

2  D.B. Anderson.

3  **Q.**   And so back in June 2012, you're being cc'd on this email

4  from Mr. Reynolds to Jason Osborn as to a transaction, and you

5  had no understanding as to what that transaction was?

6  **A.**   No.

7  **Q.**   Did you review any documents associated with that

8  transaction?

9  **A.**   Not to my recollection.

10        **MS. BRADY:**  Mr. Dyer, if you can pull up Plaintiff's

11  Exhibit 77 marked for identification.

12  **BY MS. BRADY:**

13  **Q.**   And sir, do you recognize this as another -- excuse me --

14  as an email from Jason Osborn that you were cc'd on?

15  **A.**   It looks like I was in the -- on the "to" line but it --

16  **Q.**   I'm sorry, the "to" line?

17  **A.**   Yes.

18  **Q.**   And again, this is an email that you printed by virtue of

19  the larger font on the top in your name?

20  **A.**   Yes.

21  **Q.**   And the date on this email?

22  **A.**   June 22nd, 2012.

23        **MS. BRADY:**  At this time, I offer Plaintiff's Exhibit

24  77 into evidence.

25        **THE COURT:**  Mr. Franco?

1          **MR. FRANCO:**  No objection.

2          **THE COURT:**  77 is admitted.

3          **(Plaintiff's Exhibit 77 admitted into evidence.)**

4     BY MS. BRADY:

5     **Q.**   And Mr. Petermann, can you read this email aloud.

6     **A.**   "Dear All:  Draft documents attached for your review.  We

7     should be ready to close as soon as everyone can exchange and

8     approve any revisions."

9     **Q.**   Does this indicate to you that Mr. Osborn was sending all

10    the people in the "to" and "cc" lines draft documents?

11    **A.**   Yes.

12    **Q.**   And who is this email being sent to?

13    **A.**   To Mr. McLeod at GulfSouth Bank, D.B. Anderson, to me, with

14    a copy to Rupert Phillips and Henry Fox.

15    **Q.**   And you see on the attachments it lists the dox version of

16    a number of attachments to the email?

17    **A.**   Yes.

18    **Q.**   And the first one being "Agreement to Assign Participation

19    Interest"?

20    **A.**   Yes.

21    **Q.**   And then if you read through, the last one is "Assignment

22    of Judgment"?

23    **A.**   Yes.

24    **Q.**   Did you read any documents that were attached to this

25    email?

*Rick Petermann - Direct/Brady*

1    **A.**   If I did, I don't remember reading them.  This was -- when

2    Mr. McLeod was involved with handling this matter, my

3    recollection is that I was told there was an attorney in

4    Birmingham handling this, so I pretty much didn't pay any

5    attention to it.

6    **Q.**   Well, you did receive -- you have no reason to doubt that

7    you received these emails?

8    **A.**   No, I don't doubt that.

9    **Q.**   Did it cause you any concern that -- excuse me.  Did you

10   have any concerns that a judgment-debtor and an attorney that

11   had represented --

12         **MR. FRANCO:**  Objection, Your Honor, leading.

13         **THE COURT:**  Overruled.

14   **BY MS. BRADY:**

15   **Q.**   -- and that an attorney representing at least one of the

16   judgment-debtors was being cc'd on correspondence regarding

17   assignments?

18   **A.**   I don't recall that it caused me any concern.  I'm sure

19   when I looked at it I was probably curious about what was going

20   on, probably raised my eyebrows.

21   **Q.**   Did you ask anybody what was going on?

22   **A.**   No.

23   **Q.**   Why not?

24   **A.**   It was made clear to me that my involvement was limited to

25   what I had already done.  There was a new attorney in Birmingham

1    that was handling the matter.

2    **Q.**   Did you convey any information to Mr. Sandel that there

3    were discussions regarding a transaction and you receiving an

4    email with assignments attached?

5    **A.**   Not that I can recall.

6         **MS. BRADY:**  Your Honor, at this time I want to

7    question the witness regarding Plaintiff's Exhibit 80.  That is

8    the document that you took under advisement as to admissibility.

9         **THE COURT:**  Ms. Brady, your intent is to have the

10   Court consider this as evidence of the settlement?

11        **MS. BRADY:**  That Mr. Petermann was advised there was a

12   settlement, not the truth of the matter asserted as to whether

13   there was indeed a settlement, but as to Mr. -- whether Mr.

14   Petermann was advised that -- whether Mr. Campbell advised that

15   there was.

16        **THE COURT:**  And what's the relevance of Mr. Petermann

17   being advised that there was a settlement?

18        **MS. BRADY:**  The future action that Mr. Petermann took

19   as a result of receiving this email.

20        **THE COURT:**  And is he going to testify -- I mean, did

21   he take some action?

22        **MS. BRADY:**  Yes.

23        **THE COURT:**  Okay, I'll allow it in for that reason.

24   Objection will be overruled and I'll consider it for that

25   purpose.

1          **(Plaintiff's Exhibit 80 admitted into evidence.)**

2               **MS. BRADY:**  Mr. Dyer, Exhibit 80, taken under

3      advisement and admitted.

4               **THE COURT:**  Now admitted.

5      **BY MS. BRADY:**

6      **Q.**   Sir, if you can look at this email dated June 26, 2012.  Do

7      you recall receiving this email?

8      **A.**   I don't recall receiving it, but I'm sure I did.

9      **Q.**   Okay.  Do you recall having any conversations with Mr.

10     Campbell as to whether there was a settlement with Mr. Phillips?

11     **A.**   I don't recall.

12     **Q.**   Do you recall asking anyone for any explanation as to what

13     transpired?

14     **A.**   I don't recall.

15     **Q.**   And you see that second sentence, "I'm not sure of the

16     terms but Mac is needing for us to drop the lawsuit that is

17     currently pending"?

18     **A.**   Yes.

19     **Q.**   And as a result of this email, did you dismiss the lawsuit

20     that was pending?

21     **A.**   I don't specifically recall.

22     **Q.**   You do see that this -- one second.

23               **MS. BRADY:**  Mr. Dyer, can you pull up Plaintiff's

24     Exhibit 91 marked for identification.

25     **BY MS. BRADY:**

1    **Q.**   Sir, what is this document?

2    **A.**   It's a Notice of Voluntary Dismissal.  It's signed by one

3    of my associates, Jeff Burns.

4          **MS. BRADY:**  At this time, I offer Plaintiff's Exhibit

5    91 into evidence.

6          **THE COURT:**  Mr. Franco, any objection to 91?

7          **MR. FRANCO:**  I'm trying to keep up, Your Honor.  May I

8    have one second?  No objection, Your Honor.

9          **THE COURT:**  All right, 91 is admitted.

10         **(Plaintiff's Exhibit 91 admitted into evidence.)**

11   **BY MS. BRADY:**

12   **Q.**   Sir, this is a Notice of Voluntary Dismissal of Entire

13   Action Without Prejudice dated June 28th, 2012?

14   **A.**   Correct.

15         **THE COURT:**  Let me just state -- I'm sorry.  Before

16   you go further, let me just state on the record that I will

17   consider 80 for the purpose of explaining the subsequent action

18   taken by Mr. Petermann.

19         Even though Mr. Petermann does not remember receiving

20   Plaintiff's Exhibit 80 and does not specifically recall taking

21   action based on receiving it, it's certainly circumstantial

22   evidence of his reason for taking the action that he did in

23   Plaintiff's Exhibit 91, particularly in light of the dates.  I

24   mean, the email is dated June 26, and the dismissal is dated

25   June 28.  All right.  Go ahead.

1          **MS. BRADY:**  And Your Honor, excuse me.  While we're

2     considering these documents, let's pull up Plaintiff's Exhibit

3     81 marked for identification.

4     **BY MS. BRADY:**

5     **Q.**   Sir, do you recognize this document?

6     **A.**   An email from me to Chris Campbell.

7     **Q.**   And the date?

8     **A.**   June 26.

9          **THE COURT:**  Well, this makes it even more clear.

10         **MS. BRADY:**  Yes.

11         **THE COURT:**  I wasn't aware of 81, but all right.

12         **MS. BRADY:**  At this time I offer Plaintiff's Exhibit

13    81 into evidence.

14         **THE COURT:**  Mr. Franco, if you want to place an

15    objection on the record to preserve what you can, but my ruling

16    is going to be that it's admitted.

17         **MR. FRANCO:**  No objection.

18         **THE COURT:**  All right, 81 is admitted.

19         **(Plaintiff's Exhibit 81 admitted into evidence.)**

20    **BY MS. BRADY:**

21    **Q.**   So, sir, the notice of voluntarily dismissal --

22         **MR. FRANCO:**  Objection, Your Honor, leading.

23         **MS. BRADY:**  I'll rephrase.

24    **BY MS. BRADY:**

25    **Q.**   How many days after the email that's Exhibit 80 did your

1   firm file the Notice of Voluntary Dismissal of Entire Action

2   Without Prejudice?

3   **A.**   If I remember the date on the dismissal, it was two days

4   later.

5          **MS. BRADY:**  Mr. Dyer, if you can pull up Plaintiff's

6   Exhibit 92 marked for identification.

7   **BY MS. BRADY:**

8   **Q.**   Sir, do you recognize this document?

9   **A.**   An email from Chris Campbell to me dated June 28.

10          **MS. BRADY:**  At this time, I offer Plaintiff's Exhibit

11   82 into evidence.

12          **THE COURT:**  82 will be admitted unless, Mr. Franco, is

13   there -- I mean, I don't know if you're reviewing it or --

14          **MR. FRANCO:**  I was just looking at it to see what it

15   was, Your Honor.  It's along the same lines as the other one, so

16   my position is the same.

17          **THE COURT:**  Thank you.  92 is admitted.

18          **(Plaintiff's Exhibit 92 admitted into evidence.)**

19   **BY MS. BRADY:**

20   **Q.**   And sir, the date on this email?

21   **A.**   June 28th, 2012.

22   **Q.**   And can you read this email, the top one.

23   **A.**   "Rick, my CEO is following up on this.  Did you have a

24   chance to file the dismissal yesterday?  Will you forward to me

25   so I can get it to Mac."

1  **Q.**   Thank you.  And is this email then what caused you to file

2  the Notice of Voluntary Dismissal?

3  **A.**   Yes.

4  **Q.**   Sir, do you recall you and I having any discussions

5  concerning the GulfSouth declaratory judgment action at the time

6  you filed it?

7  **A.**   No.

8  **Q.**   Do you recall you and I having any subsequent conversations

9  regarding the GulfSouth declaratory judgment action after it was

10  filed?

11  **A.**   No, I'm sorry.

12  **Q.**   Do you remember exchanging any email correspondence with me

13  regarding the GulfSouth declaratory judgment action?

14  **A.**   No.

15  **Q.**   And no email correspondence regarding the dismissal of the

16  GulfSouth declaratory judgment action?

17  **A.**   No recollection.

18        **MS. BRADY:**  Mr. Dyer, if you can pull up Plaintiff's

19  Exhibit 97 marked for identification.

20  **BY MS. BRADY:**

21  **Q.**   And sir, is that an email -- the top email, is that an

22  email from you?

23  **A.**   Yes.

24  **Q.**   Dated June 29th, 2012?

25  **A.**   Yes.

1    **Q.**   And again, the larger type at the top, Richard M.

2    Petermann, in bold reflects that it came from your email

3    account?

4    **A.**   That's correct.

5    **Q.**   And this is an email correspondence with me?

6    **A.**   Yes.

7            **MS. BRADY:**   At this time I offer Plaintiff's Exhibit

8    97 into evidence.

9            **MR. FRANCO:**   Your Honor, the bottom part of the email

10   string is from Ms. Singer, which I would object to as hearsay.

11   The top part I don't have any objection to.

12           **THE COURT:**   Okay.  I'm just now looking at it.  I had

13   to change exhibit books.  You object to the email from Mr. Burns

14   to Ms. Brady?

15           **MR. FRANCO:**   Actually, you're behind me in this

16   string.

17           **THE COURT:**   You said the bottom of the string.

18           **MR. FRANCO:**   I was looking at the first page.  I would

19   object to any of it other than the first one from Mr. Petermann.

20   The rest of it is hearsay.

21           **THE COURT:**   Ms. --

22           **MR. FRANCO:**   Self-serving, especially on behalf of Ms.

23   Brady as to what she's saying in the email.

24           **MS. BRADY:**   First, I'm not using it for the truth of

25   any matter asserted.  But second of all, I'm really only

1    primarily concerned with that top email.

2              THE COURT:  The one from Mr. Petermann to you?

3              MS. BRADY:  Yes.

4              MR. FRANCO:  I have no objection to that one, Your

5    Honor.

6              THE COURT:  Okay.  Well, then, let's just leave it at

7    that.

8              MS. BRADY:  Okay.

9              MR. FRANCO:  So for the record, just so the record is

10   straight, the rest of it is not coming in?

11             THE COURT:  The rest of it will not be considered.

12   I'm not going to require you all to redact it, I'm just not

13   going to consider it.

14             MR. FRANCO:  Okay, thank you, Your Honor.

15   BY MS. BRADY:

16   Q.   Okay, sir, can you read that top email that you sent to me

17   on June 29th, 2012.

18   A.   Yes.  "Julie, all I can tell you is that the VP of

19   GulfSouth instructed me to dismiss the complaint without

20   prejudice.  He was directed to do so by the CEO.  I have not

21   been given any other info from them.  I am just doing what I

22   have been directed to do.  Rick."

23   Q.   Taking a look at this, was this in response to an inquiry

24   as to why that action had been dismissed?

25   A.   It's in response to an email from you that's right below

1   it.

2   **Q.**   Inquiring as to why the action was dismissed?

3          **MR. FRANCO:**   Objection.   We're -- that's the hearsay

4   part, it's asking the question about the email I just objected

5   to, Your Honor.

6          **MS. BRADY:**   I'm asking him what his email in response

7   -- just generally what it was in response to.   I'm not getting

8   at the truth of any statements asserted, whether I was truthful

9   in any statements I made --

10         **THE COURT:**   I mean, what's the relevance of you asking

11   -- of you making the inquiry, I mean, to this -- to what's

12   before me here?

13         **MS. BRADY:**   Relevance is what his response was.

14         **THE COURT:**   Right, and I know we have that so --

15         **MS. BRADY:**   Okay, so I'll ask the next question.

16   **BY MS. BRADY:**

17   **Q.**   Now, at the time that you sent me this email on -- you

18   responded to this email on June 29th, 2012, you had already

19   received Plaintiff's Exhibit 80, correct?

20         **MS. BRADY:**   Mr. Dyer, can you pull up Plaintiff's

21   Exhibit 80 again.

22         **THE WITNESS:**   Yes, 80 is dated June 26.   The other one

23   was June 29th, if I remember.

24   **BY MS. BRADY:**

25   **Q.**   And in 80 Mr. Campbell stated, "Rick, my new CEO, Mac

1   McLeod, has settled with Rupert Phillips," you see that?

2   **A.**   Yes.

3           **MS. BRADY:**   And Plaintiff's Exhibit 97, Mr. Dyer, if

4   you can pull that one back up.

5   **BY MS. BRADY:**

6   **Q.**   You say, "I have not been given any other info from them"?

7   **A.**   Correct.

8   **Q.**   Why did you not tell me that GulfSouth had settled this

9   matter?

10  **A.**   I don't know.

11  **Q.**   Why did you not advise me that there had been assignments

12  regarding this -- related to this matter?

13  **A.**   Are you talking about the partial assignments that I had

14  drafted here or the ones that were referred to later on?

15  **Q.**   Let me rephrase that.   Why didn't you tell me about the

16  transaction that you had been copied on correspondence about

17  with Mr. Osborn and Mr. McLeod?

18  **A.**   I don't know.

19  **Q.**   Did anyone direct you not to inform either me or SE

20  Property or any other participating bank as to a settlement or

21  an assignment?

22  **A.**   No.

23  **Q.**   You state, "I have not been given any other info from

24  them."   But sir, did you have other info as for the reason for

25  dismissal?

1    **A.**    Not that I can recall.

2    **Q.**    What about Plaintiff's Exhibit 80?

3    **A.**    Oh, the settlement, with reference to the settlement, okay.

4            **MS. BRADY:**  Can I have a minute, Your Honor?

5            **THE COURT:**  Yes.

6            **MS. BRADY:**  Mr. Dyer, if you can pull up again

7    Plaintiff's Exhibit 75.

8    **BY MS. BRADY:**

9    **Q.**    Mr. Petermann, I asked you regarding Plaintiff's Exhibit 75

10   if you remembered providing any information to Mr. Osborn in

11   response to this email.  And do you recall providing him any

12   information?

13   **A.**    I don't recall.

14   **Q.**    If he had asked for any information, would you have

15   provided it, any documentation?

16   **A.**    I'm not sure.  I probably would have, but I -- I don't know

17   for sure unless -- today I don't know for sure whether I would

18   have or not.

19           **MS. BRADY:**  That's all, Your Honor.

20           **THE COURT:**  Mr. Franco?

21           **MR. FRANCO:**  Yes, ma'am, thank you.

22                        **CROSS-EXAMINATION**

23   **BY MR. FRANCO:**

24   **Q.**   Good morning.

25   **A.**   Good morning.

1    **Q.**   Mr. Petermann, other than at your deposition, have you and

2    I spoken at all about this case?

3    **A.**   Not that I can recall.

4    **Q.**   Now, do you recall having any conversations at all with Mr.

5    McLeod at GulfSouth, sir?

6    **A.**   No.

7    **Q.**   I am going to show you --

8    **A.**   Let me take that back.  I know I had a conversation with

9    Mr. McLeod at some point during all this, but I don't remember

10   what we talked about.

11   **Q.**   Okay.  Any of the issues that you were examined about, does

12   that -- do you recall discussing any of those issues with Mr.

13   McLeod?

14   **A.**   I just don't remember what we would have -- what we would

15   have talked about.

16   **Q.**   Now, you said -- obviously you remember the final judgment

17   of foreclosure that was obtained in this case on behalf of

18   GulfSouth?

19   **A.**   Yes.

20   **Q.**   Do you recall any objections by any of the participating

21   banks to GulfSouth taking that judgment of foreclosure in its

22   name only?

23   **A.**   No.

24   **Q.**   I'm going to show you Defendant's Exhibit 51, which I

25   understand there's no objection.

| | |
|---|---|
| 1 | **THE COURT:**  I think it's in. |
| 2 | **MR. FRANCO:**  It's already in, yes. |
| 3 | BY MR. FRANCO: |
| 4 | **Q.**   That's a May 21, 2010, email, and that email address, sir, |
| 5 | is from Martin Sandel to you.  And on May 11, 2010, he asks, |
| 6 | "Are we now proceeding on the separate deficiency judgments?" |
| 7 | You see that? |
| 8 | **A.**   Yes. |
| 9 | **Q.**   Now, you didn't consider Mr. Sandel your client, I assume; |
| 10 | is that correct? |
| 11 | **A.**   That's correct. |
| 12 | **Q.**   Were you ever instructed by GulfSouth to proceed to get |
| 13 | separate deficiency judgments? |
| 14 | **A.**   Not that I can recall. |
| 15 | **Q.**   Okay.  I want to show you next Defendant's Exhibit 53.  And |
| 16 | I believe that's in evidence as well.  This is the Motion For |
| 17 | Deficiency Judgment filed June 28, 2010, is stamped, you see |
| 18 | that? |
| 19 | **A.**   I do. |
| 20 | **MS. BRADY:**  Your Honor, I have no objection to this |
| 21 | document but my objection is this is beyond the scope. |
| 22 | **THE COURT:**  Overruled.  I'll allow you to cover it in |
| 23 | redirect if you feel you need to. |
| 24 | **MS. BRADY:**  All right. |
| 25 | **MR. FRANCO:**  Thank you, Your Honor. |

1    **BY MR. FRANCO:**

2    **Q.**   And Mr. Petermann, this -- you filed this, correct?

3    **A.**   Correct.

4    **Q.**   All right.  And so this was after Mr. Sandel's email to you

5    of May 21, 2010, asking if, quote, "we were proceeding for

6    separate judgments," and obviously you did not; is that correct?

7    **A.**   Correct.

8    **Q.**   And this was after default of the loan, obviously, wasn't

9    it?

10   **A.**   Yes.

11   **Q.**   And then I want to show you Defendant's Exhibit 56, which I

12   understand is also in evidence.  This, sir, was a complaint for

13   partition.

14        Do you remember filing this action on behalf of Northpoint

15   Asset Holdings to partition the lots because there was a

16   disagreement over -- between the banks as to how to divide the

17   lots?

18   **A.**   I remember the disagreement.  I don't specifically remember

19   this complaint, but I'm sure it was as a result of that

20   disagreement.

21   **Q.**   Okay.  And you filed that only on behalf of Northpoint

22   Holdings?  You understand what that entity is -- do you recall,

23   I should say, what that entity was?

24   **A.**   I -- I think that entity is -- was a single purposed LLC

25   that was formed to take title to the lots on behalf of GulfSouth

1    Bank.

2    **Q.**   Okay.  And I don't have to show you this, but you filed a

3    deficiency judgment, and that deficiency judgment was also filed

4    only on behalf of GulfSouth; am I correct?

5    **A.**   Yes, that's correct.

6    **Q.**   Now, prior to the deficiency judgment, there was a hearing,

7    wasn't there, do you recall that, in court?

8    **A.**   Yes, there was.

9    **Q.**   And who do you recall being present at that hearing?

10   **A.**   I was there, Chris Campbell was there, some of the

11   individual defendant guarantors were there with their -- I don't

12   know who he represented, but Mr. Fox was there on behalf of some

13   or all of those defendants.

14   **Q.**   What about Mr. Sandel?  There were two attorneys from

15   Vision, weren't there?

16   **A.**   Mr. Sandel was present with an attorney from Panama City, I

17   think it was Brian Leebrick from Panama City.  If there was

18   another attorney there for Vision, I don't remember that.

19   **Q.**   Okay.  Do you recall any objections being made or filed by

20   Vision Bank or any of the participating banks to the deficiency

21   judgment being taken in the name of GulfSouth?

22   **A.**   No.

23   **Q.**   Now, after the deficiency judgments taken -- after the

24   deficiency judgment, excuse me, was taken in the name of

25   GulfSouth, do you recall Mr. Sandel wanting something done with

1    the deficiency judgment?

2    **A.**    Yes.

3    **Q.**    Okay.  And you recall he wanted GulfSouth to assign to all

4    the banks their pro rata share of the deficiency judgment?

5    **A.**    Yes.

6    **Q.**    Do you recall any conversations with him about that issue

7    prior to the deficiency judgment?

8    **A.**    I don't recall.

9    **Q.**    Let's look at your deposition and see if that helps refresh

10   your memory.

11          **MR. FRANCO:**  May I approach, Your Honor?

12          **THE COURT:**  Yes.

13   **BY MR. FRANCO:**

14   **Q.**    Could you look at page -- maybe you start at the bottom of

15   page 21 and go to 22, so start here and go here and see if that

16   helps refresh your memory.

17          Have you had the opportunity to look at that?

18   **A.**    Yes.

19   **Q.**    And my question was, did you recall any conversations with

20   Mr. Sandel about assigning the judgment prior to the deficiency

21   judgment?

22   **A.**    And after having read that, no, I don't recall any

23   conversations about it prior to the deficiency judgment.

24   **Q.**    But when the issue was raised, you did express the concerns

25   that you testified to earlier this morning, did you not?

1   **A.**   Yes, that's correct.

2   **Q.**   Now, you talked about your investigation -- your

3   investigation about you were looking into that, correct?

4   **A.**   That's right.

5   **Q.**   All right.  And your investigation, as I understand your

6   testimony, amounted to talking to one or more of your law

7   partners about it; am I correct?

8   **A.**   That's correct.

9   **Q.**   You didn't, Mr. Petermann, do any legal research, did you,

10  on that issue?

11  **A.**   Not that I can recall, no.

12  **Q.**   And I'm not talking about just at the beginning.

13  Throughout this -- that process, you never did any legal

14  research on the issue of whether it was allowed or not?

15  **A.**   No.

16  **Q.**   What did you know about any agreement by GulfSouth to

17  divide up the deficiency judgment, sir?

18  **A.**   I don't understand your question.

19  **Q.**   Yeah, let me rephrase it.  You didn't know anything about

20  GulfSouth's agreement with anybody to divide up the judgment,

21  did you?

22  **A.**   No.

23  **Q.**   Even later, sir, when you drafted some of the assignments

24  of the deficiency judgments, you didn't know about whether

25  GulfSouth had actually agreed to do any of those assignments

1   with any of the other banks, did you?

2   **A.**   No.

3            **THE COURT:**  Let me -- I'm going to ask a question

4   here, Mr. Petermann.  You said you weren't aware of any

5   agreement between GulfSouth and the other banks to divide up the

6   judgment -- the deficiency judgment.

7            Did GulfSouth agree with Vision Bank to divide up the

8   deficiency judgment?

9            **THE WITNESS:**  I'm not aware of an agreement between

10  the banks.  I know I was instructed to prepare those partial

11  assignments, but whether there was an actual agreement, verbal

12  or written, between them about how that would be done, I'm not

13  aware of that.  I was instructed by Chris Campbell to do the

14  assignments.

15           **THE COURT:**  Thank you.

16           All right, Mr. Franco, go ahead.

17           **MR. FRANCO:**  Thank you, Your Honor.

18  BY MR. FRANCO:

19  **Q.**   Mr. Petermann, just to make it clear, did you have any

20  conversations with Mr. Sandel to the effect that there was an

21  agreement between Vision Bank and GulfSouth that the pro rata

22  judgment would be divided, that the -- I'm sorry, that's a bad

23  word -- that the judgment would be divided?  Did you have any

24  conversations to the extent that there was an agreement?

25  **A.**   I had no conversations with Mr. Sandel that there was an

```
 1   agreement.  There were conversations about doing the assignments
 2   of the pro rata interests.  And I am sure -- I don't have
 3   specific recollection, so I shouldn't speculate maybe, but more
 4   than likely Chris Campbell, Mr. Sandel, and I were on telephone
 5   conversations together.
 6   Q.   And in those telephone conversations it was not your
 7   impression there was any agreement between the parties?
 8   A.   That's correct.
 9   Q.   In fact, it's fair to say you had concerns about doing that
10   throughout your consideration of that issue, didn't you?
11   A.   I was concerned based on the practical things that I had
12   mentioned before, yes.
13   Q.   And the practical things of not only how the participating
14   banks would go forward to collect among themselves, but the
15   effect of judgment-debtors of multiple parties trying to
16   collect?
17   A.   Correct.
18   Q.   And you expressed that?
19   A.   Yes.
20   Q.   In fact, would you turn to --
21        MR. FRANCO:  Instead of me pulling it up, could I ask
22   for Plaintiff's Exhibit 36, please.
23   BY MR. FRANCO:
24   Q.   That's a July 29, '11, email from you to Mr. Sandel.  And I
25   want you to look at the last sentence.  You see where it says
```

1   "There will probably be a need for an agreement between the

2   participants"?

3   **A.**   Yes.

4   **Q.**   So did you understand there was an agreement between the

5   participants?  You said there would be a need for it, didn't

6   you?

7   **A.**   Yeah.  There wasn't one and I said there would be a need

8   for one.

9   **Q.**   Now, I want you to look at Plaintiff's Exhibit 40, if you

10   could, please.  I'm just going to use the same exhibits that

11   they did rather than go to the book.

12           **THE COURT:**  Is that last Exhibit 36 or 76?

13           **MR. FRANCO:**  Let me check my notes, Your Honor.

14           **MS. BRADY:**  36.

15           **THE COURT:**  It was what?

16           **MS. BRADY:**  36.

17           **MR. FRANCO:**  36.

18           **THE COURT:**  Okay.

19   **BY MR. FRANCO:**

20   **Q.**   Now, in Plaintiff's Exhibit 40, you were attaching partial

21   assignments for him to review; is that right?

22   **A.**   Yes.

23   **Q.**   And do you remember anything about him getting back to you

24   on that?

25   **A.**   I don't recall.

1   **Q.**   And you don't know why the document you sent to him in

2   August of 2011 was not returned to you signed, do you?

3   **A.**   No.

4   **Q.**   Now, in your earlier testimony you made a statement in --

5   actually in Plaintiff's Exhibit 48, which I don't think I need

6   to call up at this time, but you made a statement that you

7   didn't think GulfSouth needed permission from CPB to assign any

8   rights to the judgment?

9   **A.**   I remember that.

10  **Q.**   And you looked -- I assume you looked at the Participation

11  Agreement for that?

12  **A.**   Yes.

13  **Q.**   Okay.  Well, did GulfSouth need permission of the banks --

14  any of the other banks to assign any of its rights?

15  **A.**   I don't know.  I'd have to look at the agreement again.  I

16  don't recall.

17  **Q.**   Well, if -- if there was no permission needed to assign

18  these judgments, then what would cause you to believe there was

19  a need for consent of any of the banks for GulfSouth to assign

20  anything?

21  **A.**   Whether they were legally required by the agreement or

22  whether it was just in their best interest to get an agreement

23  from everyone are two different things.

24  **Q.**   Correct.

25  **A.**   And I don't recall whether the agreement obligated them to;

1    and even if it did, I don't recall whether they would have been

2    wise to do something without everyone's agreement.

3    **Q.**   Okay.  Now, I want you to look at Plaintiff's Exhibit 51,

4    if we could pull that up also.

5         Now, in this document is what we were talking about.  And

6    down here in the third paragraph you say, "GulfSouth,

7    Northpoint, and Vision Bank were all in agreement that the

8    judgment should be assigned pro rata" -- you see that?

9    **A.**   Yes.

10   **Q.**   -- "since MBF has not objected."  Do you recall that MBF

11   was the entity that involved CPB?

12   **A.**   I don't recall that.

13   **Q.**   And let's -- let me show you Defendant's Exhibit 76.   In

14   the bottom part, you -- in September of 2011, you're asking

15   Mr. Dana Matthews whether CPB has made any decision on the

16   partial assignments; am I correct?

17   **A.**   Correct.

18   **Q.**   And then Mr. Matthews responded to you that he's not aware

19   that they made any decision at this point?

20             **THE COURT:**  This is not in evidence.

21             **MR. FRANCO:**  Oh, it's not?

22             **THE COURT:**  No, it's not.

23             **MR. FRANCO:**  I'm sorry.  Then I would offer

24   Defendant's Exhibit 76.  This is a September 29 email chain

25   between Mr. Dana Matthews and Mr. Petermann.

1      **THE COURT:**  Ms. Brady?

2      **MS. BRADY:**  No objection, Your Honor.

3      **THE COURT:**  Defendant's 76 will be admitted.

4      **(Defendant's Exhibit 76 admitted into evidence.)**

5      **MR. FRANCO:**  Thank you, Your Honor, I'm sorry, I

6  apologize.

7      **THE COURT:**  All right.

8  BY MR. FRANCO:

9  **Q.**  So my question was, Mr. Petermann, first you're asking

10 whether they've made any decision -- whether CPB has made any

11 decision on partial assignments.

12     And then if you will, at the top email, he responds to you

13 that he's made no decision as -- and he'll forward to

14 Mr. Menetre to see if they have any response?

15 **A.**  Yes.

16 **Q.**  And the long and the short of that story is that apparently

17 there was difficulty communicating with CPB because they had

18 been taken over around this point in time by FNBC, correct?

19 **A.**  Correct.

20 **Q.**  And in fact, in Plaintiff's Exhibit 51 that we just looked

21 at, that was dated December 11.  So by December 11, there's

22 still no word from CPB or FNBC about what their position is on

23 this assignment, correct?

24 **A.**  Correct.

25 **Q.**  And for the record, those emails were after you had sent

1   the initial pro rata assignment draft to Mr. Campbell back in

2   August, the emails we just talked about that were in September

3   and October?

4   **A.**   Yes, that's correct.

5   **Q.**   Now, what did you understand even in -- strike that.

6        Isn't it fair that you understood that the very purpose of

7   this pro rata assignment was to allow the participating banks to

8   independently collect from the judgment-debtors?  Wasn't that

9   the purpose of it?  That's what you understood?

10  **A.**   Yes.

11  **Q.**   Now, I'm going to show you your --

12       **MR. FRANCO:**  Plaintiff's Exhibit 51, please.

13  **BY MR. FRANCO:**

14  **Q.**   This is -- by December 19, 2011, you're sending drafts to

15  Mr. Campbell.  And then by --

16       **MR. FRANCO:**  Let's pull up Plaintiff's Exhibit 56.

17  **BY MR. FRANCO:**

18  **Q.**   In this string of emails, not until January 17 does

19  Mr. Campbell say he's executed this and sending it on to you.

20       Do you know what the hold-up was between December 19 and

21  January 17 as to why Mr. Campbell had not executed the

22  agreements?

23  **A.**   No.

24  **Q.**   Did you have any involvement in that hold-up?

25  **A.**   No.

1    **Q.**   Mr. Petermann --

2              **MR. FRANCO:**  Can we go to the bottom email from Chris

3    Campbell, the one that goes on to the next page.  Thank you.

4    **BY MR. FRANCO:**

5    **Q.**   "I've signed the assignment and mailed it to Rick.  He

6    should be receiving it and distributing it to the participants."

7         Do you have any recollection as to why it was sent to you

8    to distribute to the participants as opposed to Mr. Campbell

9    simply giving it or sending it to the participants himself?

10   **A.**   No specific recollection.

11   **Q.**   Was there some issue with Mr. Campbell wanting you to still

12   consider whether it should be done, do you recall?

13   **A.**   I don't recall.

14   **Q.**   Had you been asked to distribute anything else to the

15   participants?

16   **A.**   I don't recall.

17   **Q.**   Let's look at Plaintiff's Exhibit 52, please.  I'm sorry,

18   before we do that, I apologize, let's look at Plaintiff's

19   Exhibit 57.

20        This is the partial assignment of judgment that

21   Mr. Campbell has testified he executed.  You see that?

22   **A.**   I do.

23   **Q.**   Okay.  Now, first of all, you'll note the dates are not

24   completed at all.  You see that?

25   **A.**   Yes.

1    **Q.**   Is it part of your normal practice to send a document like

2    this undated, especially undated by a notary on as a completed

3    document, sir?

4    **A.**   You mean if I received this document would I then transmit

5    it to someone else?

6    **Q.**   As a completed document.  Did you -- looking at this,

7    especially the notary at the bottom not being dated, is that --

8    is that normal in your --

9    **A.**   No, it's not normal.

10   **Q.**   -- as a completed document?

11   **A.**   It's not normal, no.

12   **Q.**   Now, I also want you to look at this assignment.  This

13   purports to assign to Vision Bank an undivided interest in the

14   deficiency judgment, not a divided interest; am I correct about

15   that?

16   **A.**   Yes.

17   **Q.**   I thought Mr. Sandel was requesting that a divided interest

18   be assigned, Mr. Petermann.  Wasn't that your understanding?

19          **MS. BRADY:**  Objection.  The rule of completeness, can

20   he read the next two words beyond "undivided"?

21          **THE COURT:**  Yeah.  I mean, you can cover this on

22   redirect, but frankly I have the same question.

23          **MR. FRANCO:**  What was the question, Your Honor?  I'm

24   sorry.

25          **THE COURT:**  It says "undivided" and there's a

1    percentage.  So it's not an undivided interest in the whole, I

2    mean, that's not how this reads, so I think that's her point.

3            **MR. FRANCO:**  Well, that's her argument.

4            **THE COURT:**  Well, just so you know, I have the same

5    question.  So if you want to leave it like this, that's fine.

6            **MR. FRANCO:**  No, no, that's fine, I'll try to clear it

7    up.

8    **BY MR. FRANCO:**

9    **Q.**   Mr. Petermann, did you have any experience in assigning any

10   interest in judgments to other people before this?

11   **A.**   I don't have specific recollection.  It's possible over the

12   past 30 years I've done it.

13   **Q.**   And you know the difference between a divided interest in

14   something and an undivided interest in something, don't you?

15   **A.**   Yes.

16   **Q.**   Now, reading this, was this -- when you drafted this, was

17   this an undivided interest in the judgment, or was it just the

18   41 percent interest that was undivided?  What did you mean by

19   "undivided"?

20   **A.**   That the bank was receiving 40 -- whatever the percentage

21   is, 44.9 percent of the judgment.

22   **Q.**   Okay.  And why did you say "undivided" then?  If it was

23   receiving 41 percent, why didn't you just say a 41 percent

24   interest in the deficiency judgment?  Why did you say

25   "undivided"?

1   **A.**   Just a term of art.  I don't think it matters whether

2   "undivided" is there or not.  I think "undivided" refers to the

3   44 -- the whatever that percentage is.

4   **Q.**   So you think "undivided" is just surplus language?

5   **A.**   I think it makes it clear that 44.9 percent is going to

6   whoever the assignee is.

7   **Q.**   Wouldn't that have been clear if you would have just said

8   assign 41 (sic) percent interest in the judgment?  Wouldn't that

9   have been clear?

10  **A.**   That would have been clear.

11  **Q.**   But "undivided" indicates that the judgment is not divided,

12  doesn't it?

13  **A.**   Not to me.

14  **Q.**   Not to you?  But to somebody else who is reading this --

15          **MS. BRADY:**  Objection, argumentative.

16          **THE COURT:**  Sustained.

17  **BY MR. FRANCO:**

18  **Q.**   To somebody else who is reading this outside in a

19  collection process, would you agree with me that that creates

20  some uncertainty as to what is meant by "undivided"?

21          **MS. BRADY:**  Objection, argumentative, speculation.

22          **THE COURT:**  He can't testify as to how someone else

23  would have interpreted this.  He can only tell you how he

24  interprets it and what he meant when he wrote it.

25  **BY MR. FRANCO:**

1  **Q.**   Did you discuss with Mr. Campbell the "undivided" language

2  that you had in this judgment?

3  **A.**   No.

4  **Q.**   Did you discuss with anybody else the "undivided" language

5  that you had in this judgment?

6  **A.**   No.

7  **Q.**   And again, even though you drafted this, so that the record

8  is clear, you still had concerns about the problems involved in

9  moving forward with such a judgment; is that correct?

10             **MS. BRADY:**   Objection, asked and answered.

11             **THE COURT:**   Overruled.

12             **THE WITNESS:**   I was always concerned about the

13  practical effect of the assignments.

14  **BY MR. FRANCO:**

15  **Q.**   Now, let's look at Plaintiff's Exhibit 52, please.

16             **THE COURT:**   Before you move the exhibit, Mr. Franco,

17  could you remove the pointer there so I can see -- okay, it is

18  -- you said 41 percent earlier.

19             **MR. FRANCO:**   If I did, I misspoke.   It's 44.9.

20             **THE COURT:**   That makes sense.   Thank you.

21  **BY MR. FRANCO:**

22  **Q.**   Let's go to Plaintiff's Exhibit 52.   Mr. Petermann, before

23  we do that, it's clear that no one instructed you not to deliver

24  these assignments -- this document we just looked at that was

25  signed by Mr. Campbell, did they?

1   **A.**   Not that I can recall.

2   **Q.**   None of the judgment-debtors, none of the banks, nobody

3   that you can recall?

4   **A.**   Well, let me put it this way:  If they were sent to me with

5   instructions to deliver them, I would have delivered them.  If I

6   didn't deliver them, there's a reason for that, and it would

7   have to have come from somebody at GulfSouth.  I don't have any

8   recollection of it, though.

9   **Q.**   Let me make sure this is clear.  Did it come from anybody

10  other than GulfSouth, to your knowledge, if it came from

11  GulfSouth?

12          **MS. BRADY:**  Objection, Your Honor.  He's testified

13  numerous times that he doesn't recall who it came from.

14          **THE COURT:**  That's true, he has.  He just -- he said

15  he doesn't recall, but he said his belief is that it would have

16  had to have come from someone if he didn't send them out, and he

17  said it would had to have come from GulfSouth.  I think --

18          Is that correct?

19          **THE WITNESS:**  That's correct.

20          **MR. FRANCO:**  That's what I was trying to make clear,

21  that's all.

22          **THE COURT:**  That's how I took it.

23  BY MR. FRANCO:

24  **Q.**   Okay.  Let's look at Plaintiff's Exhibit 52.  Now, this is

25  the letter from you on December 20, 2011, to Jason Osborn and a

1    gentleman by the name of Derek McGee.  I think you said you

2    don't recall who Derek McGee was; am I correct?

3    **A.**   Correct.

4    **Q.**   Isn't this seeking for information about Northpoint Asset

5    Holdings, which was the entity that held the real estate?

6    **A.**   Yeah, it says that they requested information about --

7    concerning the operating agreement for Northpoint Asset

8    Holdings, and that is the entity that was formed to hold the

9    real estate.

10   **Q.**   Right.  And was there any other information in here -- this

11   is about information that was requested regarding the real

12   estate, wasn't it?

13   **A.**   Yes, it looks like it.

14   **Q.**   And Northpoint Asset Holdings was the entity that held the

15   real estate, correct?

16   **A.**   Correct.

17   **Q.**   And the last paragraph talks about what's happened to that

18   real estate in other entities; am I correct?

19   **A.**   Yes.

20          **THE COURT:**  Can I ask clarification, please, here, on

21   this document.  You told me earlier Mr. Osborn was an attorney

22   for HCB; is that correct?

23          **MR. FRANCO:**  Yes, ma'am.

24          **THE COURT:**  We don't know -- at least I don't know and

25   if you do, tell me -- who Mr. McGee represented.

1          **MR. FRANCO:**  I don't know either.

2          **THE COURT:**  Okay.  So, Mr. Petermann, in this last

3    paragraph -- and you're writing this to Mr. McGee and Mr.

4    Osborn, correct?

5          **THE WITNESS:**  Correct.

6          **THE COURT:**  In the last paragraph you express some

7    confusion about their questions to you in regards to Northpoint

8    Asset Holdings, and then you refer to the real estate, and you

9    say, "It appears to me that the real estate which is now owned

10   by MBF2, LLC, by virtue of the warranty deed and the judgment in

11   which either MBF2, LLC, or your client owned this undivided" --

12   Who are you referencing there?

13         **THE WITNESS:**  I thought I was talking about Central

14   Progressive Bank as their client.

15         **THE COURT:**  So Jason Osborn represented --

16         **THE WITNESS:**  Or let me correct --

17         **THE COURT:**  -- CPB?

18         **THE WITNESS:**  Sorry to interrupt, Your Honor.  My

19   understanding or what I thought was that these two gentlemen

20   were involved with either Central Progressive or the successor

21   bank that --

22         **THE COURT:**  FNBC?

23         **THE WITNESS:**  Yes.

24         **THE COURT:**  Because that's who I thought Jason Osborn

25   represented all along so -- but now I'm hearing it's HCB, so

1    that's confusing to me.

2              MR. FRANCO:  Your Honor, Jason Osborn represents HCB.

3              THE COURT:  Who was he --

4              MR. FRANCO:  He does not represent -- this document --

5    and I'll ask a question if he knows --

6              THE COURT:  Yeah, if you could clarify with Mr.

7    Petermann who he -- and I'll let you ask the question, but I

8    want to know who he was writing -- in terms of his writing to

9    Jason Osborn, who was Jason Osborn representing in his mind.

10             MR. FRANCO:  Okay.

11             THE WITNESS:  I understand.

12   BY MR. FRANCO:

13   Q.   Let me ask it this way:  Do you recall Jason Osborn

14   representing anybody other than HCB, to your knowledge?

15   A.   Who is HCB?

16             THE COURT:  Well, that's why I was confused, because I

17   heard him earlier say he didn't know who HCB was, and then all

18   of a sudden I see this correspondence between him and Jason

19   Bourne --

20             MR. FRANCO:  Jason Osborn.

21             THE COURT:  Osborn.

22             MR. CROSSLAND:  Jason Bourne would be more

23   interesting.

24             THE COURT:  You can tell the books I read.

25             So with Jason Osborn, and you tell me he represents

1    HCB, so that's where my confusion comes from.

2              **MR. FRANCO:**  Right.  And that -- it's going to be

3    further clarified when Mr. Osborn testifies but I'll ask this

4    question and see if he remembers --

5              **THE COURT:**  Right, because Mr. Petermann wrote this

6    letter.

7              **MR. FRANCO:**  Right.

8    **BY MR. FRANCO:**

9    **Q.**   Mr. Petermann, do you recall that during this period of

10   time that there was an entity by the name of HCB that was in the

11   process of obtaining a portfolio of assets from FNBC?

12   **A.**   I don't really recall that.

13   **Q.**   And so you don't know that Jason Osborn at the time

14   represented HCB in connection with the purchase of assets from

15   FNBC which involved a CPB participation?

16   **A.**   No, I didn't.

17             **MR. FRANCO:**  I think it will be more clear when Mr.

18   Osborn testifies, Your Honor, but that's the best we can do with

19   Mr. Petermann.

20             **THE COURT:**  I guess I'm still not clear on -- I'll ask

21   the question.

22             When you wrote this letter and you referenced Mr.

23   Osborn and Mr. Magee's client -- or your client in this last

24   paragraph, who did you think they represented?

25             **THE WITNESS:**  The successor bank.

1              **THE COURT:**  FNBC?

2              **THE WITNESS:**  Yes, ma'am.

3              **MR. FRANCO:**  And at the top, Your Honor, it says

4    Central Progressive Bank, GulfSouth Private Bank participation.

5    So we will clarify that later, but this was in connection with

6    the CPB participation that came along with the FNBC portfolio

7    purchase that was testified to earlier in the trial.

8              **THE COURT:**  The line of credit?

9              **MR. FRANCO:**  Right, the line of credit, and with that

10   line of credit came the purchase of the CPB participation by

11   HCB.  That's what this was in reference to.  We'll clarify that

12   further.

13             **THE COURT:**  But at this point in time CPB had not been

14   purchased by FNBC?

15             **MR. FRANCO:**  I think it had been purchased by FNBC,

16   but subsequent to the purchase by FNBC is when HCB bought the

17   portfolio from FNBC.

18             **THE COURT:**  So that's what -- okay, maybe you'll clear

19   this up with Mr. Osborn later.

20             **MR. FRANCO:**  Right.  And it has been -- I know it's

21   confusing with all the different names.  Believe me, when I got

22   into this -- and with such short notice for you, I'm sure it's a

23   little bit confusing.  But evidence is already in that FNBC

24   purchased all of CPB assets.  And then after that is when --

25             **MS. BRADY:**  Your Honor, should we be having this in

 1    front of the witness who is testifying about this?

 2              **THE COURT:**  Do what?

 3              **MS. BRADY:**  Should we be --

 4              **THE COURT:**  Well, Mr. Petermann just said he didn't

 5    know anything about it, so I don't know that it's going to --

 6              **MR. FRANCO:**  So in order to not interrupt, let me

 7    finish --

 8              **THE COURT:**  Look, they may disagree so --

 9              **MR. FRANCO:**  That's fine, but that's the evidence so

10    far.

11              **THE COURT:**  But you all probably have differing views

12    on the evidence.  And I have my question answered right now as

13    far as the client and Mr. Osborn.  I now understand that he may

14    have been representing different entities at different times.

15              **MR. FRANCO:**  All right.

16    BY MR. FRANCO:

17    **Q.**   Let's go to Plaintiff's Exhibit 53 then.  You see in this

18    letter, Mr. Petermann -- this is to you.  You see where it says

19    here, "FNBC which acquired CPB's interest in the participation

20    from FDIC," you see that?

21    **A.**   Yes.

22    **Q.**   So that apparently had already occurred, correct?

23    **A.**   Correct.

24              **THE COURT:**  Is this a Defense exhibit?

25              **MR. FRANCO:**  This is Plaintiff's Exhibit 53.

```
 1            THE COURT:  I'm not sure because you both have a 53.

 2   So when -- Mr. Franco, you all will appreciate my staying on top

 3   of you about this later when -- if there's an appeal in this

 4   case and you want a good record.  Maybe you did reference it as

 5   Plaintiff's Exhibit 53 and I missed it but just --

 6            MR. FRANCO:  I'm trying, Your Honor.  I understand,

 7   but believe me, I'm trying.  I thought I did say Plaintiff's

 8   Exhibit.

 9            THE COURT:  And you may have, all right, but just --

10   it's important.

11            MR. FRANCO:  Yes, it is, I agree.

12   BY MR. FRANCO:

13   Q.   So, Mr. Petermann, the point I was trying to make is,

14   according to this at least, by December 29, 2011, FNBC had

15   already acquired CPB's interest in the participation?

16   A.   Yes.

17   Q.   All right.

18            THE COURT:  Mr. Franco, I apologize.  I looked at the

19   transcript, and you did say Plaintiff's Exhibit 53, so my

20   apologies.

21            MR. FRANCO:  Thank you.

22   BY MR. FRANCO:

23   Q.   Now, let's look at Plaintiff's Exhibit 68 again.  That's

24   the dec action.  Mr. Petermann, let's focus on paragraph 20

25   again, please.
```

1          Now, sir, it says, "Subsequent to the deficiency judgment,

2    Central Progressive Bank and now FNBC have indicated that it

3    does not want the deficiency judgment split," you see that?

4    **A.**   Yes.

5    **Q.**   Obviously, you wouldn't have put that in here if you

6    weren't aware that that was true, correct?

7    **A.**   Correct.

8    **Q.**   You can't tell us where you got that information from?

9    **A.**   No.

10   **Q.**   And so would you have gotten it potentially from anybody

11   other than your client?

12          **MS. BRADY:**  Objection, speculation.  He just said he

13   can't --

14          **MR. FRANCO:**  I'm trying to refresh his memory, Your

15   Honor.

16          **THE COURT:**  Well, that's not really not that --

17          **MR. FRANCO:**  If we can eliminate some people, I'm

18   trying to do that.  If we can't, we can't.

19          **THE COURT:**  Ask your question again.

20   **BY MR. FRANCO:**

21   **Q.**   Do you recall getting this information from anybody other

22   than your client?

23          **THE COURT:**  That's acceptable.

24          **THE WITNESS:**  I just don't recall.

25   **BY MR. FRANCO:**

1    **Q.**   Okay.  Now, you were concerned when you filed this about

2    GulfSouth -- first of all, you didn't file this complaint

3    without it being authorized by your client; is that correct?

4    **A.**   That's correct.

5    **Q.**   And you stated yourself that you were concerned about

6    potential liability by GulfSouth?

7    **A.**   Correct.

8    **Q.**   Would you tell us why you filed this suit when you had

9    previously concluded there was no need for CPB's or FNBC's

10   consent to the assignment?

11   **A.**   Yeah.  I think I alluded to that before.  Whether I thought

12   they had certain contractual duties under the Participation

13   Agreement was one thing.  But if they were aware of the fact

14   that there was a dispute about how to handle this, that they

15   were going to -- they couldn't move either direction without

16   potential exposure to one participant or a different

17   participant.  So my advice was, well, let's get a judicial

18   determination of what this agreement says and what you can and

19   can't do.

20   **Q.**   Okay.  And did that have something to do with the fact that

21   apparently nobody was getting any consent or word back from CPB

22   or FNBC, sir?  Did that factor into that?

23   **A.**   It may have.  I don't -- I think the goal was to have

24   unanimous consent, and if we weren't getting it for whatever

25   reason, then we were looking for a judicial --

1   **Q.**   And at that point you weren't getting it from CPB, as far

2   as you knew?

3   **A.**   As far as I knew, yes.

4   **Q.**   And also you filed it, as I recall it, probably because

5   you're not necessarily right all the time about your legal

6   conclusions; isn't that a fair statement?

7   **A.**   Yeah, that's a real fair statement.

8   **Q.**   That's what you told me in your deposition, right?

9   **A.**   That's right.

10   **Q.**   That you filed it because you're not always right.  And in

11   this particular case it's also fair -- and I don't want to be

12   disrespectful, sir, but it's also fair to say you had not done

13   any research on the legal issue?

14          **MS. BRADY:**  Objection, asked and answered.

15          **THE COURT:**  It has been asked and answered.

16   Sustained.

17          **MR. FRANCO:**  I'm asking at this point in time.

18          **THE COURT:**  Well, I think he's already testified he

19   never did any.

20          **MR. FRANCO:**  Okay, that's fine, Your Honor.

21          **THE COURT:**  Not ever, but in relation --

22          **THE WITNESS:**  Thank you, Your Honor.

23          **THE COURT:**  Well, that left as it probably would have

24   read in the transcript.

25   **BY MR. FRANCO:**

1    **Q.**   Mr. Petermann, were you aware, sir, that the Bank of Vernon

2    was the bank that wanted to sell its interest when GulfSouth

3    sold its interest in the North Tip?

4    **A.**   When I saw that letter or email or whatever it was.

5    **Q.**   Were you aware that it was Bank of Vernon who wanted to

6    sell its interest, since it had such a small amount, once it

7    found out HCB was selling and once it found out that GulfSouth

8    was selling its interest?

9    **A.**   Well, I was aware of whatever Robert Reynolds said in that

10   letter about Bank of Vernon wanting to sell its interest

11   simultaneously or -- I can't remember what the letter said

12   exactly, but I was aware of that.

13   **Q.**   You were aware of that then?

14   **A.**   By virtue of that email, yes.

15   **Q.**   I didn't hear you.  You were aware of that?

16          **THE COURT:**  By virtue of the email, he said, or the

17   correspondence.

18          **MR. FRANCO:**  One second, Your Honor.

19          **THE COURT:**  Okay.

20   **BY MR. FRANCO:**

21   **Q.**   Now, as far as you know, an entity by the name of HCB had

22   nothing to do with your filing the dec action, did it?

23   **A.**   That's true.

24   **Q.**   Did Mr. Rupert Phillips have anything to do with you filing

25   the dec action?

1    **A.**    No.

2    **Q.**    Did Jason Osborn have anything to do with you filing the

3    dec action?

4    **A.**    No.

5    **Q.**    Okay.  Let's look at -- let's look at Plaintiff's Exhibit

6    80.  The dec action, sir, was an action between -- or involving

7    the banks, wasn't it?

8    **A.**    Yes.

9    **Q.**    Mr. Phillips was not a party to that dec action, was he?

10   **A.**    No.

11   **Q.**    And this email here, did you take this as instructions to

12   dismiss the case?

13   **A.**    Yes.

14   **Q.**    Now, what did a settlement or language about a settlement

15   with Rupert Phillips have to do with the allegations in the dec

16   action, to your knowledge?

17   **A.**    None.

18   **Q.**    And in fact, sir, there's no instructions here about how to

19   dismiss the case; am I correct?

20   **A.**    Correct.

21   **Q.**    The case, by virtue of Plaintiff's Exhibit 91, was in fact

22   dismissed by you without prejudice, right?

23   **A.**    Correct.

24   **Q.**    Normally, sir, in your practice when there's a settlement

25   between parties, a case is dismissed with prejudice; isn't that

1    a fair statement?

2    **A.**   That's true.

3    **Q.**   And you certainly knew that at the time of whether that a

4    case that's settled is usually dismissed with prejudice as

5    opposed to dismissing -- and the difference of dismissing a case

6    without prejudice?

7    **A.**   Sure.

8    **Q.**   So was your -- strike that.

9        Did you have any conversations with Mr. McLeod about

10   whether he settled his -- anything with Rupert Phillips?

11   **A.**   No.

12   **Q.**   Did you have any conversations with Rupert Phillips about

13   whether or not Mr. McLeod had settled any claims against Rupert

14   Phillips?

15   **A.**   No.

16   **Q.**   And the dismissal without prejudice, we're talking to

17   judges either at a trial court level or appellate court level,

18   without prejudice allows the case to be filed again if the

19   parties so desire?

20   **A.**   Correct.

21   **Q.**   Let's pull up Plaintiff's Exhibit 97, just the top part,

22   please.  Now, here you tell Ms. -- at the time it was Ms.

23   Singer, now it's Ms. Brady, that GulfSouth instructed you to

24   dismiss the complaint without prejudice, you see that?

25   **A.**   Yes.

1  **Q.**   Okay.  And so you understood that instruction to be without

2  prejudice; is that a fair statement?

3  **A.**   Yes.

4  **Q.**   And there's nothing in here about a settlement.  Was a

5  settlement the reason that you dismissed the case, or was it

6  because your client instructed you to dismiss the case?  Which

7  was it?

8  **A.**   It was because my client instructed me to dismiss the case.

9          **MR. FRANCO:**  Your Honor, if I may have a minute?

10         **THE COURT:**  Okay.

11 **BY MR. FRANCO:**

12 **Q.**   Let me ask you this, Mr. Petermann, before I forget:  Were

13 you trying to hide anything from Ms. Brady when you responded to

14 her?

15 **A.**   No.

16 **Q.**   Was there any reason in your mind that you should be hiding

17 something?  Did you know anything was going on?

18 **A.**   No.

19 **Q.**   Did you participate at all in the drafting of any of the

20 documents under which GulfSouth assigned any of its rights to

21 HCB?

22 **A.**   No.

23 **Q.**   Were you involved in any of those negotiations?

24 **A.**   No.

25 **Q.**   In fact, as I recall your deposition testimony, you were

1    left out of the loop?

2    **A.**   That's true.

3    **Q.**   Right?

4    **A.**   Yes.

5            **MR. FRANCO:**  Your Honor, that's all the questions I

6    have.

7            Thank you, Mr. Petermann.  I tender the witness.

8            **THE COURT:**  Ms. Brady, you're probably going to take

9    more than a couple of minutes?

10           **MS. BRADY:**  No, won't take any time at all, just one

11   second.

12           **THE COURT:**  Okay.

13           **MS. BRADY:**  Nothing further.  I'm going to let

14   Mr. Petermann get to a mediation I know he has.

15           **THE COURT:**  All right.  We're going to take our

16   morning recess.  We'll be in recess until --

17           **MR. FRANCO:**  Your Honor, for the record, just for the

18   record, Mr. Petermann was under subpoena, but he can be

19   released.

20           **THE COURT:**  All right, Mr. Petermann, you're released.

21   Thank you.

22           **(Witness excused.)**

23           **THE COURT:**  All right.  We'll be in recess until 20

24   minutes to eleven.

25           **(Recess taken)**

1          **THE COURT:**  Introduce your witness, please.

2          **MR. CROSSLAND:**  Yes, Your Honor.  The Plaintiffs call

3   Jason Osborn.

4          **THE COURT:**  Raise your right hand please.

5          **JASON OSBORN, PLAINTIFF WITNESS, DULY SWORN**

6          **MADAM CLERK:**  Be seated.  Please state your full name

7   and spell your last name for the record.

8          **THE WITNESS:**  Jason Osborn, O-s-b-o-r-n.

9          **THE COURT:**  Mr. Crossland, when you're ready.

10         **MR. CROSSLAND:**  Thank you, Your Honor, may it please

11  the Court.

12         **THE COURT:**  Yes.

13                     **DIRECT EXAMINATION**

14  BY MR. CROSSLAND:

15  **Q.**   Mr. Osborn, you're an attorney, correct?

16  **A.**   Correct.

17  **Q.**   Where do you work?

18  **A.**   For Osborn Group, LLC.

19  **Q.**   What's your email address?

20  **A.**   JOsborn@Osborngroupllc.com.

21  **Q.**   You represent HBC in various matters, correct?

22  **A.**   Yes.

23  **Q.**   And when I say HCB, I'm referring to HCB Financial Corp.

24  **A.**   Yes.

25  **Q.**   You represent HCB in this matter --

1    **A.**    Correct.

2    **Q.**    How much in attorney's fees did you receive from HCB last

3    year?

4    **A.**    Roughly 115, $120,000.

5    **Q.**    How much in attorney's fees have you received from HCB this

6    year?

7    **A.**    Maybe $35,000.

8    **Q.**    Previously have you also been an attorney for Rick Olson?

9    **A.**    I don't know that I've ever represented Rick individually

10   but --

11   **Q.**    What about Olson & Associates of Northwest Florida, Inc.?

12   **A.**    Yes.

13   **Q.**    And Olson & Associates of Northwest Florida Inc. is a

14   judgment-debtor on a deficiency judgment that was initially

15   acquired by GulfSouth, correct?

16   **A.**    Correct.

17   **Q.**    And when was the last time you represented Olson &

18   Associates of Northwest Florida, Inc.?

19   **A.**    2008.

20   **Q.**    Have you also personally represented Mr. Phillips as his

21   attorney?

22   **A.**    I think in one matter.

23   **Q.**    When was that?

24   **A.**    Probably 2012, 2013.

25   **Q.**    How much did you receive in attorney's fees from Mr.

1    Phillips in 2012, or 2013 for that matter?

2    **A.**   Nothing.

3    **Q.**   Free legal work?

4    **A.**   It was free, yes.

5    **Q.**   Have you ever -- strike that.

6         Mr. Osborn, you're aware that HBC has allegedly acquired a

7    55 percent interest in a deficiency judgment that was initially

8    obtained in the name of GulfSouth Private Bank, correct?

9    **A.**   Approximately 55, yes.

10        **MR. CROSSLAND:**  Mr. Dyer, if you'll put up Plaintiff's

11   Exhibit 30, please.

12   **BY MR. CROSSLAND:**

13   **Q.**   Sir, do you recognize the deficiency judgment that is

14   Plaintiff's Exhibit 30?

15   **A.**   I think so.

16   **Q.**   Okay.  And the deficiency judgment that is Plaintiff's

17   Exhibit 30 is the deficiency judgment in which HCB has acquired

18   approximately 55 percent interest from GulfSouth, Bank of

19   Vernon, and First NBC, correct?

20   **A.**   Can we scroll through the rest so I can see the entire

21   document?

22   **Q.**   Certainly.  Actually, I'll hand you a copy since it's

23   multi-page.

24        **MR. CROSSLAND:**  May I approach, Your Honor?

25        **THE COURT:**  Yes.

1    BY MR. CROSSLAND:

2    **Q.**   Just take a look at Plaintiff's Exhibit 30 and let me know

3    if that is in fact the deficiency judgment in which HCB has

4    acquired approximately 55 percent interest from GulfSouth, Bank

5    of Vernon, and First NBC.

6    **A.**   I'm sorry, would you repeat that.

7    **Q.**   Sure.  Is the deficiency judgment that is Plaintiff's

8    Exhibit 30 the deficiency judgment in which HCB has acquired

9    approximately 55 percent interest in from GulfSouth, Bank of

10   Vernon, and First NBC?

11   **A.**   It appears to be.

12   **Q.**   Now, there were negotiations between Rupert Phillips and

13   Mac McLeod at GulfSouth regarding the acquisition of GulfSouth's

14   interest in the deficiency judgment, correct?

15   **A.**   I understand that there were.

16   **Q.**   And in the end you were involved in terms of drafting some

17   of the assignment documents, correct?

18   **A.**   Correct.

19   **Q.**   Now, you never advised SE Property or any agent or employee

20   of SE Property that there were negotiations ongoing between Mr.

21   Phillips and Mr. McLeod regarding the deficiency judgment, did

22   you?

23   **A.**   No, I did not.

24   **Q.**   And you never advised anyone at SE Property that there were

25   negotiations ongoing between Mr. Phillips and Mr. McLeod

1   regarding the possible acquisition of the Participation

2   Agreement between Vision Bank and GulfSouth, did you?

3   **A.**   No, I did not.

4   **Q.**   And once those deals were completed, you never advised

5   anyone at SE Property that HCB now had GulfSouth's interest in

6   the deficiency judgment, did you?

7   **A.**   Correct.

8   **Q.**   And you never advised anybody at SE Property that HCB was

9   now claiming originating bank status under the Participation

10   Agreement, did you?

11   **A.**   That's correct.

12   **Q.**   Isn't it true, sir, that HCB excluded SE Property from

13   those negotiations?

14   **A.**   To the extent that there were no discussions with them,

15   yes.

16   **Q.**   Isn't it true that HCB did not want SE Property involved

17   because it believed that SE Property would not negotiate a

18   settlement with Mr. Phillips?

19   **A.**   No.

20   **Q.**   Have you ever told anyone that SE Property was specifically

21   excluded from those negotiations because Mr. Phillips didn't

22   believe that SE Property would deal with him?

23   **A.**   Not that I recall.

24   **Q.**   Mr. Osborn, you're familiar with Lot 26 in Nature Walk,

25   correct?

1    **A.**    Yes.

2    **Q.**    And that was a piece of property that Mr. Phillips and Mrs.

3    Phillips previously owned, right?

4    **A.**    Correct.

5    **Q.**    They sold that property to Fred McLaughlin in June of 2011,

6    right?

7    **A.**    I think that's correct.

8    **Q.**    Okay.  And Mr. McLaughlin at the time was the vice

9    president of HCB?

10   **A.**    Yes.

11   **Q.**    And he bought Lot 26 subject to numerous liens, correct?

12   **A.**    Correct.

13   **Q.**    A deficiency judgment that is Plaintiff's Exhibit 30 was

14   one of those liens, right?

15   **A.**    I think so.

16   **Q.**    And at some point in time Mr. McLaughlin asked you to --

17   what the status was of releasing those liens, didn't he?

18   **A.**    I think so.

19   **Q.**    In August, in fact, Mr. McLaughlin sent you an email and

20   asked you what the status was?

21   **A.**    Without looking at the email, I can't remember when.

22          **MR. CROSSLAND:**  Go ahead and put it up on the board,

23   Mr. Dyer.  I think we can probably do it this way.

24   **BY MR. CROSSLAND:**

25   **Q.**    Mr. Osborn, if you'll take a look at what's been marked for

1    identification as Plaintiff's Exhibit 38 and see if it refreshes

2    your recollection as to whether or not Mr. McLaughlin sent you

3    an email in August regarding the status of the release of

4    various liens.

5    **A.**   Could we scroll down so I can see the rest of it?

6    **Q.**   Absolutely.  And whatever you need to do to have Mr. Dyer

7    help you out, let him know.

8              **THE COURT:**  This is not in evidence?

9              **MR. CROSSLAND:**  No.  It's -- just using it to try and

10   refresh at this point, Your Honor.

11             **THE WITNESS:**  Is this the entire document?

12   **BY MR. CROSSLAND:**

13   **Q.**   Actually, I do have a copy of it.  There you go, that's a

14   multi-page again.

15   **A.**   What was the question?

16   **Q.**   You would agree that in August of 2011 Mr. McLaughlin sent

17   you an email asking about the status of getting various liens

18   released on Lot 26, correct?

19   **A.**   That's correct.

20   **Q.**   And you in fact were working to get various liens released

21   on Lot 26, correct?

22   **A.**   I don't know that I was working on it.  I regularly

23   referred Fred back to his actual counsel.  I wasn't representing

24   Fred in that process.

25   **Q.**   I understand.  But, Mr. Osborn, isn't it true that you were

1    working, for example, with First Commercial Bank to get one of

2    the releases executed?

3    **A.**    Yeah, I made a couple of calls to First Commercial Bank.

4    **Q.**    So you were working with First Commercial Bank to get a

5    lien on Lot 26 released?

6    **A.**    Yeah.  I mean, I'm not trying to be difficult.  I mean,

7    First Commercial Bank returned one phone call and pretty much

8    refused to talk about it.

9    **Q.**    And ultimately the lien that First Commercial Bank held on

10   Lot 26 got released?

11   **A.**    I don't know.

12          **MR. CROSSLAND:**  May I approach and just take that back

13   from him, Judge?

14          **THE COURT:**  Yes.

15   **BY MR. CROSSLAND:**

16   **Q.**    Why were you working to get those liens released for

17   Mr. McLaughlin?

18   **A.**    I don't know.  Again, I wasn't representing Fred in the

19   process.

20   **Q.**    And did you get paid by Mr. McLaughlin to make that call to

21   First Commercial Bank regarding the status of its lien on

22   Lot 26?

23   **A.**    No.

24   **Q.**    And did you ultimately work with GulfSouth to get its

25   deficiency judgment as to Lot 26 lien released?

1   **A.**   With GulfSouth?  No.

2          **MR. CROSSLAND:**  May I approach, Your Honor?

3          **THE COURT:**  Yes.

4   **BY MR. CROSSLAND:**

5   **Q.**   I again am going to show you Plaintiff's Exhibit 38 that's

6   been marked for identification.  I'd ask you to take a look at

7   the second page and see if that helps refresh your recollection

8   as to whether or not you were working to get GulfSouth Private

9   Bank's deficiency judgment lien released.  If you look at No. 8,

10  I think that's probably instructive.

11  **A.**   I mean, it's obviously listed in this email, but I don't

12  remember having conversations with GulfSouth about releasing the

13  lien.  Again I regularly referred Fred back to his lawyers,

14  Kirby Williams at Clark, Partington.

15  **Q.**   Mr. Osborn, you know who Richard Petermann is?

16  **A.**   Yes.

17  **Q.**   Who is that?

18  **A.**   He is a lawyer at the Anchor, Smith, and Grimsley law firm.

19  **Q.**   And he represented GulfSouth in the foreclosure action

20  relating to the North Tip loan, correct?

21  **A.**   I believe that's correct.

22  **Q.**   And in late 2011, you started talking to Mr. Petermann

23  about various participation agreements relating to the North Tip

24  loan, didn't you?

25  **A.**   I think so.

1   **Q.**   And you had -- let me just go to it, Plaintiff's Exhibit

2   52, please.

3   **A.**   Do you need this one back?

4   **Q.**   You can hold it up there.  Thank you.

5        Now, Plaintiff's Exhibit 52 is a letter from Richard

6   Petermann to you on December 20 of 2011.  You see that?

7   **A.**   Yes, sir.

8   **Q.**   Do you know who Derek McGee is?

9   **A.**   Yes.

10  **Q.**   Who is that?

11  **A.**   He's a lawyer in Texas.

12  **Q.**   And who did he represent at this time?

13  **A.**   I believe he was representing First NBC Bank in New

14  Orleans.

15  **Q.**   Okay.  And the subject line of Plaintiff's Exhibit 72 is

16  "Central Progressive Bank GulfSouth Private Bank Participation

17  Driftwood," correct?

18  **A.**   Correct.

19  **Q.**   So we're talking about the Participation Agreement between

20  Central Progressive Bank and GulfSouth Private Bank at this

21  point, right?

22  **A.**   Correct.

23  **Q.**   Do you recall having a telephone conference with Richard

24  Petermann on December 20th, 2011?

25  **A.**   Vaguely.

1    **Q.**    What was the substance of that conversation?

2    **A.**    It was probably related to First NBC and Hudson Capital's

3    purchase of various aspects of Central Progressive Bank.

4    **Q.**    All right.  And who were you representing at this point in

5    time?

6    **A.**    At the time I was representing a company called Green

7    Energy Development Group and also Hudson Capital.

8    **Q.**    You were not representing HCB at this point?

9    **A.**    Correct.

10   **Q.**    So with regard to any conversations that you were having

11   with Mr. Petermann in December of 2011, you were not

12   representing HCB?

13   **A.**    Correct.

14   **Q.**    And in this letter, Mr. Petermann actually attached a copy

15   of the deficiency judgment that had been held in the name of

16   GulfSouth Private Bank, correct?

17   **A.**    Again, I only have the first page.

18   **Q.**    Sure.  So it's the last sentence in the first paragraph.

19   **A.**    Well, the letter says it was attached.

20   **Q.**    Okay.  And so you knew at this point in time that GulfSouth

21   had obtained a deficiency judgment against various

22   judgment-debtors on the North Tip matter?

23   **A.**    Yes.

24   **Q.**    And you knew that Central Progressive had a participation

25   interest in that deficiency judgment?

1    **A.**   Correct.

2    **Q.**   And you knew that that interest had been sold to First NBC

3    in November of 2011, correct?

4    **A.**   Through the FDIC takeover of CPB, yes.

5    **Q.**   Do you know who the other participants in the North Tip

6    loan were at this point?

7    **A.**   At this time obviously it was GulfSouth Private Bank.  I

8    don't know if it was Vision Bank or SE Property at the time or

9    if it was -- or whether I even knew Bank of Vernon was a

10   participant at that time.

11   **Q.**   In paragraph 2 it says -- Mr. Petermann says, "I guess I'm

12   confused as to your questions regarding the operating agreement

13   for Northpoint Asset Holdings, LLC."  You see that?

14   **A.**   Yes.

15   **Q.**   What questions did you have about the operating agreement

16   for Northpoint Asset?

17   **A.**   Apparently after the foreclosure of the North Tip property,

18   some of the assets were I guess in some respect divided.  I

19   think GulfSouth took some of the foreclosed property in its name

20   and sold those to a Central Progressive Bank subsidiary, MBF2,

21   which is referenced here.

22        Some other real estate was not sold separately to the

23   Central Progressive subsidiary; it was held by the participating

24   banks.  And I think the entities that were involved were Vision

25   Park Properties, Northpoint Asset Holdings, and MBF2.  That

1    parcel may have still been held in Central Progressive Bank, I'm

2    not sure.  But the operating agreement related Northpoint Asset

3    Holdings we were trying to figure out of the co-tenants in that

4    remaining property who the players were.

5             **MR. CROSSLAND:**  Mr. Dyer, if you'll go to Plaintiff's

6    Exhibit 53 that's in evidence.  Just give me the top portion and

7    we can end it where Mr. Osborn signs it there.

8    **BY MR. CROSSLAND:**

9    **Q.**   All right.  Plaintiff's Exhibit 53 is an email that you

10   sent to Mr. Petermann on December 29th, 2011, correct?

11   **A.**   Yeah, I'm looking at it now.

12   **Q.**   Take your time and just let me know when you're ready.

13   **A.**   Okay.

14   **Q.**   And you sent this email to Mr. Petermann on December 29,

15   2011, correct?

16   **A.**   Yes.

17   **Q.**   And did you meet with Mr. Petermann the day before?

18   **A.**   I don't know that I ever met with Mr. Petermann on this

19   matter.

20   **Q.**   Okay.  And in the first sentence of your email it says,

21   "Thank you for your time yesterday."  Was that a telephone call

22   probably?

23   **A.**   It might have been.  It might have been the phone call that

24   was referenced in the other exhibit.

25   **Q.**   Okay.  Do you -- would that have been generally the same

1    substance as you testified to before?

2    **A.**   Yes.   In this one we were seeking specifically a consent.

3    **Q.**   Okay.   And at this point obviously you knew, according to

4    the second sentence, that the participation interest in the

5    North Tip matter were between GulfSouth, Bank of Vernon, Vision

6    Bank, and First NBC, correct?

7    **A.**   Yes.

8    **Q.**   And you knew those parties had participation agreements

9    with GulfSouth?

10   **A.**   Yes.

11   **Q.**   And you knew Mr. Petermann was counsel for GulfSouth?

12   **A.**   Yes.

13   **Q.**   And you were having communications with Mr. Petermann

14   relating to various aspects of this North Tip matter?

15   **A.**   Correct.

16          **MR. CROSSLAND:**   Mr. Dyer, if you'll pull up what's

17   been marked for identification as Plaintiff's Exhibit 67.

18   **BY MR. CROSSLAND:**

19   **Q.**   Mr. Osborn, let me get you that one as well.   Because it's

20   two pages it's probably easier --

21          **MR. CROSSLAND:**   May I approach, Your Honor?

22          **THE COURT:**   Yes.   And this is not in evidence?

23          **MR. CROSSLAND:**   Correct.   I'm going to offer it in

24   just a second.

25          **MR. FRANCO:**   I'm looking at it now, Your Honor.

*Jason Osborn - Direct/Crossland*

| | |
|---|---|
| 1 | **THE COURT:**  What? |
| 2 | **MR. FRANCO:**  I'm looking at it now. |
| 3 | **THE COURT:**  Okay. |
| 4 | **BY MR. CROSSLAND:** |
| 5 | **Q.**   Once you've had a chance to read it, just let me know, |
| 6 | please. |
| 7 | **MR. FRANCO:**  No objection, Your Honor. |
| 8 | **THE COURT:**  I'll go ahead and admit 67, Mr. Crossland. |
| 9 | **(Plaintiff's Exhibit 67 admitted into evidence.)** |
| 10 | **THE WITNESS:**  Okay. |
| 11 | **MR. CROSSLAND:**  If you would go to the second page of |
| 12 | Exhibit 67, Mr. Dyer, I'm going to focus first on the bottom |
| 13 | email, if you would pull that up for the Court.  I'm sorry, give |
| 14 | me the whole thing, the email above that signature block, |
| 15 | please.  That's perfect, thank you, sir. |
| 16 | **BY MR. CROSSLAND:** |
| 17 | **Q.**   Now, this email that's on page 2, this is an email from you |
| 18 | to Gregory St. Angelo, correct? |
| 19 | **A.**   Correct. |
| 20 | **Q.**   And he was an attorney with First NBC Bank? |
| 21 | **A.**   Correct. |
| 22 | **Q.**   And this is in April of 2012? |
| 23 | **A.**   Yes. |
| 24 | **Q.**   Now, at this point you're now representing HCB? |
| 25 | **A.**   Yes. |

1   **Q.**   Okay.  And you're representing HCB with regard to obtaining

2   a possible $10 million line of credit from First NBC?

3   **A.**   Yeah, in connection with some other matters.

4   **Q.**   Right.  So ultimately the transaction was if the line of

5   credit was approved, part of the line of the credit would be

6   used to purchase assets that FNBC held?

7   **A.**   Yes.

8   **Q.**   And one of those assets was FNBC's interest in the

9   deficiency judgment that we looked at which is Plaintiff's

10  Exhibit 30?

11  **A.**   Yes.

12  **Q.**   And you knew about all of those things in your

13  communications with Mr. Petermann back at the end of 2011?

14  **A.**   About what of all things?

15  **Q.**   About the participation interest in this loan back at the

16  end of 2011 from your communications with Mr. Petermann?

17  **A.**   On North Tip?

18  **Q.**   Yes.

19  **A.**   Yes.

20          **MR. CROSSLAND:**  Mr. Dyer, if you'll go back to page 1.

21  **BY MR. CROSSLAND:**

22  **Q.**   And, Mr. Osborn, if you'll do the same.  All right.  Now,

23  the top email is also an email from you, correct?

24  **A.**   It appears to be, yes.

25  **Q.**   And it was again to Gregory St. Angelo, the attorney at

1    First NBC, correct?

2    **A.**    Correct.

3    **Q.**    And you also copied Rupert Phillips?

4    **A.**    Yes.

5    **Q.**    And Joe Dobson?

6    **A.**    That's right.

7    **Q.**    And Rupert Phillips was one of the judgment-debtors on the

8    deficiency judgment that was part of this loan portfolio?

9    **A.**    On the North Tip loan, yes.

10   **Q.**    And in your second sentence there you state, "My

11   understanding is that both the bank," which refers the First NBC

12   bank, correct?

13   **A.**    Correct.

14   **Q.**    -- "and the borrower" -- which would be HCB, correct?

15   **A.**    Yes.

16   **Q.**    -- "desire to close the loan as soon as possible"?

17   **A.**    Yes.

18   **Q.**    And in the last sentence of this first paragraph you say,

19   "To that end, I have taken the liberty of preparing the attached

20   which outlines what I believe to be the critical documents for

21   the closing."  You see that?

22   **A.**    Yes.

23   **Q.**    And as one of the critical documents that you identify in

24   this email is the closing documents for, under No. 1, the North

25   Tip Development?

**A.**   I don't know -- the documents aren't attached, so I don't know which documents they were.

**Q.**   Right.  I'm not asking you about what was actually attached.  But your email says that one of the critical documents for closing included North Tip Development, correct?

**A.**   Yes, yes.  I'm sorry.

**Q.**   And if you go to the paragraph that starts with "I have discussed," you see that one?

**A.**   Yes.

**Q.**   Your last sentence there says, "That may be optimistic, but Rupert really hasn't given me any other option!"

**A.**   Correct.

**Q.**   And Rupert Phillips was directing your activities on behalf of HCB with First NBC at this point, wasn't he?

**A.**   Yes.

**Q.**   And Rupert Phillips believed that there was a fast closing needed?

**A.**   Yes, I believe so.

**Q.**   And he didn't give you a choice to delay the closing; it had to be done by the following Monday?

**A.**   Well, that was the target.  If I had said it can't be done by Monday, it wouldn't have been done by Monday.

**Q.**   Right.  But at this point, you know, on April 26, Rupert hadn't given you any other option?

**A.**   Sure.

1          **MR. CROSSLAND:**  Mr. Dyer, if you'll please pull up

2  Plaintiff's Exhibit 72, which is into evidence already.

3  **BY MR. CROSSLAND:**

4  **Q.**   Mr. Osborn, I want to look at your email at the bottom

5  half.  And again, this one also cuts off so let me just go ahead

6  and give you this one.

7          **MR. CROSSLAND:**  May I approach, Your Honor?

8          **THE COURT:**  Yes.

9  **BY MR. CROSSLAND:**

10  **Q.**   I'm actually going to clear some of the clutter for you, if

11  that's all right.

12  **A.**   Thanks.

13  **Q.**   And I'd ask you to take a look at Plaintiff's Exhibit 72,

14  please.

15  **A.**   Okay.

16  **Q.**   The bottom email is an email from you to Rupert Phillips

17  and Bucky Fox, correct?

18  **A.**   Correct.

19  **Q.**   Well, I should say -- let me be more formal than that.

20  Henry Fox, correct?

21  **A.**   Correct.

22  **Q.**   But he goes by Bucky?

23  **A.**   Yes, sir.

24  **Q.**   And Mr. Fox was Rupert Phillips's personal attorney,

25  correct?

1    **A.**    I think so.

2    **Q.**    And the subject of your email is "GulfSouth," correct?

3    **A.**    That's correct.  May I clarify real quick?

4    **Q.**    Sure.

5    **A.**    In relation to this transaction, Bucky was also

6    representing HCB.

7    **Q.**    Okay.  So he represented both?

8    **A.**    Both -- in this transaction he was representing HCB.

9    **Q.**    But he had also been a personal -- an attorney of Mr.

10   Phillips in his individual capacity?

11   **A.**    So far as I know, yes.

12   **Q.**    Okay.  And you told Mr. Phillips, "When you talk with Mac,

13   please let him know that we need the following ASAP:"  And No. 2

14   is a copy of the Participation Agreement between GulfSouth and

15   Vision Bank, correct?

16   **A.**    Correct.

17   **Q.**    And you got that before the closing of the assignments of

18   the Participation Agreement by GulfSouth to HCB, correct?

19   **A.**    Correct.

20   **Q.**    And you knew what the terms of that agreement were?

21   **A.**    Yes.

22   **Q.**    Now, you say at the bottom of page 1, "To the extent there

23   is any pending litigation or threats of litigation among any of

24   the participants related to the participation agreements, we

25   need to know the nature of the claims, demands, threats, and

1    copies of correspondence relating to the same."

2         That's what you were asking Mr. Phillips to get from

3    Mr. McLeod, correct?

4    **A.**    Correct.

5    **Q.**    And you state that you were aware of Vision Bank's previous

6    efforts to have the judgment against North Tip assigned to

7    participants on a pro rata basis?

8    **A.**    Yes.

9    **Q.**    And you needed to know whether any such assignment may have

10   occurred?

11   **A.**    Correct.

12   **Q.**    That was an important part of this deal, wasn't it?

13   **A.**    In what respect?

14   **Q.**    Well, if there had been an assignment of some interest in

15   the deficiency judgment, that would have been important for HCB

16   to know?

17   **A.**    Yeah, absolutely.

18            **MR. CROSSLAND:**   Mr. Dyer, if you'll pull up

19   Plaintiff's Exhibit 74.

20            May I approach, Your Honor?

21            **THE COURT:**   Yes.

22   **BY MR. CROSSLAND:**

23   **Q.**    I'm going to keep bringing you exhibits and --

24            **THE COURT:**   That's fine.

25            **MR. CROSSLAND:**   Judge, is it blurry on your screen or

1   is it okay when we blow it up?

2          **THE COURT:**  It's a little blurry, but I have them

3   here, I mean, I have the copies in my book, so I'm really

4   probably referring more to those than I am the monitor.

5          **MR. CROSSLAND:**  As long as you have some sort of clean

6   copy.

7          **MR. FRANCO:**  We're doing the same thing, Your Honor,

8   it's blurry on my screen as well, even with my glasses.

9          **THE COURT:**  I'm not sure why that is.  Ms. Simms we

10  may need to let IT know that because the document itself is

11  not --

12         **MADAM CLERK:**  The auto focus button.

13         **THE COURT:**  Let's see.  Maybe we're out of focus.

14  Let's try that first.

15         **MR. FRANCO:**  When he blows it up it's easier to read.

16         **THE COURT:**  If you need to walk back and forth to Mr.

17  Osborn, you don't need to request permission.

18         **MR. CROSSLAND:**  Thank you, Your Honor.

19  **BY MR. CROSSLAND:**

20  **Q.**   Mr. Osborn, did you have a chance to look at Plaintiff's

21  Exhibit 74?

22  **A.**   No.  I was actually distracted listening --

23  **Q.**   Go ahead and take a minute to look at it and let me know

24  when you get done, please.

25  **A.**   Okay.

1    **Q.**   Mr. Osborn, I'm looking at the email from you to

2    Mr. Phillips and Mr. Fox that begins on the bottom of page 1.

3    You see that?

4    **A.**   Yes.

5    **Q.**   Now, this email was sent approximately two weeks after the

6    email you sent to Mr. Phillips and Mr. Fox which is Exhibit 72.

7    I'm going to bring it back up to you.   That's rough math not

8    knowing whether May has 31 days.   I've never been able to keep

9    that track.

10        So if you'll comply with my rough math, approximately two

11   weeks?

12   **A.**   Right.

13   **Q.**   Okay.   And the subject of this email is the "North Tip

14   loan," correct?

15   **A.**   Yes.

16   **Q.**   And you tell Mr. Phillips that you're still waiting on some

17   things, correct?

18   **A.**   Correct.

19   **Q.**   One of them  --the first one is --

20        **MR. CROSSLAND:**   If you'll go to the next page, Mr.

21   Dyer --

22   **BY MR. CROSSLAND:**

23   **Q.**   One of them is correspondence, agreements, or other

24   documents related to the resolution of the partition action

25   filed by Vision Bank/Vision-Park Properties, correct?

1   **A.**   Yes.

2   **Q.**   That's what you asked Mr. Phillips to get, that was one of

3   the things, correct?

4   **A.**   Yes.  I'm sorry.

5   **Q.**   And you also asked Mr. Phillips for any tenancy in common

6   agreements and other related correspondence or agreements

7   related to the joint ownership of the lots titled in the names

8   of Northpoint Asset Holdings, MBF2/Spa Destin, and Vision-Park

9   Properties, correct?

10  **A.**   Correct.

11  **Q.**   Correspondence or agreements related to those matters?

12  **A.**   Right.

13  **Q.**   And you state "My understanding is that there are

14  agreements or correspondence between Vision and GSPB" -- that's

15  GulfSouth, correct?

16  **A.**   Correct.

17  **Q.**   -- "relating to ownership of the lots being a tenancy in

18  common while the judgment is held entirely by GulfSouth"?

19  **A.**   Yes.

20  **Q.**   How did you have that understanding?

21  **A.**   I don't know.

22  **Q.**   And it says, "If there are no documents like these or those

23  listed above, someone needs to tell us," right?

24  **A.**   Yes.

25  **Q.**   So if there's no agreements or there's no correspondence

1    regarding those matters, you needed to know that?

2    **A.**   Right.

3    **Q.**   And you were talking to Rick Petermann about correspondence

4    or agreements that may relate to any of those matters, correct?

5    **A.**   Correct, which is probably where my understanding came

6    from.

7    **Q.**   Okay.  So you believe that your understanding that there

8    were agreements or correspondence between Vision and GulfSouth

9    relating to the ownership of the lots -- which were the

10   Driftwood Estates lots, correct?

11   **A.**   Correct.

12   **Q.**   Your understanding that there were agreements or

13   correspondence, that came from Mr. Petermann, you believe?

14   **A.**   Probably.

15   **Q.**   "Our last communication with Rick was that he locate those

16   docs and forward them to us.  No one has yet told us that no

17   such documents exist," correct?

18   **A.**   Correct.

19   **Q.**   So at this point Mr. Petermann hasn't said there's no

20   agreement between these participants relating to the lots?

21   **A.**   Correct.

22   **Q.**   Or there's no correspondence between what the parties were

23   doing with regard to the partition of the lots or the collateral

24   or how that would be done?

25   **A.**   No.

1   **Q.**   He hadn't told you that?

2   **A.**   Right.

3   **Q.**   But you asked him to get those for you?

4   **A.**   Yeah.  I mean, typically when owners own property as

5   tenants in common, there will be some sort of tenancy in common

6   agreement.  And knowing that there were at least three parties

7   owning this dirt, I didn't know what agreement they may have

8   had.

9   **Q.**   Sure.  So it's important to know what all the participants

10  might have been talking about or agreeing to, and that's part of

11  HCB's due diligence into this acquisition?

12  **A.**   Right, especially when we were buying into some real

13  estate.

14          **MR. CROSSLAND:**  Mr. Dyer, Plaintiff's Exhibit 75,

15  please.

16  **BY MR. CROSSLAND:**

17  **Q.**   I'm going to try and do this just on the screen for you,

18  but if it doesn't work for you please let me know.

19          **MR. CROSSLAND:**  Mr. Dyer, just get that top half.

20  **BY MR. CROSSLAND:**

21  **Q.**   Does that work for you or would you like a hard copy?

22  **A.**   I can see that.

23  **Q.**   Okay.  Plaintiff's Exhibit 75 is an email from you to

24  M. McLeod, and that's Mac McLeod at GulfSouth, correct?

25  **A.**   Correct.

1  **Q.**   And R. Petermann, that's Mr. Petermann at Anchors, Smith,

2  and Grimsley?

3  **A.**   Correct.

4  **Q.**   And then D.B. Anderson, correct?

5  **A.**   Yes.

6  **Q.**   And then you also copied Mr. Fox again?

7  **A.**   Right.

8  **Q.**   And you also copied Mr. Phillips again?

9  **A.**   Yes.

10  **Q.**   And this email is about 10 days after the last email we

11  looked at, correct?

12  **A.**   Yes.

13  **Q.**   And it says, "Bucky and I are working to revise some of the

14  documents based on our conversations with Rick Petermann and our

15  review of the previous and pending litigation among the various

16  participants in the North Tip Development loan transaction."

17  You see that?

18  **A.**   Yes.

19  **Q.**   So as part of your due diligence, you looked at the prior

20  and any pending litigations among the participants as part of

21  that due diligence?

22  **A.**   Yes.

23  **Q.**   And you had conversations with Rick Petermann about the

24  previous and the pending litigations?

25  **A.**   Yes.

1    **Q.**   And the pending litigation at that point in time was the

2    action that GulfSouth had filed for declaratory judgment as to

3    what to do about division of the deficiency judgment?

4    **A.**   I don't know.   I don't remember the date on that.   It's not

5    attached here.

6    **Q.**   I'm just going to hand you what's in evidence as

7    Plaintiff's Exhibit 68 and ask you just to take a look at it.

8            **MR. FRANCO:**   I'm sorry, what exhibit number is that?

9            **MR. CROSSLAND:**   68.

10   **BY MR. CROSSLAND:**

11   **Q.**   And in particular, the date that that was filed by

12   Mr. Petermann.

13   **A.**   Okay.

14   **Q.**   And what's the date of it?

15   **A.**   It appears to be May 2nd.   Is that right?

16   **Q.**   Yes.   Thank you, Mr. Osborn.   So that would have been

17   before your email on June 15th, correct?

18   **A.**   Yes, assuming I had a copy of that.   I'm not sure.

19   **Q.**   But you knew there was pending litigation?

20   **A.**   Yes.

21   **Q.**   Are you aware of any other pending litigation that related

22   to the North Tip matter?

23   **A.**   Not that I can recall.

24   **Q.**   And based on your conversations with Rick Petermann and

25   your review of the previous and pending litigation amongst the

1   participants, you expected to circulate revised assignment

2   documents no later than Monday, correct?

3   **A.**   According to this email, yes.

4         **MR. CROSSLAND:**   Mr. Dyer, if you'll put up what's been

5   marked for identification as Plaintiff's Exhibit 95.

6   **BY MR. CROSSLAND:**

7   **Q.**   Mr. Osborn, can you see the exhibit now that it's blown up?

8   **A.**   I can.

9         **THE COURT:**   This is not in either?

10        **MR. CROSSLAND:**   Not in yet.  I'm going to offer it in

11   just a second.

12   **BY MR. CROSSLAND:**

13   **Q.**   This is an email chain between yourself, Rupert Phillips,

14   and Mac McLeod, correct?

15   **A.**   Yes.

16   **Q.**   And this was on June 27th and 29th of 2012, correct?

17   **A.**   Yes.

18        **MR. CROSSLAND:**   And Your Honor, at this time we'd move

19   Plaintiff's Exhibit 95 into evidence as Plaintiff's Exhibit 95.

20        **MR. FRANCO:**   Your Honor, at this time we have a

21   hearsay objection to this.

22        **THE COURT:**   Mr. Crossland?

23        **MR. CROSSLAND:**   I'm not -- I'm not at all remotely

24   concerned about what's true or not true, just the fact that

25   these emails relating to the dismissal were actually sent.

1          **THE COURT:**  I'll allow it for that reason.  Overruled.

2   **BY MR. CROSSLAND:**

3   **Q.**   Mr. Osborn, the bottom email from Mr. McLeod, he was the

4   interim CEO for GulfSouth at the time, correct?

5   **A.**   I think so.

6   **Q.**   And he sent this email to both you and Mr. Phillips on June

7   27, 2012?

8   **A.**   Yes.

9   **Q.**   And he didn't copy anybody else at HCB on this, right?

10  **A.**   No.

11  **Q.**   And his email is about the dismissal of a lawsuit, correct?

12  **A.**   Correct.

13  **Q.**   And you're not aware of anything other than the GulfSouth

14  declaratory judgment action that was pending, right?

15  **A.**   Correct.

16  **Q.**   And so this would have been a dismissal of that lawsuit?

17  **A.**   I think so.

18  **Q.**   And then Mr. McLeod tells you on June 29 that he's on --

19  "I'm on him daily" and he can't understand what takes so long,

20  so he sent this email to you as well?

21  **A.**   Yes, he did.

22  **Q.**   Were you asking Mr. McLeod to get a dismissal of the

23  declaratory judgment action at this point?

24  **A.**   Not that I can recall.

25  **Q.**   Any reason that you know of why he sent you multiple emails

1   keeping you up to date on the status of the dismissal of that

2   lawsuit?

3   **A.**   Depending on date of the closing, it may have been just

4   post-closing cleanup on his part.

5   **Q.**   You understand that the assignment documents in this case

6   actually state that HCB shall take control of that GulfSouth

7   declaratory judgment action?

8   **A.**   I don't recall that.

9   **Q.**   But it's your testimony that you didn't tell Mr. McLeod

10   that the GulfSouth dec action needs to be dismissed?

11   **A.**   Yeah, I don't have any memory of doing that.

12   **Q.**   Do you know whether anyone else representing HCB made such

13   a statement to Mr. McLeod?

14   **A.**   No.

15            **MR. CROSSLAND:**  One minute, Your Honor?

16            **THE COURT:**  Yes.

17            **MR. CROSSLAND:**  That's all I have at this time, Your

18   Honor, thank you.

19            **THE COURT:**  Mr. Franco?

20            **MR. FRANCO:**  Yes, ma'am.  One second, Your Honor.

21            **THE COURT:**  That's fine.

22            **THE WITNESS:**  Your Honor, do I still need these

23   documents?

24            **THE COURT:**  Yes.  Mr. Crossland will come and get them

25   when he's ready for them.

1    **CROSS-EXAMINATION**

2    **BY MR. FRANCO:**

3    **Q.**   Mr. Osborn, you -- let's talk about first the Lot 26 issue.

4    **A.**   Yes, sir.

5    **Q.**   You -- tell us your understanding of why HCB released its

6    judgment lien.

7          Let me ask you this first:  That transaction -- the

8    testimony has been that it's been a short sale.  Do you

9    understand that?

10          **MR. CROSSLAND:**  Objection, Your Honor.  There's a rule

11    of sequestration for --

12          **MR. FRANCO:**  I'm sorry, Your Honor.  I'll rephrase.

13    **BY MR. FRANCO:**

14    **Q.**   You understood there to be a short sale transaction, didn't

15    you?

16    **A.**   Yes.

17    **Q.**   Can you explain what a short sale is in your understanding,

18    sir.

19    **A.**   My understanding is a short sale occurs when a piece of

20    property sells for less than the amount of debt on it, and the

21    lienholder releases its lien in exchange for its net proceeds.

22    **Q.**   Isn't it true it's a mechanism typically used to avoid a

23    foreclosure suit and the expenses associated with it?

24    **A.**   Absolutely.

25    **Q.**   And when that's done, is it normal for inferior lienholders

| | |
|---|---|
| 1 | to release their liens?  Is that normal? |
| 2 | **A.**   Yes. |
| 3 | **Q.**   That's the whole purpose of it is to avoid all the costs |
| 4 | and expenses of going through a foreclosure sale, isn't it? |
| 5 | **A.**   Yes. |
| 6 | **Q.**   Because if you go through a foreclosure sale, then all the |
| 7 | inferior liens are released anyway? |
| 8 | **A.**   Correct. |
| 9 | **Q.**   Counsel asked you -- let's look at the -- |
| 10 | **MR. FRANCO:**  One second, Your Honor. |
| 11 | **BY MR. FRANCO:** |
| 12 | **Q.**   So counsel asked why -- I think he asked why HCB would |
| 13 | release its judgment lien.  Let me just ask you, why would HCB |
| 14 | release its judgment lien in connection with that short sale? |
| 15 | **A.**   With respect to the GulfSouth lien? |
| 16 | **Q.**   Yes. |
| 17 | **A.**   There are numerous superior liens ahead of it. |
| 18 | **Q.**   Okay.  Well, he asked you a question about the First |
| 19 | Commercial lien.  Are you aware that that lien is -- there's no |
| 20 | recordation information about that lien ever being released? |
| 21 | **A.**   No, sir. |
| 22 | **Q.**   So as you sit here, you can't tell us that there's not a |
| 23 | superior lien that exists on that property that was superior to |
| 24 | GulfSouth, can you? |
| 25 | **A.**   Correct. |

1    **Q.**   The closing statement that's been introduced into evidence,

2    which is Plaintiff's Exhibit 26, had an Exhibit A attached to

3    it.

4        Now, you know what a closing statement is, you have some

5    experience in that, correct?

6    **A.**   Yes, sir.

7    **Q.**   So we have the closing statement here, and attached to the

8    closing statement is Exhibit A.  Do you know what Exhibit A

9    typically is?  Is that reference to a title policy?

10   **A.**   Typically it is.

11   **Q.**   And in Exhibit A when they talk about these liens or

12   judgments, does it say anything about -- in No. 5 -- anything

13   about First Commercial Bank agreeing to release property like it

14   does in the other ones?

15         **MR. CROSSLAND:**  Judge, I'm going to object on a lack

16   of predicate.  The witness hasn't testified as to any reason he

17   would have knowledge of this specific exhibit, and to the point

18   we get to any opinion testimony about what a real estate

19   document may or may not typically say, I would object on

20   opinion.

21         **THE COURT:**  Do you want to lay a foundation?

22         **MR. FRANCO:**  Yeah.  He went into his knowledge of

23   Lot 26 in his questions, and I was cross-examining him on this,

24   he said he was familiar with the settlement statements.  Let me

25   ask him --

1    BY MR. FRANCO:

2    Q.   Had you ever seen this particular settlement statement

3    before at some point in time?

4    A.   Yes.

5    Q.   So you're familiar with this one?

6    A.   Yes.

7            THE COURT:  Overruled.  I'll allow it.

8    BY MR. FRANCO:

9    Q.   In Exhibit A, you see here where it says in No. 3 "SPCP has

10   agreed to release," you see that?

11   A.   Yes.

12   Q.   In bold.  And in 4, "Bank Atlantic assigned" and it says

13   "HCB has agreed to release," you see that?

14   A.   Yes.

15   Q.   It doesn't say that for No. 6 -- or I'm sorry -- for No. 5,

16   does it?

17   A.   No.

18   Q.   And as you sit here today, just to make it clear, even

19   though you made some phone calls, the phone calls that you made

20   in connection with trying to get that released were never

21   returned to you?

22   A.   I spoke with Robert Rushing, but he never gave me any

23   substantive response when I asked if they'd be willing to

24   release it.

25   Q.   So is it fair to say, as a result of those phone calls they

1  didn't agree to release any liens?

2  **A.**   That's correct.

3          **THE COURT:**  Just for the record, go ahead and identify

4  who "they" are.

5          **MR. FRANCO:**  Yes, ma'am.  They are -- I'll get it

6  right.  There's so many banks in this thing.

7  **BY MR. FRANCO:**

8  **Q.**   As a result of those phone calls, First Commercial Bank

9  didn't agree to release its lien on this particular lot?

10  **A.**   That's correct.

11          **MR. FRANCO:**  Can we pull up Plaintiff's Exhibit 38,

12  please.

13  **BY MR. FRANCO:**

14  **Q.**   Now, this document is dated an August 1, 2011; am I

15  correct?

16  **A.**   Yes, sir.

17  **Q.**   And this document involves the release of liens on Lot 126

18  (sic) we were just talking about, correct?

19  **A.**   Lot 26, yes, sir.

20  **Q.**   Now, this is in August 2011, correct?

21  **A.**   Yes.

22  **Q.**   That's before HCB purchased any rights to the GulfSouth

23  interest in North Tip; is that correct?

24  **A.**   That's correct.

25  **Q.**   In fact, this is before there were any discussions about

1    purchase of any GulfSouth interest in North Tip; is that

2    correct?

3    **A.**    To my knowledge, yes.

4    **Q.**    Certainly before you were involved in any such discussions,

5    correct?

6    **A.**    Correct.

7    **Q.**    And for the record, that didn't close until June of 2012?

8    **A.**    Correct.

9    **Q.**    All right.  Let's look at Plaintiff's Exhibit 52, please.

10   Now, this is the document dated December 20, 2011, from

11   Mr. Petermann to you and Mr. Derek McGee.

12        Could you just tell us, is this part of due diligence, this

13   letter?  What was going on?  Why was this letter generated?

14        It says, "This follows our telephone conversation."  So you

15   had some telephone conversation with Mr. Petermann.  What's that

16   about in December of 2011?

17   **A.**    After Central Progressive failed -- well, Central

18   Progressive failed, FDIC became its receiver, FDIC sold all the

19   assets to First NBC.  And Hudson Realty Capital was buying what

20   were the bad assets from First NBC, and this was among the --

21   North Tip and the lots, the judgment were among those assets

22   being sold out of Central Progressive.

23   **Q.**    So that we're clear, what was Hudson Capital in the process

24   of doing at this point in time?

25   **A.**    Purchasing from First NBC what were the distressed or toxic

1   assets of Central Progressive.

2   **Q.**   And who did you represent at that time?

3   **A.**   Hudson Capital.

4   **Q.**   And that's what -- this was part of the due diligence

5   involved in that?

6   **A.**   Yes.

7   **Q.**   And as part of the assets that were ultimately purchased --

8   Did Hudson Capital actually purchase any assets from FNBC?

9   **A.**   It purchased a number of assets.

10  **Q.**   And these were distressed assets?

11  **A.**   Yes.

12  **Q.**   Did this include any of the North Tip assets?

13  **A.**   No.

14  **Q.**   So FNBC -- Hudson Capital didn't buy those?

15  **A.**   Correct.

16  **Q.**   And this was after HCB had done some due diligence to try

17  to buy all of those assets itself?

18  **A.**   Well, Green Energy Development Group, yes.

19  **Q.**   And there was some underwriting done by Mr. Dobson, I

20  believe, with respect to those assets; am I correct?

21  **A.**   Yes, extensive underwriting.

22  **Q.**   All right.  But the intent was that the company that Mr.

23  Dobson was working with was trying to buy all the distressed

24  assets --

25  **A.**   Yes.

1    **Q.**   -- from FNBC?

2    **A.**   That's right.

3    **Q.**   And instead, the company called Hudson Capital bought most

4    of those distressed assets?

5    **A.**   Yes.

6    **Q.**   There was still some left?

7    **A.**   Correct.

8    **Q.**   And is it your understanding that HCB was still interested

9    in some of those distressed assets?

10   **A.**   Yes.

11   **Q.**   And that's what this was relating to -- I'm sorry.  This

12   was relating to Hudson Capital?

13   **A.**   Correct.

14   **Q.**   All right.  You testified that Mr. McGee was an attorney in

15   Texas who represented FNBC?

16   **A.**   Yes, sir.

17   **Q.**   Do you know whether Mr. McGee had spoken to Mr. Petermann?

18   **A.**   I think Mr. McGee and I both spoke with Mr. Petermann.  I

19   know there were other lawyers involved for First NBC.  I don't

20   know if they had separate conversations with Mr. Petermann.

21   **Q.**   And you don't know what conversations that Mr. McGee from

22   Texas may have had with Mr. Petermann that you weren't involved

23   in?

24   **A.**   Correct.

25   **Q.**   But there was some communications involving Mr. McGee and

1    Mr. Petermann?

2    **A.**    Yes.

3    **Q.**    And in those communications it was your understanding that

4    Mr. McGee represented FNBC?

5    **A.**    Correct.

6    **Q.**    All right.  Let's look at Plaintiff's Exhibit 53.  This is

7    an email from you to Mr. Petermann dated December 29, 2011?

8    **A.**    Yes, sir.

9    **Q.**    Now, is it fair to say that at this point in time FNBC had

10   requested some consent in order to move forward with the

11   transaction between FNBC and Hudson Capital?

12   **A.**    Yes.

13   **Q.**    So this is still in connection with a Hudson Capital/FNBC

14   deal?

15   **A.**    Correct.

16   **Q.**    Not involving HCB?

17   **A.**    That's right.

18   **Q.**    Let's look at Plaintiff's Exhibit 67.  This is an April 26,

19   2012, email from you to FNBC people as well as others; am I

20   correct?

21   **A.**    Yes.

22   **Q.**    And on this -- we've now jumped from December of 2011 and

23   -- the prior one I just asked you about to April of 2012,

24   correct?

25   **A.**    That's right.

1   **Q.**   All right.  What is this in reference to?

2   **A.**   This is in reference to HCB's purchase of some former

3   Central Progressive assets from First NBC.

4   **Q.**   So putting this in chronological order again, Hudson

5   Capital by this point had already purchased the distressed

6   assets that it wanted from FNBC?

7   **A.**   That's right.

8   **Q.**   And now HCB, who at one point wanted all those assets, now

9   was going after some of the remaining distressed assets?

10  **A.**   That's right.

11  **Q.**   Am I correct?

12  **A.**   Yes.

13  **Q.**   Did HCB go to FNBC particularly to purchase the CPB

14  participation in North Tip?

15  **A.**   No.

16  **Q.**   In fact, the CPB participation in North Tip was part of

17  what -- of the whole portfolio that Hudson Capital and HCB were

18  discussing at some point in time, correct?

19  **A.**   That's right, yes.

20  **Q.**   That's a bad question.  Let me rephrase that.

21          **THE COURT:**  I understood it.

22          **MR. FRANCO:**  Okay, thank you, Your Honor.

23  BY MR. FRANCO:

24  **Q.**   And so the CPB participation was part of what was left over

25  for HCB to purchase?

**A.**   Correct.

**Q.**   And that's what this letter and the contents of this letter was referencing?

**A.**   That's right.

**Q.**   And these critical documents that you were referring to were documents that related to different participation loans that you were purchasing, am I correct, in number one, or different loans that you were purchasing?

**A.**   Right.  Some were participation, some were not.

**Q.**   Okay.  So this wasn't the only participation that was being discussed, right, as HCB to purchase?

**A.**   That's correct.

**Q.**   Was this the remaining distressed assets that FNBC had purchased?

**A.**   We -- we thought they were.  There were others that were not included in this transaction.

**Q.**   Okay.  But at the time you thought these were the remaining ones?

**A.**   Yes.

**Q.**   Now, counsel asked you -- here it says -- I'm looking for it, there's a provision that says that -- in your letter that says that we need this closed fast?

**A.**   Yes.

**Q.**   Was that abnormal for HCB to close fast?

**A.**   No.

1  **Q.**   Was that the standard, pretty much?

2  **A.**   Particularly when dealing with First NBC.

3  **Q.**   So this was not the only transaction that HCB asked to

4  close quickly?

5  **A.**   No.

6  **Q.**   Let's look at Plaintiff's Exhibit 72, please.  That's a May

7  22, 2012, email from you to Mr. Phillips.  And that's part of

8  the due diligence that was going on at the time?

9  **A.**   Yes, this was --

10 **Q.**   I'm focusing more at the bottom email, obviously.

11 **A.**   Yes.

12 **Q.**   But the things that you were asking for, this was part of

13 the due diligence -- actually, let's make this clear.  I think

14 it is.

15       You were one of the attorneys that Mr. Phillips turned this

16 over to to document after he had talked to Mr. McLeod; is that a

17 fair statement?

18 **A.**   That's fair, yes.

19 **Q.**   And when you do that, you do what's called due diligence,

20 correct?

21 **A.**   Correct.

22 **Q.**   And part of your due diligence is to find out as much as

23 you can about what's involved in what you're buying?

24 **A.**   That's right.

25 **Q.**   And that's what you were doing here?

1    **A.**    Yes, sir.

2    **Q.**    So this -- we've jumped ahead, but this is in connection

3    with the purchase of the GulfSouth interest?

4    **A.**    Correct.

5    **Q.**    And why were you asking for participation agreements?

6    **A.**    The original GulfSouth loan was a participated loan.   It

7    went to judgment.   There were multiple properties involved.   If

8    we were taking the judgment and the participation agreements, we

9    needed to know what was in them.

10   **Q.**    Right.   And why did you want to know about any pending

11   litigation?

12   **A.**    It's typically not our policy to buy into litigation at

13   HCB.   When I say "our policy," I mean HCB's policy.

14   **Q.**    Well, there's no question you work a lot for HCB.

15   **A.**    Correct.

16   **Q.**    All right.   And if there are any assignments, is that

17   important for you to know?

18   **A.**    Yes.

19   **Q.**    So let's look at Plaintiff's Exhibit 74.

20        So before we leave 73, is there anything unusual in what

21   you were asking for here that you've not asked for in other

22   kinds of transactions?

23   **A.**    No.   It's the same stuff that we always ask for, agreements

24   among parties, particularly if we take an assignment of an

25   agreement.

1    **Q.**   All right.  Let's look at Plaintiff's Exhibit 74.  This is

2    a June 5, 2012, email from you to Mr. Phillips at the bottom.

3    See it?

4        And the second page, if you would, again, is this part of

5    the due diligence that you were going through?

6    **A.**   Yes.

7    **Q.**   Now, as counsel pointed out, you asked about the partition

8    action that GulfSouth had filed apparently a while back, and you

9    wanted to know the status of that partition?

10   **A.**   This email references a partition action filed by Vision

11   Bank.

12   **Q.**   Okay.  So that was a prior action?

13   **A.**   Correct.

14   **Q.**   And you asked about any tenancy in common agreements that

15   related to the real estate?

16   **A.**   Correct.

17   **Q.**   Right?

18   **A.**   That's right.

19   **Q.**   And you asked about ownership in common of the lots?

20   **A.**   Correct.

21   **Q.**   You wanted to know what was going on with the real estate

22   that you were purchasing?

23   **A.**   That's right.

24   **Q.**   I'm looking at this, Mr. Osborn, and I didn't see that you

25   asked about any agreement about dividing judgments in this

1  communication.  Did you?

2  **A.**   No, I did not.

3  **Q.**   So if you'd have known about that, would you have asked for

4  it?

5  **A.**   Most likely.

6  **Q.**   Does that indicate to you whether you knew about any such

7  agreements to assign any interest in the deficiency judgments?

8  **A.**   At the time of this email, I don't know that I knew that

9  there were any such agreements.

10  **Q.**   All right.  Well, again, I'm going to make sure it's clear.

11  If you'd have known about it or had been told about it, wouldn't

12  you have asked for it?

13  **A.**   Yes.

14  **Q.**   So that's as of, for the record, June 5, 2012.  Let's look

15  at Plaintiff's Exhibit 75.  All right.  This talks about review

16  of the previous and pending litigation among the various

17  participants.  You see that?

18  **A.**   Yes, sir.

19  **Q.**   All right.  Again, it's important -- this is part of the

20  due diligence; am I correct?

21  **A.**   Yes.

22  **Q.**   And at this point the deal had not closed, and this is June

23  15, 2012?

24  **A.**   Right.

25  **Q.**   And it was important for you to know about this pending

1   litigation?

2   **A.**   Correct.

3   **Q.**   And apparently by June 15th you knew about pending

4   litigation among the participants?

5   **A.**   That's right.

6   **Q.**   Okay.  Now let's look at Plaintiff's Exhibit 68.  This is

7   the complaint for declaratory relief that we have seen a number

8   of times in this case.

9        Did you have anything to do with filing this complaint?

10   **A.**   No, sir.

11   **Q.**   Did HCB, to your knowledge, have anything to do with filing

12   the complaint?

13   **A.**   No, sir.

14   **Q.**   Did Mr. Phillips have anything to do with filing this

15   complaint, to your knowledge?

16   **A.**   No, sir.

17   **Q.**   In fact, you didn't even know about it until June 15 of

18   2012; is that accurate?

19   **A.**   Sometime around then, yes, sir.

20   **Q.**   So -- strike that.  Sorry.  Mr. Osborn, I can show it to

21   you -- I don't have the exact exhibit with me right now, but

22   there was a dismissal of the dec action eventually.  Are you

23   aware of that?

24   **A.**   Yes, sir.

25   **Q.**   Are you aware that it was dismissed without prejudice, sir?

*Jason Osborn - Cross/Franco*                                          133

1    **A.**   I don't recall right now.  It may have been.

2    **Q.**   Okay.  But you didn't have any involvement in the dismissal

3    of that action?

4    **A.**   No.

5              **MR. FRANCO:**  Thank you.  I have no further questions.

6              **THE COURT:**  Mr. Crossland?

7              **MR. CROSSLAND:**  Thank you, Your Honor.

8                        **REDIRECT EXAMINATION**

9    BY MR. CROSSLAND:

10   **Q.**   Mr. Osborn, during his examination, Mr. Franco went through

11   pretty much all the transactions that I went through.

12        You were involved in all of those, right?  So from December

13   with Hudson Realty to First NBC in April and HCB --

14   **A.**   Yes.

15   **Q.**   I mean, you were involved with every single one of those,

16   right?

17   **A.**   Yes.

18   **Q.**   There's no dispute about that?

19   **A.**   No.

20   **Q.**   And you testified that Mr. Dobson's company was trying to

21   buy all the assets that CPB held that ended up at First NBC at

22   some point, right?

23   **A.**   Correct.

24   **Q.**   And those assets would have included CPB's participation

25   interest in the North Tip loan?

1  **A.**    Correct.

2  **Q.**    Mr. Dobson was the one that initially was trying to buy

3  that?

4  **A.**    Correct.

5  **Q.**    And the documents that you requested as part of your due

6  diligence for HCB prior to acquiring GulfSouth's interest, you

7  got those documents, right?

8  **A.**    Yes.

9  **Q.**    And you wouldn't have closed the deal if you didn't get

10  those documents?

11  **A.**    That's right.

12  **Q.**    And if there was an agreement or correspondence between the

13  parties that correlated to the collateral that you were looking

14  at, you would have received that?

15  **A.**    In all likelihood, yes.

16  **Q.**    Typically if a lienholder holds the first lien on a

17  property, would that lienholder release it for zero

18  consideration?

19  **A.**    The first lienholder?  No.

20  **Q.**    Why not?

21  **A.**    He can enforce against the property without fear of a

22  superior lienholder trying to take something from it.

23  **Q.**    And in fact, when -- You know that HCB ultimately released

24  its deficiency judgment lien on Lot 26, correct?

25  **A.**    I think so, yes.

**Q.**   And that was the GulfSouth deficiency judgment lien?

**A.**   Yes.

**Q.**   And that was done in December of 2012?

**A.**   I don't know.

         **MR. CROSSLAND:**  Mr. Dyer, go to 107, please.

**BY MR. CROSSLAND:**

**Q.**   Now, Exhibit 107 is the partial release of deficiency

judgment that Joe Dobson executed as to Lot 26 on Nature Walk,

correct?

**A.**   It appears to be.  Can you back out a little bit.

**Q.**   I'm sorry?

**A.**   Can you back out of it.  I was curious whether it was

recorded.

**Q.**   Yes.

         **MR. CROSSLAND:**  Mr. Dyer, pull up the recording at the

top for him.

**BY MR. CROSSLAND:**

**Q.**   It's got some of the federal court filings on it, but you

can see the recording there, right?

**A.**   Sure, right.

**Q.**   Let's back out of that and go down to the date and the

notary.  And what's the date of that, sir?

**A.**   12/27/12.

**Q.**   Now, isn't it true, Mr. Osborn, that First Commercial did

in fact release its judgment lien as to Lot 26?

1    **A.**    I don't know.

2         **MR. CROSSLAND:**  Your Honor, at this time I'd ask the

3    Court take judicial notice of a publicly recorded document which

4    is First Commercial Bank's --

5         **MR. FRANCO:**  Before we tell what it is, there's been

6    no such exhibit listed.  There's been no such exhibit listed.

7         **MR. CROSSLAND:**  There's been pretty much -- HCB's

8    position throughout most of the witnesses that have been asked

9    about this is that First Commercial Bank never released its

10   lien.  There's a publicly recorded document that discredits

11   that.

12        **THE COURT:**  But if you didn't list it and they didn't

13   have an opportunity to --

14        **MR. FRANCO:**  This is the first time I'm hearing about

15   it.

16        **THE COURT:**  Then it's not admissible.

17        **MR. CROSSLAND:**  All right.

18   **BY MR. CROSSLAND:**

19   **Q.**    But if, in fact, Mr. Osborn, there is a release from First

20   Commercial Bank and from the other -- and the other liens on

21   Lot 26, there would have been no reason for HCB to release a

22   deficiency judgment lien in December of 2012, would there be?

23   **A.**    I mean, if HCB were the sole judgment lienholder at that

24   time, I don't know.  It depends on the circumstances associated

25   with the release and a lot of other factors.

1  **Q.**   But releasing it for zero consideration as the first

2  lienholder, that wouldn't make any sense, would it?

3  **A.**   Again, it depends on the circumstances.

4           **MR. CROSSLAND:**  That's it, Your Honor, thank you.

5           **THE COURT:**  Sir, you may step down.

6           **(Witness excused.)**

7           **THE COURT:**  Your next witness?

8           **MS. BRADY:**  Next, Your Honor, we have the video of Mac

9  McLeod.  And there are -- I don't know how you want us to handle

10 it, but there are a few objections remaining.

11          There are three underlying --

12          **THE COURT:**  Just a moment.  I need to move some other

13 exhibits and get to that.

14          **MR. FRANCO:**  Your Honor, we have a question.  May I

15 ask a question?

16          **THE COURT:**  Yes.

17          **MR. FRANCO:**  Is Mr. Osborn released of their subpoena?

18          **MR. CROSSLAND:**  We're not calling him again.

19          **MR. FRANCO:**  Thank you.

20          **THE COURT:**  Okay, I have the exhibit with me now.

21          **MS. BRADY:**  So there are three objections from HCB

22 that were made to the underlined portion that Your Honor ruled

23 on Monday she would consider.

24          And then I've made five objections later on in the

25 transcript.  I didn't know if Your Honor wanted to address them

1    before we start playing.

2              **THE COURT:**  Let's do that.  So where -- tell me --

3    point me again to where they are.

4              **MS. BRADY:**  HCB's objections to what's been underlined

5    are -- the first one is page 49, lines 21 to page 50, line 3.

6              **MR. FRANCO:**  I'm sorry, Your Honor, I didn't hear.

7              **THE COURT:**  Page 49.

8              **MS. BRADY:**  Page 49, the underlining starting at line

9    21, through page 50 through, line 3.

10             **MR. FRANCO:**  I'm sorry, is this -- may I?  So I

11   understand, is this -- is this Ms. Brady's objection or is this

12   my objection?

13             **THE COURT:**  This is your objection.

14             **MR. FRANCO:**  Okay.

15             **THE COURT:**  And your objection is to the question?

16             **MR. FRANCO:**  That it calls for speculation.

17             **THE COURT:**  It seems like a moot point.  I mean, the

18   testimony is he doesn't know.  I mean, I'm not sure that I would

19   have overruled -- I'm not sure I would have sustained the

20   objection had it been made at the time.  But given the response,

21   it seems to be a moot point.  I'm not going to accept the

22   testimony that something -- that Mr. McLeod assumes.

23             **MS. BRADY:**  Something like that, Your Honor, do we

24   need Mr. Dyer to remove that portion before we play the video?

25             **THE COURT:**  No, no.  That's just extra effort and time

1    on his part.

2            **MS. BRADY:**  The next one -- and I'll go in order first

3    of HCB's objections and then back to the remainder of SE

4    Property.  The next objection from HCB is the underlining in

5    page 97, lines 13 to 19.

6            **THE COURT:**  What about page 57?  These are underlined

7    -- there's some objections here by Mr. Franco.  Have these been

8    dealt with?

9            **MR. FRANCO:**  Your Honor, I don't show any objections

10   on page 57.

11           **THE COURT:**  The top of 57 says "Objection, calls for a

12   legal conclusion."

13           **MR. FRANCO:**  That was made --

14           **MS. BRADY:**  The objections, Your Honor, for purposes

15   of the depo designations are noted in the margins.

16           **MR. FRANCO:**  I'm sorry, what was that response?

17           **THE COURT:**  I don't know.  I'm very confused here.

18   Okay.  So what are you -- I have some underlining.  I see some

19   objections.  So have you all just come to an agreement on some

20   things or --

21           **MS. BRADY:**  Yes.  We met -- let me make -- for

22   instance on page 57 --

23           **THE COURT:**  Oh, was this in the email you all sent to

24   me?

25           **MS. BRADY:**  Yes.  I have a clean copy.

1   **THE COURT:**  I have the email and I have my notes on

2   the --

3   **MR. FRANCO:**  May I ask Ms. Brady a question, Your

4   Honor?

5   **THE COURT:**  Yes.

6   **(Conference between counsel.)**

7   **MR. FRANCO:**  So on page 57, Your Honor, we've resolved

8   that objection.  That objection can be deleted.

9   **THE COURT:**  Okay.

10   **MS. BRADY:**  Your Honor, any objections for the

11   purposes of the designations have been reflected in the margins,

12   and there's only a handful to resolve.

13   **THE COURT:**  I guess I thought on Monday I ruled that I

14   wasn't going to allow for the handwritten in the margin

15   objections because they came too late.

16   **MS. BRADY:**  You did, Your Honor.  Those were Mr.

17   Franco's additions.  You did say if they pertained to the

18   underlining you would entertain those objections.

19   **THE COURT:**  Oh, because those were new designations by

20   you, I understand.  I use that term "new" loosely.

21   Okay.  So then where are the other ones?

22   **MS. BRADY:**  So the second one is page 97, lines 13 to

23   19.

24   **MR. FRANCO:**  Same thing as we just talked about on the

25   other one, Your Honor.

| | |
|---|---|
| 1 | **THE COURT:**  This is not typically the way I entertain |
| 2 | objections.  I mean, the question itself is what you're |
| 3 | objecting to, I mean, that's what objections are.  The question |
| 4 | itself is not objectionable.  The response is "I don't know," I |
| 5 | mean, so I'm not going to consider that.  But I'm not going to |
| 6 | go and strike -- I mean, that was the same thing we just saw. |
| 7 | I mean, obviously, I'm not going to consider -- the |
| 8 | question is not evidence, so it's not going to be considered. |
| 9 | And certainly the "I don't recall" is not going to be |
| 10 | considered, but I don't need to rule on the objection. |
| 11 | **MS. BRADY:**  The last one Mr. Franco had was page 108. |
| 12 | It looks like it's only lines 4 to 10. |
| 13 | **THE COURT:**  All right.  That's overruled.  I don't |
| 14 | know what his answer is, but I wouldn't have -- I would not |
| 15 | sustain the objection to the question. |
| 16 | **MS. BRADY:**  And then as far as the objections from SE |
| 17 | Property -- and I believe we set forth -- I don't know if you |
| 18 | have the cover email that transmitted this. |
| 19 | **THE COURT:**  I do. |
| 20 | **MS. BRADY:**  And those all pertain -- there's five |
| 21 | designations, and they all really pertain to the same thing. |
| 22 | **THE COURT:**  Every one of them was overruled.  I mean, |
| 23 | I already looked at this and I overruled every one.  I did say, |
| 24 | though, on a couple of them where you had objected as to legal |
| 25 | conclusion, that I would not consider as a legal conclusion but |

1    rather as relevant on one of them to its intent, which is on

2    page 92.

3           And then also, not as to legal conclusion, but I did

4    not find the question improper -- well, maybe we need to just go

5    to those designations so I can explain to you the reason for my

6    ruling.

7           **MS. BRADY:**  The reason for the objection, Your Honor,

8    was those all dealt with asking Mr. McLeod's opinion as to

9    whether he felt he did anything improper or believed he was

10   doing anything improper.

11          And he testified earlier in his deposition at pages 56

12   and 57 that he didn't even read the participation agreements.

13   So to ask for his testimony as to whether he found any of his

14   actions improper, that was the basis of those objections.

15          **MR. FRANCO:**  Are we on page 92?

16          **THE COURT:**  Was that explained in your -- I mean, was

17   there an objection based on foundation?

18          **MS. BRADY:**  Foundation, yes.

19          **THE COURT:**  Weren't there other objections, too?  Let

20   me go to page 89 so I have it in front of me.

21          **MR. FRANCO:**  So that I'm clear, Your Honor, and up

22   with you, what page are we on now?

23          **THE COURT:**  Page 89, line 7.  There was an objection

24   as to legal conclusion --

25          **MS. BRADY:**  Foundation, and assumes facts not in

| | |
|---|---|
| 1 | evidence, the foundation one being that he had testified earlier |
| 2 | he didn't read the Participation Agreement. |
| 3 | **MR. FRANCO:**  May I respond, Your Honor? |
| 4 | **THE COURT:**  Yes. |
| 5 | **MR. FRANCO:**  I wasn't referencing the Participation |
| 6 | Agreement.  That's not the question. |
| 7 | **THE COURT:**  Yeah, I -- I agree with Mr. Franco, |
| 8 | Ms. Brady.  I -- I mean, that may go sort of to the weight, but |
| 9 | it doesn't go to admissibility.  I mean, there may be other |
| 10 | things Mr. McLeod is thinking about in terms of whether it was |
| 11 | proper or not for him to do what he did.  So I would overrule on |
| 12 | a foundation objection. |
| 13 | **MS. BRADY:**  Then we withdraw the remainder of those. |
| 14 | **THE COURT:**  And again, I don't find it improper as far |
| 15 | as asking him for a legal conclusion.  I certainly wouldn't |
| 16 | consider anything that he testified to as a legal conclusion. |
| 17 | It's just his opinion based on his participation or experience |
| 18 | in these matters, and that's how I consider it. |
| 19 | **MS. BRADY:**  With that ruling, we'd withdraw the rest |
| 20 | of the objections. |
| 21 | **THE COURT:**  Okay.  I'm going to ask you to go ahead |
| 22 | and get started with this because I have another matter that I |
| 23 | have to tend to in another case, a matter in a criminal case |
| 24 | that I'm going to be addressing here in the courtroom during the |
| 25 | lunch hour.  I'm going to start that at 12:30, so let's go until |

1    about 12:20 -- or 12:15, we'll go for another ten minutes.

2            **MR. FRANCO:**  Your Honor, may I?

3            **THE COURT:**  Yes.

4            **MR. FRANCO:**  You asked us at the beginning to try to

5    let you know in case you could use any of your time this week on

6    something else.  I believe that we're not going to be going

7    Friday, from what I understand.

8            **THE COURT:**  Okay.

9            **MR. FRANCO:**  I don't know whether y'all disagree with

10   that or not, but I don't see us going Friday.

11           **MS. BRADY:**  Can you advise us of what additional

12   witnesses you --

13           **MR. FRANCO:**  That's because I don't know what the

14   additional testimony is going to be yet.

15           **MR. CROSSLAND:**  Well, Judge, the only additional

16   testimony that's going to come in is McLeod's video, and we're

17   going to call Mr. McLaughlin for ten minutes about Lot 26, and

18   that's it.  So he can tell us who his witnesses are going to be

19   now and then we can tell you when --

20           **MR. FRANCO:**  And we're going to make some motions

21   after the close of their case.  And depending on those motions,

22   I don't anticipate more then one or two extra witnesses, if at

23   all.

24           So I don't -- that's why I'm saying I don't think

25   we're going to be going on Friday.  That's my understanding.

1       **MR. CROSSLAND:**  And, Judge, we'd ask for oral

2  closings.  And I know -- we're going to do whatever the Court

3  wants to do.  I know the Court was considering that I think in

4  pretrial.  We would request them, and we think it would be

5  helpful for the Court, but whatever the Court determines.

6       **THE COURT:**  I think it would be very helpful to the

7  Court for oral closings.

8       **MR. CROSSLAND:**  That might end up getting into

9  tomorrow morning.

10       **THE COURT:**  We could do that tomorrow morning.

11       **MR. FRANCO:**  I just wanted to let you know that I

12  didn't think we'd be doing any testimony into Friday.

13       **THE COURT:**  Okay.  Well, I appreciate that heads-up,

14  thank you.

15       **MR. FRANCO:**  I hope I'm right.

16       **THE COURT:**  I still have to take this plea at 12:30,

17  but I appreciate the heads-up for Friday.  Thank you.

18       **MS. BRADY:**  Can we ask who those witnesses may be, the

19  additional witnesses?

20       **THE COURT:**  Yeah, if you're going to call witnesses,

21  go ahead now and tell them.  I thought I had asked you to do

22  that last night.

23       **MR. FRANCO:**  I have told them what I thought at this

24  point, and I told them that as of -- not knowing the testimony

25  today, that I thought we would call anybody that was on today

1    possibly as part of our case.

2         As of right now, I'm not going to call the witnesses

3    that have testified, so those witnesses are not going to be

4    called.

5         **THE COURT:**  Who else is in the stable as a potential?

6         **MR. FRANCO:**  In the stable is Mr. Dobson and Mr.

7    Phillips and the expert, and I don't think I'm calling the

8    expert.  That depends on what happens from now to end of the

9    close of their case, but that's my thought now.

10        So, please, if I change my mind, don't say that you

11   said that you weren't going to do this.

12        **THE COURT:**  No, I would never do that.  You have up

13   until the time you rest your case to call any witnesses.  I'm

14   just asking if there's a potential they're going to be called

15   today that you let the Plaintiffs know that.

16        **MS. BRADY:**  One thing I failed to mention is with the

17   deposition of Mr. McLeod there are five additional exhibits that

18   are coming in that the exhibit number referenced in the depo

19   will be the deposition exhibit number, not the trial exhibit

20   number.  But I believe Mr. Dyer has correlated it to the trial

21   exhibit number.

22        **MR. CROSSLAND:**  It will actually play right --

23        **THE COURT:**  How is that going to look in the record?

24        **MS. BRADY:**  And then at the end I would suggest that

25   we then move those into evidence.

```
 1              THE COURT:  Yeah, just the DVD itself into --
 2              MS. BRADY:  Yes, or we could just do the five exhibits
 3    by exhibit number.  They are on the trial exhibit list.
 4              MR. FRANCO:  I'm not sure that's a good idea for the
 5    record.  I think if they're deposition exhibits, we ought to
 6    just keep them as deposition exhibits and not try to correlate
 7    that.  Because I don't know if I've correlated it to see if it's
 8    correct or not, I don't know that it's a good idea.  I don't
 9    have a great objection to it, I just don't think it's a great
10    idea.
11              THE COURT:  So these are all likely to be exhibits
12    we've already seen?
13              MS. BRADY:  No.
14              THE COURT:  These are new exhibits?
15              MS. BRADY:  Yes.  There are five exhibits.  And I do
16    have the exhibit number, but yes.
17              THE COURT:  Do we have the hard copies of the
18    exhibits?
19              MS. BRADY:  Yes.
20              THE COURT:  What I would suggest then is when you
21    admit the -- when you present the hard copies, we'll get you a
22    sticker and put on the sticker Plaintiff's McLeod No. 1, you
23    know, or whatever the number is, but just identify it with Mr.
24    McLeod, and that way we should be able to keep it straight or
25    the Eleventh Circuit will be able to keep it straight.
```

```
 1            We only have five minutes now.  Mr. Dyer, let's --
 2    we've got to take advantage of every second.  Go ahead.
 3            (WHEREUPON, the videotaped deposition of Mac McLeod
 4    was published and recorded into the court record by the court
 5    reporter, but was not ordered to be transcribed at this time and
 6    is not within this transcript.)
 7            THE COURT:  Mr. Dyer, stop.  We'll take your recess
 8    now.  We'll be in recess until 1:30.  As I said, I have another
 9    matter in here at 12:30.  Your things should be fine.  If you'll
10    just maybe push them to the back of the tables, that would be
11    helpful, just to make a little room for the other attorneys.
12    But they won't -- your things will be fine.
13            And then also, I have a -- also during this lunch hour
14    I have a conference call with the circuit.  So I'm going to say
15    1:30, I anticipate I'll be in here at 1:30.  But if I'm a couple
16    of minutes late, don't hold me in contempt.  I'll be in here as
17    quick as I can.  And Ms. Simms will give you a heads-up if I'm
18    going to be running a few minutes behind.
19            Court will be in recess until 12:30.
20            (Recess taken)
21            THE COURT:  Okay.  I'm going to continue with Mr.
22    McLeod's deposition.
23            (Video published 1:38 to 2:30 p.m.)
24            THE COURT:  Okay, your next witness?
25            MR. CROSSLAND:  Your Honor, the Plaintiff calls Fred
```

1   McLaughlin.

2           **FRED MCLAUGHLIN, PLAINTIFF WITNESS, DULY SWORN**

3           **MADAM CLERK:**  Be seated.  Please state your full name

4   and spell your last name for the record.

5           **THE WITNESS:**  Fred McLaughlin, M-c-l-a-u-g-h-l-i-n.

6           **THE COURT:**  All right, Mr. Crossland, go ahead.

7           **MR. CROSSLAND:**  May it please the Court.

8           **THE COURT:**  Yes, sir.

9                       **DIRECT EXAMINATION**

10  BY MR. CROSSLAND:

11  **Q.**   Mr. McLaughlin, let me start by apologizing.  I know you've

12  been sitting out there for some time, so let me start by

13  apologizing for that.

14          You're the vice president of HCB, correct?

15  **A.**   Yes, sir.

16  **Q.**   And you're familiar with Lot 26 in Nature Walk, correct?

17  **A.**   Yes, sir.

18  **Q.**   And you bought that from Mr. and Mrs. Phillips in June of

19  2011?

20  **A.**   Yes, sir.

21  **Q.**   When you bought it, there were a number of liens on that

22  property, correct?

23  **A.**   Yes, sir.

24  **Q.**   You paid $136,000 for it?

25  **A.**   That's correct.

1   **Q.**   Where did you get the money to buy Lot 26?

2   **A.**   Borrowed it from the company.

3   **Q.**   Borrowed it from HCB?

4   **A.**   Yes, sir.

5   **Q.**   Did you sign a note for that?

6   **A.**   I'm not sure.  I don't remember.

7   **Q.**   Okay.  Has HCB been repaid its $136,000?

8   **A.**   It's been paid out as part of my compensation package over

9   the years.

10  **Q.**   Okay.  And do you know if the $136,000 has been fully paid?

11  **A.**   I believe that it has.

12  **Q.**   And when you bought Lot 26, there was a partially

13  constructed home on it, correct?

14  **A.**   That's correct.

15  **Q.**   And you wanted to finish the construction on that house?

16  **A.**   Correct.

17  **Q.**   And you wanted to get a mortgage in order to do that,

18  correct?

19  **A.**   No.

20  **Q.**   You didn't want to get a mortgage?

21  **A.**   No.

22          **MR. CROSSLAND:**  May I approach, Your Honor?

23          **THE COURT:**  Yes.

24  **BY MR. CROSSLAND:**

25  **Q.**   I'm going to show you what's been marked as Plaintiff's

1   Exhibit 38 for identification.  It's not into evidence.  I'm

2   going to ask you to take a look at it.  Specifically I'm looking

3   at the second page.

4       You see it?

5   **A.**  I don't understand the question.

6   **Q.**  Okay.  The question I had asked -- may I take that back

7   from you.  Thank you, sir.

8       The question I had asked was:  You wanted to get a mortgage

9   to finish the home, correct?

10  **A.**  No.

11  **Q.**  Well, sir, isn't it true that in August of 2011 you sent an

12  email to Christina Mooney and Jason Osborn inquiring about the

13  release of various liens on Lot 26?

14  **A.**  That is correct.

15  **Q.**  Okay.  And you asked them, "I am going to need to secure a

16  loan on the home" -- "I'm going to need to secure a mortgage on

17  the home to finish this," right?

18  **A.**  I did.

19  **Q.**  Okay.  So you needed to get a mortgage to finish the home,

20  correct?

21  **A.**  I was contemplating it at the time.

22  **Q.**  Now, ultimately you have obtained a mortgage on Lot 26 in

23  Nature Walk?

24  **A.**  I pledged it as collateral.

25  **Q.**  Right, to get a mortgage?

1    **A.**    Right.

2         **MR. CROSSLAND:**  Mr. Dyer, pull up Plaintiff's Exhibit

3    138, please.  It's been marked for identification but not put

4    into evidence.

5    **BY MR. CROSSLAND:**

6    **Q.**  Mr. McLaughlin, if you'll look at the screen there, please.

7    This is the mortgage that you obtained from First NBC Bank

8    relating to Lot 26, correct?

9    **A.**    Correct.

10         **MR. CROSSLAND:**  Mr. Dyer, if you'd go to the sixth

11   page of that, please.

12   **BY MR. CROSSLAND:**

13   **Q.**  And that's your signature at the bottom of the mortgage,

14   correct, sir?

15   **A.**    That is correct.

16         **MR. CROSSLAND:**  Your Honor, we'd move Plaintiff's

17   Exhibit 138 marked for identification into evidence as

18   Plaintiff's Exhibit 138.

19         **THE COURT:**  That will be admitted.

20         **(Plaintiff's Exhibit 138 admitted into evidence.)**

21         **MR. CROSSLAND:**  Mr. Dyer, if you'll go back to the

22   first page, please.

23   **BY MR. CROSSLAND:**

24   **Q.**  And this mortgage, Mr. McLaughlin, is dated June 14th,

25   2013, correct?

1   **A.**   Correct.

2   **Q.**   Okay.  Now, in order to get in mortgage on Lot 26, you had

3   to get the liens that were on Lot 26 released, correct?

4   **A.**   I didn't.  I assumed that they were already released.

5   **Q.**   Okay.  But you're aware that at the time you purchased Lot

6   26 there was a judgment lien held by First Commercial Bank,

7   correct?

8   **A.**   Correct.

9   **Q.**   And that lien got released, didn't it?

10  **A.**   It did.

11  **Q.**   Okay.  And that happened in November of 2012, correct?

12  **A.**   Correct.

13  **Q.**   Okay.  And there was also a lien that was initially held by

14  the SPCP Group, correct?

15  **A.**   Yes, sir.

16  **Q.**   And that one also got released, right?

17  **A.**   Yes, sir.

18  **Q.**   That was part of the closing, wasn't it?

19  **A.**   That was part of the closing.

20  **Q.**   And then Bank Atlantic also held a lien and that one also

21  got released as well, right?

22  **A.**   Yes, sir.

23  **Q.**   Again, that was part of the closing?

24  **A.**   Yes, sir.

25  **Q.**   And the BB&T original mortgage was also on the property,

1    that was also released as part of the closing that you had with

2    Mr. Phillips?

3    **A.**    Yes, sir.

4    **Q.**    So after First Commercial Bank released its lien on Lot 26

5    in November of 2012, the only remaining lien was a deficiency

6    judgment lien that was initially in the name of GulfSouth Bank,

7    correct?

8    **A.**    I didn't think there was any liens but --

9    **Q.**    Okay.  Ultimately HCB released a deficiency judgment lien

10   that was initially held by GulfSouth, correct?

11   **A.**    I -- I guess they did.

12   **Q.**    Okay.  Let's go to it real quick.

13          **MR. CROSSLAND:**    Mr. Dyer, Plaintiff's Exhibit 107,

14   please.

15   **BY MR. CROSSLAND:**

16   **Q.**    On the screen there, Mr. McLaughlin, this is the partial

17   release of the deficiency judgment executed by Mr. Joe Dobson as

18   president of HCB, correct?

19   **A.**    Yes, sir.

20   **Q.**    And this relates to Lot 26 in Nature Walk, correct?

21   **A.**    Yes, sir.

22   **Q.**    And this release is dated December 27, 2012, correct?

23   **A.**    Correct.

24   **Q.**    That would have been a month after First Commercial

25   released its lien in November of 2012, correct?

*Fred McLaughlin - Cross/Franco*

1    **A.**   Correct.

2              **MR. CROSSLAND:**  That's all I have at this time, Your

3    Honor.

4              **THE COURT:**  Mr. Franco?

5                       **CROSS-EXAMINATION**

6    **BY MR. FRANCO:**

7    **Q.**   Mr. McLaughlin, when you purchased -- or sought to purchase

8    Lot 126, the lot was incomplete, correct?

9    **A.**   Correct.

10   **Q.**   And what was the status of the subdivision?

11   **A.**   It was gated up.  You couldn't drive a car down to it.

12   There was seven houses in different phases of construct, but

13   there wasn't water and sewer or cable to the neighborhood at

14   that point.

15   **Q.**   And who had the first mortgage on the property?

16   **A.**   BB&T.

17   **Q.**   Did you negotiate with BB&T the price?

18   **A.**   I was looking at all the homes in there, and I was making

19   offers on the two that BB&T had.

20   **Q.**   Okay.  So BB&T had a mortgage on another house as well in

21   that subdivision?

22   **A.**   Yes, they did.

23   **Q.**   All right.  And how did the $136,000 become the price?  Was

24   that the appraisal?

25   **A.**   Mr. Cook said -- he was the asset manager.  This was --

1    these assets belonged to Colonial Bank, and he said he could

2    only sell it for what it appraised at.  So he got an appraisal

3    and sent the appraisal over to me, and I accepted the appraised

4    value of the house.

5    **Q.**   Which was $136,000?

6    **A.**   Yes, sir.

7    **Q.**   And in exchange for that, what did you understand was going

8    to happen?

9    **A.**   It was a short sale.

10   **Q.**   Okay.  And what did you understand a short sale to be?

11   **A.**   That whatever amount of principal and interest was owed at

12   that time was more than $136,000.  They were going to release

13   that amount that was above that.

14        Mr. Phillips would have to pay that back if they would -- I

15   believe they may have had a judgment against him.  I'm not

16   really sure.  It's been a while.  But they sold the house to me

17   and released it in the short sale for $136,000.

18        I'm not sure I'm answering the question right, if you want

19   to ask it again.

20   **Q.**   Do you understand that a short sale is a mechanism that's

21   used to avoid a formal foreclosure by the mortgage holder?

22   **A.**   Yes, sir.

23   **Q.**   So to avoid the extra costs of going through the whole

24   foreclosure, the first mortgage holder sells it, and the concept

25   is all of the liens are released.

1          Isn't it that how it works?

2               **MR. CROSSLAND:**  Objection, Your Honor.  That's

3    testimony by counsel.  It's an improper and inaccurate legal

4    conclusion as well as part of his statement.

5               **THE COURT:**  I know you're in cross but it's --

6               **MR. FRANCO:**  I'm asking his understanding.

7               **THE COURT:**  I think he just said he didn't have an

8    understanding so --

9               **MR. FRANCO:**  I'll do it again, Your Honor, I'll

10   rephrase the question, but I don't think that's what he said.

11   If so, we'll get it clear right now.  I don't think that's what

12   he said.

13              **THE COURT:**  Okay.

14   **BY MR. FRANCO:**

15   **Q.**   Mr. McLaughlin, I'm only asking you your understanding,

16   okay.

17        Your understanding -- let's focus on this particular short

18   sale.  Your understanding of this particular short sale is it

19   was done to avoid a formal foreclosure; am I correct?

20   **A.**   That's correct.

21   **Q.**   All right.  And in a short sale, is it your understanding

22   -- or in this understanding that ultimately all the inferior

23   liens were going to be released at some point in time?

24   **A.**   Yes.

25              **MR. FRANCO:**  That's all the questions I have.  Thank

1    you, Your Honor.

2              **THE COURT:**  Any redirect?

3              **MR. CROSSLAND:**  No redirect, Your Honor.

4              **THE COURT:**  Sir, you may step down.

5              **(Witness excused.)**

6              **THE COURT:**  And your next witness?

7              **MR. CROSSLAND:**  At this time, Your Honor, Plaintiff is

8    going to read in some requests for admissions from HCB into the

9    record.

10             **THE COURT:**  Okay.

11             **MS. SIVICK:**  This comes from HCB Financial Corp.'s

12   responses to Plaintiff's first request for admission.  These are

13   dated July 15th, 2013.

14             Request for admission No. 2:  Please admit that HCB

15   has not collected any funds or other assets from any of the

16   judgment-debtors in any collection efforts related to the

17   deficiency judgment.  The response is:  Admitted.

18             No. 3:  Please admit that HCB has not obtained a Fact

19   Information Sheet from any of the judgment-debtors to the

20   deficiency judgment.  The response is:  Admitted.

21             No. 6:  Please admit that HCB has not taken a

22   deposition of any of the judgment-debtors in Case No.

23   2009-CA-2050 since the assignment of judgment dated June 26,

24   2012.  Response is:  Admitted.

25             No. 7:  Please admit that HCB has not taken any

deposition of any person or individual in Case No. 2009-CA-2050

since the assignment of the judgment dated June 26, 2012.  The

response is:  Admitted.

No. 8:  Please admit that HCB has not served any

written request for production in aid of execution on any of the

judgment-debtors in Case No. 2009-CA-2050 since the assignment

of judgment.  The response is:  Admitted.

No. 9:  Please admit that HCB has not served any

written interrogatories in aid of execution on any

judgment-debtors in Case No. 2009-CA-2050 since the assignment

of judgment dated June 26, 2012.  The response is:  Admitted.

No. 10:  Please admit that HCB has not served any

subpoenas on any person or entity in Case No. 2009-CA-2050 since

the assignment of judgment dated June 26, 2012.  The response

is:  Admitted.

No. 14:  Please admit that HCB has not commenced

proceedings supplementary in Case No. 2009-CA-2050.  The

response is:  Admitted.

**THE COURT:**  Thank you.

**MS. BRADY:**  Your Honor, erring on the side of caution,

if you'll indulge me for a second, I just wanted to make sure we

had moved for judicial notice -- and Your Honor entered an

order, and I just want to make sure it's not necessary for us to

move the joint stipulation and the order into evidence.  They're

part of the pleadings in this case.

1    **THE COURT:**  Remind me what the judicial notice -- I

2    remember vaguely that there was an issue about this.

3    **MS. BRADY:**  Sure.  It was the joint stipulation

4    between SE Property and the FDIC, wherein the FDIC disclaimed

5    any interest in the Participation Agreement and the deficiency

6    judgment, and then the order your -- the order Your Honor

7    entered so dismissing the FDIC.

8    **THE COURT:**  If that's the only purpose for which

9    you're asking I take judicial notice, then that's no problem.

10   **MS. BRADY:**  Yes, we only ask that you take judicial

11   notice that they disclaimed any interest.

12   **MR. FRANCO:**  There's no intent to change your earlier

13   order, I assume?

14   **THE COURT:**  Well, the earlier order I think -- I'm not

15   sure if I left this open or --

16   **MR. FRANCO:**  I don't think so.  Again, there's been so

17   many, I apologize, but I don't think you left it open.  I think

18   you specifically ruled as to what the effect was and who it was

19   effective against and who it wasn't effective against.

20   **THE COURT:**  I'll need to see my order.  I wasn't ready

21   for this.

22   **MR. FRANCO:**  I just don't want you to change it unless

23   you're intending to change it, that's all.

24   **THE COURT:**  Well, I'm not attending to change it

25   because I don't remember the full scope of it, so I'm not

```
 1   intending to change it.
 2              MR. FRANCO:  I understand.
 3              THE COURT:  I believe I recall there being an issue
 4   about -- I believe, Mr. Franco, you had objected to me taking
 5   notice of other facts and I --
 6              MR. FRANCO:  Would you like to see it?
 7              THE COURT:  Yes, I would, thank you.
 8              MR. FRANCO:  May I approach?
 9              THE COURT:  Yes.
10              MS. BRADY:  We're not asking to change the order.
11              UNIDENTIFIED PERSON:  Your Honor, I asked him about
12   releasing Mr. McLaughlin.
13              MR. CROSSLAND:  Mr. McLaughlin can be released.
14              THE COURT:  All right.  So you're asking -- what are
15   you seeking to have me do now?
16              MS. BRADY:  We just wanted to ask the Court for
17   clarification if it's necessary to move that stipulation and the
18   order into evidence since it's part of the Court's own
19   pleadings.
20              THE COURT:  Well, I don't know what you're -- I'm not
21   sure what you're seeking.  Because, I mean, I have entered a
22   ruling, and I indicated I would take judicial notice of
23   Documents 1, 125, and 127, for the purpose of informing the
24   Court as to the status of the pleadings, the parties, and the
25   claims at issue.
```

1          But beyond that, in terms of anything FDIC has said or

2    stipulated to with you -- or your client, excuse me, that I

3    wasn't intending to take notice of.

4          So the fact that they've been dismissed and -- I mean,

5    that would certainly be something I would take judicial notice

6    of.

7          **MS. BRADY:**  Sure, only that they were disclaiming any

8    interest.

9          **MR. FRANCO:**  I don't -- that's what she's trying to

10   get in, which I think is contrary to the order, the fact of what

11   they were doing.

12         We briefed this for the Court, and obviously, the

13   Court studied it and made its ruling.  I have no problem if we

14   want to introduce your order as an exhibit in the trial, I have

15   no problem with that.

16         **THE COURT:**  Right.

17         **MR. FRANCO:**  But I don't want anything differently

18   understood than what's in the order because, if so, I don't

19   understand it.

20         **MS. BRADY:**  We're not asking for that, Your Honor.

21   The order said, "The Court accepts as true the FDIC-R's

22   stipulation that it will claim no interest in the deficiency

23   judgment, but the stipulation between the plaintiff and the

24   FDIC-R is binding only between those parties."

25         We understand that.  I just want to make sure -- I

1    want to clarify that, for instance, Mr. Franco doesn't intend to

2    assert that there's been no evidence that the FDIC has

3    disclaimed any interest.

4         **MR. FRANCO:**  Oh, that's exactly what I'm going to

5    allege, because that's not binding on me.  That's a fact.

6    That's only binding -- that's only between them.  I think the

7    Court's order is not -- it's not effective as to me.

8         **THE COURT:**  Yeah, it's not effective as to him.  So, I

9    mean I -- I couldn't take -- I couldn't take it any other way.

10        **MS. BRADY:**  We're just asking that the Court

11   recognizes that the FDIC has disclaimed any interest, not that

12   the Court --

13        **THE COURT:**  I'm not going to recognize that.  I mean,

14   how -- I don't think I can recognize that.  I mean, I can

15   recognize they're not a party in this case and that they've been

16   dismissed.  But to -- but to -- you want me to take judicial

17   notice of a fact.  I mean, why wouldn't that be hearsay?

18        **MS. BRADY:**  Because it's a verbal act, Your Honor.

19   They disclaimed any interest -- they gave up a -- they gave up a

20   legal right which resulted in the dismissal of them from this

21   action.

22        It's a -- they're disclaiming in interest which led to

23   a stipulation dismissing them from this action.  And Your

24   Honor's entry of an order dismissing them from this action based

25   upon that stipulation is a verbal act.

1    **THE COURT:**  I don't know.  I don't recall that being

2    specifically what was briefed.

3    **MR. FRANCO:**  Your Honor, she's obviously using an

4    out-of-court statement by FDIC to prove the truth.  That's why I

5    think the Court ruled the way it did, that's why we briefed it,

6    that's why I objected to it.

7    **THE COURT:**  Yeah, I mean, I don't see the relevance.

8    I mean, you know, like what we dealt with earlier with the

9    agreement, I mean, I could take judicial -- not judicial notice,

10   I could consider those actions as verbal acts for the fact of

11   the agreement, and that was certainly relevant.

12       So I wasn't considering the truth of the matters

13   asserted in the statements in the emails, right, but I was

14   considering them as evidence of an agreement.  I didn't have a

15   -- I don't have a problem with that, and I think the case law

16   supports my doing at that as nonhearsay.

17       But what you're asking me to do is to take this as --

18   as true.

19   **MS. BRADY:**  Yes, as a verbal act, Your Honor, like a

20   contract.  A contract is a verbal act because it has legal

21   ramifications and implications.  So does a stipulation.

22   **THE COURT:**  The fact that the contract was made, yes,

23   I agree.  Okay.  But here, I mean, you're asking me I think to

24   go a step beyond that and to accept the truth of what they're

25   saying, which is to me -- I draw a distinction there.

1             Because this -- was this something you all briefed to

2    me?

3             **MR. FRANCO:**  Yes.

4             **MS. BRADY:**  Yes.

5             **MR. FRANCO:**  Yes, ma'am.  We briefed it, and that was

6    the result, your order was the result.

7             **THE COURT:**  No, I know.  I mean, but judicial notice

8    issue?

9             **MR. FRANCO:**  Yes.

10            **THE COURT:**  I mean, I know you briefed that to me.

11   But the verbal act?

12            **MR. FRANCO:**  Oh, no, that never come up.

13            **MS. BRADY:**  No.

14            **THE COURT:**  Yeah, that's what I mean, I don't remember

15   the verbal act argument being made on the judicial notice

16   question.

17            **MR. FRANCO:**  And how is that any different than the

18   FDIC documents I tried to get in that the Court ruled --

19            **THE COURT:**  I don't remember what those were.

20            **MR. FRANCO:**  Remember the agreements?  There were

21   agreements on the takeovers.

22            **THE COURT:**  I don't remember, I'm sorry.  I'm not

23   saying that it didn't happen.

24            **MR. FRANCO:**  That's okay, let me just explain.  There

25   were one or more FDIC agreements when FDIC took over a bank, and

1    there were multipage agreements that I tried to get in, and the

2    Court ruled against me at their objection that they were hearsay

3    and they were not admissible, even though I took the position

4    they were acts of the agency.  And the Court -- the Court ruled

5    that way.

6              So what's the difference between that statement out of

7    court and their statement out of court?  I think the Court's

8    ruling is consistent.

9         **MS. BRADY:**  The Court's ruling is that it accepts as

10   true the FDIC-R stipulation that it will claim no interest in

11   the deficiency judgment.

12        **THE COURT:**  Right.  But then I go further and I say

13   but that stipulation is between your client and the FDIC and is

14   binding only as to you two.

15        **MS. BRADY:**  And the verbal act is the fact that it was

16   done, the fact that the FDIC agreed to that resulting in their

17   dismissal.

18        **MR. FRANCO:**  Your Honor, a verbal act is just as much

19   hearsay as any out-of-court statement.  That's part of the

20   hearsay rule.

21        **MS. BRADY:**  A verbal act is not hearsay.

22        **THE COURT:**  Yeah, a verbal act is not hearsay, it's

23   not hearsay.  I mean, it's not hearsay when it's a verbal act

24   affecting the legal rights of the parties.

25        **MR. FRANCO:**  What's the verbal part of this?  This is

1    in writing.

2         THE COURT:  Well, I mean, I don't know that that

3    necessarily matters under the, quote/unquote, "rule" -- the

4    "verbal act rule."

5         MR. FRANCO:  What's the difference between that --

6    what they're trying to get in and what I proffered?

7         And I think the proffer is sitting right there.  Isn't

8    that the proffer sitting on the desk -- the table?

9         The proffer is the FDIC agreement that I tried to get

10   in.  What's the difference between --

11        THE COURT:  Well, that had an authentication problem

12   as a foundational matter.  It wasn't signed, you didn't have

13   someone here that could authenticate it.

14        MR. FRANCO:  Yeah, but you also sustained the hearsay

15   objection to that.

16        THE COURT:  Right, but I think I said that -- I

17   believe that I said the fundamental problem was the

18   authentication problem.

19        MR. FRANCO:  This is a reargument of the Court's

20   order, and the verbal act was not part of that.  And again --

21        THE COURT:  That's what I don't recall.

22        MR. FRANCO:  I can assure you there was not that in

23   the brief.

24        THE COURT:  Right.  I mean, if it was in the brief,

25   then I don't recall that --

1      **MR. FRANCO:**  And --

2      **THE COURT:**  -- on this issue.

3      **MS. BRADY:**  Hold on one second, Your Honor.

4      **THE COURT:**  My ruling was, Ms. Brady, was that this

5  stipulation -- and it's the stipulation you're talking about --

6  will not be considered a binding conclusion of law when the

7  Court is resolving any outstanding legal or factual issue

8  between Plaintiff and the remaining Defendant.

9          So I'm -- I'm not sure what you're trying to do now.

10     **MS. BRADY:**  Well, Your Honor, first, backing up for a

11  second, one of the cases that we gave you --

12     **THE COURT:**  Right, but Ms. Brady, you didn't argue

13  this -- you didn't make this argument to me in connection with

14  this stipulation.  This was just a judicial notice --

15     **MS. BRADY:**  Actually, yes, Your Honor.

16     **THE COURT:**  Okay.  Well, then I don't remember it.

17     **MS. BRADY:**  Page 3 of our reply, which is Document

18  337 --

19     **THE COURT:**  Your reply?

20     **MS. BRADY:**  Yes.  We did a request for judicial

21  notice.  And when we were here last Monday, you gave Mr. Franco

22  until Wednesday to file their response, and then we had untile

23  Friday to file our reply.

24     **THE COURT:**  Okay, all right.

25     **MS. BRADY:**  Our reply was filed on Friday, and it's

1   Document 337, and it discusses verbal acts.  Communications

2   between the parties to a contract that define the terms of a

3   contract or prove its contents are not hearsay as they are

4   verbal acts or legally operative facts.

5           And we also cite the *Mueller* case, which is one of the

6   cases with he gave you on Monday that I was going to point out

7   to Your Honor explaining that a contract is an example of a

8   verbal act as to which the law attaches duties and liabilities

9   and therefore is not hearsay.

10          **THE COURT:**  Okay, I apologize.  I didn't remember that

11  argument, so my apologies.  But I've ruled.  I mean, so are you

12  asking me to reconsider my ruling?

13          **MS. BRADY:**  No, Your Honor.  I didn't understand that

14  -- I understood your ruling to be that that was only binding as

15  between the FDIC and the SE Property, meaning it doesn't affect

16  your court's determination as to the validity of the assignments

17  or terminating the assignments, but that should this Court

18  invalidate the assignments and find that they revert back to the

19  FDIC, then the FDIC has disclaimed any interest, not that it

20  should have any bearing on whether on Count One or Count Two you

21  either invalidate or terminate.

22          **THE COURT:**  Okay.  Well, I don't -- I don't remember

23  any of that being argued to me.

24          **MR. FRANCO:**  Your Honor, it -- it seems to me that the

25  order as I read it was exactly the opposite of what she's

1    arguing now, that you said that that fact is not being

2    considered by the Court.

3            And they had the opportunity to have FDIC as a witness

4    as to bring somebody in here to testify.  Now they're trying to

5    get around that by using this document, and the Court has

6    already ruled, and that certainly was my understanding.  And now

7    at the end of the trial they're trying to get that changed.

8            THE COURT:  Well, it sounds to me like there's some

9    confusion about what the order says, Mr. Franco.  And I guess I

10   -- I don't remember the verbal act issue.  And because I have

11   made a ruling in the case regarding verbal acts, I'm going to

12   allow you both to brief this fully.

13           Did you respond to the verbal act argument in your --

14           MR. FRANCO:  Your Honor, we responded to their memo.

15           THE COURT:  Well, their memo apparently reads

16   different than you or I recall.

17           MR. FRANCO:  Excuse me.  Oh, this was a reply they

18   stuck into the briefing.  We didn't -- we didn't respond to this

19   verbal act issue, number one.  And number two, Your Honor, I

20   would -- I would, again, on the record --

21           THE COURT:  Mr. Franco, listen, Mr. Franco, I'm more

22   interested in getting this correct, right, I'm more interested

23   in getting this correct and letting you all have an opportunity

24   to present your arguments to me.  We don't have a jury here.

25   I'm interested in avoiding some reversible error.

1     And so we have -- I mean, I have the luxury -- because

2  we don't have a jury, I have the luxury of allowing you all to

3  brief this to me so I can make sure and be comfortable that I

4  got it right.  And I just -- I don't have any problem with that.

5  I'm not above reconsidering an order if I didn't either fully

6  consider the parties' arguments that were presented to me in

7  haste, if that's the case, and I apologize, and that -- you

8  know, I want it to be right.

9     And you may be right at the end of the day.  It may

10  not come in for the reasons that they're asking.  I'm not

11  convinced it's a verbal act.  But I'm also not convinced that I

12  considered that fully as I think I should have in making my

13  ruling.

14     **MR. FRANCO:**  Your Honor, my only issue with it at this

15  point in time is that -- and I'm not sure exactly when the Court

16  ruled, but it was certainly prior to trial, as I recall it.

17     **THE COURT:**  It was prior to trial.

18     **MR. FRANCO:**  And how far in advance, I don't know,

19  because a lot was happening.

20     **THE COURT:**  Not very far.  I think I was in the midst

21  of the trial I mentioned to you all when this was --

22     **MR. FRANCO:**  But my concern is that I don't have any

23  ability to deal with that in terms of any witnesses at this

24  point in time, and that's my concern with it.

25     How I would do that, I don't know.  I haven't thought

1    about it.  But it's the timing that causes me grief at this

2    point in time.  We've briefed it, the Court ruled.  I don't

3    think that the Court's order is not understandable.  It was

4    pretty clear when I read it as to what the deal was.

5         And it was -- it was -- the Court paid attention to

6    the fact that there was a fact that was tried to get into

7    evidence, and the Court said that it was not going to consider

8    that fact as evidence in this case by judicial notice.  That's

9    how I read it.

10        And now I'm concerned about where we are at the end of

11   their case with no more witnesses and at the end of the day.

12   That's my concern.

13        **THE COURT:**  Okay.  All right.  So you're planning

14   then -- based on this, Mr. Franco, your plan would be to argue

15   that they haven't established --

16        **MR. FRANCO:**  What happens.

17        **THE COURT:**  Excuse me?

18        **MR. FRANCO:**  They haven't established what happens if

19   the Court -- where the lead goes if the Court invalidates.

20   That's why they're trying to do it now.

21        Because, as I said in my opening, I believe, they

22   haven't -- that's part of the void in their case.  And this is

23   argument, of course, but they haven't -- that's a void in their

24   case.  Because they simply say they want it invalidated, and

25   they haven't proved where it goes when it's invalidated.

1          What I tried to get in with that document is the Smart

2     Bank agreement.  And my argument was that, if the Court

3     invalidated it, it went to Smart Bank.

4          They're trying to say something different and trying

5     to get a fact in to prove that.  That's my problem with this

6     judicial notice -- I mean, this stipulation that I wasn't a

7     party to --

8          **MS. BRADY:**  Your Honor --

9          **MR. FRANCO:**  -- and didn't have the ability to

10    cross-examine anybody that made it.

11         **MS. BRADY:**  Your Honor, we're not using this

12    stipulation with the FDIC or your order to state that it tells

13    you where the participation and deficiency judgment goes.

14         **THE COURT:**  What is your intention with it?  What do

15    you want to use it --

16         **MS. BRADY:**  The FDIC was originally included as a

17    party.

18         **THE COURT:**  Right.

19         **MS. BRADY:**  They obviously had an interest as part of

20    their -- and we could not release them as a party, understanding

21    we didn't really have recourse against the FDIC once it took

22    over, because of the fact that we were trying to invalidate the

23    assignments back to -- we were trying to invalidate the

24    assignments.

25         And then the question was, well, if they became

1   invalidated where did they go.  That's why the FDIC entered into

2   the stipulation saying they disclaimed any interest so that,

3   should this Court invalidate, Your Honor could determine where

4   between the parties they go.  But the FDIC has disclaimed any

5   interest, that's why they're no longer a party.

6           **THE COURT:**  I don't -- I don't guess I see -- well, I

7   don't know that I see the problem with that, if that's what I

8   ruled.

9           **MR. FRANCO:**  The problem is that they're insinuating

10  that it goes to FDIC so that the FDIC can disclaim any interest.

11  That's not where it went.

12          **MS. BRADY:**  No, Your Honor.

13          **THE COURT:**  That's not what I'm hearing.  And maybe

14  it's just me.  And it's, you know, getting past three o'clock,

15  so it may just be me, but that's not what I'm hearing.

16          **MS. BRADY:**  Right, Your Honor.  We're just saying this

17  is the fact that the FDIC has disclaimed any interest, period.

18  The Court can determine where it goes.

19          **MR. FRANCO:**  What does the Court do, pull something

20  out of the air for that?  That's exactly what they're trying to

21  do.

22          See, because normally it would go to -- actually, our

23  argument was this loan went to Smart Bank first before anything

24  else went to FDIC, and therefore it would go to Smart Bank who

25  purchased all the assets, not the FDIC.

1        So they're trying to prove the opposite by a

2   stipulation out of court, without a witness and without my

3   ability to cross-examine or find out what was paid for this

4   waiver, why did they do it, under what circumstances did they do

5   it.  And we didn't have any opportunity to talk to them about

6   it, so that's the prejudice.

7        **THE COURT:**  What I'm going to do is I'm going to allow

8   you to keep your case open for this one issue.

9        **MS. BRADY:**  Okay.

10       **THE COURT:**  I'm going to consider it and give you my

11  ruling tomorrow.  We have tomorrow and Friday.  I don't know

12  what you're going to do if I decide that it's not a stipulation

13  that I'm going to accept for purposes of my ruling in this case.

14       But you'll have two days left so you can -- if you

15  need to try to get a witness, you can do that and you can

16  cross-examine the witness, if we get to that point.  I don't

17  know because I don't know what my ruling is going to be.  I want

18  to look at the verbal act issue closer in terms of this, this

19  issue.

20       Do you have anything else other than this stipulation

21  that remains in your case?

22       **MS. BRADY:**  Other than just moving in the exhibits

23  from Mr. McLeod's deposition, which I can discuss with Ms.

24  Simms, no.

25       **THE COURT:**  Any -- is there any dispute as to the, Mr.

1   Franco, as to those exhibits?  I'm assuming not.

2           **MR. FRANCO:**  No, Your Honor.  I didn't object to them

3   as a result of the deposition transcript.

4           **THE COURT:**  Okay.  Do you intend to present a case?

5           **MR. FRANCO:**  Do they rest?

6           **THE COURT:**  Well, I'm allowing them to keep their case

7   open on this one issue, but other than that I understand they're

8   resting.

9           **MR. FRANCO:**  So at that point I'd like to bring a Rule

10  52 motion at this time.

11          **THE COURT:**  Okay.  Do you have a case to present?

12          **MR. FRANCO:**  No.  I'm going to -- I'm going to bring a

13  Rule 52 motion and then I'm going to state for the record that

14  I'm resting, if the Court allows anything to go forward as a

15  result of the Rule 52 motion.

16          **THE COURT:**  Okay.  Let me hear the Rule 50 motion.

17          **MR. FRANCO:**  Thank you, Your Honor.

18          May I, Your Honor?

19          **THE COURT:**  Please, yes.

20          **MR. FRANCO:**  Your Honor, Federal Rule of Civil

21  Procedure 52(c) is what I'm bringing this under.  And Rule 52(c)

22  allows for a motion after all the evidence on the issue has been

23  submitted by the plaintiff in the case.

24          And 52(c), of course, is the mechanism in a nonjury

25  trial, similar to what's before the Court in a jury trial in a

1    motion to dismiss after the plaintiff's case.

2         The difference in Rule 52(c) is the Court is allowed

3    to rule as a matter of law understanding the facts that

4    plaintiff has presented on some or all of the issues in the

5    case.

6         And so at this time, I would make a Rule 52(c) motion,

7    and I'm going to go through the issues.  And there's no shortage

8    of issues in this case, as the Court is well aware.

9         In connection with this motion, I also want to adopt

10   our trial brief that we filed in this case which briefed a lot

11   of the issues, as well as the motions in limine that we filed

12   that were denied at the time by the Court and said that that did

13   not affect our rights to bring those issues before the Court at

14   another time more appropriately than in the motion in limine.

15        And so we've briefed those, and I know from being

16   involved with this Court so far that the Court has had the

17   opportunity to look at those briefs.

18        **THE COURT:**  Right.  Are you talking about the trial

19   briefs or the motions in limine?

20        **MR. FRANCO:**  Both, you've looked at them in the past.

21        **THE COURT:**  Yes, I have.

22        **MR. FRANCO:**  Not necessarily in the last few days, of

23   course, but in the past.

24        **THE COURT:**  Yes.

25        **MR. FRANCO:**  So we would adopt those as well.

1          **THE COURT:**  But you've had rulings on the motions in

2    limine.

3          **MR. FRANCO:**  Only that they were inappropriate at the

4    time procedurally and that the Court did not take that as a

5    denial of any of the arguments substantively that we were making

6    at the time.  That was my understanding.

7          **THE COURT:**  Well, you're going to need to refresh my

8    memory as to which motions in limine you're talking about.

9    Because certainly -- and I have them, but I don't know which

10   ones you're specifically talking about.

11         Because, you know, if I defer on a motion in limine on

12   an evidentiary issue to trial, the time to bring that up is at

13   the time that the evidence --

14         **MR. FRANCO:**  No, it wasn't an evidentiary issue.  It

15   was the issues of their claims in equity --

16         **THE COURT:**  Just keep in mind, this is not my only

17   case.

18         **MR. FRANCO:**  Believe me, I understand, Your Honor.

19         **THE COURT:**  So you all have a lot better, you know,

20   recall and memory on these matters than I do.  But if you'll

21   just point me to the motion and then I can get the motion and my

22   order on it, and then it will refresh my memory about it.

23         **MR. FRANCO:**  Yes, ma'am.  The two that I'm

24   specifically referring to is the -- our motion in limine

25   regarding the equitable a claims, which is Document 300.

1              And the second one --

2              **THE COURT:**  Just a minute, please.  Okay, 300,

3     Document 300, I have that.

4              **MR. FRANCO:**  All right.  And then the second one at

5     issue is the motion in limine which is Document 302.

6              **THE COURT:**  Okay.

7              **MR. FRANCO:**  And that, in addition to the trial brief

8     that we filed, as well as the findings of fact and conclusions

9     of law that we submitted to the Court, are references to law as

10    it applies to this case.

11             As I said in the opening, Your Honor -- and I'm going

12    to put this back on the screen.  These are the counts.  This is

13    blurry even here.  Okay.  Thank you.

14             The declaratory relief that is sought in Counts One

15    and Two in this case, when you step back from all the different

16    issues that SEPH has brought before the Court, ultimately seek

17    independent collection of the pro rata share of the deficiency

18    judgment.

19             That's what the goal is at the end of the day that

20    they seek for declaratory relief in Count One as well as Count

21    Two.  And I've highlighted that here on their conclusion in

22    their trial brief.

23             **THE COURT:**  And I just looked back now at the motion

24    -- the two motions at 300 and 302 in my order, and I recall

25    exactly, you know, the order and saying that I would consider

1    this.

2          It was really -- I found it to be a motion in limine

3    sort of in disguise -- a motion for summary judgment disguised

4    as a motion in limine, so this is the proper time for me to hear

5    it.

6          **MR. FRANCO:**  Thank you, Your Honor.  And so that's the

7    ultimate goal of the declaratory judgment part of this case.

8          And the deficiency in that argument is that under

9    Florida law -- and it's the *Richard's Paint v. Onyx* case at

10   394 So.2d 1064, that's the Florida Fourth DCA, 1981, which is

11   cited in the brief in a little bit more detail.

12         But the ruling in that case is Florida law does not

13   consider a division of a judgment effective against the

14   judgment-debtors unless the judgment-debtors agree.

15         And the rationale for that decision -- and it cites

16   other cases that explain that rationale -- is because that

17   allows for multiple executions and multiple enforcements against

18   the judgment-debtors, and so therefore Florida law considers

19   that ineffective as to the judgment-debtors.

20         That is the very purpose of the dec action claims in

21   Counts One and Two.  At the end of the day, that's where they

22   want to wind up, with the ability to collect their 44.9 percent

23   of this judgment, which is 100 percent, of course -- the

24   judgment is 100 percent.  They want the ability to collect 44.9

25   percent independently on their own and have the other

1    participating banks do the same thing.

2              Now, as a matter of law, that's not allowed.  And for

3    that reason, that reason alone, their claims and all the issues

4    related to their dec actions in Counts One and Two should be

5    dismissed.

6              There's a separate reason for dismissal of Count One,

7    in that they're seeking -- actually, one of the things they're

8    seeking in order to get to the ultimate result is a declaration

9    from this Court to invalidate or rescind the assignment to

10   GulfSouth -- I'm sorry -- to HCB by GulfSouth.

11             But again, that is only a step in their process of

12   trying to get to the ultimate independent collection and

13   division of the judgment.

14             But because they're seeking an invalidation -- and

15   it's actually a recision is what they're asking for, at the end

16   of the day, that doesn't alter the fact that the claim is in

17   equity.  And for that proposition we've cited to the Court the

18   *Allegheny v. Archer* case, 2014 Westlaw 4162787, and that's a

19   Middle District of Florida case in August of 2014.

20             Just because you call it a declaratory judgment action

21   doesn't change the remedy that you're seeking.  And the remedy

22   that they're seeking in the invalidation of the assignment is to

23   invalidate that assignment, which is, in other words, to rescind

24   it, it has no effect.  Same thing.

25             Because that claim is in equity, the Court should deny

1    relief because there's an adequate remedy under the

2    Participation Agreement.  In other words, an adequate remedy at

3    law.

4         The Court earlier addressed an adequate remedy at law

5    when it was looking at the injunctive claim that they had filed

6    which the Court dismissed earlier in the case.  And the adequate

7    remedy under the Participation Agreement that SEPH continues to

8    try to avoid is the fact that they had two remedies.

9         One was to purchase the lead position, and still have

10   that right.  Had the right before they filed the lawsuit, had

11   the right since they filed the lawsuit, have the right as we sit

12   here today.

13        And as a matter of equity, the courts do not like

14   recision when there's adequate remedies available at law.  And

15   they have an adequate remedy.

16        **THE COURT:**  But the only reason they're -- they would

17   be sort of forced to do that -- and I think I'm making their

18   point -- is because of the fraud in the transfer.

19        **MR. FRANCO:**  Well, first of all, there is no fraud in

20   the transfer, but we'll get to that.

21        **THE COURT:**  But, again, I have to -- this is a Rule 52

22   motion, so I have to consider the evidence in the light most

23   favorable to --

24        **MR. FRANCO:**  No.

25        **THE COURT:**  -- to them at this point.

1    **MR. FRANCO:**  I respectfully don't agree.  I think the

2    law is that --

3         **THE COURT:**  At this point in the trial?

4         **MR. FRANCO:**  It is not, it is not, that is not the

5    standard, Your Honor.  In a Rule 52 motion the district court

6    applies the standard of proof and weighs the evidence the same

7    as it would at the conclusion of a trial.

8         **THE COURT:**  At this point?

9         **MR. FRANCO:**  Yes.  When a party is finished presenting

10   evidence and that evidence is deemed by the trier insufficient

11   to sustain the party's position, the Court need not waste time

12   but bring a halt to the proceedings and enter judgment

13   accordingly.

14        This Court resolved the disputed issues on the basis

15   of the preponderance of the evidence without drawing any special

16   inferences in favor of the plaintiff.

17        So the standard is not what you would use when it goes

18   to the jury in a jury case.  And so the Court is allowed to hear

19   all the evidence and then weigh the evidence as the Court would

20   weigh the evidence considering the burdens that the parties

21   have.

22        And so at this point --

23        **THE COURT:**  Yeah, but so -- then let me just ask you

24   to assume that there's fraud, that the Court makes that finding.

25        I mean, then why would I look at that type of a

1    remedy?   What you're suggesting is that there's this remedy

2    where they should have been required to just buy out the lead

3    position.

4            **MR. FRANCO:**  Because the agreement between the parties

5    is that, if you have a problem with any collection efforts,

6    then --

7            **THE COURT:**  But it doesn't --

8            **MR. FRANCO:**  -- you have the remedy to --

9            **THE COURT:**  It doesn't refer to fraud, though.  I

10   mean, so -- I mean, I think that's what gets you into the

11   equitable area, does it not?

12           **MR. FRANCO:**  What, the fraud?

13           **THE COURT:**  Right.

14           **MR. FRANCO:**  Even if there's an allegation of fraud,

15   that doesn't destroy the Participation Agreement.  The

16   Participation Agreement -- they're not trying to destroy the

17   Participation Agreement.  That's the basis upon which they have

18   the 44.9 percent interest.  They're trying to destroy the

19   assignment.

20           **THE COURT:**  Right.

21           **MR. FRANCO:**  Right.  So the courts -- that's an

22   equitable issue to destroy the assignment.  To rescind the

23   assignment is an equitable issue.

24           **THE COURT:**  Right.

25           **MR. FRANCO:**  There is no need to go to the recision of

1   the assignment because their right is they can do away with the

2   assignment by buying out the interest.

3           THE COURT:  But the only reason they're forced into

4   that position is because of the fraud.

5           MR. FRANCO:  It doesn't matter whether it's fraud or

6   anything else.  If they don't like the collection effort, their

7   remedy is to buy it out.  They can dispose of HCB completely

8   without the need for the Court by paying for it as the Court --

9   that's what they've been trying to do.

10          THE COURT:  But they wouldn't have had to deal with

11  HCB had there not been -- and again, I'm not making any

12  findings.  But had there not been fraud, they would not have to

13  be dealing with HCB.

14          MR. FRANCO:  But it doesn't matter whether it's HCB,

15  Mr. Phillips individually, or GulfSouth, or anybody else.  If

16  they don't like -- they say they're doing it because they don't

17  like the collection efforts because -- they they say they don't

18  like the collection efforts because they say it's in the hands

19  of Rupert Phillips.  So that's the reason -- that's no different

20  than not liking collection efforts because GulfSouth didn't

21  enforce it.

22          The remedy that they had available to them was to pay

23  for that position, and therefore it doesn't matter whether there

24  was fraud, it doesn't matter what the reasons are for their

25  disagreement on collection efforts.  They have that remedy.

1    The other remedy they have is to sue for damages.

2    There's nothing that says -- even in fraud there's nothing that

3    says that you don't have a remedy to sue for damages, if they

4    can prove their damages, which they didn't do in this case, and

5    we'll get to that part.

6    But the remedy is twofold.  The real remedy actually

7    is by the parties, look, if you don't like what the lead bank is

8    doing -- and remember, there's no prohibition by assignment of

9    the lead bank in this agreement.  The lead bank is not

10   prohibited from assigning this, right?

11   **THE COURT:**  Right.

12   **MR. FRANCO:**  So if you don't like who we give it to,

13   then you've got the right to buy them out.  The problem is, and

14   they've said, oh, but that's too expensive.

15   That's the agreement.  You don't just -- you don't

16   just set aside the agreement because you don't like the fact

17   that you have to pay for it.

18   So that's the problem in this case, that they have

19   legally that, as far as we're concerned, that they can't get

20   over because it's an adequate remedy under the law.

21   Now, that's aside from the point that that issue --

22   and what they're trying to do is still prohibited under Florida

23   law, because then they're trying to get the right to go collect

24   themselves against the judgment-debtor, which is not allowed

25   under Florida law.

1          So this is only a subsection of their claim.  This is

2     a step in their claim.  But their claim, at the end of the day,

3     is unenforceable against the judgment-debtors.  They are not

4     allowed under Florida law to go enforce a 44.9 percent interest

5     independently against the judgment-debtors, and that's what

6     they're trying to do.

7          If that's not what they're trying to do, they're

8     wasting this Court's time, because that's where they're trying

9     to get to, and that's where Florida law didn't allow them to get

10    to.

11         Mr. Petermann didn't find that law.  He didn't

12    research it, and he acknowledged that.  And that's the problem

13    with it even going any further than that.  It was not allowed.

14    Even Mr. Sandel said, if I found out it was not allowed, then we

15    wouldn't be doing it.  And in fact, it's not.

16         We didn't make up the case.  The case has been around

17    since 1981.  And the rationale is the same rationale, by

18    coincidence.

19         If you might remember, the rationale in that case

20    about the problem with multiple enforcements against the

21    judgment-debtors was the same trepidation that Mr. Petermann had

22    from square one.  And Mr. Reynolds also cited in a letter about

23    multiple judgments against multiple enforcements, everybody

24    going their separate ways.

25         So by coincidence, not by reading the case law, but my

1   coincidence they had the same problems with a division of the

2   judgment that Florida law has, and that's because Florida law

3   uses the same rationale that you can't do it.

4            So at the end of the day, the assignment is not the

5   critical issue.  The critical issue in this case, at the end of

6   the day, legal issue, is do they have the right to go -- to

7   independently collect themselves, because there are other

8   participants in this loan -- there were other participants,

9   there's still other participants in this loan.

10           And so at the end of the day, there's multiple

11  executions available.  That's why Florida law doesn't allow it.

12  That's the controlling legal issue in this case.

13           **THE COURT:**  Well, who is left as the participants?

14           **MR. FRANCO:**  HCB still has the CPB participation.

15           **THE COURT:**  Right.  So it's HCB and SE Property?

16           **MR. FRANCO:**  That's correct.

17           **THE COURT:**  Anybody else?

18           **MR. FRANCO:**  Not now, but at the time there was.

19           **THE COURT:**  I thought you were suggesting there were

20  more.

21           **MR. FRANCO:**  At the time of the agreement there was.

22           **THE COURT:**  I see your point, all right.

23           **MR. FRANCO:**  At the time of the agreement it was not

24  allowed, and now it's not allowed because HCB -- at the end of

25  the day, they're not asking that HCB's purchase of the CPB

1    participation be nullified.  There's no basis for that.

2            And so now it's -- it's HCB and them, multiple

3    judgment holders?  And what if HCB sells it to somebody else?

4    Somebody else is a judgment holder.

5            So at the end of the day, the agreement that's been

6    proffered to this Court was illegal under Florida law against

7    the judgment-debtors.  And their case of trying to get around

8    that, that's -- all these other issues are trying to get around

9    that law.  So that's the problem with seeking this in equity.

10           There's another reason, and that is, because this is a

11   claim in equity that they're trying to rescind, the relief

12   should be denied by this Court, because when you destroy an

13   agreement by rescinding it, when you invalidate it, then in

14   equity you put the parties back in the same position they would

15   have been.

16           And that can't be done here, because at the time

17   GulfSouth was the lead bank, and GulfSouth is now insolvent, and

18   GulfSouth cannot return the $200,000 that was paid.  That's one

19   problem.  That's another reason by itself why the recision is

20   not in order.

21           The other legal reason is that GulfSouth cannot retain

22   the lead bank position because it's not in existence.

23           And you heard even Mr. Sandel say they didn't want the

24   lead to go to FDIC.  Mr. Phillips didn't want the lead to go to

25   FDIC.  I don't know anybody who wants the lead to go to FDIC.

1    And so for that reason, additionally, as a matter in

2    equity, there's no basis for rescinding it, because you can't

3    put the parties back in the same position that they were in.  So

4    that's another problem legally for them.

5    Count Two of the dec action is to invalidate the

6    agency status or to terminate it.

7    Again, though, again, looking at the -- looking at

8    their conclusion, where do they want to go with this?

9    They want, at the end of the day, and the reason for

10   invalidating the agency status is they ultimately want the right

11   to independently collect.  That's what they want.  It's right

12   here, it's on the screen, that's what they want.

13   Now, they're trying to ignore that by getting into the

14   details of the agency status, et cetera, et cetera.  But at the

15   end day, that's the same thing they're trying to get as Count

16   One.  And they're using the same mechanism, a dec action, and

17   it's in equity.  Again, they're trying to divide the judgment.

18   Another reason why the dec action is not appropriate

19   legally for that is because there was no need for the Court to

20   become involved in that issue.  They had the right to terminate

21   the agency at their sole discretion.  They didn't need a court

22   for that.

23   That's a reason the Courts decline the declaratory

24   judgment in the first place.  Why did you need to come to me?

25   All you had to do was write them a letter or a note and say I'm

1    terminating your agency status.  That's another reason why the

2    dec action regarding the agency status is illegal.

3         That leaves their counts for damages.  The Court has

4    already dismissed their count for injunctive relief, so that

5    leaves their Counts Three, Four, and Six for damages.

6         There's some major problems with their damage claims,

7    nonetheless of which is they haven't fulfilled their burden of

8    proving any damages.

9         Let's talk about the claim for tortious interference

10   and conspiracy first.  According to SEPH, if you believe their

11   arguments, everybody is in on a conspiracy or interference --

12   Mr. McLeod, Mr. Petermann, Mr. Osborn, Mr. Phillips, everybody.

13        But every time they made those allegations, as the

14   Court heard, there were reasonable explanations for everything

15   that happened in this case.

16        From square one when Mr. Phillips walked in to try to

17   resolve a GP Air loan, you heard Mr. McLeod's testimony, it

18   confirms what Mr. Rupert Phillips testified to.  He didn't raise

19   the North Tip loan, Mr. McLeod did.  And basically, in order to

20   get the GP Air loan resolved, something had to be done with this

21   North Tip loan.  That wasn't Mr. Phillips that suggested that or

22   used that as, quote, "leverage."  That was Mr. McLeod.

23        So -- but the tortious interference and the conspiracy

24   are based on an alleged agreement to assign the pro rata share

25   of the deficiency judgment.  And that's again what we come back

1    to.

2          Because such an agreement is ineffective under Florida

3    law, there is no interference or conspiracy for its alleged

4    breach because there's no valid agreement at the end of the day

5    that's effective.  So how can you interfere with an agreement

6    that's not effective?  That's the problem with their tortious

7    interference argument and their conspiracy argument.

8          Also, they failed to fulfill their burden to prove

9    that there was any meeting of the minds for an agreement on the

10   pro rata distribution, Your Honor.

11         There's -- you've heard the evidence.  That is what

12   you heard Mr. Sandel say, "I requested it."  He said it on

13   counsel for SEPH's direction, "I requested it."

14         In an affidavit by Mr. Campolo, he used the word

15   "requested."  In their amended complaint they used the word

16   "requested."  They changed course after that and then tried to

17   make it an agreement when it was nothing but a request.

18         Mr. Campbell testified that it was one of the options

19   on the table that was being discussed, and he testified that as

20   far as he was concerned there was no agreement.

21         Mr. Petermann just testified today, and he said, "I

22   never understood there was an agreement to do this.  It was

23   being considered."

24         Mr. Sandel was pushing it.

25         **THE COURT:**  They certainly acted consistent with an

1    agreement.

2         **MR. FRANCO:**  Well, how do you act consistent with an

3    agreement that was made in 2012, or when he said, 2010, and it

4    was 2012 before anything of any substance happened?  There was

5    no agreement.  They were continuing to do this.

6         Let me ask you this --

7         **THE COURT:**  No, just -- the evidence that I recall,

8    there were, you know, a number of emails that actually used the

9    term "agreement" and then they actually acted consistent with

10   that.  I'm just -- that's just what the evidence was.

11        **MR. FRANCO:**  Well, I -- how do they act consistent

12   with it if, at the end of the day, no such agreement was

13   delivered?

14        And I'll tell you why no such agreement was delivered.

15   Now, all of these gentlemen who testified all had some problems

16   in recalling what happened way back then.

17        And what happened, when we look at the evidence, is

18   there was an effort by GulfSouth to try to make sure that

19   everybody agreed as they went forward with what they were doing.

20   In fact, that's in accordance with the Participation Agreement

21   in paragraph 10(a).

22        In paragraph 10(a), once there's a default, then the

23   participating banks and the lead bank will attempt to agree on

24   how to move forward.

25        And in the event they don't agree, that's when the

1    participating banks have the remedy to buy out if they don't

2    agree.

3            Now, so GulfSouth was attempting to have everybody

4    agree as they went forward.  As they were going forward, CPB

5    gets bought by FNBC.  And when it comes down to, okay, do we

6    have an agreement by all the parties, they could not get an

7    agreement for CPB.  Nobody would call them back because they

8    were in the middle of being taken over and bought.

9            When FNBC bought them, FNBC advised them through this

10   counsel in Texas who Mr. Petermann alluded to that CPB did not

11   want it divided.  And there's a reason why CPB would not want it

12   divided.  Because CPB had as much interest -- 44.9 percent -- as

13   SEPH had.

14           So if it was giving SEPH the right to go out and

15   collect and keep the money, that was to CPB's disadvantage.

16   Because CPB could have the lead bank go do that and split the

17   proceeds among the -- as the interests were.

18           So there was no reason for FNBC to agree to split up

19   the judgment so that another bank could go out and collect and

20   not -- and them have not -- and them not get any money for it.

21   So that was the reason for it.

22           And so because they couldn't get the consent of CPB,

23   that's why the dec action was filed.

24           Now, the dec action is contrary to the concept of an

25   agreement.  And those agreements that were executed by

1    Mr. Campbell that were never completed, because they weren't

2    even dated, they were never returned, and instead a lawsuit was

3    filed.

4            And by the way, HCB had nothing do with that.  Nobody

5    has testified that HCB was involved in either the agreement to

6    divide the judgment or in connection with the dec action that

7    was filed.  There was no involvement by HCB in that.  That was

8    because they couldn't get the CPB bank or FNBC to agree, and

9    that's when they walked in and filed the dec action to have the

10   Court determine that.

11           Now, that's consistent with no agreement, I

12   respectfully urge the Court.  That's what happened.  There was

13   trepidation about this all along.

14           The original -- if the Court were to remember, the

15   original draft of such an agreement for even Mr. Campbell to

16   review was back in August of 2011, and we're into 2012 before

17   anything of any substance is done on that.

18           There's a reason why that was held up.  There was

19   trepidation about that.  There was doubt about whether it could

20   be done.  How would it be done?  What happens when the bank --

21   when one bank goes to seize an asset?  Does it have to tell the

22   other bank or does it just get the asset and not tell the other

23   bank?  What if the other bank finds out?  Do they intervene into

24   the proceeding?

25           Those are the problems, the practical problems with

1   it, and that's why it's not done and, guess what, that's why

2   it's not effective in Florida unless a judgment-debtor agrees

3   that other people can come after them all independently.  That's

4   the problem they have in this case.  That's the legal issue.

5            Let's talk about the breach of the Participation

6   Agreement, because they don't claim that the Participation

7   Agreement is invalid.

8            In order for them to succeed under the contract, the

9   parties agreed that SEPH has to prove that any breaches or any

10  conduct was in bad faith, willful misconduct, or gross

11  negligence.

12           The first thing they talk about is the release of Lot

13  26 from the deficiency judgment.

14           I think the Court heard probably more than necessary

15  the fact that the release of Lot -- the release of the

16  deficiency judgment was normal under the circumstances in a

17  short sale.  It wasn't -- it wasn't bad faith or willful

18  misconduct or gross negligence.  That's how a short sale was

19  done.

20           The lead bank, in order to avoid foreclosure, accepted

21  an amount of money.  And the understanding is, when that

22  happens, instead of the foreclosure, which would have wiped out

23  all of these inferior liens, that all the inferior liens are

24  therefore later dismissed.  And that's what happened.

25           It took more time for some to release than others, but

1       that was the understanding from square one.  That is the

2       understanding in a short sale.  And in Florida there are a lot

3       of short sales.

4               And the reason there are a lot of short sales in

5       Florida is because it avoids costly foreclosure litigation.

6       That's what it avoids, and that's why -- and otherwise, if would

7       have foreclosed, then that property has to go up for public

8       sale, and they have no idea what they're going to get.

9               This way the first mortgage holder got the appraised

10      value for the property at that point.  And that's how it works.

11      That was their incentive to do a short sale.  And the

12      understanding is that the liens were dismissed, and that's what

13      happened.  There's nothing nefarious about that.  There's no bad

14      faith.  That's what happened.

15              The fact that the man got a loan from the company that

16      he works for to pay for it, there's nothing nefarious about

17      that.  That happens all the time.

18              Let's talk about another breach of contract claim.

19      Not notifying SEPH of the assignment to HCB.

20              Mr. Phillips testified that the normal course is that

21      the lead bank at the time notifies.  That's GulfSouth.  That

22      wasn't us.  That wasn't HCB.  That was GulfSouth.

23              And again, there's no prohibition for HCB to assign,

24      so there's no damage for the fact that GulfSouth had the right

25      to assign.  They could assign to anybody they wanted to.  There

1   was no prohibition in the contract for that.

2          There was, by the way, a requirement that the

3   participating banks in the Participation Agreement notify when

4   -- and get permission when they assigned.

5          Actually, Vision Bank violated the Participation

6   Agreement when its rights were assigned to SEPH.  It didn't

7   notify anybody at that point, and it violated the agreement.

8          But the point is, the participating banks had an

9   obligation with respect to assignments; the lead bank did not.

10          Their claim for breach of contract because all of

11  these -- all of these admissions that they just read into the

12  record of what HCB has not done at this time, that's not a

13  breach of the agreement.

14          Why is it not a breach of the agreement?  Because,

15  number one, they don't -- they didn't have an expert to testify

16  on commercial reasonableness.  The law requires them to have

17  expert testimony on commercial reasonableness.  They did not.

18  They had the opportunity to and they did not.

19          Do you want me to tell you why?  Because if they would

20  have put an expert up there, the expert would have said, when

21  there's millions of dollars of superior liens, as the prior

22  superior lienholders did, there's no reason to try to collect.

23  The superior lienholders are going to come in and take whatever

24  you find.  That's the reason they didn't have an expert on

25  commercial reasonableness.

1          And to back that up, you heard the testimony -- I

2    believe it was Mr. Phillips -- who said that the prior superior

3    lienholders, Bank Atlantic, and I believe it was Fifth Bank

4    (sic) -- and I'm sorry if I get my banks mixed up in this case,

5    but two superior lienholders, before HCB even purchased any of

6    those rights, those other banks did take depositions and did

7    investigate, and they didn't -- they found nothing.  And they

8    didn't go after anything because they found nothing.

9          Now, would it make any sense for a 70-year-old man who

10   has millions of dollars of judgments to go buy assets?  Of

11   course not.  He has no incentive to go buy assets because those

12   assets are subject to seizure.

13         And guess what?  Those -- the Atlantic Bank and the

14   Fifth Bank are not the only superior liens that exist.  There's

15   still multi-million dollar liens that exist that have nothing to

16   do with HCB.

17         So aside from the fact that they have no expert as

18   required by law to testify in commercial reasonableness, there's

19   nothing that says that it's commercially unreasonable under the

20   circumstances in this case not to do anything at this point in

21   time against a 70-year-old man who has multi-million dollar

22   judgments against him at this point in time.

23         And then they complicated the issue when they filed

24   this lawsuit.  Because when they filed the Second Amended

25   Complaint, then they put a hiatus on anything HCB could do

1  because they were contending that the claim against Rupert

2  Phillips was settled and, more importantly, that HCB had no

3  rights to do anything because it was an invalid assignment.

4         So HCB -- there's a lot of financial privacy laws in

5  this country.  And HCB, if it doesn't have the right to get

6  financial information and it does it, could subject itself to

7  liability, especially from Mr. Olson.

8         Now, you know, they try to ignore that there's another

9  guarantor on this loan, and they try to ignore that there's

10  other guarantors on the loans that were purchased by Bank

11  Atlantic and from Fifth Bank.

12        You heard Mr. Phillips.  Mr. Phillips is a deal junky.

13  He loves to make deals at a bargain, just like I love to go in

14  and buy something on sale.  He got a $49 million judgment for

15  $250,000.  That's a bargain.

16        You know why it's a bargain?  Because he's still got

17  not only a debt against himself, but he's got a debt against

18  another comaker, and maybe more.  I don't remember how many.

19        The same thing on the other one.  That debtor could

20  revive at some point in time.  Mr. Olson is younger than Mr.

21  Phillips, and who knows who is going to get what at what point

22  in time.

23        So he's a junky, and he doesn't just buy these at a

24  discount.  He buys -- and why would a -- why would a judgment

25  holder of $49 million sell a judgment for $250,000 anyway?  You

1   know why?  Because it's not collectible at that point.

2          That's the same reason for the Fifth Bank.  $9 million

3   for a hundred and something thousand.  Those are business deals.

4   That's just like the other business deals HCB buys.

5          So at the end of the day -- and by the way, the case

6   that requires the commercial reasonableness is *Barnett Bank v.*

7   *Lipp*, 364 So.2d 28.  It's Florida DCA, I'm not sure which DCA,

8   1978.

9          And they didn't do it because it would have been

10  detrimental to them.  But the fact of the matter is, they can't

11  prove -- the Court is not an expert in banking.  And I don't

12  mean to be disrespectful, but I'm assuming --

13         **THE COURT:**  You would not be mistaken.

14         **MR. FRANCO:**  And that's why the law requires an

15  expert.  And they didn't do it because it would have been

16  detrimental to them, and under these circumstances it is.

17         So they haven't proven that all of these actions are a

18  breach of the contract.  They haven't proven that.

19         Again, if they don't like -- if they don't like the

20  collection efforts, they can buy it.  That was the agreement of

21  the parties.  If you -- if you don't pay attention to that,

22  you're reading a part of the Participation Agreement out.

23         These parties, when they signed that agreement, they

24  agreed, hey, guys, if you -- if I don't like what you're doing

25  as the lead bank with only 8.9 percent, I can buy your interest

1    out and take the lead.  And that's what they're trying to avoid.

2         Mr. Sandel was trying to push this for free.  They're

3    trying to push it now for free.  That's not the deal.  That was

4    not the bargain.  That's their remedy.  They have that remedy as

5    we sit here.  They had that remedy before they filed this suit.

6    There was no reason for them to file this dec action.

7         Just like there was no reason for them to file the dec

8    action to terminate the agency status and involve this Court in

9    a dec action, there was no reason for them to file this action

10    on the other basis.  Because they had the right to go in and buy

11    it.  They didn't need the Court to do that.

12         Mr. Sandel said --

13        **THE COURT:**  I just don't think they ever contemplated

14    having to buy that right from the debtor himself essentially.

15        **MR. FRANCO:**  It doesn't matter who they had to buy it

16    from.

17        **THE COURT:**  It may not.  I'm just giving you my --

18        **MR. FRANCO:**  Agreed.  But don't you -- wouldn't you

19    agree, Your Honor, that it was contemplated that if the parties

20    didn't like the collection efforts they could buy the lead?  Of

21    course, because it was in the agreement.

22        **THE COURT:**  Well, certainly.

23        **MR. FRANCO:**  Right?  So what difference does it make

24    who was doing the collecting?  If they don't like it, they can

25    eliminate that person.  They can just eliminate it.  They could

1    have eliminated that person before they file this lawsuit.

2         What happened was they got stuck.  What happened was

3    they brought this lawsuit to enforce a pro rata assignment.

4         When the Court denied their injunctive relief, they

5    recognized that the Court read this contract, understood this

6    contract, and was ready to enforce this contract, and then they

7    turned around and said, uh-oh, we've got to think of a way to

8    try to get around this contract, so we're going to now assert an

9    invalidity, when all they had to do is say -- *I don't like what*

10   *you're doing, HCB.*

11        If it was Rupert Phillips himself -- which they keep

12   saying that HCB and Rupert Phillips are one and the same.

13   They're ignoring the law on that.  That's a piercing argument.

14   That's a one and the same argument.

15        They're ignoring HCB as a separate entity.  They're

16   ignoring that HCB is in fact the agent.  But Rupert Phillips is

17   not the agent.  Rupert Phillips is actually an agent of HCB.

18   But --

19        **THE COURT:**  I think their claim is a breach of a

20   fiduciary.

21        **MR. FRANCO:**  But in order to have a fiduciary you've

22   got to be an agent.  That's the problem.  And HCB is the agent,

23   not Rupert Phillips.

24        **THE COURT:**  Okay.

25        **MR. FRANCO:**  And so they're ignoring the distinction.

1    But again, even if it was Rupert Phillips -- let's take an

2    example that it was Rupert Phillips who walked in and Rupert

3    Phillips bought this judgment for $200,000 in his own name.

4         If they didn't like that, they could buy him out and

5    eliminate Rupert Phillips.  That's -- Rupert Phillips didn't buy

6    this to do something detrimental to them.  Rupert Phillips had

7    HCB buy this so that he could get the GP loan out of default.

8    That's clearly the testimony.

9         **THE COURT:**  I think their position would probably be

10   that is very convenient, right, for Mr. Phillips.

11        **MR. FRANCO:**  Then you'd have to believe -- then you'd

12   have to disbelieve Mr. McLeod.  In order to get there, you'd

13   have to disbelieve a person who didn't know him, doesn't know

14   him now, and his only incentive was to get money in the bank.

15        And what he said more than one time is, he said, I

16   used it as leverage, and Mr. Phillips said he was telling me he

17   couldn't do it without -- that he couldn't do it.  You have to

18   disbelieve Mr. McLeod, and I don't think -- I don't think we get

19   there.  I don't think there's a basis not to believe this

20   gentleman.

21        He's not a party to the suit.  He had nothing to do

22   with it.  He said, I needed the money for the bank, and I was

23   doing anything I could to get it, and I used it as leverage.  I

24   even tried to compliment the man so I could get him to get me

25   money so I could make this loan current.

1    It was -- it was convenient at the end of the day

2  because GulfSouth was in trouble, and nobody wants to see a lead

3  go to FDIC.  They already had -- "they" being HCB already had

4  the CPB participation in this loan as a result of the portfolio

5  they purchased.

6         So the convenience or the advantage that it also

7  provided is it provided that the loan wouldn't go to -- the lead

8  wouldn't go to FDIC.  Mr. Phillips didn't want to see that.

9  Mr. Sandel didn't want to see that.  There's nothing nefarious

10 about that either.

11        But it's not like Rupert Phillips walked into Mr.

12 McLeod's office and said, hey, I want you to participate in this

13 scheme with me, I want to buy this loan from you.

14        That's not what happened.  That's not what happened.

15 Mr. McLeod brought it up, and that's how it happened.

16        They're trying to use circumstantial evidence when

17 there's not only a reasonable explanation for something

18 different, it's a more reasonable explanation for something

19 different.

20        Now, if somebody -- if Mr. McLeod would have said, oh,

21 Mr. Phillips came in -- in fact, there was a question asked

22 which was -- which I found was a little inappropriate.

23        When Mr. Phillips was on the stand he was asked, Did

24 you ever tell Mr. Lloyd that this was your -- that this was what

25 you do, you go out and purchase loans against yourself?

1    You remember that question?  And he said, of course, I

2  didn't say that.

3    Why would you ask that question and not bring

4  Mr. Lloyd in to testify to that?

5    Mr. Lloyd was on his witness list and he didn't bring

6  him here to testify.  That question was inappropriate.

7  Mr. Phillips said, "I didn't make that statement" and Mr. Lloyd

8  didn't come here to say he did.

9    So all of these insinuations, all of these allegations

10 are just that, when there's other reasonable explanations.

11 That's what we tried to do along the way.

12    Even though all these are minor issues of the big

13 legal issues in this case, we provided to the Court the

14 reasonable explanations of everything that happened.  They're

15 trying to insinuate something other than what the evidence is to

16 get to where they're going.

17    Where are they going?  They want to collect the 44.9

18 percent interest in the loan.  And if they can't do that

19 independently against Florida law, if they can't do that, what

20 are they asking the Court to do?

21    *Oh, just give us the money, just give us the*

22 *$5 million.  Even though we didn't prove any damages at this*

23 *point, just give us the money.*

24    There's no case law to back that up.

25    When there's a claim for breach of an agreement, you

1    have an obligation to come in and prove your damages.  They

2    haven't fulfilled that.  And I think the legal remedy for that,

3    the correct legal remedy is, I'm sorry, but I can't give you

4    damages you didn't plead.

5              In fact, then they tried to say, *Oh, wait, there was a*

6    *fraudulent transfer when Mr. Phillips transferred his HCB stock*

7    *to Phillips Capital Partners.*

8              And I think the Court even made a comment during that

9    evidence.  But we proved without any countervailing evidence

10   that at the time that was done HCB was dormant, it had no

11   assets.  There was no fraudulent transfer.

12             All of their allegations are just that, insinuations,

13   allegations, without proof, without legal proof.

14             But I stress to you two things of most importance and

15   I'm going to finish.  One, what they really want, at the end of

16   the day, in their declaratory judgment actions is to

17   independently collect against the judgment-debtors.  Clear

18   violation of Florida law, both Counts One and Count Two.

19             Damages, they haven't proved them.  And more

20   importantly, what they allege aren't breaches.

21             And that's, at the end of the day, where this case

22   should fall.  Thank you, Your Honor, for your time.

23             **THE COURT:**  And Mr. Franco, I apologize.  I was

24   thinking about Rule 50, not Rule 52, so my apologize.

25             **MR. FRANCO:**  Your Honor, I've been doing this for a

1    long time, and I had to look up which rule I had to go under.

2            **THE COURT:**  Well, I -- you know, this isn't my first

3    bench trial, but I'm used to the Rule 50 standard more often,

4    and in criminal cases Rule 29 of the Criminal Rules of

5    Procedure, and so I apologize.

6            **MR. FRANCO:**  Thank you, Your Honor.

7            **THE COURT:**  We're going to take a brief recess,

8    everybody use the restroom, come back in, and I'll hear from you

9    all.

10           I think we're hearing closing arguments, or that's

11   what I'm hearing is closing arguments.  I don't know that

12   there's -- unless you put on a case, but I don't think there's

13   much more to --

14           **MR. CROSSLAND:**  Well, Judge, I mean, I wasn't prepared

15   to put on a closing argument, but I certainly agree what Mr.

16   Franco just did was closing argument.  I probably can be if I

17   could --

18           **THE COURT:**  Well, I can give you more than ten minutes

19   if you want to take a little bit longer, just so you don't have

20   to come back.

21           **MR. CROSSLAND:**  If I could have a half-hour?

22           **THE COURT:**  That's fine.

23           **MR. CROSSLAND:**  Thank you, Judge.

24           **THE COURT:**  We'll be back in a half-hour.  Thank you.

25           **(Recess taken.)**

1    **THE COURT:**  All right.  I'm assuming you were okay,

2    Mr. Crossland, with the extra little bit of time, but I do

3    apologize.  I've had some administrative matters I've needed to

4    deal with today.

5    **MR. CROSSLAND:**  Not a problem.

6    **THE COURT:**  That's what I was doing just now.

7    All right.  Mr. Crossland, if you want to go ahead and present

8    your response.

9    **MR. CROSSLAND:**  Yes, Judge --

10   **THE COURT:**  To the Rule 52 motion.  I'm sorry, go

11   ahead.

12   **MR. CROSSLAND:**  Well, I appreciate, first, the

13   opportunity for a few extra minutes, and it seems to me as if

14   we're pretty much now into closings.  And they've rested, and

15   we're not going to be here tomorrow doing closings.

16   **THE COURT:**  Yeah.  You're shaking your head.

17   **MR. FRANCO:**  Well, I just want to make sure we do it

18   procedurally correct.

19   **THE COURT:**  Right.  I know you haven't technically

20   rested, and I'm the one that brought up the closing argument.

21   **MR. FRANCO:**  I mean, I've told you that I intend to

22   rest, but --

23   **THE COURT:**  Right.

24   **MR. CROSSLAND:**  -- technically that's why it's a

25   Rule 52 at this point.  And I have not technically rested,

1   but -- I'm not changing direction.  I just want to make sure we

2   do it procedurally correct.

3          **THE COURT:**  Well, I can tell you all that I'm going to

4   take this motion under advisement.  I'm not going to rule from

5   the bench this afternoon.  So you'll have to decide if you're

6   going to go forward with evidence or rest as soon as

7   Mr. Crossland finishes.

8          **MR. CROSSLAND:**  And I just want -- you know, if this

9   ends up being the last word, I don't want defendants to get, you

10  know, a chance to now rebut my closing, because that's not how

11  we would do it tomorrow, but let's just proceed --

12         **THE COURT:**  Okay.

13         **MR. CROSSLAND:**  -- and we'll do what we can.

14  Judge, during opening, I read from the City of Leesburg case,

15  and what I said was that no man can be the judge of his own

16  cause.  And, in fact, that's exactly what you've heard

17  throughout this trial.  In fact, it's exactly the position that

18  Mr. Franco waved in front of this Court's eye; that even if

19  Mr. Phillips bought this judgment himself, we have a right,

20  Judge.  Pay him the money.  Take over the loan.  Take over the

21  collection.

22         HCB's opinion in a near shameful effort -- shameless

23  effort throughout this trial has been bias.  Well, what are did

24  HCB do?  They paid $200,000 for this, and they expect to get a

25  $700,000 windfall from us to go collect against Rupert Phillips

1    who is a *de facto* owner and the chairman of HCB?  Judge, there's

2    something wrong with that.

3          And Mr. Franco cites back to our trial brief and says

4    we're asking for the right to collect independently.

5    Absolutely.  Absolutely without question.  And any sentiment

6    that any part of this transaction with -- which my client had

7    zero involvement -- has been free, is disingenuous and not true.

8    Nothing about this has been free.

9          Coming to trial to get the right to collect pursuant

10   to an agreement that was done well before HCB came in; having to

11   undo what this Court has discussed as a possible fraud has not

12   been free.  There has been a significant cost.  Not just of

13   attorneys fees but the loss of opportunities.  One of which we

14   saw during trial.

15         Now, HCB can say whatever it wants about the stock

16   transfer here when I don't have the benefit of discovery about

17   what HCB was at the time and what Mr. Phillips paid.  HCB can

18   make all sorts of comments it wants from its witnesses, because

19   I don't have the benefit of what HCB's financials were back in

20   2010.  But what we learned is that Rupert Phillips transferred

21   his stock that he owned individually in HCB in 2010 and he put

22   it in Phillips Capital.  And Mr. Dobson told us why did he it.

23   He did it to consolidate it and put it under the Phillips

24   Capital umbrella.  And what did Phillips Capital give him for

25   it?  Nothing, not a dollar.  No consideration.  And he did it

1    when he was on the verge of bankruptcy.

2             He's been sitting here today -- he's been sitting in

3    trial telling the Court, I was on the verge of bankruptcy.  I'm

4    70 years old.  I've got nothing.  I'm not going to own anything

5    the rest of my life.

6             Well, Judge, how did he get a $10 million line of

7    credit from First NBC as the only personal guarantor?  How is it

8    possible that a 70-year-old semiretired man who is completely

9    uncollectible buried under $80 million in judgments, how does he

10   be the only personal guarantor on a $10 million line of credit?

11            The reason why is because this is Mr. Phillips'

12   workout strategy, exactly what did he in this case.  He did it

13   with BankAtlantic.  He took the biggest judgment against them,

14   and he bought it for nickels.  That, in and of itself, has its

15   own issues, but he uses it as a shield against his creditors,

16   and he says, no, sorry, you can't get me, I've got $50 million

17   in judgment hanging over my head.  But then he probably went and

18   told First NBC:  Don't worry about that.  HCB has control of it.

19            And some of the comments and testimony that have come

20   out deserved to be met with a bit of outrage, because they are

21   outrageous.  But let me get to what the evidence told us.

22   In Count One, Judge, there is no question, and I do not run from

23   the fact, I will not hide from the fact, that we are

24   unequivocally asking for the right to independently collect our

25   *pro rata* share of the judgment.  There is no question.  That is

 1   absolutely what we're doing.

 2           And we're doing that, Judge, for two reasons under

 3   Count One.  The assignment of participation interest must be

 4   invalidated based on the public policy rationale that we already

 5   talked about in our trial brief, and because there was a

 6   settlement in violation of the participation agreement.

 7           This Court cited Young v. Field in its summary

 8   judgment order.  It's at 548 So.2d 784, and it's an opinion from

 9   the Fourth DCA it's from 1989.  And what it tells us is that:

10   The moment the agent ceases to be the representative of his

11   employer and places himself in a position towards his principal

12   where his interests may come in conflict with those of his

13   principal, no matter how fair his conduct may be in the

14   particular transaction, that moment he ceases to be that which

15   his service requires and his duty -- and his duty to his

16   principal demands.

17           It continues:  In such cases, the courts do not stop

18   to inquire whether the agent has obtained an advantage or not or

19   whether his conduct has been fraudulent or not.  When the fact

20   is established that he has attempted to assume two distinct and

21   opposite characters in the same transaction, in one of which

22   with he acted for himself and in the other pretended to act for

23   another person and to have secured for each the same measure of

24   advantage that would have been obtained if each had been

25   represented by a disinterested and loyal representative, they do

1    not pause to speculate concerning the merits of the

2    transactions, but they at once pronounce the transaction as void

3    because it's against public policy.

4           It's almost as if we didn't have to put on evidence

5    because HCB doesn't dispute it, Judge.

6           Joe Dobson testified, and Joe Dobson is the president

7    of HCB.  And to his credit, Judge, I thought he was honest

8    during his testimony.  He told us that HCB, despite all the

9    allegations in this case, has never established an ethical wall

10   between Mr. Phillips.  In fact, we know Mr. Phillips attended

11   mediation as the corporate rep.

12          Mr. Phillips sat up there and told you he talked to

13   Mr. Dobson during the settlement conference and immediately

14   after that he called Tom Button at Park.  They did not try to

15   wall him off.  They did not try to say, Wait, you can't be part

16   of this; this deals is with you.  And they haven't said, You

17   can't be involved in our collection decisions because we're are

18   collecting against you.  They've never even bothered to try to

19   stop the conflict from being there.

20          Now, Mr. Franco believes that we're trying to pierce

21   the corporate veil, but that's not what the case law requires.

22   It's the conflict.  There's no requirement to pierce, and that's

23   why we haven't tried, because we don't have to.

24          Not at any point during this trial have we claimed

25   that HCB may not have some other legitimate business purpose.

 1    I've never said that, Ms. Brady has never said that, because we

 2    don't have to say it.  The conflict is what does it, and we know

 3    that it was Mr. Phillips' decision to acquire these interests in

 4    the deficiency judgment.

 5           We know that it was him exclusively that negotiated

 6    it.  We know from the testimony of Mr. Phillips and Mr. Dobson

 7    that there was no board meeting.  There was no board approval.

 8    There was no discussion.  Mr. Phillips set the price that HCB

 9    would pay to get the judgment against himself.

10           **THE COURT:**  So if I agree with you, and I say, you

11    know, the assignment is void as against public policy, then

12    where does that -- where does that leave you?

13           **MR. CROSSLAND:**  Yes, Judge.  And I think, in all

14    candor, that has been the toughest part of this case for

15    Ms. Brady and I, because I don't think the facts are disputed.

16    I think the conflict is clear.  And we spent a lot of time

17    considering that.

18           And where we come down on both Counts One and Two is

19    whether it's because the assignments are invalid or because the

20    agency status has been terminated, it's clear that all of the

21    parties, before HCB came in, intended that Vision Bank would

22    have the ability to collect on its own.  And so the remedy I

23    think that we're asking for -- I think there's two ways the

24    Court can do it.  It can find that the executed *pro rata*

25    assignment of judgment is valid and enforceable for all purposes

1    under Florida law.  Understanding I'm going to get to the

2    Richard's argument --

3            **THE COURT:**  Okay.

4            **MR. CROSSLAND:**  -- about judgment-debtors.  But I

5    think the Court could find that the one that's been executed and

6    notarized is fully enforceable for all purposes of Florida law.

7    Or I think the Court can find, in whatever judgment it enters,

8    that we have the right to collect on our 44.9 percent interest

9    under the deficiency judgment and that SE Property would then

10   use this Court's declaration as its tool for collection, because

11   the DJ is still in the name of GulfSouth.  So those are the two

12   remedies that we're really asking for.

13          Now, HCB's going to tell the Court, Well, Judge, we

14   paid 180 grand, and you heard Mr. Franco talk about rescission

15   to no end, almost if rescission was a claim in this case, but

16   it's not.  And he keeps snickering every time I say that, but

17   the reality is there's no claim for rescission in this case.

18   There's not.  And we recognize that HCB paid $180,000.  No

19   dispute.  We agreed.  They paid $180,000, but they got 9 percent

20   ownership interest in the deficiency, and the right as

21   originating bank.  The right to be the originating bank is not

22   theirs to have.  It never can be, and it never should have been.

23   That's what we're asking the Court to invalidate.

24          So, you know, we're not -- it's not inequitable to

25   take that away from HCB, the right to be originating bank, the

1    right to collect under this portion.  And that's what equity

2    tells the Court and tells us is that equity allows the Court to

3    do to the full extent possible to revive the wronged party the

4    relief that it seeks.  And so because it's a dec action and

5    because it's an equity, I think the Court has leeway to fashion

6    the most full and complete remedy possible for SE Property.

7            Let me just address what I think the entire point of

8    Mr. Franco's Rule 52 motion was, because what I just said has

9    some limitations.

10           Throughout his argument, he has claimed that the

11   *pro rata* assignment and the split of this deficiency judgment is

12   unlawful.  And candidly, I'm surprised that that argument

13   continues to be raised because that's just not what the case

14   says.  It just doesn't say that.  In fact, it says the exact

15   opposite.  I'm going to read from Richard's.

16           It's Richard's Paint Manufacturing Company, Inc. V.

17   Onyx Paint, Inc.  It's 394 So.2d 1064 and it's a Fourth DCA

18   opinion from 1981.

19           Does the Court have a copy of this?

20           **THE COURT:**  Yes.

21           **MR. CROSSLAND:**  Okay.  What Richard's actually says is

22   that while as between the assignor and assignee, the assignment

23   of a part of a judgment is valid and binding.  Between the

24   assignor and the assignee, it is valid and binding.  We can stop

25   right there, because what we are saying is that the *pro rata*

1  assignment between GulfSouth and SE Property was valid and

2  binding.  As between us, there's no question according to

3  Richard's that it's valid and binding.

4        And we cited other case law in our trial brief on the

5  same point.

6        **THE COURT:**  Doesn't the case, though, discuss some of

7  practical problems?

8        **MR. CROSSLAND:**  Absolutely.  Absolute it does.  And

9  it's always been interesting to me that HCB is raising arguments

10  for the judgment-debtors because what does HCB care?  I mean, I

11  understand why the judgment-debtors are going to raise that

12  argument.  That makes total sense.  But why is HCB raising it?

13  I mean, HCB shouldn't care.

14        But the point of the matter is when and if the

15  judgment-debtors get their day to raise that argument, the

16  concerns identified by HCB on their behalf in this case are

17  simply not there.

18        In our trial brief, we cite --

19        **THE COURT:**  If it's a public policy issue, then that's

20  a concern for this Court.

21        **MR. CROSSLAND:**  Okay.

22        **THE COURT:**  So I think I need you to -- you know to

23  accept that.

24        **MR. CROSSLAND:**  Certainly.  The concerns raised in

25  Richard's are concerns, but those concerns are not present in

1    this case.

2              THE COURT:  And why is that?

3         MR. CROSSLAND:  We cited the Court to an opinion

4    Gilroy v. Lowe.  It's a Utah Supreme Court case from 1981, 626

5    P.2d 469.  And Utah has a very similar opinion to Richard's and

6    actually the Gilroy case says it.

7              What Gilroy says is:  As a general rule a partial

8    assignment of a judgment while valid as between the parties --

9    just like Richard's -- is of no effect against the

10   judgment-debtor unless he consents thereto or ratifies it.

11   However, under certain circumstances, the concerns about

12   judgment-debtors facing these multiple collection actions just

13   aren't present.

14             And in the Gilroy case the judgment-debtor had never

15   paid any part of the judgment.  It said in the instant case the

16   judgment-debtor has not paid any portion of the sizable judgment

17   against him, has not been subjected to collection efforts by the

18   original judgment-creditor, and any amounts recovered by the

19   assignee, Federal Leasing, apparently enure to the benefit of

20   the assignor.  There's no claim of prejudice.

21             Okay.  In this case -- may I approach the timeline?

22             THE COURT:  Yes.

23         MR. CROSSLAND:  In this case, Judge, those same things

24   are true.  They haven't paid a penny on it, and the reality is,

25   what the judgment-debtors are going to argue, is, well, we are

1    facing collection from SE Property on this portion of the

2    judgment and HCB on this portion.  Okay.  That's fair.  Taken in

3    a vacuum that might make sense.

4         Now the problem with that argument and why these

5    concerns don't apply:  That right there.  The $49 million

6    judgment that HCB already holds.  They're going -- if HCB was

7    actually ever going to collect against the judgment-debtors,

8    they can do it right there.  They don't have to do it under this

9    one.  So whether it's by this being divided up or not, they're

10   always going to be subject to HCB collection efforts.  It's not

11   the fact that this judgment is being divided up; it's the fact

12   that HCB already has prior judgments.

13        So it's not -- there's no concern of facing two

14   creditors from this.  They already face two different judgments,

15   one of which HCB holds already.  And they haven't paid anything.

16   And we know that HCB hasn't really collected.  So while there

17   are concerns -- and I understand that the Court wants -- while

18   the Court needs to address these public policy issues, the

19   circumstances just are never going to be present in this case.

20        And that's what Gilroy tells us, and that's what the

21   other judgments HCB holds tell us, because they already have the

22   right to collect.  So splitting the judgment is not going to do

23   anything different than is already is going to happen.

24   HCB's argued that -- some of these arguments are difficult to

25   kind of wrap my head around.

1          HCB's argued that there's no principal agent problem

2     because Mr. Phillips is the chairman of board and he owes an

3     agent duty to HCB.  It's just a total ignorance of Phillips

4     Capital.

5          Mr. Dyer if you'll put up Exhibit 11.

6     We know that the only reason Phillips Capital is a shareholder

7     was so that they could put this -- they could consolidate these

8     matters under the Phillips Capital umbrella.  But when we looked

9     at the written consent of Phillips Capital, we found out a few

10    things about Phillips Capital, that Rupert Phillips is the sole

11    director.  So Mr. Phillips directs every action of the

12    shareholder.  He's the president.  And we learned that the

13    owners are Mr. Phillips, his wife, and their three kids.

14         Well, HCB will say, Well, Judge, it's through the

15    trust, and the trust is a legal entity.  That's true.  But

16    they're the trustees and Mr. Dobson told us they're the

17    beneficiaries.  He's the owner.  He directs as the shareholder

18    of -- he's -- Phillips Capital's sole shareholder.  He directs

19    what's going to happen.  He owns it.  He's the president.

20         So this whole argument that somehow Mr. Phillips is

21    just an agent of HCB and there's not two masters is -- it holds

22    no water.

23         The competing judgments are critical for another

24    reason, because -- we cited the Court to the Treasure Salvors

25    case, and it's the critical reason why HCB can't be our agent.

1   The Treasure Salvors case is a case where they go find the

2   wreckage off the cost of Florida, and Treasure Salvors hires a

3   captain, and the captain is doing work for his principal.  And

4   he's going along, going along.  He hits the jackpot.  He finds

5   the fortune that every man is looking for, and he keeps it.  And

6   the Court said no.  That's -- you're violating your duty to your

7   principal.

8            And the Court in Treasure Salvors said an agent owes a

9   duty of the utmost loyalty to his principal.  A fiduciary is

10  held to the punctilio of an honor the most sensitive and the

11  agent must act solely for the benefit of its principal in all

12  matters connected with his agency.  He must not compete with his

13  principal concerning the subject matter of the agency.

14           If HCB finds the sunken treasure that Mr. Phillips is

15  hiding, what's it going to do?  I asked Mr. Dobson:  If you find

16  $5,000 in a garnishment, who's getting it?  You or are you going

17  to take it and split it with us under our judgment?  Because

18  easily HCB could claim, well, we have the $49 million judgment.

19  It's first.  We'll just keep it.

20           But what Treasure Salvors tells us is that when you

21  find a sunken treasure, you can't be in this conflict situation,

22  and that's what we have.

23           And I thought maybe the most critical evidence of this

24  conflict of interest is how Mr. Phillips uses HCB at his whim.

25  I told the Court in opening that Mr. Phillips uses HCB at his

1    whim.  And he does it to protect himself and his kids.  And to

2    his credit, he did not deny it.  He told us that when Steven

3    Roe, his son-in-law, purchased the stock in GulfSouth from the

4    FDIC that when the deal went south, HCB bought it from him, and

5    they did it to protect him.  He didn't want his daughter and his

6    son-in-law to lose all that money.  So who took the loss?  HCB

7    bought it and lost its entire investment.  HCB bought it because

8    Rupert said to buy it when they knew the deal was going south,

9    when private bank stock was dead.  He used HCB at his control.

10           Now, Mr. Dobson wants you to believe that HCB is in

11   the business of making money.  But if HCB was so independent of

12   Mr. Phillips, it never would have bought dead bank stock knowing

13   that the money was going to be lost.  And it's undeniable

14   evidence that Mr. Phillips uses HCB at his whim, and he uses it

15   to protect his family, because that's exactly what he told the

16   Court that he does.

17           The other reason that the assignment should be

18   invalidated under Count One is because, in fact, the assignments

19   are a settlement in violation of the agreement.

20           Mr. Dyer, if you'll put up Exhibit 1, please.  Go to

21   paragraph 3, please.  No, 3.  Thank you.

22           3(c) says:  The originating bank may not, however,

23   without the prior consent and concurrence of the participating

24   bank waive or release any claim against any borrower or any

25   guarantor.  Any claim against any borrower.

1       Every single person who worked on these assignments

2  between HCB and GulfSouth believed they were a settlement.  We

3  saw Exhibit 80.

4       Mr. Dyer, Exhibit 80.

5       This is the e-mail that was sent the day the

6  assignments were signed:  Rick, my new, CEO, Mac McLeod, has

7  settled with Rupert Phillips.  He's talking about the

8  assignments to HCB.  He settled with Rupert Phillips.

9       Exhibit 72, please.

10      Mr. Phillips believed that these were a settlement as

11  well.  Mr. Phillips told Mac McLeod:  I'll contact Larry Huggins

12  and settle with the Bank of Vernon.

13      When the Court goes and looks at the evidence, the

14  assignments done with Bank of Vernon are identical to the

15  assignments with GulfSouth.  And Mr. Phillips tells the Court in

16  Exhibit 72 that he's settling with Bank of Vernon, and HCB uses

17  the exact same documents with Bank of Vernon that it does with

18  GulfSouth.  Mr. Phillips believed it was the settlement.

19      Exhibit 26, please.

20      You go to Exhibit A, please.

21      Judge, I have to tell you, we spent more time on

22  Lot 26 than I had ever imagined, but it really tells a story,

23  because Lot 26 was sold by Mr. Phillips and his wife in June

24  2014, and he had a deal with Mr. McLaughlin to get the

25  satisfactions.  In fact, that's what it says right there.

1          In June 2011, it says:  You're taking this subject to

2     satisfaction in favor of GulfSouth Private Bank.

3          Now, Mr. Phillips didn't have the ability to get

4     GulfSouth to do that at this point, but that's what he told him

5     he'd do, because nobody would buy a lot worth $136,000 when

6     there's $80 million in judgment liens.  Nobody would do that

7     unless there were told in advance, don't worry, I'll get the

8     liens taken off.  And what did we learn?  That Mr. McLaughlin

9     used funds borrowed from HCB to buy it.

10          I think the undeniable testimony about whether this

11    was a settlement or not came from Mr. Phillips when during -- it

12    wasn't -- I didn't even ask the question.  When Mr. Franco was

13    asking him questions, he said, Yep, Mac McLeod told me I can't

14    deal with you on GP Air until we settle North Tip.  And I went

15    back on cross and I said, Sir, your testimony is that you could

16    not have helped your son with GP Air until you settled North

17    Tip.  And he said, Well, Mr. Crossland, you're playing with

18    words now.  And I said, No, sir, those were your words.  That's

19    what he told the Court.

20          The only way he could help his son -- I don't -- it

21    doesn't matter who approached who.  The only way he could help

22    his son was to settle North Tip.  That's what Mac McLeod told

23    him.  And Mac McLeod, there was back and forth about him, but

24    undeniably at the end, what he told Ms. Sivick when she took the

25    depo was that he was settling.  She asked:  So all the GulfSouth

1    portion of the judgment held by GulfSouth, we talked about it

2    earlier, 932,000-plus, right?  That's correct.  You were

3    settling for 200,000?  He answered:  Exactly.

4         This settlement was not allowed and Kohl v. Blue Cross

5    tells us that you can void assignments either for public policy

6    or for breach of an agreement.  Both of those happened.

7    You know Mr. Franco cites Allegheny, I don't know if the Court's

8    had a chance yet or not to read Allegheny.  It's like every

9    other case they cite in their trial brief.  Every one of those

10   cases has a claim for rescission.  There's no claim for

11   rescission claim here.  This is not a rescission claim.

12         Allegheny has a dec count and a claim for rescission.

13   Rescission is a claim where you and I have an issue and I want

14   to rescind our agreement.  You and I are in the agreement.  I've

15   gotten the benefit and the burden of it.  We're not a party to

16   the agreement.  We can't rescind it.

17         And we looked for cases, and Judge, Brunswick Corp v.

18   Creel, 471 So.2d 617 is a Fifth DCA case from Florida, 1985, and

19   there was a case where there was a dec action without rescission

20   where there was avoidance of an assignment.  There's no

21   rescission claim there.

22         And, again, after reading the trial brief, how HCB can

23   stand here and make a Rule 72 objection about an adequate remedy

24   of law is difficult to comprehend, because what we've alleged

25   and what we've proven is the right to declaratory relief under

 1    two counts for declaratory relief under Chapter 86 of the

 2    Florida statutes.

 3            And even if you accept there's an adequate remedy of

 4    law, Florida Statues 86.111 says -- I had it attached to my

 5    copies, which I don't -- 86.111 talks about the existence of

 6    another adequate remedy of law, and it says if you're trying to

 7    get declaratory relief from the Court under this statute, that,

 8    quote, the existence of another adequate remedy does not

 9    preclude a judgment for declaratory relief.  That's what 86.111

10    says.

11            And I know we're in federal court so we looked at the

12    federal rules, and the Federal Rules of Civil Procedure under

13    Rule 57 says:  The existence of and -- well, Rule 57 is

14    declaratory judgment.  It says, the existence of another

15    adequate remedy does not preclude a declaratory judgment that's

16    otherwise appropriate.

17            So even if you believe that we have an adequate remedy

18    of law, so what?  We're asking for declaratory relief in --

19    under either the Florida or the federal rules, we're permitted

20    to have an adequate remedy of law while simultaneously asking

21    for declaratory relief.  And we cited case law to that effect in

22    our trial brief.

23            And again, the claim that the adequate remedy is to

24    buy is nonsensical, and as Mr. Campolo and Mr. Sandel told you,

25    my client's never going to do that.  We're not giving them a

1    $700,000 profit to go collect against them.  It's nonsensical.

2    It's just nonsensical to do that.

3            Count Two.  Mr. Dryer, Exhibit 1.

4            One of the themes of HCB's defense is that we

5    shouldn't be here because we should have just terminated.

6            Number 4, Mr. Dyer.

7            It says that the originating bank's agency status

8    under Section 3 above shall terminate the election of the

9    participating bank upon if within the opinion of participating

10   bank, the originating bank shall fail to comply with its

11   fiduciary and/or other duties.

12           We presented the testimony of Mr. Campolo that, in our

13   opinion, they breached those duties.  We didn't terminate,

14   Judge, because what happens when we terminate?  I asked

15   Mr. Dobson.  Okay, we send you a already and we terminate, and

16   we start collecting.  What happens?  We don't have a judgment.

17   We've terminated you.

18           And that's exactly what this Court found in its

19   summary judgment order is that there's an ambiguity.  We don't

20   know what happens.  So instead of being so litigious, as we've

21   been accused of being throughout this case, we filed -- we asked

22   the Court, What do we do?  That's what Count Two is.  We think

23   we can terminate.  Tell us what to do so that we can comply with

24   whatever it is we should be doing.

25           They breached their fiduciary duty.  Lot 26, the

1    entire argument is a farce.  Every one of those liens ahead of

2    the deficiency judgment lien was gone by the time HCB released

3    it.  Lot 26 was sold in June 2011, and BB&T got its partial

4    release on the mortgage in July.  BB&T's out of the picture.

5    The short sale is over.  The only reason you do a short sale is

6    to get the lender to take less than the full value and get it

7    out of the way.  Now, that's true, the lender could foreclose,

8    but in this case, BB&T didn't do that.  BB&T executed its

9    partial release two weeks later, and that's one of the exhibits

10   we presented.

11          And then we know that the SPCP loan and the

12   BankAtlantic one were both done as part of the closing.  And you

13   heard the testimony of Mr. McLaughlin that the first commercial

14   one, which is the only one ahead of the deficiency lien, was

15   released in November of 2012.  So as of December 2012, HCB's the

16   only lien on Lot 26.  They're first priority.  No one can take

17   them out.  No mortgage can come in.  There's no threat of

18   anything to HCB's deficiency judgment lien.  What could have

19   happened?  Nothing.  But HCB releases it and takes nothing for

20   it.  They took nothing, and they had no reason to release it.

21          HCB's breached its fiduciary duties because it failed

22   to notify us of anything.  Never told us they were negotiating.

23   Never told us they were the originating bank.  And that leads me

24   to the point of even if you believe everything HCB says and that

25   paragraphs 10 and 11 should apply --

1    If you go to paragraph 10 and 11, Mr. Dyer.

2    Just go to 11 actually.  It might be easier for you.

3    We only have to buy -- if you believe everything else

4    HCB says, we only have to buy their interest if we have not

5    agreed.  Well, how could we agree, Judge?  We didn't even know

6    HCB had the loan.  They've never come to us and said, Hey,

7    here's our course of collection.  Here's what we want to do.  Do

8    you agree, or do you not agree?  And without the mutual

9    agreement, an agreement we couldn't have made because we didn't

10   know about them, they can't force us to buy them out.  So even

11   if you believe that, they haven't done the condition precedent

12   to it.

13   They've also breached their fiduciary duty by being

14   commercially unreasonable.  And their entire position on that is

15   that we didn't have an expert, and we can't prove that they've

16   been commercially unreasonable, and that we were fearful of what

17   an expert would have told us.  And I have to tell you, Judge:

18   There's no fear on SE Property's side about what an expert would

19   have said about their collection efforts.

20   The reason we didn't call an expert is because we

21   didn't need one.  Some things are just so obvious.  We've

22   already talked about the conflict issue.  Now HCB relies on

23   Barnett Bank.  Barnett Bank doesn't have an expert.  There's no

24   expert mentioned in that case.

25   Barnett Bank says in light of the appellant's failure

1    to present evidence concerning the applicable standards of the

2    banking industry, we cannot say as a matter of law the jury

3    erroneously determined the appellant's blind reliance.  Our

4    decision, in part, in based on certain testimony presented by

5    appellee, not an expert, to the effect that the appellant

6    cashier failed to obtain the initials of the bank officer.  And

7    they just argue that it wasn't a sound banking principal.

8    There's no mention of an expert in there, and the Court relied

9    on the evidence.

10          Judge, some things are just so obvious that you don't

11   need an expert, and that's what -- if I can find it -- that's

12   what the Court of Special Appeals in Maryland in Free State Bank

13   & Trust v. Ellis, it's 411 A.2d 1090, and it's a 1980 opinion,

14   and here's what the ultimate holding was.  And this is a case

15   where a bank released collateral for no reason.  There was no

16   basis to release collateral, and we actually have that here.

17          But the Maryland Court said:  We think that even if

18   expert testimony is ordinarily needed to prove the standard of

19   reasonable care used by banks in the community and its dealings

20   with its customers, the case now before us is of the type that

21   the average juror would now without expert testimony that banks

22   simply do not ordinarily do what the appellant bank did in this

23   case.  No expert testimony was necessary to require -- required

24   to demonstrate the negligence of the bank and its release of the

25   deed of trust.

1          The conflict of interest is so undeniable that we

2    don't need an expert.  The utter lack of collection efforts is

3    so undeniable just from the facts, we don't need an expert.

4          Rupert Phillips told this Court that he gave them fact

5    information sheets, and we looked at those.  The only ones that

6    were verified -- and this is Plaintiff's Exhibit 5.  The only

7    ones that were verified were verified back in 2009, and they

8    were wrong when he signed them.  Remember they said Phillips

9    Property pays me every two weeks.  He hadn't gotten paid by

10   Phillips Property since 2001, eight years before he signed it.

11   That one was notarized.

12         The other one we saw was -- had a of 2012, but it

13   wasn't notarized, and it wasn't dated.  If we can't rely on the

14   verified fact information sheet of Mr. Phillips being connect,

15   we certainly can't rely on an unverified one to be correct.  But

16   even if we could, Mr. Phillips told the Court that both of those

17   were outdated, and he wouldn't even rely on them.  But that's

18   what he gave HCB.  That's the only evidence there is.

19         So we don't need an expert for commercial

20   reasonableness.

21         Tortious interference and civil conspiracy.

22         Mr. Franco completely skipped half of our tortious

23   interference claim, and I know why.  Our tortious interference

24   claim is based on two contracts.  That HCB tortiously interfered

25   with the participation agreement and that HCB tortiously

1    interfered with the agreement for *pro rata* assignments.

2         Just today I questioned Mr. Osborn whether or not he

3    knew about the participation agreements.  There was a lengthy

4    discussion.  Look at e-mails.  He knew about the participation

5    agreements, and he said that he knew what the terms were.

6    Clearly the participation agreement prevents a settlement,

7    release, or waiver.  HCB knew it.  They acquired those

8    agreements.  They're valid and enforceable and they knew it.

9    And HCB intentionally and unjustifiably interfered with that

10   when it settled -- when it got GulfSouth to settle in violation

11   of the terms of that agreement.

12        That one -- that is not a difficult claim at all based

13   on the evidence we've seen.  We've got the participation

14   agreement is valid and  enforceable.  HCB knew about it, knew

15   about the terms, and they intentionally interfered with it, and

16   they did so unjustifiably for the benefit of Mr. Phillips.

17        And I'll get to damages in just a second.

18        The civil conspiracy -- I'm sorry, the other contract

19   is the *pro rata* assignment.  And I'm going to deal with that

20   when I kind of do civil conspiracy, but we know that Mr. Osborn

21   saw much, if not all, the correspondence.

22        So let's go to civil conspiracy.

23        When I talked about this in opening, Judge, I said

24   that nobody ever admits to civil conspiracy.  No one ever admits

25   to conspiracy.  Those cases would be significantly more easy to

1  prove if we had an agreement.  So we have to look at the

2  circumstances of what happened.

3          Mr. Dyer, if you'll pull up Exhibit 52.

4          During the examination of Mr. Osborn, I went through

5  e-mail by e-mail his involvement in this.  And it might be

6  helpful if I go with the board just a little bit.

7          Mr. Osborn and his involvement really started right

8  around this time.  Right around November of 2011.  Mr. Dobson

9  told you that CPB had asked HCB to come in and do due diligence

10  of its assets, and then Mr. Dobson and Mr. Osborn did that.  One

11  of the assets they looked at was CPB's interest in the

12  participation agreement.  They knew about it the whole time.

13          Mr. Osborn talked about, at length, what due diligence

14  means.  Well, I need to know everything.  I need to know what

15  we're buying.  If we've got property, I've got to know what the

16  agreements are, if there's a time for correspondence between the

17  parties.  I've got to know all those things.  That's what he's

18  looking for, and he told you:  I absolutely got stuff looked at

19  or else we wouldn't have done the deal.

20          He gets involved when he starts doing due diligence of

21  CPB's assets here.  CPB fails in November, and that's when First

22  NBC takes over.  In December, he gets a letter from Rick

23  Petermann.

24          Now, initially, Mr. Franco tried to convince the Court

25  that Jason Osborn was representing HCB, but then the Court asked

1    Mr. Petermann, Well, who did you think he represented?  Well,

2    Mr. Petermann told us, Well, I thought he represented First NBC.

3    That was my understanding.  And it turns out that Mr. Osborn

4    wasn't representing HCB.  He was representing another company,

5    but he was talking about, with Mr. Petermann, the Central

6    Progressive Bank private bank participation in Driftwood.  All

7    the same stuff we're talking about, he knew about it all in

8    December of 2011.

9             And, in fact, Mr. Petermann tells him:  I'm confused

10   as to why you're asking.  He couldn't figure out why he's

11   asking.

12            Let's go to 53, Mr. Dyer.

13            And we found out from Mr. Osborn that he was trying to

14   work a deal for his client, Hudson Realty Capital, and he

15   confirms for us that he knows all the players in our deal.  He

16   knows that North Tip was participating among GulfSouth, Bank of

17   Vernon, Vision Bank, and First NBC.  He knows that.

18            Exhibit 74, Mr. Dyer.

19            Let's go to just the bottom real quick.

20            Mr. Osborn sends Mr. Phillips and Mr. Phillips'

21   personal attorney, Mr. Fox, an e-mail.  He says, Rupert, we're

22   waiting on the following.

23   Let's go to the next page, Mr. Dyer.  Exactly.

24   This is what we're waiting on:  Correspondence, agreements, or

25   other documents related to the resolution of the partition

1    action filed by Vision Bank and Vision-Park Properties.

2            Any tenancy in common agreements or other related

3    correspondence or agreements related to the joint ownership of

4    the lots titled in the name of the special purpose entities we

5    heard about.  Mr. Sandel told you, Your Honor, that the

6    agreement to divide up the judgment, however that was going to

7    happen, was made in consideration for the sale of the lots to

8    CPB.  And we've seen extensive e-mails and correspondence

9    between all the parties relating to the lot sale and the

10   lot-drawing procedure talking about this agreement.

11           So correspondence and agreements relating to these

12   lots were exactly what Mr. Osborn was requesting.  And then he

13   tells us:  My understanding is that there are agreements or

14   correspondence between Vision and GulfSouth Private Bank

15   relating to the ownership of the lots of the tenancy in common.

16   That was his understanding.  So he's on the lookout for

17   agreements.  If there are no documents like these or those

18   listed above, someone needs to tell us.  Our last communication

19   with Rick, which was Richard Petermann, was that he locate these

20   docs and forward them to us.

21           Go back to page 1, Mr. Dyer.  Go to the top.

22           This is in June of 2012.  We've walked through

23   Exhibit 56 and 57 and 51.  We know that Rick Petermann had the

24   executed *pro rata* assignments in his file in January of 2012.

25   And Jason Osborn is asking for the Court -- they're talking to

1   Rick Petermann and asking him for relevant documents.

2   Mr. Petermann had them in his file.  He's asking for them, and

3   Mr. Petermann said, If they asked me, I gave it to them.  And

4   Mr. Osborn said, If I asked for them, I got them, or we wouldn't

5   have done the deal.  So he knew about the *pro rata* assignment.

6   He's not going to tell the Court that.

7           **THE COURT:**  Who is he conspiring with?

8           **MR. CROSSLAND:**  I'm getting to that right now, and

9   this goes to the tortious interference on the *pro rata*

10  agreement, that they knew of this *pro rata* agreement.  That's

11  what this shows.  That's what these show.

12          Let's go to 73 -- let's go to 75.

13          **THE COURT:**  Let me stop you for a moment.  Let me go

14  back to the tortious interference with the *pro rata* agreements.

15  There is evidence that -- as I said to Mr. Franco at some point

16  today.  There's certainly evidence of the parties, at least

17  GulfSouth and SE Property or Vision Bank, acting consistent with

18  an agreement.  But there's also a good bit of evidence that

19  GulfSouth, as originating bank, wanted mutuality on consent

20  among the participating banks, and that you didn't have that

21  with FNBC.  And so this -- I don't know that you can tortiously

22  interfere with efforts to make a contract.

23          **MR. CROSSLAND:**  Understood.  So let me address that

24  directly.

25          **THE COURT:**  And I don't think you can.

```
 1              MR. CROSSLAND:  Okay.  And hopefully I can address it
 2     how I'm about to, because --
 3              The agreement that Mr. Sandel and Mr. Campolo
 4     testified to was an agreement to divide up the judgment.  And
 5     that agreement was reached when the sale of lots was agreed to
 6     when Mr. Sandel said, okay, CPB, you can take the lots for
 7     $23,000.  And in exchange for that, what I'm going to do is I'm
 8     going to let you take those lots for $23,000, but you're going
 9     to give us a split of the judgment.  And that agreement was
10     between CPB, because it was the participant at the time, Vision
11     Bank, Bank of Vernon, and GulfSouth.  That's how it happened on
12     the conference call.
13              Mr. Dyer, put up Exhibit 24.
14              THE COURT:  Yeah, I was going to ask you what exhibit
15     would I look at for that.
16              MR. CROSSLAND:  Absolutely.
17              Go to the bottom, please.
18              Exhibit 24, is the exhibit you're looking for, Your
19     Honor.  At the bottom, Brian Berns, the vice president of CPB,
20     sends an e-mail to Chris Campbell, and the subject is North Tip.
21     He says:  Chris, refresh my memory.  Did we get judgments
22     against Carl Richard Olson, Rupert and Sandra Phillips, or did
23     they deed the property back to the participants?
24              Go to the top, please.
25              Copying his counsel, Chris Campbell responds.  He
```

```
 1   says:  Brian, we did get a judgment granted.  As per our
 2   original agreement with Vision, Rick Petermann is trying to find
 3   out how we can divide up the approximate $10 million judgment
 4   into our pro rata shares.  Rick will provide Brian a copy of the
 5   judgment for their file.  Please copy me as well.  I'm not sure
 6   we ever received one.
 7            I asked Mr. Campbell:  Did Mr. Berns ever write you
 8   back and tell you, no, there was no agreement; we never agreed
 9   to that?  And he said, no, I don't recall that.
10            There's zero evidence that CPB didn't, at the time it
11   got the lots, agree.  And in the e-mails where Mr. Sandel is
12   responding to the request of Robert Reynolds -- Exhibit 24 tells
13   us that Brian Berns got this e-mail where Chris Campbell said
14   there's an agreement, and there's zero testimony.  There's zero
15   evidence that Mr. Berns said wait, wait, wait.  I didn't agree
16   to that.  That's not our agreement.
17            Mr. Dyer, pull up 22, please.
18            And I think the other one the Court can go to is this
19   one right.  Top one is fine.
20            There was discussion between Mr. Franco and
21   Mr. Sandel, because Mr. Reynolds was questioning whether or not
22   this could be done and it might be difficult.  And Mr. Sandel
23   told them, no, we had an agreement, and then he sends them this
24   second e-mail, which is Plaintiff's Exhibit 22.  And he says,
25   Gentlemen, please see my e-mail below of October 29, 2010,
```

1    outlining the terms of our settlement and agreement to sell

2    Vision's interest in the lots to Central Progressive.  I trust

3    that this will refresh your recollection of our agreement.

4          He copies on this e-mail Robert Reynolds, Richard

5    Petermann, Chris Campbell, Larry Huggins at Bank of Vernon, and

6    Brian Berns at CPB, the executive president of CPB.  And then we

7    asked Mr. Sandel:  Did anyone tell you that wasn't our

8    agreement?  And he said no.  At no point did anyone tell me we

9    didn't have the agreement.  CPB got the benefit.  They got what

10    they wanted.  All Mr. Sandel wanted in return was a division of

11    the judgment.  CPB got the benefit.  So to claim that CPB later

12    went back on this agreement is not true.

13          And what we know is that the only time there's a

14    disagreement is after First NBC acquires CPB's interest.  And

15    who was involved?  Mr. Osborn was involved.  He knew about the

16    participation agreement.  And who did he turn out to be counsel

17    for?  He turned out to be counsel for HCB.  And the dec action,

18    which HCB loves to cite to, wasn't filed until well after First

19    NBC came into the picture.  There was an agreement between the

20    original participating banks, and Vision Bank gave consideration

21    for it, and Mr. Sandel testified that he would not have agreed

22    to the deal without it.  And so that agreement was done and with

23    regards to the lots, which brings us back to these e-mails we

24    were looking at.

25          Exhibits 76, Mr. Dyer.  I'm sorry, 77.  I think I

1    missed 75.  I think that's the one I missed.  Okay.  Yep.  This

2    is it.  My apologies, Judge.

3              **THE COURT:**  That's all right.

4              **MR. CROSSLAND:**  In June, Jason Osborn sends an e-mail

5    to the various people, including Rupert Phillips, Mr. Fox, and

6    he says:  Bucky and I are working to revise the documents based

7    on our conversations with Rick Petermann and in our review of

8    previous and pending litigation among the participants in the

9    North Tip loan.

10             They're changing the assignment based on what they

11   learned by looking at the prior litigations, one of which,

12   Judge, was Vision Bank's injunctive action to get rid of this

13   lot-drawing procedure which resulted in the agreement that we

14   talked about, the agreement where all the parties had the

15   correspondence.

16             And Mr. Osborn told you that he conducted extensive

17   due diligence relating to what agreements there were around the

18   property.  So he knew about it.  And they also revised the

19   assignment documents based on conversations with Rick Petermann

20   who had received the partial assignment.

21             92, Mr. Dyer.

22             Ultimately we have the dismissal of the lawsuit.

23   And then 97.

24             This e-mail solidifies the conspiracy.  The conspiracy

25   was between GulfSouth and HCB to get this deal done without

1   Vision Bank knowing about it, to settle with Mr. Phillips

2   without SE Property knowing about it.  They left us in the dark.

3   They never once told us there were negotiations.  They never

4   once told us the deal was done.  They left us in the dark the

5   whole time.  And in this e-mail, they go one step further.

6          Mr. Petermann tells Ms. Singer when she asked why did

7   you dismiss the GulfSouth dec action, and he says, Julie, all I

8   can tell you is that the VP of GulfSouth instructed me to

9   dismiss the complaint without prejudice.  He was directed to do

10  so by the CEO.  I've not been give any other info from them.

11  I'm just doing what I have been directed to do.  Rick.  I've not

12  been given any other info from them.  This is on June 29th.

13         Mr. Dyer, can you pull up Exhibit 80 right next to

14  this and give me both of them back?

15         Thank you.

16         But Mr. Petermann did know more.  He knew, because

17  three days earlier, Chris Campbell told him:  My new CEO, Mac

18  McLeod, has settled with Rupert Phillips.  Mr. Petermann knew

19  who Mr. Phillips was.  He was a judgment-debtors.  He sued him.

20  And then three days later when Ms. Brady asked him, Why did you

21  dismiss the action?  He tells you -- tells her, I don't have any

22  more information.

23         He could have left it off.  He didn't have to tell

24  Ms. Brady anything, but he affirmatively told her:  I don't know

25  anything else.  And that's because while nobody will admit it,

1   the plan was to leave SE Property out of it, to get this deal

2   done and leave SE Property in the dark for as long as possible.

3   And, in fact, HCB has never, to this day, prior to this

4   litigation told us that they did the deal.

5          **THE COURT:**  How is Mr. Petermann going to reveal that

6   kind of communication?  Why would he do that, as attorney for

7   GulfSouth, reveal that kind of communication with Ms. Brady?

8          **MR. CROSSLAND:**  Right, I agree.

9          **THE COURT:**  As an attorney for GulfSouth?

10         **MR. CROSSLAND:**  No, absolutely.  I've thought about

11  that, and if he hadn't said anything, if he had just said,

12  Ms. Brady, it's privileged, I can't tell you why it's been done,

13  that certainly would have been an understandable position.  I

14  mean, any attorney can understand you're not going to divulge

15  that.  But he already told Ms. Brady:  All I can tell you is

16  that the VP of GulfSouth instructed me to dismiss the complaint.

17         That privilege issue was not a concern for him at that

18  point.  And that's exactly what Mr. Campbell tells him to do in

19  Exhibit 80, but he goes the step further and he tells her:  I

20  have not been given any other information.  And he knew there

21  had been a settlement with one of judgment-debtors, and he knew

22  about it just three days prior.

23         So you're right, Judge.  In a typical case he could

24  have said, it's privileged, I can't tell you.  All I can tell

25  you is it has been dismissed.  But he when a step further.  And

```
 1    the evidence is that the plan the whole time was to keep SE

 2    Property in the dark.  And these e-mails demonstrate the plan.

 3    They demonstrate that we were kept in the dark, and everyone has

 4    testified that they never told us about it.  And they

 5    demonstrate that HCB knew about the pro rata assignments and

 6    tortiously interfered with it.

 7              THE COURT:  So lets it hear about your damages.

 8              MR. CROSSLAND:  So we get to damages, Judge.

 9    In our trial brief, Judge, what we told the Court was is that

10    HCB, through it's efforts has prevented us from knowing what our

11    damages are.  Because in taking control of this, they've

12    protected all the judgment-debtors, and they won't let us do

13    anything, and we cited the Court to Americana v. Zable.

14              Americana Hotel, Inc. V. Zable.  It's a Third DCA

15    opinion from 1969, and it's 226 So.2d 272.  And I don't know if

16    the Court's had a chance to read it, but I have to admit, it's a

17    disaster.  It's a tough read.  But the point of Zable is that

18    there was an agreement and the agreement had six contingent

19    liabilities, contingent opportunities.  And if any one of those

20    opportunities hit, the plaintiff would get paid a million

21    dollars.  They were all contingent.  There was no guarantee that

22    it would ever get done.  The defendants worked together to make

23    sure that those contingencies never happened through a variety

24    of transactions.  And what the Court ultimately said is that the

25    appellants achieved indirectly that which they could not do
```

1  directly.  The six contingencies regulating Zable's rights to

2  payment of up to a maximum of a million dollars were all bottoms

3  on the inherently implied duty of the appellants not to destroy

4  the source of payment.

5       **THE COURT:**  But they were parties to a contract.

6       **MR. CROSSLAND:**  They were parties to a contract, and I

7  don't want to say something out of turn; although, I don't think

8  this was a straight breach of contract case.  But the damages

9  analysis that the Court used is exactly what we have here.

10  HCB has done indirectly for Mr. Phillips what he couldn't do

11  directly, which is shield himself from the collection efforts of

12  SE Property.  And the stock transfer is a prime example of

13  exactly what we're talking about.  Because whether or not that

14  was a fraudulent transfer, what it proves is that that transfer

15  was four years ago.  And if we get the right to collect, we are

16  most certainly going to face a challenge on the statute of

17  limitations from Mr. Phillips about that stock transfer, because

18  it was more than four years ago.

19       **THE COURT:**  But you don't get a windfall.

20       **MR. CROSSLAND:**  I'm not asking for a windfall.

21       **THE COURT:**  In any case.

22       **MR. CROSSLAND:**  Absolutely.

23       **THE COURT:**  And I -- I mean, that's -- that's

24  troubling to me, the suggestion that you all -- what you're

25  asking for in terms of the amount, your percentage amount of the

1    judgment.  I mean, I just -- I can't see putting you in a better

2    position under any circumstance.

3              MR. CROSSLAND:  Totally agree.  Absolutely agree,

4    Judge.

5              THE COURT:  You're not -- you weren't even a party in

6    a contract where you were bargaining for something with HCB.

7              MR. CROSSLAND:  Right, Judge.

8              THE COURT:  But they then acted to sort of prevent.  I

9    don't -- that's just --

10             MR. CROSSLAND:  If I may?

11             THE COURT:  Yes.

12             MR. CROSSLAND:  Okay.  I totally agree, Judge.  We are

13   not asking for a windfall.  Absolutely not.  What we're entitled

14   to is what we would have been able -- what we -- our percentage

15   of the *pro rata* judgment.

16             And one of these windfall concerns is that, well,

17   okay, if you give us the right to get 5.5 million against HCB,

18   we still might have the right, if the Court rules in our favor

19   on Counts One and Two, to go collect against the guarantors.  SE

20   Property will not seek $11 million.  It would be no different

21   than a scenario where you have joint and several liability.  If

22   we collect $3 million from HCB, then we still get to collect

23   $2 million against the judgment-debtors.

24             THE COURT:  Why do you get to collected anything?

25             MR. CROSSLAND:  Against?

1          **THE COURT:**  Anybody.  I mean, without -- I mean,

2     why would I just put X number of million dollars in our pockets?

3     That I don't follow.  I mean, I follow the other -- your

4     other -- you know, your other points on remedies in terms of

5     voiding the assignment and perhaps giving you the lead position.

6     Those make some sense to me.  I'm not saying I'm doing that.

7     I'm just -- we're -- theoretically we're talking here.  This one

8     doesn't.

9          **MR. CROSSLAND:**  The damages part?

10          **THE COURT:**  Right.

11          **MR. CROSSLAND:**  Right.  I have to go back to Zable

12     because it's contingent.  And we admit it's contingent.

13          **THE COURT:**  But I think those were parties to a

14     contract.  I'll go back and read it again.

15          **MR. CROSSLAND:**  Sure.  The other point is the stock

16     transfer shows quantifiable damages, because what we --

17          **THE COURT:**  Say that again.

18          **MR. CROSSLAND:**  The stock transfer shows that we have

19     actually been damaged.  The stock transfer was done --

20     If I may?

21          **THE COURT:**  All right.

22          **MR. CROSSLAND:**  Stock transfer was done back in

23     November of 2010, right here, when he transfers everything to

24     Phillips Capital.  What we learn is that he did it for nothing.

25     He got no consideration.  He got nothing.  He did it when he was

```
1    on the verge of bankruptcy.  We know there was already

2    $49 million in judgments against him, because this $49 million

3    judgment was entered in June of 2009.  So before.  This was when

4    HCB got it, right here in 2011.  But actually, the judgment was

5    obtained in 2009.  So before.  So we know he's already -- has

6    creditors, and the reason he did it is because he wanted to

7    consolidate under the Phillips Capital umbrella.

8              THE COURT:  But here's the problem -- Mr. Crossland,

9    I'm sorry.  Here's the problem:  At the time GulfSouth had the

10   lead bank position.  You don't know what they would have done.

11   You don't know if they ever would have collected.

12             MR. CROSSLAND:  Right.  GulfSouth, though, has been

13   out of this picture since 2012.  Even if we had gotten this --

14             THE COURT:  But that's really not HCB's fault.

15             MR. CROSSLAND:  Well, it is and it isn't, though,

16   because HCB picked off GulfSouth's interest right before

17   GulfSouth went to FDIC in control.  Under the participation

18   agreement, if GulfSouth becomes insolvent, it's terminated, and

19   then we would have had the right to collect.  In 2012, two years

20   after the stock transfer happens, we would have had two years to

21   discover, find, and execute on the stocks.  So, in fact, it is

22   HCB's fault that we didn't get to act on the stock transfer,

23   because we would have been the bank under our participation

24   agreement, the originating bank, as soon as GulfSouth went

25   insolvent.
```

1      **THE COURT:**  My point was they didn't -- they're not at

2  fault for the insolvency.

3      **MR. CROSSLAND:**  No, no, they're not.  I'd love to say

4  that Steven Roe stock did him in, but I'm not saying that.

5  So the stock transfer is quantifiable damages.  It was a

6  fraudulent transfer.  I don't have the benefit of it, but I

7  know --

8      **THE COURT:**  Did you plead this?

9      **MR. CROSSLAND:**  Well, we pled damages, absolutely.

10      **THE COURT:**  But did you plead this?

11      **MR. CROSSLAND:**  I didn't -- we did not specifically

12  plead that there is a stock transfer that we couldn't have known

13  about.  We only discovered it, obviously, in discovery.  So, no,

14  did we -- we --

15      **THE COURT:**  And I'm not suggesting you need it.  I

16  just hadn't heard.  I don't remember hearing.

17      **MR. CROSSLAND:**  I wish I knew all of that stuff then,

18  the complaint might have been longer.  I think everyone would

19  have appreciated that.

20      But it proves quantifiable damages because Mr. Dobson

21  has told us that they have at least $6 million in assets now,

22  and so you'd have to believe that HCB would have just stopped

23  doing business because we had the stock.  But we know that HCB

24  is worth 6 million.  We know that would have the stock in HCB

25  because it was a fraudulent transfer.

1          **THE COURT:**  How long did GulfSouth -- remind me, how

2    long did GulfSouth have the originating -- the participation

3    agreement versus the insolvency?

4          **MR. CROSSLAND:**  I think --

5          **THE COURT:**  I can't recall.

6          **MR. CROSSLAND:**  I think, if I'm answering it

7    correctly, the participation agreement was first signed in March

8    of 2006, and then GulfSouth went under in 2012, October 19,

9    2012.  So it was six years, a little more than -- five and a

10   half.

11          And the judgment was entered in March of 2011.  And I

12   know we're getting on to 5:30, and you've heard so much --

13          **THE COURT:**  So March 2011 was the deficiency judgment?

14          **MR. CROSSLAND:**  Yes, Your Honor It was only -- I mean,

15   it's --

16          **THE COURT:**  And that's what I meant.  I asked you for

17   the date of the participation agreement, and I really meant the

18   date of the deficiency judgment so I apologize.

19          **MR. CROSSLAND:**  It's actually just five months, you

20   know, after.  And we know he's preparing.  We know he's

21   preparing for the deficiency, because he actually resigns all of

22   his positions seven days before that.

23          The other amount of damages, Judge, is the attorneys

24   fees.  HCB, I understand the Court's concerns about whether or

25   not HCB caused insolvency, and I can appreciate that and -- but

1    I do stand on our damages position.  But what is not in question

2    is that HCB has certainly caused us to engage in protracted

3    litigation completely unnecessarily.  They never told us that

4    they were negotiating.  They never told us they had a deal.

5    They never asked us for an agreement.  They never told us about

6    Mr. Phillips.  Those are not in dispute.  And --

7          **THE COURT:**  Those stem from your tort claims?

8          **MR. CROSSLAND:**  Well, they stem from both, yeah --

9    yes, yes.  And those actions that HCB has undertaken forced us

10   into this protracted litigation and candidly without very little

11   basis of defense warrants us to our fees as substantive damages

12   in this case.  And I know that we dealt with this issue, and

13   we'll put up the amount of fees at some other point if the Court

14   determines that the fees are something they are liable for, and

15   we'll deal with that later.  We've cited the case law.

16         **THE COURT:**  Right.

17         **MR. CROSSLAND:**  Maybe not in our trial briefs, but it

18   was something else.

19         **THE COURT:**  It was a motion in limine, I believe.

20   Wasn't it?  I think it was a motion in limine.

21         **MR. CROSSLAND:**  I think it was.

22   I'm going to be so short on closing, and if the Court has any

23   more questions.

24         Mr. Sandel had a bit of an outburst during his

25   examination of Mr. Franco, and his outburst was about what

1   happens when judgment-debtors try to commit a fraud on the

2   creditors.  And I think typically you might coach a witness not

3   to have outbursts or not show emotions, but I think it

4   underlines exactly what my client feels.

5        Sometimes things are just so wrong that they're wrong,

6   and HCB just doesn't deny any of it.  They don't deny the

7   conflict.  Everyone believed there was a settlement.  They left

8   us in the dark.  They never told us anything.  The only thing we

9   heard prior to this litigation was a lie from Mr. Petermann that

10  he didn't know there had been a settle with the very

11  judgment-debtor he had sued.

12       And so the outburst -- I'm not even going to call it

13  an outburst, but the show of emotion from Mr. Sandel was real,

14  and nothing in this case has been free.  And any accusation that

15  SE Property is trying to get something for free is absolutely

16  and unequivocally true.  The law provides SE Property with the

17  right to collect on its portion of the judgment, and there is no

18  doubt that that's what we're asking for.

19       **THE COURT:**  All right.  Thank you.

20  Mr. Franco, I'm going to allow you to respond to the attorneys'

21  fee issue.  Now, I'm not -- we're not doing point, counterpoint.

22  These were closings.

23       **MR. FRANCO:**  So you consider this closing as opposed

24  to my motion?

25       **THE COURT:**  Well, I don't have to give you rebuttal in

```
 1    your motion in any event.  There's no law that requires that.

 2              MR. FRANCO:  Can I give the Court at least the benefit

 3    of some case cites?

 4              THE COURT:  Sure.

 5              MR. FRANCO:  Okay.  In connection with -- let me get

 6    up here, Your Honor.

 7              THE COURT:  All right.  I mean, we'll be here all

 8    evening, Mr. Franco, and I'm --

 9              MR. FRANCO:  That's unfortunate but I understand.

10    Let me give you the case cites.

11              THE COURT:  Okay.

12              MR. FRANCO:  In connection with this argument about a

13    fraudulent transfer, please look at the matter of Watson,

14    W-A-T-S-O-N, 22 Bankruptcy 938 at 941.  It's Bankruptcy Middle

15    District of Florida case 1982.  It holds that where actual stock

16    transfer had no value whatsoever but was merely stock in a

17    closely-held corporation without any assets of consequence, the

18    corporation had nothing but bare potential to generate income to

19    future sales of insurance policies in a claim for fraudulent

20    transfer could not be sustained.

21              At the time, you remember that there was no assets in

22    that company.

23              MR. CROSSLAND:  Judge, if we're just doing case cites,

24    obviously, no issue; but let's just give the case --

25              THE COURT:  You know, I -- actually, I think in
```

1    fairness to Mr. Franco, I should allow him to address the stock

2    transfer if he wishes to do so.

3             **MR. CROSSLAND:**  I just -- like I said, I don't us --

4             **THE COURT:**  That damages issue, I do think it would be

5    fair to let him do that.

6             **MR. FRANCO:**  Because that that's the only damages

7    issue that really is -- really should be at issue in this case.

8    And that case stands for the proposition and the argument that

9    we made to the Court through the evidence was at the time of

10   this transfer, HCB was dormant.  And even if you would recover

11   in a fraudulent transfer, you only recover what was transferred.

12   There was no assets there.

13           Now, there are assets there now, but there were to had

14   assets there then.  Take a look at this case.  It stands for the

15   proposition that that is not a basis for a fraudulent transfer.

16   Counsel had talked about the commercial reasonableness

17   requirement of an expert.  Here's two cases.  We cited the

18   Pan Am Bank of Orlando case, 372 So.2d 1126.  That's a Florida

19   Fourth DCA case in 1979, as well as the Keane v. Pan Am Bonita

20   case, and Keane is K-E-A-N-E at 309 So.2d 579.  That's Florida

21   Second DCA in 1975.

22           Both of those stands for the proposition, Florida law,

23   that expert testimony is required, along with -- I'm sorry.  The

24   case he cited was Indiana law and is not Florida.  And the other

25   cases he was referring to in his testimony -- in his argument

1    were not Florida cases.

2              All we're asking -- I have utmost confidence you can

3    read the cases that we're citing.  Utmost confidence.

4              **THE COURT:**  Thank you.

5              **MR. FRANCO:**  And when you read the cases, you'll see

6    that what we say and what we cite is our position.

7              Thank you, Your Honor, for your patience --

8              **THE COURT:**  Thank you.

9              **MR. FRANCO:**  -- and for accommodating us, and I am

10   glad at least we saved you two days this week.

11             **THE COURT:**  Yeah.  You-all did a great job.  I was

12   going to say that I know it's an emotional case, both sides, a

13   lot of emotion.  You guys have been at this for several years,

14   and it's probably not, you know, what you would consider

15   enjoyable litigation, I know, because, like I said, it's hotly

16   contested.  But the trial was enjoyable for me, and I give

17   you-all all the credit for that.  You did a great job.  Your

18   clients are here.  They need to know that, regardless of the

19   outcome.

20             We have an adversarial system, so someone is going to

21   prevail, or be happy, and someone's going to lose and not be

22   happy.  In this type of case, there might be a split when you

23   have multiple issues.  I don't know.  But at the end of the day,

24   there's usually a winner and a loser in our system, and so I

25   want your clients to know that the attorneys did an excellent

```
 1    job in presenting your cases to the Court.

 2             At the end of the day, I don't know how I'm going to

 3    rule.  And you shouldn't take anything from my comments, frankly

 4    at any point during the trial, as any indication of how I'm

 5    going to rule.  I'm kind of like the jury.  You don't know.  You

 6    don't know what I'm going to do when I get behind that door and

 7    look at the facts and look at the law.  I'll do the best I can,

 8    and I'll come up with a ruling.

 9             But in any event, you-all did a great job.  You don't

10    make up the facts.  You don't get to decide the facts.  The

11    clients bring you their case, and you obviously don't make the

12    law.  And so you're kind of stuck with the facts that the

13    clients bring you, and you're stuck with the law that exists,

14    but you did a great job in presenting the facts and arguing the

15    law, and I appreciate that.  And you're very professional in

16    spite of the emotion involved in this case.  You-all worked very

17    professionally, as far as I could tell, and that makes the trial

18    much more pleasant for me, so I appreciate that.  And you're all

19    welcome back any time.  It would be my pleasure to have you.

20             MR. FRANCO:  Your Honor, one thing to tidy up.

21             THE COURT:  The parties are laughing.  They don't want

22    to come back.  I know.

23             MR. FRANCO:  One thing to tidy up, just for the

24    procedure purposes.  My motion has now been made, and it's my

25    turn to put on my case and so I --
```

1    **THE COURT:**  I apologize.  You're correct.  You have --

2    **MR. FRANCO:**  I just want the record to be complete so

3 nobody says, wait a minute, something -- you're sending us back

4 here because we didn't complete.

5    **THE COURT:**  It's late.  I apologize, Mr. Franco.

6    **MR. CROSSLAND:**  That's okay.

7    **THE COURT:**  No, if you have evidence to present,

8 you --

9    **MR. FRANCO:**  No, I do not.  And I wanted to say that I

10 rest without any witnesses.

11    Thank you, Your Honor, very much.

12    **THE COURT:**  All right.  Thank you.  Again, I apologize

13 for that, getting ahead of you.

14    There's still outstanding this issue on the judicial

15 notice of the stipulation involving FDIC.

16    **MR. FRANCO:**  May I make a suggestion?

17    **THE COURT:**  Yes.

18    **MR. FRANCO:**  Why don't you think about what you're

19 going to do in this case, and if that becomes an issue, ask us

20 for a brief.

21    **THE COURT:**  I'm not sure it's going to become an

22 issue.  I don't know.  I was trying to work that out in my mind

23 earlier on a recess, and I'm just not sure.  Another, you know,

24 beauty of the bench trial is I can pretty much fix anything, so

25 if we have to come back, we come back.  Right?

1          **MR. FRANCO:**  Right.

2          **MR. CROSSLAND:**  Yes, Your Honor.

3          **THE COURT:**  Hear more testimony.

4          **MR. FRANCO:**  No, we don't want to come back.

5          **THE COURT:**  I know you-all don't want that.

6          **MR. FRANCO:**  We enjoyed it, but we don't want to come

7     back.

8          **THE COURT:**  Can't do that with a jury, but I can do it

9     with a bench trial.

10          All right.  I will look at it.  I will look at it in

11     light of the argument you-all made in your reply, which was as

12     to the verbal act, which I didn't pay a lot of attention to, to

13     be quite honest.  I was just thinking, judicial notice, I'll

14     take judicial notice of it.  I wasn't looking so much at the

15     verbal act on the hearsay issue.

16          **MR. FRANCO:**  We did not brief that, so --

17          **THE COURT:**  Right, and I --

18          **MR. CROSSLAND:**  If you think it's an issue, why don't

19     you just let us know, and we'll brief it.  If you don't consider

20     it an issue based on what you're going to do, then don't waste

21     your time and ours.

22          **THE COURT:**  And that's why I'm sure I didn't spend too

23     much time on it, and my apologies to you-all for that.  But I'll

24     let you know if it becomes an issue, and I'll give you an

25     opportunity, both, to fully -- both sides to fully address it

1    with the Court.  And if we get to -- like I said, if at the end

2    of the day we get to the point where, you know, I think you

3    ought to be entitled to present some evidence, I'll let you

4    know; otherwise, thank you all again very much.  Have a nice

5    rest of the week.  Take the rest of week off.

6         **MR. CROSSLAND:**  Judge, do you want us to take any

7    notebooks out of your way, get anything out of your hands?

8    Sometimes they get -- well, they are massive.  Or do you want --

9         **THE COURT:**  All that's really -- that's a good

10   question, Mr. Crossland.  All that's really relevant to me at

11   the point is the evidence that was admitted, which did

12   you-all -- did you-all admit -- no, I just have the exhibits.

13   Or did they he admit hard copies?  I can't recall.

14        **DEPUTY CLERK:**  You have hard copies, Annette has hard

15   copies.  The defendants had witness books here --

16        **MR. FRANCO:**  Which we'll take with us.

17        **DEPUTY CLERK:**  -- that I'll keep.

18        **MR. FRANCO:**  We'll take those back.

19        **MS. SMITH:**  Susan is keeping those.

20        **THE COURT:**  We'll just keep ours.  Thank you, though.

21        **MR. FRANCO:**  I just want to be clear, because I wasn't

22   quite paying attention to the detail of what actually physically

23   got to you.  You have physically the exhibits that were

24   introduced?

25        **THE COURT:**  We have those and more.

1        **MR. FRANCO:**  But you have the physical ones for the

2   record in the event that this goes up?  You have the physical

3   exhibits?

4        **DEPUTY CLERK:**  Yes.

5        **MR. FRANCO:**  Okay.  Thank you.

6        **THE COURT:**  The only thing I guess is Mr. McLeod's

7   deposition and those exhibits you were going to mark.

8        **MS. BRADY:**  Yes, we've already done that.

9        **THE COURT:**  Okay.  Any other loose ends?

10       **MR. FRANCO:**  Not that we can think of.

11       **MS. SMITH:**  Do we have time to get everything out of

12   here tonight?

13       **THE COURT:**  Oh, yes, yes.  You certainly do have time

14   for that.

15       **MR. CROSSLAND:**  Thank you, Judge.

16       **MS. BRADY:**  Thank you, Judge.

17       (Proceedings concluded at 6:00 p.m.)

18       --------------------

19   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.  Any
20   redaction of personal data identifiers pursuant to the Judicial
     Conference Policy on Privacy are noted within the transcript.

21
                                              3-26-2015
22   _____              Date
     Donna L. Boland, RPR, FCRR
     Official Court Reporter

23

24

25

INDEX

PAGE

**WITNESSES FOR THE PLAINTIFF:**

*RICK PETERMANN*
    Direct Examination by Ms. Brady                    2
    Cross-Examination by Mr. Franco                   51

*JASON OSBORN*
    Direct Examination by Mr. Crossland              86
    Cross-Examination by Mr. Franco                 117
    Redirect Examination by Mr. Crossland           133

*FRED MCLAUGHLIN*
    Direct Examination by Mr. Crossland             149
    Cross-Examination by Mr. Franco                 155


CERTIFICATE OF REPORTER                             260